Christopher S. Morris, Esq., SBN 163188
cmorris@morrislawfirmapc.com
Danielle R. Pena, Esq., SBN 286002
dpena@morrislawfirmapc.com
Chanell A. Kachi, Esq., SBN 279761
ckachi@morrislawfirmapc.com
MORRIS LAW FIRM, APC
501 West Broadway, Suite 1480
San Diego, CA 92101
Telephone: (619) 826-8060
Facsimile: (619) 826-8065

Attorneys for Michelle Moriarty, as
Successor in Interest and *Guardian Ad Litem*
to Alexandria, Elijah and Eternity Moriarty

## IN THE UNITED STATES DISTRICT COURT

## FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MICHELLE MORIARTY, an individual, as Successor in Interest to the ESTATE OF HERON MORIARTY and as GUARDIAN AD LITEM to ALEXANDRIA MORIARTY, ELIJAH MORIARTY, and ETERNITY MORIARTY,<br><br>    Plaintiffs,<br><br>      v.<br><br>COUNTY OF SAN DIEGO, DR. ALFRED JOSHUA, individually, and DOES 1 through 10, Inclusive,<br><br>    Defendants. | Case No.:   **'17 CV 1154 LAB AGS**<br><br>COMPLAINT AND REQUEST FOR APPOINTMENT OF *GUARDIAN AD LITEM* |

COMPLAINT

1

**TABLE OF CONTENTS**

2    **I. INTRODUCTION** ................................................................................3

3    **II. JURISDICTION** ...............................................................................7

4    **III. PARTIES** .........................................................................................8

5    **IV. FACTS RELEVANT TO ALL COUNTS** ...................................10

6    **FIRST CAUSE OF ACTION 42 U.S.C Section 1983 – 14th Amendment** ....15

7    **SECOND CAUSE OF ACTION 42 U.S.C Section 1983 – 14th Amendment** 17

8    **THIRD CAUSE OF ACTION 42 U.S.C Section 1983 – 14th Amendment** ...26

9    **FOURTH CAUSE OF ACTION 42 U.S.C Section 1983 – Due Process –**

10    **Deprivation of Familial Relationships** ...............................................29

11    **FIFTH CAUSE OF ACTION Negligence** ..........................................30

12    **SIXTH CAUSE OF ACTION Medical Malpractice** ........................31

13    **SEVENTH CAUSE OF ACTION Wrongful Death** ..........................32

14    **PRAYER FOR RELIEF** ......................................................................33

15    **REQUEST FOR JURY** .......................................................................33

16

17

18

19

20

21

22

23

24

25

26

27

28

COMPLAINT

# I.

## **INTRODUCTION**

1.      Heron Moriarty was the quintessential family man.  He met his wife Michelle at church in 1997.  Heron and Michelle had three children Alexandria, Elijah, and Eternity.



2.      Heron was a humble, God fearing man.  As a church leader for over twenty years, he helped lead his community towards a higher purpose. Heron and Michelle also owned a successful electrical contracting business.

3.      In the six weeks leading to his incarceration, Heron started to exhibit manic behavior.  Heron was talking and acting erratically.  He believed in his delusional thoughts that he was God's prophet sent to ward away "humanity's demons."  Heron had no previous history of mental illness.

4.      Heron had two psychiatric hospitalizations within two (2) weeks prior to his arrest and incarceration at Vista Detention Facility (herein "VDF").  His first psychiatric hospitalization was on April 26, 2016, at Sharp Mesa Vista San Diego Psychiatric Hospital.  Heron was placed on a 5150 hold for three (3) days.  His second psychiatric hospitalization was on May 1, 2016.  After a court hearing, Heron was certified on a 14-day hold at San Diego County's East County Mental Health Clinic (Herein "ECMHC").  Heron was taken to the county's mental health clinic because he had made delusional threats to hurt his family.  As documented in his medical reports, during his behavioral assessment at ECMHC, Heron made suicidal statements and was evasive when asked if he was currently suicidal.  Heron

3

told the staff that he was suicidal but did not feel like killing himself "because he had to save people from demons." Those same records indicate Heron first attempted suicide by running in front of moving cars.

5.     Upon discharge from ECMHC on May 12, 2016, Heron was diagnosed with psychosis, bipolar disorder, and mania. Twelve (12) days later, Heron had another episode of psychosis.

6.     On May 23, 2016, in a conversation he had with his business partner, Heron threatened the life of his wife and family again. The business partner's wife called authorities. The next evening sheriffs visited Heron but determined he was "normal." On May 25, 2016, Heron went to visit his brother who also lived on the same property as Heron. When Heron realized his brother locked the patio door, Heron lost control. He began screaming and threatening his brother. When Heron threw a patio table at the sliding glass door, Heron's brother was forced to call authorities. Once he did, Heron got in his truck and left.

7.     Minutes later, a CHP officer located Heron as he was "lying in the middle of the roadway [where he] would get up and run into vehicles with his body." Heron informed the CHP officer he had just been released "from a psych hospital a couple of days ago." At that point, two San Diego county sheriffs arrived looking for Heron. The CHP officer informed the sheriffs of everything Heron said. The sheriffs determined they were going to arrest Heron for vandalism. The sheriffs did not have Heron psychologically cleared prior to taking him to VDF.

8.     Once taken to VDF, Heron was never evaluated by a psychiatrist. He was housed in administrative segregation (herein "ad-seg"), with minimal observation.

9.     On May 25, 2016, the night of Heron's arrest, Michelle persistently called every psychiatric hospital in the phone book hoping to locate her husband. Finally, Michelle was informed by Rancho San Diego sheriffs that Heron was booked in VDF.

COMPLAINT

10.     Once informed Heron was at VDF, Michelle called the facility to inform the staff of Heron's recent bout with mental illness, his recent diagnosis and his current suicidal ideations.  In fact, over the span of five (5) days, Michelle called VDF <u>31 times</u>.[1] Each time she pleaded with nurses to get Heron the care he needed and stated she was scared for his life.  Still, Heron remained in ad-seg, waiting to be evaluated by a psychiatrist.

11.     During Heron's five (5) day stint, Michelle also sent VDF three (3) faxes.  One fax was a Psychiatric Emergency Response Team (herein "PERT") evaluation from May 1, 2016, in support of Heron's first 5150 hold.  The assessment stated that during the event leading to his 5150, Heron told officers "he wanted to kill himself" and was found holding knife in a store parking lot.  Despite being in receipt of this information, Heron remained in ad-seg, waiting to be evaluated by a psychiatrist.

12.     The other two (2) faxes informed VDF staff that Heron was recently released from a psychiatric hospital with a diagnosis of manic-psychosis.  Michelle's two (2) faxes requested that Heron be transferred to a facility suited to treat his mental illness.  Despite being in receipt of this information, Heron remained in ad-seg, waiting to be evaluated by a psychiatrist.

13.     It appears at some point, Heron was only evaluated by a mental health nurse, not a psychiatrist.  Heron was prescribed medication by the nurse.  Michelle was informed that Heron was not taking his medications as instructed and that he was still acting erratically.  Still, Heron remained in ad-seg, waiting to be evaluated by a psychiatrist.

14.     Based on information and belief, while at VDF Heron was showing signs and symptoms of severe mental illness and required intense psychiatric supervision.  However, VDF is not equipped to house severely mentally disabled

---

[1] Attached hereto as Exhibit 1 true and correct copy of Michelle Moriarty's cellular phone records for the time period in question.

COMPLAINT

inmates.  Unlike Central jail, which has a designated psychiatric floor with psychiatrists on duty, VDF is inadequate in providing meaningful mental health evaluations and treatment because there are no psychiatrists present at VDF. Further, it is believed despite Michelle and VDF nurses' suggestion, Heron was not transferred to Central's psychiatric unit (herein "PSU") even though there was available housing accommodations.

15.    On May 31, 2016, Heron was found dead in his ad-seg cell.  Heron strangled himself by wrapping a shirt around his neck while he stuffed another shirt in his mouth.  Heron's cause of death was asphyxia.

16.    Heron's suicidal ideations were blatantly obvious and explicitly relayed to county staff on numerous occasions.  Heron was first contacted by authorities when trying to jump in front of cars to kill himself.  He informed authorities he was just released from a fourteen (14) day psychiatric hospitalization a couple of days before.  The next day, Michelle directly informed VDF staff – approximately thirty-one (31) times in total – that Heron needed psychiatric help and suicide prevention.  Michelle also faxed over documents illustrating Heron's recent psychiatric hospitalizations and suicidal statements made to PERT officers earlier in the month.  Still, with full knowledge of Heron's psychotic episode and on-going suicidal ideations and erratic behavior, Heron remained segregated with minimal observation never to be evaluated by a psychiatrist.

17.    Unfortunately, Heron is one of <u>many</u> county inmates to have died from a preventable suicide.  As stated in a Grand Jury report filed on May 4, 2017, "The suicide rate in San Diego County jails is the highest in all of California's large county jail systems.  Data from the U.S. Bureau of Justice Statistics show five suicides in San Diego County jails in 2013, six in 2014, seven in 2015, and the San Diego County Sheriff's Department confirmed five in 2016.  By contrast, since 2014, San Bernardino County has had three jail suicides; Los Angeles and Santa

/ / /

COMPLAINT

Clara counties have had one each.  Orange and Sacramento counties have had none."[2]  Since 2014, San Diego County jails has had eighteen (18) suicides.

18.    Due to the rash of jail suicides, the Grand Jury specifically examined the county's suicide prevention policies and training thereon.  The Grand Jury found that the policies "lacked detailed training procedures" and further found the policies did not incorporate "nationally recognized protocols or a clear policy statement for suicide prevention."

19.    The rash of preventable suicides themselves put the county on notice that its policies and training were grossly inadequate.  The county's failure to address the inadequacies is a moving force in Heron's death.  Further, the induvial staff's failure to communicate recognized warnings, signs and/or triggers of suicidal ideations is also a moving force in Heron's death.  But for the county and its staff's deliberate indifference, Heron would have been properly evaluated, housed, and managed.  For these reasons, Michelle, Alexandria, Elijah, and Eternity (herein "Plaintiffs") bring this suit against the County of San Diego and its DOE nursing and correctional staff.

## II.

## JURISDICTION

20.    This is a lawsuit for monetary damages and is brought pursuant to 42 U.S.C. section 1983, *et seq.*, and the Eighth and Fourteenth Amendments to the United States Constitution, for wrongful death and violation of constitutional rights by Defendants County of San Diego and its DOE staff.  Jurisdiction is founded on 28 U.S.C. sections 1331 and 1343 and the aforementioned statutory and Constitutional provisions.  State law claims for wrongful death, negligence, and medical malpractice are alleged as well.  Plaintiffs invoke the Court's supplemental jurisdiction pursuant to 28 U.S.C. section 1367(a) to consider the state law claims.

---

[2] Attached hereto as Exhibit 2 is a true and correct copy is the May 4, 2017, Grand Jury Report entitled "Examining the Issue of Suicides in San Diego Jails."

COMPLAINT

# III.

## PARTIES

21.     This action arises from the preventable death of Heron Moriarty, who at all times mentioned herein was a resident of the county of San Diego, State of California.  Plaintiffs Michelle Moriarty, Heron's Successor in Interest, and his children Alexandria, Elijah, and Eternity are Heron's only living heirs.  At all times mentioned herein, Michelle and her children were residents of the County of San Diego, State of California.  (Code Civ. Proc. § 377.32; Declaration of Michelle Moriarty, Attached hereto as Exhibit 3.)

22.     By and through this complaint, and pursuant to Federal Rule of Civil Procedure 17(c)(2), Michelle Moriarty moves this Court to appoint her as *guardian ad litem* on behalf of her children, Alexandria age 17, Elijah age 15, and Eternity age 9, for the sole purpose of pursuing this action against the county and its DOE nursing and correctional staff.

23.     Defendant County of San Diego ("county") is, and at all times mentioned herein was, a public entity authorized by law to establish certain departments responsible for enforcing the laws and protecting the welfare of San Diego County citizens.  At all times mentioned herein, Defendant county was responsible for overseeing the operation, management, and supervision of the San Diego County jails such as VDF, as well as its Corrections Officers, Medical Staff, and inmates.  The county is also responsible for developing, implementing, and amending jail policies, procedures, and training.

24.     Defendant Dr. Alfred Joshua (Herein "Dr. Joshua") is the San Diego Chief Medical Officer for the Sheriff's Detention Services.  Dr. Joshua is responsible for creating, implementing, authorizing, and amending or replacing medical policies and medical standards for San Diego county jails.  As such, Dr. Joshua promulgated, adopted, and implemented, and/or failed to rectify fatally

/ / /

8

COMPLAINT

flawed policies which were a moving force in repudiating Heron's constitutional rights.

25.     The names of the individual Sheriff's Deputies, Corrections Officers, and VDF Medical Staff who were responsible for the care and custody of Heron, and who were responsible for the adhesion to and implementation of policies and procedures, or the modification of said policies and procedures, designed to insure that the medical needs of the VDF inmates are adequately met, are currently unknown to Plaintiffs.  As such, these individuals are sued herein as DOES 1-10.

26.     The true names and capacities whether individual, corporate, associate, agent or otherwise, of Defendants named herein as DOES 1-10 are unknown to Plaintiffs, who therefore sue said Defendants by said fictitious names.  Plaintiffs will amend this complaint to show said Defendants true names and capacities when the same have been ascertained.  Plaintiffs are informed and believe and thereon allege that all Defendants sued herein as DOES 1-10 are in some manner responsible for the acts and injuries alleged herein.

27.     At all times mentioned herein Defendants DOES 1-10 were employees and/or independent contractors of Defendant County of San Diego and in doing the acts hereinafter described acted within the course and scope of their employment. The acts of all Defendants and each of them were also done under the color and pretense of the statutes, ordinances, and regulations of the County of San Diego and the State of California.  In committing the acts and/or omissions alleged herein, all Defendants acted under color of authority and/or under color of law.  Plaintiffs sue all public employees named as Defendants in their individual capacities.

28.     On October 17, 2016, Plaintiffs filed a claim with the County of San Diego.  Their claim was denied on December 9, 2016.

/ / /

/ / /

/ / /

COMPLAINT

### IV.

### <u>FACTS RELEVANT TO ALL COUNTS</u>

29.     Heron Moriarty was only 43 years old.  He meant the world to his family.  He coached his children's sports teams and helped them with their homework.  He provided for his family.  Heron was respected and trusted by his church congregation and business customers.  He was the model of the perfect father that any child would be lucky to have.  No one could predict or understand Heron's sudden psychotic break.

30.     In April of 2016, Heron started acting strange.  He began forming piles of junk in the house and yard as if they were treasures.  He would have manic episodes and fits.  He had delusional thoughts that God was speaking to him and that he was a prophet sent to protect the world from demons.  After Heron made a threat to harm himself and his family, Michelle called authorities and Heron was committed to a psychiatric hospital on a 5150 hold.  Once Heron began to consistently take his medication, his behavior became less erratic.  However, Heron had difficulties consistently taking his medication because he believed the medication was interfering with his communications with God.

31.     On May 1, 2016, Heron made another biblical-like threat to harm his family, stating if God asked him to sacrifice his family he would.  This time Heron was committed to ECMHC on a certified fourteen (14) day hold, which required a court order.  The court also placed a temporary restraining order between Heron and his children until Heron could be rehabilitated and stabilized.  The restraining order did not include Michelle, as she wanted to maintain contact so that she could help Heron.

32.     Heron was released from ECMHC on May 12, 2016, with a diagnosis of psychosis, bipolar disorder, and mania.  Once Heron was discharged he told Michelle he was going to stop taking his medication because it interfered with his prophecies.  Michelle sent her kids to stay with their grandparents so she could help

10

COMPLAINT

1  Heron through his bout of psychosis.  Approximately a week later, Heron
2  completely lost control of reality and started living in a trailer on the Moriarty
3  property.

4      33.    During this time Heron had two follow up appointments at ECMHC,
5  the latest being on May 19, 2016.  As documented in a May 19, 2016 progress note,
6  a psychiatrist noted Heron was still delusional and suicidal.

7      34.    On May 23, 2016, Heron was visiting the office of his business
8  partner, Chris.  During their conversation, Heron began acting manic and threatened
9  to kill himself and his children again.  Chris' wife called the sheriffs.  The next
10  evening (May 24, 2016), sheriffs visited Heron and determined he was "normal."
11  The next day, May 25, 2016, Heron experienced another psychotic episode.  Heron
12  began acting erratic.  His brother/neighbor became frightened of him and locked the
13  patio door to prevent Heron from entering.  Heron became enraged; he threw a
14  patio table into the sliding glass door and repeatedly threatened to kill his brother.
15  His brother ran out of the house and called the sheriffs.

16      35.    In response to the sheriffs being called, Heron drove away in his truck.
17  He later told authorities God told him to drive the truck with his eyes closed, so he
18  did, smashing into parked cars along the way.  One of his neighbors stopped him
19  and called the sheriff again.  The neighbor stated that Heron was "acting crazy and
20  talking incoherently."  Heron then took off on foot.  According to the arrest report,
21  the sheriffs immediately started receiving calls that "there was a male who was
22  yelling and screaming and acting 'crazy.'"

23      36.    Witnesses reported that Heron was lying in the middle of the roadway
24  trying to get hit by passing cars.  CHP contacted Heron as he was lying in the street.
25  Soon thereafter, Sheriffs arrived on scene.  According to the police report, Heron
26  "started to ramble incoherently about being God's prophet and that God was
27  speaking through him to [the sheriff.]"  Heron told sheriffs that he intentionally
28  tried to run into parked cars to get hit.  Heron also admitted that he was released

COMPLAINT

from San Diego County Psychiatric Hospital just two (2) days prior.   Heron was then arrested for vandalism and taken to VDF.  Heron was not taken to anyone to get psychologically cleared prior to incarceration.

37.   Once Heron was booked, he was assigned to a single cell in ad-seg (administrative segregation).  Despite sheriffs knowing Heron was 1) having a psychotic break, 2) only two (2) days removed from a certified fourteen (14) day hold, and 3) tried to kill or severely injure himself by jumping in front of cars moments before sheriffs arrested him, Heron was not taken for psychological clearance nor was he placed in a suicide or high-observation cell.

38.   Rather, Heron was housed alone in an ad-seg cell and given only one hour of recreation time per day.  He was not allowed visitors or calls.  The next day, May 26, 2016, Michelle called the sheriff's department to find out where her husband had been taken.  Once she was informed Heron was taken to VDF she tried to visit him immediately.  Michelle was turned away because Heron had been placed in ad-seg; she was also denied medical information because Heron had not yet signed a waiver for disclosure of information.  Michelle tried to speak with her husband but was told by a nurse he was "not in a place to talk."

39.   During that visit Michelle told every deputy/staff member present about Heron's recent episodes and that he was a danger to himself and needed to be medicated, evaluated, and observed.  Over the next four (4) days, Michelle wrote at least two letters requesting suicide intervention and requested Heron be transferred to a psychiatric hospital.  She faxed these letters to VDF.

40.   She also informed Heron's public defender that Heron needed suicidal supervision and proper medical attention.  The public defender dismissed Michelle and told her she should probably not tell him that.  Michelle knew her husband was in danger; so much so that despite knowing she could not talk to her husband because he was in ad-seg, she called the jail repeatedly in order to advise VDF staff about Heron's suicidal ideations and his recent mental instability.

12

41.     The following table summarizes Michelle's calls to VDF staff over a six (6) day period.

| Date of Calls | Number of Calls |
|---|---|
| May 26, 2016 | 3 calls |
| May 27, 2016 | 5 calls |
| May 28, 2016 | 7 calls |
| May 29, 2016 | 4 calls |
| May 30, 2016 | 7 calls |
| May 31, 2016 | 5 calls |
| **Total Number of Calls** | **31 calls** |
| **Total Talk Time** | **3 hours and 14 minutes** |

42.     During her various calls over a five (5) day span, Michelle inquired about her husband's status.  On May 29, 2016, Michelle's fears were compounded when a VDF nurse informed her that Heron was not taking his medication.[3] Michelle informed the staff that Heron's behavior became extremely erratic when he stopped taking his medications.

43.     Each time Michelle called VDF she stressed the fact Heron needed to take his medication; she also begged that he be transferred to a psychiatric facility and explicitly told any nurse that gave her the time-of-day that Heron was actively suicidal and that she was scared for his life.

44.     On May 29, 2016, four (4)  days after his incarceration, Michelle received a voice message from a VDF charge nurse stating that Heron was continuing to refuse his medications and that they would expedite his psych

---

[3] According to the death investigation, Heron was taking his medications. However, Michelle called VDF staff twice daily specifically asking if Heron was taking his daily medication.  Each time a nurse informed Michelle that Heron was refusing to take medication.

13

appointment to June 1, 2016.[4]  Michelle called the nurse back that night.  Michelle asked if Heron had been evaluated by a psychiatrist.  He had not.  The nurse said because Heron was refusing to take his medications and acting erratically, she expedited his evaluation to June 1, 2016.

45.     According to that nurse, Heron missed his arraignment because he was "acting violently" prior to his hearing.  Further, according to a death investigator, Michelle was informed that at one point Heron was seen banging his head against his cell door repeatedly.  Despite this erratic behavior and his refusal to take his medication, Heron was still housed in an ad-seg cell waiting to be psychologically evaluated.

46.     The next day, May 30, 2016, having not spoken to her husband and knowing Heron was refusing medication, in an attempt to stress the severity of Heron's suicidal state of mind, Michelle faxed over a note written by a PERT officer from Sharp Mesa Vista Hospital.  The note stated that Heron was extremely delusional and suicidal having made suicidal statements to El Cajon and PERT officers earlier that month.  Despite this, Heron remained in ad-seg cell and was not evaluated by a psychiatrist despite staff being well aware Heron was in a state of psychosis and had been refusing medication since incarceration.

47.     After five (5) days of incarceration and segregation, and going without medication, observation, or psychological evaluation, on May 31, 2016, Heron strangled himself by stuffing a shirt in his mouth and using another to apply pressure around his neck.

48.     On the Morning of May 31, 2016, Michelle looked up Heron on the sheriff's website like she did every morning to see if Heron's status had changed. She could not find Heron in the system.  Michelle immediately called VDF.  She spoke with many representatives from VDF but nobody was willing to tell her the

---

[4] Heron was forced to go unevaluated for over five (5) days because psychiatrists were not available (via videoconferencing) during Memorial Day weekend.  This delay in evaluation and medication was a substantial cause in Heron's death.

truth.  Eventually, she was informed that someone would call her back.  Hours later, when dropping off Elijah at school, she received a call from the Coroner's Office informing her Heron was dead.

## FIRST CAUSE OF ACTION

### 42 U.S.C Section 1983 – 14th Amendment

### [Against DOES 1-10 – Deliberate Indifference to a Serious Medical Need]

(Brought by Michelle Moriarty as Successor in Interest to Heron Moriarty)

49.     Plaintiffs reallege and incorporate by reference all paragraphs stated above, as though fully set forth herein.

50.     Here, VDF staff was on notice of Heron's current suicidal ideations and on-going psychotic break.  They were informed Heron was arrested as he was trying to commit suicide.  Staff was aware Heron was experiencing a psychotic break and had recently been discharged from a fourteen (14) day certification hold.  Documents from the County Psych Hospital stated Heron was recently diagnosed with psychosis and mania.  Those documents also indicated Heron made several suicidal threats during his certification hold.  Plaintiffs later learned Heron was acting violently and banging his head on his cell door.  Heron had refused all forms of psychotropic drugs.  Further, Michelle called VDF thirty-one (31) times and sent three (3) faxes informing VDF staff that Heron was currently suicidal and manic.  Despite all of these warnings, VDF staff failed to have Heron psychologically evaluated or placed in a high observation cell.

51.     Aside from Michelle's warnings and Heron's obvious ideations, Heron satisfied many noted "triggers" of a potential suicide which are set forth in the county's operative suicide prevention policy.  Among the triggers are, first time offenders, mental illness, arraignment hearings, and previous suicide attempts.  These recognized triggers alone should have sparked further evaluation and observation on the part of VDF staff.

/ / /

COMPLAINT

52.     The facts indicate DOE nursing and correctional staff were squarely confronted with Heron's need for suicide prevention; however, the signs and warnings that were recognized and acknowledged by staff were not appropriately communicated among all jail staff. Importantly, the Grand Jury found that county staff does not have specialized communication skills required for effective suicide prevention.

53.     Still, despite these warnings and pitfalls, VDF staff took no precautions to prevent Heron from taking his own life.  He was not monitored, evaluated, or medicated.  He was not given a cellmate.  He was kept away from his family.  He was given normal clothes and bedding from which he could choke himself.

54.     Further, based on information and belief, VDF staff has access to a database that incorporates important medical information gathered from various county agencies such as ECMHC.  Thus, staff had access to Heron's May 12, 2016, and May 19, 2016, assessments claiming Heron suffered from psychosis and suicidal ideations.

55.     Had VDF staff not been deliberately indifferent to Heron's obvious medical needs by failing to provide meaningful treatment and medication or had staff housed Heron in a psychiatric unit or on suicide watch/high observation cell, Heron would not have had the opportunity or means to kill himself.

56.     The Grand Jury Report referenced above cites "65% of suicides occur in the first 30 days."  According to the Suicide Prevention Resource Center, inmates are at the highest risk for suicide during their initial days of incarceration. The risks increase exponentially when the inmate suffers from mental illness or prior suicide attempts.  Given Heron's imminent suicidal ideations and mental illness coupled with the triggering event of his first incarceration, it is glaringly obvious that Heron should have been monitored, evaluated, medicated, and properly housed or transferred upon intake.  This is especially so after being

COMPLAINT

explicitly advised – thirty-one (31) times – that Heron attempted suicide moments before his arrest, was currently suffering from a psychotic break and released from a fourteen (14) day certified hold just days prior to his incarceration.

57.   In doing the acts and/or omissions herein alleged, DOE Defendants were deliberately indifferent to Heron's serious medical needs which resulted in his untimely death.  The actions and inactions of the VDF staff resulted in the violation of Heron's rights under the Fourteenth Amendment of the United States Constitution.

58.   As a result thereof, Plaintiffs are entitled to damages pursuant to 42 U.S.C. section 1983 in an amount to be proven at trial.

59.   The aforementioned acts and/or omissions of DOE staff members were accomplished with a conscious and deliberate indifference of Heron's rights thereby entitling Plaintiffs to an award of exemplary and punitive damages according to proof.

## SECOND CAUSE OF ACTION

### 42 U.S.C Section 1983 – 14th Amendment

### [Against Defendant County of San Diego – Suicide Matrix Policy]

(Brought by Michelle Moriarty as Successor in Interest to Heron Moriarty)

60.   Plaintiffs reallege and incorporate by reference all paragraphs stated above, as though fully set forth herein.

61.   VDF's woefully deficient "Suicide Matrix Policy" was a moving force in Heron's constitutional deprivations.  Heron was known to be actively harboring suicidal ideations and he was known to suffering from an on-going psychotic break.  Heron attempted suicide minutes before being arrested.  He told sheriffs he was purposefully trying to be hit by cars.  His wife called VDF thirty-one (31) times and faxed three (3) letters pleading for Heron to get the psychological help due to his current state.  She stated time and time again that she was scared for his life.  Staff also knew Heron was refusing to take medication and was acting erratically in the

17

form of banging his head on his cell door repeatedly.  Despite all of this, Heron was not housed in a safety or observation cell.  Nor, was he evaluated by a psychiatrist prior to his death.

62.    The county's failures are numerous.

63.    Based on information and belief, one of the requirements instituted in the current suicide matrix relies heavily on the jails working with other partners and county agencies that come into contact with inmates prior to and during incarceration.  This is to ensure that jail staff is acutely knowledgeable about their inmates' medical and mental conditions as their incarceration continues.

64.    If there was adequate information sharing protocols, jail staff would have been required to obtain information from both the on-scene sheriffs and ECMHC – a county agency.  At that point, Heron would have been flagged as a "high suicide risk" pursuant to the current suicide matrix.  In this regard, the County's policy is inadequate.  To magnify this point, VDF's own jail staff failed to pass-down vital information regarding Heron's past and current suicidal ideations when learned from Michelle – on thirty-one (31) occasions.

65.    Similarly, the operative suicide prevention policy delineates certain triggers staff should be aware of that indicates a potential suicide attempt.  Heron displayed several of these triggers.  Such as, first time offender, severe mental illness, looming arraignment hearing and previous suicide attempts.  However, as addressed in the Grand Jury Report, the suicide prevention policy is silent on how to respond or who to inform when such triggers are recognized.  In short, there is no procedure to follow once these triggers are recognized.

66.    Thus, not only was Heron inadequately processed during intake, once VDF staff was explicitly informed of Heron's current suicidal ideations, he remained housed in ad-seg rather than being placed in a safety or high observation cell.  Still, Heron remained unevaluated by a psychiatrist.

/ / /

18

COMPLAINT

67.     Another substantial factor leading to Heron's death is the County's failure to provide adequate access to mental evaluations and treatment plans. Despite having been evaluated by a psychiatric nurse who knew Heron was suffering from a psychotic break and was refusing medicine, Heron was deprived a meaningful evaluation by a psychiatrist.

68.     Based on information and belief, VDF does not have a psychiatrist on-site.  Rather, VDF only has psychiatric nurse practitioners on site.  The practitioner is to be "supervised" by the psychiatrist; however, supervision is impossible without physical monitoring.  In reality, the psychiatrist works form another facility and simply reviews the practitioner's notes and evaluates inmates based on those notes.  It is believed that a psychiatrist never evaluates the inmate in person at VDF.

69.     Thus, if providing meaningful psychiatric management is impossible at VDF, Heron should have been transferred to Central, the only facility in the county that had a specialized floor equipped to manage mentally ill inmates.

70.     The county is well aware of its inadequate policies and treatment of known suicidal inmates.  The county currently faces over eight (8) active lawsuit stemming from identical allegations.  Further, the County has the dubious distinction of having the highest suicide rate among the state's largest jail systems. In light of this pattern, the County instituted new policies and protocols (matrix) in 2015 (prior to Heron's death) in an effort to reduce suicides, after six (6) in 2014. Seemingly, the current matrix, or the training thereon, remains inadequate as there were seven (7) suicides in 2015, and five (5) in 2016.  According to Kelly Davis, a local reporter for *CityBeat*, "These numbers are significant in comparison to the other five largest jail systems in California.  Since 2014, San Bernardino had three jail suicides.  Los Angeles and Santa Clara have had one each; and Orange and Sacramento counties have had none."  Since 2014, there have been at least eighteen (18) suicides in San Diego County jails.

/ / /

COMPLAINT

71.     Unfortunately, Heron is not the only one.  There is a pattern of similar constitutional violations due to the county's inadequate suicide prevention policies and training programs.  The sheer number of obvious and preventable suicides occurring in county jails across San Diego imputes knowledge on the county that its inadequate policies and training were the moving force behind these preventable deaths and therefore required modification.

72.     Kelly Davis is a local reporter who has dedicated her career to reporting and investigating deaths in San Diego County jails.  She began her series of investigations into San Diego jail suicides in 2007.  Since this time she has published over a dozen articles highlighting the outrageous pattern of deaths and suicides in San Diego County jails.  Not only do the underlying deaths and circumstances put the County and its policymakers on actual and constructive notice of a pattern of constitutional violations, but Kelly Davis' countless *CityBeat* publications – in which the County spokeswomen comments in every article –also puts the county on notice of a pattern of constitutional violations.  (Attached hereto as Exhibit 4, "*60 Dead Inmates.*")

73.     According to Kelly Davis' research – based on public records requests for official death investigation reports and coroner's reports - there have been eighteen (18) suicides in San Diego County jails since 2014.  The following incidents are just a few of the deaths in which inmates displayed obvious suicidal ideations prior to killing themselves.  These incidents occurred prior to Heron's death.

74.     According to a June 2014 publication, *"Law Enforcement Review Board Finds Deputy Error in Inmate Suicide,"* in CityBeat, Kelly Davis reports, "the Citizens Law Enforcement Review Board (CLERB), the independent oversight body charged with investigating deaths-in-custody and allegations of law-enforcement misconduct, has twice found that San Diego County sheriff's deputies violated policy and procedure in instances of inmate suicides."

75.    One of those instances involved 27 year-old, Jose Sierra.  Mr. Sierra was a mentally ill Mexican citizen who had been arrested for being under the influence of a controlled substance.  According to *CityBeat*, a summary of the incident in the CLERB's June agenda stated, During a security check Deputies 1 and 2 discovered Sierra hanging from a bed-sheet in his single occupancy locked cell … During the previous security check, Deputies 1 and 2 observed and unauthorized laundry line affixed to the top bunk in Sierra's cell, and failed to take corrective action per Sheriff's Polices & Procedures.  Deputies 1 & 2 failed to remove the unauthorized laundry line or confront Sierra to direct its removal, actions which may have prevented Sierra from carrying out the suicide at that time.  (Attached hereto as Exhibit 5.)

76.    Another instance involved a mentally ill inmate, Anna Wade.  In this particular case, the CLERB found that the deputy violated policy and procedure by logging a security check that did not actually happen.  According to *CityBeat*, a summary of the incident in the CLERB's October agenda stated, "Checks are supposed to happen hourly, but two hours passed between when Wade was last seen alive and when she was found hanging in her cell on April 28, 2013."  (Exhibit 5.)

77.    According to an October 2013 publication, "*10 More Dead Inmates,*" in CityBeat, another inmate, Robert Lubsen, displayed suicidal ideations – known and ignored by county staff – prior to committing suicide on February 7, 2013.  In that case, Mr. Lubsen was arrested by San Marcos campus police for a drug related crime.  While he was being detained in the campus holding cell, Mr. Lubsen attempted to commit suicide by trying to hang himself with his shoelaces.  The attempt was witnessed and stopped by campus police.  Mr. Lubsen was transferred the next day to VDF.  During intake it was noted that Mr. Lubsen had ligature marks around his neck.  In addition to the ligature mark, VDF "received a tip that Robert Lubsen was a risk to himself.  Despite the prior attempted suicide and

Robert Lubsen's history with substance abuse.  The San Diego County Sheriffs determined the tip was not credible." (Attached hereto as Exhibit 6.)

78.     Further, according to a December 2014 publication, *"San Diego County Sets a Dubious Record for Jail Deaths,"* in CityBeat, "Hector Lleras, 36, the fifth suicide of the year, twice told jail staff – first a nurse, then a deputy – that he was going to kill himself.  On July 1, he was put in a safety cell and then released 24 hours later.  Almost exactly 24 hours after that, he was found hanging in his Central Jail cell." (Attached hereto as Exhibit 7.)

79.     According to that same article, in 2014, another inmate, Christopher Carroll, was a mentally ill homeless man who was placed in administrative segregation because he was unable to get along with other inmates.  Mr. Carroll had scrawled a suicide note on his cell walls using his blood.  Prior to hanging himself he had urinated on the floor and stuck food and feces to the ceiling of his cell.  Carroll was never transferred out of his Ad-seg call.  (Exhibit 7.)

80.     Jonathan Thomas was a paranoid schizophrenic whom was transferred from Atascadero State Hospital to Central jail.  Central jail had knowledge that Mr. Thomas had attempted suicide multiple times at Atascadero.  Central also knew Mr. Thomas had previously jumped twice from the second tier while in custody in county jail.  In 2014, upon a routine commitment hearing, despite knowing about Mr. Thomas' previous suicide attempts, mental conditions, and transfer status, Central housed Mr. Thomas on a second tier cell.  Days later Mr. Thomas jumped from the second tier sustaining severe injuries.

81.     In February 2014, Kristopher NeSmith hung himself in his general population cell.  NeSmith displayed classic triggers of active suicidal ideations; such as, previous suicide attempts while in custody, severe mental and personality disorders, repeated family warnings of suicidal ideations, recorded admissions of a desire to kill himself, and a change in his medication prescriptions.  An hour before he hung himself, a deputy saw a noose hanging from NeSmith's light fixture.

COMPLAINT

1   Instead of taking any proactive measures, the deputy said, "NeSmith, what are you

2   trying to do?  Kill yourself?  Take that thing down!"  Nesmith was found dead

3   hours later.

4        82.    Jason Nishimoto's case is most similar to Heron's.  Jason had never

5   had a run-in with the law.  However, Jason was a known paranoid schizophrenic.

6   Jason attempted to overdose on prescription pain pills but his brother intervened.

7   As he had done in the past, his brother called the authorities to have them take

8   Jason in for evaluation.  Jason, and his family, informed the sheriffs Jason was

9   trying to kill him.  Instead, Jason was arrested and taken to VDF.  Jason's mother

10  spoke to a psychiatric nurse the following day and informed her Jason was

11  schizophrenic and suicidal. The nurse indicated Jason may not get his medicine

12  because it was too expensive but that she would schedule an appointment. The

13  nurse said, "don't worry mom, we'll take care of him."  Jason was then housed in

14  ad-seg.  After three (3) days of seclusion, being un-medicated, and having gone

15  unevaluated by a psychiatrist, Jason hung himself.

16       83.    Further, Pursuant to Federal Rule of Evidence 201 *Judicial Notice of*

17  *Adjudicative Facts* and Rule 32.1 *Citing Judicial Dispositions*, Plaintiffs' request

18  this Court take judicial notice of a recent September 12, 2016, Order written by

19  Judge Sammartino in *NeSmith v. County of San Diego*.  In pertinent part, the Order

20  states, Plaintiffs' Second Amended Complaint describes a number of previous

21  suicides and events leading up to them in San Diego County jails so as to establish

22  a pre-existing pattern that put the county on notice it's policies and training were

23  inadequate and in need of modification.  (Exhibit 8.)

24       84.    As a result of these preventable suicides, the county has been sued

25  several times in the past three (3) years – at least eight (8) times.  These notable

26  suicides have garnered intense focus by media sources.  The exposure that has

27  resulted from multiple lawsuits and poor media attention caused a Grand Jury to

28  investigate the flaws of the county's suicide prevention program.

85.     According to the Grand Jury Report, the county's suicide prevention program is flawed in four (4) ways, each being implicated in this case.  First, "The county's Policy and Procedures Manual lacks detailed training procedures required for correctional officers to effectively reduce suicides."  Second, "The Policy and Procedures Manual does not clearly show the inclusion of nationally recognized protocols or a clear policy statement for suicide prevention."  Third, "The sheriff's department chief medical officer does not employ an in-house staff supervisor for contract mental health workers and instead relies on contracted supervision."  Lastly, and most importantly, "There is no process in place that calls for continuous oversight as part of a suicide-prevention policy."

86.     Another failure addressed by the Grand Jury is the county's ill-training of deputies in regards to adequate communication of acknowledged ideations and warning by family members or by the detainee himself.  If individual staff notice an inmate is displaying suicidal ideations but is not trained on how to react or how to communicate what was seen to other staff members, suicide prevention is substantively impossible.

87.     Further, as indicated in the Grand Jury Report, the county's suicide matrix policy attempts to focus on the intake process, but there are no meaningful protocols that relate to the monitoring of suicidal ideations occurring after intake. In short, VDF's suicide matrix policy does not require continuous follow-ups for inmates who answer "yes" to the question, "have you ever attempted suicide?" unless they answer "yes" to the question, "are you currently feeling suicidal?"  Had there been protocols requiring follow up after intake, Michelle's warnings would have been adhered to and Heron should have been assigned to a safety or high-observation cell.

88.     Another failure noted by the Grand Jury, is the county's failure to employ an in-house psychiatrist or supervisor.  As a result, Heron never had a clinical evaluation.

COMPLAINT

89.    Further, as indicated by the Grand Jury, the county's suicide prevention policy, generally speaking, does not incorporate "nationally recognized protocols or a clear policy statement for suicide prevention."  Nationally recognized standards for suicide prevention focus on six critical components 1) staff training, 2) intake screening and assessment, 3) housing, 4) levels of supervisions, 5) recognition and intervention, and 6) administrative review.

90.    Nationally recognized protocols for risk identification include "routine screenings and formal mechanisms for determining if arresting or transporting officers have pertinent information regarding the inmate's suicide risk."

91.    Further, resources cited in the Grand Jury Report state the policies "should address a method for what to do if information about an inmate's possible suicide risk comes in from any other source, such as a family member or friend, lawyer, probation officer, etc."

92.    National standards also recognize a need for a sound classification process setting a basis for determining the most appropriate housing for an inmate who has a potential suicide risk.  A policy should describe the classification that is in place and how suicide risk factors into classification decisions.  (Exhibit 8.)

93.    Standards also include specification of observation standards based on a particular category of housing and inmate needs.  Standards require criteria for documentation of such checks.

94.    Lastly, and most importantly, national standards focus on communication between staff.  "Effective communication protocols is a key element of a good suicide prevention policy.  There must be good communication among correctional staff members, between correctional staff and medical and mental health care providers, and with the inmates themselves.  Communication involves both informal sharing of information as well as more formalized opportunities, such as shift briefings, multi-disciplinary meetings and de-briefings following critical incidents."

COMPLAINT

95.   As such, the county was acutely aware it needed to modify its policies due to the rash of suicides in 2013-2015.  This is especially so because the county has been the focus of several news publications chastising the county for having the highest jail-suicide in the state.  Despite this knowledge, the county sat idle.  It is the county's deliberate indifference that ws a moving force in Heron's untimely death.

96.   In doing the acts and/or omissions herein alleged, the county was deliberately indifferent to Heron's serious medical needs, which caused his untimely death.

97.   The aforementioned acts and/or omissions of the county caused a violation of Heron's civil rights which was the direct and proximate result of the county's policies, procedures, and training.

## THIRD CAUSE OF ACTION

### 42 U.S.C Section 1983 – 14th Amendment

### [Against Defendant County of San Diego – Failure to Train]

(Brought by Michelle Moriarty as Successor in Interest to Heron Moriarty)

98.   Plaintiffs reallege and incorporate by reference all paragraphs stated above, as though fully set forth herein.

99.   VDF's woefully deficient training was a moving force in Heron's constitutional deprivations.  Heron was known to be actively harboring suicidal ideations and he was known to suffering from an on-going psychotic break.  Heron attempted suicide minutes before being arrested.  He told sheriffs he was purposefully trying to be hit by cars.  His wife called VDF thirty-one (31) times and faxed three (3) letters pleading for Heron to get the psychological help due to his current state.  She stated time and time again that she was scared for his life.  Staff also knew Heron was refusing to take medication and was acting erratically in the form of banging his head on his cell door repeatedly.  Despite all of this, Heron was not housed in a safety or observation cell.  Nor, was he evaluated by a psychiatrist

26

COMPLAINT

prior to his death.  In short, despite recognition of Heron's obvious symptoms and signs of current ideations and Michelle's thirty-one (31) warnings, county staff took no action.

100.    The county is liable for its failure to train its staff to recognize and treat a prisoner's signs, symptoms, triggers and warnings of imminent suicide.

101.    The Grand Jury found the current policies lack detailed training procedures required for correctional officers to effectively reduce suicides.

102.    The Grand Jury Report further indicates "properly trained correctional staff is essential.  Just having adequate mental health, medical, or other professional staff available seldom prevents suicides because suicides typically take place in inmate housing units.  Furthermore, suicides commonly occur at night or on weekends, when mental health staff may not be readily available or on-site.  Therefore, guards and correctional staff trained in suicide-prevention techniques and who have subsequently developed an intuitive sense about the inmates under their care must be counted on to prevent these incidents."

103.    The report further states, adequate training "requires a continuum of comprehensive suicide prevention services aimed at the collaborative identification, continued assessment, and safe management if inmates at risk for self-harm."

104.    The report also states, "To be effective, suicide-prevention training must include consistent and thorough communication among all jail staff.  They recommend suicide prevention efforts start at the point of arrest and continue until the inmate is released.  During this time, inmates may exhibit certain behaviors that indicate a risk of suicide.  If these behaviors are detected and communicated to others, the likelihood of a completed suicide will be reduced.  Additionally, corrections staff, with proper training, can prevent suicide by establishing trust and communication with inmates in order to observe their actions and pass along what they hear and see to other corrections staff."

/ / /

COMPLAINT

105.   Most importantly, the Grand Jury Report states, "The Grand Jury believes increased efforts in suicide prevention are required.  The Grand Jury understands that the P&PM contains documentation that outlines procedures that are formulated to direct the staff on the process to carry out a desired objective. However, these standalone procedures are not a suicide-prevention plan.  A suicide-prevention plan incorporates training, intervention, communications, and supervision in a dynamic way that will ensure the correctional officers are focused on seeing the triggers that alert them of a possible suicide."

106.   The Grand Jury even specified its thoughts as to adequate training. The report states, "The Grand Jury believes that suicide-prevention training should not be just a scheduled class. Instead, it should be a continuous charge to be mindful of suicide characteristics.  Effective suicide-prevention communication should not be just a comment posted to the Jail Information Management System (JIMS).  It should also be the mental health nurse talking to the on-duty jail staff about the condition of an inmate."

107.   It further specifies, "'The initial training should include instruction regarding administrator and staff attitudes about suicide and how negative attitudes impede suicide-prevention efforts, why correctional facilities' environments are conducive to suicidal behavior, potential predisposing factors to suicide, high-risk suicide periods, warning signs and symptoms, how to identify suicidal inmates despite a denial of risk, components of the facility's suicide-prevention policy, and liability issues associated with inmate suicide.  The two hour refresher training should review the topics discussed during the initial training and also describe any changes to the facility's suicide prevention plan.  The annual training should also include a general discussion of any recent suicides and/or suicide attempts in the facility.'"  These failures are implicated in Heron's death.

108.   Akin to the allegations set forth in the Second Cause of Action, the county was on notice via a pattern of similar preventable suicides, unfavorable

COMPLAINT

medial publication that its training was inadequate and therefore caused many untimely suicides.  Despite this knowledge, the county sat idly by.  This is deliberate indifference.

109.    In doing the acts and/or omissions herein alleged, the county was deliberately indifferent to Heron's serious medical needs, which caused his untimely death.

110.    The aforementioned acts and/or omissions of the county caused a violation of Heron's civil rights which was the direct and proximate result of the county's policies, procedures, and training.

## FOURTH CAUSE OF ACTION

**42 U.S.C Section 1983 – Due Process – Deprivation of Familial Relationships**

**[Against the County and DOES 1-10]**

(Brought by Michelle Moriarty, individually and as Guardian Ad Litem to Alexandria, Elijah, and Eternity Moriarty)

111.    Plaintiffs reallege and incorporate by reference the foregoing paragraphs stated above as though fully set forth herein.

112.    Defendants' acts and/or omissions hereinabove described was so egregious and outrageous it would shock the contemporary conscience.  Heron was attempting to commit suicide minutes before he was arrested.  He told sheriffs he was released days prior from a fourteen (14) day certification hold and was diagnosed with manic psychosis.  Once at VDF, Heron was erratic and refusing medication.  His wife Michelle called VDF thirty-one (31) times and sent three (3) faxes begging for Heron to get the psychological help he needed.  Each time stressing Heron's suicidal ideations.  All of this was ignored.  Heron remained secluded, unmonitored, unmediated, and unevaluated.  As a result, Michelle, Alexandria, Elijah, and Eternity were deprived of their constitutional right to familial association, society, and companionship, without due process of law, in violation of the Fourteenth Amendment of the United States Constitution.

COMPLAINT

113.   These facts, in conjunction with the county's overall position that its policies are adequate despite having the highest suicide rate in the state, equates to conduct that shocks the conscience.

## FIFTH CAUSE OF ACTION

### Negligence

### [Against ALFRED JOSHUA and DOES 1-10]

(Brought by Michelle Moriarty, individually and as Guardian Ad Litem to Alexandria, Elijah, and Eternity Moriarty)

114.   Plaintiffs reallege and incorporate by reference the foregoing paragraphs stated above as though fully set forth herein.

115.   Dr. Joshua, DOE Defendants, and each of them, have a duty to monitor, supervise, operate, and manage VDF and its inmates in a manner so as to prevent the acts and/or omissions alleged herein.  Said Defendants owed Heron, as an inmate in Defendants' custody, care, and control, a duty of due care to protect his health and physical safety.

116.   Dr. Joshua and DOE Defendants were negligent and their conduct fell below a reasonable standard of care when they failed to discharge their duties as custodians of Heron.  It was foreseeable that as a result of Defendants' acts and omissions, as described above, Heron, known to have imminent suicidal tendencies and suffering from a sudden and severe psychotic break, would attempt to kill himself.

117.   The fact that Heron admitted to sheriffs that he attempted suicide minutes before his arrest and was just released from a fourteen (14) day certification hold, county staff did nothing.  Instead, they housed him in an isolated cell with clothes and bedding allowing for ease and access to kill himself.  They compounded their inaction by failing to evaluate and medicate a known inmate suffering from psychosis.  Defendants' breach proximately caused the injuries and damages to Heron as alleged herein.

COMPLAINT

118.   Further, Dr. Joshua was negligent due to his personal failure to modify the county's suicide prevention program.  Dr. Joshua knew inmates were dying at a rate far surpassing the average.  He knew the county was facing numerous lawsuits claiming the policies and training were inadequate.  Still, Dr. Joshua failed to respond.  Even in the face of scathing news publication, ominous statistics and Grand Jury investigations, Dr. Joshua failed to modify the county's suicide program.  His failure to do so was the direct and proximate cause in Heron's untimely death.

119.   Due to their callous, oppressive, and malicious conduct, Plaintiffs request punitive damages.

## SIXTH CAUSE OF ACTION

### Medical Malpractice

### [Against ALFRED JOSHUA and DOES 1-10]

(Brought by Michelle Moriarty as Successor in Interest to Heron Moriarty)

120.   Plaintiffs reallege and incorporate by reference all paragraphs stated above, as though fully set forth herein.

121.   Dr. Joshua and DOES had a duty to operate and manage VDF in a manner so as to prevent the acts and/or omissions alleged herein.  Said Defendants owed Heron, as an inmate in Defendants' custody, care, and control, a duty of due care to protect his health and physical safety.

122.   Defendants were negligent in their administering of medical care. DOE Defendants either failed to give medical care or gave such care that falls below the standard of reasonable care when they failed to discharge their duties as custodians and/or medical professionals.  It was foreseeable that as a result of Defendants' acts and omissions, as described above, Heron, known to have suicidal tendencies and mental illnesses, would attempt to kill himself absent meaningful treatment and monitoring.  Defendants' breach proximately caused injuries and damages to Heron as alleged herein.

31

COMPLAINT

123.   Further, Dr. Joshua was medically negligent due to his personal failure to modify the county's suicide prevention program.  Dr. Joshua knew inmates were dying at a rate far surpassing the average.  He knew the county was facing numerous lawsuits claiming the policies and training were inadequate.  Still, Dr. Joshua failed to respond.  Even in the face of scathing news publication, ominous statistics, and Grand Jury investigations, Dr. Joshua failed to modify the county's suicide program.  His failure to do so was the direct and proximate cause in Heron's untimely death.

## SEVENTH CAUSE OF ACTION

### Wrongful Death

### [Against ALFRED JOSHUA and DOES 1-10]

(Brought by Michelle Moriarty, individually, and as Successor in Interest to Heron Moriarty)

124.   Plaintiffs reallege and incorporate by reference all paragraphs stated above, as though fully set forth herein.

125.   As a result of Dr. Joshua and DOES' negligent reaction and treatment of Heron's serious medical needs, Heron suffered a painful and untimely death.

126.   The negligent actions/inactions of DOE defendants is detailed above. Their failure to react appropriately, or at all, amounts to a breach of duty and was the direct and proximate cause of Heron's death.

127.   Dr. Joshua is the Chief Medical Officer for the Sheriff's Department and is in charge of developing, implementing and, if need be, modifying existing policies.  Dr. Joshua was acutely aware the county's suicide prevention program was inadequate and in need of modification.  Despite eighteen (18) suicides since 2014, Dr. Joshua failed to implement an adequate program.  His failure amounts to a breach of duty and was the direct and proximate cause of Heron's death.

/ / /

/ / /

32

COMPLAINT

128. By reason of Heron's death, his heirs have suffered and continue to suffer loss of society, companionship, comfort, care, guidance, financial support, and other services as a result of Heron's preventable death.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for the following relief:

1. For compensatory, general, and special damages against each Defendant, jointly and severally, in an amount according to proof;

2. For punitive and exemplary damages against each individually named Defendant in their individual capacity in an amount appropriate to punish Defendants and deter others from engaging in similar misconduct;

3. For costs and reasonable attorney's fees pursuant to 42 U.S.C. section 1988 and as otherwise authorized by statute or law; and

4. For such other relief, including injunctive and/or declaratory relief, as the Court may deem proper.

## REQUEST FOR JURY

Plaintiffs hereby request a jury trial in this action.

Respectfully submitted,

**MORRIS LAW FIRM, APC**


Dated: June 9, 2017

*s/Danielle R. Pena*
Danielle R. Pena, Esq.
dpena@morrislawfirmapc.com
Christopher S. Morris, Esq.
cmorris@morrislawfirmapc.com
Attorneys for Attorneys for Michelle Moriarty, as Successor in Interest and *Guardian Ad Litem* to Alexandria, Elijah and Eternity Moriarty

33

COMPLAINT

1
2
<u>**INDEX OF EXHIBITS AMENDED COMPLAINT**</u>

3
4

| Exhibit | Description | Pages |
|---------|-------------|-------|
| 1 | Michelle Moriarty Phone Records from Verizon | 35-41 |
| 2 | San Diego County Grand Jury Report Examining the Issues of Suicides in San Diego County Jails | 42-53 |
| 3 | Declaration of Michelle Moriarty Pursuant to California Code of Civil Procedure Section 377.32 | 54-60 |
| 4 | San Diego CityBeat Article – Too Many Dead Inmates in San Diego Jails | 61-68 |
| 5 | San Diego CityBeat Article – Law Enforcement Review Board Finds Deputy Error in Inmate Suicide | 69-73 |
| 6 | San Diego CityBeat Article – 10 More Dead Inmates | 74-83 |
| 7 | San Diego CityBeat Article – San Diego County Sets a Dubious Record for Jail Deaths | 84-95 |
| 8 | US Department of Justice, National Institution of Corrections - National Study of Jail Suicide 20 Years Later | 96-181 |

23
24
25
26
27
28

COMPLAINT

# EXHIBIT 1

# verizon√

(3.14 MIN)

Invoice Number   Account Number   Date Due   Page
1504290647   6627 18169-00001   Past Due   33 of 74

## Detail for Elle Moriarty: 619-929-8297

## Voice, continued

(31)

*Handwritten: 5/26 = 3   5/27 = 5   5/28 = 37*
*5/29 = 4   5/30 = 7   5/31 = 5*

| Date | Time | Number | Rate | Usage Type | Origination | Destination | Min. | Airtime Charges | Long Dist/ Other Chgs | Total |
|---|---|---|---|---|---|---|---|---|---|---|
| 5/25 | 5:36P | 619-990-8067 | Peak | M2MAllow | Chula Vist CA | San Diego CA | 3 | — | — | — |
| 5/25 | 5:43P | 619-368-9567 | Peak | M2MAllow | Chula Vist CA | Incoming CL | 1 | — | — | — |
| 5/25 | 5:50P | 619-851-4139 | Peak | M2MAllow | Chula Vist CA | Incoming CL | 9 | — | — | — |
| 5/25 | 5:56P | 619-929-1080 | Peak | PlanAllow,CallWait | Chula Vist CA | Incoming CL | 1 | — | — | — |
| 5/25 | 7:16P | 619-252-5455 | Peak | PlanAllow | Chula Vist CA | Incoming CL | 18 | — | — | — |
| 5/25 | 7:57P | 619-742-6869 | Peak | PlanAllow | San Diego CA | LA Jolla CA | 1 | — | — | — |
| 5/25 | 8:00P | 619-597-4220 | Peak | PlanAllow | San Diego CA | LA Mesa CA | 1 | — | — | — |
| 5/25 | 8:09P | 619-392-4060 | Peak | PlanAllow | Chula Vist CA | Chulavista CA | 2 | — | — | — |
| 5/25 | 8:12P | 619-368-9567 | Peak | M2MAllow | Chula Vist CA | Incoming CL | 2 | — | — | — |
| 5/25 | 8:15P | 619-929-1080 | Peak | PlanAllow | Chula Vist CA | Incoming CL | 2 | — | — | — |
| 5/25 | 8:24P | 858-386-9647 | Peak | M2MAllow | Chula Vist CA | Incoming CL | 3 | — | — | — |
| 5/25 | 8:35P | 619-742-1946 | Peak | M2MAllow | Chula Vist CA | Incoming CL | 2 | — | — | — |
| 5/25 | 8:35P | 619-392-4060 | Peak | PlanAllow,CallWait | Chula Vist CA | Incoming CL | 2 | — | — | — |
| 5/25 | 8:53P | 619-395-0744 | Peak | PlanAllow | Chula Vist CA | Chulavista CA | 1 | — | — | — |
| 5/25 | 8:53P | 619-990-8067 | Peak | M2MAllow | Chula Vist CA | San Diego CA | 2 | — | — | — |
| 5/25 | 9:02P | 619-929-1080 | Off-Peak | N&W | Chula Vist CA | Incoming CL | 2 | — | — | — |
| 5/25 | 9:10P | 619-531-2000 | Off-Peak | N&W *Police* | Chula Vist CA | San Diego CA | 2 | — | — | — |
| 5/25 | 9:21P | 619-531-2000 | Off-Peak | N&W *Police* | Chula Vist CA | San Diego CA | 9 | — | — | — |
| 5/25 | 9:32P | 858-386-9647 | Off-Peak | N&W | Chula Vist CA | Incoming CL | 4 | — | — | — |
| 5/25 | 9:37P | 619-929-1080 | Off-Peak | N&W | Chula Vist CA | San Diego CA | 1 | — | — | — |
| 5/25 | 9:42P | 619-929-1080 | Off-Peak | N&W | Chula Vist CA | Incoming CL | 4 | — | — | — |
| 5/25 | 10:10P | 858-472-2352 | Off-Peak | N&W | Chula Vist CA | Incoming CL | 10 | — | — | — |
| 5/25 | 10:30P | 619-201-1418 | Off-Peak | N&W | Jamul CA | El Cajon CA | 34 | — | — | — |
| 5/25 | 11:04P | 619-742-1946 | Off-Peak | N&W | Chula Vist CA | LA Jolla CA | 5 | — | — | — |
| 5/25 | 11:34P | 619-368-9567 | Off-Peak | N&W | Chula Vist CA | Incoming CL | 1 | — | — | — |
| 5/25 | 11:45P | 858-565-5200 | Off-Peak | N&W *Sheriff R.S.D.* | Chula Vist CA | Lnda Vista CA | 3 | — | — | — |
| 5/26 | 7:41A | 619-392-4060 | Peak | PlanAllow | Springs VA CA | Chulavista CA | 1 | — | — | — |
| 5/26 | 7:43A | 619-392-1837 | Peak | PlanAllow | Jamul CA | Chulavista CA | 2 | — | — | — |
| 5/26 | 8:09A | 405-213-0699 | Peak | PlanAllow | Lakeside CA | Incoming CL | 20 | — | — | — |
| 5/26 | 8:29A | 858-386-9647 | Peak | M2MAllow | El Cajon CA | Poway CA | 5 | — | — | — |
| 5/26 | 8:35A | 858-565-5200 | Peak | PlanAllow *R.S.D. Shorill* | El Cajon CA | Lnda Vista CA | 9 | — | — | — |
| 5/26 | 8:45A | 858-402-5252 | Peak | PlanAllow | Lakeside CA | Sndg Lvta CA | 7 | — | — | — |
| 5/26 | 9:01A | 760-936-0014 | Peak | PlanAllow ✗ | Lakeside CA | Vista CA | (9) | — | — | — |
| 5/26 | 9:36A | 619-597-4220 | Peak | PlanAllow | Lakeside CA | LA Mesa CA | 1 | — | — | — |
| 5/26 | 9:55A | 858-386-9647 | Peak | M2MAllow | Lakeside CA | Poway CA | 2 | — | — | — |
| 5/26 | 9:58A | 858-472-2352 | Peak | M2MAllow | El Cajon CA | Anchobrndo CA | 1 | — | — | — |
| 5/26 | 10:02A | 619-368-9567 | Peak | M2MAllow | El Cajon CA | Incoming CL | 2 | — | — | — |
| 5/26 | 10:23A | 619-656-5020 | Peak | PlanAllow | El Cajon CA | Chulavista CA | 3 | — | — | — |
| 5/26 | 10:33A | 858-386-9647 | Peak | M2MAllow | El Cajon CA | Poway CA | 2 | — | — | — |
| 5/26 | 10:36A | 619-656-5020 | Peak | PlanAllow | El Cajon CA | Chulavista CA | 5 | — | — | — |
| 5/26 | 10:41A | 888-688-5680 | Peak | PlanAllow | Spring Vel CA | Toll-Free CL | 1 | — | — | — |
| 5/26 | 10:42A | 619-656-5020 | Peak | PlanAllow | Spring Val CA | Chulavista CA | 2 | — | — | — |
| 5/26 | 10:47A | 619-579-8760 | Peak | M2MAllow | Spring Val CA | Sndg Sndg CA | 2 | — | — | — |
| 5/26 | 11:01A | 619-992-0720 | Peak | M2MAllow | Lemon Grov CA | VM Deposit CL | 1 | — | — | — |
| 5/26 | 11:08A | 619-495-8615 | Peak | M2MAllow | Lemon Grov CA | VM Deposit CL | 1 | — | — | — |

*Handwritten right margin totals: 9 3 5 5 4 32 59 6 59 2 16 7 T20 3 6 7 10 4 1:58 10 17 13 2:36 2 8 3 2:14 8 4 3 301 7 3*

*Handwritten bottom: 5 5 6 10*

*Handwritten bottom right: 314*

*Left margin: Control #50000025-00001964   Copy #: 03   Order #: 2517   Copy #: 03*


# verizon√

| | Invoice Number | Account Number | Date Due | Page |
|---|---|---|---|---|
| | 1504290647 | 6627181690-00001 | Past Due | 34 of 74 |

## Detail for Elle Moriarty: 619-929-8297

## Voice, continued

| Date | Time | Number | Rate | Usage Type | Origination | Destination | Min. | Airtime Charges | Long Dist/ Other Chgs | Total |
|---|---|---|---|---|---|---|---|---|---|---|
| 5/26 | 11:09A | 619-647-7194 | Peak | PlanAllow | Lemon Grov CA | El Cajon CA | 1 | — | — | — |
| 5/26 | 11:21A | 619-656-5020 | Peak | PlanAllow | Lemon Grov CA | Chulavista CA | 3 | — | — | — |
| 5/26 | 11:27A | 888-559-1922 | Peak | PlanAllow | LA Mesa CA | Toll-Free CL | 1 | — | — | — |
| 5/26 | 11:28A | 844-292-8615 | Peak | PlanAllow | LA Mesa CA | Toll-Free CL | 5 | — | — | — |
| 5/26 | 11:33A | 619-647-7194 | Peak | PlanAllow | El Cajon CA | El Cajon CA | 6 | — | — | — |
| 5/26 | 11:39A | 619-431-7089 | Peak | PlanAllow | Lakeside CA | Sndg Sndg CA | 9 | — | — | — |
| 5/26 | 11:55A | 916-970-1850 | Peak | PlanAllow | Lakeside CA | Incoming CL | 1 | — | — | — |
| 5/26 | 12:15P | 619-736-8055 | Peak | PlanAllow | Jamul CA | Incoming CL | 4 | — | — | — |
| 5/26 | 12:29P | 619-916-7914 | Peak | M2MAllow | Jamul CA | Incoming CL | 2 | — | — | — |
| 5/26 | 12:31P | 619-990-8067 | Peak | M2MAllow | Jamul CA | Incoming CL | 2 | — | — | — |
| 5/26 | 12:47P | 844-292-8615 | Peak | PlanAllow | Jamul CA | Incoming CL | 13 | — | — | — |
| 5/26 | 12:59P | 858-492-5252 | Peak | PlanAllow | Jamul CA | Sndg Lvta CA | 2 | — | — | — |
| 5/26 | 1:13P | 619-656-5020 | Peak | PlanAllow | Jamul CA | Incoming CL | 11 | — | — | — |
| 5/26 | 2:09P | 619-392-4060 | Peak | PlanAllow | Jamul CA | Incoming CL | 2 | — | — | — |
| 5/26 | 2:36P | 619-832-6187 | Peak | PlanAllow | Jamul CA | Incoming CL | 1 | — | — | — |
| 5/26 | 2:46P | 619-832-6187 | Peak | PlanAllow | Jamul CA | LA Mesa CA | 1 | — | — | — |
| 5/26 | 4:02P | 844-370-0306 | Peak | PlanAllow | Jamul CA | Incoming CL | 1 | — | — | — |
| 5/26 | 4:56P | 619-948-6418 | Peak | M2MAllow | Springs VA CA | Chulavista CA | 1 | — | — | — |
| 5/26 | 5:24P | 619-368-9567 | Peak | M2MAllow | Jamul CA | VM Deposit CL | 1 | — | — | — |
| 5/26 | 5:40P | 910-650-2937 | Peak | PlanAllow | Chula Vist CA | Incoming CL | 2 | — | — | — |
| 5/26 | 5:47P | 760-936-0014 | Peak | PlanAllow | Chula Vist CA | Vista CA | (5) | — | — | — |
| 5/26 | 5:54P | 858-386-9647 | Peak | M2MAllow | Chula Vist CA | Poway CA | 2 | — | — | — |
| 5/26 | 5:59P | 619-392-4060 | Peak | PlanAllow | Chula Vist CA | Incoming CL | 1 | — | — | — |
| 5/26 | 6:00P | 619-929-1080 | Peak | PlanAllow | Chula Vist CA | San Diego CA | 10 | — | — | — |
| 5/26 | 6:10P | 760-936-0014 | Peak | PlanAllow | San Diego CA | Vista CA | (3) | — | — | — |
| 5/26 | 7:07P | 619-368-9567 | Peak | M2MAllow | Chula Vist CA | Incoming CL | 1 | — | — | — |
| 5/26 | 7:07P | 619-368-9567 | Peak | M2MAllow | Chula Vist CA | Incoming CL | 1 | — | — | — |
| 5/26 | 7:32P | 910-650-2937 | Peak | PlanAllow | Chula Vist CA | Port Huron MI | 25 | — | — | — |
| 5/26 | 7:57P | 619-392-1037 | Peak | PlanAllow | Chula Vist CA | Chulavista CA | 12 | — | — | — |
| 5/26 | 8:10P | 619-840-4360 | Peak | PlanAllow | Chula Vist CA | San Diego CA | 33 | — | — | — |
| 5/26 | 8:49P | 619-840-4360 | Peak | N&W,PlanAllow,Span | Chula Vist CA | San Diego CA | 19 | — | — | — |
| 5/26 | 9:08P | 619-392-4060 | Off-Peak | N&W | Chula Vist CA | Chulavista CA | 10 | — | — | — |
| 5/26 | 9:28P | 619-916-7914 | Off-Peak | N&W | Chula Vist CA | VM Deposit CL | 1 | — | — | — |
| 5/26 | 9:29P | 619-916-7914 | Off-Peak | N&W | Chula Vist CA | Incoming CL | 19 | — | — | — |
| 5/27 | 7:42A | 619-754-6686 | Peak | PlanAllow | Springs VA CA | Incoming CL | 1 | — | — | — |
| 5/27 | 7:49A | 760-936-0014 | Peak | PlanAllow | Springs VA CA | Vista CA | (5) | — | — | — |
| 5/27 | 8:49A | 844-292-8615 | Peak | PlanAllow | Jamul CA | Incoming CL | 13 | — | — | — |
| 5/27 | 10:54A | 619-368-9567 | Peak | M2MAllow | Jamul CA | Incoming CL | 1 | — | — | — |
| 5/27 | 12:05P | 760-936-0014 | Peak | PlanAllow | Springs VA CA | Vista CA | (4) | — | — | — |
| 5/27 | 2:24P | 619-392-4060 | Peak | PlanAllow | El Cajon CA | Chulavista CA | 1 | — | — | — |
| 5/27 | 2:25P | 760-936-0014 | Peak | PlanAllow | El Cajon CA | Vista CA | (32) | — | — | — |
| 5/27 | 3:02P | 619-368-9567 | Peak | M2MAllow | El Cajon CA | Incoming CL | 1 | — | — | — |
| 5/27 | 3:18P | 619-832-6187 | Peak | PlanAllow | El Cajon CA | LA Mesa CA | 1 | — | — | — |
| 5/27 | 3:40P | 858-386-9647 | Peak | M2MAllow | El Cajon CA | Poway CA | 1 | — | — | — |
| 5/27 | 3:41P | 619-305-0744 | Peak | PlanAllow | El Cajon CA | Chulavista CA | 1 | — | — | — |



## Detail for Elle Moriarty: 619–929–8297

## Voice, continued

| Date | Time | Number | Rate | Usage Type | Origination | Destination | Min. | Airtime Charges | Long Dist/ Other Chgs | Total |
|---|---|---|---|---|---|---|---|---|---|---|
| 5/27 | 3:45P | 619–431–7089 | Peak | PlanAllow | El Cajon CA | Sndg Sndg CA | 1 | — | — | — |
| 5/27 | 4:06P | 619–368–9567 | Peak | M2MAllow | LA Mesa CA | El Cajon CA | 2 | — | — | — |
| 5/27 | 4:06P | 619–735–8055 | Peak | PlanAllow,CallWait | El Cajon CA | Incoming CL | 3 | — | — | — |
| 5/27 | 4:09P | 619–381–0989 | Peak | PlanAllow | LA Mesa CA | San Diego CA | 3 | — | — | — |
| 5/27 | 4:21P | 619–381–0989 | Peak | PlanAllow | Springs VA CA | Incoming CL | 3 | — | — | — |
| 5/27 | 4:22P | 619–395–0744 | Peak | PlanAllow,CallWait | Springs VA CA | Incoming CL | 2 | — | — | — |
| 5/27 | 4:24P | 619–368–9567 | Peak | M2MAllow | Chula Vist CA | Incoming CL | 1 | — | — | — |
| 5/27 | 4:27P | 619–381–0989 | Peak | PlanAllow | Springs VA CA | San Diego CA | 2 | — | — | — |
| 5/27 | 4:31P | 760–936–0014 | Peak | PlanAllow | Chula Vist CA | Vista CA | 6 | — | — | — |
| 5/27 | 4:40P | 619–206–9235 | Peak | PlanAllow | Chula Vist CA | San Diego CA | 2 | — | — | — |
| 5/27 | 4:46P | 760–936–0014 | Peak | PlanAllow | Chula Vist CA | Vista CA | 5 | — | — | — |
| 5/27 | 5:05P | 810–650–2987 | Peak | PlanAllow | Chula Vist CA | Port Huron MI | 1 | — | — | — |
| 5/27 | 5:09P | 800–523–5933 | Peak | PlanAllow | Chula Vist CA | Toll–Free CL | 4 | — | — | — |
| 5/27 | 5:16P | 888–724–7240 | Peak | PlanAllow | Chula Vist CA | Toll–Free CL | 38 | — | — | — |
| 5/27 | 7:07P | 619–392–4060 | Peak | PlanAllow | Chula Vist CA | Incoming CL | 1 | — | — | — |
| 5/27 | 7:24P | 619–916–7914 | Peak | M2MAllow | Chula Vist CA | Incoming CL | 6 | — | — | — |
| 5/27 | 7:29P | 619–431–7089 | Peak | PlanAllow | Chula Vist CA | Sndg Sndg CA | 23 | — | — | — |
| 5/28 | 12:54A | 900–578–5000 | Off–Peak | N&W | Chula Vist CA | Toll–Free CL | 3 | — | — | — |
| 5/28 | 9:26A | 619–517–0205 | Off–Peak | N&W | Chula Vist CA | San Diego CA | 6 | — | — | — |
| 5/28 | 9:32A | 760–936–0014 | Off–Peak | N&W | Chula Vist CA | Vista CA | 16 | — | — | — |
| 5/28 | 10:12A | 619–392–4060 | Off–Peak | N&W | Chula Vist CA | Incoming CL | | — | — | — |
| 5/28 | 10:13A | 760–643–0262 | Off–Peak | N&W | Chula Vist CA | Incoming CL | 6 | — | — | — |
| 5/28 | 10:34A | 619–381–0989 | Off–Peak | N&W | Chula Vist CA | Incoming CL | 3 | — | — | — |
| 5/28 | 10:46A | 619–832–6187 | Off–Peak | N&W | Chula Vist CA | LA Mesa CA | 2 | — | — | — |
| 5/28 | 11:01A | 810–650–2987 | Off–Peak | N&W | Chula Vist CA | Port Huron MI | 1 | — | — | — |
| 5/28 | 11:03A | 760–643–0262 | Off–Peak | N&W | Chula Vist CA | Vista CA | 1 | — | — | — |
| 5/28 | 11:04A | 760–936–0014 | Off–Peak | N&W | Chula Vist CA | Vista CA | 7 | — | — | — |
| 5/28 | 11:11A | 810–650–2987 | Off–Peak | N&W | Chula Vist CA | Port Huron MI | 7 | — | — | — |
| 5/28 | 11:48A | 619–368–9567 | Off–Peak | N&W | Chula Vist CA | Incoming CL | 2 | — | — | — |
| 5/28 | 12:10P | 619–793–9444 | Off–Peak | N&W | Chula Vist CA | Sndg Sndg CA | 1 | — | — | — |
| 5/28 | 12:22P | 760–936–0014 | Off–Peak | N&W | Chula Vist CA | Vista CA | 3 | — | — | — |
| 5/28 | 12:28P | 760–936–0014 | Off–Peak | N&W | Chula Vist CA | Vista CA | 8 | — | — | — |
| 5/28 | 12:44P | 619–832–6187 | Off–Peak | N&W | Chula Vist CA | LA Mesa CA | 2 | — | — | — |
| 5/28 | 12:55P | 619–381–0989 | Off–Peak | N&W | Chula Vist CA | Incoming CL | 3 | — | — | — |
| 5/28 | 3:52P | 619–237–9111 | Off–Peak | N&W | Chula Vist CA | Incoming CL | 1 | — | — | — |
| 5/28 | 3:56P | 619–381–0989 | Off–Peak | N&W | Chula Vist CA | San Diego CA | 1 | — | — | — |
| 5/28 | 4:09P | 619–381–0989 | Off–Peak | N&W | Chula Vist CA | San Diego CA | 1 | — | — | — |
| 5/28 | 4:09P | 619–381–0989 | Off–Peak | N&W | Chula Vist CA | San Diego CA | 1 | — | — | — |
| 5/28 | 4:10P | 619–522–4941 | Off–Peak | N&W | Chula Vist CA | Coronado CA | 1 | — | — | — |
| 5/28 | 4:13P | 619–678–6490 | Off–Peak | N&W | Jamul CA | Chulavista CA | 3 | — | — | — |
| 5/28 | 4:16P | 619–832–6187 | Off–Peak | N&W | Chula Vist CA | LA Mesa CA | 1 | — | — | — |
| 5/28 | 4:50P | 619–678–6490 | Off–Peak | N&W | Chula Vist CA | Chulavista CA | 1 | — | — | — |
| 5/28 | 4:51P | 619–381–0989 | Off–Peak | N&W | Chula Vist CA | San Diego CA | 2 | — | — | — |
| 5/28 | 5:05P | 619–381–0989 | Off–Peak | N&W | Chula Vist CA | Incoming CL | 1 | — | — | — |
| 5/28 | 5:10P | 855–341–8184 | Off–Peak | N&W | Chula Vist CA | Incoming CL | 4 | — | — | — |

Order # : 08574 · Copy # : 03   Control # :500000023-00031985



## Detail for Elle Moriarty: 619–929–8297

## Voice, continued

| Date | Time | Number | Rate | Usage Type | Origination | Destination | Min. | Airtime Charges | Long Dist/ Other Chgs | Total |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| 5/28 | 6:51P | 760–936–0014 | Off–Peak | N&W | Chula Vist CA | Vista CA | 7 | — | — | — |
| 5/28 | 7:40P | 619–368–9567 | Off–Peak | N&W | Chula Vist CA | Incoming CL | 1 | — | — | — |
| 5/28 | 8:22P | 619–368–9567 | Off–Peak | N&W | Chula Vist CA | El Cajon CA | 1 | — | — | — |
| 5/29 | 8:31A | 760–936–0014 | Off–Peak | N&W | Chula Vist CA | Vista CA | 10 | — | — | — |
| 5/29 | 10:11A | 619–252–5455 | Off–Peak | N&W | Chula Vist CA | San Diego CA | 8 | — | — | — |
| 5/29 | 11:57A | 619–368–9567 | Off–Peak | N&W | Chula Vist CA | El Cajon CA | 1 | — | — | — |
| 5/29 | 12:30P | 619–368–9567 | Off–Peak | N&W | Chula Vist CA | El Cajon CA | 1 | — | — | — |
| 5/29 | 1:21P | 619–947–1850 | Off–Peak | N&W | Chula Vist CA | Chulavista CA | 1 | — | — | — |
| 5/29 | 2:04P | 760–936–0014 | Off–Peak | N&W | Chula Vist CA | Vista CA | 4 | — | — | — |
| 5/29 | 2:08P | 858–386–9047 | Off–Peak | N&W | Chula Vist CA | Poway CA | 3 | — | — | — |
| 5/29 | 2:13P | 619–947–1850 | Off–Peak | N&W | Chula Vist CA | Incoming CL | 2 | — | — | — |
| 5/29 | 2:55P | 619–368–9567 | Off–Peak | N&W | Chula Vist CA | El Cajon CA | 1 | — | — | — |
| 5/29 | 8:31P | 760–936–0014 | Off–Peak | N&W | Chula Vist CA | Vista CA | 10 | — | — | — |
| 5/29 | 9:30P | 760–936–0014 | Off–Peak | N&W | Jamul CA | Vista CA | 17 | — | — | — |
| 5/30 | 8:12A | 619–368–9567 | Peak | M2MAllow | Chula Vist CA | Incoming CL | 1 | — | — | — |
| 5/30 | 8:38A | 619–252–5455 | Peak | PlanAllow | Chula Vist CA | Incoming CL | 3 | — | — | — |
| 5/30 | 8:51A | 760–936–0014 | Peak | PlanAllow | Chula Vist CA | Vista CA | 13 | — | — | — |
| 5/30 | 9:10A | 619–517–0205 | Peak | M2MAllow | Chula Vist CA | San Diego CA | 27 | — | — | — |
| 5/30 | 9:39A | 619–368–9567 | Peak | M2MAllow | Chula Vist CA | Incoming CL | 1 | — | — | — |
| 5/30 | 9:45A | 619–252–5455 | Peak | PlanAllow | Chula Vist CA | Incoming CL | 1 | — | — | — |
| 5/30 | 9:59A | 760–453–3342 | Peak | PlanAllow | Chula Vist CA | Incoming CL | 8 | — | — | — |
| 5/30 | 10:35A | 619–832–6187 | Peak | PlanAllow | Chula Vist CA | LA Mesa CA | 1 | — | — | — |
| 5/30 | 10:49A | 619–381–0359 | Peak | PlanAllow | Chula Vist CA | San Diego CA | 3 | — | — | — |
| 5/30 | 10:57A | 619–832–6187 | Peak | PlanAllow | Chula Vist CA | Incoming CL | 1 | — | — | — |
| 5/30 | 11:19A | 866–443–0911 | Peak | PlanAllow | Chula Vist CA | Toll–Free CA | 18 | — | — | — |
| 5/30 | 11:53A | 619–742–6869 | Peak | PlanAllow | Chula Vist CA | LA Jolla CA | 1 | — | — | — |
| 5/30 | 12:20P | 760–936–0014 | Peak | PlanAllow | Chula Vist CA | Vista CA | 5 | — | — | — |
| 5/30 | 12:35P | 619–392–1837 | Peak | PlanAllow | Bonita CA | Chulavista CA | | — | — | — |
| 5/30 | 12:41P | 619–742–8857 | Peak | PlanAllow | National C CA | Incoming CL | 8 | — | — | — |
| 5/30 | 12:52P | 810–650–2987 | Peak | PlanAllow | San Diego CA | Port Huron MI | 31 | — | — | — |
| 5/30 | 1:27P | 619–929–1080 | Peak | PlanAllow | Vista CA | San Diego CA | 1 | — | — | — |
| 5/30 | 1:47P | 619–390–8067 | Peak | M2MAllow | Vista CA | Incoming CL | 3 | — | — | — |
| 5/30 | 2:14P | 951–445–6799 | Peak | PlanAllow | Vista CA | Murrieta CA | 27 | — | — | — |
| 5/30 | 2:56P | 951–445–6799 | Peak | PlanAllow | Vista CA | Murrieta CA | 1 | — | — | — |
| 5/30 | 2:57P | 951–445–6799 | Peak | PlanAllow | Vista CA | Murrieta CA | 1 | — | — | — |
| 5/30 | 2:58P | 619–325–9459 | Peak | PlanAllow | Vista CA | Sndg Sndg CA | 2 | — | — | — |
| 5/30 | 2:58P | 951–445–6799 | Peak | PlanAllow, CallWait | Vista CA | Incoming CL | 4 | — | — | — |
| 5/30 | 3:03P | 760–936–0014 | Peak | PlanAllow | Vista CA | Vista CA | 3 | — | — | — |
| 5/30 | 3:14P | 760–643–0252 | Peak | PlanAllow | Vista CA | Incoming CL | 2 | — | — | — |
| 5/30 | 3:16P | 951–445–6799 | Peak | PlanAllow | Vista CA | Murrieta CA | 1 | — | — | — |
| 5/30 | 3:30P | 760–936–0014 | Peak | PlanAllow | Vista CA | Vista CA | 6 | — | — | — |
| 5/30 | 3:38P | 760–936–0014 | Peak | PlanAllow | Escondido CA | Vista CA | 4 | — | — | — |
| 5/30 | 3:46P | 619–392–1837 | Peak | PlanAllow | San Diego CA | Chulavista CA | 8 | — | — | — |
| 5/30 | 3:57P | 619–201–1418 | Peak | PlanAllow | San Diego CA | El Cajon CA | 1 | — | — | — |
| 5/30 | 3:57P | 619–840–4360 | Peak | PlanAllow | San Diego CA | San Diego CA | 24 | — | — | — |



## Detail for Elle Moriarty: 619-929-8297

## Voice, continued

| Date | Time | Number | Rate | Usage Type | Origination | Destination | Min. | Airtime Charges | Long Dist/ Other Chgs | Total |
|---|---|---|---|---|---|---|---|---|---|---|
| 5/30 | 7:15P | 619-381-0989 | Peak | PlanAllow | Chula Vist CA | San Diego CA | 1 | — | — | — |
| 5/30 | 7:18P | 619-381-0989 | Peak | PlanAllow | National C CA | Incoming CL | 4 | — | — | — |
| 5/30 | 7:28P | 619-431-7089 | Peak | PlanAllow | Chula Vist CA | Incoming CL | 12 | — | — | — |
| 5/30 | 8:34P | 619-431-7089 | Peak | PlanAllow | Chula Vist CA | Incoming CL | 5 | — | — | — |
| 5/30 | 9:06P | 619-381-0989 | Off-Peak | N&W | Chula Vist CA | Incoming CL | 1 | — | — | — |
| 5/30 | 9:58P | 619-431-7089 | Off-Peak | N&W | Chula Vist CA | Incoming CL | 2 | — | — | — |
| 5/30 | 11:37P | 760-936-0014 | Off-Peak | N&W | Chula Vist CA | Vista CA | (3) | — | — | — |
| 5/31 | 6:52A | 619-832-6187 | Peak | PlanAllow | Chula Vist CA | LA Mesa CA | 1 | — | — | — |
| 5/31 | 7:11A | 760-936-0014 | Peak | PlanAllow | Chula Vist CA | Vista CA | (7) | — | — | — |
| 5/31 | 7:35A | 619-669-2700 | Peak | PlanAllow | Jamul CA | LA Mesa CA | 1 | — | — | — |
| 5/31 | 7:45A | 619-401-5500 | Peak | PlanAllow | El Cajon CA | El Cajon CA | 1 | — | — | — |
| 5/31 | 8:15A | 619-401-5500 | Peak | PlanAllow | El Cajon CA | El Cajon CA | 4 | — | — | — |
| 5/31 | 8:20A | 619-542-4166 | Peak | PlanAllow | El Cajon CA | Sndg Sndg CA | 27 | — | — | — |
| 5/31 | 9:15A | 877-534-2524 | Peak | PlanAllow | El Cajon CA | Toll-Free CL | 2 | — | — | — |
| 5/31 | 9:31A | 877-534-2524 | Peak | PlanAllow | El Cajon CA | Toll-Free CL | 10 | — | — | — |
| 5/31 | 9:47A | 619-543-1434 | Peak | PlanAllow | El Cajon CA | San Diego CA | 5 | — | — | — |
| 5/31 | 9:52A | 619-691-8008 | Peak | PlanAllow | El Cajon CA | Chulavista CA | 11 | — | — | — |
| 5/31 | 10:03A | 619-441-4583 | Peak | PlanAllow | El Cajon CA | El Cajon CA | 9 | — | — | — |
| 5/31 | 12:01P | 619-309-8679 | Peak | PlanAllow | El Cajon CA | Incoming CL | 32 | — | — | — |
| 5/31 | 12:48P | 619-220-7397 | Peak | PlanAllow | El Cajon CA | Incoming CL | 1 | — | — | — |
| 5/31 | 1:16P | 858-386-9647 | Peak | M2MAllow | LA Mesa CA | Poway CA | 5 | — | — | — |
| 5/31 | 1:41P | 619-431-7089 | Peak | PlanAllow | El Cajon CA | Incoming CL | 2 | — | — | — |
| 5/31 | 2:20P | 951-263-1822 | Peak | PlanAllow | El Cajon CA | Incoming CL | 2 | — | — | — |
| 5/31 | 2:27P | 760-643-0262 | Peak | PlanAllow (County) | El Cajon CA | Incoming CL | (3) | — | — | — |
| 5/31 | 2:32P | 951-263-1822 | Peak | PlanAllow | El Cajon CA | Incoming CL | 9 | — | — | — |
| 5/31 | 3:37P | 760-936-0014 | Peak | PlanAllow | El Cajon CA | Vista CA | (3) | — | — | — |
| 5/31 | 4:22P | 619-309-8679 | Peak | PlanAllow | El Cajon CA | Incoming CL | 20 | — | — | — |
| 5/31 | 4:42P | 619-691-8008 | Peak | PlanAllow | LA Mesa CA | Chulavista CA | 3 | — | — | — |
| 5/31 | 4:47P | 810-650-2987 | Peak | PlanAllow | Spring Val CA | Port Huron MI | 15 | — | — | — |
| 5/31 | 5:43P | 877-627-5757 | Peak | PlanAllow | Chula Vist CA | Toll-Free CL | 9 | — | — | — |
| 5/31 | 5:44P | 619-381-0989 | Peak | PlanAllow,CallWait | Chula Vist CA | Incoming CL | 1 | — | — | — |
| 5/31 | 5:54P | 810-650-2987 | Peak | PlanAllow | Chula Vist CA | Port Huron MI | 5 | — | — | — |
| 5/31 | 5:59P | 619-840-4360 | Peak | PlanAllow | Chula Vist CA | San Diego CA | 13 | — | — | — |
| 5/31 | 6:17P | 619-990-8067 | Peak | M2MAllow | Chula Vist CA | Incoming CL | 1 | — | — | — |
| 5/31 | 6:19P | 619-368-9567 | Peak | M2MAllow | Chula Vist CA | Incoming CL | 4 | — | — | — |
| 5/31 | 8:23P | 619-368-9567 | Peak | M2MAllow | Chula Vist CA | El Cajon CA | 1 | — | — | — |
| 5/31 | 8:41P | 619-840-4360 | Peak | PlanAllow | Chula Vist CA | San Diego CA | 3 | — | — | — |
| 5/31 | 8:25P | 619-368-9567 | Peak | M2MAllow | Chula Vist CA | Incoming CL | 3 | — | — | — |
| 5/31 | 8:32P | 760-936-0014 | Peak | PlanAllow | Chula Vist CA | Vista CA | (5) | — | — | — |
| 5/31 | 9:10P | 760-936-0014 | Off-Peak | N&W | Chula Vist CA | Vista CA | (6) | — | — | — |
| 5/31 | 9:32P | 619-201-1418 | Off-Peak | N&W | Chula Vist CA | El Cajon CA | 1 | — | — | — |
| 5/31 | 9:34P | 619-201-1418 | Off-Peak | N&W | Chula Vist CA | Incoming CL | 8 | — | — | — |
| 5/31 | 9:44P | 619-368-9567 | Off-Peak | N&W | Chula Vist CA | El Cajon CA | 1 | — | — | — |
| 5/31 | 9:56P | 619-368-9567 | Off-Peak | N&W | Chula Vist CA | Incoming CL | 1 | — | — | — |
| 6/01 | 12:36A | 619-368-9567 | Off-Peak | N&W | Chula Vist CA | El Cajon CA | 1 | — | — | — |

Order # : 2674  Copy # 1 0 3   Control #:560002023-00001995

40



## Detail for Elle Moriarty: 619-929-8297

## Voice, continued

| Date | Time | Number | Rate | Usage Type | Origination | Destination | Min. | Airtime Charges | Long Dist/ Other Chgs | Total |
|------|------|--------|------|------------|-------------|-------------|------|-----------------|------------------------|-------|
| 6/01 | 6:42A | 760-936-0014 | Peak | PlanAllow | Chula Vist CA | Vista CA | 10 | --- | --- | --- |
| 6/01 | 7:28A | 951-445-6799 | Peak | PlanAllow | Chula Vist CA | Murrieta CA | 1 | --- | --- | --- |
| 6/01 | 7:30A | 858-571-7723 | Peak | PlanAllow | Springs VA CA | Incoming CL | 2 | --- | --- | --- |
| 6/01 | 7:35A | 858-386-9647 | Peak | M2MAllow | Chula Vist CA | Poway CA | 1 | --- | --- | --- |
| 6/01 | 7:37A | 858-386-9647 | Peak | M2MAllow | Chula Vist CA | Poway CA | 1 | --- | --- | --- |
| 6/01 | 7:39A | 951-263-1822 | Peak | PlanAllow | Chula Vist CA | Riverside CA | 1 | --- | --- | --- |
| 6/01 | 7:40A | 951-445-6799 | Peak | PlanAllow | Chula Vist CA | Incoming CL | 5 | --- | --- | --- |
| 6/01 | 7:52A | 619-929-1080 | Peak | PlanAllow | Chula Vist CA | San Diego CA | 1 | --- | --- | --- |
| 6/01 | 7:52A | 619-309-8678 | Peak | PlanAllow | Chula Vist CA | San Diego CA | 1 | --- | --- | --- |
| 6/01 | 7:52A | 858-386-9647 | Peak | M2MAllow | Chula Vist CA | Incoming CL | 2 | --- | --- | --- |
| 6/01 | 7:55A | 619-369-9567 | Peak | M2MAllow | Chula Vist CA | Incoming CL | 1 | --- | --- | --- |
| 6/01 | 7:57A | 619-929-1080 | Peak | PlanAllow | Chula Vist CA | San Diego CA | 1 | --- | --- | --- |
| 6/01 | 7:59A | 619-392-1837 | Peak | PlanAllow | Chula Vist CA | Chulavista CA | 1 | --- | --- | --- |
| 6/01 | 8:00A | 619-392-4060 | Peak | PlanAllow | Chula Vist CA | Chulavista CA | 2 | --- | --- | --- |
| 6/01 | 8:02A | 760-207-5493 | Peak | PlanAllow | Chula Vist CA | Vista CA | 1 | --- | --- | --- |
| 6/01 | 8:02A | 619-851-4139 | Peak | M2MAllow | Chula Vist CA | San Diego CA | 8 | --- | --- | --- |
| 6/01 | 8:04A | 619-742-1946 | Peak | M2MAllow,CallWait | Chula Vist CA | Incoming CL | 5 | --- | --- | --- |
| 6/01 | 8:10A | 619-929-1080 | Peak | PlanAllow | Chula Vist CA | San Diego CA | 1 | --- | --- | --- |
| 6/01 | 8:10A | 760-207-5493 | Peak | PlanAllow | Chula Vist CA | Vista CA | 1 | --- | --- | --- |
| 6/01 | 8:10A | 858-472-2352 | Peak | M2MAllow | Chula Vist CA | Rnchobrnoc CA | 1 | --- | --- | --- |
| 6/01 | 8:11A | 619-840-4360 | Peak | PlanAllow | Chula Vist CA | San Diego CA | 1 | --- | --- | --- |
| 6/01 | 8:12A | 619-778-7581 | Peak | M2MAllow | Chula Vist CA | San Diego CA | 1 | --- | --- | --- |
| 6/01 | 8:13A | 858-386-9647 | Peak | M2MAllow | Chula Vist CA | Poway CA | 1 | --- | --- | --- |
| 6/01 | 8:13A | 858-472-2352 | Peak | M2MAllow,CallWait | Chula Vist CA | Incoming CL | 4 | --- | --- | --- |
| 6/01 | 8:17A | 310-795-6828 | Peak | PlanAllow | Chula Vist CA | San Monica CA | 2 | --- | --- | --- |
| 6/01 | 8:20A | 619-710-9607 | Peak | PlanAllow | Chula Vist CA | Chulavista CA | 7 | --- | --- | --- |
| 6/01 | 8:33A | 619-309-8678 | Peak | PlanAllow | Chula Vist CA | Incoming CL | 5 | --- | --- | --- |
| 6/01 | 8:40A | 760-207-5493 | Peak | PlanAllow | Chula Vist CA | Incoming CL | 2 | --- | --- | --- |
| 6/01 | 8:46A | 619-929-1080 | Peak | PlanAllow | Chula Vist CA | San Diego CA | 1 | --- | --- | --- |
| 6/01 | 8:50A | 619-656-5020 | Peak | PlanAllow | Chula Vist CA | Incoming CL | 5 | --- | --- | --- |
| 6/01 | 9:03A | 619-916-7814 | Peak | M2MAllow | Chula Vist CA | Incoming CL | 2 | --- | --- | --- |
| 6/01 | 9:04A | 619-381-0988 | Peak | PlanAllow | Chula Vist CA | San Diego CA | 1 | --- | --- | --- |
| 6/01 | 9:05A | 619-929-1080 | Peak | PlanAllow | Chula Vist CA | Incoming CL | 3 | --- | --- | --- |
| 6/01 | 9:07A | 619-840-4360 | Peak | PlanAllow,CallWait | Chula Vist CA | Incoming CL | 2 | --- | --- | --- |
| 6/01 | 9:20A | 619-431-7089 | Peak | PlanAllow | Chula Vist CA | Incoming CL | 3 | --- | --- | --- |
| 6/01 | 9:29A | 619-840-4360 | Peak | PlanAllow | Chula Vist CA | Incoming CL | 4 | --- | --- | --- |
| 6/01 | 9:34A | 619-597-4220 | Peak | PlanAllow | Chula Vist CA | LA Mesa CA | 2 | --- | --- | --- |
| 6/01 | 9:51A | 619-517-0205 | Peak | M2MAllow | Chula Vist CA | Incoming CL | 6 | --- | --- | --- |
| 6/01 | 9:53A | 619-719-2426 | Peak | PlanAllow,CallWait | Chula Vist CA | Incoming CL | 2 | --- | --- | --- |
| 6/01 | 10:01A | 858-386-9647 | Peak | M2MAllow | Chula Vist CA | Poway CA | 4 | --- | --- | --- |
| 6/01 | 10:46A | 810-650-2987 | Peak | PlanAllow | Chula Vist CA | Port Huron MI | 5 | --- | --- | --- |
| 6/01 | 10:52A | Unavailable | Peak | PlanAllow,CallWait | Chula Vist CA | Incoming CL | 1 | --- | --- | --- |
| 6/01 | 11:03A | 619-691-8008 | Peak | PlanAllow | Chula Vist CA | Incoming CL | 2 | --- | --- | --- |
| 6/01 | 11:35A | 619-669-7700 | Peak | PlanAllow | Chula Vist CA | Incoming CL | 1 | --- | --- | --- |
| 6/01 | 1:27P | 619-732-2783 | Peak | PlanAllow | Chula Vist CA | Incoming CL | 5 | --- | --- | --- |

# EXHIBIT 2

# EXAMINING THE ISSUE OF SUICIDES IN SAN DIEGO JAILS

## SUMMARY

The suicide rate in San Diego County jails is the highest in all of California's large county jail systems. According to the San Diego County Sheriff's Department (Sheriff's Department), 46 people have committed suicide in San Diego County jails in the past 12 years. The 2016/2017 San Diego County Grand Jury (Grand Jury), responding to public concern, investigated why the number of suicides in San Diego County jails is so high.

The Grand Jury noted during its detention facilities inspections that, in an attempt to reduce suicides in the jails, the Sheriff's Department has recently added enhanced observation housing modules, new safety cells, and medical isolation cells. In March 2016, the Sheriff's Departments Detention Services Bureau updated its Policy and Procedures Manual (P&PM) to include procedures for the use of these units. In spite of these efforts, the suicide rate remains high.

The Grand Jury found that the P&PM lacks detailed training procedures required for correctional officers to effectively reduce suicides and believes that training must address the specialized communication skills required to be effective. Further, the P&PM does not clearly show the inclusion of nationally recognized protocols or a clear policy statement for suicide prevention.

The Grand Jury also learned that the Sheriff Department's Chief Medical Officer does not employ an in-house staff supervisor for the contract mental health workers and instead relies on contracted supervision.

Finally, the Grand Jury did not find a process that calls for continuous oversight as part of a suicide-prevention policy. In light of these findings, the Grand Jury recommends an update to the Policy and Procedures Manual, the hiring of a full-time professional mental health staff member to supervise all professional mental health workers, and the establishment of a suicide-prevention oversight group.

## INTRODUCTION

California Penal Code §919b mandates that the Grand Jury annually inquire into the condition and management of all public jails within the county. As part of its inquiry, the Grand Jury paid particular attention to the number and frequency of suicides within the jails and  examined the policies and procedures the Sheriff's Department employs as preventive measures. The Grand Jury's intent was to identify the reasons that San Diego County's jails are experiencing a higher suicide rate than jails in other California counties.

## *PROCEDURE*

The Grand Jury examined a large volume of jail suicide-prevention research, including published policies, procedures, and recommendations, including the following:

- The San Diego County Sheriff's Department Detention Services Bureau Policy and Procedures Manual
- The San Diego County Sheriff's Department Medical Services Divisions Policy and Procedures Manual.

The Grand Jury also interviewed officials from the San Diego Sheriff's Department medical staff and re-entry services and asked many questions of detention officers during visits to all detention facilities.

## *DISCUSSION*

The suicide rate in San Diego County jails is the highest in all of California's large county jail systems. Data from the U.S. Bureau of Justice Statistics show five suicides in San Diego County jails in 2013, six in 2014, seven in 2015, and the San Diego County Sheriff's Department confirmed five in 2016. By contrast, since 2014, San Bernardino County has had three jail suicides; Los Angeles and Santa Clara counties have had one each. Orange and Sacramento counties have had none.

During the last several years, media sources have focused intently on the number of suicides in San Diego jails. All of these news reports have an effect on what the community thinks about the correctional staff's ability to control suicides and keep inmates safe. According to numerous news stories, a 21-year-old Marine in 2014 hanged himself in the Vista Detention Facility despite jail officials' knowledge of numerous previous suicide threats. Other news stories reported that, in 2015, another inmate's family repeatedly cautioned jail officials that their relative was suicidal, yet the inmate did not receive the necessary oversight to prevent him from hanging himself in his cell.

In order to clarify and understand the issue of suicides in the San Diego County jails, the Grand Jury investigated the issue. The Grand Jury's goal in its investigation was to identify and recommend tested, successful methods for preventing jail suicides not fully implemented in our jails.

The Grand Jury acknowledges that the Sheriff's Department is experiencing unprecedented challenges in accommodating and treating inmates with mental health problems. Estimates by recognized experts suggest about 15 percent to 20 percent of jail

2

inmates nationwide may be suffering from serious mental illness.[1] With an average daily population of about 5,000, that means approximately 800 inmates with serious mental illness could be in San Diego County jails at any given time.

Clearly, dealing with mental illness and suicide prevention within the county jails is an ongoing concern. According to the National Institute of Corrections, properly trained correctional staff is essential. Just having adequate mental health, medical, or other professional staff available seldom prevents suicides because suicides typically take place in inmate housing units. Furthermore, suicides commonly occur at night or on weekends, when mental health staff may not be readily available or on-site. Therefore, guards and correctional staff trained in suicide-prevention techniques and who have subsequently developed an intuitive sense about the inmates under their care must be counted on to prevent these incidents.

"The greatest challenge for those who work in the correctional system is to view the issue as one that requires a continuum of comprehensive suicide-prevention services aimed at the collaborative identification, continued assessment, and safe management of inmates at risk for self-harm."[2] The Grand Jury believes this statement indicates that all corrections staff must be focused on suicide prevention at all times.

Recognized experts say that, to be effective, suicide-prevention training must include consistent and thorough communication among all jail staff. They recommend suicide-prevention efforts start at the point of arrest and continue until the inmate is released. During this time, inmates may exhibit certain behaviors that indicate a risk of suicide. If these behaviors are detected and communicated to others, the likelihood of a completed suicide will be reduced. Additionally, corrections staff, with proper training, can prevent suicide by establishing trust and communication with inmates in order to observe their actions and pass along what they hear and see to other corrections staff.

The Grand Jury believes that effective communication must exist in several areas and that this is key in suicide prevention. These areas include the following:
- Communication between people who come in contact with the inmate before booking (arresting officer and transport officers) and the people receiving the inmate (nurses and gatekeepers) at the jail during intake
- Communication between intake personnel and the internal correctional staff, including professional staff (medical and mental health personnel)
- Communication between all staff and the potentially suicidal inmate in order to ensure the safety of all involved

---

[1] "More Mentally Ill Persons Are in Jails and Prisons than Hospitals: A Survey of the States," Treatment Advocacy Center, May 2010, http://www.treatmentadvocacycenter.org/storage/documents/final_jails_v_hospitals_study.pdf (accessed August 2016).

[2] "National Study of Jail Suicide: 20 Years Later," National Institute of Corrections (U.S. Department of Justice), 2010, http://static.nicic.gov/Library/024308.pdf (accessed September 2016).

In addition to saving lives, the County avoids unnecessary human suffering and liability when an effective training program is in place.

In studying the P&PM, the Grand Jury concentrated on the policies and procedures pertaining to suicide-prevention training. The Grand Jury then examined national jail suicide data because it provided more research reports. The increased number of suicide victims studied allowed the demographic data to be more comprehensive.

The findings in the documentation for jail suicides and the training to prevent jail suicides were similar in content. Table 1 summarizes the reports:

| **Published Protocols Related to Jail Suicides** | National Study of Jail Suicides: 20 Years Later[3] | Writing a Suicide Prevention Policy[4] | Prison Suicide: An Overview & Guide to Prevention[5] | Developing & Revising Suicide Prevention Protocols within Jails & Prisons[6] | Preventing Suicide in Jails & Prisons[7] |
|---|---|---|---|---|---|
| Training in suicide prevention | X | X | X | X | X |
| Identification of suicide risk | X | X | X | X | X |
| Communication needed between all staff and inmate | X | X | X | X | X |
| Housing for safety of suicidal inmate | X | X | X | X | X |
| Observation plan | X | X | X | X | X |
| Evaluation by mental health staff | X | X | X | X | |
| Referral by mental health staff | X | X | X | X | |
| Reporting, all staff to submit statements | X | X | X | X | |
| Mortality-morbidity review to look at facts and make recommendations | X | X | X | X | |
| Notification to all appropriate staff | X | X | X | | |
| Critical Incident Stress Debriefing (CISD): talk to involved staff within 72 hours | X | X | | | |
| Treatment plan | X | | | | X |
| Social intervention: do not cut off social contacts | | | | | X |
| Intervention by trained staff with first aid knowledge and assume inmate is alive | | X | X | X | |

Table 1

---

[3] "National Study of Jail Suicide: 20 Years Later," National Institute of Corrections (U.S. Department of Justice), 2010.

[4] Marty Drapkin, "Writing a Suicide Prevention Policy," *CorrectionsOne*, October 20, 2007.

[5] Lindsay M. Hayes, "Prison Suicide," An Overview and Guide to Prevention, National Institute of Corrections, June 1995.

[6] Lindsay M. Hayes, "Guide to Developing and Revising Suicide Prevention Protocols within Jails and Prisons," National Center on Institutions and Alternatives, 2011.

[7] "Preventing Suicide in Jails and Prisons," World Health Organization, Department of Mental Health and Substance Abuse, 2007.

4

In Section A.1, the Sheriff's Department's P&PM states, "The Sheriff's detention facilities shall be operated in accordance with established Department Policy and Procedures, California State Law, applicable case law and acceptable professional standards."[8]

The Grand Jury believes that Table 1 highlights the minimum protocols required for a detention facility's policy and procedures manual. Each report lists the protocols needed for a comprehensive suicide-prevention program. Five of the protocols were used in all five reports, four of the protocols were used in four, and three of the protocols were used in two or fewer of the reports. (Because these three protocols are not unique to suicide prevention, they could have been included in another section of the policy and procedures manual.)

The Grand Jury believes that the San Diego Sheriff's Department P&PM does not include adequate policy regarding suicide prevention, and there is no discussion on protocols to be used or how compliance will be ensured. The Grand Jury believes the suicide-prevention policy should be clearly stated for the P&PM users to know what attitude to have and what actions to take. The policy should state the attitude of management toward suicide prevention, the protocols to be used, and how oversight will be enforced.

The Grand Jury also noted that the assumed triggers for suicide varied. Experts claim that two main causes exist for suicide in jail: First, the jail's environment itself contributes to suicidal tendencies. Second, the inmate is in a crisis situation, a condition that jail staff repeatedly verified during the Grand Jury's visits to detention facilities. Inmates are fearful of the immediate future and the consequences of their crime, they have lost control over their lives, and they are isolated from family and friends. The psychological effect of incarceration, combined with drug and alcohol use and withdrawal, exacerbate mental illness symptoms and can lead to suicide. Incarceration is stressful on every level, and that alone is enough to provoke suicide ideation.[9]

One study showed that 65 percent of suicides occur in the first 30 days of incarceration and 85 percent in the first four months, but it also shows suicide can occur at any time.

The Grand Jury believes increased efforts in suicide prevention are required. The Grand Jury understands that the P&PM contains documentation that outlines procedures that are formulated to direct the staff on the process to carry out a desired objective. However, these standalone procedures are not a suicide-prevention plan. A suicide-prevention plan incorporates training, intervention, communications, and supervision in a dynamic way

---

[8] Policy and Procedure Manual, Detention Services Bureau, San Diego County Sheriff's Department, https://www.sdsheriff.net/documents/pp/dsb-20160310.pdf, (accessed October 2016).
[9] "National Study of Jail Suicid: 20 Years Later," National Institute of Corrections (U.S. Department of Justice), 2010.

that will ensure the correctional officers are focused on seeing the triggers that alert them of a possible suicide.

According to the P&PM, Section D.1, "The Detention Facility Training Program will have policies and procedures to ensure training programs for all employees are specifically planned, coordinated, supervised, and evaluated."[10]

The Grand Jury believes that suicide-prevention training should not be just a scheduled class. Instead, it should be a continuous charge to be mindful of suicide characteristics. Effective suicide-prevention communication should not be just a comment posted to the Jail Information Management System (JIMS). It should also be the mental health nurse talking to the on-duty jail staff about the condition of an inmate. A suicide plan should foster the belief by all workers that "a suicide will not happen on my watch."

The National Institute of Corrections strongly recommends that all correctional, medical, and mental health personnel receive eight hours of initial suicide-prevention training and two hours of refresher training in subsequent years.

"The initial training should include instruction regarding  administrator and staff attitudes about suicide and how negative attitudes impede suicide-prevention efforts, why correctional facilities' environments are conducive to suicidal behavior, potential predisposing factors to suicide, high-risk suicide periods, warning signs and symptoms, how to identify suicidal inmates despite a denial of risk, components of the facility's suicide-prevention policy, and liability issues associated with inmate suicide. The two-hour refresher training should review the topics discussed during the initial training and also describe any changes to the facility's suicide prevention plan. The annual training should also include a general discussion of any recent suicides and/or suicide attempts in the facility."[11]

On several occasions, the San Diego County jail staff stated that they visited the Texas prison system to discover lessons learned in lowering its suicide rates. A *Dallas Morning News* article cited changes made to mental health training for Texas prison system officers: "This year, the criminal justice department beefed up mental health training for officers. New cadets receive more than 33 hours of mental health training, and those already on the job get monthly sessions . . . The training is designed to help officers recognize signs of a mental health crisis."[12]

---

[10] Policy and Procedure Manual, Detention Services Bureau, San Diego County Sheriff's Department, https://www.sdsheriff.net/documents/pp/dsb-20160310.pdf, (accessed October 2016).
[11] "National Study of Jail Suicide: 20 Years Later," National Institute of Corrections (U.S. Department of Justice), 2010, http://static.nicic.gov/Library/024308.pdf (accessed September 2016).
[12] Brandi Grissom, "Suicides and Attempts on the Rise in Texas Prisons," *Dallas Morning News*, August 29, 2016, http://www.dallasnews.com/news/texas/2015/11/28/suicides-and-attempts-on-the-rise-in-texas-prisons (accessed September 2016).

The Grand Jury concurs with the *Dallas Morning News* article and believes annual training of two hours may be inadequate. (However, after the correctional staff has been trained in constant awareness of the signs of potential suicide risk and regular, periodic on-the-job training is in place, then two hours of formal training per year may be adequate.) In order to keep suicide-prevention skills fresh, the training must be timely. In fact, the Grand Jury believes the training could include a brief reminder every week by the watch captain about suicide-prevention skills.

The Grand Jury reviewed a Sheriff's Department training document containing a detailed list of factors indicating a risk for inmate suicide, along with possible characteristics of a suicidal inmate. The list was good, but the document did not state how often the training might take place.

There are at least three different stages where at-risk suicidal inmates can be identified: at the time of arrest and intake, at the time the inmate is housed in a secure cell, and at the time the inmate is in mainline housing. The requirements for safety cell use in the P&PM, Section J, clearly state that the safety cell is temporary housing, typically lasting for only a few hours. This is a clear suggestion that inmates should remain in suicide counseling and observation as they are moved to more appropriate housing. The Grand Jury recognizes that these three different stages call for three training scenarios that require different training for each one, but it would support a consistent suicide-prevention plan.

In San Diego County jails under the jurisdiction of the San Diego County Sheriff's Department, those working in suicide prevention include private contract personnel and jail staff. The Grand Jury believes it is important that they are working from the same plan; therefore, it is important they receive the same training. The training period is when all suicide-prevention workers will learn about the jail staff's attitude about enforcement of the suicide policy.

The Grand Jury found that most County health departments use private contract personnel as their mental health workers. In the jails, psychiatrists are contract workers, including the supervisor, who reports to the Chief Medical Officer. The jail has responsibility for all services for all inmates with mental health problems (including drug and alcohol abuse), suicide prevention, and inmates in the re-entry facility. The Grand Jury believes coordinating these functions should be the responsibility of a full-time employee, specifically, a mental health professional.

The P&PM in Section M.7 states that after an inmate death in the detention facility, "A meeting shall be held after all autopsy and other pertinent reports have been received to discuss findings with the Detention Services Bureau and facility command staff, Sheriff's legal counsel, and medical services administration. As appropriate, the detention facility

supervising nurse, psychiatric director, and other staff who are relevant to the incident, as deemed appropriate by the medical services administrator, shall also be included."[13]

Section M.7 does not appear to provide for any input regarding the policies and procedures or training group, nor does it provide for any real-time monitoring or updating of the suicide plan, which the Grand Jury believes is a necessary component of suicide-prevention efforts.

The Grand Jury noted that the Sheriff's Department instituted new protocols in early 2015 to reduce suicides in the jails. These new protocols affected various procedures and resulted in changes to the facilities. The Grand Jury does not believe these changes were an indication of operational problems in the jails; on the contrary, a new emphasis was instituted. In the same manner, the Grand Jury's recommendations merely suggest a change in emphasis is needed.

The 2015 changes did coincide with a seven-month period with no suicides. Yet, after that seven-month period, suicides returned to previous levels. The Grand Jury believes that the new protocols showed that management placed an increased importance on suicide prevention, which could have motivated the jail staff to increase attention to suicide prevention. But because there was no sustained effort to maintain that motivation, the number of suicides returned to previous levels.

As the Grand Jury conducted research to find an approach for suicide prevention that was not in use at the jails, a scheduled inspection by the Grand Jury took place at one of the San Diego jails. Near the end of the inspection, a correctional officer was asked if a suicide had occurred in that facility. The answer was no, then a pause, and then "No, there have been no suicides in this facility. You are not allowed to die in this facility." This was the only time the Grand Jury heard a correctional officer with the attitude that suicides are not acceptable in jail. As a result, the Grand Jury looked for a way to instill in the minds of all correctional staff the attitude that suicides are unacceptable. During this process, the Grand Jury concluded that procedures alone would not change attitudes, but policy could, and continuing training on multiple levels is necessary to change attitudes.

The Grand Jury offers three simple recommendations:

- Senior management needs to adopt a clear policy stating the attitude and protocols needed to minimize suicides in the jails.
- The training needs to include ongoing instruction for all staff and mental health personnel working with at-risk inmates.
- Supervisors need to oversee the training to ensure compliance with the policy.

---

[13] Policy and Procedure Manual, Detention Services Bureau, San Diego County Sheriff's Department, https://www.sdsheriff.net/documents/pp/dsb-20160310.pdf, (accessed October 2016).

8

The Grand Jury believes these recommendations can be implemented quickly at low cost and will reduce suicides.

## *FACTS AND FINDINGS*

*Fact:* The Sheriff's Department P&PM, Section A.1, Purpose, states that operation of detention facilities shall comply with its own policy and procedures, state law, case law, and professional standards.

*Fact:* The Sheriff's Department P&PM states that inmates who are recognized and observed as being a potential suicide risk shall be assessed for consideration of placement into an Inmate Safety Program housing option. Sworn staff shall immediately notify medical staff and the watch commander of any inmate that presents a potential danger to self, danger to others, or unable to care for self.

**Finding 01:** The Policy and Procedures Manual does not contain a comprehensive overall suicide-prevention plan with a policy statement listing the protocols (professional standards) to be used, nor does it clearly state that suicide-prevention principles must be in effect at all times.

*Fact:* The Sheriff's Department P&PM requires training programs for all employees.

*Fact***:** The Sheriff's Department P&PM states that training is defined as an organized, planned, and evaluated activity designed to achieve specific learning objectives through classroom studies and closely supervised on-the-job training.

*Fact***:** The Sheriff's Department P&PM states that staff development is defined as an organized, planned, and evaluated activity designed to further increase the staff members' level of competence, which enables them to function more effectively.

**Finding 02:** The P&PM shows provisions for various training and development but does not show adequate and sustained training programs to ensure a continuum of comprehensive suicide-prevention services.

*Fact:* The Sheriff's Chief Medical Officer does not have a full-time Mental Health Officer on staff.

**Finding 03:** There is a need great enough for mental health services supervision in the Detention Services Bureau that a full-time Mental Health Officer for the jails should be a requirement.

*Fact:* The P&PM requires a post-suicide meeting of all appropriate staff to discuss findings.

9

*Fact:* In the P&PM, none of the procedures pertain to the oversight of the suicide-prevention plan.

**Finding 04:** A continuous oversight of the suicide-prevention plan is needed in order to ensure that the suicide-prevention plan, the P&PM, and the facilities' physical features are kept current with suicide methods used by the inmates.

## *RECOMMENDATIONS*

**The 2016/2017 San Diego County Grand Jury recommends the San Diego County Sheriff's Department:**

**17-24:** **Update the Policy and Procedures Manual to include a detailed suicide-prevention policy noting the nationally recognized protocols used in the jails for suicide prevention.**

**17-25:** **Update the Policy and Procedure Manual to include appropriate and ongoing training for all staff and mental health personnel who observe or counsel suicide-risk inmates.**

**17-26:** **Create and fill the position of a full-time Mental Health Director for the County jails.**

**17-27:** **Create a suicide-prevention oversight group that recommends changes to the P&PM, verifies that suicide-prevention training is taking place, and implements any changes needed to keep the facilities as suicide-proof as possible.**

## *REQUIREMENTS AND INSTRUCTIONS*

The California Penal Code §933(c) requires any public agency which the Grand Jury has reviewed, and about which it has issued a final report, to comment to the Presiding Judge of the Superior Court on the findings and recommendations pertaining to matters under the control of the agency. Such comment shall be made *no later than 90 days* after the Grand Jury publishes its report (filed with the Clerk of the Court); except that in the case of a report containing findings and recommendations pertaining to a department or agency headed by an <u>elected</u> County official (e.g. District Attorney, Sheriff, etc.), such comment shall be made *within 60 days* to the Presiding Judge with an information copy sent to the Board of Supervisors.

Furthermore, California Penal Code §933.05(a), (b), (c), details, as follows, the manner in which such comment(s) are to be made:
>    (a) As to each grand jury finding, the responding person or entity shall indicate one of the following:
>>        (1) The respondent agrees with the finding

10

(2) The respondent disagrees wholly or partially with the finding, in which case the response shall specify the portion of the finding that is disputed and shall include an explanation of the reasons therefor.

(b) As to each grand jury recommendation, the responding person or entity shall report one of the following actions:

(1) The recommendation has been implemented, with a summary regarding the implemented action.

(2) The recommendation has not yet been implemented, but will be implemented in the future, with a time frame for implementation.

(3) The recommendation requires further analysis, with an explanation and the scope and parameters of an analysis or study, and a time frame for the matter to be prepared for discussion by the officer or head of the agency or department being investigated or reviewed, including the governing body of the public agency when applicable. This time frame shall not exceed six months from the date of publication of the grand jury report.

(4) The recommendation will not be implemented because it is not warranted or is not reasonable, with an explanation therefor.

(c) If a finding or recommendation of the grand jury addresses budgetary or personnel matters of a county agency or department headed by an elected officer, both the agency or department head and the Board of Supervisors shall respond if requested by the grand jury, but the response of the Board of Supervisors shall address only those budgetary or personnel matters over which it has some decision making authority. The response of the elected agency or department head shall address all aspects of the findings or recommendations affecting his or her agency or department.

Comments to the Presiding Judge of the Superior Court in compliance with the Penal Code §933.05 are required from the:

| Responding Agency | Recommendations | Date |
|---|---|---|
| San Diego County Sheriff's Department | 17-24 through 17-27 | 07/03/17 |

**SAN DIEGO COUNTY GRAND JURY 2016/2017 (filed May 4, 2017)**

# EXHIBIT 3

Christopher S. Morris, Esq., SBN 163188
cmorris@morrislawfirmapc.com
Danielle R. Pena, Esq., SBN 286002
dpena@morrislawfirmapc.com
Chanell A. Kachi, Esq., SBN 279761
ckachi@morrislawfirmapc.com
MORRIS LAW FIRM, APC
501 West Broadway, Suite 1480
San Diego, CA 92101
Telephone:  (619) 826-8060
Facsimile:  (619) 826-8065

Attorneys for Michelle Moriarty, as
Successor in Interest and *Guardian Ad Litem*
to Alexandria, Elijah and Eternity Moriarty

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MICHELLE MORIARTY, an individual, as Successor in Interest to the ESTATE OF HERON MORIARTY and as GUARDIAN AD LITEM to ALEXANDRIA MORIARTY, ELIJAH MORIARTY, and ETERNITY MORIARTY, <br><br> Plaintiffs, <br><br> v. <br><br> COUNTY OF SAN DIEGO, DR. ALFRED JOSHUA, individually, and DOES 1 through 10, Inclusive, <br><br> Defendants. | Case No.: <br><br> DECLARATION OF MICHELLE MORIARTY PURSUANT TO CALIFORNIA CODE OF CIVIL PROCEDURE SECTION 377.32 |

DECLARATION OF MICHELLE MORIARTY

55

I, Michelle Moriarty, submit this declaration pursuant to California Code of Civil Procedure section 377.32 as decedent's successor in interest and hereby declare as follows:

1. MICHELLE MORIARTY is the decedent, HERON MORIARTY'S, wife.  HERON MORIARTY was found dead at Vista Detention Facility on May 31, 2016.

2. No proceeding is now pending in California for administration of HERON MORIARTY'S ESTATE.

3. MICHELLE MORIARTY is HERON MORIARTY'S Successor in Interest and succeed his interest in this action pursuant to California Code of Civil Procedure sections 377.01, 377.11, and California Probate Code section 6402.

4. HERON MORIARTY was survived by three minor children, Alexandria, Elijah, and Eternity MORIARTY.

5. No other person has a superior right to commence the above-entitled proceeding or to be a substituted for successor in interest in the above-entitled proceeding.

6. Attached as Exhibit 1 is a true and correct copy of the death certificate for HERON MORIARTY.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Date: _____                    _____
                                          Michelle Moriarty

declare as follows:

1. MICHELLE MORIARTY is the decedent, HERON MORIARTY'S, wife. HERON MORIARTY was found dead at Vista Detention Facility on May 31, 2016.

2. No proceeding is now pending in California for administration of HERON MORIARTY'S ESTATE.

3. MICHELLE MORIARTY is HERON MORIARTY'S Successor in Interest and succeed his interest in this action pursuant to California Code of Civil Procedure sections 377.01, 377.11, and California Probate Code section 6402.

4. HERON MORIARTY was survived by three minor children, Alexandria, Elijah, and Eternity MORIARTY.

5. No other person has a superior right to commence the above-entitled proceeding or to be a substituted for successor in interest in the above-entitled proceeding.

6. Attached as Exhibit 1 is a true and correct copy of the death certificate for HERON MORIARTY.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Date: June 7, 17

Michelle Moriarty

2

DECLARATION OF MICHELLE MORIARTY

# EXHIBIT 1
# to Moriarty Declaration

# STATE OF CALIFORNIA
## CERTIFICATION OF VITAL RECORD

# COUNTY OF SAN DIEGO
## CERTIFICATE OF DEATH

3052016111703

3291637009451

**1 of 2**

**DECEDENT'S PERSONAL DATA**

- NAME: **HERON** (first) / **DITTENHAVER** (middle) / **MORIARTY** (last)
- DATE OF BIRTH: **10/01/1972** — AGE: **43** — SEX: **M**
- BIRTH STATE: **CA**
- MARITAL STATUS: **MARRIED**
- DATE OF DEATH: **05/31/2016** — HOUR: **2144**
- EDUCATION: **SOME COLLEGE**
- RACE: **CAUCASIAN**
- USUAL OCCUPATION: **BUSINESS OWNER** — KIND OF BUSINESS: **ELECTRICIAN** — YEARS IN OCCUPATION: **23**

**USUAL RESIDENCE**

- RESIDENCE: **2925 PIONEER WAY**
- CITY: **JAMUL** — COUNTY: **SAN DIEGO** — ZIP: **91935** — YEARS IN COUNTY: **43** — STATE: **CA**
- INFORMANT: **MICHELLE MORIARTY, WIFE** — **2925 PIONEER WAY, JAMUL, CA 91935**

**SPOUSE AND PARENT INFORMATION**

- NAME OF SURVIVING SPOUSE: **MICHELLE** (first) / **LYNN** (middle) / **GONZALES** (last)
- FATHER/PARENT: **JAMES** / **JOSEPH** / **MORIARTY** — BIRTH STATE: **MI**
- MOTHER/PARENT: **GLENDA** / **ESTHER** / **DITTENHAUER** — BIRTH STATE: **CA**

**FUNERAL DIRECTOR / LOCAL REGISTRAR**

- DISPOSITION DATE: **06/06/2016**
- PLACE OF FINAL DISPOSITION: **RESIDENCE: MICHELLE MORIARTY 2925 PIONEER WAY, JAMUL, CA 91935**
- TYPE OF DISPOSITION: **CR/RES** / **NOT EMBALMED**
- NAME OF FUNERAL ESTABLISHMENT: **EAST COUNTY MORTUARY & CREMATION SERVICE** — **FD2125**
- SIGNATURE OF LOCAL REGISTRAR: **WILMA J WOOTEN, MD MPH** — DATE: **06/06/2016**

**PLACE OF DEATH**

- PLACE OF DEATH: **JAIL**
- COUNTY: **SAN DIEGO**
- FACILITY ADDRESS: **325 S. MELROSE DRIVE SUITE 200**
- CITY: **VISTA**

**CAUSE OF DEATH**

- IMMEDIATE CAUSE: (A) **ASPHYXIA** — **16-0103**
- (B) **AIRWAY OBSTRUCTION AND NECK COMPRESSION**
- OTHER SIGNIFICANT CONDITIONS: **NONE**
- WAS AN AUTOPSY PERFORMED: **NO**

**PHYSICIAN'S CERTIFICATION**

- INJURY AT WORK: **05/31/2016**
- HOUR: **UNK**

**CORONER'S USE ONLY**

- PLACE OF INJURY: **VISTA DETENTION CENTER**
- DESCRIBE HOW INJURY OCCURRED: **PLACED SHIRT IN MOUTH AND ANOTHER SHIRT AROUND NECK**
- LOCATION OF INJURY: **325 S. MELROSE DRIVE, SUITE 200, VISTA, CA 92081**
- SIGNATURE OF CORONER/DEPUTY CORONER: **OTHON J MENA MD** — DATE: **06/03/2016** — TYPE NAME/TITLE: **OTHON J MENA MD DME**

**STATE REGISTRAR**

A003026518

County of San Diego –Health & Human Services Agency – 3851 Rosecrans Street. This is to certify that, if bearing the OFFICIAL SEAL of the STATE OF CALIFORNIA, the OFFICIAL SEAL OF SAN DIEGO COUNTY AND THEIR DEPARTMENT OF HEALTH SERVICES EMBOSSED SEAL, this is a true copy of the ORIGINAL DOCUMENT FILED. This copy not valid unless prepared on engraved border displaying seal and signature of Registrar

*Wilma J. Wooten, M.D.*

DATE ISSUED: June 8, 2016

WILMA J. WOOTEN, M.D., M.P.H.
REGISTRAR OF VITAL RECORDS
County of San Diego

**ANY ALTERATION OR ERASURE VOIDS THIS CERTIFICATE**

CASANDIEDL

# STATE OF CALIFORNIA
## CERTIFICATION OF VITAL RECORD

# COUNTY OF SAN DIEGO

**AFFIDAVIT TO AMEND A RECORD**
NO ERASURES, WHITEOUTS, PHOTOCOPIES, OR ALTERATIONS

3052016111703
STATE FILE NUMBER

3201637009451
LOCAL REGISTRATION NUMBER

1.1

☐ BIRTH   ☒ DEATH   ☐ FETAL DEATH

2 of 2

TYPE OR PRINT CLEARLY IN BLACK INK ONLY – THIS AMENDMENT BECOMES AN ACTUAL PART OF THE OFFICIAL RECORD

## PART I   INFORMATION TO LOCATE RECORD

INFORMATION AS IT APPEARS ON ORIGINAL RECORD

| 1A. NAME—FIRST | 1B. MIDDLE | 1C. LAST |
|---|---|---|
| HERON | DITTENHAVER | MORIARTY |

| 2. SEX | 3. DATE OF EVENT—MM/DD/CCYY | 4. CITY OF EVENT | 5. COUNTY OF EVENT |
|---|---|---|---|
| M | 05/31/2016 | VISTA | SAN DIEGO |

| 6. FULL NAME OF FATHER/PARENT AS STATED ON ORIGINAL RECORD | 7. FULL NAME OF MOTHER/PARENT AS STATED ON ORIGINAL RECORD |
|---|---|
| JAMES JOSEPH MORIARTY | GLENDA ESTHER DITTENHAUER |

## PART II   STATEMENT OF CORRECTIONS TO BIRTH, DEATH, OR FETAL DEATH RECORD

LIST ONE ITEM PER LINE

| 8. ITEM NUMBER TO BE CORRECTED | 9. INCORRECT INFORMATION THAT APPEARS ON ORIGINAL RECORD | 10. CORRECTED INFORMATION AS IT SHOULD APPEAR |
|---|---|---|
| 37 | DITTENHAUER | DITTENHAVER |

REASON FOR CORRECTION

11. NEED TO CORRECT SPELLING

AFFIDAVITS AND SIGNATURES

We, the undersigned, hereby certify under penalty of perjury that we have personal knowledge of the above facts and that the information given above is true and correct.

ONLY PERSONS MUST SIGN THIS FORM TO CORRECT A BIRTH, DEATH, OR FETAL DEATH RECORD

| 12A. SIGNATURE OF FIRST PERSON | 12B. PRINTED NAME | 12C. TITLE/RELATIONSHIP TO PERSON IN PART I |
|---|---|---|
| ► RITA SHAYA | RITA SHAYA | OFFICE MANAGER |

| 12D. ADDRESS: STREET and NUMBER, CITY, STATE, ZIP | | 12E. DATE SIGNED—MM/DD/CCYY |
|---|---|---|
| 374 N. MAGNOLIA AVE., EL CAJON, CA 92020 | | 06/06/2016 |

| 13A. SIGNATURE OF SECOND PERSON | 13B. PRINTED NAME | 13C. TITLE/RELATIONSHIP TO PERSON IN PART I |
|---|---|---|
| ► ROBERT ZAKAR | ROBERT ZAKAR | FUNERAL DIRECTOR |

| 13D. ADDRESS: STREET and NUMBER, CITY, STATE, ZIP | | 13E. DATE SIGNED—MM/DD/CCYY |
|---|---|---|
| 374 N. MAGNOLIA AVE., EL CAJON, CA 92020 | | 06/06/2016 |

STATE/LOCAL REGISTRAR USE ONLY

| 14. OFFICES OF VITAL RECORDS OR LOCAL REGISTRAR | | 15. DATE ACCEPTED FOR REGISTRATION |
|---|---|---|
| ► STATE REGISTRAR - OFFICE OF VITAL RECORDS | | 06/07/2016 |

STATE OF CALIFORNIA, DEPARTMENT OF PUBLIC HEALTH, OFFICE OF VITAL RECORDS

FORM VS 24e (REV. 1/08)
1.1

020101202304075

County of San Diego –Health & Human Services Agency – 3851 Rosecrans Street. This is to certify that, if bearing the OFFICIAL SEAL OF THE STATE OF CALIFORNIA. the OFFICIAL SEAL OF SAN DIEGO COUNTY AND THEIR DEPARTMENT OF HEALTH SERVICES EMBOSSED SEAL, this is a true copy of the ORIGINAL DOCUMENT FILED. This copy not valid unless prepared on engraved border displaying seal and signature of Registrar

*Wilma J. Wooten, M.D.*

DATE ISSUED: June 8, 2016

WILMA J. WOOTEN, M.D., M.P.H.
REGISTRAR OF VITAL RECORDS
County of San Diego

A003026519

**ANY ALTERATION OR ERASURE VOIDS THIS CERTIFICATE**

# EXHIBIT 4

Newsletter Signup      Submit Your Event      Find A Paper      Advertise   Contact Us      Custom Search



NEWS & OPINION      CULTURE      MUSIC      FOOD & DRINK      EVENTS      NEIGHBORHOODS

GALLERY      SPECIAL ISSUES      FREE STUFF      ARCHIVE

May 8, 2013 12:00 AM                                        RSS

# Too many dead inmates in San Diego jails

The first thing the Sheriff's Department must do is admit it has a problem

by CityBeat Staff


Print





If you read "60 Dead Inmates," our five-part investigative series, reported and written by Kelly Davis and Dave Maass, examining the fatalities that occurred in San Diego County jails from 2007 to 2012, you were no doubt left with the impression that the attitude of the San Diego Sheriff's Department, which oversees the jail system, is basically this: So what?

Is 60 dead inmates in six years a lot? If you look at the number the way the U.S. Bureau of Justice Statistics (BJS) does, which is the same way major health organizations like the Centers for Disease Control do, it is. Those agencies use the mortality rate, which is the number of deaths divided by a jail or prison system's average daily population—the average number of prisoners in the facility on any given day in a year. It's the standard formula because it allows for comparisons in facilities across the country.

Of the 10 largest jail systems in California, San Diego County had the highest average mortality rate from 2007 to 2012: 202 deaths per 100,000 inmates.

http://sdcitybeat.com/news-and-opinion/many-dead-inmates-san-diego-jails/

Case 3:17-cv-01154-LAB-AGS   Document 1   Filed 06/09/17   PageID.64   Page 64 of 181

The local Sheriff's Department doesn't use the mortality rate; it uses the "at-risk" rate, which is the number of deaths divided by the total number of bookings in a year. But the BJS doesn't use bookings-related data because high turnover in jails skews the data. Lindsey Hayes, project director at the National Center on Institutions & Alternatives, told us that the BJS "has been using the calculation of average daily population for 20 or 30 years or more, and no one complains about it unless they have a higher rate than the national average."

Since the Sheriff's Department doesn't use the standard formula, it apparently doesn't need to acknowledge that there's a problem, and the conversation ends.

But there is a problem. Using the mortality rate, if there were 17 fewer deaths between 2007 and 2012, San Diego County would've landed in the middle of the state's 10 largest jail systems. Our examination of the circumstances surrounding all 60 deaths showed that at least 19 of them were preventable. Some of the them, like the case of 35-year-old Tommy Tucker, featured in Part 2 of our series, involved excessive use of force. Others involved overdoses of drugs inmates shouldn't have had in their possession.

And many cases involved an egregious lack of monitoring of at-risk inmates' condition, even when other inmates alerted guards to cellmates

in crisis. Indeed, failure to properly monitor inmates who were going through withdrawal from drugs, like 21- year-old Daniel Sisson, who was profiled in Part 3, or suicidal, like 39-year-old Shane Hipfel, who was featured in Part 4, was a thread that ran throughout our investigation—simple regular cell checks would've prevented some of these deaths.

The Sheriff's Department could have responded by saying our findings raised important questions, promising to look into the details and reexamine its policies if necessary. It didn't. It simply said that it takes all inmates deaths seriously and regularly ensures that its policies are being followed, stopping short of even acknowledging that the number of deaths is high.

Further underscoring the need for scrutiny is the fact that five inmates have died in county jails so far this year—two from drug overdoses and three by suicide.

We wish we could say that we have confidence in the entities that should be providing oversight—the county Grand Jury, the District Attorney's office, the county Board of Supervisors and, particularly, the Citizens Law Enforcement Review Board (CLERB). We don't.

The Sheriff's Department must initiate a review of recent deaths, ideally bringing in a consultant

http://sdcitybeat.com/news-and-opinion/many-dead-inmates-san-diego-jails/

from outside the department to lead it. If Sheriff Bill Gore is unwilling to do so, the Board of Supervisors and CLERB must compel him to act. The department must also start treating the families of dead inmates with respect. A troubling pattern that we noticed in our reporting was how impossible it's been for families to get basic factual information; they sometimes have to sue the county to learn what happened, unnecessarily costing taxpayers money.

We recognize the difficulties in managing thousands of inmates, many of whom are mentally ill and/or drug-addicted. People who land in jail typically haven't been great at taking care of themselves.

But we'll leave you with a quote from Marc Stern, an expert in healthcare in correctional facilities and one of the folks we spoke to amid our research: "Dostoyevsky said one can judge a society by the way it treats its prisoners; the sentence is being in prison, not dying from poor healthcare."

What do you think? Write to editor@sdcitybeat.com.

OPINION   EDITORIAL   INMATE DEATHS   60 DEAD INMATES
SAN DIEGO SHERIFF'S DEPARTMENT   JAIL

by CityBeat Staff
May 8, 2013 12:00 AM

# RELATED





**Kaepernick: Free speech swings both ways**

**The point behind Melania plagiarizing Michelle**





**An open letter to Lester Holt**

**Money, endorsements and media bias**

## Comments

Type subject here...

Case 3:17-cv-01154-LAB-AGS   Document 1   Filed 06/09/17   PageID.68   Page 68 of 181

Home  News & Opinion  Culture  Music  Food & Drink  Events  Neighborhoods  Gallery
Special Issues  Free Stuff  Archive

About Us    Contact Us    Advertise    Privacy Policy    Find a Paper

© San Diego City Beat 2016. All Rights Reserved

Built with Metro Publisher™

http://sdcitybeat.com/news-and-opinion/many-dead-inmates-san-diego-jails/

# EXHIBIT 5

Newsletter Signup     Submit Your Event     Find A Paper     Advertise     Contact Us

Custom Search



NEWS & OPINION     CULTURE     MUSIC     FOOD & DRINK     EVENTS     NEIGHBORHOODS

GALLERY     SPECIAL ISSUES     FREE STUFF     ARCHIVE

June 12, 2014 12:00 AM                              RSS

# Law enforcement review board finds deputy error in inmate suicide

It's the second recent instance where procedural violation may have played a role

by Kelly Davis

http://sdcitybeat.com/last-blog-earth-news/law-enforcement-review-board-finds-deputy-error-inmate-...





In the last nine months, the Citizens Law Enforcement Review Board (CLERB), the independent oversight body charged with investigating deaths-in-custody and allegations of law-enforcement misconduct, has twice found that San Diego County sheriff's deputies violated policy and procedure in instances of inmate suicides. ---

The most recent involves Jose Sierra, a 27-year-old Mexican citizen who'd been arrested for being under the influence of a controlled substance and was awaiting trial. On April 17, 2013, Sierra was found hanging in his cell in the county's Central Jail. A summary of the incident in CLERB's June agenda suggests that Sierra had hung himself with the help of an "unauthorized laundry line" that deputies noticed in his cell, but didn't order him to remove. Its removal, the summary says, "may have prevented Sierra from carrying out the suicide." Here's the full summary:

> During a security, check Deputies 1 and 2 discovered Sierra hanging from a bed-sheet in his single occupancy locked cell; he was transported to UCSD Medical Center where he was later pronounced dead. During the previous security check, Deputies 1 and 2

> observed and unauthorized laundry line affixed to the
> top bunk in Sierra's cell, and failed to take corrective
> action per Sheriff's Polices & Procedures. Deputies 1 &
> 2 failed to remove the unauthorized laundry line or
> confront Sierra to direct its removal, actions which
> may have prevented Sierra from carrying out the
> suicide at that time. The Medical Examiner
> determined the cause of death was due to hanging,
> and the manner of death as suicide.

Inmates usually commit suicide by tying a bed sheet (torn into strips) or a piece of clothing around a bunk post or door handle and then lean forward to strangle themselves. It's not clear how Sierra used the laundry line in conjunction with the bed sheet, or whether the laundry line was made from a torn bed sheet. The medical examiner's report is light on details, saying only that deputies "observed him hanging by the neck" and that the detective assigned to the case "did not know where or how the sheet was tied."

In October, CLERB found that a deputy violated policy and procedure by logging a security check on a mentally ill inmate, Anna Wade, that didn't actually happen. Checks are supposed to happen hourly, but two hours passed between when Wade was last seen alive and when she was found hanging in her cell on April 28, 2013. CLERB ultimately found that "there was insufficient evidence to determine if a mandated security check… could have precluded this suicide in any way." *CityBeat* reported on Wade's death in October.

CLERB's not yet reviewed the case of Dervin Bowman, who was found hanging in his Central Jail cell on Nov. 17, 2013. A medical examiner's reported noted that Bowman, who was able-bodied, had been placed in a cell for disabled inmates that contained a movable chair. The report suggests that, if not for the chair, Bowman wouldn't have been able to tie the end of a torn bed sheet to an overhead fire sprinkler. Bowman's case wasn't

turned over to CLERB for review until two months ago,
when *CityBeat* asked about it.

*Write to* *kellyd@sdcitybeat.com*.

**LAST BLOG ON EARTH | NEWS**   **60 DEAD INMATES**   **CLERB**

**by Kelly Davis**
June 12, 2014 12:00 AM

# Comments

Type subject here...

Home   News & Opinion   Culture   Music   Food & Drink   Events   Neighborhoods   Gallery
Special Issues   Free Stuff   Archive

About Us   Contact Us   Advertise   Privacy Policy   Find a Paper

© San Diego City Beat 2016. All Rights Reserved

Built with Metro Publisher™

http://sdcitybeat.com/last-blog-earth-news/law-enforcement-review-board-finds-deputy-error-inmate-...

# EXHIBIT 6

Newsletter Signup    Submit Your Event    Find A Paper    Advertise    Contact Us

Custom Search



San Diego
**CityBeat**

NEWS & OPINION      CULTURE      MUSIC      FOOD & DRINK      EVENTS      NEIGHBORHOODS

GALLERY      SPECIAL ISSUES      FREE STUFF      ARCHIVE

October 16, 2013 12:00 AM                              RSS

# 10 more dead inmates

People are still losing and taking their
lives in San Diego County jails

by Kelly Davis


Print



http://sdcitybeat.com/news-and-opinion/news/10-dead-inmates/

Case 3:17-cv-01154-LAB-AGS   Document 1   Filed 06/09/17   PageID.76   Page 76 of 181



When Robert Lubsen was booked into the Vista Detention Facility on the afternoon of Feb. 6, 2013, he was first placed in a lower-level cell but later moved to a cell on the jail's second floor. The next morning, after cell doors opened to allow inmates access to a common area, Lubsen climbed onto a walkway railing, leaned over and fell, headfirst, 9 feet to the concrete floor below. He was taken to Palomar Medical Center, where, on Feb. 12, his family decided to take him off life support.

Lubsen, who was 26, was the first inmate to die in San Diego County jails in 2013 and one of four suicides so far this year.

At booking, jail staff documented what looked like ligature marks on Lubsen's neck and, on the morning of his death, his cellmate reportedly tried to warn staff that the young man planned to harm himself but was deemed not credible. While the medical examiner's report says that Lubsen, during the intake process, didn't express an intent to kill himself—inmates are asked to answer "yes" or "no" to "Are you feeling suicidal?"—the jail system's own written policy says that after intake, "[a]ll reports of suicidal behavior shall be considered serious."

Lubsen's family filed a claim with the county on July 26, the first step in a lawsuit. The claim alleges that

Case 3:17-cv-01154-LAB-AGS   Document 1   Filed 06/09/17   PageID.77   Page 77 of 181

the Sheriff 's Department knew Lubsen was at risk of harming himself but did nothing about it.

His father, Paul, says his son had struggled with drug addiction for seven years. In 2012, it looked like he'd pulled his life together—he had a girlfriend, a job with a shoring and drilling company and his own apartment. But toward the end of the year, when work dried up, he fell back into addiction. He was arrested for burglary on Feb. 6.

"I always believed that when Rob was using, that the best thing for him was to be in jail and that he'd be safe there," his dad says. "I was wrong. I don't believe the Sheriff's Department took any steps to protect him."

In March, *CityBeat* reported that from 2007 to 2012, San Diego County had the highest average mortality rate among California's 10 largest county jail systems and the second-highest suicide rate—in all, 60 people died during that period. This followed a Bureau of Justice Statistics finding that from 2000 through 2007, San Diego had the second highest death rate of California's large jail systems.

As of Oct. 14, 10 people have died in jail custody this year, matching the 10-deaths-per-year average that pushed the county to the top of the list for 2007 through 2012. Of the six years *CityBeat* examined, the highest annual number of suicides was five, in 2011, and the six-year average was just under three per year.

Case 3:17-cv-01154-LAB-AGS   Document 1   Filed 06/09/17   PageID.78   Page 78 of 181

"You don't have to average two or three suicides a year in your jail system," says Lindsay Hayes, a national expert on in-custody suicide prevention.

In addition to the four suicides this year, there were two drug-overdose deaths and two natural deaths, one of which was Alba Cornelio, who in February was found guilty of manslaughter after her two pit bulls attacked and killed her neighbor. Cornelio, who was battling leukemia, collapsed after the verdict and was taken to the hospital, where she died a month later. Though she wasn't incarcerated at the time of her death, because she was in Sheriff's custody—shackled to her bed—both the state Attorney General's office and the federal Department of Justice, which track jail deaths, consider Cornelio to have died in custody.

The remaining two deaths are still being investigated by the Medical Examiner's office. One of those is David Inge, whose daughter, Nichole Johnson, says a homicide detective told her that her father had complained about feeling ill when he was booked into the Vista Detention Facility on Aug. 9.

"But I guess they hear that a lot, because they didn't take it too seriously," she says.

Late on Aug. 9, Inge was found unresponsive in his cell. Johnson hopes her father's autopsy report will offer more information.

Of the 20 suicides in San Diego County jails since 2007, only two have been women, both of them

diagnosed with mental illness. Qiongxian Wang Wu
fashioned a noose out of a pair of socks and hanged
herself on Feb. 27, 2011, and 64-year-old Anna Wade
used a bed sheet to hang herself from her bunk on
April 28 of this year. Both were at Las Colinas
Women's Correctional Facility.

Wade, who was schizophrenic, had been in custody for
more than two years after being charged with stalking
for sending threatening letters to a former attorney
and a police officer who'd arrested her. The letters,
which are included in Wade's court file, are largely
nonsensical. Written in English, Spanish, Arabic and
gibberish, they're filled with anti-Semitic language
and references to the Old Testament and the occult.
But they were enough to prompt her former attorney
to move his family into a hotel.

In May 2012, after being declared incompetent to
stand trial, Wade was sent to Patton State Hospital for
three months. According to her court file, she'd done
at least three stints there since 2004. Back at Las
Colinas, she was put in administrative segregation
and "green-banded," meaning she wore a fluorescent-
green wristband to indicate she was prone to
aggressive behavior.

Cmdr. John Ingrassia, jail supervisor for the Sheriff's
Department, says Wade was being seen "at least
twice a month" by a psychiatrist; her next scheduled
evaluation would have been April 30.

Kristin Scogin, the deputy public defender who represented Wade after she was released from Patton, said that, by April, when jury selection began for her trial, Wade "seemed fine." Bailiffs who remembered Wade from previous cases would stop Scogin and tell her they thought Wade was doing really well.

But, on Friday, April 26, after returning from the second day of jury selection, Wade refused to shower or leave her cell for recreation time, according to the medical examiner's report. She remained in her cell on Saturday, too.

Sheriff's Department policy requires deputies to conduct security checks "on an hourly or more frequent basis"; they're supposed to "look in each cell, and observe each inmate for any obvious signs of medical distress, trauma, or criminal activity."

The medical examiner's report notes that at 12:16 p.m. on Sunday, April 28, Wade was observed in her cell during a routine security check. She wasn't checked on again for almost two hours, when she was found hanging from her bunk.

The report notes that Wade had no history of suicide attempts or threats and was given Zyprexa, an anti-psychotic medication, nightly. But the report also suggests that since returning from court on Friday, Wade had quickly gone downhill. In addition to refusing shower and rec time, she'd made a mess of her cell. Her things were scattered all over, she'd drawn a swastika on the wall and, according to the

Case 3:17-cv-01154-LAB-AGS   Document 1   Filed 06/09/17   PageID.81   Page 81 of 181

report, "chronic urination was noted to her top bunk bed and the floor."

An investigation by the Citizens Law Enforcement Review Board, the oversight body that reviews jail deaths and officer-related misconduct, found that the deputy whose job it was to notify other deputies to perform a floor check had failed to do so, but there was "insufficient information to determine if a mandated security check that was not performed, could have precluded this suicide in any way."

*Email kellyd@sdcitybeat.com or follow her on Twitter at @citybeatkelly. Read the rest of our coverage on inmate deaths in San Diego County jails.*

NEWS   60 DEAD INMATES   INMATE DEATHS   SAN DIEGO PRISON
SAN DIEGO SHERIFF'S DEPARTMENT

by Kelly Davis
October 16, 2013 12:00 AM

# RELATED





## Tuan's perseverance



## The taxing prospects of Prop 64



## Tiny Houses for the homeless



## San Diego hires Stacie Spector to oversee homelessness

## Comments

Type subject here...

Case 3:17-cv-01154-LAB-AGS   Document 1   Filed 06/09/17   PageID.83   Page 83 of 181

© San Diego City Beat 2016. All Rights Reserved

Built with Metro Publisher™

# EXHIBIT 7

Newsletter Signup    Submit Your Event    Find A Paper    Advertise   Contact Us

Custom Search



_San Diego_
## CityBeat

NEWS & OPINION    CULTURE    MUSIC    FOOD & DRINK    EVENTS    NEIGHBORHOODS

GALLERY    SPECIAL ISSUES    FREE STUFF    ARCHIVE

December 22, 2014 12:00 AM                                   RSS

# San Diego County sets a dubious record for jail deaths

Will policy changes make a difference in 2015?

by Kelly Davis

Print



http://sdcitybeat.com/news-and-opinion/news/san-diego-county-sets-dubious-record-jail-deaths/



It's likely no one will ever know for sure what happened to Jerry Cochran the night before he died. On the evening of Sept. 15, 2014, his girlfriend, Vella Rhinehart, called an ambulance to take Cochran to the emergency room—she was concerned about some swollen spider bites on his neck. They were homeless, and Cochran had trouble walking without assistance.

The last time Rhinehart saw Cochran, he was in the back of the ambulance, his walker folded up next to him. He was wearing his medical-ID necklace that let folks know he was diabetic, she says. The EMT told her Cochran didn't need his wallet or medication; she told the EMT to tell the hospital to call her when Cochran was discharged—she'd find a way to come get him.

"Nobody ever called," she says. "I called and called and called, and walked and walked"—up and down Fourth and Fifth avenues the next day, the path Cochran might have taken on his way back to their camp. Wednesday night, after two days of searching, Rhinehart got a phone call

from her sister telling her Cochran had been arrested and died in jail.

Since March 2013, CityBeat 's been reporting on deaths in San Diego County jails, a series prompted by our finding that the county had the highest inmate mortality rate of California's 10 largest jail systems between 2007 and 2012. During that period, the county averaged 10 deaths a year, with a high of 12 in 2009 and a low of eight in both 2007 and 2012. Twelve people died in 2013. This year, as of Dec. 19, 16 county-jail inmates have died.

"Sixteen deaths in a one year period is a concern to us," wrote Sheriff's Cmdr. John Ingrassia in an email to CityBeat . He noted that several of those inmates were terminally ill— CityBeat counted four based on medical examiner's reports. He also noted that the Sheriff's Department books more people into jail than similarly sized counties due to different booking acceptance criteria—a point the Sheriff's Department's has made to us in the past to challenge our reporting. But, Ingrassia added, "we don't hide behind this figure as an excuse or justification for the number of jail deaths."

"Our goal is to have zero inmate deaths," he wrote, "and we take each and every case very seriously."

****

Cochran didn't make it beyond a Central Jail holding cell. On the morning of Sept. 16, he was arrested for trespassing only a few blocks from Scripps Mercy hospital, where Rinehart says he was taken ( CityBeat wasn't able to confirm this due to patient-privacy rules). He was wandering in and out of a chiropractor's office, "mumbling gibberish" about having lost his wallet, according to the medical examiner's report. At the jail's sally port, he refused to get out of the police car and had to be carried inside.

Rhinehart believes his behavior was the result of him being without his medication and food for possibly a dozen hours.

"He would have been like a 2-year-old," she says.

Rhinehart doesn't know if Cochran was coherent enough to let the jail's medical staff know during intake that he was diabetic. She doesn't know if he was still wearing his medical-ID necklace—it wasn't among the items inventoried by the medical examiner. At around 12:30 p.m., less than two hours after he'd arrived at the jail, he fell face-forward off a bench. Paramedics were called, and he was taken to UCSD Medical Center, where he was pronounced dead at 2:15. The cause of death was diabetic ketoacidosis, a condition caused by an insulin shortage that's rarely fatal if treated immediately.

Rhinehart says a sheriff's homicide detective told her that deputies "did nothing wrong." Ingrassia told CityBeat that a review of Cochran's death is scheduled for next month.

Rhinehart's back in North Carolina, where she and Cochran are from, living with her sister. "I don't go out of my bedroom," she says. "I don't leave my bed. He was my life."

****

During the six-year period CityBeat examined for its initial story, three lawsuits had been filed against the county over inmate deaths. By comparison, there have been three lawsuits filed in 2014 alone; last week, CityBeat confirmed that a claim's been filed in a fourth case, the precursor to a lawsuit. And, in November, a jury found the county liable in the death of Daniel Sisson, a 21-year-old who was found dead in his jail cell on June 25, 2011, from an acute asthma attack made worse by heroin withdrawal. The county is appealing the $3-million verdict.

One of the cases filed this year was by Anna Sandoval, whose husband, Ronnie Sandoval, died in the Central Jail on Feb. 23, the result of a drug overdose. He'd been arrested on Feb. 22 for methamphetamine possession. The medical examiner's report notes that during intake, Sandoval was observed to be sweating profusely. The lawsuit argues that despite obvious signs he

was in distress, he was deprived of "life-saving medical attention."

A response filed by the county argues, among other points, that Sandoval alone was responsible for his death. According to the medical examiner's report, during the intake screening, he denied ingesting drugs.

"We don't know what Ronnie told the nurses, at least not yet," says Diana Adjadj, Anna Sandoval's attorney. Regardless, "there were objective signs" of possible overdose, Adjadj says. The limited records she's been able to get say that in addition to Sandoval's profuse sweating, he struggled to respond to questions during intake. At some point, he was removed from a general-population holding cell and put in a single cell, where he remained for nearly eight hours, a possible violation of California's Minimum Standards for Local Detention Facilities, which says that an inmate who's placed in a sobering cell isn't to be left there for longer than six hours without being evaluated.

"They knew something was wrong with him," Adjadj says, "but instead of monitoring him, they isolated him in a holding cell."

According to the medical examiner's report, at close to 1 a.m., a guard saw Sandoval slump over and fall to the ground in a seizure. Emergency personnel showed up 20 minutes later but were

unable to transport him; he was declared dead at 2:15 a.m.

****

In his email to CityBeat , Ingrassia noted that while there have been five suicides this year, none have happened since July, "which I believe is a positive sign that changes implemented by our new medical director, Dr. [Alfred] Joshua, and mandatory training received by our deputies are working."

Joshua was hired in January, and CityBeat spoke with him in July about policy changes he'd made and strategies he planned to implement to reduce the number of inmate deaths. He was looking to implement a "step-down unit" for inmates who'd been taken off suicide watch. He also said staff would be trained to be more attentive to signs that might indicate mental distress, like the condition of an inmate's cell or whether someone was refusing meals.

The two last suicides of 2014 highlight the need for these new approaches.

Hector Lleras, 36, the fifth suicide of the year, twice told jail staff—first a nurse, then a deputy—that he was going to kill himself. On July 1, he was put in a safety cell and then released 24 hours later. Almost exactly 24 hours after that, he was found hanging in his Central Jail cell.

Christopher Carroll, a mentally ill homeless man, was arrested on June 14 for disorderly conduct. A chronic alcoholic who, according to his family, suffered from serious mental illness, Carroll was placed in administrative segregation because, during previous jail stays, he'd been unable to get along with other inmates. His segregated status meant he was allowed out of his cell for only one hour every 48 hours.

On June 18 at 11:45 a.m., Carroll inquired, via intercom, when he'd get his hour in the dayroom and was told it wasn't time yet. At 12:30, he was found with a noose around his neck, attached to the cell's top bunk.

According to the medical examiner's report, he'd smeared blood on the wall of his cell. He'd urinated on the floor and food and feces were stuck to the ceiling.

Carroll was only 5 feet tall and weighed 105 pounds. His family tried to help him, says his brother Ken, but he'd reject their offers. When he was lucid, he was funny and outgoing, "full of life," Ken says. "But mental illness just kept dragging him back in."

Ken says the family wasn't able to get much information about Christopher's death. They didn't know, for instance, that he'd scrawled a suicide note on his cell wall. When CityBeat told Ken that Christopher had been placed in solitary

confinement, he wondered if that's what pushed his brother to kill himself.

"He just didn't like four walls," Ken said. "He couldn't stand four walls."

Email kellyd@sdcitybeat.com or follow her on Twitter at @citybeatkelly.

NEWS   JAIL DEATHS

by Kelly Davis
December 22, 2014 12:00 AM





## Tuan's perseverance



## The taxing prospects of Prop 64



## Tiny Houses for the homeless



## San Diego hires Stacie Spector to oversee homelessness

## Comments

Type subject here...

Home   News & Opinion   Culture   Music   Food & Drink   Events   Neighborhoods   Gallery

Special Issues   Free Stuff   Archive

About Us    Contact Us    Advertise    Privacy Policy    Find a Paper

http://sdcitybeat.com/news-and-opinion/news/san-diego-county-sets-dubious-record-jail-deaths/

Case 3:17-cv-01154-LAB-AGS   Document 1   Filed 06/09/17   PageID.95   Page 95 of 181

© San Diego City Beat 2016. All Rights Reserved

Built with Metro Publisher™

# EXHIBIT 8

**U.S. Department of Justice**
National Institute of Corrections





National Study of **Jail Suicide**

**20 Years Later**

**U.S. Department of Justice**
**National Institute of Corrections**
**320 First Street, NW**
**Washington, DC 20534**

**Morris L. Thigpen**
*Director*

**Thomas J. Beauclair**
*Deputy Director*

**Virginia A. Hutchinson**
*Chief, Jails Division*

**Fran Zandi**
*Program Manager*

---

**National Institute of Corrections**
*www.nicic.gov*

---

# National Study of Jail Suicide

## 20 Years Later

**Lindsay M. Hayes, Project Director**
National Center on Institutions and Alternatives

April 2010
NIC Accession Number 024308

This document was prepared under cooperative agreement number 06J47GJM0 from the National Institute of Corrections, U.S. Department of Justice. Points of view or opinions stated in this document are those of the author and do not necessarily represent the official position or policies of the U.S. Department of Justice.

# Contents



Foreword ................................................................................................ vii

Acknowledgments ..................................................................................... ix

Executive Summary ................................................................................... xi

**Chapter 1. Introduction** ............................................................................ 1
Prior Jail Suicide Research .......................................................................... 2
A Word About Suicide Victim Profiles ........................................................... 3
Death in Custody Reporting Act of 2000 ....................................................... 4

**Chapter 2. National Study of Jail Suicides: 20 Years Later** ................................ 7
Methodology: Phase 1 ................................................................................ 7
Methodology: Phase 2 ................................................................................ 9

**Chapter 3. Demographic Findings of Jail Suicide Data** ..................................... 11
Personal Characteristics of the Victims .......................................................... 11
Characteristics of the Suicides ..................................................................... 19
Characteristics of the Jail Facilities ............................................................... 32

**Chapter 4. Special Considerations** ................................................................ 43
The Changing Face of Jail Suicide ................................................................ 43
Jail Suicide Rates ..................................................................................... 43

**Chapter 5. Conclusion** .............................................................................. 47
Comprehensive Suicide-Prevention Programming ............................................ 47
Future Training Efforts ............................................................................... 53
Data Limitations and Further Research Needed ............................................... 54
The Continuing Challenge of Prevention ........................................................ 54

**References** .............................................................................................. 55

**Appendix A. National Study of Jail Suicides Survey** ......................................... 59

**Appendix B. National Study of Jail Suicides Questionnaire** ................................ 61

# List of Tables



Table 1. Sources for Identifying Inmate Suicides in U.S. Jails: 2005–06 .................8

Table 2. Total Number of Suicides Identified in U.S. Jails: 2005–06 ......................9

Table 3. Race of Suicide Victims in U.S. Jails: 2005–06......................................12

Table 4. Gender of Suicide Victims in U.S. Jails: 2005–06...................................12

Table 5. Age of Suicide Victims in U.S. Jails: 2005–06.......................................13

Table 6. Marital Status of Suicide Victims in U.S. Jails: 2005–06 .........................14

Table 7. Most Serious Charge of Suicide Victims in U.S. Jails: 2005–06...............15

Table 8. Most Serious Prior Charge of Suicide Victims in U.S. Jails: 2005–06 ........16

Table 9. History of Substance Abuse Among Suicide Victims in U.S. Jails:
2005–06 ..............................................................................16

Table 10. History of Medical Problems Among Suicide Victims in U.S. Jails:
2005–06 ..............................................................................17

Table 11. History of Mental Illness Among Suicide Victims in U.S. Jails:
2005–06..............................................................................18

Table 12. History of Psychotropic Medication Use Among Suicide Victims in
U.S. Jails: 2005–06 ...............................................................18

Table 13. History of Suicidal Behavior Among Suicide Victims in U.S. Jails:
2005–06 ..............................................................................19

Table 14. Month in Which Suicide Occurred in U.S. Jails: 2005–06......................20

Table 15. Time of Day When Suicide Occurred in U.S. Jails: 2005–06 ..................21

Table 16. Length of Confinement Prior to Suicide in U.S. Jails: 2005–06 ................22

Table 17. Intoxication of Suicide Victims in U.S. Jails: 2005–06 ...........................23

Table 18. Method of Suicide in U.S. Jails: 2005–06 ...........................................24

Table 19. Instrument Used in Suicide in U.S. Jails: 2005–06 .................................24

Table 20. Anchoring Device Used in Hanging in U.S. Jails: 2005–06 ....................25

Table 21. Time Span Between Last Observation and Finding Victim
U.S. Jails: 2005–06.................................................................26

Table 22. Administration of Cardiopulmonary Resuscitation (CPR) to Suicide
Victims in U.S. Jails: 2005–06 ...............................................26

Table 23. Isolation or Segregation at Time of Death for Suicide Victims in
U.S. Jails: 2005–06..................................................................27

Table 24. Suicide Precaution Status Among Suicide Victims in U.S. Jails: 2005–06 ...............................................................28

Table 25. No-Harm Contracts Used in U.S. Jails: 2005–06 ....................29

Table 26. Qualified Mental Health Professional (QMHP) Assessment of Suicide Victims in U.S. Jails: 2005–06 ....................................29

Table 27. Suicide Victims' Last Contact With a Qualified Mental Health Professional (QMHP) in U.S. Jails: 2005–06 ..........................30

Table 28. Suicides Occurring Close to Date of Court Hearing in U.S. Jails: 2005–06 ...............................................................31

Table 29. Suicides Occurring Close to a Scheduled Court Hearing in U.S. Jails: 2005–06 ...............................................................31

Table 30. Suicides Occurring Close to a Telephone Call or Visit in U.S. Jails: 2005–06 ...............................................................32

Table 31. Suicides Occurring Close to a Scheduled Telephone Call or Visit in U.S. Jails: 2005–06 ...............................................................32

Table 32. Intake Screening for Suicide Risk in U.S. Jails: 2005–06 ........33

Table 33. Verification of Suicide Risk During Prior Confinement in U.S. Jails: 2005–06 ...............................................................34

Table 34. Arresting and/or Transporting Officer Opinion About Suicide Risk in U.S. Jails: 2005–06 ...............................................................34

Table 35. Suicide-Prevention Training in U.S. Jails: 2005–06 ................35

Table 36. Frequency of Suicide-Prevention Training in U.S. Jails: 2005–06 ..............36

Table 37. Certification in Cardiopulmonary Resuscitation (CPR) in U.S. Jails That Sustained a Suicide: 2005–06 ......................................36

Table 38. Suicide Watch Protocol in U.S. Jails: 2005–06 ......................37

Table 39. Authorization To Discharge Inmates From Suicide Watch in U.S. Jails: 2005–06 ...............................................................38

Table 40. Safe Housing for Suicidal Inmates in U.S. Jails: 2005–06 ......39

Table 41. Mortality Review Process in U.S. Jails: 2005–06 ....................40

Table 42. Written Suicide-Prevention Policy in U.S. Jails: 2005–06 ........41

Table 43. Changing Face of Suicide in U.S. Jails: 1985–86 to 2005–06 ..............44

# Foreword



This report represents the third collaboration between the National Institute of Corrections and the National Center on Institutions and Alternatives (NCIA) regarding national studies of jail suicide. During the 1980s, two NCIA studies found high rates of suicide in county jails throughout the country. Although suicide continues to be a leading cause of death in jails, the rate of suicide continues to decrease, as demonstrated in this report, *National Study of Jail Suicide: 20 Years Later.* Yet this report does more than simply present a calculation of suicide rates. It presents the most comprehensive updated information on the extent and distribution of inmate suicides throughout the country, including data on the changing face of suicide victims. Most important, the study challenges both jail and health-care officials and their respective staffs to remain diligent in identifying and managing suicidal inmates. The National Institute of Corrections hopes that this report will encourage continued research, training, and development and revision of comprehensive prevention programs that are critical to the continued reduction of jail suicide throughout the country.

**Morris L. Thigpen**
*Director*
National Institute of Corrections

# Acknowledgments



I would like to acknowledge several individuals for their assistance in completing this national study of jail suicides. Catherine A. Gallagher, Ph.D., Associate Professor at George Mason University's Justice, Law and Crime Policy Program, was instrumental in the data analysis portion of the project. As she has done on many prior occasions, Alice Boring of the National Center on Institutions and Alternatives (NCIA) brought the report together to its final form.

The National Institute of Corrections (NIC) continues to be an advocate for suicide prevention in correctional facilities. NIC provided the funding to NCIA to carry out this study and other national studies on jail and prison suicide. NIC also previously funded NCIA's *Jail Suicide/Mental Health Update,* a quarterly newsletter distributed throughout the country at no charge to correctional and health-care administrators, their staff, and other interested persons for more than 20 years.

Special thanks are extended to Virginia Hutchinson, Chief of the NIC Jails Division, and Fran Zandi, Correctional Program Specialist in the NIC Jails Division and the program manager who oversaw this project. This project would not have come to fruition without the support of Ms. Hutchinson and Ms. Zandi, who were committed to finding the precious federal dollars necessary to fund the study. I applaud their commitment and appreciate their patience with me in completing this project.

**Lindsay M. Hayes**
*Project Director*
National Center on Institutions and Alternatives

# Executive Summary



Suicide continues to be a leading cause of death in jails across the country; the rate of suicide in county jails is estimated to be several times greater than that in the general population. In September 2006, the National Center on Institutions and Alternatives (NCIA) entered into a cooperative agreement with the National Institute of Corrections (NIC) to conduct a national study on jail suicide that would determine the extent and distribution of inmate suicides in local jails (i.e., city, county, and police department facilities) and also gather descriptive data on the demographic characteristics of each victim, characteristics of the incident, and characteristics of the jail facility that sustained the suicide. The study, a followup to a similar national survey that NCIA conducted in 1986, resulted in a report of the findings to be used as a resource tool for both jail personnel in expanding their knowledge base and correctional (as well as mental health and medical) administrators in creating and/or revising policies and training curricula on suicide prevention.

The study identified 696 jail suicides in 2005 and 2006, with 612 deaths occurring in detention facilities and 84 in holding facilities. Demographic data were subsequently analyzed on 464 of these suicides.

Following are some findings regarding characteristics of the suicide victims:

- Sixty-seven percent were white.

- Ninety-three percent were male.

- The average age was 35.

- Forty-two percent were single.

- Forty-three percent were held on a personal and/or violent charge.

- Forty-seven percent had a history of substance abuse.

- Twenty-eight percent had a history of medical problems.

- Thirty-eight percent had a history of mental illness.

- Twenty percent had a history of taking psychotropic medication.

- Thirty-four percent had a history of suicidal behavior.

Following are some findings regarding characteristics of the suicides:

- Deaths were evenly distributed throughout the year; certain seasons and/or holidays did not account for more suicides.

- Thirty-two percent occurred between 3:01 p.m. and 9 p.m.

- Twenty-three percent occurred within the first 24 hours, 27 percent between 2 and 14 days, and 20 percent between 1 and 4 months.

- Twenty percent of the victims were intoxicated at the time of death.

- Ninety-three percent of the victims used hanging as the method.

- Sixty-six percent of the victims used bedding as the instrument.

- Thirty percent of the victims used a bed or bunk as the anchoring device.

- Thirty-one percent of the victims were found dead more than 1 hour after the last observation.

- Cardiopulmonary resuscitation (CPR) was administered in 63 percent of incidents.

- Thirty-eight percent of the victims were held in isolation.

- Eight percent of the victims were on suicide watch at the time of death.

- No-harm contracts were used in 13 percent of cases.

- Thirty-seven percent of the victims were assessed by qualified mental health professionals; 47 of the victims who committed suicide and were assessed saw a clinician within 3 days of death.

- Thirty-five percent occurred close to the date of a court hearing, with 80 percent occurring in less than 2 days.

- Twenty-two percent occurred close to the date of a telephone call or visit, with 67 percent occurring in less than 1 day.

Following are some findings regarding characteristics of the jail facilities:

- Eighty-four percent were administered by county, 13 percent by municipal, 2 percent by private, and less than 2 percent by state or regional agencies.

- Seventy-seven percent provided intake screening to identify suicide risk, but only 27 percent verified the victim's suicide risk during prior confinement and only 31 percent verified whether the arresting or transporting officer believed the victim was a suicide risk.

- Sixty-two percent provided suicide prevention training, but 63 percent either did not provide training or did not provide it on an annual basis.

- Sixty-nine percent of training provided was for 2 hours or less, and only 6 percent was for a duration of 8 hours.

- Eighty percent provided CPR certification.

- Ninety-three percent provided a protocol for suicide watch, but less than 2 percent had the option for constant observation; most (87 percent) used 15-minute observation periods.

- Fifty-one percent allowed only mental health personnel to downgrade and discharge inmates from suicide watch.

- Thirty-two percent maintained safe housing for suicidal inmates.

- Thirty-five percent maintained a mortality review process.

- Eighty-five percent maintained a written suicide prevention policy, but suicide prevention programming was not comprehensive.

Twenty years after the survey that was conducted in 1986, this national study of jail suicides found substantial changes in the demographic characteristics of inmates who committed suicide. Some of these changes were stark. For example, suicide victims once characterized as being confined on "minor other" offenses were found in the 2005–06 data to be held on "personal and/or violent" charges. Intoxication was previously viewed as a leading precursor to inmate suicide, yet recent data indicate that it is now found in only a minority of cases. Whereas more than half of all jail suicide victims were dead within the first 24 hours of confinement according to 1986 data, current data suggest that less than a quarter of all victims commit suicide during this time period, with an equal number of deaths occurring between 2 and 14 days of confinement. In addition, inmates who committed suicide appeared to be far less likely to be housed in isolation than previously reported and, for unknown reasons, were less likely to be found within 15 minutes of the last observation by staff. Finally, more jail facilities that experienced inmate suicides had both written suicide prevention policies and an intake screening process to identify suicide risk than in years past, although the comprehensiveness of programming remains questionable.

In 2006, the suicide rate in detention facilities was 36 deaths per 100,000 inmates, which is approximately 3 times greater than that in the general population (Mumola and Noonan 2008). This rate, however, represents a dramatic decrease in the rate of suicide in detention facilities during the past 20 years. The nearly threefold decrease from a previously reported 107 suicides per 100,000 inmates in 1986 is extraordinary. Absent indepth scientific inquiry, there may be several explanations for the reduced suicide rate. During the past several years, national studies of jail suicide have given a face to this longstanding and often ignored public health issue in the nation's jails. Study findings have been widely distributed throughout the country and were eventually incorporated into suicide prevention training curricula. The increased awareness of inmate suicide is also reflected in national correctional standards that now require comprehensive suicide prevention programming, better training of jail staff, and more indepth inquiry of suicide risk factors during the intake process. Finally, litigation involving jail suicide has persuaded (or forced) jurisdictions and facility administrators to take corrective actions in reducing the opportunity for future deaths. Therefore, based on this dramatic decrease in the rate of suicides, the antiquated mindset that "inmate suicides cannot be prevented" should forever be put to rest.

This report offers recommendations in the areas of comprehensive suicide prevention programming, staff training, and future research efforts.

In conclusion, findings from this study create a formidable challenge for both correctional and health-care officials as well as their respective staff. Although our knowledge base continues to increase, which has seemingly corresponded to a dramatic reduction in the rate of inmate suicide in detention facilities, much work lies ahead. The data indicate that inmate suicide is no longer centralized to the first 24 hours of confinement and can occur at any time during an inmate's confinement. As such, because roughly the same number of deaths occurred within the first several hours of custody as occurred during more than a few months of confinement, intake screening for the identification of suicide risk upon entry into a facility should be viewed as time limited. Because inmates can be at risk for suicide at any point during confinement, the biggest challenge for those who work in the corrections system is to view the issue as requiring a continuum of comprehensive suicide prevention services aimed at the collaborative identification, continued assessment, and safe management of inmates at risk for self-harm.

In 2006, the suicide rate in detention facilities was 36 deaths per 100,000 inmates. This rate represents a dramatic decrease in the rate of suicide in detention facilities during the past 20 years.

# Chapter 1. Introduction



Suicide continues to be a leading cause of death in jails across the country, where well over 400 inmates take their lives each year (Hayes 2005). Mumola and Noonan (2008) estimate the rate of suicide in county jails to be approximately three times greater than that in the general population. Prior research indicates that most jail suicide victims were young white males who were arrested for nonviolent offenses and were intoxicated upon arrest. Many were placed in isolation and were dead within 24 hours of incarceration (Davis and Muscat 1993; Hayes 1989), although more recent research (Frottier et al. 2002) found that jail inmates are at a higher risk for suicide at both 24 to 48 hours and after 60 days of confinement. The overwhelming majority of victims were found hanging by either bedding or clothing. Most victims were not adequately screened for potentially suicidal behavior upon entry into the jail (Hayes 1989). A disproportionate number of suicide attempts involved inmates with mental illness (Goss et al. 2002). Research specific to suicide in urban jail facilities provided some disparate findings. Most victims of suicide in large urban facilities were arrested for violent offenses and were dead within 1 to 4 months of incarceration (DuRand et al. 1995; Marcus and Alcabes 1993). Because of the extended length of confinement prior to suicide, intoxication was not always the salient factor in urban jails as it was in other types of jail facilities. Characteristics such as age, race, gender, method, and instrument used were generally consistent in both urban and nonurban jails.

The precipitating factors of suicidal behavior in jail are well established (Bonner 1992, 2000; Winkler 1992). Experts theorize that two primary causes for jail suicide exist: (1) jail environments are conducive to suicidal behavior and (2) the inmate is facing a crisis situation. From the inmate's perspective, certain features of the jail environment enhance suicidal behavior: fear of the unknown, distrust of an authoritarian environment, perceived lack of control over the future, isolation from family and significant others, shame of incarceration, and perceived dehumanizing aspects of incarceration. In addition, certain factors are prevalent among inmates facing a crisis situation that could predispose them to suicide: recent excessive drinking and/or drug use, recent loss of stabilizing resources, severe guilt or shame over the alleged offense, current mental illness, prior history of suicidal behavior, and approaching court date. In addition, some inmates simply are (or become) ill equipped to handle the common stresses of confinement. During initial confinement in a jail, this stress can be limited to fear of the unknown and isolation from family, but over time (including stays in prison) it may become exacerbated and include loss of outside relationships, conflicts within the institution, victimization, further legal frustration, physical and emotional breakdown, and problems coping in the institutional environment (Bonner 1992). As the inmate reaches an emotional breaking point, the result can be suicidal ideation (i.e., a wish to die without a specific threat or plan), attempt, or completion.

Although suicide is well recognized as a critical problem in jails, the issue of prison suicide has not received comparable attention, primarily because the number of jail suicides far exceeds the number of prison suicides. Suicide ranks third (behind natural causes and AIDS) as the leading cause of death in prisons (Mumola 2005). Even though the rate of suicide in prisons is considerably lower than in jails, it still remains greater than the rate in the general population (Hayes 1995). Most research on prison suicide has found that the vast majority of victims are convicted of personal crimes, housed in single cells (often some type of administrative confinement), and have histories of prior suicide attempts and/or mental illness (Daniel and Fleming 2006; He et al. 2001; Patterson and Hughes 2008; Salive, Smith, and Brewer 1989; White and Schimmel 1995). Although normally serving long sentences, most victims commit suicide in the early stages of their prison confinement (New York State Department of Correctional Services 2002) as well as during earlier stages of disciplinary confinement (Way et al. 2007). Precipitating factors in prison suicide may include new legal problems, marital or relationship difficulties, and inmate-related conflicts (Kovasznay et al. 2004).

Finally, an inmate's suicide is emotionally devastating to the victim's family and can be financially devastating to the correctional facility (and its personnel) sustaining the death. Many inmate suicides result in litigation against a state or local jurisdiction alleging that the cause of death was negligence and/or deliberate indifference on the part of facility personnel. Although the plaintiff's burden to demonstrate liability in these cases remains high (Cohen 2008), several recent federal court jury awards have well exceeded $1 million (*Sanville* v. *Scaburdine* 2002; *Woodward* v. *Myres* 2003).

## Prior Jail Suicide Research

In February 1988, the National Institute of Corrections released the National Center on Institutions and Alternatives' (NCIA's) *National Study of Jail Suicides: Seven Years Later* (Hayes 1989), which replicated an earlier national survey *(And Darkness Closes In . . . A National Study of Jail Suicides)* that NCIA conducted in 1981 (Hayes 1983). The 1988 report was a compilation of data gathered on jail suicides that occurred in 1986. About 30 percent of the 1986 suicides took place in holding facilities (which normally detain persons for less than 48 hours) and about 70 percent took place in detention facilities (which normally detain persons or house committed and/or sentenced offenders for more than 48 hours but less than 2 years). Other findings are as follows:

- Seventy-two percent of victims were white.

- Ninety-four percent of victims were male.

- The average (mean) age of the victim was 30.

- Fifty-two percent of victims were single.

- Seventy-five percent of victims were detained on nonviolent charges, with 27 percent detained on alcohol and/or drug-related charges.

- Eighty-nine percent of victims were confined as detainees.

*Margin note:* Suicide ranks third (behind natural causes and AIDS) as the leading cause of death in prisons.

- Seventy-eight percent of victims had prior charges, yet only 10 percent were previously held on personal and/or violent offenses.

- Sixty percent of victims were intoxicated at the time of incarceration.

- Thirty percent of suicides occurred during a 6-hour period between midnight and 6 a.m.

- Ninety-four percent of suicides were by hanging.

- Forty-eight percent of victims used their bedding as the instrument.

- Two out of three victims were in isolation.

- Fifty-one percent of suicides occurred within the first 24 hours of incarceration; 29 percent occurred within the first 3 hours.

- Eighty-nine percent of victims were not screened for potentially suicidal behavior at booking.

- Fifty-two percent of all victims charged with alcohol and/or drug-related offenses died within the first 3 hours of confinement.

- Seventy-eight percent of victims who were intoxicated died within the first 24 hours of incarceration; 48 percent died within the first 3 hours.

- The suicide rate in detention facilities was projected to be approximately nine times greater than that in the general population.

In addition, data from holding facilities include the following:

- Forty-six percent of victims were held on alcohol and/or drug-related charges.

- Eighty-two percent of victims were intoxicated at the time of their incarceration.

- Sixty-four percent of victims died within the first 3 hours.

- Ninety-seven percent of victims were not screened for potentially suicidal behavior at booking.

Jail facilities that experienced a suicide in 1986 provided suicide prevention programs in only 58 percent of detention facilities and 32 percent of holding facilities. The study did not analyze the quality of these programs. Despite minor variations, findings from the 1988 study were consistent with NCIA's 1981 national study of jail suicides (which used 1979 data). Allowing for slight differences in characteristics of jail suicides, most of the key indicators (offense, intoxication, method and/or instrument, isolation, and length of incarceration) showed the same value over time.

## A Word About Suicide Victim Profiles

Efforts to prevent suicide in jails are sometimes geared toward quick-fix solutions. These types of approaches (e.g., use of closed-circuit television monitors, use of safety garments, and removal of blankets) are usually attempts to treat only the symptom. Although these tools can be an important part of jail suicide prevention, experts agree that they should never be used in lieu of staff training, intervention, and supervision.

Suicide victim profiles have also fallen victim to quick-fix, superficial prevention techniques. At times, these profiles are simply a mirror of a jail's inmate population. Other times they seem to be contradictory. When used without an awareness of potentially suicidal behavior, they are mislead-ing. NCIA constructed and released its first victim profile from 1979 jail suicide data; at that time it was equally praised and criticized. Although the profile appeared in many training manuals throughout the country, it was maligned because critics claimed it allowed jail personnel to believe that profiles can predict and thus prevent suicides. Further, critics charged that many of the charac-teristics appearing in the suicide profile fit those of a typical jail inmate and, therefore, such a pro-file was useless as a predictive tool. The primary objective of NCIA's report—to help jail personnel become sensitive to the characteristics or variables that appear most often in jail suicide victims—became lost in the controversy. Quick-fix advocates embraced NCIA's profile, while foes argued that "not all jail suicides occur on Saturday nights in September." Both camps missed the point.

Demographic victim profiles cannot predict suicide risk; jail officials have been warned that these profiles should only be used to help correctional personnel understand the general risk of sui-cide for those in custody (Hayes 1989; Winter 2003). As stated by Farmer and colleagues: "In predicting who will be at risk over time, factors such as mental disorders, prior psychiatric hospi-talizations, prior suicidal and self-destructive acts, substance abuse, and ongoing stressors may eventually prove to be more useful danger signals than demographic variables such as age, race, and gender" (Farmer, Felthous, and Holzer 1996:246). That is, a demographic profile of suicide victims should not be viewed as a "death certificate" for all inmates in the nation's jails, nor should jail personnel ignore those inmates who exhibit suicidal tendencies but do not fit within certain demographic variables. The fundamental goal of a victim profile is to help correctional, medical, and mental health personnel become sensitive to the characteristics that appear most often in jail suicide victims, while at the same time acting as a supplement to the warning signs of potential suicidal behavior. In essence, ignoring obvious signs of potentially suicidal behavior because the individual does not fit the profile is not only foolish, but also negligent.

## Death in Custody Reporting Act of 2000

Before 2000, state and local jurisdictions did not have uniform requirements for reporting the cir-cumstances surrounding the deaths of inmates in their custody, and some had no system for requir-ing such reports. Therefore, the number of individuals who were dying in custody and the causes of death could not be determined. The two national studies of jail suicides that NCIA released in 1981 and 1988 provided the only data regarding the extent and scope of inmate suicides throughout the country.

Signed into law on October 13, 2000, the Death in Custody Reporting Act of 2000 (Public Law 106–297) requires each state that receives prison construction funding under the federal truth-in-sentencing incentive grant program to "report, on a quarterly basis, information regarding the death of any person who is in the process of arrest, is en route to be incarcerated, or is incarcerat-ed at a municipal or county jail, state prison, or other local or state correctional facility (including any juvenile facility) that, at a minimum, includes (a) the name, gender, race, ethnicity, and age of

the deceased; (b) the date, time, and location of death, and (c) a brief description of the circumstances surrounding the death." The Bureau of Justice Statistics (BJS) is responsible for collecting and analyzing the data, and implemented the Act over a 4-year period. Data collection on deaths in local jail facilities began in 2000, followed by collection from state prisons in 2001. In 2002, BJS began collecting records of deaths from all state juvenile correctional systems, and in 2003, it began collecting data on arrest-related deaths involving approximately 17,784 state and local law enforcement agencies throughout the country. BJS requests data quarterly and reports it annually.

According to the most recent BJS data, 277 inmate suicides occurred in more than 3,000 jail facilities in 2006 (Mumola and Noonan 2008).[1] The suicide rate in these jails was calculated to be 36 deaths per 100,000 inmates. During the period 2000–06, the BJS data found that 92 percent of jail suicide victims were male, 70 percent were white, and most were 25 to 44 years old. Earlier BJS data (Mumola 2005) found that white jail inmates were six times more likely than African-American inmates, and more than three times more likely than Hispanic inmates, to commit suicide. In addition, male inmates had higher rates of suicide than female inmates, and violent offenders had a much higher suicide rate than nonviolent offenders. Almost half of the jail suicides occurred during an inmate's first week in custody (Mumola 2005).

---

[1] For purposes of reporting on the number of deaths in custody, jail facilities excluded law enforcement and police department lockups, privately operated jails, and facilities operated by multiple jurisdictions (e.g., regional jails). In 2003, BJS began surveying law enforcement and police department lockups to obtain these data, which are not available to date.

# Chapter 2.
# National Study of Jail Suicides: 20 Years Later



Historically, jail suicides have created publicity, increased public awareness, and ultimately led to litigation against jail facilities, city governments, county commissioners, and others. The past 20 years have produced national studies on inmate suicide, training curricula on suicide prevention in correctional facilities, and revised suicide prevention provisions in national correctional standards that call for increased emphasis on suicide risk inquiry at intake. There is little argument that jail administrators are far more aware of the suicide risk in their facilities today than in years past. Most important are indications that the suicide rate in U.S. jails has fallen substantially. In 1988, the National Center on Institutions and Alternatives' (NCIA's) national study of jail suicides calculated that there were 107 county jail suicides per 100,000 inmates in 1986, a rate about 9 times greater than that in the general population.[2] As stated in chapter 1, the Bureau of Justice Statistics (BJS) recently calculated that in 2006 the suicide rate in these jails was 36 deaths per 100,000 inmates, which is about 3 times greater than that in the general population.

Because the last comprehensive national study on jail suicides was conducted more than 20 years ago and BJS data, although useful, are limited to basic demographic information (e.g., age, race, gender, most serious offense, length of confinement), the current study was born out of the belief that a new, comprehensive study regarding the total scope and extent of inmate suicides in jails and lockups throughout the country was long overdue.

In September 2006, NCIA entered into a cooperative agreement with the National Institute of Corrections (NIC) to conduct a national study on jail suicides that would determine the extent and distribution of inmate suicides in local jails (i.e., city, county, and police department facilities) and to collect data on the demographic characteristics of each victim, each incident, and the jail facility that sustained the suicide. A report of the findings would become a resource tool to help jail personnel expand their knowledge base and help correctional (as well as mental health and medical) administrators create and/or revise policies and training curricula on suicide prevention.

## Methodology: Phase 1

This survey, the third national study that NCIA conducted for NIC (see Hayes 1983 and 1989), was divided into two phases. During phase 1, surveys were mailed to 15,978 facilities across the United States, including 3,173 county jails and 12,805 law enforcement agencies that administered short-term lockups. Each respondent was asked to complete a one-page survey if his/her facility sustained one or more suicides in 2005 and/or 2006 (see appendix A). A jail was defined

---

[2] According to Heron and colleagues (2009), the suicide rate in the general population is approximately 11 deaths per 100,000 citizens.

as any facility operated by a local jurisdiction (e.g., county, municipality), private entity, or multi-jurisdictional authority whose purpose was to confine individuals primarily apprehended by law enforcement personnel. Per this definition, jails included temporary holding and pretrial detention facilities, lockup facilities that normally detained individuals for less than 72 hours, and facilities that normally detained individuals or housed committed and/or sentenced offenders for more than 72 hours. The definition also included facilities that housed inmates from other jurisdictions (e.g., a state or federal prison system), including privately operated jails and regional jails.

Phase 1 surveys were mailed to all jail facilities in July and August 2007. Return business reply envelopes were included in the mailing to ensure a higher rate of return. Further, to help verify data, survey forms were also sent (from September through December 2007) to state medical examiner offices, state and federal jail inspection and/or regulatory agencies, state police/bureau of investigation offices, and private health-care providers that had contracts with county and municipal jurisdictions. Finally, an Internet search engine was used to search newspaper articles on inmate suicides that were not identified through other sources.

Phase 1 data identified a total of 696 jail suicides in 2005 and 2006 (366 in 2005 and 330 in 2006). The suicides occurred in 47 states and the District of Columbia.[3] Table 1 shows that 383 (55 percent) of the deaths were identified through jail facilities' self-reports. Data from state inspection, investigation, and regulatory agencies showed an additional 177 (25.4 percent) suicides that were not identified through self-reports. Of the remaining deaths, 92 (13.2 percent) were identified through the Internet and newspaper articles, 28 (4.1 percent) through state medical examiner offices, 12 (1.7 percent) through private health-care providers, and 4 (0.6 percent) from other sources.[4]

**Table 1.** Sources for Identifying Inmate Suicides in U.S. Jails: 2005–06

| SOURCE | NUMBER | PERCENT |
|---|---|---|
| Self-report | 383 | 55.0 |
| Inspection, investigation, and regulatory agencies | 177 | 25.4 |
| Internet and newspaper articles | 92 | 13.2 |
| Medical examiners | 28 | 4.1 |
| Private health-care providers | 12 | 1.7 |
| Other | 4 | 0.6 |
| **Total** | **696** | **100.0** |

Source: National Institute of Corrections and National Center on Institutions and Alternatives, National Study of Jail Suicides, 2006.

---

[3] No suicides were reported in Alaska, Hawaii, and Vermont.

[4] Other sources were from the project director's expert witness consultation and/or technical assistance to facilities that sustained these deaths.

It is important to note that "self-report" is the primary category for identifying jail suicide. For example, if a jail suicide was identified by multiple sources, including a self-report from the facility in which the suicide occurred, the source would be attributed to a self-report. Table 1 is intended to reflect a survey respondent's willingness to self-report an inmate suicide within his/her facility rather than the data collection efforts of state inspection and/or regulatory agencies, state medical examiners, or other organizations.

A total of 696 jail suicides were identified during phase 1—in 2005, 324 deaths occurred in detention facilities and 42 occurred in holding facilities and in 2006, 288 deaths occurred in detention facilities and 42 occurred in holding facilities (see table 2). The vast majority (89 percent) of suicides occurred in detention facilities (612 of 696 deaths).

**Table 2.** Total Number of Suicides Identified in U.S. Jails: 2005–06

| YEAR | FACILITY TYPE | | | | | |
|---|---|---|---|---|---|---|
| | HOLDING (0–72 hours) | | DETENTION (>72 hours) | | COMBINED | |
| | NUMBER | PERCENT | NUMBER | PERCENT | NUMBER | PERCENT |
| 2005 | 42 | 50.0 | 324 | 52.9 | 366 | 52.6 |
| 2006 | 42 | 50.0 | 288 | 47.1 | 330 | 47.4 |
| **Total** | **84** | **100.0** | **612** | **100.0** | **696** | **100.0** |

Source: National Institute of Corrections and National Center on Institutions and Alternatives, National Study of Jail Suicides, 2006.

## Methodology: Phase 2

In phase 1, facilities that experienced one or more suicides in 2005 and/or 2006 were identified. In phase 2, the survey process was initiated, including dissemination of an eight-page survey instrument to facility administrators (see appendix B). The survey instrument was designed to collect the following data:

- Demographic characteristics of each victim, including but not limited to age, gender, race, living status, current offense(s), prior offense(s), legal status (detained or sentenced), length of confinement, alcohol and/or drug intoxication at confinement, history of isolation or segregation, room confinement, substance abuse history, medical and/or mental health history, psychotropic medication history, and history of suicidal behavior.

- Characteristics of each incident, including but not limited to date, time, and location of suicide; intoxication at time of incident; housing assignment (e.g., single or multiple occupancy, whether the victim was in isolation or segregation and/or on suicide watch); method and instrument used; time span between when the incident occurred and when the victim was found; whether cardiopulmonary resuscitation (CPR) and/or an automated external defibrillator were used in emergency response; whether a "no-harm" contract was used prior to the incident; whether the

victim attended a court hearing, received a visit or telephone call, and/or was assessed by a qualified mental health professional close to the date of the incident; and any possible precipitating factors to the suicide.

- Facility characteristics, including but not limited to facility type; facility ownership (e.g., state, county, private); capacity and/or population when the suicide occurred; and the suicide-prevention measures in place at the time of the incident (e.g., written policy, intake screening, staff training in suicide prevention and CPR, observation levels, safe housing, and mortality review).

In January 2008, phase 2 survey instruments were initially mailed to facility administrators of the 696 facilities that sustained suicides; 422 surveys were completed and returned. Between March and August 2008, facility administrators who did not respond to the initial survey received a followup letter and a phone call; as a result, an additional 42 surveys were completed and returned. Survey respondents were given the following assurances verbally and in writing: "Data provided will be coded and held in the strictest confidence. Results of this study will be presented in summary fashion, therefore, victim and facility names will _not_ appear in any project report." Nevertheless, some facility administrators did not cooperate with requests to complete the survey. In September 2008, data collection efforts were concluded with a final response rate of 67 percent (464 responses out of 696 surveys).[5]

---

[5] The response rate for this study was lower than the rates from the two earlier studies of jail suicide (82 percent for the 1981 study and 85 percent for the 1988 study). Facility administrators gave several reasons for not fully participating in the study, including ongoing litigation and advice from legal counsel, sensitivity of the subject matter, issues of confidentiality, and time and/or manpower constraints. Some respondents incorrectly stated that completing the survey would violate the Health Insurance Portability and Accountability Act Privacy Rule. In addition, some facility administrators may have decided not to participate in the process because of the time it would have taken to complete the comprehensive eight-page survey instrument.



# Chapter 3.
# Demographic Findings of Jail Suicide Data

As stated in chapter 2, project staff analyzed data on 464 of the 696 jail suicides identified between 2005 and 2006. Demographic findings in this section will be presented in relationship to the type of jail facility. For purposes of this analysis, two facility types were considered: (1) holding facilities (which normally detain individuals for less than 72 hours) and (2) detention facilities (which normally detain individuals or house committed and/or sentenced offenders for more than 72 hours but less than 2 years). Twelve percent (58) of the jail suicides took place in holding facilities and 88 percent (406) took place in detention facilities. Although the data presented in the following tables are categorized by facility type rather than by the jurisdictional agency that controls the facility, it is important to note that 84 percent of the suicides occurred in facilities operated by county governments, nearly 13 percent in facilities operated by municipal governments, less than 2 percent in facilities operated by private organizations, and less than 2 percent in facilities operated by multijurisdictional authorities.

*African-American inmates, who account for nearly the same percentage of the total jail population as whites, constitute a much lower percentage of jail suicide victims.*

## Personal Characteristics of the Victims

### Race

Table 3 shows that approximately two-thirds (67.2 percent) of suicide victims were white, 15.1 percent were African American, 12.7 percent were Hispanic, and 2.8 percent were American Indian. These percentages are consistent with both the National Center on Institutions and Alternatives' (NCIA's) 1988 study (Hayes 1989) and recent Bureau of Justice Statistics (BJS) data (Mumola and Noonan 2008). More white victims committed suicide in detention facilities than holding facilities and more Hispanic victims committed suicide in holding facilities than detention facilities.[6] Of note is that, although white inmates account for about 44 percent of the total jail population throughout the country, they represent the majority (67 percent) of inmates who committed suicide, whereas African-American inmates, who account for nearly the same percentage of the total jail population as whites (39 percent), constitute a much lower percentage of jail suicide victims (15 percent).[7] Other recent BJS data also found that white inmates had higher rates of suicide than African-American inmates (Mumola 2005). The cause of this disproportionate relationship is outside the purview of this survey.

---

[6] For purposes of this study, differences greater than 10 percent will be considered significant.

[7] For comparative data on jail inmates, see Minton and Sabol 2009.

**Table 3.** Race of Suicide Victims in U.S. Jails: 2005–06

| RACE | FACILITY TYPE | | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| | HOLDING (0–72 hours) | | DETENTION (>72 hours) | | COMBINED | |
| | NUMBER | PERCENT | NUMBER | PERCENT | NUMBER | PERCENT |
| White | 32 | 55.2 | 280 | 68.9 | 312 | 67.2 |
| African American | 11 | 19.0 | 59 | 14.5 | 70 | 15.1 |
| Hispanic | 14 | 24.1 | 45 | 11.1 | 59 | 12.7 |
| American Indian | 1 | 1.7 | 12 | 3.0 | 13 | 2.8 |
| Other | 0 | 0.0 | 10 | 2.5 | 10 | 2.2 |
| **Total** | **58** | **100.0** | **406** | **100.0** | **464** | **100.0** |

Source: National Institute of Corrections and National Center on Institutions and Alternatives, National Study of Jail Suicides, 2006.

## Gender

An overwhelming majority (93.1 percent) of the victims were male. The data presented in table 4 are consistent with both NCIA's 1988 study (Hayes 1989) and recent BJS data (Mumola and Noonan 2008). No significant gender differences were found between suicides that occurred in holding and detention facilities. These findings are not surprising because the vast majority of jail inmates throughout the country are male (Minton and Sabol 2009).

**Table 4.** Gender of Suicide Victims in U.S. Jails: 2005–06

| GENDER | FACILITY TYPE | | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| | HOLDING (0–72 hours) | | DETENTION (>72 hours) | | COMBINED | |
| | NUMBER | PERCENT | NUMBER | PERCENT | NUMBER | PERCENT |
| Male | 54 | 93.1 | 378 | 93.1 | 432 | 93.1 |
| Female | 4 | 6.9 | 28 | 6.9 | 32 | 6.9 |
| **Total** | **58** | **100.0** | **406** | **100.0** | **464** | **100.0** |

Source: National Institute of Corrections and National Center on Institutions and Alternatives, National Study of Jail Suicides, 2006.

## Age

Table 5 shows that more than one-third of all suicide victims (approximately 36 percent) were ages 33 to 42. Only four victims (0.9 percent) were 17 or younger, and the average age was 35. These percentages are slightly higher than those from both NCIA's 1988 study (Hayes 1989) and recent BJS data (Mumola and Noonan 2008). No significant age differences were found between suicides that occurred in holding and detention facilities.

**Table 5.** Age of Suicide Victims in U.S. Jails: 2005–06

| AGE | FACILITY TYPE | | | | | |
|---|---|---|---|---|---|---|
| | HOLDING (0–72 hours) | | DETENTION (>72 hours) | | COMBINED | |
| | NUMBER | PERCENT | NUMBER | PERCENT | NUMBER | PERCENT |
| ≤17 | 1 | 1.7 | 3 | 0.7 | 4 | 0.9 |
| 18–22 | 5 | 8.6 | 55 | 13.5 | 60 | 12.9 |
| 23–27 | 7 | 12.1 | 58 | 14.3 | 65 | 14.0 |
| 28–32 | 8 | 13.8 | 48 | 11.8 | 56 | 12.1 |
| 33–37 | 12 | 20.7 | 72 | 17.8 | 84 | 18.0 |
| 38–42 | 13 | 22.5 | 70 | 17.3 | 83 | 17.9 |
| 43–47 | 6 | 10.3 | 57 | 14.0 | 63 | 13.6 |
| 48–53 | 5 | 8.6 | 21 | 5.2 | 26 | 5.6 |
| ≥53 | 1 | 1.7 | 22 | 5.4 | 23 | 5.0 |
| **Total** | **58** | **100.0** | **406** | **100.0** | **464** | **100.0** |

Source: National Institute of Corrections and National Center on Institutions and Alternatives, National Study of Jail Suicides, 2006.

## Marital Status

Forty-two percent of the victims were single, 21.4 percent were married or living in a common-law relationship, and 8.8 percent were divorced (see table 6). The remaining 4.7 percent were either separated or widowed. These percentages are consistent with the findings from NCIA's 1988 study (Hayes 1989). More single inmates committed suicide in detention facilities than holding facilities, and slightly more married inmates committed suicide in holding facilities than detention facilities. No information is available on the marital status of almost one-quarter of all suicide victims, a finding that might relate to the inadequacy of intake screening at facilities that sustained the suicides.

**Table 6.** Marital Status of Suicide Victims in U.S. Jails: 2005–06

| MARITAL STATUS | FACILITY TYPE | | | | | |
|---|---|---|---|---|---|---|
| | HOLDING (0–72 hours) | | DETENTION (>72 hours) | | COMBINED | |
| | NUMBER | PERCENT | NUMBER | PERCENT | NUMBER | PERCENT |
| Single | 19 | 32.8 | 176 | 43.3 | 195 | 42.0 |
| Married | 15 | 25.9 | 74 | 18.2 | 89 | 19.2 |
| Common law | 4 | 6.9 | 6 | 1.5 | 10 | 2.2 |
| Separated | 2 | 3.4 | 13 | 3.2 | 15 | 3.2 |
| Divorced | 4 | 6.9 | 37 | 9.1 | 41 | 8.8 |
| Widowed | 1 | 1.7 | 6 | 1.5 | 7 | 1.5 |
| Unknown | 13 | 22.4 | 94 | 23.2 | 107 | 23.1 |
| Total | 58 | 100.0 | 406 | 100.0 | 464 | 100.0 |

Source: National Institute of Corrections and National Center on Institutions and Alternatives, National Study of Jail Suicides, 2006.

## Most Serious Charge

For purposes of this study, the most serious charge was broken down into four offense categories: personal and/or violent, serious property, alcohol and/or drug related, and minor other. Table 7 shows that 43.4 percent of the victims were charged with a personal and/or violent offense(s), followed by minor other (22.5 percent), alcohol and/or drug related (19.0 percent), and serious property (15.1 percent). These data vary widely from the findings of NCIA's 1988 study (Hayes 1989), which showed that suicide victims were fairly evenly distributed across the four offense categories and that personal and/or violent charges accounted for only 24.7 percent of victims. These current data, however, are consistent with other recent BJS data that also found that inmates charged with violent offenses had higher rates of suicide than those charged with nonviolent offenses (Mumola 2005). More inmates charged with alcohol and/or drug-related offenses committed suicide in holding facilities than detention facilities and more inmates charged with serious property offenses committed suicide in detention facilities than holding facilities.

In almost 50 percent of jail suicides, the victims had been charged with one or more of the following offenses: sexual assault and/or murder of a child (32), possession of drugs (27), murder (24), burglary (21), driving while intoxicated (21), rape/sexual assault (20), assault (19), aggravated assault (17), domestic violence (17), and attempted murder (16). The single charge of sexual assault and/or murder of a child was associated with approximately 7 percent of all jail suicides.

**Table 7.** Most Serious Charge of Suicide Victims in U.S. Jails: 2005–06

| MOST SERIOUS CHARGE | FACILITY TYPE | | | | | |
|---|---|---|---|---|---|---|
| | HOLDING (0–72 hours) | | DETENTION (>72 hours) | | COMBINED | |
| | NUMBER | PERCENT | NUMBER | PERCENT | NUMBER | PERCENT |
| Personal and/or violent | 23 | 39.7 | 178 | 43.8 | 201 | 43.4 |
| Serious property | 4 | 6.9 | 66 | 16.3 | 70 | 15.1 |
| Alcohol and/or drug related | 22 | 37.9 | 67 | 16.5 | 89 | 19.0 |
| Minor other | 9 | 15.5 | 95 | 23.4 | 104 | 22.5 |
| **Total** | **58** | **100.0** | **406** | **100.0** | **464** | **100.0** |

Notes: "Personal and/or violent" includes murder, negligent manslaughter, armed robbery, rape, sexual assault, indecent assault, child abuse, domestic violence, assault, battery, aggravated assault, kidnapping, and other offenses. "Serious property" includes burglary, grand larceny, auto theft, robbery (other), receiving stolen property, arson, breaking and entering, entering without breaking, vandalism, carrying a concealed weapon and/or firearm, and other offenses. "Alcohol and/or drug related" includes public intoxication, driving while intoxicated, disorderly conduct, resisting arrest, possession and/or distribution of controlled dangerous substances, narcotics (unspecified), and other offenses. "Minor other" includes shoplifting, petty larceny, prostitution, sex offenses (other), trespassing, unauthorized use of motor vehicle, traffic offenses (other), violation of probation, contempt of court, vagrancy, indecent exposure, status offenses, escape, forgery, embezzlement, and other offenses.

Source: National Institute of Corrections and National Center on Institutions and Alternatives, National Study of Jail Suicides, 2006.

## Additional Charges and Jail Status

Almost 42 percent of inmates who committed suicide had a second current charge filed against them,[8] and the overwhelming majority (90.1 percent) of suicide victims were in detention facilities at the time of their death. These percentages are consistent with the findings from NCIA's 1988 study (Hayes 1989). However, these data are quite different from those of inmates who do not commit suicide. Current BJS data indicate that 62 percent of all inmates confined in U.S. jails in 2006 were on detention status (Minton and Sabol 2009). The fact that most inmates who committed suicide were on detention status at the time of their deaths may be related to the shorter length of confinement prior to the suicide (see table 16, page 22).

## Most Serious Prior Charge

More than one-third (37.7 percent) of the inmates who committed suicide did not have a history of prior arrests (see table 8). The data also show that 19.6 percent of the victims were charged with a minor other offense, followed by alcohol and/or drug related (19.4 percent), personal and/or violent (16.0 percent), and serious property (7.3 percent). These percentages are somewhat consistent with the findings from NCIA's 1988 study, although that study indicated fewer (21.8 percent) victims with no history of prior arrests (Hayes 1989). No significant differences were found between suicides that occurred in holding and detention facilities in regard to the most serious prior charge.

---

[8] Data were recorded on only the two most serious charges filed against inmates who committed suicide; more than two charges were filed against only a small percentage of victims.

**Table 8.** Most Serious Prior Charge of Suicide Victims in U.S. Jails: 2005–06

| MOST SERIOUS PRIOR CHARGE | FACILITY TYPE | | | | | |
|---|---|---|---|---|---|---|
| | HOLDING (0–72 hours) | | DETENTION (>72 hours) | | COMBINED | |
| | NUMBER | PERCENT | NUMBER | PERCENT | NUMBER | PERCENT |
| Personal and/or violent | 8 | 13.8 | 66 | 16.2 | 74 | 16.0 |
| Serious property | 1 | 1.7 | 33 | 8.1 | 34 | 7.3 |
| Alcohol and/or drug related | 13 | 22.4 | 77 | 19.0 | 90 | 19.4 |
| Minor other | 12 | 20.7 | 79 | 19.5 | 91 | 19.6 |
| None | 24 | 41.4 | 151 | 37.2 | 175 | 37.7 |
| **Total** | **58** | **100.0** | **406** | **100.0** | **464** | **100.0** |

Source: National Institute of Corrections and National Center on Institutions and Alternatives, National Study of Jail Suicides, 2006.

## History of Substance Abuse

Nearly 47 percent of inmates who committed suicide were identified during the intake process as having a history of substance abuse (see table 9). Most victims used alcohol, marijuana, synthetic drugs (e.g., methamphetamine, PCP, OxyContin), or multiple illegal drugs. These data are consistent with available BJS data on substance abuse history among inmates in U.S. jails (Karberg and James 2005). No significant differences were found between suicides that occurred in holding and detention facilities in regard to substance abuse. No information is available on the substance abuse history of approximately 35 percent of all inmates who committed suicide, a finding that might relate to the inadequacy of intake screening in facilities that sustained the suicides.

**Table 9.** History of Substance Abuse Among Suicide Victims in U.S. Jails: 2005–06

| SUBSTANCE ABUSE | FACILITY TYPE | | | | | |
|---|---|---|---|---|---|---|
| | HOLDING (0–72 hours) | | DETENTION (>72 hours) | | COMBINED | |
| | NUMBER | PERCENT | NUMBER | PERCENT | NUMBER | PERCENT |
| Yes | 29 | 50.0 | 188 | 46.3 | 217 | 46.8 |
| No | 11 | 19.0 | 72 | 17.7 | 83 | 17.9 |
| Unknown | 18 | 31.0 | 146 | 36.0 | 164 | 35.3 |
| **Total** | **58** | **100.0** | **406** | **100.0** | **464** | **100.0** |

Source: National Institute of Corrections and National Center on Institutions and Alternatives, National Study of Jail Suicides, 2006.

## History of Medical Problems

Only 27.6 percent of inmates who committed suicide indicated a history of medical problems (e.g., cardiac issues, seizures, diabetes, hypertension, asthma) during the intake process (see table 10). This is somewhat lower than available BJS data on medical problems among inmates in U.S. jails (Maruschak 2006). Significant differences were found between suicides that occurred in holding and detention facilities in regard to medical problems; holding facilities reported fewer medical problems. No information is available about medical concerns in approximately 30 percent of all inmates who committed suicide, a finding that might relate to the inadequacy of intake screening in facilities that sustained the suicides.

**Table 10.** History of Medical Problems Among Suicide Victims in U.S. Jails: 2005–06

| MEDICAL PROBLEMS | FACILITY TYPE | | | | | |
|---|---|---|---|---|---|---|
| | HOLDING (0–72 hours) | | DETENTION (>72 hours) | | COMBINED | |
| | NUMBER | PERCENT | NUMBER | PERCENT | NUMBER | PERCENT |
| Yes | 5 | 8.6 | 123 | 30.3 | 128 | 27.6 |
| No | 32 | 55.2 | 166 | 40.9 | 198 | 42.7 |
| Unknown | 21 | 36.2 | 117 | 28.8 | 138 | 29.7 |
| **Total** | **58** | **100.0** | **406** | **100.0** | **464** | **100.0** |

Source: National Institute of Corrections and National Center on Institutions and Alternatives, National Study of Jail Suicides, 2006.

## History of Mental Illness

The research literature on suicide in the general community shows a strong relationship between suicide and mental illness. Although the vast majority of individuals who suffer from mental illness do not commit suicide, it is estimated that more than 90 percent of suicides are associated with mental or addictive disorders and that approximately two-thirds of individuals who commit suicide are depressed at the time of their deaths (Moscicki 2001).

Only 38.1 percent of inmates who committed suicide were identified as having a history of mental illness during the intake process (see table 11). Most inmates with mental illness who later committed suicide suffered from depression or psychosis.[9] The percentage of victims with mental illness was also significantly lower than available BJS data on mental health problems among inmates in U.S. jails. For example, recent BJS data show that 64 percent of jail inmates reported a history of mental health problems and 61 percent reported symptoms of mental health disorders within the past 12 months (James and Glaze 2006). Significant differences were found between suicides that occurred in holding and detention facilities in regard to prior mental illness, with holding facilities reporting far fewer such issues. No information is available about the mental health of approximately 30 percent of all inmates who committed suicide. This finding, along with the relatively low

---

[9] Survey respondents did not list the victims' mental illness according to the *Diagnostic and Statistical Manual III* or *IV* criteria.

reporting rate of mental illness in jail suicide victims (particularly in holding facilities), might relate to the inadequacy of intake screening in facilities that sustained the suicides.

## History of Psychotropic Medication

Nearly 20 percent of inmates who committed suicide took psychotropic medication to treat their mental illness, and most were reported to have taken an antidepressant (see table 12). This is consistent with available BJS data on the use of psychotropic medication by inmates in U.S. jails (James and Glaze 2006). The findings also indicated that approximately 16 percent of all inmates who committed suicide were receiving psychotropic medication at the time of their death. Only slight differences were found between suicides that occurred in holding and detention facilities in regard to the use of psychotropic medication. No information is available about the use of psychotropic medication in approximately 40 percent of all inmates who committed suicide, a finding that might relate to the inadequacy of intake screening in facilities that sustained the suicides.

**Table 11.** History of Mental Illness Among Suicide Victims in U.S. Jails: 2005–06

| MENTAL ILLNESS | FACILITY TYPE | | | | | |
|---|---|---|---|---|---|---|
| | HOLDING (0–72 hours) | | DETENTION (>72 hours) | | COMBINED | |
| | NUMBER | PERCENT | NUMBER | PERCENT | NUMBER | PERCENT |
| Yes | 14 | 24.1 | 163 | 40.1 | 177 | 38.1 |
| No | 23 | 39.7 | 123 | 30.3 | 146 | 31.5 |
| Unknown | 21 | 36.2 | 120 | 29.6 | 141 | 30.4 |
| Total | 58 | 100.0 | 406 | 100.0 | 464 | 100.0 |

Source: National Institute of Corrections and National Center on Institutions and Alternatives, National Study of Jail Suicides, 2006.

**Table 12.** History of Psychotropic Medication Use Among Suicide Victims in U.S. Jails: 2005–06

| PSYCHOTROPIC MEDICATION | FACILITY TYPE | | | | | |
|---|---|---|---|---|---|---|
| | HOLDING (0–72 hours) | | DETENTION (>72 hours) | | COMBINED | |
| | NUMBER | PERCENT | NUMBER | PERCENT | NUMBER | PERCENT |
| Yes | 7 | 12.0 | 85 | 20.9 | 92 | 19.8 |
| No | 19 | 32.8 | 169 | 41.7 | 188 | 40.5 |
| Unknown | 32 | 55.2 | 152 | 37.4 | 184 | 39.7 |
| Total | 58 | 100.0 | 406 | 100.0 | 464 | 100.0 |

Source: National Institute of Corrections and National Center on Institutions and Alternatives, National Study of Jail Suicides, 2006.

## History of Suicidal Behavior

The research literature on suicide in jails shows a strong relationship between suicide and a history of suicidal behavior. A history of suicide attempts has consistently been shown to be one of the strongest risk factors for completed suicides (Moscicki 2001). Although the vast majority of individuals who think about suicide and/or engage in suicidal behavior do not commit suicide, it is estimated that 20 to 50 percent of individuals who commit suicide made a previous attempt to do so (American Foundation for Suicide Prevention 2009).

Only 33.8 percent of inmates who committed suicide reported a history of suicidal behavior during the intake process (see table 13). The percentage of victims who had a history of suicidal behavior is significantly higher than available BJS data on prior suicidal behavior among inmates in U.S. jails (James and Glaze 2006). Recent BJS data indicate that only 13 percent of jail inmates reported one or more suicide attempts within the past 12 months (James and Glaze 2006). Significant differences were found between suicides that occurred in holding and detention facilities in regard to prior suicidal behavior, with holding facilities reporting far less behavior. No information is available on the prior suicidal behavior of approximately 24 percent of all inmates who committed suicide; this finding, along with the relatively low identification of prior suicidal behavior in jail suicide victims, might relate to the inadequacy of intake screening in facilities that sustained the suicides.

**Table 13.** History of Suicidal Behavior Among Suicide Victims in U.S. Jails: 2005–06

| SUICIDAL BEHAVIOR | FACILITY TYPE | | | | | |
|---|---|---|---|---|---|---|
| | HOLDING (0–72 hours) | | DETENTION (>72 hours) | | COMBINED | |
| | NUMBER | PERCENT | NUMBER | PERCENT | NUMBER | PERCENT |
| Yes | 11 | 19.0 | 146 | 36.0 | 157 | 33.8 |
| No | 29 | 50.0 | 168 | 41.4 | 197 | 42.5 |
| Unknown | 18 | 31.0 | 92 | 22.6 | 110 | 23.7 |
| Total | 58 | 100.0 | 406 | 100.0 | 464 | 100.0 |

Source: National Institute of Corrections and National Center on Institutions and Alternatives, National Study of Jail Suicides, 2006.

## Characteristics of the Suicides

### Date

Fifty-two percent (240) of the suicides occurred in 2005 and 48 percent (224) occurred in 2006. The suicides were fairly evenly distributed throughout the year, although more than 22 percent occurred in July and August (see table 14). This is similar to the findings from NCIA's 1988 study (Hayes 1989). Contrary to common belief, particular seasons and/or holidays did not account for a significantly higher number of suicides, a finding confirmed by other research on suicide in

**Table 14.** Month in Which Suicide Occurred in U.S. Jails: 2005–06

| MONTH | FACILITY TYPE | | | | | |
|---|---|---|---|---|---|---|
| | HOLDING (0–72 hours) | | DETENTION (>72 hours) | | COMBINED | |
| | NUMBER | PERCENT | NUMBER | PERCENT | NUMBER | PERCENT |
| January | 6 | 10.3 | 32 | 7.9 | 38 | 8.2 |
| February | 3 | 5.2 | 21 | 5.2 | 24 | 5.2 |
| March | 10 | 17.4 | 32 | 7.9 | 42 | 9.1 |
| April | 2 | 3.4 | 39 | 8.9 | 41 | 8.8 |
| May | 5 | 8.6 | 36 | 8.9 | 41 | 8.8 |
| June | 2 | 3.4 | 33 | 8.1 | 35 | 7.6 |
| July | 6 | 10.3 | 51 | 12.8 | 57 | 12.3 |
| August | 4 | 6.9 | 43 | 10.8 | 47 | 10.2 |
| September | 3 | 5.2 | 28 | 6.9 | 31 | 6.7 |
| October | 4 | 6.9 | 29 | 7.2 | 33 | 7.1 |
| November | 6 | 10.3 | 31 | 7.7 | 37 | 7.8 |
| December | 7 | 12.1 | 31 | 7.7 | 38 | 8.2 |
| Total | 58 | 100.0 | 406 | 100.0 | 464 | 100.0 |

Source: National Institute of Corrections and National Center on Institutions and Alternatives, National Study of Jail Suicides, 2006.

confinement (Fruehwald et al. 2004). No significant differences were found between suicides that occurred in holding and detention facilities in regard to month and day of the week in which the suicides took place.

## Time of Day

Experts theorize that inmate suicides occur more often when jail staff perform less frequent supervision. NCIA's 1988 study generally supported this theory—project staff found that more than 30 percent of all suicides occurred during the 6 hours between midnight and 6 a.m. Results from the current study, however, show that almost one-third (31.9 percent) of all suicides occurred during the 6 hours between 3:01 and 9 p.m. (see table 15). This is consistent with other recent BJS data that also found that the frequency of suicides was fairly evenly distributed throughout the day (Mumola 2005). No significant differences were found between the time of day when suicides occurred in holding and detention facilities.

## Length of Confinement Prior to Suicide

Less than one-quarter (23.4 percent) of all inmates who committed suicide were dead within the first 24 hours of confinement (see table 16). This is in stark contrast to NCIA's 1988 study (Hayes 1989), which found that more than 50 percent of victims were dead within the first 24 hours. This

**Table 15.** Time of Day When Suicide Occurred in U.S. Jails: 2005–06

| TIME OF SUICIDE | FACILITY TYPE | | | | | |
|---|---|---|---|---|---|---|
| | HOLDING (0–72 hours) | | DETENTION (>72 hours) | | COMBINED | |
| | NUMBER | PERCENT | NUMBER | PERCENT | NUMBER | PERCENT |
| 12:01–3 a.m. | 8 | 13.8 | 55 | 13.5 | 63 | 13.6 |
| 3:01–6 a.m. | 5 | 8.6 | 43 | 10.6 | 48 | 10.3 |
| 6:01–9 a.m. | 1 | 1.7 | 40 | 9.9 | 41 | 8.8 |
| 9:01 a.m.–noon | 10 | 17.2 | 46 | 11.3 | 56 | 12.1 |
| 12:01–3 p.m. | 8 | 13.8 | 43 | 10.6 | 51 | 11.0 |
| 3:01–6 p.m. | 10 | 17.2 | 65 | 16.0 | 75 | 16.2 |
| 6:01–9 p.m. | 12 | 20.7 | 61 | 15.0 | 73 | 15.7 |
| 9:01 p.m.–midnight | 4 | 7.0 | 53 | 13.1 | 57 | 12.3 |
| **Total** | **58** | **100.0** | **406** | **100.0** | **464** | **100.0** |

Source: National Institute of Corrections and National Center on Institutions and Alternatives, National Study of Jail Suicides, 2006.

current finding, however, is consistent with other recent BJS data regarding length of confinement prior to suicide (Mumola 2005). In addition, whereas NCIA's prior study found that 15 percent of suicides occurred between 2 and 14 days of confinement, the most recent data indicate that 26.6 percent of the deaths occurred during this same period. However, almost half (44.8 percent) of all inmates who committed suicide in holding facilities in 2005 and 2006 were dead within the first 6 hours of confinement. Although significant, this finding is much lower than NCIA's 1988 study, which found that 80 percent of suicides in holding facilities occurred within the first 6 hours (Hayes 1989).

The availability of better screening to identify suicide risk during the initial booking process is a possible explanation for the variations in time periods prior to suicide between this study and the earlier study. Another explanation may be increased staff awareness through training that emphasized the first few hours of confinement as the highest risk period for suicide. Overall, half (52.3 percent) of all inmates who committed suicide in detention and holding facilities were dead between 2 days and 4 months of confinement (in contrast to 34.5 percent in NCIA's 1988 study).

## Intoxication

NCIA's 1988 study found a significant relationship between intoxication and inmate suicide— 60 percent of inmates who committed suicide were under the influence of alcohol, drugs, or both at the time of their death. In contrast, the recent data show that only 19.6 percent of all inmates (including 15 percent of detention facility inmates) who committed suicide were intoxicated at the time of their deaths (see table 17). However, more than 50 percent of inmates who committed suicide in holding facilities were intoxicated at the time of death. This finding is consistent with the

**Table 16.** Length of Confinement Prior to Suicide in U.S. Jails: 2005–06

| LENGTH OF CONFINEMENT | FACILITY TYPE | | | | | |
|---|---|---|---|---|---|---|
| | HOLDING (0–72 hours) | | DETENTION (>72 hours) | | COMBINED | |
| | NUMBER | PERCENT | NUMBER | PERCENT | NUMBER | PERCENT |
| 0–3 hours | 14 | 24.2 | 23 | 5.6 | 37 | 8.0 |
| 4–6 hours | 12 | 20.7 | 18 | 4.4 | 30 | 6.5 |
| 7–9 hours | 2 | 3.4 | 8 | 1.9 | 10 | 2.1 |
| 10–12 hours | 1 | 1.7 | 11 | 2.7 | 12 | 2.6 |
| 13–18 hours | 0 | 0.0 | 4 | 0.9 | 4 | 0.8 |
| 19–24 hours | 3 | 5.2 | 13 | 3.2 | 16 | 3.4 |
| 25–48 hours | 5 | 8.6 | 40 | 9.8 | 45 | 9.7 |
| 2–14 days | 11 | 19.0 | 112 | 27.7 | 123 | 26.6 |
| 15–30 days | 1 | 1.7 | 25 | 6.1 | 26 | 5.6 |
| 1–4 months | 4 | 6.9 | 89 | 22.1 | 93 | 20.1 |
| 5–7 months | 1 | 1.7 | 29 | 7.2 | 30 | 6.5 |
| 8–12 months | 0 | 0.0 | 15 | 3.7 | 15 | 3.2 |
| >1 year | 3 | 5.2 | 13 | 3.2 | 16 | 3.4 |
| Unknown | 1 | 1.7 | 6 | 1.5 | 7 | 1.5 |
| **Total** | **58** | **100.0** | **406** | **100.0** | **464** | **100.0** |

Source: National Institute of Corrections and National Center on Institutions and Alternatives, National Study of Jail Suicides, 2006.

data in table 16, which indicate that fewer inmates committed suicide within the first 24 hours of confinement, the most likely time period in which they would have been intoxicated.

Although these findings seem to indicate that most of the inmates who committed suicide were not intoxicated at the time of their deaths, there remains a strong relationship between intoxication and suicide. Intoxication acts as a precipitant of suicidal behavior, and has been consistently linked to impulsive suicides in the general community (Moscicki 2001).

## Method, Instrument, and Anchoring Device

The overwhelming majority (92.7 percent) of inmates who committed suicide chose asphyxiation by hanging as the method (see table 18). No significant differences in the method used were found between suicides that occurred in holding and detention facilities. This is consistent with findings from NCIA's 1988 study (Hayes 1989). Methods listed as "other" included self-strangulation and asphyxiation using a plastic bag.

**Table 17.** Intoxication of Suicide Victims in U.S. Jails: 2005–06

| INTOXICATION | FACILITY TYPE | | | | | |
|---|---|---|---|---|---|---|
| | HOLDING (0–72 hours) | | DETENTION (>72 hours) | | COMBINED | |
| | NUMBER | PERCENT | NUMBER | PERCENT | NUMBER | PERCENT |
| Alcohol | 19 | 32.7 | 33 | 8.1 | 52 | 11.2 |
| Drugs | 8 | 13.8 | 25 | 6.2 | 33 | 7.1 |
| Both alcohol and drugs | 3 | 5.2 | 3 | 0.7 | 6 | 1.3 |
| Neither alcohol nor drugs | 21 | 36.2 | 307 | 75.6 | 328 | 70.7 |
| Unknown | 7 | 12.1 | 38 | 9.4 | 45 | 9.7 |
| **Total** | **58** | **100.0** | **406** | **100.0** | **464** | **100.0** |

Source: National Institute of Corrections and National Center on Institutions and Alternatives, National Study of Jail Suicides, 2006.

As shown in table 19, two-thirds (66.4 percent) of inmates who committed suicide used their bedding as the instrument. Clothing (other than shoelaces and belts) was used in 15.5 percent of suicides. These findings are in contrast to NCIA's 1988 study, which found that slightly less than half (47.9 percent) of the suicides involved bedding and 34 percent involved clothing (Hayes 1989). Significant differences in regard to the instrument used were found between suicides that occurred in holding and detention facilities. Clothing (other than shoelaces and belts) was used in 46.5 percent of suicides that occurred in holding facilities, but in only 11.1 percent of those that occurred in detention facilities. Bedding was used in 71.2 percent of suicides that occurred in detention facilities, but in only 32.8 percent of those that occurred in holding facilities. It is likely that these differences, which are consistent with findings from NCIA's 1988 study (Hayes 1989), occurred because holding facilities are less likely to confine individuals overnight and therefore make less use of bedding.

More than half of the inmates who committed suicide by hanging used either the bed/bunk (29.6 percent) or bars or cell door (27.0 percent) as the anchoring device (see table 20). Ventilation grates were used in 18.2 percent of the deaths; another study on prison suicide found that ventilation grates were used in more than 50 percent of deaths by hanging (He et al. 2001). A recently released national study on juvenile suicides in confinement found that door knobs and hinges (21 percent), air vent grates (20 percent), bunk frames and holes (20 percent), and window frames (15 percent) were the anchoring devices used in most suicides that occurred among youth (Hayes 2009). Telephones that have cords of varying length and that are located inside holding and booking cells also have been used in hanging attempts (Hayes 2003; Quinton and Dolinak 2003). Findings from this study indicate that multiple anchoring devices, however innocuous they may appear, are routinely available to inmates who attempt to commit suicide by hanging.

**Table 18.** Method of Suicide in U.S. Jails: 2005–06

| METHOD | FACILITY TYPE | | | | | |
|---|---|---|---|---|---|---|
| | HOLDING (0–72 hours) | | DETENTION (>72 hours) | | COMBINED | |
| | NUMBER | PERCENT | NUMBER | PERCENT | NUMBER | PERCENT |
| Hanging | 56 | 96.6 | 374 | 92.1 | 430 | 92.7 |
| Overdose | 1 | 1.7 | 5 | 1.2 | 6 | 1.3 |
| Cutting | 0 | 0.0 | 6 | 1.5 | 6 | 1.3 |
| Jumping | 0 | 0.0 | 8 | 2.0 | 8 | 1.7 |
| Ingestion of foreign object | 0 | 0.0 | 2 | 0.5 | 2 | 0.4 |
| Other | 1 | 1.7 | 11 | 2.7 | 12 | 2.6 |
| **Total** | **58** | **100.0** | **406** | **100.0** | **464** | **100.0** |

Source: National Institute of Corrections and National Center on Institutions and Alternatives, National Study of Jail Suicides, 2006.

**Table 19.** Instrument Used in Suicide in U.S. Jails: 2005–06

| INSTRUMENT | FACILITY TYPE | | | | | |
|---|---|---|---|---|---|---|
| | HOLDING (0–72 hours) | | DETENTION (>72 hours) | | COMBINED | |
| | NUMBER | PERCENT | NUMBER | PERCENT | NUMBER | PERCENT |
| Bedding | 19 | 32.8 | 289 | 71.2 | 308 | 66.4 |
| Clothing | 27 | 46.5 | 45 | 11.1 | 72 | 15.5 |
| Shoelace | 7 | 12.1 | 12 | 3.0 | 19 | 4.1 |
| Belt | 1 | 1.7 | 5 | 1.2 | 6 | 1.3 |
| Towel | 0 | 0.0 | 7 | 1.7 | 7 | 1.5 |
| Razor/knife | 0 | 0.0 | 5 | 1.2 | 5 | 1.1 |
| Drugs | 1 | 1.7 | 5 | 1.2 | 6 | 1.3 |
| None | 0 | 0.0 | 7 | 1.7 | 7 | 1.5 |
| Unknown | 3 | 5.2 | 31 | 7.7 | 34 | 7.3 |
| **Total** | **58** | **100.0** | **406** | **100.0** | **464** | **100.0** |

Source: National Institute of Corrections and National Center on Institutions and Alternatives, National Study of Jail Suicides, 2006.

## Time Span Between Last Observation and Finding Victim

Nearly 21 percent of suicide victims were found less than 15 minutes after the last observation, and 30.8 percent of victims were found more than 1 hour after the last observation (see table 21). No significant differences were found between suicides that occurred in holding and detention facilities in regard to time span. This is different from NCIA's 1988 study, which found that 42.3 percent of victims were found less than 15 minutes after the last observation and only 11.2 percent were found more than 1 hour after the last observation (Hayes 1989). There is no clear explanation for these differences in time span between the two studies.

## Administration of Cardiopulmonary Resuscitation

Almost two-thirds (62.7 percent) of respondents stated that jail staff administered cardiopulmonary resuscitation (CPR) to the victim before medical personnel arrived (see table 22). Jail staff did not administer CPR in the remaining cases because they believed the victim was already dead, were waiting for medical staff to arrive, or did not have training in CPR. This finding is consistent with a recent study of prison suicides, which found that first responders (usually officers) failed to initiate life-saving measures in approximately one-third of cases involving suicide (Patterson and Hughes 2008). In addition, only 35.6 percent of respondents stated that jail or medical personnel used an automated external defibrillator (AED) on the victim. In the majority of cases, staff did not have access to an AED.

**Table 20.** Anchoring Device Used in Hanging in U.S. Jails: 2005–06

| ANCHORING DEVICE | NUMBER | PERCENT |
|---|---|---|
| Bed or bunk | 127 | 29.6 |
| Bars or cell door | 116 | 27.0 |
| Ventilation grate | 78 | 18.2 |
| Shower hardware | 16 | 3.7 |
| Corded telephone | 14 | 3.3 |
| Conduit piping | 12 | 2.8 |
| Light fixture | 9 | 2.1 |
| Window | 8 | 1.8 |
| Shelf/clothing hook | 8 | 1.8 |
| Smoke detector | 6 | 1.3 |
| Other | 24 | 5.6 |
| Unknown | 12 | 2.8 |
| **Total** | **430** | **100.0** |

Source: National Institute of Corrections and National Center on Institutions and Alternatives, National Study of Jail Suicides, 2006.

**Table 21.** Time Span Between Last Observation and Finding Victim in U.S. Jails: 2005–06

| TIME SPAN | FACILITY TYPE | | | | | |
|---|---|---|---|---|---|---|
| | HOLDING (0–72 hours) | | DETENTION (>72 hours) | | COMBINED | |
| | NUMBER | PERCENT | NUMBER | PERCENT | NUMBER | PERCENT |
| <15 minutes | 10 | 17.2 | 86 | 21.2 | 96 | 20.7 |
| 15–30 minutes | 12 | 20.7 | 91 | 22.4 | 103 | 22.2 |
| 30–60 minutes | 9 | 15.5 | 78 | 19.2 | 87 | 18.8 |
| 1–3 hours | 15 | 25.9 | 89 | 21.9 | 104 | 22.4 |
| >3 hours | 9 | 15.5 | 30 | 7.4 | 39 | 8.4 |
| Unknown | 3 | 5.2 | 32 | 7.9 | 35 | 7.5 |
| **Total** | **58** | **100.0** | **406** | **100.0** | **464** | **100.0** |

Source: National Institute of Corrections and National Center on Institutions and Alternatives, National Study of Jail Suicides, 2006.

**Table 22.** Administration of Cardiopulmonary Resuscitation (CPR) to Suicide Victims in U.S. Jails: 2005–06

| CPR ADMINISTRATION | FACILITY TYPE | | | | | |
|---|---|---|---|---|---|---|
| | HOLDING (0–72 hours) | | DETENTION (>72 hours) | | COMBINED | |
| | NUMBER | PERCENT | NUMBER | PERCENT | NUMBER | PERCENT |
| Yes | 36 | 62.1 | 255 | 62.8 | 291 | 62.7 |
| No | 22 | 37.9 | 151 | 37.2 | 173 | 37.3 |
| **Total** | **58** | **100.0** | **406** | **100.0** | **464** | **100.0** |

Source: National Institute of Corrections and National Center on Institutions and Alternatives, National Study of Jail Suicides, 2006.

## Housing Assignment

At the time of death, approximately 60 percent of inmates who committed suicide were assigned to single-occupancy cells and 40 percent were housed in multiple-occupancy cells. Cellmates were absent from the cells in about two-thirds of the suicides that occurred in multiple-occupancy cells. No significant differences were found between suicides that occurred in holding and detention facilities in regard to housing assignment.

Well over one-third (38.4 percent) of inmates who committed suicide were in isolation or segregation at the time of their deaths (see table 23), and 29.3 percent of inmates who committed suicide had a history of being placed in isolation or segregation prior to their deaths. Many more inmates who committed suicide in detention facilities were in isolation or segregation than inmates who died in holding facilities (41.1 percent versus 19.0 percent). In contrast, NCIA's 1988 study found that 67 percent of the victims were held in isolation at the time of their death (Hayes 1989). A possible explanation for the decreased use of isolation for inmates who later committed suicide is increased staff awareness through training that emphasized isolation as a contributing factor to inmate suicides.

**Table 23.** Isolation or Segregation at Time of Death for Suicide Victims in U.S. Jails: 2005–06

| ISOLATION/ SEGREGATION | FACILITY TYPE | | | | | |
|---|---|---|---|---|---|---|
| | HOLDING (0–72 hours) | | DETENTION (>72 hours) | | COMBINED | |
| | NUMBER | PERCENT | NUMBER | PERCENT | NUMBER | PERCENT |
| Yes | 11 | 19.0 | 167 | 41.1 | 178 | 38.4 |
| No | 47 | 81.0 | 236 | 58.2 | 283 | 61.0 |
| Unknown | 0 | 0.0 | 3 | 0.7 | 3 | 0.6 |
| **Total** | **58** | **100.0** | **406** | **100.0** | **464** | **100.0** |

Source: National Institute of Corrections and National Center on Institutions and Alternatives, National Study of Jail Suicides, 2006.

## Suicide Precautions

Only 7.5 percent of the inmates who committed suicide were on suicide precautions at the time of their deaths (see table 24). No significant differences were found between suicides that occurred in holding and detention facilities in regard to suicide precautions. Of the 35 inmates who committed suicide while on suicide precautions, 6 were being observed at 30-minute intervals, 24 at 15-minute intervals, 1 at 10-minute intervals, and 4 were under constant observation (including closed-circuit television (CCTV) monitoring). Of the inmates who committed suicide, 29.5 percent had previously been placed on suicide precautions during their current or previous confinement, and some of them were removed from this status shortly before their death.

**Table 24.** Suicide Precaution Status Among Suicide Victims in U.S. Jails: 2005–06

| SUICIDE PRECAUTION STATUS | FACILITY TYPE | | | | | |
|---|---|---|---|---|---|---|
| | HOLDING (0–72 hours) | | DETENTION (>72 hours) | | COMBINED | |
| | NUMBER | PERCENT | NUMBER | PERCENT | NUMBER | PERCENT |
| Yes | 4 | 6.9 | 31 | 7.6 | 35 | 7.5 |
| No | 54 | 93.1 | 375 | 92.4 | 429 | 92.5 |
| **Total** | **58** | **100.0** | **406** | **100.0** | **464** | **100.0** |

Source: National Institute of Corrections and National Center on Institutions and Alternatives, National Study of Jail Suicides, 2006.

There may be several reasons why inmates are able to commit suicide while on suicide precautions: (1) jail staff do not observe the inmate at the required time interval, (2) the inmate is on an observation level that is not commensurate with the level of risk (e.g., an acutely suicidal inmate placed on a 15-minute observation level), (3) the inmate is on an observation level that is not consistent with national correctional standards (e.g., a 30-minute interval), (4) CCTV monitoring is not reliable, and (5) the inmate is placed in a cell that contains anchoring devices that can be used in a hanging attempt. In fact, because medical experts warn that brain damage from asphyxiation caused by a suicide attempt can occur within 4 minutes and death can occur within 5 to 6 minutes (American Heart Association 1992), observation at 10- or 15-minute intervals is only sufficient under the following conditions—surveillance must be conducted at staggered intervals (e.g., 5 minutes, 10 minutes, 7 minutes) and the cell housing the suicidal inmate must be free of protrusions (Hayes 2006).

## No-Harm Contracts

Mental health clinicians often develop no-harm contracts with potentially suicidal inmates, seeking assurance that their clients will not engage in self-injurious behavior. Correctional facilities may also ask each incoming inmate to sign a no-harm letter as a protection against liability. In truth, however, most legal experts believe that a no-harm contract or letter does not afford legal protection to a correctional agency or mental health worker. Although no-harm contracts or letters may be positive in some cases, most clinicians agree that once an inmate becomes acutely suicidal, his or her written or verbal assurances cannot be taken seriously (Thienhaus and Piasecki 1997).

The survey questionnaire defined a no-harm contract as "a verbal and/or written agreement between the inmate and facility staff/clinician in which the inmate provides assurances they will not commit suicide or engage in self-injurious behavior." Table 25 shows that 12.7 percent of the inmates who committed suicide stated that they would not commit suicide or engage in self-injurious behavior, thus casting significant doubt as to the usefulness of such a contract.

**Table 25.** No-Harm Contracts Used in U.S. Jails: 2005–06

| NO HARM CONTRACTS | FACILITY TYPE | | | | | |
|---|---|---|---|---|---|---|
| | HOLDING (0–72 hours) | | DETENTION (>72 hours) | | COMBINED | |
| | NUMBER | PERCENT | NUMBER | PERCENT | NUMBER | PERCENT |
| Yes | 1 | 1.7 | 58 | 14.3 | 59 | 12.7 |
| No | 51 | 87.9 | 317 | 78.1 | 368 | 79.3 |
| Unknown | 6 | 10.4 | 31 | 7.6 | 37 | 8.0 |
| **Total** | **58** | **100.0** | **406** | **100.0** | **464** | **100.0** |

Source: National Institute of Corrections and National Center on Institutions and Alternatives, National Study of Jail Suicides, 2006.

## Assessment by a Qualified Mental Health Professional

The survey questionnaire defined a qualified mental health professional (QMHP) as "an individual by virtue of their education, credentials, and experience that is permitted by law to evaluate and care for the mental health needs of patients. May include, but is not limited to, a psychiatrist, psychologist, clinical social worker, and psychiatric nurse." Table 26 shows that 37.1 percent of inmates who committed suicide were assessed by a QMHP prior to their deaths. Because holding facilities do not usually have QMHP staff, significant differences were found between suicides that occurred in holding and detention facilities in regard to a QMHP assessment; a much higher percentage of suicide victims in detention facilities were seen by a QMHP prior to their deaths.

**Table 26.** Qualified Mental Health Professional (QMHP) Assessment of Suicide Victims in U.S. Jails: 2005–06

| QMHP ASSESSMENT | FACILITY TYPE | | | | | |
|---|---|---|---|---|---|---|
| | HOLDING (0–72 hours) | | DETENTION (>72 hours) | | COMBINED | |
| | NUMBER | PERCENT | NUMBER | PERCENT | NUMBER | PERCENT |
| Yes | 10 | 17.2 | 162 | 39.9 | 172 | 37.1 |
| No | 46 | 79.4 | 217 | 53.4 | 263 | 56.6 |
| Unknown | 2 | 3.4 | 27 | 6.7 | 29 | 6.3 |
| **Total** | **58** | **100.0** | **406** | **100.0** | **464** | **100.0** |

Source: National Institute of Corrections and National Center on Institutions and Alternatives, National Study of Jail Suicides, 2006.

Among inmates who committed suicide and received a QMHP assessment prior to their deaths, almost half (47 percent) had been assessed within 3 days before their death (see table 27). No significant differences were found between suicides that occurred in holding and detention facilities in regard to last contact with a QMHP.

Inmates on suicide precautions should be assessed daily for suicide risk (Hayes 2005; National Commission on Correctional Health Care 2008); however, of the 35 inmates on suicide precautions at the time of their deaths, only 20 percent had been seen by a QMHP within the previous 24 hours.

**Table 27.** Suicide Victims' Last Contact With a Qualified Mental Health Professional (QMHP) in U.S. Jails: 2005–06

| LAST CONTACT WITH QMHP | NUMBER | PERCENT |
|---|---|---|
| <1 day | 34 | 19.7 |
| 1–3 days | 47 | 27.3 |
| 4–6 days | 13 | 7.6 |
| 7–13 days | 15 | 8.8 |
| 14–30 days | 18 | 10.4 |
| 1–2 months | 16 | 9.4 |
| 3–4 months | 4 | 2.3 |
| 5–6 months | 5 | 2.9 |
| 7–9 months | 1 | 0.6 |
| >1 year | 1 | 0.6 |
| Unknown | 18 | 10.4 |
| **Total** | **172** | **100.0** |

Source: National Institute of Corrections and National Center on Institutions and Alternatives, National Study of Jail Suicides, 2006.

## Court Hearing, Telephone Call, and/or Visit Prior to Suicide

Although the possible relationship between an inmate suicide and a court hearing, telephone call, and/or visit has not received considerable attention in recent prior research efforts, one earlier study found that approximately 50 percent of suicides in a large urban jail system occurred within 3 days of a court hearing (Marcus and Alcabes 1993). Approximately one-third (34.5 percent) of the inmates who committed suicide attended (or were scheduled to attend) a court hearing close to the date of their deaths (see table 28).

The vast majority (80 percent) of the inmates who committed suicide attended (or were scheduled to attend) a court hearing within 2 days of when they committed suicide (see table 29). No

**Table 28.** Suicides Occurring Close to Date of Court Hearing in U.S. Jails: 2005–06

| SUICIDE AND COURT HEARING | FACILITY TYPE | | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| | HOLDING (0–72 hours) | | DETENTION (>72 hours) | | COMBINED | |
| | NUMBER | PERCENT | NUMBER | PERCENT | NUMBER | PERCENT |
| Yes | 15 | 25.8 | 145 | 35.8 | 160 | 34.5 |
| No | 39 | 67.3 | 207 | 50.9 | 246 | 53.0 |
| Unknown | 4 | 6.9 | 54 | 13.3 | 58 | 12.5 |
| Total | 58 | 100.0 | 406 | 100.0 | 464 | 100.0 |

Source: National Institute of Corrections and National Center on Institutions and Alternatives, National Study of Jail Suicides, 2006.

**Table 29.** Suicides Occurring Close to a Scheduled Court Hearing in U.S. Jails: 2005–06

| SCHEDULED COURT HEARING | NUMBER | PERCENT |
| --- | --- | --- |
| <1 day | 39 | 24.3 |
| 1–2 days | 89 | 55.7 |
| 3–7 days | 32 | 20.0 |
| Total | 160 | 100.0 |

Source: National Institute of Corrections and National Center on Institutions and Alternatives, National Study of Jail Suicides, 2006.

significant differences were found in regard to attendance at a court hearing between suicides that occurred in holding and detention facilities.

Only 21.8 percent of the inmates who committed suicide received a telephone call and/or visit close to the date of their deaths (see table 30). The vast majority (approximately 80 percent) of the events were telephone calls. This variable received nearly 46 percent of "unknown" responses.

Approximately two-thirds (67.3 percent) of the inmates who committed suicide and received a telephone call and/or visit died less than 24 hours after the event (see table 31). No significant differences were found between suicides that occurred in holding and detention facilities in regard to receiving a telephone call or visit.

A significant number of respondents answered "unknown" to survey questions regarding the proximity of the suicide to a court hearing, telephone call, and/or visit. Based on the author's experience in reviewing inmate suicide cases and mortality reviews, it is likely that these relationships would be proved stronger if jails kept appropriate records.

**Table 30.** Suicides Occurring Close to a Telephone Call or Visit in U.S. Jails: 2005–06

| TELEPHONE CALL OR VISIT | FACILITY TYPE | | | | | |
|---|---|---|---|---|---|---|
| | HOLDING (0–72 hours) | | DETENTION (>72 hours) | | COMBINED | |
| | NUMBER | PERCENT | NUMBER | PERCENT | NUMBER | PERCENT |
| Yes | 16 | 27.6 | 85 | 20.9 | 101 | 21.8 |
| No | 24 | 41.4 | 127 | 31.3 | 151 | 32.5 |
| Unknown | 18 | 31.0 | 194 | 47.8 | 212 | 45.7 |
| **Total** | **58** | **100.0** | **406** | **100.0** | **464** | **100.0** |

Source: National Institute of Corrections and National Center on Institutions and Alternatives, National Study of Jail Suicides, 2006.

**Table 31.** Suicides Occurring Close to a Scheduled Telephone Call or Visit in U.S. Jails: 2005–06

| RECEIPT OF TELEPHONE CALL OR VISIT | NUMBER | PERCENT |
|---|---|---|
| <1 day | 68 | 67.3 |
| 1–2 days | 10 | 9.9 |
| 3–7 days | 3 | 3.0 |
| Unknown (but within 7 days) | 20 | 19.8 |
| **Total** | **101** | **100.0** |

Source: National Institute of Corrections and National Center on Institutions and Alternatives, National Study of Jail Suicides, 2006.

## Characteristics of the Jail Facilities

### Type, Administration, Population, and Capacity

As stated previously, data were received from 406 detention facilities and 58 holding facilities. County governments administered the vast majority (83.9 percent) of facilities that experienced suicides, followed by municipal governments (12.8 percent), private agencies (1.8 percent), and state or regional governments (1.5 percent). The average population of most detention facilities that sustained suicides was about 550 inmates, whereas holding facilities averaged 5 inmates. Approximately 70 percent of the facilities that experienced suicides were at or under capacity at the time of the inmate suicide, suggesting that overcrowding was not a contributing factor to the deaths.

### Identification and/or Screening for Suicide Risk

A correctional facility's suicide prevention efforts must include the screening and assessment of inmates when they enter the facility (Hayes 2005; National Commission on Correctional Health Care 2008). Although mental health and medical communities agree that no single set of risk factors can predict suicide, there is little disagreement about the value of screening and assessment in preventing suicide (Cox and Morschauser 1997; Hughes 1995). Intake screening for all inmates and ongoing assessment of at-risk inmates are critical because research consistently reports that at least two-thirds of suicide victims communicate their intent some time before death, and that an individual with a history of one or more suicide attempts is at a much higher risk for suicide than one who has never made an attempt (Clark and Horton-Deutsch 1992; Maris 1992). Although ideation, prior attempt(s), and/or other forms of suicidal behavior indicate current risk, other factors such as a recent significant loss, limited prior incarceration, lack of social support system, and various stressors of confinement can also be strongly related to suicide (Bonner 1992). Intake screening should include not only questions about current suicidal ideation and prior suicidal behavior, but also questions about the inmate's suicide risk during any prior confinement in the facility and the arresting and/or transporting officer(s)' belief that the inmate is currently at risk (Hayes 2005; National Commission on Correctional Health Care 2008).

Table 32 shows that the vast majority (77.1 percent) of respondents reported that they maintained an intake screening process to identify inmates' suicide risk when they entered the facility; holding facilities screened for suicide risk to a lesser degree (63.7 percent) than detention facilities (79.1 percent). However, only 27.4 percent of respondents reported that the intake screening process included verification as to whether the newly arrived inmate was on suicide precautions during any prior confinement in the jail facility (see table 33).

**Table 32.** Intake Screening for Suicide Risk in U.S. Jails: 2005–06

| INTAKE SCREENING FOR SUICIDE RISK | FACILITY TYPE | | | | | |
|---|---|---|---|---|---|---|
| | HOLDING (0–72 hours) | | DETENTION (>72 hours) | | COMBINED | |
| | NUMBER | PERCENT | NUMBER | PERCENT | NUMBER | PERCENT |
| Yes | 37 | 63.7 | 321 | 79.1 | 358 | 77.1 |
| No | 21 | 36.3 | 85 | 20.9 | 106 | 22.9 |
| **Total** | **58** | **100.0** | **406** | **100.0** | **464** | **100.0** |

Source: National Institute of Corrections and National Center on Institutions and Alternatives, National Study of Jail Suicides, 2006.

In addition, only 30.6 percent of respondents reported that the intake screening process included verification as to whether the arresting and/or transporting officer(s) believed that the newly arrived inmate was at risk for suicide (see table 34).

**Table 33.** Verification of Suicide Risk During Prior Confinement in U.S. Jails: 2005–06

| SUICIDE RISK DURING PRIOR CONFINEMENT | FACILITY TYPE | | | | | |
| | HOLDING (0–72 hours) | | DETENTION (>72 hours) | | COMBINED | |
| | NUMBER | PERCENT | NUMBER | PERCENT | NUMBER | PERCENT |
| Yes | 15 | 25.9 | 112 | 27.6 | 127 | 27.4 |
| No | 43 | 74.1 | 294 | 72.4 | 337 | 72.6 |
| Total | 58 | 100.0 | 406 | 100.0 | 464 | 100.0 |

Source: National Institute of Corrections and National Center on Institutions and Alternatives, National Study of Jail Suicides, 2006.

**Table 34.** Arresting and/or Transporting Officer Opinion About Suicide Risk in U.S. Jails: 2005–06

| ARRESTING AND/OR TRANSPORTING OFFICER OPINION ABOUT SUICIDE RISK | FACILITY TYPE | | | | | |
| | HOLDING (0–72 hours) | | DETENTION (>72 hours) | | COMBINED | |
| | NUMBER | PERCENT | NUMBER | PERCENT | NUMBER | PERCENT |
| Yes | 18 | 31.0 | 124 | 30.6 | 142 | 30.6 |
| No | 40 | 69.0 | 282 | 69.4 | 322 | 69.4 |
| Total | 58 | 100.0 | 406 | 100.0 | 464 | 100.0 |

Source: National Institute of Corrections and National Center on Institutions and Alternatives, National Study of Jail Suicides, 2006.

Thus, although a high percentage of facilities that sustained inmate suicides had a screening process to identify potentially suicidal behavior at intake, the process was flawed in that most facilities did not verify whether the newly arrived inmate was on suicide precautions during any prior confinement in the jail facility, nor whether the arresting and/or transporting officer(s) believed that the inmate was at risk for suicide.

## Suicide-Prevention Training

The essential component in any suicide prevention program is properly trained correctional staff, who form the backbone of any jail or prison facility. Very few suicides are actually prevented by

mental health, medical, or other professional staff because suicides usually take place in inmate housing units, often during late evening hours or on weekends when inmates are generally outside the purview of program staff. Therefore, correctional staff who have been trained in suicide-prevention techniques and have developed an intuitive sense about the inmates under their care must prevent these incidents. In addition, correctional officers are often the only staff available 24 hours a day and thus form the front line of defense in preventing suicides. However, as with medical and mental health personnel, correctional staff cannot detect, assess, or prevent a suicide without training. Lives are lost and jurisdictions incur unnecessary liability from these deaths when administrators fail to create and maintain effective training programs (Cohen 2008; Hayes 2005).

Table 35 shows that the majority (61.8 percent) of respondents reported that they had provided suicide-prevention training to at least 90 percent of their correctional staff, although holding facilities provided far less training (48.3 percent) than detention facilities (63.7 percent).

**Table 35.** Suicide-Prevention Training in U.S. Jails: 2005–06

| SUICIDE PREVENTION TRAINING | FACILITY TYPE | | | | | |
|---|---|---|---|---|---|---|
| | HOLDING (0–72 hours) | | DETENTION (>72 hours) | | COMBINED | |
| | NUMBER | PERCENT | NUMBER | PERCENT | NUMBER | PERCENT |
| Yes | 28 | 48.3 | 259 | 63.7 | 287 | 61.8 |
| No | 30 | 51.7 | 147 | 36.3 | 177 | 38.2 |
| **Total** | **58** | **100.0** | **406** | **100.0** | **464** | **100.0** |

Source: National Institute of Corrections and National Center on Institutions and Alternatives, National Study of Jail Suicides, 2006.

Of the respondents who reported suicide-prevention training, 74.9 percent stated that the training took place yearly. The remainder (25.1 percent) reported that training took place either biennially or on a preservice basis. Holding facilities provided far less annual training (32.2 percent) than detention facilities (79.5 percent). Further, only 6 percent of all reported suicide-prevention training was 8 hours in length. The majority (69 percent) of training was 2 hours or less. No significant differences were found between suicides that occurred in holding and detention facilities in regard to the duration of suicide-prevention training.

The combined data in tables 35 and 36 indicate that almost two-thirds (63.3 percent) of all facilities that sustained a suicide either did not provide suicide-prevention training or did not provide the training annually.

**Table 36.** Frequency of Suicide-Prevention Training in U.S. Jails: 2005–06

| FREQUENCY OF SUICIDE PREVENTION TRAINING | FACILITY TYPE | | | | | |
|---|---|---|---|---|---|---|
| | HOLDING (0–72 hours) | | DETENTION (>72 hours) | | COMBINED | |
| | NUMBER | PERCENT | NUMBER | PERCENT | NUMBER | PERCENT |
| Yearly | 9 | 32.2 | 206 | 79.5 | 215 | 74.9 |
| Other | 19 | 67.8 | 53 | 20.5 | 72 | 25.1 |
| **Total** | **28** | **100.0** | **259** | **100.0** | **287** | **100.0** |

Source: National Institute of Corrections and National Center on Institutions and Alternatives, National Study of Jail Suicides, 2006.

## CPR Certification

Following a suicide attempt, the victim's chances for survival depend on both the level and promptness of staff intervention. According to most national correctional standards and practices, a facility's emergency response policy should require all staff to be trained in CPR procedures. The vast majority (80.3 percent) of respondents reported providing CPR training to their correctional staff (see table 37); holding facilities provided slightly less training (70.7 percent) than detention facilities (81.7 percent). Almost two-thirds (62.7 percent) of respondents stated that their jail staff administered CPR to the victim before medical personnel arrived (see table 22, page 26).

**Table 37.** Certification in Cardiopulmonary Resuscitation (CPR) in U.S. Jails That Sustained a Suicide: 2005–06

| CPR CERTIFICATION | FACILITY TYPE | | | | | |
|---|---|---|---|---|---|---|
| | HOLDING (0–72 hours) | | DETENTION (>72 hours) | | COMBINED | |
| | NUMBER | PERCENT | NUMBER | PERCENT | NUMBER | PERCENT |
| Yes | 41 | 70.7 | 332 | 81.7 | 373 | 80.3 |
| No | 17 | 29.3 | 74 | 18.3 | 91 | 19.7 |
| **Total** | **58** | **100.0** | **406** | **100.0** | **464** | **100.0** |

Source: National Institute of Corrections and National Center on Institutions and Alternatives, National Study of Jail Suicides, 2006.

## Suicide Watch and Levels of Observation

National correctional standards and practices recommend two levels of supervision for suicidal inmates: close observation and constant observation (Hayes 2005; National Commission on Correctional Health Care 2008). Close observation is appropriate for an inmate who is not actively suicidal, but who expresses suicidal ideation and/or has a recent prior history of self-harming behavior. Staff should observe these inmates at staggered intervals not to exceed every 10 minutes

(e.g., 5 minutes, 10 minutes, 7 minutes). Constant observation is appropriate for an inmate who is actively suicidal (i.e., either threatening or engaging in suicidal behavior). Staff should observe these inmates on a continuous, uninterrupted basis. In some jurisdictions, staff use an intermediate level of observation that involves monitoring at staggered intervals that do not exceed 5 minutes. Other aids (e.g., CCTV, inmate companions, or observers) can be used as a supplement to, but never as a substitute for, these observation levels.

Table 38 shows that the overwhelming majority (92.7 percent) of respondents reported that they maintained a suicide watch[10] protocol (apart from CCTV or an inmate companion[11]) to provide staff observation of inmates identified as suicidal; holding facilities had such a process to a far lesser degree (69.0 percent) than detention facilities (96.1 percent). One reason why holding facilities reported a lower percentage for suicide watch protocol could be their traditional reliance on CCTV.

**Table 38.** Suicide Watch Protocol in U.S. Jails: 2005–06

| SUICIDE WATCH PROTOCOL | FACILITY TYPE | | | | | |
|---|---|---|---|---|---|---|
| | HOLDING (0–72 hours) | | DETENTION (>72 hours) | | COMBINED | |
| | NUMBER | PERCENT | NUMBER | PERCENT | NUMBER | PERCENT |
| Yes | 40 | 69.0 | 390 | 96.1 | 430 | 92.7 |
| No | 18 | 31.0 | 16 | 3.9 | 34 | 7.3 |
| **Total** | **58** | **100.0** | **406** | **100.0** | **464** | **100.0** |

Source: National Institute of Corrections and National Center on Institutions and Alternatives, National Study of Jail Suicides, 2006.

In addition, although the vast majority of facilities had a suicide watch protocol, only 1.7 percent of respondents reported that constant observation was an option for supervising suicidal inmates. The vast majority (87.2 percent) of inmates on suicide watch were required to be closely observed at 15-minute intervals. No significant differences were found between suicides that occurred in holding and detention facilities in regard to the levels of observation provided to suicidal inmates.

Slightly more than half (51.2 percent) of the respondents reported that only mental health personnel were authorized to downgrade and discharge inmates from suicide watch (see table 39). In approximately one-quarter (25.4 percent) of the facilities, either medical or mental health personnel were authorized to downgrade and discharge inmates from suicide watch. In a small number (2.2 percent) of facilities, inmates could only be removed from suicide watch when they were released from custody. Significant differences were found between holding and detention

---

[10] For purposes of the survey, "suicide watch" was defined as "the level(s) of direct visual observation by staff that is given to an inmate identified as being at risk of suicide. Excludes closed circuit television, inmate companions/inmate observation aide, or any other non-staff monitoring."

[11] For purposes of the survey, "inmate companion" was defined as "a designation by which another inmate is entrusted with the responsibility of providing observation to an inmate on suicide watch."

**Table 39.** Authorization To Discharge Inmates From Suicide Watch in U.S. Jails: 2005–06

| AUTHORIZATION TO DISCHARGE FROM SUICIDE WATCH | FACILITY TYPE | | | | | |
| | HOLDING (0–72 hours) | | DETENTION (>72 hours) | | COMBINED | |
| | NUMBER | PERCENT | NUMBER | PERCENT | NUMBER | PERCENT |
|---|---|---|---|---|---|---|
| Correctional | 40 | 68.9 | 3 | 0.7 | 43 | 9.3 |
| Medical | 6 | 10.3 | 25 | 6.1 | 31 | 6.7 |
| Mental health | 0 | 0.0 | 238 | 58.6 | 238 | 51.2 |
| Medical or mental health | 3 | 5.2 | 115 | 28.3 | 118 | 25.4 |
| All | 1 | 1.8 | 23 | 5.7 | 24 | 5.2 |
| None | 8 | 13.8 | 2 | 0.6 | 10 | 2.2 |
| **Total** | **58** | **100.0** | **406** | **100.0** | **464** | **100.0** |

Source: National Institute of Corrections and National Center on Institutions and Alternatives, National Study of Jail Suicides, 2006.

facilities—most holding facilities (68.9 percent) permitted correctional personnel to downgrade and discharge inmates from suicide watch, presumably because these facilities lacked medical and/or mental health personnel. Holding facilities were also more likely to remove inmates from suicide watch only when they were released from custody.

## Safe Housing

Inmates placed on suicide precautions are frequently housed in unsafe cells containing protrusions (i.e., anchoring devices) that could be used to commit suicide by hanging (Hayes 2005; National Commission on Correctional Health Care 2008). It is well established that hanging is the method of choice in the overwhelming majority of inmate suicides (Hayes 1989). Although it is impossible to create a "suicide-proof" cell environment in any correctional facility, it is possible to ensure that any cell housing a potentially suicidal inmate is free of all obvious protrusions (Atlas 1989; Hayes 2006). Decisions about the location of cells designated to house suicidal inmates should be based on the ability to maximize staff interaction with those inmates. When possible, suicidal inmates should be housed in the general population unit, mental health unit, or medical infirmary, if available, but they should always be located close to staff. As a federal appeals court once stated, "It is true that prison officials are not required to build a suicide-proof jail. By the same token, however, they cannot equip each cell with a noose" (*Tittle* v. *Jefferson County Commission* 1992).

Two-thirds (67.9 percent) of respondents reported that they did not maintain a protocol by which suicidal inmates would be assigned to a safe, suicide-resistant, and protrusion-free cell (see table 40). No significant differences were found between holding and detention facilities in regard to the safe housing of suicidal inmates.

**Table 40.** Safe Housing for Suicidal Inmates in U.S. Jails: 2005–06

| SAFE HOUSING FOR SUICIDAL INMATES | FACILITY TYPE | | | | | |
|---|---|---|---|---|---|---|
| | HOLDING (0–72 hours) | | DETENTION (>72 hours) | | COMBINED | |
| | NUMBER | PERCENT | NUMBER | PERCENT | NUMBER | PERCENT |
| Yes | 16 | 27.6 | 133 | 32.8 | 149 | 32.1 |
| No | 42 | 72.4 | 273 | 67.2 | 315 | 67.9 |
| **Total** | **58** | **100.0** | **406** | **100.0** | **464** | **100.0** |

Source: National Institute of Corrections and National Center on Institutions and Alternatives, National Study of Jail Suicides, 2006.

## Mortality Review Process

Every completed suicide, as well as attempts that require hospitalization, should be examined through a morbidity-mortality review process (Hayes 2005, 2007; National Commission on Correctional Health Care 2008). If resources permit, a clinical review through a psychological autopsy is also recommended (Aufderheide 2000; Sanchez 2006). Ideally, an outside agency should coordinate the morbidity-mortality review to ensure impartiality. The review (separate from other formal investigations that may be required to determine the cause of death) should include a critical inquiry of the circumstances surrounding the incident, procedures relevant to the incident, all relevant training that involved staff received, pertinent medical and mental health services or reports involving the victim, precipitating factors that may have led to the suicide, and any recommendations for changes involving policy, training, the physical plant, medical or mental health services, and operational procedures.

Table 41 shows that the majority (62.9 percent) of respondents reported that they did not conduct a mortality review following the inmate suicide.[12] No significant differences were found between suicides that occurred in holding and detention facilities in regard to the mortality review process, although holding facilities were slightly less likely to conduct a review.

Survey respondents were also asked whether any possible precipitating factors (i.e., circumstances that may have caused the victim to commit suicide) were uncovered during the mortality review process. Although mortality reviews were not conducted in most cases, when they did occur, respondents either did not cite any precipitating factors or cited possible factors such as a recent conviction or sentence, fear of transfer to the state prison system, frustration or anger regarding release, death of a family member or friend, lack of family visitation, and ending of a relationship. In addition, several respondents reported poor communication among staff and/or inadequate observation by correctional officers as precipitating factors in the suicides.

---

[12] For purposes of the survey, a "mortality review" was defined as "an interdisciplinary committee process comprised of correctional, medical, and mental health personnel that examines the events surrounding the death to determine if the incident was preventable. The review process may include recommendations aimed at reducing the opportunity of future deaths."

**Table 41.** Mortality Review Process in U.S. Jails: 2005–06

| MORTALITY REVIEW PROCESS | FACILITY TYPE | | | | | |
|---|---|---|---|---|---|---|
| | HOLDING (0–72 hours) | | DETENTION (>72 hours) | | COMBINED | |
| | NUMBER | PERCENT | NUMBER | PERCENT | NUMBER | PERCENT |
| Yes | 16 | 27.6 | 148 | 36.5 | 164 | 35.3 |
| No | 42 | 72.4 | 250 | 61.6 | 292 | 62.9 |
| Unknown | 0 | 0.0 | 8 | 1.9 | 8 | 1.8 |
| **Total** | **58** | **100.0** | **406** | **100.0** | **464** | **100.0** |

Source: National Institute of Corrections and National Center on Institutions and Alternatives, National Study of Jail Suicides, 2006.

Finally, respondents were asked whether the mortality review process resulted in any recommendations for corrective action to reduce the likelihood of future suicides. For the cases in which the reviews occurred, respondents either did not cite any recommendations for corrective action or cited actions such as staff being reassigned or fired, increased staff training, revision of the suicide watch process, and revision of the intake screening process.

### Written Suicide-Prevention Policy

The literature is replete with examples of how jail and prison systems have developed effective suicide-prevention programs (Cox and Morschauser 1997; Goss et al. 2002; Hayes 1995, 1998; White and Schimmel 1995). New York experienced a significant drop in the number of jail suicides following the implementation of a statewide comprehensive prevention program (Cox and Morschauser 1997). Texas saw a 50-percent decrease in the number of county jail suicides and nearly a sixfold decrease in the rate of these suicides from 1986 through 1996; much of it can be attributed to increased staff training and a state requirement for jails to maintain suicide-prevention policies (Hayes 1996). One researcher reported no suicides during a 7-year period in a large county jail after suicide-prevention policies were developed based on the following principles: screening; psychological support; close observation; removal of dangerous items from cells; clear and consistent procedures; and diagnosis, treatment, and transfer of suicidal inmates to the hospital as necessary (Felthous 1994).

The American Correctional Association (ACA), American Psychiatric Association (APA), and National Commission on Correctional Health Care (NCCHC) are advocates for comprehensive suicide prevention programs. These organizations have promulgated national correctional standards that are adaptable to individual jail, prison, and juvenile facilities. Although the ACA standards are the most widely recognized throughout the country, they provide limited guidance about suicide prevention and simply state that institutions should have a written prevention policy that is

reviewed by medical or mental health staff. ACA's broad focus on the operation and administration of correctional facilities precludes these standards from containing needed specificity. Both the APA and NCCHC standards, however, are much more instructive and offer the following recommendations for a suicide prevention program: identification, training, assessment, monitoring, housing, referral, communication, intervention, notification, reporting, review, and critical incident debriefing (American Psychiatric Association 2000; National Commission on Correctional Health Care 2008).

Table 42 shows that the vast majority (84.9 percent) of survey respondents reported that their facilities maintained a written suicide-prevention policy at the time of the suicide, although holding facilities maintained policies to a lesser degree (70.7 percent).

**Table 42.** Written Suicide-Prevention Policy in U.S. Jails: 2005–06

| WRITTEN SUICIDE PREVENTION POLICY | FACILITY TYPE | | | | | |
| | HOLDING (0–72 hours) | | DETENTION (>72 hours) | | COMBINED | |
| | NUMBER | PERCENT | NUMBER | PERCENT | NUMBER | PERCENT |
| Yes | 41 | 70.7 | 353 | 86.9 | 394 | 84.9 |
| No | 17 | 29.3 | 53 | 13.1 | 70 | 15.1 |
| **Total** | **58** | **100.0** | **406** | **100.0** | **464** | **100.0** |

Source: National Institute of Corrections and National Center on Institutions and Alternatives, National Study of Jail Suicides, 2006.

However, as stated previously, the quality of the written policies for suicide prevention is questionable. For example, although many respondents reported that their facilities maintained an intake screening process to identify the suicide risk of inmates entering the facility, in most facilities the process did not include verification as to whether the arresting and/or transporting officer(s) believed that the newly arrived inmate was at risk for suicide, nor whether the inmate was at risk for suicide during prior confinement. In addition, although the majority of respondents reported that staff in their facilities received suicide-prevention training, most of the training was 2 hours or less in duration. Most surveyed facilities had a suicide watch protocol, but few provided constant observation. Further, only one-third of respondents reported the availability of protrusion-free housing for suicidal inmates, and most did not provide a mortality review following an inmate suicide. These findings are consistent with a national survey on juvenile suicide in confinement indicating that although the vast majority of facilities had a written suicide-prevention policy, only 20 percent had written policies encompassing all of the components of a suicide-prevention program (Hayes 2009).

# Chapter 4. Special Considerations



## The Changing Face of Jail Suicide

The National Center on Institutions and Alternatives' (NCIA's) 1981 and 1988 national studies of jail suicide found that, despite a 7-year time interval, demographic data on inmate suicides did not change dramatically. Most of the key characteristics of jail suicide—offense, intoxication, method and instrument, isolation, and length of confinement—remained constant over time (Hayes 1989).

Twenty years later, this national study of jail suicides found substantial changes in the demographic characteristics of inmates who committed suicide during 2005–06. Table 43 shows that some of these changes are stark. For example, suicide victims once characterized as being confined on "minor other" offenses were most recently confined on "personal and/or violent" charges. Intoxication was previously viewed as a leading precipitant to inmate suicide, yet recent data indicate that it is now found in only a minority of cases. Previously, more than half of all jail suicide victims were dead within the first 24 hours of confinement; current data suggest that less than one-quarter of all victims commit suicide during this time period, with an equal number of deaths occurring between 2 and 14 days of confinement. In addition, it appears that inmates who committed suicide were far less likely to be housed in isolation than previously reported, yet for unknown reasons it was less likely that they would be found within 15 minutes of the last observation by staff. Finally, more jail facilities that experienced inmate suicides had both written suicide-prevention policies and an intake screening process to identify suicide risk than in previous years, although the comprehensiveness of programming remains questionable.

*Previously, more than half of all jail suicide victims were dead within the first 24 hours of confinement; current data suggest that less than one-quarter of all victims commit suicide during this time period, with an equal number of deaths occurring between 2 and 14 days of confinement.*

## Jail Suicide Rates

Suicide continues to be a leading cause of death among inmates in the nation's jails. However, a simple question that is routinely asked—"Aside from the number of deaths, what is the jail suicide rate throughout the country?"—often evokes controversy (Lester and Yang 2008; Metzner 2002; O'Toole 2008). Suicide rates are calculated using either average daily population (ADP) or yearly admission data. Many jail administrators would argue that the suicide rate should be calculated based on the total number of inmates who pass through a facility each year, suggesting that each of them is at potential risk of suicide and should be counted. A suicide rate calculated according to yearly admissions would result in a much lower number. For example, few would argue that there would be cause for concern if a 2,000-bed jail experienced 3 inmate suicides during the course of 12 months. If yearly admissions were used to calculate the suicide rate of this jail, and approximately 17,000 inmates passed through the facility each year,[13] the rate would be 17.6 deaths per 100,000 inmates. If, however, the ADP was used to calculate the suicide rate, the rate would be 150 deaths per 100,000 inmates.

---

[13] Based on an actual example.

**Table 43.** Changing Face of Suicide in U.S. Jails: 1985–86 to 2005–06

| VARIABLE | 1985–86 | 2005–06 |
|---|---|---|
| Facility type | 70% detention | 88% detention |
| Race | 72% white | 67% white |
| Gender | 94% male | 93% male |
| Age | 30 | 35 |
| Marital status | 52% single | 42% single |
| Most serious charge | 29% minor other | 43% personal and/or violent |
| Jail status | 89% detained | 91% detained |
| Intoxication at death | 60% | 20% |
| Time of suicide | 30% between midnight and 6 a.m. | 32% between 3:01 and 9 p.m. |
| Length of confinement | 51% within first 24 hours | 23% within first 24 hours |
| Method | 94% hanging | 93% hanging |
| Instrument | 48% bedding | 66% bedding |
| Time span between last observation and finding victim | 42% found within 15 minutes | 21% found within 15 minutes |
| Isolation | 67% | 38% |
| Known history of suicidal behavior | 16% | 34% |
| Known history of mental illness | 19% | 38% |
| Intake screening for suicide risk | 30% | 77% |
| Written suicide-prevention policy | 51% | 85% |

Source: National Institute of Corrections and National Center on Institutions and Alternatives, National Study of Jail Suicides, 2006.

Historically, suicide rates have been calculated using the ADP. Experts in methodology would argue that yearly admission data are often unreliable (Mumola 2005) and, because the vast majority of individuals spend considerably less time in jail during the year than in the community, it is more appropriate to use the ADP. As previously discussed, the Bureau of Justice Statistics (BJS) has been collecting and analyzing limited inmate suicide data pursuant to the Death in Custody Reporting Act of 2000. Although BJS calculations of suicide rates have previously been based on the ADP, BJS apparently was sensitive to the controversy when it recently wrote that "BJS has usually based jail mortality rates on the average daily population of inmates (an ADP of under 700,000). A more sensitive measure of jail mortality would reflect the far larger number of admissions into these facilities over the entire year (nearly 13 million). All of these persons admitted are at risk of dying while held in jail" (Mumola 2005:5). BJS began collecting annual admission data on the 50 largest jails "to calculate an at-risk measure of mortality" and found the ADP-based suicide rate for these jurisdictions (29 per 100,000) was 14 times the at-risk suicide rate (2 per 100,000) (Mumola 2005). However, BJS still uses ADP data to calculate the overall suicide rate of jails (excluding holding facilities) throughout the country. According to the most recent BJS data, the suicide rate in jails during 2006 was 36 deaths per 100,000 inmates. These data also suggest that the jail suicide rate has been in decline since the reporting program began in 2000 (Mumola and Noonan 2008).

It is important to compare jail suicide rates with the suicide rate in the general population. The Centers for Disease Control and Prevention (CDC) uses general population statistics (not data based on yearly admission or entry into the United States) to calculate the suicide rate in the community each year. Thus, to compare the rate of suicide in jail to that in the community, the ADP must be used. The most recent CDC data calculate the suicide rate in the community at 11 deaths per 100,000 citizens (Heron et al. 2009). Based on these data, the jail suicide rate (as calculated by BJS) is approximately three times greater than that in the general population in the community.

There are several reasons for the higher rate of suicide in jail. Jail environments are conducive to suicidal behavior and an individual entering a jail is at increased risk of facing a crisis situation. From an inmate's perspective, certain features of the jail environment may enhance suicidal behavior: fear of the unknown, distrust of an authoritarian environment, perceived lack of control over the future, isolation from family and significant others, the shame of being incarcerated, and the perceived dehumanizing aspects of incarceration. In addition, certain factors that are common among inmates facing a crisis situation could predispose them to suicide: recent excessive use of alcohol and/or drugs, recent loss of stabilizing resources, severe guilt or shame over the alleged offense, current mental illness, prior history of suicidal behavior, and approaching court date. Some inmates simply are (or become) ill equipped to handle the common stresses of confinement.

Some have argued that jail populations are biased in a number of ways that affect and, perhaps, distort suicide rates. One theorist stated that: "Two of the primary problems that make jails high suicide risk points are their unusual population and the high cyclic rate or the total number of people exposed to a jail in the course of a year" (Stone 1987:84), arguing that there are certain variables (including sex, age, marital status, occupational status, and alcoholism) that relate to suicide

in the general population that are predominantly found in jails and, therefore, make such environments more suicide prone. In addition, the jail suicide rate "is affected by the 'cyclic rate'…. What is occurring in jails is that large numbers of a very suicide-prone population are submitted to short periods of stay. You might say that our jails are 'testing' the suicide potential of a suicide prone group" (Stone 1987:84).

Despite this possible distortion, the examination of suicide rate comparisons enhances our understanding of the jail suicide problem. The 1988 national study of jail suicides calculated 107 suicides per 100,000 inmates in detention facilities in 1986 (based on the ADP in those facilities); that rate was approximately 9 times greater than the rate in the general population (Hayes 1989).[14] NCIA's most recent national study of jail suicide identified 288 suicides that occurred in detention facilities in 2006. Based on these data, and using the BJS methodology indicating a national ADP of 755,896,[15] there were 38 suicides per 100,000 inmates in detention facilities in 2006, and that rate was approximately 3 times greater than the rate in the general population.

This calculation is consistent with previously reported BJS data and it confirms that there has been a dramatic decrease in the suicide rate in detention facilities during the past 20 years. The nearly threefold decrease from 107 suicides in 1986 to 38 suicides in 2006 is extraordinary. Absent indepth scientific inquiry, there may be several explanations for the reduced suicide rate. During the past several years, NCIA's prior national studies of jail suicide have given a face to this long-standing and often ignored public health issue in the nation's jails. Findings from the studies have been widely distributed throughout the country and were eventually incorporated into suicide-prevention training curricula. The increased awareness about the problem of suicide among jail inmates is also reflected in national correctional standards that now require comprehensive suicide-prevention programming, better training of jail staff, and more indepth inquiry of suicide risk factors during the intake process. Finally, litigation involving jail suicide has persuaded (or forced) counties and facility administrators to take corrective actions in reducing the opportunity for future deaths. Therefore, the antiquated mindset that "inmate suicides cannot be prevented" should forever be put to rest.

*The increased awareness about the problem of suicide among jail inmates is also reflected in national correctional standards that now require comprehensive suicide-prevention programming, better training of jail staff, and more indepth inquiry of suicide risk factors during the intake process.*

---

[14] Rates of suicide in holding facilities were not computed due to the unreliability of average daily population data.

[15] See Sabol, Minton, and Harrison 2007.

# Chapter 5. Conclusion



The primary goal of this study was to provide updated data on the extent and distribution of inmate suicides throughout the country, as well as to gather recent descriptive data on the demographic characteristics of each victim, characteristics of the incident, and characteristics of the holding or detention facility that sustained the suicide. To that end, project staff compiled significant data on inmate suicides throughout the country, and it is hoped that these findings can be used as a resource tool for practitioners in expanding their knowledge base and for facility administrators in creating and/or revising sound policies and training curricula on suicide prevention.

## Comprehensive Suicide-Prevention Programming

The findings indicate that, although the vast majority of facilities that sustained a suicide had a written suicide-prevention policy, the comprehensiveness of the program was questionable. For example, even though many respondents reported that their facilities maintained an intake screening process to identify the suicide risk of inmates entering the facility, the process for most facilities did not include verification as to whether the arresting and/or transporting officer(s) believed that the newly arrived inmate was at risk for suicide, nor whether the inmate was at risk for suicide during prior confinement. In addition, although the majority of respondents reported that their facilities provided suicide-prevention training to staff, most of the training was 2 hours or less in duration. Most surveyed facilities had a suicide watch protocol, but few provided for constant observation. Further, only one-third of respondents reported the availability of protrusion-free housing for suicidal inmates and most did not provide a mortality review following an inmate suicide.

*Although the vast majority of facilities that sustained a suicide had a written suicide-prevention policy, the comprehensiveness of the program was questionable.*

Consistent with national correctional standards, as well as practices in facilities that have effectively reduced the opportunity for inmate suicide, all holding and detention facilities (regardless of size and type) must have a detailed, written, suicide-prevention policy that addresses each of the critical components discussed in the following sections (Hayes 2005; Metzner and Hayes 2006; National Commission on Correctional Health Care 2008).

### Training

All correctional, medical, and mental health personnel, as well as any staff who have regular contact with inmates, should receive 8 hours of initial suicide-prevention training and 2 hours of refresher training each year. The initial training should include instruction regarding administrator and staff attitudes about suicide and how negative attitudes impede suicide-prevention efforts, why correctional facilities' environments are conducive to suicidal behavior, potential predisposing factors to suicide, high-risk suicide periods, warning signs and symptoms, how to identify suicidal inmates despite a denial of risk, components of the facility's suicide-prevention policy, and liability

issues associated with inmate suicide. The 2-hour refresher training should review the topics discussed during the initial training and also describe any changes to the facility's suicide prevention plan. The annual training should also include a general discussion of any recent suicides and/or suicide attempts in the facility.

In addition, all staff who are in contact with inmates should be trained in standard first aid and cardiopulmonary resuscitation (CPR) procedures, and all staff should learn how to use the emergency equipment located in each housing unit. To ensure an efficient emergency response to suicide attempts, mock drills should be incorporated into both the initial and refresher training for all staff.

## Identification, Referral, and Evaluation

Intake screening and ongoing assessment of all inmates are critical to a correctional facility's suicide-prevention efforts. Screening should not be a single event but a continuous process because inmates can become suicidal at any point during their confinement, including during initial admission into the facility, after adjudication when the inmate is returned to the facility from court, after receiving bad news or after suffering any type of humiliation or rejection, during confinement in isolation or segregation, and following a prolonged stay in the facility.

*Screening should not be a single event but a continuous process because inmates can become suicidal at any point during their confinement.*

Intake screening for suicide risk can be included on the medical screening form or it can be a separate form. The screening process should include questions about past suicidal ideation and/or attempts; current ideation, threat, or a plan to commit suicide; prior mental health treatment or hospitalization; any recent significant loss (e.g., job, relationship, death of family member or close friend); history of suicidal behavior by a family member or close friend; suicide risk during prior confinement; and the arresting and/or transporting officer(s)' belief that the inmate is currently at risk. Specifically, the suicide screening process should determine the following:

- Was the inmate a medical, mental health, or suicide risk during any prior contact and/or confinement in this facility?

- Does the arresting and/or transporting officer have any information (e.g., from observed behavior, documentation from sending agency or facility, conversation with family member) that indicates the inmate is currently a medical, mental health, or suicide risk?

- Has the inmate ever attempted suicide?

- Has the inmate ever considered suicide?

- Is the inmate being treated for mental health or emotional problems, or has the inmate been treated in the past?

- Has the inmate recently experienced a significant loss (e.g., relationship, death of family member or close friend, job)?

- Has a family member or close friend ever attempted or committed suicide?

- Does the inmate feel there is nothing to look forward to in the immediate future (i.e., is the inmate expressing helplessness and/or hopelessness)?

- Is the inmate thinking of hurting and/or killing himself or herself?

An inmate's verbal responses during the intake screening process are critically important when assessing the risk of suicide. However, staff should not rely exclusively on an inmate's statement that he or she is not suicidal and/or does not have a history of mental illness or suicidal behavior, particularly when the inmate's behavior, actions, or previous confinement in the facility suggest otherwise. The process should also include procedures for referring the inmate to mental health and/or medical personnel for a more thorough and complete assessment.

In addition, given the strong association between suicide and placement in isolation or a special housing unit (e.g., disciplinary and/or administrative segregation), any inmate assigned to such a special housing unit should receive a written assessment for suicide risk by medical or mental health staff upon admission to the placement.

Finally, findings from this study demonstrate that the majority of suicides do not occur within the first 24 hours of confinement. In addition, various high-risk periods are associated with potentially suicidal behavior, including whether the inmate has an upcoming date for a court hearing and following a telephone call or scheduled visit. Staff must be aware of these high-risk periods so they can effectively assess inmates' risk for suicide.

## Communication

The screening and assessment process is one of several tools that can be used to identify suicide risk in inmates. This process, coupled with staff training, will be successful only if an effective method of communication is in place at the facility.

The inmate may exhibit certain behaviors that indicate a risk of suicide. If these behaviors are detected and communicated to others, the likelihood of suicide can be reduced. In addition, most suicides can be prevented by correctional staff who establish trust and rapport with inmates, gather pertinent information, and take action. Three levels of communication are important in preventing inmate suicides:

- **Communication between the arresting and/or transporting officer and correctional staff.** In many ways, suicide prevention begins at the point of arrest. What an arrestee says and how he or she behaves during arrest, transport to the facility, and at intake are crucial in detecting suicidal behavior. The scene of arrest is often the most volatile and emotional time for the individual, and the arresting officer should pay close attention to the arrestee during this time. Suicidal behavior may occur because of the arrestee's feelings of anxiety or hopelessness, and previous suicidal behavior can be confirmed by family members and/or friends. The arresting or transporting officer must communicate any pertinent information about the arrestee's well-being to correctional staff. It is also critically important for correctional staff to maintain open lines of communication with family members, who often have pertinent information about the inmate's mental health.

- **Communication among facility staff (correctional, medical, and mental health personnel).** Effective management of suicidal inmates depends on communication between the facility's correctional personnel and other professional staff. Because inmates can become suicidal at any point during confinement, correctional staff must maintain awareness, share information, and make appropriate referrals to mental health and medical staff. At a minimum, the

Various high-risk periods are associated with potentially suicidal behavior, including whether the inmate has an upcoming date for a court hearing and following a telephone call or scheduled visit.

facility's shift supervisor should ensure that appropriate correctional staff are properly informed of the status of each inmate placed on suicide precautions. At the end of a shift, the shift supervisor should inform the incoming shift supervisor about the status of all inmates on suicide precautions. Multidisciplinary team meetings that include correctional, medical, and mental health personnel should occur on a regular basis to discuss the status of inmates on suicide precautions. Finally, the authorization for suicide precautions, any changes in suicide precautions, and observation of inmates placed on precautions should be documented on designated forms and distributed to appropriate staff.

- **Communication between facility staff and the suicidal inmate.** Facility staff must use various communication skills with the suicidal inmate, including active listening, staying with the inmate if immediate danger is suspected, and maintaining contact through conversation, eye contact, and body language. Correctional staff should trust their own judgment and observation of risk behavior and should not let other facility personnel (including mental health staff) convince them to ignore signs of suicidal behavior. Poor communication among correctional, medical, and mental health personnel, as well as with outside entities (e.g., arresting or referral agencies and family members) is a common factor in many custodial suicides. A lack of respect, personality conflicts, and boundary issues often lead to problems with communication. Simply stated, facilities that maintain a multidisciplinary approach avoid preventable suicides.

## Housing

When determining the most appropriate housing location for a suicidal inmate, correctional facility officials (with concurrence from medical and/or mental health staff) often tend to physically isolate (or segregate) and sometimes restrain the individual. Although these responses may be convenient for facility staff, they are detrimental to the inmate because isolation escalates a sense of alienation and further removes the individual from proper staff supervision. Whenever possible, suicidal inmates should be housed in the general population unit, mental health unit, or medical infirmary, and should be located close to facility staff. Further, removal of an inmate's clothing (excluding belts and shoelaces) and the use of physical restraints (e.g., restraint chairs or boards, leather straps, handcuffs, and straitjackets) should be avoided whenever possible; these measures should only be used as a last resort when the inmate is physically engaging in self-harming behavior. Housing assignments should be based on the ability to maximize staff interaction with the inmate, not on decisions that heighten depersonalizing aspects of confinement.

All cells designated to house suicidal inmates should be as suicide resistant as possible, free of all obvious protrusions, and provide full visibility. These cells should contain tamperproof light fixtures along with smoke detectors and ceiling and/or wall air vents that are free of protrusions. In addition, the cells should not contain any live electrical switches or outlets, bunks with open bottoms, any type of clothing hook, towel racks on desks or sinks, radiator vents, or any other object that provides an easy anchoring device for hanging. Each cell door should contain a heavy-gauge Lexan (or equivalent grade) clear panel that is large enough to allow staff a full and unobstructed view of the cell interior. Finally, each housing unit in the facility should have an emergency response bag. The bag should contain emergency equipment, including a first aid kit, a pocket

*Housing assignments should be based on the ability to maximize staff interaction with the inmate, not on decisions that heighten depersonalizing aspects of confinement.*

mask or face shield, a self-inflating resuscitator bag, and a rescue tool (to quickly cut through fibrous material). Correctional staff should ensure that such equipment is in working order on a daily basis.

## Observation and Treatment Plan

Two levels of observation are generally recommended for suicidal inmates:

- Close observation is recommended for the inmate who is not actively suicidal but expresses suicidal ideation and/or has a recent history of self-harming behavior. In addition, an inmate who denies suicidal ideation or does not threaten suicide, but demonstrates other behavior (through actions, current circumstances, or recent history) that could indicate the potential for self-injury, should be placed under close observation. Staff should observe such an inmate in a protrusion-free cell at staggered intervals not to exceed every 10 minutes (e.g., at 5 minutes, 10 minutes, 7 minutes).

- Constant observation is recommended for the inmate who is actively suicidal (i.e., either threatening or engaging in suicidal behavior). Staff should observe such an inmate on a continuous, uninterrupted basis. Some jurisdictions also use an intermediate level of supervision, with observation at staggered intervals that do not exceed 5 minutes.

Other aids (e.g., closed-circuit television monitors, inmate companions, and cellmates) can be used as a supplement to, but never as a substitute for, these observation levels.

Mental health staff should assess and interact with (not just observe) the suicidal inmate daily. The daily assessment should focus on the inmate's current behavior as well as changes in thoughts and behavior during the past 24 hours. For example, mental health staff can ask the following questions: "What are your current feelings and thoughts?", "Have your feelings and thoughts changed over the past 24 hours?", and "What are some of the things you have done or can do to change these thoughts and feelings?"

An individualized treatment plan (including followup services) should be developed for each inmate on suicide precautions. Qualified mental health staff should develop the plan in conjunction with both the inmate and medical and correctional personnel. The treatment plan should describe signs, symptoms, and the circumstances under which the risk for suicide is likely to recur; how the inmate can avoid having suicidal thoughts; and actions the inmate and staff will take if suicidal ideation recurs.

Finally, because of the strong correlation between prior suicidal behavior and suicide, and to safeguard the continuity of care for suicidal inmates, all inmates who are discharged from suicide precautions should remain on mental health caseloads and receive regularly scheduled followup assessments by mental health personnel until they are released from custody. Although there is no nationally accepted schedule for followup, a suggested assessment schedule following discharge from suicide precautions might be: daily for 5 days, once a week for 2 weeks, and then once a month until release.

## Intervention

National correctional standards and practices generally acknowledge that a facility's policy regarding intervention should include three components. First, all staff who have contact with the inmate should be trained in standard first aid procedures and CPR. Second, a staff member who discovers an inmate engaging in self-harming behavior should immediately survey the scene to assess the severity of the emergency, alert other staff to call for medical personnel if necessary, and begin standard first aid and/or CPR if necessary. If facility policy prohibits an officer from entering a cell without backup support, the first responding officer should, at a minimum, make the proper notification for backup support and medical personnel, secure the area outside the cell, and retrieve the housing unit's emergency response bag. Third, correctional staff should never presume that the victim is dead, but rather should initiate and continue appropriate lifesaving measures until medical personnel arrive. Finally, although not all suicide attempts require emergency medical intervention, all such attempts do require immediate intervention and assessment by mental health staff.

## Notification and Reporting

In the event of a serious suicide attempt (i.e., one that requires hospitalization for injuries) or a completed suicide, all appropriate officials should be notified through the chain of command. Following the incident, the victim's family and appropriate outside authorities should be notified immediately. All staff who had contact with the victim before the incident should be required to submit a statement that includes any information they may have about the inmate and/or the incident.

## Critical Incident Stress Debriefing and Mortality-Morbidity Review

An inmate suicide is extremely stressful for both staff and other inmates. Staff members who recently had contact with the inmate may also feel ostracized by other personnel and administration officials. Following a suicide, a correctional officer may experience guilt because he or she might ask, "What if I had made my cell check earlier?" Staff and inmates who are affected by a traumatic event such as inmate suicide should be offered immediate assistance. One form of assistance is critical incident stress debriefing (CISD). A CISD team, composed of professionals trained in crisis intervention and traumatic stress awareness (e.g., police officers, paramedics, firefighters, clergy, and mental health personnel), allows staff and inmates to process their feelings about the incident, develop an understanding of critical stress symptoms, and seek ways of dealing with those symptoms. For maximum effectiveness, the CISD process or other appropriate support services should occur within 24 to 72 hours of the critical incident.

Every completed suicide, as well as every serious suicide attempt, should be examined through a mortality-morbidity review process. If resources permit, a clinical review through a psychological autopsy is also recommended. Ideally, an outside agency should coordinate the mortality-morbidity review to ensure impartiality. This review, which is separate and apart from other formal investigations that may be required to determine the cause of death, should include the following:

• A critical inquiry of the circumstances surrounding the incident.

• Facility procedures relevant to the incident.

• Relevant training that involved staff received.

• Pertinent medical and mental health services or reports involving the victim.

- Possible precipitating factors that led to the suicide or serious suicide attempt.

- Recommendations, if any, for changes in policy, training, physical plant, medical or mental health services, and operational procedures.

## Future Training Efforts

Although findings from this study show that most of the facilities that experienced a suicide provided some type of suicide-prevention training to staff, a sizable number (approximately 38 percent) did not offer any training. In addition, almost two-thirds (63.3 percent) of the facilities that experienced a suicide either did not provide suicide-prevention training to staff or did not provide the training on an annual basis. Only a handful of facilities provided a full day of suicide prevention training to staff.

In addition, as indicated by the report's findings, many of the demographic characteristics of suicide victims and characteristics of the incidents have changed dramatically since prior studies. For example, suicide victims previously confined on "minor other" offenses were more recently confined on "personal and/or violent" charges. Intoxication was previously viewed as a leading precipitant to inmate suicide, yet recent data indicate that this factor is now found in only a minority of cases. Whereas more than half of all jail suicide victims were previously dead within the first 24 hours of confinement, current data show that less than one-quarter of all victims commit suicide during this time period, with an equal number of deaths occurring between 2 and 14 days of confinement. In addition, inmates who committed suicide were far less likely to be housed in isolation than previously reported, yet for unknown reasons they were less likely to be found within 15 minutes of the last observation by staff.

Correctional administrators should ensure that suicide-prevention training curricula are developed and/or revised to reflect these new research findings and that all correctional, medical, and mental health personnel receive regular and comprehensive instruction in suicide-prevention methods.

For the reasons stated above, correctional administrators should ensure that suicide-prevention training curricula are developed and/or revised to reflect these new research findings and that all correctional, medical, and mental health personnel receive regular and comprehensive instruction in suicide-prevention methods. At a minimum, initial suicide-prevention training should include but not be limited to the following topics: administrator and staff attitudes about suicide and how negative attitudes impede suicide-prevention efforts, ways in which correctional facility environments are conducive to suicidal behavior, potential predisposing factors to suicide, high-risk suicide periods, warning signs and symptoms, how to identify suicidal inmates even if they deny they are at risk, components of the facility's suicide-prevention policy, and liability issues associated with inmate suicide. Annual refresher training should include a review of administrator and staff attitudes about suicide and how negative attitudes impede suicide-prevention efforts, predisposing risk factors, warning signs and symptoms, how to identify suicidal inmates despite a denial of risk, and a review of any changes to the facility's suicide-prevention plan. The annual training should also include a general discussion of any recent suicides and/or suicide attempts in the facility.

Holding or detention facility staff will lack the means to both identify and manage suicidal inmates if they have received little or no training in suicide-prevention methods. Lives will continue to be lost and jurisdictions will incur unnecessary liability from these tragic deaths if administrators do not create and maintain effective training programs.

## Data Limitations and Further Research Needed

Project staff mailed survey requests to nearly 16,000 jail facilities in the United States as well as to hundreds of secondary sources (e.g., state medical examiner offices, state and federal jail inspection and/or regulatory agencies, state police and/or bureau of investigation offices, and private health-care providers that have contracts with county and municipal jurisdictions). This mailing, along with a review of newspaper articles retrieved from Internet search engines, yielded an accounting of jail suicides during 2005 and 2006 that is as accurate as is reasonably possible. However, because of underreporting and a reluctance to share data, it is not certain whether every death was identified. In addition, a sizable number of survey respondents were unable to supply some data and answered "unknown" to several key variables (e.g., substance abuse, medical and mental health, psychotropic medication, and history of suicidal behavior), thus reflecting either inadequate intake screening, inadequate recordkeeping, or a combination of both. Only about one-third of respondents conducted mortality reviews following the suicides; this factor also hindered data collection efforts.

In addition, although this study represented the National Institute of Corrections' third comprehensive national survey of inmate suicide, the current findings invite additional research. For example, future research could explore in more detail the reason(s) behind the occurrence of more suicides during the first 2 to 14 days of confinement rather than within the first 24 hours of confinement. This study revealed a possible relationship between suicide and an inmate's confinement for sexual assault and/or murder of a child (which accounted for approximately 7 percent of all suicides), but additional research is necessary to explain the reasons for this relationship. Further research is also necessary to explore the relationship between the occurrence of inmate suicides and recent court hearings, telephone calls, and visitation, as well as other possible precipitating factors that study respondents could not identify. The identification of precipitating factors to inmate suicide is critically important to the field's further understanding of the problem.

## The Continuing Challenge of Prevention

In conclusion, findings from this study create a formidable challenge for both correctional and health-care officials as well as their respective staffs. Although the knowledge base continues to increase, which seemingly corresponds to a dramatic reduction in the rate of inmate suicide in detention facilities, much work lies ahead. The data indicate that inmate suicide no longer occurs mostly during the first 24 hours of confinement and can occur at any time during an inmate's confinement. Given that roughly the same number of deaths occurred within the first few hours of custody as occurred in more than several months of confinement, information gathered about current suicide risk during intake screening should be viewed as time limited. Because inmates can be at risk at any point during confinement, the greatest challenge for those who work in the correctional system is to view the issue as one that requires a continuum of comprehensive suicide-prevention services aimed at the collaborative identification, continued assessment, and safe management of inmates at risk for self-harm.

# References



American Foundation for Suicide Prevention. 2009. *Risk Factors for Suicide.* New York: American Foundation for Suicide Prevention.

American Heart Association, Emergency Cardiac Care Committee and Subcommittees. 1992. "Guidelines for Cardiopulmonary Resuscitation and Emergency Cardiac Care." *Journal of the American Medical Association* 268(16):2172–83.

American Psychiatric Association. 2000. *Psychiatric Services in Jails and Prisons, 2nd Edition.* Washington, DC: American Psychiatric Association.

Atlas, R. 1989. "Reducing the Opportunity for Inmate Suicide: A Design Guide." *Psychiatric Quarterly* 60:161–71.

Aufderheide, D. 2000. "Conducting the Psychological Autopsy in Correctional Settings." *Journal of Correctional Health Care* 7:5–36.

Bonner, R. 1992. "Isolation, Seclusion, and Psychological Vulnerability as Risk Factors for Suicide Behind Bars." In R. Maris, A. Berman, J. Maltsberger, and R. Yufit (eds.), *Assessment and Prediction of Suicide.* New York: Guilford Press, pp. 398–419.

Bonner, R. 2000. "Correctional Suicide Prevention in the Year 2000 and Beyond." *Suicide and Life-Threatening Behavior* 30: 370–76.

Clark, D., and S. Horton-Deutsch. 1992. "Assessment in Absentia: The Value of the Psychological Autopsy Method for Studying Antecedents of Suicide and Predicting Future Suicides." In R. Maris, A. Berman, J. Maltsberger, and R. Yufit (eds.), *Assessment and Prediction of Suicide.* New York: Guilford Press, pp. 144–82.

Cohen, F. 2008. *The Mentally Disordered Inmate and the Law, 2nd Edition.* Kingston, NJ: Civic Research Institute.

Cox, J., and P. Morschauser. 1997. "A Solution to the Problem of Jail Suicide." *Crisis: The Journal of Crisis Intervention and Suicide Prevention* 18:178–84.

Daniel, A., and J. Fleming. 2006. "Suicides in a State Correctional System, 1992–2002: A Review." *Journal of Correctional Health Care* 12:24–35.

Davis, M., and J. Muscat. 1993. "An Epidemiologic Study of Alcohol and Suicide Risk in Ohio Jails and Lockups, 1975–1984." *Journal of Criminal Justice* 21:277–83.

DuRand, C., G. Burtka, E. Federman, J. Haycox, and J. Smith. 1995. "A Quarter Century of Suicide in a Major Urban Jail: Implications for Community Psychiatry." *American Journal of Psychiatry* 152:1077–80.

Farmer, K., A. Felthous, and C. Holzer. 1996. "Medically Serious Suicide Attempts in a Jail With a Suicide Prevention Program." *Journal of Forensic Sciences* 41:240–46.

Felthous, A. 1994. "Preventing Jailhouse Suicides." *Bulletin of the American Academy of Psychiatry and the Law* 22:477–88.

Frottier, P., S. Fruehwald, K. Ritter, R. Eher, J. Schwaerzler, and P. Bauer. 2002. "Jailhouse Blues Revisited." *Social Psychiatry and Psychiatric Epidemiology* 37:68–73.

Fruehwald, S., P. Frottier, T. Matschnig, F. Koenig, S. Lehr, and R. Eher. 2004. "Do Monthly or Seasonal Variations Exist in Suicides in a High-Risk Setting?" *Psychiatry Research* 121:263–69.

Goss, J., K. Peterson, L. Smith, K. Kalb, and B. Brodey. 2002. "Characteristics of Suicide Attempts in a Large Urban Jail System With an Established Suicide Prevention Program." *Psychiatric Services* 53:574–79.

Hayes, L. 1983. "And Darkness Closes In: A National Study of Jail Suicides." *Criminal Justice and Behavior* 10:461–84.

Hayes, L. 1989. "National Study of Jail Suicides: Seven Years Later." *Psychiatric Quarterly* 60:7–29.

Hayes, L. 1995. "Prison Suicide: An Overview and Guide to Prevention." *The Prison Journal* 75:431–56.

Hayes, L. 1996. "Jail Standards and Suicide Prevention: Another Look." *Jail Suicide/Mental Health Update* 6:9–11.

Hayes, L. 1998. "Model Suicide Prevention Programs, Part III." *Jail Suicide/Mental Health Update* 8:1–7.

Hayes, L. 2003. "A Jail Cell, Two Deaths, and a Telephone Cord." *Jail Suicide/Mental Health Update* 11:1–8.

Hayes, L. 2005. "Suicide Prevention in Correctional Facilities." In C. Scott and J. Gerbasi (eds.), *Handbook of Correctional Mental Health.* Washington, DC: American Psychiatric Publishing, pp. 69–88.

Hayes, L. 2006. "Suicide Prevention and Designing Safer Prison Cells." In G. Dear (ed.), *Preventing Suicide and Other Self-Harm in Prison.* New York: Palgrave MacMillan, pp. 167–74.

Hayes, L. 2007. "Reducing Inmate Suicides Through the Mortality Review Process." In R. Greifinger (ed.), *Public Health Behind Bars: From Prisons to Communities.* New York: Springer, pp. 280–92.

Hayes, L. 2009. "Juvenile Suicide in Confinement: A National Survey." *Suicide and Life-Threatening Behavior* 39:353–63.

He, X., A. Felthous, C. Holzer, P. Nathan, and S. Veasey. 2001. "Factors in Prison Suicide: One Year Study in Texas." *Journal of Forensic Sciences* 46(4):896–901.

Heron, M., D. Hoyert, S. Murphy, J. Xu, K. Kochanek, and B. Tejada-Vera. 2009. "Deaths: Final Data for 2006." *National Vital Statistics Reports* 57(14). Hyattsville, MD: U.S. Department of Health and Human Services, Centers for Disease Control and Prevention, National Center for Health Statistics.

Hughes, D. 1995. "Can the Clinician Predict Suicide?" *Psychiatric Services* 46:449–51.

James, D., and L. Glaze. 2006. *Mental Health Problems of Prison and Jail Inmates.* Special Report. Washington, DC: U.S. Department of Justice, Office of Justice Programs, Bureau of Justice Statistics.

Karberg, J., and D. James. 2005. *Substance Dependence, Abuse, and Treatment of Jail Inmates, 2002.* Special Report. Washington, DC: U.S. Department of Justice, Office of Justice Programs, Bureau of Justice Statistics.

Kovasznay, B., R. Miraglia, R. Beer, and B. Way. 2004. "Reducing Suicides in New York State Correctional Facilities." *Psychiatric Quarterly* 75:61–70.

Lester, D., and B. Yang. 2008. "Calculating Jail Suicide Rates: A Rebuttal to Michael O'Toole." *American Jails* January/February:45–46.

Marcus, P., and P. Alcabes. 1993. "Character-istics of Suicides by Inmates in an Urban Jail." *Hospital and Community Psychiatry* 44:256–61.

Maris, R. 1992. "Overview of the Study of Suicide Assessment and Prediction." In R. Maris, A. Berman, J. Maltsberger, and R. Yufit (eds.), *Assessment and Prediction of Suicide.* New York: Guilford Press, pp. 3–22.

Maruschak, L. 2006. *Medical Problems of Jail Inmates.* Special Report. Washington, DC: U.S. Department of Justice, Office of Justice Programs, Bureau of Justice Statistics.

Metzner, J. 2002. "Class Action Litigation in Correctional Psychiatry." *Journal of the American Academy of Psychiatry and the Law* 30:19–29.

Metzner, J., and L. Hayes. 2006. "Suicide Prevention in Jails and Prisons." In R. Simon and R. Hales (eds.), *Textbook of Suicide Assessment and Management.* Washington, DC: American Psychiatric Publishing, pp. 139–55.

Minton, T., and W. Sabol. 2009. *Jail Inmates at Midyear 2008 – Statistical Tables.* Special Report. Washington, DC: U.S. Department of Justice, Office of Justice Programs, Bureau of Justice Statistics.

Moscicki, E. 2001. "Epidemiology of Completed and Attempted Suicide: Toward a Framework for Prevention." *Clinical Neuroscience Research* 1:310–23.

Mumola, C. 2005. *Suicide and Homicide in State Prisons and Local Jails.* Special Report. Washington, DC: U.S. Department of Justice, Office of Justice Programs, Bureau of Justice Statistics.

Mumola, C., and M. Noonan. 2008. *Deaths in Custody Statistical Tables.* Washington, DC: U.S. Department of Justice, Office of Justice Programs, Bureau of Justice Statistics.

National Commission on Correctional Health Care. 2008. *Standards for Health Services in Jails, 8th Edition.* Chicago: National Commission on Correctional Health Care.

New York State Department of Correctional Services. 2002. *Inmate Suicide Report, 1995–2001.* Albany, NY: New York State Department of Correctional Services.

O'Toole, M. 2008. "Response to David Lester and Bijon Yang." *American Jails* January/February:48–51.

Patterson, R., and K. Hughes. 2008. "Review of Completed Suicides in the California Department of Corrections and Rehabilitation, 1999 to 2004." *Psychiatric Services* 59:676–82.

Quinton, R., and D. Dolinak. 2003. "Suicidal Hangings in Jail Using Telephone Cords." *Journal of Forensic Sciences* 48:1151–52.

Sabol, W., T. Minton, and P. Harrison. 2007. *Prison and Jail Inmates at Midyear 2006.* Special Report. Washington, DC: U.S. Department of Justice, Office of Justice Programs, Bureau of Justice Statistics.

Salive, M., G. Smith, and T. Brewer. 1989. "Suicide Mortality in the Maryland State Prison System, 1979 Through 1987." *Journal of the American Medical Association* 262:365–69.

Sanchez, H. 2006. "Inmate Suicide and the Psychological Autopsy Process. *Jail Suicide/Mental Health Update* 15:5–11.

*Sanville* v. *Scaburdine,* U.S. District Court, Eastern District of Wisconsin, Case No. 99–C–715 (2002).

Stone, W. 1987. "Jail Suicide." *Corrections Today* December:84–87.

Thienhaus, O., and M. Piasecki. 1997. "Assessment of Suicide Risk." *Psychiatric Services* 48:293–94.

*Tittle* v. *Jefferson County Commission,* 966 F.2d 606 (11th Cir. 1992).

Way, B., D. Sawyer, S. Barboza, and R. Nash. 2007. "Inmate Suicide and Time Spent in Special Disciplinary Housing in New York State Prison." *Psychiatric Services* 58:558–60.

White, T., and D. Schimmel. 1995. "Suicide Prevention in Federal Prisons: A Successful Five-Step Program." In L. Hayes (ed.), *Prison Suicide: An Overview and Guide to Prevention.* Washington, DC: U.S. Department of Justice, National Institute of Corrections, pp. 46–57.

Winkler, G. 1992. "Assessing and Responding to Suicidal Jail Inmates." *Community Mental Health Journal* 28:317–26.

Winter, M. 2003. "County Jail Suicides in a Midwestern State: Moving Beyond the Use of Profiles." *The Prison Journal* 83:130–48.

*Woodward* v. *Myres,* U.S. District Court, Northern District of Illinois, Case No. 00–C–6010 (2003).

# Appendix A



## NATIONAL STUDY OF JAIL SUICIDES

### INFORMATION REQUESTED BY:

### THE NATIONAL CENTER ON
### INSTITUTIONS AND ALTERNATIVES
### ON BEHALF OF THE
### NATIONAL INSTITUTE OF CORRECTIONS
### U.S. DEPARTMENT OF JUSTICE

Dear Sheriff, Police Chief, and/or Facility Commander:

The National Institute of Corrections, U.S. Department of Justice, has requested the National Center on Institutions and Alternatives (NCIA) to conduct a national study on jail suicides. You may recall that a similar comprehensive study was conducted by NCIA during the 1980s. With your assistance, the project will utilize collected on inmate suicides to generate programmatic recommendations to confront this issue. This information can then be employed by your agency and others in an effort to reduce the occurrence of future inmate suicides.

DATA PROVIDED BY INDIVIDUAL FACILITIES WILL BE CODED AND HELD IN THE STRICTEST CONFIDENCE. RESULTS OF THIS STUDY WILL BE PRESENTED IN SUMMARY FASHION, THUS PREVENTING THE DIRECT LINKAGE OF SPECIFIC DATA TO THE PARTICULAR FACILITY FROM WHICH THE INFORMATION ORIGINATED.

**Data requested for this study (see over) should be limited to inmate suicides occurring between the two-year period of January 1, 2005 thru December 31, 2006.**

In order to facilitate data compilation, we ask that you utilize the definitions provided on the back of this form. When this is not possible, please inform us of specific differences in your reporting.

For your convenience in submitting the completed form, we have enclosed a self-addressed, business reply envelope. We ask that the completed form be returned within thirty (30) days of its receipt. **We also ask that you return the completed form only if you had a suicide(s) during 2005 and/or 2006.**

If you have any questions regarding completion of this form or the study, please feel free to contact Mr. Lindsay M. Hayes of NCIA at (508) 337-8806 or lhayesta@msn.com. Thank you for your cooperation. Copies of the final report will be available upon request.

Sincerely,

Morris L. Thigpen, Director
National Institute of Corrections
U.S. Justice Department

Lindsay M. Hayes, Project Director
National Center on Institutions
and Alternatives

## DEFINITIONS

**SUICIDE:** Any death of an individual while in custody of any law enforcement agency resulting from or leading directly from any self-inflicted act perpetrated by that individual. Further, any incident in which the individual was left in a comatose and/or brain-dead state would be included within this definition. (NOTE: <u>For purposes of this study, an individual who attempted suicide within the facility yet later died enroute to or at the hospital or other health care provider is classified as an inmate suicide and should be reported below.</u>)

**JAIL**: Any facility operated by a local jurisdiction (e.g., county, municipality, etc.), private entity, or multi-jurisdictional authority whose purpose is the confinement of individuals primarily apprehended by law enforcement personnel. Jails, as defined here, would include temporary holding and pre-trial detention facilities, lockup facilities which normally detain persons for less than 72 hours, as well as facilities which normally detain individuals or have committed/sentenced offenders for more than 72 hours. The definition includes facilities which are housing inmates for another jurisdiction (e.g., state or federal prison system), including privately operated jails and regional jails.

## QUESTIONS

In the spaces provided below, please indicate the TOTAL NUMBER OF INMATE SUICIDES occurring in your facility during the two-year period between JANUARY 1, 2005 THRU DECEMBER 31, 2006. Please only complete the form if your jail facility had a suicide(s) during this two-year period. If you have any questions regarding completion of this form or the study, please feel free to contact Mr. Lindsay M. Hayes of NCIA at (508) 337-8806 or lhayesta@msn.com.

1.     Number of inmate suicides between:     January 1, 2005 and December 31, 2005 _____

                                              January 1, 2005 and December 31, 2006 _____

2.     Which of the following categories best describes your facility? (**Please only check one category.**)

    a)    Facility for committed/sentenced offenders       _____

    b)    Temporary Holding or Pre-Trial Detention Facility (0 to 72 hours)     _____

    c)    Pre-Trial Detention Facility (over 72 hours)     _____

    d)    Other (Specify:_____)     _____

### THE FOLLOWING WILL BE UTILIZED FOR INTERNAL PURPOSES ONLY

**Completed by (name/title):** _____

**Name of Facility:** _____

**Street Address:** _____

**City, State, Zip:** _____

**Telephone/E-Mail:**   ( ) _____ E-Mail:_____

**Please return the completed survey within 30 days of receipt to:**
**NCIA**
**P.O. BOX 111**
**MANSFIELD, MA 02048**

# Appendix B



## PHASE 2: NATIONAL STUDY OF JAIL SUICIDES

NATIONAL CENTER ON INSTITUTIONS AND ALTERNATIVES
Acting as Collecting Agent for the
NATIONAL INSTITUTE OF CORRECTIONS
U.S. DEPARTMENT OF JUSTICE

Items contained in this questionnaire refer to a suicide that occurred in your facility between January 1, 2005 and December 31, 2006 as identified during Phase 1 of the National Study of Jail Suicides project. Please complete the following questionnaire by checking the appropriate boxes and/or filling in the blanks (and use additional sheets if necessary). Definitions for certain terms used in this questionnaire appear on page 8.

**DATA PROVIDED WILL BE CODED AND HELD IN THE STRICTEST CONFIDENCE. RESULTS OF THIS STUDY WILL BE PRESENTED IN SUMMARY FASHION, THEREFORE, VICTIM AND FACILITY NAMES WILL <u>NOT</u> APPEAR IN ANY PROJECT REPORT.**

We ask that you complete and return this questionnaire within 30 days. Should you have any questions or concerns regarding completion of this questionnaire, please contact Lindsay M. Hayes, Project Director, National Center on Institutions and Alternatives (NCIA), P.O. Box 111, Mansfield, Massachusetts 02048, 508/337-8806, e-mail: LHayesta@msn.com.

**NAME OF FACILITY**_____**STATE**_____

### PART A: PERSONAL CHARACTERISTICS OF VICTIM

1)  **Victim's Name** (or any other identifiable notation): _____
                                          Last                First              M.I.

2)  **Race/Ethnicity:**   (1)_____Caucasian          (4)_____American Indian
                          (2)_____African-American    (8)_____Other (Specify_____)
                          (3)_____Hispanic            (9)_____Unknown

3)  **Sex:**              (1)_____Male               (2)_____Female

4)  **Date-of-Birth:**    ___/___/___      or      _____**Years-Old**

5)  **Marital Status:**   (1)_____Single             (5)_____Widowed
                          (2)_____Married            (6)_____Common-Law Relationship
                          (3)_____Separated          (8)_____Other (Specify_____)
                          (4)_____Divorced           (9)_____Unknown

Please specify **Current Charge(s)** for which the victim was confined at time of suicide and whether victim was being **Detained** or had been **Sentenced** on those charge(s).

| CHARGE(S) | DETAINED | SENTENCED |
|---|---|---|
| _____ | (1)_____ | (1)_____ |
| _____ | (2)_____ | (2)_____ |
| _____ | (3)_____ | (3)_____ |

7a)  Did the victim have a record of **Prior Arrests**?
     (1)_____Yes          (2)_____No          (9)_____Unknown

7b)   If the victim had a prior arrest record, specify the **Most Recent Prior Charges**.

**Most Recent Prior Charge(s)**                              **Date**

_____                  _____

_____                  _____

_____                  _____

8)    What was the total **Length of Confinement** that the victim had been in your facility prior to their death?  (If less than two days, indicate in hours.)

_____Hours           _____Days           _____Months           _____Years

9a)   Did the victim have a history of **Substance Abuse**?

(1)_____Yes           (2)_____No           (9)_____Unknown

9b)   If the victim had a history of substance abuse, briefly **Describe Type of Substance Abuse**._____
      _____

10a)  Did the victim have a history of **Medical Problems**?

(1)_____Yes           (2)_____No           (9)_____Unknown

10b)  If the victim had a history of medical problems, briefly **Describe Type of Medical Problems**._____
      _____

11a)  Did the victim have a history of **Mental Illness**?

(1)_____Yes           (2)_____No           (9)_____Unknown

11b)  If the victim had a history of mental illness, briefly **Describe Type of Mental Illness**._____
      _____
      _____

12a)  Did the victim have a history of taking **Psychotropic Medication**?

(1)_____Yes           (2)_____No           (9)_____Unknown

12b)  If the victim had a history of taking psychotropic medication, briefly **Describe Type of Psychotropic Medication(s)**._____
      _____

12c)  Was the victim receiving **Psychotropic Medication** during the most recent confinement?

(1)_____Yes           (2)_____No           (9)_____Unknown

12d)  If the victim was receiving psychotropic medication during the most recent confinement, briefly **Describe Type of Psychotropic Medication**._____
      _____

13a)   Did the victim have a history of **Suicidal Behavior**?

    (1)_____Yes          (2)_____No      (9)_____Unknown

13b)   If the victim had a history of suicidal behavior, briefly **Describe Suicidal Behavior**._____
_____
_____

14a)   Was the victim ever on **Suicide Watch** (see definition on page 8) in your facility either during this confinement or a prior confinement?

    (1)_____Yes          (2)_____No      (9)_____Unknown

14b)   If the victim had previously been on Suicide Watch at any time in your facility, what was the **Time Span between Discharge from Suicide Watch and the Suicide, and Briefly Describe the Circumstances that resulted in Discharge from Suicide Watch.**_____
_____
_____
_____

15a)   Did the victim have a **history** of placement in **Isolation** or **Segregation** while in your facility?

    (1)_____Yes          (2)_____No      (9)_____Unknown

15b)   If the victim had a history of placement in isolation or segregation, briefly **Describe Type and Circumstances of Isolation or Segregation**._____
_____
_____


## PART B: SUICIDE INCIDENT CHARACTERISTICS

16)   What was the **Date** and **Time** of the victim's suicide?

    **Date:**_____/_____/200_       **Time (found):**_____am       _____pm

17)   What was the **Method** of suicide and the **Instrument** used?

| **Method** | | **Instrument** | | | |
|---|---|---|---|---|---|
| (1)_____Hanging [from_____(bed, vent, etc.)] | (01)_____Clothing (specify type:_____) | | | | |
| (2)_____Overdose | (02)_____Belt | (08)_____Knife | | | |
| (3)_____Cutting | (03)_____Shoelace | (09)_____Glass | | | |
| (4)_____Shooting | (04)_____Bedding | (10)_____Drugs | | | |
| (5)_____Jumping | (05)_____Telephone Cord   Specify_____ | | | | |
| (6)_____Ingestion of Foreign Object(s) | (06)_____Razor | | | | |
| (8)_____Other | (07)_____Other (Specify_____) | | | | |

18)   What was the **Time Span** between the suicide and finding the victim?

    (1)_____Less Than 15 Minutes      (4)_____Between 1 and 3 Hours
    (2)_____Between 15 and 30 Minutes    (5)_____Greater Than 3 Hours
    (3)_____Between 30 and 60 Minutes    (9)_____Unknown

19a)   At the time of the suicide, was the victim **Under the Influence** of:

    (1)_____ Drugs                 (4)_____ Neither Drugs or Alcohol
    (2)_____ Alcohol              (9)_____ Unknown
    (3)_____ Drugs and Alcohol

19b)   If the victim was under the influence of drugs at the time of the suicide, briefly **Describe the Type(s) of Drugs:**_____

    _____

20a)   At the time of the suicide, was the victim assigned to a **Single** or **Multiple Occupancy** cell?

    (1)_____ Single          (2)_____ Multiple       (9)_____ Unknown

20b)   If the victim was assigned a multiple occupancy cell, **Were other Inmates in the Cell at the Time of the Suicide?**

    (1)_____ Yes         (2)_____ No        (9)_____ Unknown

21a)   Did correctional staff initiate **Cardiopulmonary Resuscitation** on the victim prior to the arrival of medical personnel?

    (1)_____ Yes         (2)_____ No        (9)_____ Unknown

21b)   If **Cardiopulmonary Resuscitation** was **not** provided on the victim prior to the arrival of medical personnel, briefly **Describe Reasons why it was not provided**._____

    _____
    _____

22)   Did either correctional or medical staff utilize an **Automated External Defibrillator** on the victim?

    (1)_____ Yes         (2)_____ No        (9)_____ Unknown

23a)   Was the victim under any type of **Isolation or Segregation at the Time of the Suicide?**

    (1)_____ Yes         (2)_____ No        (9)_____ Unknown

23b)   If the victim was under **Isolation** or **Segregation** at the time of the suicide, what was **Time Span between placement in Isolation/Segregation and the Suicide, and Briefly Describe Type and Circumstances of Isolation or Segregation.**_____

    _____
    _____

24a)   Was the victim under **Suicide Watch** (see definitions on page 8) **at the Time of the Suicide?**

    (1)_____ Yes         (2)_____ No        (9)_____ Unknown

24b)   If the victim was under suicide watch at the time of the suicide, what was the **Frequency of Direct Visual Observation by Staff** (excluding any closed circuit television monitoring and/or inmate companion/ inmate observation aide)?

    (1)_____ Continuous          (5)_____ Every 30 Minutes
    (2)_____ Every 5 Minutes     (6)_____ Every 60 Minutes
    (3)_____ Every 10 Minutes   (8)_____ Other (Specify_____)

(4)_____Every 15 Minutes

24c)  If the victim was under suicide watch at the time of the suicide, was **Closed Circuit Television Monitoring** utilized as a method of observation?

(1)_____Yes          (2)_____No          (9)_____Unknown

24d)  If the victim was under suicide watch at the time of the suicide, was an **Inmate Companion/ Inmate Observation Aide** (see definition on page 8) utilized as a method of observation?

(1)_____Yes          (2)_____No          (9)_____Unknown

25)  Did facility staff utilize a **No-Harm or No-Suicide Contract** (see definition on page 8) at any time with the victim?

(1)_____Yes          (2)_____No          (9)_____Unknown

26a)  Did the victim attend a **Court Hearing or other Legal Proceeding** in close proximity to the suicide?

(1)_____Yes          (2)_____No          (9)_____Unknown

26b)  If the victim attended a court hearing or other legal proceeding in close proximity to the suicide, what was **Time Span between the Hearing/Legal Proceeding and the Suicide, and Briefly Describe the Circumstances of the Court Hearing/Legal Proceeding?**_____
_____
_____

27a)  Did the victim have a **Visit or Telephone Call** in close proximity to the suicide?

(1)_____Yes          (2)_____No          (9)_____Unknown

27b)  If the victim had a visit or telephone call in close proximity to the suicide, what was **Time Span between the Visit/Telephone Call and the Suicide, and Briefly Describe the Circumstances of the Visit/ Telephone Call?**_____
_____
_____
_____

28a)  Was the victim ever **Assessed by a Qualified Mental Health Professional** (see definitions on page 8) prior to the suicide?

(1)_____Yes          (2)_____No          (9)_____Unknown

28b)  If the victim was assessed, specify the **Last Contact by a Qualified Mental Health Professional** prior to the suicide? (If less than two days, indicate in hours.)

_____Hours          _____Days          _____Weeks          _____Months

29a)  Was a **Mortality Review** (see definitions on page 8) conducted following the suicide?

(1)_____Yes          (2)_____No          (9)_____Unknown

29b)  If a mortality review was conducted, did the process offer any **Possible Precipitating Factors** (i.e., circumstances which may have caused the victim to commit suicide)?  If yes, briefly list: _____

_____
_____
_____
_____
_____

29c)  If a mortality review was conducted, did the process offer any **Recommendations to Prevent Future Suicides**? If yes, briefly list: _____

_____
_____
_____
_____
_____

## PART C: FACILITY CHARACTERISTICS

30)  The **Facility** is best described as a:

        (1)_____ Facility for Pre-Trial Detainees and Sentenced Inmates
        (2)_____ Temporary Holding or Pre-Trial Detention Facility (0 to 72 hours)
        (3)_____ Pre-Trial Detention Facility (over 72 hours)
        (4)_____ Other (Specify:_____)

31)  At the time of the suicide, what was the rated **Capacity** and **Population** of the facility?

(1)_____Capacity        (2)_____Population

32)  The facility is **Administered** by a:

(1)_____State     (3)_____Municipality     (8)_____Other (Specify_____)
(2)_____County    (4)_____Private Organization

33)  At the time of the suicide, did the facility have a **Written Suicide Prevention Policy**?

(1)_____Yes        (2)_____No

34a)  At the time of the suicide, did the facility have an **Intake Screening** process **to Identify Suicide Risk**?

(1)_____Yes        (2)_____No

34b)  At the time of the suicide, did the **Intake Screening** process include the ability to verify whether the victim had been on **Suicide Watch During a Prior Confinement?**

(1)_____Yes        (2)_____No

34c)  At the time of the suicide, did the **Intake Screening** process include the ability to verify whether the **Arresting/Transporting Officer Believed the Victim was at Risk for Suicide?**

(1)_____Yes        (2)_____No

35a) At the time of the suicide, had most (90% or more) correctional staff received **Suicide Prevention Training**?

(1)_____ Yes                    (2)_____ No

35b) If most correctional staff had received suicide prevention training, what was the **Frequency and Duration of the Suicide Prevention Training** at the time of the suicide?

| **Frequency** | **Duration** |
|---|---|
| (1)_____ Yearly | (01)_____ Hours (Specify Number) |
| (8)_____ Other (Specify_____) | (02)_____ Minutes (Specify Number) |

36) At the time of the suicide, had most (90% or more) correctional staff received **Certification in Cardiopulmonary Resuscitation**?

(1)_____ Yes                    (2)_____ No

37a) At the time of the suicide, did the facility have a **Suicide Watch** process (excluding any closed circuit television monitoring and/or inmate companion/inmate observation aide)?

(1)_____ Yes                    (2)_____ No

37b) If the facility had a suicide watch process at the time of the suicide, what was the **Frequency Level(s) of Direct Visual Observation by Staff**?  (Check all that apply.)

(1)_____ Continuous              (5)_____ Every 30 Minutes
(2)_____ Every 5 Minutes         (6)_____ Every 60 Minutes
(3)_____ Every 10 Minutes        (8)_____ Other (Specify_____)
(4)_____ Every 15 Minutes

37c) At the time of the suicide, which of the following **Best Describes Which Staff were Permitted to Downgrade and Discharge an Inmate from Suicide Watch**?

(1)_____ Correctional    (3)_____ Mental Health              (5)_____ All of the above
(2)_____ Medical         (4)_____ Medical and/or Mental Health  (8)_____ Other (Specify_____)

38) At the time of the suicide, did the facility have a **Housing** process by which a suicidal inmate would be assigned to a safe, suicide-resistant, and protrusion-free cell?

(1)_____ Yes                    (2)_____ No

## DEFINITIONS

**SUICIDE WATCH**: The level(s) of direct visual observation by staff that is given to an inmate identified as being at risk of suicide. Excludes closed circuit television, inmate companion/inmate observation aide, or any other non-staff monitoring.

**INMATE COMPANION/INMATE OBSERVATION AIDE**: A designation by which another inmate is entrusted with the responsibility of providing observation to an inmate on suicide watch.

**NO-HARM/NO-SUICIDE CONTRACT**: A verbal and/or written agreement between the inmate and facility staff/clinician in which the inmate provides assurance they will not commit suicide or engage in self-injurious behavior.

**QUALIFIED MENTAL HEALTH PROFESSIONAL**: An individual by virtue of their education, credentials, and experience that is permitted by law to evaluate and care for the mental health needs of patients.  May include, but is not limited to, a psychiatrist, psychologist, clinical social worker, and psychiatric nurse.

**MORTALITY REVIEW**: An interdisciplinary committee process comprised of correctional, medical, and mental health personnel that examines the events surrounding the death to determine if the incident was preventable.  The review process may include recommendations aimed at reducing the opportunity of future deaths.

---

### THE FOLLOWING WILL BE USED FOR INTERNAL PURPOSES ONLY:

Completed by (name/title): _____

Facility/Agency: _____

Address (street): _____

      City: _____ State: _____ Zip Code: _____

Telephone: _____

E-Mail Address: _____

Date Completed: _____

Would you like to be placed on the mailing list to receive the *Jail Suicide/Mental Health Update* (a free quarterly newsletter devoted to jail suicide prevention and produced by the National Center on Institutions and Alternatives under contract with the National Institute of Corrections, U.S. Justice Department) and receive notification of the findings from this National Study of Jail Suicides?     _____Yes          _____No

---

### THANK YOU FOR YOUR COOPERATION

**Please return this completed questionnaire in the enclosed business reply envelope <u>within 30 days</u> to:**

**NCIA**
**P.O. Box 111**
**Mansfield, MA 02048**

**or fax to NCIA at:**
**508/337-3083**

**or e-mail to:**
**Lhayesta@msn.com**

U.S. Department of Justice

National Institute of Corrections

*Washington, DC 20534*

Official Business
Penalty for Private Use $300

Address Service Requested

PRESORTED STANDARD
POSTAGE & FEES PAID
U.S. Department of Justice
Permit No. G–231

**www.nicic.gov**