# EXHIBIT "B"



Dale Arthur Weidenthaler  8/29/2018

```
 1              IN THE UNTIED STATES DISTRICT COURT

 2            FOR THE SOUTHERN DISTRICT OF CALIFORNIA

 3    _____
      MICHELLE MORIARTY, an individual,)
 4    as Successor in Interest to the  )
      ESTATE OF HERON MORIARTY and as  )
 5    GUARDIAN AD LITEM to ALEXANDRIA   )
      MORIARTY ELIJAH MORIARTY, and     )
 6    ETERNITY MORIARTY,               )
                                       )
 7             Plaintiffs,             )
                                       )
 8        vs.                          ) Case No.: 3:17-cv-
                                       )          01154-LAB-AGS
 9                                     )
      COUNTY OF SAN DIEGO, DR. ALFRED  )
10    JOSHUA, individually, and DOES   )
      1 through 10, Inclusive,         )
11                                     )
               Defendants.            )
12    _____)

13

14

15       VIDEOTAPED DEPOSITION OF DALE ARTHUR WEIDENTHALER

16                   SAN DIEGO, CALIFORNIA

17                    AUGUST 29, 2018

18

19

20

21    REPORTED BY MANDY L. KERSH, CSR No. 10674

22

23

24

25
```

**EXHIBIT "B"          17cv1154-LAB(AGS)**

Dale Arthur Weidenthaler  8/29/2018

```
 1              IN THE UNTIED STATES DISTRICT COURT

 2          FOR THE SOUTHERN DISTRICT OF CALIFORNIA

 3    _____
      MICHELLE MORIARTY, an individual,)
 4    as Successor in Interest to the  )
      ESTATE OF HERON MORIARTY and as  )
 5    GUARDIAN AD LITEM to ALEXANDRIA  )
      MORIARTY ELIJAH MORIARTY, and    )
 6    ETERNITY MORIARTY,               )
                                       )
 7              Plaintiffs,            )
                                       )
 8         vs.                         ) Case No.: 3:17-cv-
                                       )         01154-LAB-AGS
 9                                     )
      COUNTY OF SAN DIEGO, DR. ALFRED  )
10    JOSHUA, individually, and DOES   )
      1 through 10, Inclusive,         )
11                                     )
                Defendants.            )
12    _____)

13

14

15

16

17       VIDEOTAPED DEPOSITION OF DALE ARTHUR WEIDENTHALER,

18    taken by the Attorneys for the Plaintiffs, commencing at

19    the hour 10:43 a.m., on Wednesday, August 29, 2018 at

20    10620 Treena Street, Suite 230, San Diego, California,

21    before MANDY L. KERSH, Certified Shorthand Reporter in and

22    for the State of California.

23

24

25
```

**EXHIBIT "B"**        **17cv1154-LAB(AGS)**

Dale Arthur Weidenthaler  8/29/2018

```
 1   APPEARANCES:

 2       For the Plaintiffs:
             MORRIS LAW FIRM, APC
 3           BY:  CHRISTOPHER S. MORRIS, ESQ.
             BY:  DANIELLE R. PENA, ESQ.
 4           501 West Broadway, Suite 1480
             San Diego, California  92101
 5           T: 619.826.8060
             F: 619.826.8065
 6

 7       For the Defendant Dr. Ralph Lissaur:
             WILSON ELSER MOSKOWITZ EDELMAN & DICKER LLP
 8           BY:  MARTY B. READY, ESQ.
             401 West A Street, Suite 1900
 9           San Diego, California  92101
             T: 619.881.6200
10           F: 619.321.6201

11       For the Defendant Dale Weidenthaler:
             LAW OFFICES OF JOHN T. KUTYLA
12           BY:  JOHN T. KUTYLA, ESQ.
             10620 Treena Street, Suite 230
13           San Diego, California  92131
             T: (858) 695-2600

14

15       For the Defendant the County of San Diego:
             OFFICE OF COUNTY COUNSEL
16           BY: CHRISTOPHER J. WELSH, ESQ.
             1600 Pacific Highway, Room 355
17           San Diego, California  92101-2469
             T: 619.557.4039
18           F: 619.531.6005
             christopher.welsh@sdcounty.ca.gov
19

20       For the Defendant Amanda Daniels and CPMG:
             LOTZ, DOGGETT & RAWERS
21           BY:  JEFF DOGGETT, ESQ.
             101 West Broadway, Suite 1110
22           San Diego, California  92101
             T: 619.233.5565
23           F: 619.233.5564
             jdoggett@ldrlaw.com
24
         Also Present:  Shayne Davidson, Videographer
25                       T: 619.234.1990
```

**EXHIBIT "B"**          **17cv1154-LAB(AGS)**

Dale Arthur Weidenthaler  8/29/2018

1  **information system that the deputies can update as to**

2  **their interactions with certain inmates and those kind of**

3  **things.  When you were doing the jail information systems,**

4  **were you managing either of those two systems?**

5      A.   Okay.  The system was vastly different then than

6  it is today.

7      **Q.   Makes sense.**

8      A.   The only access that I had to a computer was

9  read.  I could look at the display and respond to

10  questions from the public as to what someone was arrested

11  for, what their bail amount was and what their charges

12  were.

13      **Q.   Gotcha.**

14      A.   And that was it.

15      **Q.   So I take it as a jail informations clerk, you**

16  **didn't have access to the medical side of it?**

17      A.   Oh, no.  I didn't.  No.

18      **Q.   Okay.  And then did you ever have an interest in**

19  **actually going into the field or was it always detentions?**

20      A.   No.  I never had an interest in going into the

21  field.  I had a curiosity about it, not really an

22  interest.  No.

23      **Q.   Gotcha.  So in 1990 you enroll in the detentions**

24  **academy at Miramar?**

25      A.   Negative.  Southwestern College.

**EXHIBIT "B"          17cv1154-LAB(AGS)**

Dale Arthur Weidenthaler  8/29/2018

1    **Q.    Okay.  And at that time the detentions academy --**
2    **let me take a stab -- was three months?**
3    A.    Yeah.  12 weeks or -- yeah.  9 to 12 weeks.
4    Something like that.
5    **Q.    Okay.**
6    A.    It was a long time ago.
7    **Q.    And were you self-funded into the academy or were**
8    **you actually hired?**
9    A.    I was hired.
10   **Q.    If you could, walk us through your career arc**
11   **there with the sheriff's department as a sworn**
12   **department -- detentions deputy.**
13   A.    After the academy I was assigned to the Vista
14   jail where I worked a couple of assignments as a training
15   officer, court holding deputy, before being promoted in
16   1996 to detention sergeant.  After that I was trained --
17   or at that time I was transferred to Las Colinas Detention
18   Facility.  I spent 15 months there.  And personnel up at
19   Vista had requested that I put in my transfer request to
20   go back to Vista.  I did.  And I was trans -- subsequently
21   transferred back to Vista jail.  I spent about six years
22   there at that time and then I was transferred down to
23   George Bailey Detention Facility in, I think, 2004.  Then
24   I spent two years at George Bailey and went back to Vista
25   jail after that.  I spent several more years at Vista and

**EXHIBIT "B"          17cv1154-LAB(AGS)**

Dale Arthur Weidenthaler  8/29/2018

1    I put in for the transportation sergeant job for prisoner

2    transportation.  I was selected for that.  I went down to

3    work not far from here at the county operations center

4    with prisoner transportation.

5         Q.    What year was that?

6         A.    2010, 2011.

7         Q.    Okay.

8         A.    I spent 3 1/2 years there.  Returned to Vista

9    jail, I think, in January of 2014 until my retirement in

10   March of this year.

11        Q.    How many years of service did you have when you

12   retired?

13        A.    With my sick time, I had 30.9.

14        Q.    You guys are -- is 3.0?  3.0 per year worked?

15              (Inaudible.)

16              THE WITNESS:  Pardon me?

17   BY MR. MORRIS:

18        Q.    It is a 3.0 -- 3 percent of your highest

19   salary --

20        A.    Oh, yes.  As long as you're over 50 years old and

21   have over 20 years on.

22        Q.    I think you public employees are capped at 90

23   percent, so you just about hit that?

24        A.    Actually their cap for safety members with the

25   county at 99 percent.  33 years would have been max.

**EXHIBIT "B"**          **17cv1154-LAB(AGS)**

Dale Arthur Weidenthaler  8/29/2018

```
1        A.    Yes.
2        Q.    Was that an often occurrence where you would be
3   the go-between informing McNeely that somebody is
4   requesting some sort of safety cell placement?
5        A.    I would categorize it more as an occasional.
6        Q.    And I imagine, correct me if I'm wrong, my
7   rudimentary understanding of how things would work, that
8   they call the watch commander's office, nobody picks up,
9   no paging system, so they call the sergeant and you got to
10  go track down the watch commander?
11       A.    Yes, if it's required.
12       Q.    Did you feel that you, as a sergeant working at
13  Vista Detention Facility, had the authority to overrule a
14  safety cell recommendation made by psychiatric staff?
15            MR. WELSH:  Incomplete hypothetical, vague and
16  ambiguous.
17            THE WITNESS:  If someone were suicidal, they
18  would go into the safety cell.  If someone were homicidal,
19  they may or may not go in the safety cell.
20  BY MR. MORRIS:
21       Q.    Okay.  So if I'm understanding your testimony
22  correctly, you felt like you had the authority -- or you
23  had some discretion whether or not to place somebody in a
24  safety cell if the recommendation was based on homicide,
25  not suicide?
```

**EXHIBIT "B"**          **17cv1154-LAB(AGS)**

Dale Arthur Weidenthaler  8/29/2018

```
1        A.    Yes.
2        Q.    Where did you -- what is the basis of your
3   understanding that you had discretion in that area?
4        A.    Policy -- under policy on J.1 --
5        Q.    Yes, sir.
6        A.    It says, "Inmates who have been assessed for
7   Inmate Safety Program housing and approved by the watch
8   commander for placement may" -- may -- "be temporarily
9   placed in a safety cell when necessary to prevent the
10  inmate from imminently inflicting physical harm on
11  themselves or others, or destroying property."
12       Q.    Right.
13       A.    So for me the key words there, in this Moriarty
14  case, are "imminently inflicting physical harm on others"
15  and "may be temporarily."
16       Q.    Okay.  So I just want to look at this a little
17  closely.  The "may," as I read this policy, doesn't just
18  apply to physical harm to others; the "may" applies to all
19  bases for placing somebody in a safety cell, right?
20       A.    Yes.  This policy applies to all safety cell
21  placements.
22       Q.    Right.  But the word "may," as it's used in this
23  policy, isn't limited to just homicidal inmates, right?
24  The "may" applies to all the different reasons you could
25  place somebody in a safety cell?
```

**EXHIBIT "B"**          **17cv1154-LAB(AGS)**

Dale Arthur Weidenthaler  8/29/2018

1    A.   Yes.

2    **Q.   Okay.  Why is it that you, as the sergeant,**

3  **understood that while you had discretion when it comes to**

4  **homicidal inmates, you didn't have discretion for suicidal**

5  **inmates given that the "may" that's written in this cell**

6  **applies across the board?**

7    A.   Directions from supervisors.

8    **Q.   And could you -- let me -- enlighten me as to**

9  **what those directions that you understood came from**

10  **supervisors regarding discretion as it pertained to**

11  **homicidal inmates?**

12    A.   One at a time?  Suicidal versus homicidal?

13    **Q.   I just asked for homicidal.  Just tell me what is**

14  **the basis of your information, or why do you think that --**

15  **or who told you -- you know, where did this come from that**

16  **you had discretion for homicide but not for suicide?**

17    A.   I couldn't tell you -- well, okay.  For -- to

18  answer your question, policy and procedure says that

19  "may."

20    **Q.   Right.  But it's "may" to all.**

21    A.   But -- but supervisors can always make something

22  more strict than policy.  They can't lessen the

23  requirements of policy, but they can make them more

24  strict.

25    **Q.   Okay.  So if I'm understanding what you're**

**EXHIBIT "B"**          **17cv1154-LAB(AGS)**

Dale Arthur Weidenthaler  8/29/2018

1    telling me, the custom and practice at the jail was that

2    the supervisors had adopted a custom and practice of

3    placing all suicidal inmates being referred by psych staff

4    into safety cells, right?

5         A.   I can only answer for my supervisor.  That's what

6    my supervisor wanted.

7         Q.   Okay.  But when it came to -- or when it comes to

8    homicidal inmates, there was a little more discretion?

9         A.   Yes.

10        Q.   And on how many prior occasions had you -- and I

11   don't mean this pejoratively.  I'm just trying to figure

12   out the -- like, overruled or not followed a

13   recommendation from psych staff as it pertained to

14   placement of a homicidal inmate into a safety cell?

15        A.   Two, three.

16        Q.   Okay.  How many different occasions had you been

17   made aware of where that had happened?  For instance, what

18   I'm talking about, where a psych staff had made a

19   recommendation for placement in the safety cell for a

20   homicidal inmate and somebody other than you had not

21   followed that recommendation.  And if it's easier to say,

22   "It happened once a month" or "It happened five times that

23   I'm aware of"?

24             MR. WELSH:  Calls for speculation.

25             THE WITNESS:  Yeah.  I -- I would be hard-pressed

EXHIBIT "B"          17cv1154-LAB(AGS)

Dale Arthur Weidenthaler  8/29/2018

1    to give a number or even a range, for that matter,

2    considering that I was a sergeant for 22 years at three

3    different facilities with safety cells.

4              MR. KUTYLA:  Can you give an answer without

5    guessing?

6              THE WITNESS:  No.

7    BY MR. MORRIS:

8         Q.   Okay.

9         A.   It would be a guess.

10        Q.   But you're aware of that happening?

11        A.   Yes.

12        Q.   Okay.  With sergeants and watch commanders other

13   than you?

14        A.   Yes.

15        Q.   Are you aware of that ever happening -- and just

16   so you know, Deputy Guillory testified in her deposition

17   of that happening with a suicidal inmate with a

18   recommendation for a placement in a safety cell for a

19   suicidal, not homicidal, inmate that was not followed by

20   command staff; not you.  Are you aware of that ever

21   happening with respect to a suicidal inmate?

22        A.   I don't have any knowledge or recollection of

23   that.

24        Q.   So just to sum up this area of testimony, your

25   testimony is that there was a more strict interpretation

**EXHIBIT "B"**        **17cv1154-LAB(AGS)**

Dale Arthur Weidenthaler  8/29/2018

1    of the policy when it came to suicidal inmates in that all

2    things being equal, availability, other things, that a

3    suicidal inmate would be placed in a safety cell whereas

4    there was some discretion, a little more discretion, when

5    it came to homicidal inmates?

6        A.    Generally on my team, yes.

7        Q.    And when you say on your team, are you the team

8    leader?

9        A.    The watch commander is the team leader.

10       Q.    All right.  So on -- on a given team, can you

11   walk me through the hierarchy, the chain of command, on

12   that team?

13       A.    A lieutenant is the watch commander.  There are

14   two sergeants at Vista jail, those being the processing

15   sergeant and the security sergeant.  In our case those

16   duties would alternate daily, usually.  And then there are

17   corporals and training officers and deputies.

18       Q.    Gotcha.  And so at least -- let me ask you this:

19   In May of 2016, how long had you been on Lieutenant Mc --

20   was it Lieutenant McNeely?

21       A.    Yes.

22       Q.    How long had you been on Lieutenant McNeely's

23   team?

24       A.    Estimate would be a year and a half.

25       Q.    And when we talked about the discretion for

**EXHIBIT "B"**        **17cv1154-LAB(AGS)**

Dale Arthur Weidenthaler  8/29/2018

1    placement, homicide versus suicide, that would have been

2    something that would have been communicated to you or

3    discussed with Lieutenant McNeely, fair?

4        A.    I'm sorry.  Say it again.

5        Q.    With this notion that there was a discretion when

6    it came to the homicide but not necessarily when it came

7    to suicide, would that have been something that came from

8    Lieutenant McNeely as far as your team leader?  Because

9    you used the word "on my team" that was my understanding

10   of the policy?

11       A.    I would say -- to answer your question directly,

12   I can't remember a time when we specifically spoke on that

13   issue.  However, I would refer back to the Enhanced

14   Observation Housing policy.  And when that came out, there

15   was discussion between the watch commander, myself and

16   Sergeant Nagy about how we were going to handle suicidal

17   inmates.  And, you know, with the incorporation of the

18   gatekeeper and consultation and this and that and -- he

19   was clear that he wanted that process to work as -- in the

20   procedure for suicidal inmates.

21       Q.    Okay.  So he was clear that when it came to

22   suicidal inmates, the gatekeeper procedure would be

23   followed, they would be medically assessed and placed in

24   safety cells?

25       A.    Yes.

**EXHIBIT "B"**        **17cv1154-LAB(AGS)**

Dale Arthur Weidenthaler 8/29/2018

1      Q.    Did you -- while he made it clear this was his

2   desire when it came to suicidal inmates, did he also

3   express a desire or that there was an element of

4   discretion, as you've discussed, when it came to homicidal

5   inmates?

6      A.    No.

7      Q.    By absence of discussion of a strict adherence to

8   the policy when it came to suicide, your understanding

9   was, is that there was some discretion, then, for

10  homicidal inmates; is that what you're saying?

11     A.    Yes, with my understanding of the policy and my

12  20-plus years as a supervisor.

13     Q.    Okay.  Gotcha.  So the policy gives -- says

14  "may," right?  That's the policy.  "May" for everybody?

15  Nothing is mandatory in the policy, right?

16     A.    Right.

17     Q.    So when he says, "Okay.  We're going to not give

18  you the 'may' discretion when it comes to suicide," by

19  omission, you still have the "may" discretion when it came

20  to homicide, fair enough?

21     A.    That's an oversimplified characterization, I

22  would say.

23     Q.    Okay.  Explain it to me.

24     A.    Because we were talking about this policy, which

25  is for --

**EXHIBIT "B"        17cv1154-LAB(AGS)**

1    Q.    EOH?

2    A.    -- reference, J.5, for EOH, and deals with

3    inmates being suicidal, are in need of enhanced

4    observation.  So that's what we were discussing.  Nothing

5    was said in those discussions that changed my

6    understanding of the way things have been for very long --

7    for a very long time.

8    Q.    Oh.  Okay.  So let me recap.  The discussion that

9    you recall regarding strict adherence to the policy

10    regarding the J.5 inmate suicide prevention practices

11    policy with respect to suicidal inmates, we were going to

12    follow the gatekeeper procedure outlined in J.5, strictly

13    follow it, when it came to suicidal inmates, right?

14    A.    Yes.

15    Q.    Nothing in that discussion changed your opinion

16    of your obligations as pertained to J.1 safety cell

17    policy?

18    A.    Correct.

19    Q.    Your understanding of the J.1 safety cell policy

20    was prior to that discussion regarding EOH and after that

21    discussion, was that there was some discretion given for

22    homicidal inmates, not any for suicidal inmates?

23    A.    Yes.

24    Q.    Where did your understanding of that J.1

25    discretion -- discretion for homicide/no discretion for

Dale Arthur Weidenthaler  8/29/2018

 1   **suicide as it pertained at the J.1 safety cell policy,**

 2   **where did that come from?**

 3           MR. WELSH:  Asked and answered.

 4           THE WITNESS:  Specifically, I couldn't say, but

 5   it goes very far back.

 6   BY MR. MORRIS:

 7       **Q.   Do you have a distinct recollection of somebody**

 8   **explicitly telling you that "When I'm on duty" or**

 9   **"Under my command" or "This is the policy with jail, you**

10   **have discretion for suicide, you have no discretion for**

11   **homicidal"?**

12       A.   No.

13       **Q.   That was something that was a custom and practice**

14   **within the jail?**

15       A.   Yes.

16           MR. MORRIS:  She keeps passing these notes...

17           MR. WELSH:  Ready for another break, Chris?

18           THE WITNESS:  I'm ready.

19           MR. MORRIS:  Okay.  Let's take a break.

20           THE VIDEOGRAPHER:  Off the record.  The time is

21   12:46 p.m.

22           (A brief recess was taken.)

23           THE VIDEOGRAPHER:  We are back on the record at

24   the 1:00 p.m.

25   ///

**EXHIBIT "B"**          **17cv1154-LAB(AGS)**

Dale Arthur Weidenthaler  8/29/2018

1   BY MR. MORRIS:

2       Q.   Dale, we are back on the record in this case.

3   You understand, I'm sure, that same admonitions apply,

4   fair enough?

5       A.   Yes.

6       Q.   Okay.  Great.

7            When we were discussing the interplay between the

8   policy as it pertained to suicidal inmates and the policy

9   as it pertained to homicidal inmates, you expressed to me

10  a certain level of discretion when it came to homicide as

11  opposed to the custom and practice being a strict

12  adherence to the safety cell policy when it came to

13  suicidal inmates.  Do you recall that discussion?

14      A.   Yes.

15      Q.   Okay.  Was this difference in how those who types

16  of inmates are handled, was that your understanding --

17  that was also the understanding or the implementation that

18  was done by Sergeant Nagy who worked with you?

19      A.   My understanding, yes.

20      Q.   And this sort of understanding of the discretion

21  in one but not the other, that's something that existed

22  prior to implementation of this J.5 safety cell -- excuse

23  me -- J.1 safety cell, Exhibit 2, right?  This is March

24  11th, 2016.  This is something that existed prior to the

25  implementation of this policy?

**EXHIBIT "B"**        **17cv1154-LAB(AGS)**

Dale Arthur Weidenthaler  8/29/2018

1    A.   Yes.

2         MR. WELSH:  Vague and ambiguous.

3  BY MR. MORRIS:

4    Q.   **To the best of your estimate, how long had that**

5  **been your understanding of the custom and practice of the**

6  **jail as far as discretion for one but not the other?**

7    A.   Well, as you said, there's discretion for all of

8  them, if you're to read this, just the policy section,

9  verbatim.

10   Q.   **Totally with you.**

11   A.   However -- now with that being said, could you

12  rephrase?

13   Q.   **Sure.  This notion that you had homicidal inmate**

14  **discretion, or that the policy was to strictly adhere to**

15  **the safety cell placement when it came to suicidal**

16  **inmates, but a more strict reading of the policy as far as**

17  **the discretion that's set forth in the policy when it came**

18  **to homicidal inmates, that sort of interplay between**

19  **homicidal and suicidal existed prior to the adoption of**

20  **this J.1 in March 11, 2016, fair enough?**

21        MR. WELSH:  Vague and ambiguous.

22        THE WITNESS:  Yes.

23  BY MR. MORRIS:

24   Q.   **To the best of your estimate -- so best of your**

25  **recollection or your best estimate -- how long had that**

**EXHIBIT "B"        17cv1154-LAB(AGS)**

1    been your understanding of the difference between how the

2    suicidal inmates are treated versus how homicidal inmates

3    are treated?

4        A.    Estimate, I would have to say my entire career.

5        Q.    Last sort of background policy question or area:

6    In this case there was a meeting to discuss Mr. Moriarty

7    that took place under the auspices of what's been known in

8    this case as a multidisciplinary group meeting.  Do you

9    know anything about the multidisciplinary group in

10   general?

11       A.    Yes.

12       Q.    What is your understanding of the purposes of the

13   multidisciplinary group?

14       A.    The multidisciplinary group was initially formed

15   years ago and brought in the different disciplines of

16   security, administration, medical, psychiatric, counseling

17   and I'm not sure who else, if anyone else --

18       Q.    Okay.

19       A.    -- to discuss inmates with specific issues, needs

20   and problems as identified by any one of those groups.

21       Q.    And in your course as a sergeant, did you ever

22   participate in the multidisciplinary group meetings?

23       A.    I believe I did when they were first formed.

24   That would be back in, like, 2000 or 2001 when I was the

25   facility training sergeant.

**EXHIBIT "B"**          **17cv1154-LAB(AGS)**

Dale Arthur Weidenthaler  8/29/2018

1      Q.    Okay.

2      A.    I believe I sat in on one or two of them.

3      Q.    Just for training purposes?

4      A.    No.  I believe I was there to backfill for the

5  admin sergeant.

6      Q.    Okay.  When you attended those meetings, did you

7  actually present on any particular inmate, like give

8  background information on anybody that was going to be

9  discussed?

10     A.    No.

11     Q.    And in May of 2016, do you have any knowledge as

12  to what documents were typically brought to the

13  multidisciplinary group meeting for discussion purposes?

14     A.    No.

15     Q.    And do you have any specific knowledge of the

16  documents that were brought to the meeting to discuss

17  Mr. Moriarty?

18     A.    No.

19     Q.    And safe to assume, Dale, that you did not attend

20  the multidisciplinary group meeting on May 31st, 2016 in

21  which Mr. Moriarty's position -- excuse me --

22  Mr. Moriarty's circumstances were the topic of discussion?

23     A.    No, I did not.

24     Q.    Turning your attention to the week of May 31st,

25  the preceding week of May 31st, 2016, you were the -- a

**EXHIBIT "B"**        **17cv1154-LAB(AGS)**

Dale Arthur Weidenthaler  8/29/2018

1    sergeant employed by the sheriff's department at the Vista

2    Detention Facility, true?

3        A.   True.

4        Q.   And your schedule, as far as I understood it, had

5    you working the preceding five days, so the 26th,

6    27th, 28th, 29th, 30th -- oops.  I got it off by one.  The

7    27th, 28th, 29th, 30th and 31st, right?

8        A.   Yes.

9             (Cell phone rings.)

10            MR. MORRIS:  Let the record reflect that

11   Mr. Welsh is receiving a phone call during a deposition.

12   BY MR. MORRIS:

13       Q.   Okay.  All right.  So in jail parlance -- I'm

14   sorry.  This is how understood when I worked at juvie --

15   the last day of a five-day shift, you guys called it your

16   Friday?

17       A.   Correct.

18       Q.   And those shifts would have started at what time

19   in the morning?

20       A.   For the sergeants, they started 0500 hours and

21   for the deputies they started 0600 hours.

22       Q.   And those shifts go to what time for the

23   sergeants?

24       A.   1730 hours for the sergeants.

25            MR. WELSH:  Vague and ambiguous.

**EXHIBIT "B"**          **17cv1154-LAB(AGS)**

Dale Arthur Weidenthaler  8/29/2018

```
 1    BY MR. MORRIS:
 2         Q.   5:30?
 3         A.   Yes, p.m.
 4         Q.   Great.  That would have been your typical shift,
 5    5:00 in the morning to 5:30 in the aft -- in the evening?
 6         A.   Yes.
 7         Q.   And you get a lunch break?
 8         A.   Yes.
 9         Q.   You eat the jail food?
10         A.   No.
11         Q.   Why is that?
12         A.   Because I have a wonderful wife who would prepare
13    meals for me.
14              Can I get a copy of this?
15              No.  I didn't eat the jail food.
16         Q.   I worked at juvie.  I ate the jail food until,
17    you know, you'd find things in there that the workers
18    planted it and then --
19         A.   Right.
20         Q.   -- never again.  Plus it's super fattening, jail
21    food.
22              All right.  So on the day of -- at any time
23    leading up to your -- the call that you received from
24    Lieutenant -- excuse me -- Deputy Guillory, did you have
25    any knowledge of -- or any interaction or any information
```

**EXHIBIT "B"**        **17cv1154-LAB(AGS)**

1    **pertaining to Heron Moriarty?**

2         A.   I had some information on him.

3         **Q.   What information did you have regarding Heron**

4    **Moriarty prior to the call you received from Deputy**

5    **Guillory?**

6         A.   I'm sorry?

7         **Q.   What information did you have regarding Heron**

8    **Moriarty prior to receiving the call from Deputy Guillory?**

9         A.   Okay.  When we came in to work after our days off

10   on Friday morning, that date being the 26th?  Friday --

11        **Q.   I think it was the 27th.**

12        A.   The 27th?

13        **Q.   Yes, sir.**

14        A.   The beginning of our five days on, we received --

15   we, Sergeant Nagy and I -- received brief information of a

16   guy who had -- an inmate -- who had been diverted from

17   SDCJ and came up to Vista.  And when he got to Vista -- he

18   was supposed to go in the safety cell down there, but as I

19   recall, there wasn't one available so he was diverted -- I

20   don't know if he stopped -- I don't remember if I was even

21   told -- but I don't know if he was -- if he went via EPU

22   and then to Vista jail or if he went direct to Vista jail.

23   But when he got there and spoke to the nurses, he was

24   determined to be not suicidal and he had been moved

25   upstairs already.  And that was the extent of the briefing

Dale Arthur Weidenthaler 8/29/2018

1    we got from the previous sergeant working nightshift

2    Thursday night.

3        Q.   And that would have been the procedure that's

4    known in jail parlance as the pass-down?

5        A.   Yes.

6        Q.   And in that pass-down from the sergeant -- who

7    was that sergeant, if you can recall?

8        A.   Hightower.

9        Q.   Hightower.  In the briefing that you received

10   from Sergeant Hightower, he told you that an inmate had

11   been taken to CJ, CJ had determined he was suicidal, that

12   he had been sent to Vista, whether to EPU first or

13   directly to Vista, you didn't know?

14       A.   I don't know now.  I don't remember if he

15   specified on that or not.

16       Q.   Okay.  You don't know one way or the other

17   whether he told you he had gone through EPU first?

18       A.   Correct.

19       Q.   But because the suicide cells -- excuse me, old

20   parlance -- safety cells were full at CJ, they had taken

21   him to Vista?

22       A.   Yes.

23       Q.   And when this information was relayed to you, you

24   said that that inmate was upstairs.  What --

25       A.   In-housing.

EXHIBIT "B"        17cv1154-LAB(AGS)

Dale Arthur Weidenthaler 8/29/2018

1    Q.   In-housing.  Would that have been -- would

2    in-housing -- with a reference to "upstairs," would that

3    have included the cells -- the disciplinary cells, the

4    S-1, 2, 3, 4 and 5?  Would that have -- let me ask it this

5    way:  Was it your understanding that when he said

6    "upstairs," that Mr. Moriarty was in mainline housing?

7    A.   I don't recall.

8    Q.   And when -- in jail nomenclature, when somebody

9    says "He's already upstairs," referring to housing units,

10   right?

11   A.   Right.

12   Q.   Would that -- that term of art as it's used in

13   the jail, the "upstairs" term of art, would that have

14   included a safety -- excuse me -- disciplinary cell

15   placement in south housing as 1, 2, 3, 4 and 5?

16   A.   I'm sorry.  I'm having difficulty with the

17   vernacular.

18   Q.   Me too.  I'm struggling with this.

19        Moriarty, at that point in time, according to the

20   records, was in S-5?

21   A.   And S-5 along with S-1, 2, 3 and 4 are alternate

22   housing cells.

23   Q.   They've been referred to in this case as

24   disciplinary housing as opposed to ad seg.

25   A.   In --

**EXHIBIT "B"**          **17cv1154-LAB(AGS)**

Dale Arthur Weidenthaler  8/29/2018

```
 1          MR. KUTYLA:  Hold on.

 2          What was your question?

 3  BY MR. MORRIS:

 4      Q.  Was it your understanding -- was it your

 5  understand in May of 2016 that S-1 through 5 were

 6  disciplinary housing?

 7      A.  No.

 8      Q.  What was your understanding of the uses for S-1

 9  through 5?

10      A.  The uses could include disciplinary housing.

11      Q.  Gotcha.  So they were isolation cells, single

12  cells?

13      A.  Right.

14      Q.  Whether they would fall under the rubric of ad

15  seg or discipline depends on -- for the reasons the inmate

16  was placed there?

17      A.  Yes, and even medical overflow.

18      Q.  They can be used for medical overflow as well.

19          And enlighten me as far as your understanding:

20  Ad seg, correct me if I'm wrong -- my understanding is

21  that an ad seg, somebody who is administratively

22  segregated and placed in one of those cells, would get out

23  one hour a day for interaction?

24      A.  Yes.

25      Q.  Somebody who's placed in one of those cells for
```

**EXHIBIT "B"**        **17cv1154-LAB(AGS)**

Dale Arthur Weidenthaler  8/29/2018

1    disciplinary purposes would get out once every 48 hours to

2    shower?

3        A.   Yes.

4        Q.   And somebody who's placed in there for medical

5    isolation would be placed in there -- would be treated

6    medically?

7        A.   Again, situationally dependent.

8        Q.   Total get you.

9        A.   For, like, scabies or, you know, something

10   infectious.

11       Q.   TB?

12       A.   Right.  Well, not TB.  TB they have pressurized

13   cells for.

14       Q.   Oh.  I'm sorry.  Okay.

15            Now as far as the observation that pertains to

16   those units, correct me if I'm wrong, my understanding is

17   it's the once-an-hour Title 15 checks for those cells,

18   right?

19       A.   Yes.

20       Q.   Hands on -- eyes on, not through video

21   monitoring?

22       A.   Yes.

23       Q.   Checking for signs of life?

24       A.   Yes.

25       Q.   Looking for obvious medical distress as opposed

**EXHIBIT "B"          17cv1154-LAB(AGS)**

Dale Arthur Weidenthaler  8/29/2018

```
 1    to waiting at each window waiting to see the chest rise

 2    and fall?

 3         A.   Yes.

 4         Q.   Okay.  And when Sergeant Hightower relayed this

 5    information regarding Mr. Moriarty to you, he said, "We

 6    got a guy turned away from CJ," did he identify that guy

 7    as Heron Moriarty?

 8         A.   I don't recall.

 9         Q.   So what you understood -- or what you recall as

10    we sit here now, is that Sergeant Hightower relayed to

11    you, that information that you discussed, whether he had

12    specifically identified that inmate that he was talking

13    about as Heron Moriarty, you don't know?

14         A.   Correct.

15         Q.   Did you, prior to your interaction with Deputy

16    Guillory, make that connection that this individual that

17    we discussed who had been turned away was Heron Moriarty,

18    the person that Lieutenant Guillory was speaking about?

19         A.   Deputy Guillory.

20         Q.   Sorry.  Deputy Guillory was speaking about?

21         A.   Yes, because after the briefing by Sergeant

22    Hightower, the watch commander Lieutenant McNeely came

23    into our office, just as he usually would to check in, see

24    what was going on, asked about our days off, et cetera.

25    But he said he -- he informed us -- I know he used the
```

**EXHIBIT "B"**        **17cv1154-LAB(AGS)**

Dale Arthur Weidenthaler  8/29/2018

1   name Moriarty.

2       Q.   Oh.   Okay.   And that would have been on the 27th

3   when you came back to work?

4       A.   Yes.

5       Q.   That Friday, right?

6       A.   Yes.

7       Q.   Okay.   And so at that point in time you connected

8   Lieutenant -- excuse me.   At that point in time you

9   connected Heron Moriarty with the individual that Sergeant

10  Hightower had given you a description of?

11      A.   Yes.

12      Q.   Did you determine at that point in time, Friday,

13  5/27, where exactly Mr. Moriarty was housed?

14      A.   I don't recall.

15      Q.   And what did Lieutenant McNeely say about

16  Mr. Moriarty there on that morning of 5/27?

17      A.   He said that there had been a big mess with this

18  inmate out in the field in terms of getting him into -- A,

19  arresting him; B, getting him into sheriff's custody; C,

20  when they got to the central jail.   He didn't provide the

21  details of that.   He just said basically it had been a big

22  mess.   But the bottom line was that he's up in Vista in

23  our custody.

24      Q.   Okay.   Did you know -- when he said "big mess,"

25  was he referring to, like, a use of force in the field or

**EXHIBIT "B"          17cv1154-LAB(AGS)**

Dale Arthur Weidenthaler  8/29/2018

1    **confusion about where to house him?  Did you understand**

2    **the nature of the mess that Lieutenant McNeely was**

3    **referring to?**

4        A.   I don't recall.  I don't recall if he made that

5    clear.

6        Q.   **Did Lieutenant McNeely relay to you that**

7    **Mr. Moriarty had been driving his car into other cars with**

8    **his eyes closed or laying in the road when they found him?**

9            (Instruction by the court reporter.)

10           MR. WELSH:  Chris, he wasn't laying in the road

11   when they found him.

12           MR. KUTYLA:  Could you ask the question again?

13           MR. MORRIS:  I'll break it down so I don't ask a

14   compound question.

15           MR. KUTYLA:  There you go.

16   BY MR. MORRIS:

17       Q.   **Did Lieutenant McNeely relay to you that**

18   **Mr. Moriarty had been driving his car into other cars with**

19   **his eyes closed prior to his arrest?**

20       A.   I don't recall, but I don't think so.

21       Q.   **Did he relay to you any other suicidal -- excuse**

22   **me -- any self-harming behavior that the arresting**

23   **deputies had observed with respect to Mr. Moriarty?**

24       A.   No.

25       Q.   **Did he relay to you that at CJ when questioned by**

**EXHIBIT "B"        17cv1154-LAB(AGS)**

Dale Arthur Weidenthaler  8/29/2018

1    **the nurse, Mr. Moriarty admitted that he was suicidal?**

2       A.    I believe so.

3       **Q.    Given that he had relayed to you that he was**

4    **suicidal -- well, let me ask it this way:  Is it your**

5    **understanding of the suicide protocol that an inmate who**

6    **admits to being suicidal can take that back such that you**

7    **don't need to follow the suicide protocol?**

8          MR. WELSH:  It's vague and ambiguous, incomplete

9    hypothetical.

10         MR. DOGGETT:  Join.

11         MR. KUTYLA:  Do you understand the question?

12         THE WITNESS:  Yes.  I understand the question.

13         Having been a supervisor as long as I have been,

14   or was -- it's been a very long time since I hung out in

15   the medical screening area to see how that back and forth

16   works.  I know there have been occasions where someone

17   who's come in drunk or under the influence gets asked so

18   many times by whomever, sworn staff, medical staff,

19   whoever, "Are you suicidal?  Are you suicidal?  Are you

20   suicidal?"

21         Just to shut them up ostensibly, the inmate will

22   say, "Yeah, I'm suicidal," and then renege on it and say,

23   "No, I'm not suicidal.  I'm sick and tired of you asking

24   my if I'm suicidal," or words to that effect.

25   BY MR. MORRIS:

**EXHIBIT "B"          17cv1154-LAB(AGS)**

Dale Arthur Weidenthaler 8/29/2018

1      Q.    Sure.

2      A.    And, you know, then medical staff will ask

3   additional questions.  And once the guy is being

4   cooperative, and -- they may say that he goes directly to

5   housing.

6      **Q.    Okay.  But in a situation like this where it's --**

7   **medical staff actually takes heed of those suicidal**

8   **ideations and actually begins to implement the suicide**

9   **protocol, so once it's determined, "Okay.  This isn't**

10  **just, 'Yeah, I'm suicidal because I'm tired of you asking**

11  **me'" or some other flippant response, an actual legitimate**

12  **thing that needs to be heeded.  Once the suicidal**

13  **protocols begins, do you have any knowledge one way or the**

14  **other as to whether or not you can derail that protocol by**

15  **taking back that suicidal thought or statement?**

16            MR. DOGGETT:  Lacks foundation, incomplete

17  hypothetical.

18            MR. KUTYLA:  Right.  All of those things.  It is

19  vague and ambiguous, too.

20            But if you -- do you understand the question,

21  Dale?

22            THE WITNESS:  I understand the question.  And I

23  don't really feel I'm qualified.  In my position, absent

24  any medical staff, somebody said it once, they go.

25  ///

**EXHIBIT "B"          17cv1154-LAB(AGS)**

Dale Arthur Weidenthaler  8/29/2018

1    BY MR. MORRIS:

2        **Q.   In your position as a --**

3        A.   As a sworn staff member.

4        **Q.   Sworn staff member, detentions deputy, detentions**

5    **sergeant, somebody says, "I'm suicidal and I'm not just**

6    **being flip or joking around," but actually says, "I'm**

7    **suicidal" such that you believed them, the protocol**

8    **begins?**

9        A.   Right.

10       MR. WELSH:   Incomplete hypothetical, vague and

11   ambiguous, calls for speculation.

12   BY MR. MORRIS:

13       **Q.   Given your understanding of the policy and the**

14   **information that was relayed to you that he had said he**

15   **was suicidal such that the protocol had been initiated,**

16   **when Lieutenant McNeely told you about this, did you**

17   **assume at that point that Moriarty was in a safety cell?**

18       A.   No.   Part of what he told me was that when he got

19   here, he wasn't suicidal.   I don't remember if that was

20   strictly from our medical staff, if he had gone past EPU

21   or come to Vista via EPU and had been cleared by a

22   psychiatrist, I don't know.

23       **Q.   Your understanding at that time, at least as it**

24   **pertained to Vista, would have been that he would have had**

25   **to have gone through EPU if he said he was suicidal, true?**

**EXHIBIT "B"**          **17cv1154-LAB(AGS)**

Dale Arthur Weidenthaler  8/29/2018

1          MR. WELSH:  Incomplete hypothetical.

2    BY MR. MORRIS:

3        **Q.    At least as to Vista?**

4        A.    No.  Because I'm unsure as to the breakdown of

5    that pilot project and what that meant for somebody who

6    was brought in by the sheriff's department and then

7    diverted to Vista.  I don't -- I don't know what the

8    protocol was for them.

9        **Q.    Safe to say because of the Pilot Program, you're**

10   **sort of confused as to whether or not this guy would have**

11   **necessarily gone through EPU?**

12         MR. WELSH:  Calls for speculation, lacks

13   foundation, assumes facts not in evidence.

14         THE WITNESS:  Yes.

15   BY MR. MORRIS:

16       **Q.    Thank you.**

17         **And I think I'd already asked you this, but just**

18   **to sum:  You didn't receive any training on situations**

19   **like this, right?  Where, okay, we've got this Pilot**

20   **Program, but it's still full.  Then we go through here,**

21   **does the guy, yes, go to EPU?  No EPU?  You hadn't**

22   **received any training or education as to what should**

23   **happen in a circumstance such as this, right?**

24         MR. WELSH:  Vague and ambiguous.

25         MR. KUTYLA:  Do you understand what he means

**EXHIBIT "B"          17cv1154-LAB(AGS)**

Dale Arthur Weidenthaler  8/29/2018

1    "such as this"?

2              THE WITNESS:  I understand.

3              And "such as this" includes a whole lot of

4    variables.  But a direct answer to your question is no.

5    BY MR. MORRIS:

6        Q.  **Thank you.**

7              **So when Lieutenant McNeely identified or relayed**

8    **to you the information regarding Mr. Moriarty, in your**

9    **mind were you thinking, "Okay.  If he's in normal housing**

10   **and not in a safety cell, I imagine he's been cleared by**

11   **EPU"?  Were you thinking that in your mind given your**

12   **history?**

13       A.   No.  I remember thinking of him being up in

14   medical.  And I don't know where I got that from, if I got

15   it from Hightower or if I got it from McNeely.  But

16   McNeely was advising us, "This is a name you got to watch

17   out for.  Something comes up with this guy, you know,

18   follow up right away," type of thing.

19       Q.  **Gotcha.**

20             **And your understanding was at that time that**

21   **Mr. Moriarty was still up in medical?**

22       A.   I would have to call it my impression.

23       Q.  **Fair enough.  So that's the information you got**

24   **when you got to work on your Monday, May 27th.  What's the**

25   **next time that -- let me ask it this way:  Did you receive**

**EXHIBIT "B"**              **17cv1154-LAB(AGS)**

Dale Arthur Weidenthaler  8/29/2018

1    any other further updates or information regarding

2    Mr. Moriarty or have any interaction with Mr. Moriarty up

3    until the point that you had this communication with

4    Deputy Guillory?

5        A.   Not that I recall.

6        Q.   Were you informed at all that Mr. Moriarty was in

7    S-5 as a disciplinary inmate?  Did that information ever

8    get relayed to you prior to your discussion with Guillory?

9        A.   I don't think so.

10       Q.   Did anybody ever tell you about the event where

11   they had to take him off the transfer bus or he was going

12   to get transferred to CJ for some reason, either for court

13   or for placement, where he acted up on the bus and they

14   had to drag him off the bus?  Anybody ever tell you about

15   that?

16       A.   Not that I recall.

17       Q.   And let's walk through the morning of May 31st.

18            You arrive to work at 5:00, fair enough?

19       A.   Yes.

20       Q.   And do you have a distinct and independent

21   recollection of some of the events of that day?

22       A.   Yes.

23       Q.   So in your mind's eye, you can recall certain

24   things that happened that day?

25       A.   Yes.

**EXHIBIT "B"**        **17cv1154-LAB(AGS)**

Dale Arthur Weidenthaler  8/29/2018

1    things, that they had actually used force on Mr. Moriarty

2    the previous day?

3        A.   No.

4        Q.   And you hadn't physically laid eyes on

5    Mr. Moriarty prior -- at any time?

6        A.   At any time.

7        Q.   Okay.

8        A.   No.

9        Q.   Fair enough.

10            And you stopped by medical.  And you don't recall

11   the exact purpose, but you think it may have been to do

12   with Mr. Moriarty?

13       A.   It was that -- it was to ask what's going on.

14   And occasionally I would do this.  And -- so I would know

15   what we could be looking at for the day.

16       Q.   Okay.  The specific question I had, do you have a

17   specific recollection of stopping by medical to inquire

18   regarding Mr. Moriarty?

19       A.   No.

20       Q.   Is it your assumption, based on the facts of the

21   case and what was going on and what you knew about

22   Mr. Moriarty, that you would have inquired regarding

23   Mr. Moriarty on May 31st in the morning at medical?

24       A.   No.

25       Q.   So you just kind of generally wanted to know,

**EXHIBIT "B"**          **17cv1154-LAB(AGS)**

Dale Arthur Weidenthaler  8/29/2018

1   liaisons work one at a time as far as I know, right?

2       A.   Yes.

3       Q.   So there wouldn't have been any other psych

4   liaison there as far as you knew?

5       A.   No.

6       Q.   Okay.  After this communication you had with

7   medical staff, can you tell me what happened -- what's the

8   next thing you remember -- when I say "medical staff," I

9   mean both the detention deputies that work in medical and

10  nursing staff.

11       Okay.  Moving forward, what's the next thing you

12  recall happening on May 31st, 2016?

13      A.   Significant would be at about 9:20 or 9:30, in

14  that range, Lieutenant McNeely came into my office and

15  said, "This guy up in S-5" -- and I believe that's the way

16  he referred to him -- "this guy up in S-5 is going to go

17  down to SDCJ.  He's going to be admitted to PSU.  We're

18  going to have to administer -- extract him because he's

19  not cooperating.  We're going to have to administer

20  medication before he's transported.  So it may well be

21  forced medication.  So assemble a team," meaning a

22  tactical team, "and get them upstairs to South House to do

23  the forced meds."  And he indicated -- I'm not sure of the

24  sequence, where in the conversation, but he -- he

25  indicated "This guy is a spitter, a gasser."

EXHIBIT "B"          17cv1154-LAB(AGS)

Dale Arthur Weidenthaler  8/29/2018

1   **Q.   What's a gasser?**

2   A.   Someone in custody who expels fluids onto staff

3   or -- well, yeah, to staff, any staff, whether it's

4   spitting, throwing, whatever.

5   **Q.   Okay.  And so your recollection is that**

6   **Lieutenant McNeely, in -- prepping you for this, did he**

7   **identify, did he use by name, Mr. Moriarty in identifying**

8   **this individual?**

9   A.   I don't recall him doing that.

10   **Q.   Did he state specifically, that you can recall as**

11   **you sit here today, did he use the term "The guy's in**

12   **S-5"?**

13   A.   Yes.

14   **Q.   All right.**

15   A.   Because I needed to know that to know where the

16   team I assembled was going.

17   **Q.   Okay.  And when you received that information,**

18   **what did you do?**

19   A.   The first thing I believe I did was to call

20   control and advise them that we were going to be doing a

21   cell extraction in South House and to lock down the

22   facility and notify our predesignated TAC team to meet me

23   in the tactical room, which is located in Lower West.

24   **Q.   And did you go to the Lower West?**

25   A.   Ultimately, but not right away.

**EXHIBIT "B"          17cv1154-LAB(AGS)**

Dale Arthur Weidenthaler  8/29/2018

1     Q.    Okay.  So the TAC team would then have to

2  assemble and get the padded gear on, right?

3     A.    Right.

4     Q.    Helmets and shields?

5     A.    Get their assignments, get briefed on what was

6  going on.

7     Q.    And that briefing would take place as they're

8  getting their gear on?

9     A.    Yes.

10    Q.    After you had communicated that to -- who did you

11  communicate that to, again?  I'm sorry?

12    A.    Whoever was working control deputy.

13    Q.    Oh.  I'm sorry.  Control.  I couldn't read my

14  writing.

15         After you had communicated that to the control

16  deputy, what did you do?

17    A.    I picked up a copy of the deployment.

18    Q.    What's that?

19    A.    That is what deputy is working where.

20    Q.    Okay.

21    A.    Our staffing for the day.

22    Q.    Fair enough.  You picked up a copy of the

23  staffing chart.  And what did you do?

24    A.    I looked to see who would be good deputies to

25  assign to the transportation run.  And there would be two

**EXHIBIT "B"**          **17cv1154-LAB(AGS)**

Dale Arthur Weidenthaler  8/29/2018

1    deputies going out on that run.

2        Q.    **Taking this individual to CJ?**

3        A.    Correct.

4        Q.    **Do you recall what deputies you selected?**

5        A.    I do not.

6        Q.    **After you made -- did you make a choice as to**

7    **which deputies would be transporting?**

8        A.    Yes.

9        Q.    **Once you'd made the choice regarding transport**

10   **deputies, what did you -- what happened next?**

11       A.    I went down -- I walked down to male intake,

12   which kind of serves as control for the processing area,

13   and I -- if I recall correctly, I told the deputy working

14   that area that we're going to be doing a cell extraction

15   up in South House and forced meds, and letting him know,

16   A, to keep him informed and, B, to let him know that he

17   was going to be short-staffed because I was going to take

18   some people for the tactical team.

19       Q.    **Out of intake?**

20       A.    Out of intake.

21             Now I didn't actually do that.  Control did that,

22   because they have a copy of the designated TAC team for

23   that day.  And I had assigned them to call the TAC team.

24       Q.    **Fair enough.**

25       A.    So I believed -- usually there's somebody from

**EXHIBIT "B"**          **17cv1154-LAB(AGS)**

Dale Arthur Weidenthaler  8/29/2018

```
1   intake that's assigned to the TAC team, so I was letting

2   them know about that.

3        Q.   So you went down to intake, give them a heads-up,

4   they're going to be losing maybe one or two of their

5   staffers because you got to assemble a TAC team?

6        A.   Right.

7        Q.   And then after you've gone to intake, what do you

8   do next?

9        A.   I started to go walk back over to Lower West.

10       Q.   And that's where the TAC team is going to be

11  assembled?

12       A.   Correct, in the TAC room.  I walked past the

13  sergeant's office.  As I walked past the sergeant office,

14  I heard the phone was ringing.

15       Q.   And where was Sergeant Nagy at the time?

16            MR. WELSH:  Calls for speculation.

17  BY MR. MORRIS:

18       Q.   If you know?

19       A.   I don't know.

20       Q.   Not in the office?

21       A.   Not in the office.

22       Q.   Would he have had a role in this assembling of

23  the TAC team?

24       A.   Yes -- well, not in assembling of the TAC team.

25  He would have a role in this.  And normally when something
```

**EXHIBIT "B"**          **17cv1154-LAB(AGS)**

1   was going on like this, a cell extraction, the security

2   sergeant -- the way we work things on our team -- would

3   go -- would respond to the house where the activity was

4   going to occur or was occurring, while the processing

5   sergeant would assemble the TAC team, brief them and

6   escort them upstairs.

7         Q.   Okay.  So in situations like this, the security

8   **sergeant would actually be the one onsite during the**

9   **extraction?**

10        A.   Yes.

11        Q.   **Whereas the processing sergeant would be the one,**

12  **more logistical, assembling the TAC team, picking the team**

13  **members and briefing them?**

14        A.   Yes.

15        Q.   **Okay.  So you're not sure where Nagy was at the**

16  **time, given his role?  He didn't -- he wasn't going to**

17  **have a role in the briefing in Lower West, right?**

18        A.   No, he was not.

19        Q.   **Okay.**

20        A.   I presumed that he was already on scene in South

21  House.

22        Q.   **Okay.  That's your assumption, but you don't know**

23  **that for sure?**

24        A.   Correct.

25        Q.   **Fair enough.**

Dale Arthur Weidenthaler  8/29/2018

1          Be the logical place for him to be.  Whether he

2     was there or not, we don't know?

3          A.    Right.

4          Q.    Okay.  So you're walking past the sergeant's

5     office, which is next to the watch commander's office,

6     right?

7          A.    Yes.

8          Q.    And was Lieutenant -- where was Lieutenant

9     McNeely at this time?

10         A.    To my -- to the best of my recollection, he was

11    in his office; but I'm not 100 percent on that.

12         Q.    Okay.

13         A.    Because I believed that after he told me -- and

14    during the conversation he -- he implied an urgency to get

15    up there to South House and get this guy taken care of.

16         Q.    Okay.

17         A.    I believe he went back to his office and sat

18    down.

19         Q.    You didn't see him in there though?

20         A.    I -- I can't say at this time that I remember

21    seeing him in there.

22         Q.    You don't have a recollection as you sit here

23    today of not seeing him, though, right?  You just don't

24    have a recollection --

25         A.    Correct.  Right.

**EXHIBIT "B"**          **17cv1154-LAB(AGS)**

Dale Arthur Weidenthaler  8/29/2018

1      Q.    You don't have --

2      A.    I do have a recollection of later -- sorry if I'm

3   jumping ahead a little bit.

4      Q.    No.

5      A.    -- of being on the phone with Deputy Guillory

6   wondering why she didn't call the Lieutenant.

7      Q.    Right.

8            Given your earlier testimony that if --

9      A.    Right.

10     Q.    -- the Lieutenant's not there, you'd be the next

11  logical person to call?

12     A.    And so I thought "Well, maybe she did and he's

13  not there."

14     Q.    So you're walking past the sergeant's office?

15     A.    Yes.

16     Q.    Next to the watch commander's office?  Don't have

17  a recollection of McNeely being in there one way or the

18  other and you hear the phone ring?

19     A.    Yes.

20     Q.    Are you in your tactical gear?

21     A.    No.

22     Q.    You don't wear tactic gear?  You're not involved

23  in the extraction, right?

24     A.    Correct.

25     Q.    So you walk back, you hear the phone ring, what

**EXHIBIT "B"**        **17cv1154-LAB(AGS)**

Dale Arthur Weidenthaler  8/29/2018

1   **do you do?**

2       A.   I hesitated on whether I should go to Lower West

3   for the team that was waiting for me or to answer the

4   phone.  Thinking that it may have some bearing on this

5   extraction that we were about to do, I went in and

6   answered the phone.

7       **Q.   And what did you hear Lieutenant -- or excuse me.**

8   **Who was on the phone?**

9       A.   Deputy Guillory.

10      **Q.   And what did Deputy Guillory say to you?**

11      A.   Deputy Guillory told me that Nurse Daniels wanted

12  Moriarty to go in the safety cell for homicidal ideation.

13      **Q.   And is it your distinct recollection as you sit**

14  **here today that Deputy Guillory used the term "homicidal"?**

15      A.   Absolutely.  Yes.

16      **Q.   And she referred to the inmate by name and not by**

17  **cell?**

18      A.   Yeah.  I believe she did.  I believe she did.

19      **Q.   So do you have a distinct recollection as you sit**

20  **here today that she used the -- she referred to the deputy**

21  **[sic] as Moriarty and not S-5?**

22      A.   The inmate as Moriarty.

23      **Q.   What did I say?  Did I say --**

24      A.   You said "deputy."

25      **Q.   Sorry.**

**EXHIBIT "B"**          **17cv1154-LAB(AGS)**

Dale Arthur Weidenthaler  8/29/2018

1        **Do you have a distinct recollection that she**

2   **referred to the inmate by name, Moriarty, and not by cell**

3   **S-5?**

4        A.   I do not.  I can't say that for certain.

5        **Q.   Okay.  And when she said that this inmate --**

6   **whether the inmate in S-5 or the inmate Moriarty --**

7   **whether -- when she said "This inmate needs to be moved to**

8   **safety cell per Daniels," what was your response?**

9        A.   I was confused.  I thought she was talking about

10   the same guy that we were going up there to extract.  And

11   so now I've got different information coming in.  "Well,

12   what are we doing with this guy?"  I didn't say this, but

13   going through my head, "What are we doing with this guy?

14   Are we -- are we taking -- are we exacting him and force

15   medicating him and then putting him in the safety cell, or

16   what are we doing?"  I'm pretty sure she said the name.

17   And -- so it took a few minutes -- not a few minutes.  It

18   took a few seconds for me to catch up and for those

19   pistons to drop into place in the brain housing group, who

20   she was talking about, and that who she was talking about

21   was not the same guy that we were extracting.

22        But while I was paused like that thinking these

23   things out, Deputy Guillory -- and I believe it was at

24   this point.  I'm not exactly sure of the sequence -- but I

25   believe it was at this point she said, "No," like, with a

**EXHIBIT "B"          17cv1154-LAB(AGS)**

Dale Arthur Weidenthaler  8/29/2018

```
 1   question mark.
 2          And I thought, "No?  I didn't say anything about
 3   'no.'"
 4          And I don't remember if I said anything or not,
 5   because I'm still trying to put all this together in my
 6   head.  And it's coming together and, "Okay.  She's talking
 7   about the other guy."  Daniels had already talked to the
 8   first guy that we were going to extract --
 9      Q.   The "gasser," we'll call him?
10      A.   The gasser.  And I got the news via Lieutenant
11   McNeely.  And then they had gone back and talked to the
12   guy in the next cell.  And now this is the word coming
13   back from this cell about this guy -- about -- as it
14   turned out -- Moriarty.  And somehow I -- I reaffirmed
15   that this guy is homicidal.  And she told me that, "Yeah,
16   he said that if anybody comes in his cell today, he's
17   going to kill them."
18          And I said, "Okay."
19          And then I -- again, at some point, for the
20   second time, she said, "No?"
21          And I said -- and I -- I paused.  I said, "No,"
22   paused again, "Not right now," or "not now," something
23   like that.
24      Q.   Okay.  Let's go through this a little bit.
25          When Deputy Guillory informed you that an
```

**EXHIBIT "B"**          **17cv1154-LAB(AGS)**

Dale Arthur Weidenthaler  8/29/2018

1   BY MR. MORRIS:

2       Q.   **Go ahead.**

3       A.   It was not late in the shift.

4       Q.   **Been there five hours?**

5       A.   In a 12-hour day.

6       Q.   **Well, you were leaving at 1:00 though?**

7       A.   This was -- I had been there about 4 1/2 hours.

8            MR. KUTYLA:  Just so the record is clear, can you

9   restate the question again, because I think we got

10  sidetracked there?

11  BY MR. MORRIS:

12      Q.   **Okay.  So you started work at 5:00.  You had this**

13  **conversation with him around 6:00 and now we're here at**

14  **10:00.  So they've been under the knowledge that you were**

15  **trying to get out of there early for four hours.  Okay?**

16      A.   I'm sorry.  I've got to correct you.  It was no

17  later than 9:30 that we had this conversation with

18  Guillory and me.

19      Q.   **Okay.  Fair enough, 9:30.  So 3 1/2 hours.  Make**

20  **sure the record is clear.  I appreciate that.  So 3 1/2**

21  **hours.**

22           **And now they're telling you at 9:30, not only is**

23  **there this inmate that you're assembling the TAC team for,**

24  **but another inmate.  Knowing what we know now is that you**

25  **had to leave at 1:00 and that a lot of this work**

**EXHIBIT "B"          17cv1154-LAB(AGS)**

1 associated with these movements and extractions would fall

2 on Nagy, were you disappointed that this had not been

3 handled earlier?

4   A. No.  I did not even think of it in that context.

5   Q. Okay.  And when you realized it was Moriarty, did

6 you then also connect that name Moriarty with what

7 Lieutenant McNeely had told you about the guy who had

8 gotten turned away because the safety cells were full?

9   A. Yes.

10   Q. Given that this is now the individual who had

11 admitted homicidal -- or suicidal -- suicidal thoughts on

12 the 27th that you had been informed of, and now was also

13 being requested by the psych nurse for a safety cell

14 placement, was it your intent to go ahead and place him in

15 a safety cell?

16   A. No.

17   MR. WELSH:  It's vague and ambiguous and

18 misstates testimony.

19 BY MR. MORRIS:

20   Q. Okay.  Help me out, Dale.  You know that this is

21 the guy that had gotten turned away because safety cells

22 were full and said he was suicidal.  Now five days later

23 this is the guy that the psych nurse is saying he needs to

24 be in a safety cell.  Why didn't you have an intent -- I

25 realize right now you had other things going on.  I got

Dale Arthur Weidenthaler  8/29/2018

1    **what you're going through on that.  Why wasn't it your**

2    **intent, then, to at least put him in a safety cell at some**

3    **point in time that day?**

4        A.    He was housed appropriately.  He said that "If

5    somebody comes into my cell today, I'm going to kill

6    them."

7            Things to consider:  How is he going to kill

8    them, particularly if nobody comes in the cell and we only

9    pass through food through a food flap?  How is he going to

10   kill anyone?  He was housed appropriately for the behavior

11   he was currently demonstrating.

12       **Q.    Earlier in your testimony I talked about the**

13   **discretion that came for homicidal inmates.  And you said**

14   **one thing we don't do, though, is second-guess the medical**

15   **opinion by refusing this request from Nurse Practitioner**

16   **Daniels to put him in a safety cell.  Aren't you doing**

17   **that exact thing?  Aren't you second-questioning --**

18   **second-guessing her medical opinion?**

19           MR. WELSH:  Misstates his earlier testimony.

20   It's argumentative, incomplete hypothetical.

21           THE WITNESS:  As I said earlier, there is

22   discretion.  And I wasn't getting my information directly

23   from the psych nurse.  I was getting my information from

24   Deputy Guillory.  I did not have time at that time for

25   further discussion or to search out Nurse Daniels, not

**EXHIBIT "B"**          **17cv1154-LAB(AGS)**

Dale Arthur Weidenthaler  8/29/2018

1  the medical staff said, "Yeah.  He's good to go."  We went

2  out the control slider, or control gate, got on the

3  elevator, went downstairs to the processing area.  I

4  ensured that the deputies who were doing the transport

5  were ready to go, that they had his property, that they

6  had his face card, his booking jacket and everything else

7  they needed to make a complete trans run.  And I believe

8  medical staff checked his vitals again while we were down

9  there for a short time, maybe 5 minutes, and then we took

10  him out into the vehicle sally port, through the intake

11  sally port -- excuse me -- into the vehicle sally port and

12  into the waiting van that was right outside the door.

13      **Q.   And he was being transferred down to CJ?**

14      A.   Correct.

15      **Q.   Presumably to the PSU?**

16      A.   Presumably.

17           MR. WELSH:  Getting close?

18           MR. MORRIS:  Close.

19  BY MR. MORRIS:

20      **Q.   No use of force needed?**

21      A.   No.

22      **Q.   So no use of force paperwork?**

23      A.   No.  But I still had the assistant team leader

24  write a report documenting everything that we had done.

25      **Q.   What time was it in the morning where you**

**EXHIBIT "B"**          **17cv1154-LAB(AGS)**

Dale Arthur Weidenthaler  8/29/2018

1    finished this -- where this -- where the guy was on his

2    way to CJ?

3        A.   I would say that was about 10:30 to 10:40.

4        Q.   Given that you still had, then, 3 1/2 hours left

5    of your shift, can you tell us why it is that you didn't

6    turn your attention to the previous request of Moriarty --

7    regarding Mr. Moriarty?

8            MR. WELSH:  Two and a half.

9            THE WITNESS:  I'm still working with, yeah, the

10   time.

11   BY MR. MORRIS:

12       Q.   Okay.  I'm sorry.

13           10:30.  You wanted to leave at 1:00, right?

14   Actually, you know what?  We'll go ahead and mark this now

15   since we're getting down to time.

16           The records indicate you wanted to leave at 1:30.

17   I'll give it to you right now.

18           MR. MORRIS:  Mark this as Exhibit No --

19           MR. WELSH:  Are we at a good spot for a quick

20   break, Chris?

21           MR. MORRIS:  Sure.  We're almost done.

22           MR. WELSH:  I know.

23           MR. MORRIS:  So you can look at it while you're

24   on break and we can get right to it.  The day in question

25   is 5/29.

**EXHIBIT "B"**          **17cv1154-LAB(AGS)**