EXHIBIT "D"



EXHIBIT "D"          17cv1154-LAB(AGS)

Amanda Daniels  8/24/2018

```
 1              IN THE UNITED STATES DISTRICT COURT

 2           FOR THE SOUTHERN DISTRICT OF CALIFORNIA

 3
     _____
 4                                          )
     MICHELLE MORIARTY, AN INDIVIDUAL, AS   )
 5   SUCCESSOR IN INTEREST TO THE ESTATE    )
     OF HERON MORIARTY AND AS GUARDIAN AD   )
 6   LITEM TO ALEXANDRIA MORIARTY, ELIJAH   )
     MORIARTY, AND ETERNITY MORIARTY,       )
 7                                          ) CASE NO.
                                            ) 3:17-CV-01154-LAB-
 8                    Plaintiffs,           ) AGS
                                            )
 9               vs.                        )
                                            )
10   COUNTY OF SAN DIEGO, DR. ALFRED        )
     JOSHUA, INDIVIDUALLY, AND DOES 1       )
11   THROUGH 10, INCLUSIVE,                 )
                                            )
12                    Defendants.           )
     _____)
13

14

15

16              DEPOSITION OF AMANDA DANIELS

17                 TEMECULA, CALIFORNIA

18                   AUGUST 24, 2018

19

20

21

22

23   REPORTED BY SANDRA NALLEY, CSR NO. 13607

24

25
```

EXHIBIT "D"          17cv1154-LAB(AGS)

Amanda Daniels  8/24/2018

```
 1              IN THE UNITED STATES DISTRICT COURT

 2             FOR THE SOUTHERN DISTRICT OF CALIFORNIA

 3
     _____
 4                                       )
     MICHELLE MORIARTY, AN INDIVIDUAL, AS )
 5   SUCCESSOR IN INTEREST TO THE ESTATE  )
     OF HERON MORIARTY AND AS GUARDIAN AD )
 6   LITEM TO ALEXANDRIA MORIARTY, ELIJAH )
     MORIARTY, AND ETERNITY MORIARTY,     )
 7                                        ) CASE NO.
                                          ) 3:17-CV-01154-LAB-
 8                      Plaintiffs,       ) AGS
                                          )
 9                  vs.                   )
                                          )
10   COUNTY OF SAN DIEGO, DR. ALFRED      )
     JOSHUA, INDIVIDUALLY, AND DOES 1     )
11   THROUGH 10, INCLUSIVE,               )
                                          )
12                      Defendants.       )
     _____)
13

14

15            DEPOSITION OF AMANDA DANIELS,

16   taken at the offices of the Perryman Law Firm, 32605

17   Temecula Parkway, Suite 314, Temecula, California, on

18   Friday, August 24, 2018, at 9:07 a.m., before Sandra

19   Nalley, Certified Shorthand Reporter, CSR No. 13607.

20

21

22

23

24

25
```

EXHIBIT "D"            17cv1154-LAB(AGS)

Amanda Daniels  8/24/2018

```
 1                    A P P E A R A N C E S:

 2

 3   FOR THE PLAINTIFFS:

 4           MORRIS LAW FIRM
             BY:  CHRISTOPHER S. MORRIS, ESQ.
 5           BY:  DANIELLE R. PENA, ESQ.
             401 West A Street, Suite 1820
 6           San Diego, California 92101
             619.826.8060
 7           Dpena@morrislawfirmapc.com

 8

     FOR THE DEFENDANT DR. RALPH LISSAUR:
 9
             WILSON ELSER
10           BY:  MARTY B. READY, ESQ.
             401 West A Street, Suite 1900
11           San Diego, California 92101
             619.321.6200
12           Marty.ready@wilsonelser.com

13

     FOR THE DEFENDANT DALE WEIDENTHALER:
14
             LAW OFFICE OF JOSEPH T. KUTYLA
15           BY:  JOSEPH T. KUTYLA, ESQ.
             10620 Treena Street, Suite 230
16           San Diego, California 92131
             858.345.9560
17           Jtklaw@outlook.com

18

     FOR THE DEFENDANT AMANDA DANIELS:
19
             LOTZ, DOGGETT & RAWERS, LLP
20           BY:  JEFFREY S. DOGGETT, ESQ.
             101 West Broadway, Suite 1110
21           San Diego, California 92101
             619.233.5565
22           Jdoggett@ldr.law.com

23

24

25
```

**EXHIBIT "D"**          **17cv1154-LAB(AGS)**

Amanda Daniels  8/24/2018

```
 1                A P P E A R A N C E S (CONTINUED)

 2

 3    FOR THE DEFENDANT:

 4            OFFICE OF COUNTY COUNSEL
              BY:  CHRISTOPHER J. WELSH, ESQ.
 5            1600 Pacific Highway, Room 355
              San Diego, California 92101
 6            619.557.4039
              Christopher.welsh@sdcounty.ca.gov
 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

EXHIBIT "D"          17cv1154-LAB(AGS)

Amanda Daniels  8/24/2018

1      A.   I don't.

2      Q.   **How about his appearance?  What did he -- how**

3   **was his general appearance?  Was he disheveled?  Was he**

4   **groomed?  Was he...**

5      A.   I didn't -- there wasn't anything remarkable

6   that stands out in his appearance, other than the toilet.

7      Q.   **Yeah.  Other than the standing with one or**

8   **two feet in the toilet?**

9      A.   Right.

10     Q.   **As you began to have this interaction with him,**

11  **I think you alluded to the fact that he started to say**

12  **things that were not making sense.  What kind of things**

13  **was he saying that were sort of incoherent or not**

14  **tracking?**

15     A.   He got agitated when I brought up

16  hospitalization with him.  He was adamant he did not want

17  to go to the hospital.

18     Q.   **Okay.**

19     A.   And that's when he threatened if anyone came in

20  the cell, that he was going to kill them.

21          This is probably really bad timing, but I have

22  to go to the bathroom.

23          MR. DOGGETT:  There's no bad timing.

24          THE WITNESS:  Sorry.  Too much coffee.

25          MR. MORRIS:  No problem.  Off the record.

**EXHIBIT "D"          17cv1154-LAB(AGS)**

Amanda Daniels  8/24/2018

1          MR. DOGGETT:  Join.

2          MR. MORRIS:  She's pretty well versed in

3    psychiatric medicine, especially in a custodial setting.

4          THE WITNESS:  I'm not sure I understand what

5    your question is.

6    BY MR. MORRIS:

7          Q.   All right.  And this is just me as a layperson.

8    I have no idea.  But somebody who's expressed, hey, I'm

9    going to kill somebody, right, they're homicidal, are

10   they also at an increased risk for suicide?

11         MR. WELSH:  Same objections.

12         MR. DOGGETT:  Join.

13         THE WITNESS:  I couldn't say for sure.

14   Everybody is different.

15   BY MR. MORRIS:

16         Q.   And when you saw Mr. Moriarty that day, you

17   didn't have any knowledge regarding why he had been moved

18   from Central to Vista on the --

19         MS. PENA:  26th.

20   BY MR. MORRIS:

21         Q.   -- 25th?

22         A.   No.

23         Q.   No one had told you that he had expressed

24   suicidal ideations at Central jail and had been moved to

25   Vista to be placed in a safety cell?  You didn't know

**EXHIBIT "D"          17cv1154-LAB(AGS)**

Amanda Daniels  8/24/2018

1  that?

2      A.   No.

3      Q.   If you had known that information, right, if

4  somebody had said, hey, we took him to jail on the 25th,

5  late that evening, said he was suicidal, we moved him to

6  Vista to be placed in a safety cell, would that have

7  given your recommendation for safety cell placement on

8  the 30th -- on the 31st, would that have made any

9  difference to you?

10         MR. DOGGETT:  It calls for speculation.

11  Incomplete hypothetical.

12         THE WITNESS:  With every case, I make my own

13  assessment.  Sure, collateral information, you know,

14  assists, but I make my own assessment.  I couldn't say

15  looking back what any information -- I would have done

16  the same thing if I was in that situation and had the

17  information I did.

18  BY MR. MORRIS:

19      Q.   No -- no stepped-up placement other than safety

20  cell, right?  I mean, that's just --

21      A.   Safety cell --

22         MR. WELSH:  That's vague and ambiguous.

23         THE WITNESS:  The safety cell is where you put

24  people if they're suicidal or homicidal.

25  ///

**EXHIBIT "D"**        **17cv1154-LAB(AGS)**

Amanda Daniels  8/24/2018

```
 1   BY MR. MORRIS:
 2        Q.   Okay.  Let's go ahead and look through your
 3   note if we could, entry date 5/31/2016, 8:55, right, at
 4   the top?
 5        A.   Correct.
 6        Q.   And entered by you, A. Daniels?
 7        A.   Correct.
 8        Q.   And your married name is Martin?
 9        A.   Yes.
10        Q.   Great.  You wrote -- and this is your note,
11   right?  You wrote this?
12        A.   Yes.
13        Q.   "Forty-three-year-old Caucasian male diagnosed
14   with bipolar," right?
15        A.   Correct.
16        Q.   And "DO" would be disorder?
17        A.   Correct.
18        Q.   I'm getting better.  I actually -- don't laugh,
19   because I'm always a mess when it comes to the shorthand
20   medical verbiage.  "Prescribed Risperdal."  What is
21   Risperdal?
22        A.   An antipsychotic.
23        Q.   LiCO3 is?
24        A.   Lithium.
25        Q.   And Benadryl.  What is the difference
```

EXHIBIT "D"          17cv1154-LAB(AGS)

Amanda Daniels  8/24/2018

1      A.    Correct.

2      **Q.    Did that involve Sergeant Weidenthaler?**

3      A.    No.

4      **Q.    Do you know if it was Deputy Guillory or Deputy**

5   **Johnson or any of the other liaisons?  Can you name who**

6   **it was who would be with you at that time?**

7      A.    I can't recall for sure.

8      **Q.    So at the conclusion of your meeting with --**

9   **and assessment of Mr. Moriarty, the positive development**

10  **was that he was agreeing to take his medicine?**

11     A.    Yes.

12     **Q.    And you thought if he takes his medicine, he's**

13  **likely to improve, correct?**

14     A.    That's the hope.

15     **Q.    That's the plan?**

16     A.    Right.

17     **Q.    And then the concerning -- most concerning part**

18  **of that visit was that he was threatening to kill whoever**

19  **would come in his cell if someone tried to move him to a**

20  **mental hospital or mental unit?**

21     A.    Yes.

22     **Q.    Okay.**

23            MR. WELSH:  That's all the questions I have.

24  Thank you for your time.

25            MR. READY:  Nothing.

**EXHIBIT "D"          17cv1154-LAB(AGS)**

Amanda Daniels  8/24/2018

```
 1                      EXAMINATION

 2   BY MR. KUTYLA:

 3        Q.   Joe Kutyla.  I represent Dale Weidenthaler.  I

 4   have a few questions.

 5        A.   Okay.

 6        Q.   On Exhibit 1, referring to your report, do you

 7   have that in front of you?

 8             MR. DOGGETT:  Yeah.  The one on top.  There you

 9   go.

10   BY MR. KUTYLA:

11        Q.   Down at the bottom under Plan, I'll let you

12   read from it.  It says, "Discussed safety cell placement

13   for HI with deputy."  Were there any other reasons, other

14   than what you have stated in this report, for the safety

15   cell placement?

16        A.   Just homicidal ideation.

17        Q.   Right.  So this report accurately reflects all

18   of the reasons that you had for recommending a safety

19   cell placement for Mr. Moriarty; is that correct?

20        A.   Yes.

21        Q.   Okay.  And earlier you talked about criteria

22   for placement in a safety cell, and you mentioned

23   currently a danger to self, currently a danger to others,

24   and you defined imminent as present.  Did I more or less

25   accurately state what you had said earlier?
```

**EXHIBIT "D"**          **17cv1154-LAB(AGS)**

Amanda Daniels  8/24/2018

1        A.   Yes.

2        Q.   Okay.  If you had felt that Mr. Moriarty met

3    any of those criteria after you had examined him on

4    May 31st, would you have put that into your report?

5             MS. PENA:  Vague.

6             THE WITNESS:  I'm sorry.  So the question is

7    again?

8    BY MR. KUTYLA:

9        Q.   If you had felt that Mr. Moriarty -- I'll

10   rephrase.

11            If you felt that Mr. Moriarty was currently,

12   that is imminently or presently a danger to himself after

13   you examined him on May 31st, would you have put that

14   into your report?

15            MS. PENA:  Vague.  The document speaks for

16   itself.

17            MR. MORRIS:  Assumes facts not in evidence.

18   The report actually indicates that.

19            THE WITNESS:  Yes.

20   BY MR. KUTYLA:

21       Q.   Thank you.

22            Do you recall if there was a second cell

23   extraction going on in the same housing unit around the

24   same time that you saw Mr. Moriarty?

25            MS. PENA:  Calls for speculation.

EXHIBIT "D"          17cv1154-LAB(AGS)

Amanda Daniels  8/24/2018

```
 1              THE WITNESS:  I don't remember.

 2    BY MR. KUTYLA:

 3         Q.   Do you remember there was another inmate who

 4    had gassed another deputy the same morning that you saw

 5    Mr. Moriarty?

 6              MS. PENA:  Calls for speculation.  Lacks

 7    foundation.

 8              THE WITNESS:  I don't.

 9    BY MR. KUTYLA:

10         Q.   You don't?  Do you recall there being a team of

11    deputies in their gear and so forth that they usually

12    wear for cell extractions being assembled anywhere near

13    Mr. Moriarty's cell at or around the time you had done

14    your assessment of Mr. Moriarty?

15              MS. PENA:  Calls for speculation.  Lacks

16    foundation.

17              THE WITNESS:  I can recall people being in

18    their gear.  I don't -- in that area.  I don't know if it

19    was that day.

20    BY MR. KUTYLA:

21         Q.   Okay.  Have you ever spoken to

22    Dale Weidenthaler regarding this incident?

23         A.   No.

24         Q.   And did you ever have any conversation with

25    Dale Weidenthaler on May 31st, the day of these events?
```

**EXHIBIT "D"        17cv1154-LAB(AGS)**