UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MICHELLE MORIARTY,<br><br>                        Plaintiff,<br><br>v.<br><br>COUNTY OF SAN DIEGO, et al.,<br><br>                      Defendants. | Case No.: 17cv1154-LAB (AGS)<br><br>**ORDER GRANTING IN PART MOTION TO DISMISS; AND**<br><br>**ORDER GRANTING IN PART MOTION TO STRIKE**<br><br>**[DOCKET NUMBERS 27, 28.]** |

Heron Moriarty ("Moriarty") was arrested on May 25, 2016, showing signs of being mentally unbalanced, and was kept in custody at the Vista Detention Facility ("VDF"). Six days later, he committed suicide in his cell. His widow, Plaintiff Michelle Moriarty ("Plaintiff"), through counsel, filed this action, bringing claims against the County of San Diego and several individual Defendants under 42 U.S.C. § 1983 and under several state law causes of action. Moriarty voluntarily amended once, filing her first amended complaint ("FAC") on March 21, 2018. Because the parties are not diverse, Moriarty relies on federal question jurisdiction for the § 1983 claims, and supplemental jurisdiction for the state law claims.

Six Defendants, all employees of the County—Deputy Escobar, Deputy Dwyer, Nurse Preechar, Dr. Joshua, Captain Schroeder, and Lt. Mitchell— moved to dismiss for

failure to state a claim (Docket no. 27), and to strike certain portions of the FAC. (Docket no. 28.) But Schroeder and Mitchell have since settled with Plaintiff and have been dismissed (Docket no. 48), and the motion is moot as to them. For purposes of convenience, this order refers to the four as the "Defendants."

## I. Motion to Dismiss

### A. Legal Standards

#### 1. Rule 12(b)(6) Motions

A Rule12(b)(6) motion to dismiss tests the sufficiency of the complaint. *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001). The pleading standard is governed by *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 554–55 (2007); and *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). Under Fed. R. Civ. P. 8(a)(2), "a short and plain statement of the claim showing that the pleader is entitled to relief," is required, in order to "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Bell Twombly*, 550 U.S. at 554–55. "Factual allegations must be enough to raise a right to relief above the speculative level . . . ." *Id*. at 555. "[S]ome threshold of plausibility must be crossed at the outset" before a case is permitted to proceed. *Id*. at 558 (citation omitted). The well-pleaded facts must do more than permit the Court to infer "the mere possibility of conduct"; they must show that the pleader is entitled to relief. *Iqbal*, 556 U.S. at 679.

When determining whether a complaint states a claim, the Court accepts all allegations of material fact in the complaint as true and construes them in the light most favorable to the non-moving party. *Cedars-Sinai Medical Center v. National League of Postmasters of U.S*., 497 F.3d 972, 975 (9th Cir. 2007) (citation omitted). "Conclusory allegations and unreasonable inferences, however, are insufficient to defeat a motion to dismiss." *Sanders v. Brown*, 504 F.3d 903, 910 (9th Cir. 2007). Nor does the Court "assume the truth of legal conclusions merely because they are cast in the form of factual allegations . . . ." *Navajo Nation v. Dept. of Interior*, 876 F.3d 1144, 1163 (9th Cir. 2017) (citation and quotation marks omitted).

/ / /

### 2. § 1983 Claims

The FAC identifies the Eighth and Fourteenth Amendments to the U.S. Constitution as the basis for Moriarty's § 1983 claims. Because it appears Moriarty was not a prisoner but rather a pretrial detainee, the Court will analyze the claims under the Fourteenth Amendment's Due Process clause only. *See Castro v. City of Los Angeles*, 833 F.3d 1060, 1067–68 (9th Cir. 2016) (en banc). Under either clause, Moriarty must show that officials acted with "deliberate indifference." *Id*. And even though the Court is analyzing the claims under the Fourteenth Amendment, Eighth Amendment standards can show a minimum standard of care. *Gordon v. Cnty. of Orange*, 888 F.3d 1118, 1122 (9th Cir. 2018).

In a case such as this, where the claim is based on failure to protect a detainee,[1] the elements of a claim are:

(1) The defendant made an intentional decision with respect to the conditions under which the [detainee] was confined;

(2) Those conditions put the plaintiff at substantial risk of suffering serious harm;

(3) The defendant did not take reasonable available measures to abate that risk, even though a reasonable officer in the circumstances would have appreciated the high degree of risk involved—making the consequences of the defendant's conduct obvious; and

(4) By not taking such measures, the defendant caused the plaintiff's injuries.

*Castro*, 833 F.3d at 1071 (citation omitted).

In the failure-to-protect context, the "deliberate indifference" standard is an objective one; the defendant's conduct must be objectively unreasonable. *Gordon*, 888 F.3d at 1124–25. Merely showing that a defendant failed to exercise due care does not establish a Fourteenth Amendment violation. *Id.* at 1125.

---

[1] Failure-to-protect claims include failure to prevent a detainee's suicide. *See Castro*, 833 F.3d at 1068 (citing *Clouthier v. County of Contra Costa*, 591 F.3d 1232, 1236 (9th Cir. 2010)).

The fourth element, causation, requires actual and proximate cause. *Leer v. Murphy*, 844 F.2d 628, 634 (9th Cir. 1988). Even in analyzing § 1983 claims, the Court looks to traditional tort law to determine causation, including whether intervening causes have broken the chain of proximate causation. *See Van Ort v. Estate of Stanewich*, 92 F.3d 831, 837 (9th Cir. 1996).

"In order for a person acting under color of state law to be liable under section 1983 there must be a showing of personal participation in the alleged rights deprivation: there is no respondeat superior liability under section 1983."*Jones v. Williams*, 297 F.3d 930, 934 (9th Cir. 2001).

**B. Factual Allegations**

The following allegations are taken from the FAC, and the Court accepts them as true for purposes of ruling on Defendants' motion.

In the weeks leading up to his death, Moriarty began to exhibit signs of mental illness, and had two psychiatric hospitalizations. After the first, he was placed on a "5150" hold for three days.[2] After the second, he was put on a 14-day hold. During these episodes, he made threats to harm himself and others.

On May 23, 2016, during a conversation with his business partner, Moriarty threatened the life of his wife and family. The business partner's wife called authorities. The next evening, sheriffs visited Moriarty but determined he was normal.

At 7:52 p.m. on May 25, 2016, Deputy Lelevier and Deputy Escobar were dispatched to an address in Jamul in response to a report of vandalism, which they learned had been committed by Moriarty; he reportedly threw a chair through his brother's patio door and drove away. A short while later, the deputies were sent to another address two miles away, in response to a report of a man threatening suicide. En route to that call, they heard a call requesting assistance; a man had crashed into several parked cars and was

---

[2] A 5150 hold is indicated for someone who has a severe mental disorder, who is a danger to himself or others, or who is "gravely disabled." (FAC, ¶ 21.) *See also* Cal. Welf. & Inst. Code § 5150.

4

standing in the street, attempting to get hit by passing cars. When they arrived and compared descriptions of the suspects, they realized Moriarty was involved in all three incidents.

The Deputies heard Moriarty making delusional statements, and saying he had just been released from a psychiatric hospital, though he appeared "normal," because he was well-groomed and dressed in clean clothes. Moriarty also made remarks suggesting he would provoke the Deputies to shoot him. They took him to the Rancho San Diego holding station, where he made more remarks about provoking the Deputies to kill him, and violently kicked his cell door. The Deputies realized Moriarty was having a mental breakdown, put him in restraints, and transferred him to Central Jail. Because of a temporary policy then in place (known as the Pilot Program), they did not take him for psychological clearance.

At Central Jail, Moriarty was asked if he was suicidal. He answered "no," then "yes." The sergeant on duty, Sgt. Sawyer, refused to accept him, because the Central Jail did not have a safety cell available. Instead, the Deputies transported Moriarty to VDF. Because of the policy then in place, he was not taken for psychological evaluation and clearance before being transferred. The sergeant confirmed that a safety cell was available at VDF, and told "various VDF Deputies that Moriarty was en route and required a safety cell." (FAC, ¶ 61.) The FAC identifies one of these as Sgt. Banks. (*Id.*, ¶ 11.)

The FAC alleges that if the Deputies had "followed policy" and taken Moriarty for psychological evaluation and clearance, they would have learned about his two earlier 5150 holds. (FAC, ¶¶ 62, 134.) But, allegedly because of a lack of training, they did not realize what the policy for VDF was, and incorrectly thought it was the same as for Central Jail. (*Id.,* ¶¶ 62, 131.) Even assuming they had learned about Moriarty's earlier 5150 holds, the FAC does not adequately allege what the Deputies would have learned. A 5150 hold is used for someone who is a danger to himself <u>or</u> a danger to others; he need not be both, as the FAC later argues. (*See* FAC, ¶¶ 43, 44 (alleging that someone may be subject to a 5150 hold only if they have a severe mental disorder, and are "a danger to self and others").)

5

Knowing that Moriarty had been subject to a 5150 hold, without more, would only have told the Deputies that he was either a danger to himself or a danger to others, not necessarily that he was both. Moriarty, however, was both threatening towards others, and suicidal.

When the two Deputies arrived, they were contacted by Deputy Dwyer. Escobar did not mention the possibility that Moriarty was suicidal, but Lelevier did, telling Deputy Dwyer about it as soon as they arrived. (FAC, ¶¶ 63–64.) Dwyer did not tell the intake nurse, Nurse Jamie Preechar that Moriarty was suicidal, however.

The restraints were removed, and Deputies Lelevier and Escobar took Moriarty to Nurse Preechar. Escobar did not mention to her that Moriarty was suicidal, but Lelevier did, telling her that Moriarty had been turned away from Central Jail because it had no available safety cell. The FAC alleges that before being accepted into county jail, every inmate must be asked whether they are suicidal. When Nurse Preechar asked Moriarty this, he answered "no." The FAC alleges that, based on this response, she disregarded Lelevier's warning about Moriarty being suicidal. She did not flag him as a suicide risk, and sent him through the ordinary booking process.

That same afternoon, for unknown reasons Moriarty was being transferred back to Central Jail when his behavior became too bizarre and threatening. He was put on a "'psych hold' to be evaluated on a priority basis." (FAC, ¶ 66.) He was then put into an ad-seg cell in VDF by himself.

In the days that followed, Plaintiff called VDF staff repeatedly, telling them that Moriarty was suicidal and mentally unstable, and needed to be transported to a psychiatric hospital, and supplying them with Moriarty's psychiatric and medical information. On May 28, Moriarty was finally evaluated by a psychiatrist, Dr. Lissaur, who noted Moriarty's obvious mental problems, but sent him back to his ad-seg cell. Moriarty's behavior continued to be unstable and violent, and he was refusing to take medications.

On May 30, Dr. Lissaur evaluated Moriarty again, and determined he was experiencing a bipolar/manic episode. Dr. Lissaur recommended that if he were released the next day, he should be taken to a hospital and a 5150 hold put on him. Dr. Lissaur sent

Moriarty back to his ad-seg cell. The next morning, a psychiatric nurse, Defendant Daniels, evaluated Moriarty. He told her that he might become violent and kill anyone who entered his cell. Daniels initially sent him back to his ad-seg cell, then changed her mind and recommended that he be placed in a safety cell. However, Defendant Weidnthaler, the sergeant on duty, refused.

An hour later, VDF staff had a "multi-disciplinary meeting" Nurse Daniels, Captain Schroeder, Lt. Mitchell, and Dr. Goldstein all discussed Moriarty. Dr. Goldstein recommended sending him to the psychiatric security unit in Central Jail, but the group decided to keep him in ad-seg and arrange for a 5150 hold on his release.

About twelve hours later, Moriarty was found dead in his cell, having used two T-shirts to choke himself.

Although the FAC includes other allegations, they do not directly concern Defendants. The only allegations that identify Dr. Joshua's involvement are a very generalized claim that he was responsible for creating and implementing the medical policies for San Diego county jails, and his actions or inactions were responsible for violating Moriarty's rights. (FAC, ¶¶ 36, 157, 162, 166.) The FAC alleges that because of scathing news reports and other warnings, Dr. Joshua was aware of the need to change the jails' suicide prevention policy. (FAC, ¶¶ 157, 162, 166.)

### C. Request for Judicial Notice

In support of their motion to dismiss, Defendants ask the Court to take judicial notice of the tort claim Plaintiff filed as required by Cal. Govt. Code § 911.2. Plaintiff has not questioned the authenticity of this document, and notice is proper under Fed. R. Evid. 201. *See D.K. ex rel. G.M. v. Solano Cnty. Office of Educ.*, 667 F. Supp. 2d 1184, 1189–90 (E.D. Cal., 2009). The request is **GRANTED**.

### D. Analysis of Motion to Dismiss

The motion to dismiss correctly points out that the FAC fails to identify a constitutional violation by any of the Defendants. Although the Court has not discussed all the pleading deficiencies at length, Defendants' arguments are well-taken and identify

7

reasons why the claims must be dismissed. This analysis focuses on problems that prevent Plaintiff from successfully amending, at least as to three of the four Defendants.

### 1. Causation

The FAC's allegations point to two errors that, if corrected, could have saved Moriarty's life. First, it argues he should have been forced to take medication, or otherwise treated. (FAC, ¶ 82, 90, 156.) It argues he should have been kept under more constant observation or at least given a cellmate. (*Id.,* ¶ 26, 80, 82, 84, 90, 156.) It also argues that because he was known to be suicidal, he should not have been given regular shirts. (*Id.*, ¶ 82, 156.) Although the FAC points to other errors (*e.g.*, allowing him to have regular bedding, putting him a cell with tie-off points), those did not lead to Moriarty's death.

Three of the Defendants—Deputy Escobar, Deputy Dwyer, and Nurse Preechar—are only alleged to have had any involvement with Moriarty on May 25, six days before he died. Their liability, if any, must arise from whatever they did or failed to do that day. The FAC faults them for failing to recognize that Moriarty was suicidal or communicate that fact to others at VDF, failing to send him for a psychiatric evaluation, and failing to make sure he was confined in a safe cell. But none of these acts or failures to act proximately caused Moriarty's death six days later.

Any failure to recognize that Moriarty was suicidal or to communicate to VDF staff the danger Moriarty was in when he arrived was soon corrected. Well before Moriarty's death, VDF staff knew he was mentally unbalanced and a suicide risk. Any failure to have him evaluated before he arrived at VDF was corrected when, in the six days following his arrest, he was evaluated twice by a psychiatrist and once by a nurse. Nor are any of the three Defendants alleged to have had any involvement in the decision to leave him unmonitored on the day he died. Of the three, only Nurse Preechar had anything to do with where he was placed. But she is not alleged to have been responsible for keeping him there. He was removed from his ad-seg cell several times, and each time someone else had him sent back to ad-seg. (FAC, ¶¶ 16 (placed in an ad-seg cell alone, by an unidentified person); 18, 21, 68, 71 (sent back to ad-seg twice by Dr. Lissaur); 22, 44, 72 (Nurse Daniels'

8

recommendation to house him in a safety cell instead of ad-seg overruled by Sgt. Weidnthaler).) Finally, a multi-disciplinary committee that included a doctor and a nurse also discussed how to handle his case, and decided to leave him in ad-seg. (*Id*., ¶¶ 23, 73.)

Whatever these three Defendants may have done or failed to do on May 25 was not a proximate cause of Moriarty's death on May 31. For this reason, they cannot be liable for either negligence or a § 1983 violation.

### 2. Deputy Escobar

The FAC repeatedly faults Deputy Escobar for assuming that staff at VDF knew that Moriarty was suicidal, and failing to tell them so himself. (FAC, ¶¶ 13, 37,63.) In fact, Escobar had every reason to believe VDF staff did know this. He was present when Sgt. Sawyer called VDF and informed Sgt. Banks that Moriarty was on his way and would need a safety cell. (FAC, ¶ 11.) He was also present when Deputy Lelevier told both Deputy Dwyer and Nurse Preechar that Moriarty was suicidal. (*Id*., ¶¶14, 15, 64, 65.) Even accepting, *arguendo*, that he did not hear what Sgt. Sawyer or Deputy Levier said, his assumption turned out to be right anyway—VDF staff were told Moriarty was suicidal.

In short, nothing in the FAC plausibly suggests Deputy Escobar was either deliberately indifferent or negligent, or that he did or failed to do anything that led to Moriarty's death.

### 3. Deputy Dwyer

The FAC alleges that Deputy Lelevier told Deputy Dwyer that Moriarty was suicidal, but that Dwyer then failed to communicate that fact to the intake nurse, Nurse Preechar. Dwyer allegedly had been told to expect a suicidal inmate, but did not think it was Moriarty, because Moriarty was in a type of restraints used for assaultive inmates, not suicidal inmates. (FAC at 7 n.1.)

The FAC's allegations about Dwyer point to a mistake, misunderstanding, or miscommunication, rather than indifference. Errors based on unreasonable mistakes or misunderstandings could support a negligence claim, but not a deliberate indifference Fourteenth Amendment claim. *See Davidson v. Cannon*, 474 U.S. 344, 347–48 (1986).

9

Dwyer allegedly said he heard something about Moriarty being suicidal, but that his responsibility was limited to getting Moriarty to the intake nurse, and did not include communicating that information to medical staff or commanding officers. (FAC, ¶ 14.) The FAC does not allege that Dwyer was wrong about this, but even assuming that he was, his mistake was harmless, because Deputy Lelevier told Nurse Preechar the same thing. If Deputy Dwyer had said anything, he would have merely been repeating what Lelevier had just said to both him and Nurse Preechar.

Nothing in the FAC plausibly suggests that anything Deputy Dwyer did or failed to do amounted to deliberate indifference or led to Moriarty's death.

### 4. Nurse Preechar

Nurse Preechar was allegedly told that Moriarty was suicidal, but based on his answer to her question, she rejected this, determining that he was not suicidal and did not need to be in a safety cell. A mistake about whether he was suicidal does not amount to deliberate indifference, *Davidson*, 474 U.S. at 347–48, although it presents a closer question about negligence. And if Moriarty had died the first day he was admitted, the Court would be faced with a harder question. But because, as noted, he died six days later, after many changes of circumstance, her action or inaction cannot be the proximate cause of his death.

Well before Moriarty's death, VDF staff had recognized that he was suicidal and had arranged for him to be evaluated multiple times. Even if Nurse Preechar's negligence or deliberate indifference had led her to classify him as not suicidal and to fail to have him evaluated, that was corrected well before he died.

With regard to Moriarty's cell assignment, during the intervening six days others had also moved him into and out of an ad-seg cell. Even if the chain of causation had not been broken before then, two events on May 31 conclusively broke it. First, Sgt. Weidnthaler overruled a different nurse's recommendation that Moriarty be placed in a safety cell. Then a multi-disciplinary committee that included a doctor and nurse made the determination to place him in ad-seg. Nothing in the FAC suggests she would have had the

10

authority to overrule Sgt. Weidnthaler or the committee. Even if there were some question about causation before, this constitutes a superseding intervening cause. In light of the many developments in the intervening days, he fact that Nurse Preechar failed to flag him as a suicide risk or place him in a safety cell on his first day at VDF cannot be said to be a proximate cause of his death six days later.

### 5. Dr. Joshua

The FAC's claims against Dr. Joshua arise solely under state law; no claims are brought against him under § 1983.

The allegations against him are almost wholly conclusory. The FAC identifies only two policies that Dr. Joshua might have had anything to do with: a temporary policy, under which arrestees were taken directly to Central Jail without first being evaluated, and a policy requiring that detainees who say they are not suicidal are not to be placed in safety cells. For reasons discussed above, neither of these led to Moriarty's death. Furthermore, the FAC alleges that because of poor training, personnel were actually unaware of the details of the temporary policy and mistakenly thought it also applied at VDF.

The FAC brings a medical malpractice claim against Dr. Joshua, but this is pled in even less detail. The FAC does not allege that he treated Moriarty or had any role in treating him, or that he was even at VDF.

Even if Plaintiff had pled a medical malpractice claim against Dr. Joshua, the state law claims appear to be barred by Cal. Govt. Code § 945.4. The motion to dismiss points out that the FAC has failed to plead compliance with Cal. Govt. Code § 911.2(a), which requires that litigants suing a public employee to first file a claim with the public entity within six months of the claim's accrual. Unless a written claim is presented and acted on by the relevant agency, Cal. Govt. Code § 945.4 provides that no suit may be brought against the employee. *See State of Calif. v. Superior Ct.*, 32 Cal.4th 1234, 1239, 1243 (2004) (holding that compliance with this requirement is an element of plaintiff's claim and must be alleged); *City of San Jose v. Superior Court*, 12 Cal.3d 447, 454 (1974) (holding that government claims procedures are mandatory and failure to file the required claim means

the action must be dismissed). *See also Karim-Panahi v. Los Angeles Police Dept.*, 839 F.2d 621, 627 (9th Cir. 1988) (affirming dismissal of supplemental state claims, for failure to allege compliance with California tort claims procedures).

The Court has taken judicial notice of the tort claim, and it does not include a claim for medical malpractice based on anything Dr. Joshua did or failed to do. Plaintiff's opposition brief does not dispute that Plaintiff failed to file a timely tort claim for medical malpractice, and does not address the motion's argument that this means the claim is barred.

The Court concludes that medical malpractice claims against Dr. Joshua are barred because Plaintiff failed to comply with Cal. Govt. Code § 911.2. His other state law claims are inadequately pled. This does not mean that Plaintiff could not successfully amend to state a § 1983 claim against him. But Dr. Joshua has also filed a motion for summary judgment. (Docket no. 73.) That motion is not yet fully briefed, so it is too early at this stage to say whether Plaintiff will be given an opportunity to amend to bring claims against him.

## II. Motion to Strike

Defendants move to strike four general groups of allegations: 1) contentions that Moriarty was never evaluated by a psychiatrist; 2) allegations regarding the temporary policy in place at Central Jail (the Pilot Program); 3) details of newspaper articles; and 4) details of a 2017 grand jury report.

Under Fed. R. Civ. P. 12(f), the Court may strike from the FAC "any redundant, immaterial, impertinent, or scandalous matter." Motions to strike under this rule are generally disfavored and "should not be granted unless it is clear that the matter to be stricken could have no possible bearing on the subject matter of the litigation." *Neuveu v. City of Fresno*, 392 F. Supp. 2d 1159, 1170 (E.D. Cal. 2005).

Plaintiffs have agreed that allegations to the effect that Moriarty was never examined by a psychiatrist are inaccurate, and they do not oppose striking those.

///

The remainder of the allegations appear to be only marginally helpful to Plaintiff's case. There is no reason to believe, for example, that Dr. Joshua or the County knew what was going to be in the 2017 grand jury report. It is not likely that the grand jury report or newspaper articles can be admitted in this case. The report and articles can, at best, serve as background that puts Plaintiff's allegations in perspective and makes them generally more plausible. Furthermore, they are both already public materials, and there is no harm in leaving them in the complaint. Though the Pilot Program did not cause Moriarty's death, it too can serve as background.

### III. Conclusion and Order

For these reasons, the motion to dismiss is **GRANTED**. The FAC's claims against Defendants Escobar, Dwyer, and Preechar are **DISMISSED WITH PREJUDICE**. The medical malpractice claim against Dr. Joshua is **DISMISSED WITHOUT LEAVE TO AMEND**, because Plaintiff failed to comply with California's tort claim procedures as to this claim. The claims for negligence and wrongful death against Dr. Joshua are **DISMISSED WITHOUT PREJUDICE**. As to Defendants Schroeder and Mitchell, the motion is **DENIED AS MOOT**.

This order does not prevent Plaintiff from pursuing § 1983 claims against Dr. Joshua, if the facts warrant it, and it does not prevent from amending her negligence and wrongful death claims against Dr. Joshua. This order does not prevent Plaintiff from raising claims against Defendants Escobar, Dwyer, or Preechar based on different facts, although the history and posture of this case suggest it is unlikely she can do so.

The motion to strike is **GRANTED** as to statements that Moriarty was never evaluated by a psychiatrist and **DENIED** as to the other matters. Because a number of motions are pending, the Court will not require Plaintiff to file a third amended complaint at this time. Instead, the allegations that Moriarty was never evaluated by a psychiatrist are **DEEMED STRICKEN**, and should not be considered part of the FAC.

Plaintiff has filed a motion for leave to amend the complaint to add new claims, and this motion is still pending. If she wishes to amend in light of this order, she must promptly

13

seek leave to do so. If and when she amends the complaint, she must omit the stricken allegations.

**IT IS SO ORDERED.**

Date: March 20, 2019

*Larry A. Burns*
Hon. Larry A. Burns
Chief United States District Judge