UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MICHELLE MORIARTY, et al.<br><br>　　　　　　　　　　Plaintiffs,<br><br>v.<br><br>COUNTY OF SAN DIEGO, et al.,<br><br>　　　　　　　　　　Defendant. | Case No.: 17cv1154-LAB (AGS)<br><br>**ORDER GRANTING IN PART AND DENYING IN PART MOTIONS FOR SUMMARY JUDGMENT; AND**<br><br>**ORDER DENYING MOTION FOR LEAVE TO AMEND**<br><br>**[DOCKET NUMBERS 49, 70, 79.]** |

This case arises from the death of Heron Moriarty while in custody in the Vista Detention Facility ("VDF"). Plaintiffs brought claims under 42 U.S.C. 1983, as well as various state law theories. The first amended complaint ("FAC," Docket no. 23) is the operative pleading, although a number of claims and parties have been dismissed. Two motions for summary judgment are still pending, however, and Plaintiffs have filed a motion for leave to amend.

Two Defendants who worked at VDF, Sgt. Dale Weidenthaler and Nurse Practitioner Amanda Daniels, filed motions for summary judgment. (Docket nos. 49 and 79, respectively.) Plaintiffs also seek leave to amend the FAC to add four individual Defendants in place of Doe Defendants, to bring new claims against Correctional

1

Physicians Medical Group ("CPMG"), and to add new allegations and a new theory of liability relating to their third cause of action.

The Court's ruling on earlier motions to dismiss or strike is now law of the case (Docket no. 87, "Dismissal Order")) and informs the Court's analysis.

**Factual Background**

In the weeks leading up to his death, Moriarty began to exhibit signs of mental illness, and had two psychiatric hospitalizations. After the first, he was placed on a "5150" hold for three days. After the second, he was put on a 14-day hold. During these episodes, he made threats to harm himself and others.

On May 23, 2016, during a conversation with his business partner, Moriarty threatened the life of his wife and family. The business partner's wife called authorities. The next evening, sheriffs visited Moriarty but determined he was normal.

At 7:52 p.m. on May 25, 2016, Deputy Lelevier and Deputy Escobar were dispatched to an address in Jamul in response to a report of vandalism, which they learned had been committed by Moriarty; he reportedly threw a chair through his brother's patio door and drove away. A short while later, the deputies were sent to another address two miles away, in response to a report of a man threatening suicide. En route to that call, they heard a call requesting assistance; a man had crashed into several parked cars and was standing in the street, attempting to get hit by passing cars. When they arrived and compared descriptions of the suspects, they realized Moriarty was involved in all three incidents.

The Deputies heard Moriarty making delusional statements, and saying he had just been released from a psychiatric hospital, though he appeared "normal," because he was well-groomed and dressed in clean clothes. Moriarty also made remarks suggesting he would provoke the Deputies to shoot him. They took him to the Rancho San Diego holding station, where he made more remarks about provoking the Deputies to kill him, and violently kicked his cell door. The Deputies realized Moriarty was having a mental breakdown, put him in restraints, and transferred him to Central Jail. Because of a

temporary policy then in place (known as the Pilot Program), they did not take him for psychological clearance.

At Central Jail, Moriarty was asked if he was suicidal. He answered "no," then "yes." The sergeant on duty, Sgt. Sawyer, refused to accept him, because the Central Jail did not have a safety cell[1] available. Instead, the Deputies transported Moriarty to VDF. Because of the policy then in place, he was not taken for psychological evaluation and clearance before being transferred. The sergeant confirmed that a safety cell was available at VDF, and told "various VDF Deputies that Moriarty was en route and required a safety cell." (FAC, ¶ 61.) The FAC identifies one of these as Sgt. Banks. (Id., ¶ 11.)

The FAC alleges that if the Deputies had "followed policy" and taken Moriarty for psychological evaluation and clearance, they would have learned about his two earlier 5150 holds. (FAC, ¶¶ 62, 134.) But, allegedly because of a lack of training, they did not realize what the policy for VDF was, and incorrectly thought it was the same as for Central Jail. (Id., ¶¶ 62, 131.) Even assuming they had learned about Moriarty's earlier 5150 holds, the FAC does not adequately allege what the Deputies would have learned. A 5150 hold is used for someone who is a danger to himself or a danger to others; he need not be both, as the FAC later argues. (See FAC, ¶¶ 43, 44 (alleging that someone may be subject to a 5150 hold only if they have a severe mental disorder, and are "a danger to self and others").) Moriarty, as it turned out, was both threatening towards others, and suicidal.

When the two Deputies arrived, they were contacted by Deputy Dwyer. Escobar did not mention the possibility that Moriarty was suicidal, but Lelevier did, telling Deputy Dwyer about it as soon as they arrived. (FAC, ¶¶ 63–64.) The restraints were removed,

---

[1] A safety cell is a cell specially designed to be suicide-proof. (Opp'n to Mot. for Summ. J., at 8 n.1 (citing Ex. 8 (Safety Cell Policy)).) The policy makes clear they are not designed for long-term confinement. Inmates are required to be evaluated at least every 24 hours to determine whether they still need to be housed there. (Ex. 8 at 3.) The watch commander or designee is required every eight hours to review whether continued retention in the safety cell is needed, and has authority to remove inmates from safety cells. (Id. at 3–4.)

and Deputies Lelevier and Escobar took Moriarty to Nurse Preechar. Escobar did not mention to her that Moriarty was suicidal, but Lelevier did, telling her that Moriarty had been turned away from Central Jail because it had no available safety cell. The FAC alleges that before being accepted into county jail, every inmate must be asked whether they are suicidal. When Nurse Preechar asked Moriarty this, he answered "no." The FAC alleges that, based on this response, she disregarded Lelevier's warning about Moriarty being suicidal. She did not flag him as a suicide risk, and sent him through the ordinary booking process.

That same afternoon, for unknown reasons Moriarty was being transferred back to Central Jail when his behavior became too bizarre and threatening. He was put on a "'psych hold' to be evaluated on a priority basis." (FAC, ¶ 66.) He was then put into an ad-seg cell in VDF by himself. In the days that followed, Moriarty's wife called VDF staff repeatedly, telling them that Moriarty was suicidal and mentally unstable, and needed to be transported to a psychiatric hospital. She supplied VDF staff with Moriarty's psychiatric and medical information. On May 28, Moriarty was finally evaluated by a psychiatrist, Dr. Lissaur, who noted his obvious mental problems, but sent him back to his ad-seg cell. Moriarty's behavior continued to be unstable and violent and refused to take medications.

On May 30, Dr. Lissaur again evaluated Moriarty. He determined that Moriarty was experiencing a bipolar/manic episode. Dr. Lissaur recommended that if Moriarty were to be released the next day, he should be taken to a hospital and that a 5150 hold should be placed on him. Dr. Lissaur sent Moriarty back to his ad-seg cell. The next morning, a psychiatric nurse, Defendant Daniels, evaluated Moriarty. He told her that he might become violent and kill anyone who entered his cell. Daniels initially sent him back to his ad-seg cell, then changed her mind and recommended that he be placed in a safety cell. However, Defendant Weidenthaler, the sergeant on duty, refused.

An hour later, VDF staff had a "multi-disciplinary meeting" where Nurse Practitioner Daniels, Captain Schroeder, Lt. Mitchell, and Dr. Goldstein all discussed Moriarty. Dr. Goldstein recommended sending him to the psychiatric security unit in

Central Jail, but the group decided to keep him in ad-seg and arrange for a 5150 hold on his release. About twelve hours later, Moriarty was found dead in his cell. He had used two T-shirts to choke himself.

**Motion to Amend**

Ordinarily, leave to amend is governed by Fed. R. Civ. P. 15(a)'s standard. Here, however, amendment would also require amending the scheduling order, implicating Fed. R. Civ. P. 16. This requires a showing of good cause. *See Coleman v. Quaker Oats Co.*, 232 F.3d 1271, 1294 (9th Cir. 2000). Among other things, the Court considers the moving party's diligence. *See Johnson v. Mammoth Recreations, Inc.*, 975 F.2d 604, 609 (9th Cir. 1992). "If that party was not diligent, the inquiry should end." *Id*.

As a general matter, the Court notes that the scheduling order, including discovery deadlines, has already been extended multiple times. The third amended scheduling order, issued July 24, 2018, was amended twice before Plaintiffs filed their motion for leave to amend: once on October 18, 2018, and again on January 23, 2019, when the discovery deadline was extended to February 20. The October 18 amendment granted a joint motion to continue expert-related dates because the parties were exploring mediation; it did not mention any discovery-related delays. (Docket no. 50.) The January 23 amendment was in response to a joint request made during a status conference on January 17. But based on the audio record of that conference the underlying reason was Plaintiffs' counsel's December discovery requests pertaining to CPMG.[2] The audio record also shows that Plaintiffs' counsel promised to file a motion for leave to amend the following week. In fact, it was filed nearly four weeks later.

///
///

---

[2] The parties blamed the pendency of a motion to dismiss and a motion for summary judgment for the slow discovery. But it is not at all clear why this would hinder or delay discovery.

**Claims Against CPMG and Its Officials**

With regard to CPMG and the training it provided, Plaintiffs were on notice quite early that CPMG provided little training. Plaintiffs point out that they propounded discovery requesting suicide-related training materials CPMG provided to medical workers. (Mot. to Amd. at 10:25–27.) But CPMG points out it timely responded to those requests by providing orientation materials, the only responsive document. The absence of an employee handbook or other training materials was one source of early notice.

Another was the deposition of Nurse Practitioner Daniels on August 24, 2018. Without citing the transcript, Plaintiffs characterize her testimony as being "not clear on the issue of CPMG's training." (Mot. to Amd. at 10:27–28.) In fact, Daniels testified that she received all her formal training from the Sheriff's department; the only training she received from CPMG involved shadowing another nurse. (Opp'n to Mot. to Amd., Ex. 3 (Daniels Depo. Tr.) at 16:22–17:6; 98:11–16; 125:7–13.)

Plaintiffs also accuse Dr. Joshua of lying during his deposition, saying he was "satisfied" with CPMG's training. (Mot. to Amd. at 10:28–11:5.) They characterize this as intentional concealment of facts that would support a claim against CPMG. The deposition occurred in a separate but similar case, *Nishimoto v. County of San Diego*, 16cv1974-BEN (JMA) (S.D. Cal., filed June 9, 2017). The transcript (Mot. to Amd., Ex. 7) does not bear out Plaintiffs' characterization. Joshua was asked whether he had any criticism as medical director in 2015 with the way CPMG trained its psychiatrists and nurse practitioners. He responded by saying that it was "essentially done on the individual level as providers were coming on board . . . by the medical director." (*Id*. at 140:17–141:1.) Joshua did not say he was satisfied; rather, he gave an arguably non-responsive answer, by saying he had been told all the new psychiatrists and nurse practitioners were given individual training. His testimony concerning the division of training responsibilities essentially agrees with Nurse Practitioner Daniels'. (*See id*. at 141:2–21.)

/ / /

/ / /

Defendants also point to an email by Plaintiffs' counsel dated October 17, 2018, in which he says they have a claim against CPMG in this case for failing to provide training. (Opp'n to Mot. to Amd., Ex. 4.)

With regard to new allegations and claims against CPMG, Plaintiffs have not been diligent, and amendment of the scheduling order to provide for this untimely amendment is **DENIED**.

Plaintiffs seek to add three officials of CPMG, Drs. Mannis, Rao, and Badre, for their part in CMPG's failure to train. Because these claims are derivative of claims against CPMG, leave to add them as Defendants is **DENIED** as well. Even if they were added as nominal parties, none of the claims would apply to them. Furthermore, CPMG will be vicariously liable if and only if any of its providers are liable (just as Drs. Mannis, Rao, and Badre would be), so there is little or no effect on Plaintiffs' substantive rights.

Plaintiffs' reliance on Cal. Civ. Proc. Code 474, which allows substitution of Doe defendants, is unavailing. Even assuming, *arguendo*, this overrides Fed. R. Civ. P. 16(b)(4)'s "good cause" standard as to the supplemental state law claims (which is doubtful),[3] Section 474 does not require any court to grant leave to amend where the plaintiff has unreasonably delayed seeking leave to amend. *A.N. v. Cty. of Los Angeles*,

---

[3] The decisions Plaintiffs cite pertain to conflicts between Cal. Civ. Proc. Code § 474, which permits amendment to substitute named parties as Doe defendants within three years, and Fed. R. Civ. P. 15—particularly statutes of limitations and relation back of amendments. *See, e.g., Cabrales v. Cty. of Los Angeles*, 864 F.2d 1454, 1462–63 (9th Cir. 1988), *vacated on other grounds*, 490 U.S. 1087 (1989) (applying §474 in § 1983 action). As far as the Court is aware, the only in-circuit decision considering whether § 474 abrogated the requirements of Fed. R. Civ. P. 16 in § 1983 actions is an unpublished memorandum that discussed the issue without resolving it. *See Viehmeyer v. City of Santa Ana*, 67 Fed. Appx. 470, 472 (9th Cir. 2003). A district court decision held that Rule 16(b)'s "good cause" standard was procedural for *Erie* purposes, though § 474 was not at issue there. *See Robert Half Int'l. Inc. v. Murray*, 2008 WL 2610793, at *4 (E.D. Cal., June 24, 2008). And at least one other Circuit has also held it is procedural. *See Gwyn v. Loon Mtn. Corp.*, 350 F.3d 212, 218 (1st Cir. 2003).

171 Cal. App. 4th 1058, 1066–68, as modified on denial of reh'g (Apr. 6, 2009). For reasons discussed above, Plaintiffs could and should have filed any motion for leave to substitute named parties for Does much earlier. And permitting such a late amendment would unfairly prejudice these three doctors who have had no opportunity for discovery and no time to prepare a defense. The unwarranted delay would also prejudice Defendants generally.

**Sgt. Banks' Testimony**

During her deposition on January 8, 2019, Sgt. Banks testified that she did not tell anyone Moriarty was suicidal, only that he was in restraints. This, Plaintiffs believe, is the key to the puzzle about why Moriarty was not placed in a safety cell at VDF. They also argue that they learned for the first time that the "Pilot Program" was also in effect at VDF, which explains why he was not taken for a psychological evaluation on arrival.

Plaintiffs also seek leave to add Sgt. Banks as a Defendant. When Sgt. Snyder from Central Jail called to ask if a safety cell was available, he told Sgt. Banks it was needed because Moriarty was suicidal. Because she did not mention Moriarty's suicidal ideations at the time, he was not housed in a safety cell that night.

These proposed amendments pertain to the first night of Moriarty's custody, however. The Dismissal Order pointed out these and similar allegedly negligent acts on the first night of Moriarty's confinement did not cause his death. (*See* Dismissal Order at 10:15–11:5.) Moriarty was held in custody six days before his suicide, and events between his cell assignment on May 26 and his death on May 31 conclusively broke the chain of proximate causation. Well before Moriarty's death, VDF staff had arranged for him to be evaluated multiple times. And on May 31, the multi-disciplinary group ("MDG") made the determination to place him in ad-seg instead of in a safety cell. Plaintiffs have not pointed to anything Banks did or failed to do that proximately caused Moriarty's death six days later. Nor have they pointed to any way that the timing of his evaluations led to his death. Leave to amend to add claims based on Sgt. Banks' testimony or the Pilot Program at VDF

is **DENIED**. And, for the same reasons, leave to add Sgt. Banks as a Defendant is **DENIED**.

**Legal Standards for Summary Judgment**

Summary judgment is appropriate where "there is no genuine issue as to any material fact and . . . the moving party is entitled to summary judgment as a matter of law." Fed. R. Civ. P. 56(a). It is the moving party's burden to show there is no factual issue for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party meets this requirement, the burden shifts to the non-moving party to show there is a genuine factual issue for trial. *Id*. at 324. The non-moving party must produce admissible evidence and cannot rely on mere allegations. *Estate of Tucker ex rel. Tucker v. Interscope Records, Inc.*, 515 F.3d 1019, 1033 n.14 (9th Cir. 2008). This can be done by presenting evidence that would be admissible at trial, s*ee Orr v. Bank of Am., NT & SA*, 285 F.3d 764, 773 (9th Cir. 2002), or by pointing to facts or evidence that could be presented in admissible form at trial. *See Fraser v. Goodale*, 342 F.3d 1032, 1036 (9th Cir. 2003). But evidence that is not admissible and could not be presented at trial in admissible form is not enough to resist summary judgment. *See Orr*, 285 F.3d at 773.

The Court does not make credibility determinations or weigh conflicting evidence. *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 255 (1986). Rather, the Court determines whether the record "presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id*. at 251–52. Not all factual disputes will serve to forestall summary judgment; they must be both material and genuine. *Id*. at 247–49. Factual disputes whose resolution would not affect the outcome of the suit are irrelevant to the consideration of a motion for summary judgment. *Id*. at 248.

**Legal Standards for § 1983 Claims**

The FAC identifies the Eighth and Fourteenth Amendments to the U.S. Constitution as the basis for Plaintiffs' § 1983 claims. Because it appears Moriarty was not a prisoner but rather a pretrial detainee, the Court analyzes the claims under the Fourteenth

Amendment's Due Process clause only. *See Castro v. City of Los Angeles*, 833 F.3d 1060, 1067–68 (9th Cir. 2016) (en banc). Under either clause, Plaintiffs must show that officials acted with "deliberate indifference." *Id*. And though the Court is analyzing the claims under the Fourteenth Amendment, Eighth Amendment standards can show a minimum standard of care. *Gordon v. Cty. of Orange*, 888 F.3d 1118, 1122 (9th Cir. 2018).

In a case such as this, where the claim is based on failure to protect a detainee, the elements of a claim are:

> (1) The defendant made an intentional decision with respect to the conditions under which the [detainee] was confined;
>
> (2) Those conditions put the plaintiff at substantial risk of suffering serious harm;
>
> (3) The defendant did not take reasonable available measures to abate that risk, even though a reasonable officer in the circumstances would have appreciated the high degree of risk involved—making the consequences of the defendant's conduct obvious; and
>
> (4) By not taking such measures, the defendant caused the plaintiff's injuries.

*Castro*, 833 F.3d at 1071 (citation omitted).

In the failure-to-protect context, the "deliberate indifference" standard is an objective one; the defendant's conduct must be objectively unreasonable. *Gordon*, 888 F.3d at 1124–25. This is not a negligence standard; merely showing that a defendant failed to exercise due care does not establish a Fourteenth Amendment violation. *Id*. at 1125.

The fourth element, causation, requires actual and proximate cause. *Leer v. Murphy*, 844 F.2d 628, 634 (9th Cir. 1988). Even in analyzing § 1983 claims, the Court looks to traditional tort law to determine causation, including whether intervening causes have broken the chain of proximate causation. *See Van Ort v. Estate of Stanewich*, 92 F.3d 831, 837 (9th Cir. 1996).

10

17cv1154-LAB (AGS)

"In order for a person acting under color of state law to be liable under section 1983 there must be a showing of personal participation in the alleged rights deprivation: there is no respondeat superior liability under section 1983." *Jones v. Williams*, 297 F.3d 930, 934 (9th Cir. 2001).

**Defendant Weidenthaler's Motion for Summary Judgment**

Defendant Weidenthaler argues he is entitled to qualified immunity as to the § 1983 claims, and also seeks summary judgment as to the § 1983 claims and state-law negligence claim.

The motion points out that Weidenthaler was initially told that Moriarty was not suicidal when he arrived at VDF, and that he was given no more information about Moriarty until May 27, when Lt. McNeeley told him that Moriarty had told the nurse at Central jail that he was suicidal. After that, Weidenthaler was given no more information about Moriarty until May 31, when Deputy Guillory called him. Deputy Guillory told him that Nurse Practitioner Daniels wanted Moriarty housed in a safety cell for homicidal ideation. According to Weidenthaler, he thought Moriarty was homicidal, not suicidal, and therefore not required to be housed in a safety cell. As the Court's Dismissal Order pointed out, whether Defendants knew or should have known that Moriarty was a danger to others is not at issue, and would not give rise to liability here. The key is whether they knew or reasonably should have known Moriarty was a danger to himself.

Weidenthaler agrees that prison officials' duty to protect suicidal inmates is clearly established. *See Castro*, 833 F.3d at 1068–71 (giving standard for pretrial detainee's claim for deliberate indifference to serious medical need); *Estate of Vargis v. Binnewies*, 2017 WL 2289357, at *4 (E.D. Cal., May 25, 2017) (discussing duty to protect pretrial detainee known to be at heightened risk for suicide). His qualified immunity argument, rather, is that he could reasonably have believed that his conduct was reasonable under the circumstances, because he did not know Moriarty was suicidal. *See Rudebusch v. Hughes*, 313 F.3d 506, 514 (9th Cir. 2002) (holding that qualified immunity standard encompasses both mistakes of fact and mistakes of law); *Estate of Ford v. Ramirez-Palmer*, 301 F.3d

11

1043, 1049–50 (9th Cir. 2002) (noting that officers who reasonably but mistakenly fail to appreciate the degree of risk of harm to inmates are entitled to qualified immunity). Weidenthaler bears the burden of establishing this. *See Neely v. Feinstein*, 50 F.3d 1502, 1509 (9th Cir. 1995).

The qualified immunity standard requires the Court to examine a defendant's conduct, not as a broad general concept, but in light of the specific conduct of the case. *See Hamby v. Hammond*, 821 F.3d 1085, 1091 (9th Cir. 2016) (citation omitted). The dispositive question is whether the violative nature of the defendant's particular actions was clearly established. *Id.* (citation omitted). "That is, existing precedent must have 'placed beyond debate the unconstitutionality of' the officials' actions, as those actions unfolded in the specific context of the case at hand." *Id.* (quoting *generally Taylor v. Barkes*, 135 S. Ct. 2042, 2044 (2015) (per curiam)). If the constitutionality of an official's action was unclear or debatable, he is entitled to qualified immunity. *Id.* For purposes of the § 1983 claim, the reasonableness of a defendant's actions are judged in light of what he knew at the time. *See Hunter v. Bryant*, 502 U.S. 224, 227 (1991).

Throughout their briefing, Plaintiffs attempt to bundle all mental problems together, and to treat deliberate indifference to some other problem with deliberate indifference to a risk of suicide. That approach is erroneous. The fact that a person is homicidal or psychotic, or is suffering from mental problems more generally does not mean that officials are constitutionally required to anticipate and guard against suicide. *See Taylor*, 135 S. Ct. at 2044–45 (holding prison officials not liable for failing to discover and address the "particular vulnerability to suicide" of an inmate with a long history of mental and substance abuse problems). And it is the heightened risk of suicide—not Moriarty's general mental condition—that is at issue here. *See Vivanco v. Cal. Dept. of Corr. & Rehab.*, 2019 WL 2764397, slip op. at *6 (E.D. Cal., July 2, 2019) (citing *Conn v. City of Reno*, 591 F.3d 1081, 1095 (9th Cir. 2010), *vacated* 563 U.S. 915 (2011), *opinion reinstated in relevant part*, 568 F.3d 897 (9th Cir. 2011)) (distinguishing between a "generalized risk" of suicide and "the heightened risk required to establish deliberate indifference"). *See also Rocha v.*

*Kernan*, 2019 WL 294031, slip op. at *6 (C.D. Cal., Mar. 13, 2019) (citing *Simmons v. Navajo Cty., Ariz.*, 609 F.3d 1011, 1018 (9th Cir. 2010), *overruled on other grounds by Castro*, 833 F.3d 1060). The Court's Dismissal Order addresses in greater detail the effect of a 5150 hold, and general evidence of mental problems. In brief, while Weidenthaler either knew or objectively should have known that Moriarty was experiencing serious mental health problems, the real question is whether he knew—or whether any reasonable officer in his position would have known— that Moriarty was suicidal.

Plaintiffs rely primarily on Weidenthaler's deposition testimony in an effort to show he knew Moriarty was suicidal. They point to evidence around the time of Moriarty's arrival at VDF, showing that he had been sent from Central Jail to be housed in a safety cell, and that he had made a suicide threat on arrival. There is some evidence Weidenthaler either knew or objectively should have known that Moriarty was suicidal before he was brought to VDF, and that he was mentally unstable throughout his time there. But the issue here is whether Weidenthaler knew or objectively should have known that Moriarty was suicidal days after his admission to VDF and should have been housed in a safety cell for that reason.

Weidenthaler testified that Deputy Guillory told him that, on Moriarty's arrival at VDF, nurses had determined he was not suicidal. (Depo. Tr. of Weidenthaler (Ex. 3 to Opp'n to Mot for Summ. J.), at 85:23–25.) Weidenthaler agrees he was told that Moriarty was sent to VDF specifically to be housed in a safety cell. He was also told that Moriarty had told a nurse at Central Jail that he was suicidal. (*Id.* at 92:25–96:2.) Plaintiffs argue that Weidenthaler testified there was a policy that a suicide threat could not be retracted (*id.* at 94:6–24.) In fact, however, he testified that he did not know, but that would have been his working assumption unless medical staff told him otherwise. (*Id.* at 94:22–24.)

Plaintiffs point to the report of their correctional procedures expert, who opined that Weidenthaler's refusal to follow Nurse Practitioner Daniels' recommendation to move Moriarty to a safety cell was unreasonable and inconsistent with the practices of a trained jail sergeant, because he knew Moriarty had earlier told a nurse at Central Jail that he was

13

17cv1154-LAB (AGS)

suicidal. (Opp'n to Mot. for Summ. J., Ex. 19 (report of Richard Lichten), at 8.) The expert's report is not directly relevant to the qualified immunity question, because it gives the expert's position on Weidenthaler's actions, and does not speak to what Weidenthaler could have believed. Furthermore, there is no evidence that the other actions the expert believes Weidenthaler should have taken (*e.g.*, more consultation and better documentation of decisions) would have made any difference here, particularly because the MDG later reviewed Moriarty's placement.

Plaintiffs also contend Weidenthaler had bad motives or acted unadvisedly or unreasonably. For example, they cite evidence he acted as he did so that he could go home early, instead of staying to handle the administrative matters himself or handing it over to the next sergeant on duty. Plaintiffs also point to evidence that overruling a psychiatric nurse's cell placement recommendation is unusual and only done in extraordinary circumstances, and that refusing to house a homicidal inmate in a safety cell might be contrary to local policy. Even accepting, *arguendo*, that Weidenthaler was motivated mainly by a selfish desire to leave work early and that his decision was high-handed or contrary to VDF policy, this would not transform an otherwise constitutionally permissible act into a constitutional violation.

The parties disagree over whether Weidenthaler had discretion under local policy to decline safety cell placement for homicidal inmates, and the policy itself is not particularly clear on this point. Non-medical VDF personnel decide where inmates are housed, and have discretion whether to retain them in safety cells. But it is unclear how the VDF's policy would have applied here. The fact that the policy could mean what Weidenthaler thought it meant lends some support to his qualified immunity claim. But while local policy informs the analysis generally, compliance with the Constitution, not local policy, is the key issue. *See Bibeau v. Pac. Northwest Research Foundation Inc.*, 188 F.3d 1105, 1113 (9th Cir. 1999) (holding that violation of a duty arising under state law was insufficient to show that the defendant violated clearly established constitutional rights). And violation of
/ / /

14

17cv1154-LAB (AGS)

a policy intended to deal with homicidal inmates does not speak directly to whether Weidenthaler was deliberately indifferent to the risk of harm to a suicidal inmate.

For purposes of the qualified immunity analysis, the issue is not whether Weidenthaler's actions were reasonable, but whether he reasonably could have believed his conduct was constitutional. Here, Weidenthaler has met his burden of showing that he could have. Even accepting that he had reason to believe Moriarty was suicidal days earlier, Weidenthaler was told in the interim that Moriarty had been determined not to be suicidal. Weidenthaler knew Nurse Practitioner Daniels, a psychiatric nurse, had recommended that Moriarty be housed in a safety cell, and he personally overruled that recommendation. But he also knew the basis for Nurse Practitioner Daniels' recommendation was that Moriarty was homicidal, not that he was suicidal. (Jt. Stmt. of Undisputed Facts, ¶ 10.) Her examination notes confirm that she believed that Moriarty was homicidal but not suicidal, and Plaintiffs agree this is what she believed.

Plaintiffs correctly point out that Weidenthaler had no particular medical or psychological expertise, and had to rely on the advice of others who did. As a layman, Weidenthaler was not responsible for making a diagnosis or attempting to confirm or rebut Daniels'. Once a psychiatric nurse gave him to understand that Moriarty was not at that time a suicide risk, he could reasonably have believed it, and no clearly established law would have told him otherwise. In light of this, he could reasonably have believed that he was not ignoring a serious risk of suicide. That is enough to entitle him to qualified immunity as to the federal constitutional claim.

Plaintiffs' other evidence is likewise insufficient to counter Weidenthaler's position. For example, they cite a general warning that watch commander McNeeley gave Weidenthaler several days earlier. But a warning to "watch out" for Moriarty would only have raised generalized concerns; it cannot reasonably be construed as a warning that Moriarty was, or might be, suicidal. There is no evidence that Weidenthaler would have known, based on what he was told or what happened days earlier, on May 25, that Moriarty was suicidal on May 31.

If Moriarty had acted on his homicidal ideations, and if housing him in a safety cell rather than an ad-seg cell would have reduced the risk,[4] Weidenthaler would probably be liable. But that did not happen. Instead, a different risk—one he had less reason to be aware of—tragically played out. Even if he was negligent in failing to appreciate that risk or failing to take the steps Plaintiffs' expert suggests he should have, he has shown that he could reasonably have thought he was acting lawfully.

The Court finds Weidenthaler has met his burden of establishing qualified immunity. There is, however, sufficient evidence to support the negligence claims against him.

**Daniels' Motion for Summary Judgment**

Defendant Daniels seeks summary judgment on the § 1983 claims as well as the negligence claim. She does not seek qualified immunity.

Daniels interacted with Moriarty on May 31, when she performed a psychiatric evaluation and determined he was homicidal and needed to be placed in a safety cell. She herself had no authority to order him placed in a safety cell, however, and could only recommend it. She later participated in the MDG meeting where it was decided Moriarty should be returned to ad-seg. She did not mention that Sgt. Weidenthaler had overruled her safety cell placement recommendation.

Plaintiffs' opposition misunderstands the "deliberate indifference" standard for § 1983 claims, treating it as a heightened negligence standard. They admit Daniels did not realize Moriarty was at risk for suicide, but instead argue that the "main inquiry" was whether her actions (including her failure to appreciate Moriarty's high risk of suicide) were objectively reasonable. (Opp'n to Mot. for Summ. J., at 13:21–26.) They agree she "did not think Moriarty posed a risk of suicide." (Opp'n to Mot. for Summ. J.at 14:7–9.) But they claim she ignored obvious signs, which they catalog.

---

[4] The ad-seg cell he was housed in was a type of isolation cell, albeit one that could pose a risk to suicidal inmates. (*See* Opp'n to Mot. for Summ. J.at 14:7–9.)

Plaintiffs cite *Gordon*, 888 F.3d 1118, as announcing that the new standard is objective reasonableness. They have misapplied *Gordon* and its predecessor *Castro*, however, in part because objective unreasonableness is only one part of the test:

> Based thereon, the elements of a pretrial detainee's medical care claim against an individual defendant under the due process clause of the Fourteenth Amendment are: (i) the defendant made an intentional decision with respect to the conditions under which the plaintiff was confined; (ii) those conditions put the plaintiff at substantial risk of suffering serious harm; (iii) the defendant did not take reasonable available measures to abate that risk, even though a reasonable official in the circumstances would have appreciated the high degree of risk involved—making the consequences of the defendant's conduct obvious; and (iv) by not taking such measures, the defendant caused the plaintiff's injuries.

*Gordon*, 888 F.3d at 1125. They also confuse the objective reasonableness standard with a negligence standard, which both *Castro* and *Gordon* made clear does not apply here. Neither *Castro* nor *Gordon* called into question Supreme Court decisions such as *Estelle v. Gamble*, 429 U.S. 97 (1976) or *Farmer v. Brennan*, 511 U.S. 825 (1994). These decisions rely on the longstanding proposition that inadvertent misdiagnosis or negligent medical care does not amount to deliberate indifference. *See, e.g., Estelle* at 106 (holding that negligence in diagnosing a condition does not amount to a constitutional violation). The Ninth Circuit continues to cite and rely on them for this proposition. *See Edmo v. Corizon, Inc.*, ___ F.3d ___, 2019 WL 3978329, at *20 (9th Cir. Aug. 23, 2019).

Each of Daniels' actions fails to satisfy at least one of the *Gordon* elements. When diagnosing Moriarty, her failure to appreciate that he was suicidal was not an "intentional decision," as the first element requires. *See Castro*, 833 F.3d at 1070 (pointing out that accidents cannot satisfy this element). Nor can it be said that she failed to take steps to abate an obvious risk of misdiagnosing him, as required for the third element. She reviewed two recent sets of notes by Dr. Lissaur, who had examined Moriarty several times and who most recently determined he was experiencing a bipolar/manic episode. She also examined Moriarty herself, and her notes from that examination are attached to the motion. (Mot. for

17

17cv1154-LAB (AGS)

Summ., J., Ex. C.) At the time, she did not have access to Moriarty's full records, however. Plaintiffs' opposition claims that Daniels "intentionally failed to appreciate" Moriarty's risk of suicide. (Opp'n at 14:1-2.) There was no evidence, however, that Daniels knowingly or intentionally misdiagnosed Moriarty. Nor do Plaintiffs point to steps she could or should have taken to abate any obvious risk of misdiagnosing him.

It is also uncontested that Daniels had no authority to order Moriarty placed in a safety cell, and that she could only make such a recommendation—which she did. Before the MDG met, she made no intentional decision with respect to Moriarty's placement.

Plaintiffs also argue that Daniels could and should have brought the matter to Watch Commander McNeeley's attention either before the MDG meeting or at the meeting, and present evidence that if she had done so, he would have ordered Moriarty placed in a safety cell. The evidence is in conflict regarding exactly what was said and what happened at the meeting, which McNeeley and Daniels both attended. Daniels says she thought the other committee members knew her recommendation had been overruled and that the MDG was merely considering alternatives. Plaintiffs point to conflicting evidence suggesting that other committee members, including McNeeley, did not know, and that she should have mentioned it.

The flaw in Plaintiffs' argument is that Daniels believed Moriarty was homicidal, not suicidal, and was not deliberately indifferent to a substantial risk that he was suicidal. Rather, she believed he needed to be in a safety cell because he was homicidal and psychotic. Plaintiffs do not dispute this, and in fact they adopt this position in their briefing. As it turned out, had she recommended during the MDG meeting that Moriarty be housed in a safety cell for homicidal ideations, there is evidence the request would have been granted and Moriarty's suicide attempt might have been forestalled. But as with Weidenthaler, this fortuitous result would have stemmed from efforts to protect against a different and known risk, *i.e.*, the risk that Moriarty would attempt to harm someone else. Neither she nor Weidenthaler knew Moriarty was suicidal. Daniels was therefore not acting with deliberate indifference to a substantial risk of suicide.

Plaintiffs also argue that Daniels should have taken other steps, such as sending him to the psychiatric security unit at Central Jail instead of treating him at VDF,[5] but these are premised on an assumption that she knew he was suicidal.

Daniels is therefore entitled to summary judgment on the § 1983 claims. As for the negligence claims, however, there is enough conflict in the evidence to create a triable issue of fact.

**Conclusion and Order**

The motion for leave to amend (Docket no. 70) is **DENIED**.

Defendant Weidenthaler's motion for summary judgment (Docket no. 49) is **GRANTED IN PART AND DENIED IN PART**. Because he is entitled to qualified immunity as to the federal claims, the § 1983 claims against him are **DISMISSED WITH PREJUDICE**. As to the negligence claims against him, the motion is **DENIED**.

Defendant Daniels' motion for summary judgment (Docket no. 79) is **GRANTED IN PART AND DENIED IN PART**. Because she was, at most, negligent in failing to recognize that Moriarty was suicidal, and because she acted on the basis of her belief that he was not suicidal, she is entitled to summary judgment on the § 1983 claims against her, and these are **DISMISSED WITH PREJUDICE**. But the motion is **DENIED** as to the negligence claims against her.

**IT IS SO ORDERED.**

Date: September 24, 2019

*Larry A. Burns*
Hon. Larry A. Burns
Chief United States District Judge

---

[5] In support of this alternate course of action, Plaintiffs cite Exhibit 3 to their Motion for Leave to Amend (Docket no. 70-1, at 3.) This is an email by Dr. Joshua, and Defendants have correctly pointed out that it is inadmissible hearsay. Although Plaintiffs claim there is evidence CPMG director Dr. Rao agreed with this, they did not cite anything, not even inadmissible evidence.