# Exhibit A

COUNTY CONTRACT NUMBER 549469
### AGREEMENT WITH CORRECTIONAL PHYSICIANS MEDICAL GROUP FOR ON-SITE AND TELEPSYCHIATRY SERVICES

This Agreement ("Agreement") is made and entered into on the date shown on the signature page ("Effective Date") by and between the County of San Diego, a political subdivision of the State of California ("County") and Contractor Correctional Physicians Medical Group, 3525 Del Mar Heights Road, #213, San Diego CA 92067 (" Contractor"), with reference to the following facts:

#### RECITALS

A. Pursuant to Administrative Code section 401, the County's Director of the Department of Purchasing and Contracting is authorized to award this Contract for On-Site and Telepsychiatry Services.

B. Contractor is specially trained and possesses certain skills, experience, education and competency to perform these services.

C. The Chief Administrative Officer made a determination that Contractor can perform the services more economically and efficiently than the County, pursuant to Section 703.10 of the County Charter.

D. The Agreement shall consist of this document, Exhibit A Statement of Work, Exhibit B Insurance Requirements and Exhibit C, Payment Schedule. In the event that any provision of the Agreement or its Exhibits, A, A-1, B or C, conflicts with any other term or condition, precedence shall be: First (1st) the Agreement; Second (2nd) Exhibit B; Third (3rd) Exhibit A; and Fourth (4th) Exhibit C.

NOW THEREFORE, for valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties agree as follows:

#### ARTICLE I
#### PERFORMANCE OF WORK

1.1 Standard of Performance. Contractor shall, in good and workmanlike manner and in accordance with the highest professional standards, at its own cost and expense, furnish all of the labor, technical, administrative, professional and all other personnel, all supplies and materials, equipment, printing, transportation, facilities, and all other means whatsoever, except as herein otherwise expressly specified to be furnished by County, necessary or proper to perform and complete the work and provide the services required of Contractor by this Agreement.

1.2 Contractor's Representative. The person identified on the signature page ("Contractor's Representative") shall ensure that Contractor's duties under this Agreement shall be performed on behalf of the Contractor by qualified personnel; Contractor represents and warrants that (1) Contractor has fulfilled all applicable requirements of the laws of the State of California to perform the services under this Agreement and (2) Contractor's Representative has full authority to act for Contractor hereunder. Contractor and County recognize that the services to be provided by Contractor's Representative pursuant to this Agreement are unique: accordingly, Contractor's Representative shall not be changed during the Term of the Agreement without County's written consent. County reserves the right to terminate this Agreement pursuant to Clause 7.1 "Termination for Default", if Contractor's Representative should leave Contractor's employ, or if, in County's judgment, the work hereunder is not being performed by Contractor's Representative.

1.3 Contractor as Independent Contractor. Contractor is, for all purposes of this Agreement, an independent Contractor, and neither Contractor nor Contractor's employees or subcontractors shall be deemed to be employees of the County. Contractor shall perform its obligations under this Agreement according to the Contractor's own means and methods of work which shall be in the exclusive charge and under the control of the Contractor, and which shall not be subject to control or supervision by County except as to the results of the work. Neither Contractor nor Contractor's employees or subcontractors shall be entitled to any benefits to which County employees are entitled, including without limitation, overtime, retirement benefits, workers' compensation benefits and injury leave.

1.4 Contractor's Agents and Employees or Subcontractors. Contractor shall obtain, at Contractor's expense, all agents, employees and subcontractors required for Contractor to perform its duties under this Agreement, and all such services shall be performed by Contractor's Representative, or under Contractor's Representatives' supervision, by persons authorized by law to perform such services. Retention by Contractor of any agent, employee or subcontractor shall be at Contractor's sole cost and expense, and County shall have no obligation to pay Contractor's agents, employees or subcontractors; to support any such person's or entity's claim against the Contractor; or to defend Contractor against any such claim.

Any subcontract or consultant agreement, which is in excess of fifty thousand dollars ($50,000) or twenty five percent (25%) of the value of the contract, whichever is less, or a combination of subcontracts or consultant agreements to the same individual or firm for the Agreement period, or any subcontract or consultant agreement for professional medical or mental health services, regardless of value, must have prior concurrence of the Contracting Officer's Representative ("COR"). Contractor shall provide Contracting Officer Representative with copies of all other subcontracts relating to this Agreement entered into by Contractor within 30 days after the effective date of the subcontract. Such subcontractors of Contractor shall

CSD000182

CPMG 000036

COUNTY CONTRACT NUMBER 549469
AGREEMENT WITH CORRECTIONAL PHYSICIANS MEDICAL GROUP FOR ON-SITE AND
TELEPSYCHIATRY SERVICES

be notified of Contractor's relationship to County. "Subcontractor" means any entity, other than County, that furnishes to Contractor services or supplies relevant to this Agreement other than standard commercial supplies, office space, and printing services.

1.4.1   Contractor Responsibility. In the event any subcontractor is utilized by Contractor for any portion of the project, Contractor retains the prime responsibility for carrying out all the terms of this Agreement, including the responsibility for performance and insuring the availability and retention of records of subcontractors in accordance with this Agreement. No subcontract utilizing funds from this Agreement shall be entered into which has a term extending beyond the ending date of this Agreement.

1.4.2   Mandated Clause. All subcontracts shall include the Standard Terms and Conditions required of Contractor Articles 3, 7, 8, 9, 10, 11, 12, 13 and 16 herein.

1.4.3   County Approval. As identified above, all subcontracts under this Agreement shall have prior written approval of the Contracting Officer Representative.

## ARTICLE 2
### SCOPE OF WORK

2.1   Statement of Work. Contractor shall perform the work described in the "Statement of Work" attached as Exhibit "A" to this Agreement, and by this reference incorporated herein, except for any work therein designated to be performed by County.

2.2   Right To Acquire Equipment and Services. Nothing in this Agreement shall prohibit the County from acquiring the same type or equivalent equipment and/or service from other sources, when deemed by the County to be in its best interest.

2.3   Responsibility For Equipment. For cost reimbursement Agreements, County shall not be responsible nor be held liable for any damage to persons or property consequent upon the use, misuse, or failure of any equipment used by Contractor or any of Contractor's employees, even though such equipment may be furnished, rented, or loaned to Contractor by County. The acceptance or use of any such equipment by Contractor or Contractor's employees shall be construed to mean that Contractor accepts full responsibility for and agrees to exonerate, indemnify and hold harmless County from and against any and all claims for any damage whatsoever resulting from the use, misuse, or failure of such equipment, whether such damage be to the employee or property of Contractor, other Contractors, County, or other persons. Equipment includes, but is not limited to material, computer hardware and software, tools, or other things.

2.3.1   Contractor shall repair or replace, at Contractor's expense all County equipment or fixed assets that are damaged or lost as a result of Contractor negligence.

2.4   Non-Expendable Property Acquisition. County retains title to all non-expendable property provided to contractor by county, or which Contractor may acquire with funds from this Agreement if payment is on a cost reimbursement basis, including property acquired by lease purchase Agreement. Contractor may not expend funds under this Agreement for the acquisition of non-expendable property having a unit cost of $5,000 or more and a normal life expectancy of more than one year without the prior written approval of Contracting Officer Representative. Contractor shall maintain an inventory of non-expendable equipment, including dates of purchase and disposition. Inventory records on expendable equipment shall be retained, and shall be made available to the County upon request, for at least three years following date of disposition. Non-expendable property that has value at the end of a contract (e.g. has not been depreciated so that its value is zero), and which the County may retain title under this paragraph, shall be disposed of at the end of the Agreement as follows: At County's option, it may: 1) have Contractor deliver to another County contractor or have another County contractor pick up the non-expendable property; 2) allow the contractor to retain the non-expendable property provided that the contractor submits to the County a written statement in the format directed by the County of how the non-expendable property will be used for the public good; or 3) direct the Contractor to return to the County the non-expendable property.

## ARTICLE 3
### DISENTANGLEMENT

3.1   General Obligations

At County's discretion, Contractor shall accomplish a complete transition of the services as set forth in Exhibit A to this Agreement (for purposes of this Article 3.1, these shall be referred to as the "Disentangled Services") being terminated from Contractor and the Subcontractors to County, or to any replacement provider designated by County, without any interruption of or adverse impact on the Disentangled Services or any other services provided by third parties. This process shall be referred to as the Disentanglement. Contractor shall fully cooperate with County and any new service provider and

CSD000183

CPMG 000037

COUNTY CONTRACT NUMBER 549469
AGREEMENT WITH CORRECTIONAL PHYSICIANS MEDICAL GROUP FOR ON-SITE AND
TELEPSYCHIATRY SERVICES

otherwise promptly take all steps, including, but not limited to providing to County or any new service provider all requested information or documentation, required to assist County in effecting a complete Disentanglement. Contractor shall provide all information or documentation regarding the Disentangled Services or as otherwise needed for Disentanglement, including, but not limited to, data conversion, client files, interface specifications, training staff assuming responsibility, and related professional services. Contractor shall provide for the prompt and orderly conclusion of all work required under the Agreement, as County may direct, including completion or partial completion of projects, documentation of work in process, and other measures to assure an orderly transition to County or the County's designee of the Disentangled Services. All Contractor work done as part of the Disentanglement shall be performed by Contractor and will be reimbursed by the County at no more than Contractor's costs, up to the total amount of this Agreement. Contractor shall not receive any additional or different compensation for the work otherwise required by the Agreement. Contractor's obligation to provide the Services shall not cease until the earlier of the following: 1) The Disentanglement is satisfactory to County, including the performance by Contractor of all asset-transfers and other obligations of Contractor provided in this Paragraph, has been completed to the County's reasonable satisfaction or 2) twelve (12) months after the Expiration Date of the Agreement.

3.2   Disentanglement Process
The Disentanglement process shall begin on any of the following dates:  (i) the date County notifies Contractor that no funds or insufficient funds have been appropriated so that the Term shall be terminated pursuant to the Agreement, Article 7; (ii) the date designated by County not earlier than sixty (60) days prior to the end of any initial or extended term that County has not elected to extend pursuant to the Agreement's, Signature Page, Contract Term; or (iii) the date any Termination Notice is delivered, if County elects to terminate any or all of the Services pursuant to the Agreement, Article 7.  Subject to Exhibit A Contractor's obligation to perform Disentangled Services, and County's obligation to pay for Disentangled Services, shall expire:  (A) when funds appropriated for payment under this Agreement are exhausted, as provided in this Agreement, Article 7; (B) at the end of the initial or extended term set forth in this Agreement's, Signature Page, Contract Term; or (C) on the Termination Date, pursuant to this Agreement, Article 7 (with the applicable date on which Contractor's obligation to perform the Services expires being referred to herein as the "Expiration Date"). Contractor and County shall discuss in good faith a plan for determining the nature and extent of Contractor's Disentanglement obligations and for the transfer of the Disentangled Services in process provided, however, that Contractor's obligation under this Agreement to provide all Disentangled Services shall not be lessened in any respect.

3.3   Specific Obligations
The Disentanglement shall include the performance of the following specific obligations:

3.3.1   No Interruption or Adverse Impact
Contractor shall cooperate with County and all of the County's other service providers to ensure a smooth transition at the time of Disentanglement, with no interruption of Disentangled Services or other work required under the Agreement, no adverse impact on the provision of Disentangled Services or other work required under the Agreement or County's activities, no interruption of any services provided by third parties, and no adverse impact on the provision of services provided by third parties.

3.3.2   Third-Party Authorizations
Without limiting the obligations of Contractor pursuant to any other clause in Exhibit A herein, Contractor shall, subject to the terms of any third-party contracts, procure at no charge to County any third-party authorizations necessary to grant County the use and benefit of any third-party contracts between Contractor and third-party contractors used to provide the Disentangled Services, pending their assignment to County. Similarly, at County's direction, Contractor shall obtain all legally necessary client consents or authorizations legally necessary to transfer client data to County or any new service provider.

3.3.3   Return, Transfer and Removal of Assets

3.3.3.1   Contractor shall return to County all County assets in Contractor's possession, pursuant to Paragraph 2.4 of the Agreement.

3.3.3.2   County shall be entitled to purchase at net book value those Contractor assets used for the provision of Disentangled Services to or for County, other than those assets expressly identified by the Parties as not being subject to this provision.  Contractor shall promptly remove from County's premises, or the site of the work being performed by Contractor for County, any Contractor assets that County, or its designee, chooses not to purchase under this provision.

3.3.4   Transfer of Leases, Licenses, and Contracts

CSD000184

CPMG 000038

COUNTY CONTRACT NUMBER 549469
AGREEMENT WITH CORRECTIONAL PHYSICIANS MEDICAL GROUP FOR ON-SITE AND
TELEPSYCHIATRY SERVICES

Contractor, at its expense, shall convey or assign to County or its designee such fully-paid leases, licenses, and other contracts used by Contractor, County, or any other Person in connection with the Disentangled Services, as County may select, when such leases, licenses, and other contracts have no other use by Contractor. Contractor's obligation described herein, shall include Contractor's performance of all obligations under such leases, licenses, and other contracts to be performed by it with respect to periods prior to the date of conveyance or assignment and Contractor shall reimburse County for any losses resulting from any claim that Contractor did not perform any such obligations.

3.3.5   Delivery of Documentation
Contractor shall deliver to County or its designee, at County's request, all documentation and data related to County, including, but not limited to, the County Data and client files, held by Contractor, and Contractor shall destroy all copies thereof not turned over to County, all at no charge to County.  Notwithstanding the foregoing, Contractor may retain one (1) copy of the documentation and data, excluding County Data, for archival purposes or warranty support.

3.4   Findings Confidential.  Any reports, information, data, etc., given to or prepared or assembled, by Contractor under this Agreement which the County requests to be kept as confidential shall not be made available to any individual or organization by the Contractor without the prior written approval of the County.

3.5   Publication, Reproduction or Use of Materials.  No material produced, in whole or in part, under this Agreement shall be subject to copyright in the United States or in any other country.  The County shall have unrestricted authority to publish, disclose, distribute and otherwise use, in whole or in part, any reports, data or other materials prepared under this Agreement. All reports, data and other materials prepared under this Agreement shall be the property of the County upon completion of this Agreement.

## ARTICLE 4
## COMPENSATION

The Payment Schedule, and/or budget are in Exhibit C and the compensation is on the Signature page.  County will pay Contractor the agreed upon price(s), pursuant to Exhibit C for the work specified in Exhibit A, Statement of Work. The County is precluded from making payments prior to receipt of services (advance payments).  Contractor shall provide and maintain an accounting and financial support system to monitor and control costs to assure the Agreements completion.  Invoices are subject to the requirements below.

4.1  Fiscal for Fixed Pricing. (Rev. 7/31/08)

4.1.1   General Principles.  Contractor shall comply with generally accepted accounting principles and good business practices, including all applicable cost principles published by the Federal Office of Management and Budget, which can be viewed at http://www.whitehouse.gov/omb/circulars. Contractor shall comply with all Federal, State and other funding source requirements. Contractor shall, at its own expense, furnish all cost items associated with this Agreement except as herein otherwise specified in the budget or elsewhere to be furnished by County.

4.1.2   Invoices.  Payment for the services performed under this Agreement shall be in accordance with Exhibit C, unless other payment methodologies are negotiated and agreed to by both Contractor and County. Contractor shall submit approved invoices monthly to the Contracting Officer's Representative ("COR") for work performed in the monthly period, accordingly.  Contractor's monthly invoices shall be completed and submitted in accordance with written COR instructions and shall include a statement certifying whether it is in compliance with Paragraph 8.15 of this Agreement

4.1.3   Payments.  County agrees to pay Contractor in arrears only after receipt and approval by COR of properly submitted, detailed and itemized original invoice referencing the Agreement number and a detailed listing of each pay point target, accomplishment, unit price and/or percentages, and showing the appropriate calculation for each, a progress report documenting the status and accomplishments of Contractor during the billing period pursuant to Exhibit C.  Payment shall be NET 30 days from receipt and approval of invoice unless otherwise stated.

4.1.4   Full Compensation.  Pending any adjustments by the COR, each invoice approved and paid shall constitute full and complete compensation to the Contractor for all work completed during the billing period pursuant to Exhibit A and Exhibit C.  Contractor shall be entitled only to compensation, benefits, reimbursements or ancillary services specified in this Agreement.  Payment shall be NET 30 days from receipt and approval of invoice unless otherwise stated.

4.1.5   Prompt Payment for Vendors and Subcontractors

CSD000185

CPMG 000039

COUNTY CONTRACT NUMBER 549469
AGREEMENT WITH CORRECTIONAL PHYSICIANS MEDICAL GROUP FOR ON-SITE AND
TELEPSYCHIATRY SERVICES

4.1.5.1   Prompt payment for vendors and subcontractors.

4.1.5.1.1.  Unless otherwise set forth in this paragraph, Contractor shall promptly pay its vendors and subcontractor(s) for satisfactory performance under its subcontract(s) to this Agreement. Such prompt payment shall be no later than thirty (30) days after Contractor receives payment for such services from County and shall be paid out of such amounts as are paid to Contractor under this Agreement.

4.1.5.1.2   Contractor shall include a payment clause conforming to the standards set forth in Paragraph 4.1.5.2.3 of this Agreement in each of its subcontracts, and shall require each of its subcontractors to include such a clause in their subcontracts with each lower-tier subcontractor or supplier.

4.1.5.2   If Contractor, after submitting a claim for payment to County but before making a payment to a vendor or subcontractor for the goods or performance covered by the claim, discovers that all or a portion of the payment otherwise due such vendor or subcontractor is subject to withholding from the vendor or subcontractor in accordance with the vendor or subcontract agreement, then the Contractor shall:

4.1.5.2.1   Furnish to the vendor or subcontractor and the COR within three (3) business days of withholding funds from its vendor or subcontractor a notice stating the amount to be withheld, the specific causes for the withholding under the terms of the subcontract or vendor agreement; and the remedial actions to be taken by the vendor or subcontractor in order to receive payment of the amounts withheld.

4.1.5.2.2   Contractor shall reduce the subcontractor's progress payment by an amount not to exceed the amount specified in the notice of withholding furnished under paragraph 4.1.5.2.1 of this Agreement and Contractor may not claim from the County this amount until its subcontractor has cured the cause of Contractor withholding funds;

4.1.5.2.3   Upon the vendor's or subcontractor's cure of the cause of withholding funds, Contractor shall pay the vendor or subcontractor as soon as practicable, and in no circumstances later than ten (10) days after the Contractor claims and receives such funds from County.

4.1.5.3   Contractor shall not claim from County all of or that portion of a payment otherwise due to a vendor or subcontractor that Contractor is withholding from the vendor or subcontractor in accordance with the subcontract agreement where Contractor withholds the money before submitting a claim to County. Contractor shall provide its vendor or subcontractor and the COR with the notice set forth in Paragraph 4.1.5.2.1 of this Agreement and shall follow Paragraph 4.1.5.2.3 of this Agreement when vendor or subcontractor cures the cause of Contractor withholding its vendors or subcontractor's funds.

4.1.5.4   Overpayments. If Contractor becomes aware of a duplicate contract financing or invoice payment or that County has otherwise overpaid on a contract financing or invoice payment, Contractor shall immediately notify the COR and request instructions for disposition of the overpayment.

4.1.6   Conditions Prerequisite To Payments.  County may elect not to make a particular payment if any of the following exists:

4.1.6.1   Misrepresentation.  Contractor, with or without knowledge, made any misrepresentation of substantial and material nature with respect to any information furnished to County.

4.1.6.2   Unauthorized Actions by Contractor.  Contractor took any action pertaining to this Agreement, which required County approval, without having first received said County approval.

4.1.6.3   Default.  Contractor was in default under any terms and conditions of this Agreement.

4.1.7   Withholding Of Payment.  County may withhold payment until reports, data, audits or other information required for Agreement administration or to meet County or State reporting or auditing requirements are received and approved by COR or designee. The County may also withhold payment if, in the County's opinion, Contractor is in non-compliance with this Agreement.

4.1.8   Availability of Funding.  The County's obligation for payment of any Agreement beyond the current fiscal year is contingent upon the availability of funding from which payment can be made. No legal liability on the part of the County shall arise for payment beyond June 30 of the calendar year unless funds are designated by the County and are made available for such performance.

County shall, in its sole discretion, have the right to terminate or suspend Agreement or reduce compensation and service levels proportionately upon thirty (30) days' written notice to Contractor in the event that Federal, State or

CSD000186

CPMG 000040

COUNTY CONTRACT NUMBER 549469
AGREEMENT WITH CORRECTIONAL PHYSICIANS MEDICAL GROUP FOR ON-SITE AND
TELEPSYCHIATRY SERVICES

County funding for this Agreement ceases or is reduced prior to the ordinary expiration of the term of this Agreement. In the event of reduction of funding for the Agreement, County and Contractor shall meet within ten (10) days of written notice to renegotiate this Agreement based upon the modified level of funding. In this case if no agreement is reached between County and Contractor within 10 days of the first meeting, either party shall have the right to terminate this Agreement within ten (10) days written notice of termination.

In the event of termination of this Agreement in accordance with the terms of this Section, Contractor shall be entitled to retain all sums paid as of the effective date of such termination, subject to any payment offset to which County may be entitled, for damages or otherwise, under the terms of this Agreement. In the event of termination of this Agreement pursuant to this Section, in no event shall Contractor be entitled to any loss of profits on the portion of this Agreement so terminated, or to other compensation, benefits, reimbursements or ancillary services other than as herein expressly provided.

4.1.9 Disallowance. In the event the Contractor receives payment for services under this Agreement which is later disallowed by the County, Contractor shall promptly refund the disallowed amount to County on request, or at its option, County may offset the amount disallowed from any payment due or to become due to Contractor under any Agreement with the County.

4.1.10 Maximum Price. During the performance period of this Agreement, the maximum price for the same or similar items and/or services shall not exceed the lowest price at which Contractor then offers the items and/or services to its most favored customer.

## ARTICLE 5
## AGREEMENT ADMINISTRATION

5.1 County's Agreement Administrator. The Director of Purchasing and Contracting is designated as the Contracting officer ("Contracting Officer") and is the only County official authorized to make any Changes to this Agreement. The County has designated the individual identified on the signature page as the Contracting Officer's Representative ("COR")

5.1.1 County's COR will chair Contractor progress meetings and will coordinate County's Agreement administrative functions. The COR is designated to receive and approve Contractor invoices for payment, audit and inspect records, inspect Contractor services, and provide other technical guidance as required. The COR is not authorized to change any terms and conditions of this Agreement. Only the Contracting Officer, by issuing a properly executed amendment to this Agreement, may make changes to the scope of work or total price.

5.1.2 Notwithstanding any provision of this Agreement to the contrary, County's COR may make Administrative Adjustments ("AA") to the Agreement, such as line item budget changes or adjustments to the service requirements, which do not change the purpose or intent of the Statement of Work, the Terms and Conditions, the Agreement period or the total Agreement price. Each AA shall be in writing and signed by COR and Contractor. All inquiries about such AA will be referred directly to the COR.

5.2 Agreement Progress Meeting. The COR and other County personnel, as appropriate, will meet periodically with the Contractor to review the Contractor performance. At these meetings the COR will apprise the Contractor of how the County views the Contractor's performance and the Contractor will apprise the County of problems, if any, being experienced. The Contractor shall also notify the Contracting Officer (in writing) of any work being performed, if any, that the Contractor considers being over and above the requirements of the Agreement. Appropriate action shall be taken to resolve outstanding issues. The minutes of these meetings will be reduced to writing and signed by the COR and the Contractor. Should the Contractor not concur with the minutes, the Contractor shall set out in writing any area of disagreement. Appropriate action will be taken to resolve any areas of disagreement.

## ARTICLE 6
## CHANGES

6.1 Contracting Officer. The Contracting Officer may at any time, by a written order, make changes ("Changes"), within the general scope of this Agreement, in the definition of services to be performed, and the time (i.e.) hours of the day, days of the week, etc. and place of performance thereof. If any such Change causes an increase or decrease in the cost of, or the time required for, the performance of any part of the work under this Agreement, whether changed or not changed by such an order, an equitable adjustment shall be made in the Agreement price or delivery schedule, or both, and the Agreement shall be modified in writing accordingly. Such changes may require Board of Supervisors approval.

6.2 Claims. Contractor must assert any claim for adjustment under this clause within thirty (30) days from the date of receipt by the Contractor of the notification of Change; provided, however, that the Contracting Officer, if he decides that the facts justify such

CSD000187

CPMG 000041

COUNTY CONTRACT NUMBER 549469
AGREEMENT WITH CORRECTIONAL PHYSICIANS MEDICAL GROUP FOR ON-SITE AND
TELEPSYCHIATRY SERVICES

action, may receive and act upon any such claim asserted at any time prior to final payment under this Agreement. Where the cost of property made obsolete or excess as a result of a change is included in the Contractor's claim for adjustment, the Contracting Officer shall have the right to prescribe the manner of disposition of such property. Failure to agree to any adjustment shall be a dispute concerning a question of fact within the meaning of the clause of this Agreement entitled "Disputes" (Article 15). However, nothing in this clause shall excuse the Contractor from proceeding with this Agreement as changed.

**ARTICLE 7**
**SUSPENSION, DELAY AND TERMINATION**

7.1   Termination For Default.   Upon Contractor's breach of this Agreement, County shall have the right to terminate this Agreement, in whole or part.  Prior to termination for default, County will send Contractor written notice specifying the cause. The notice will give Contractor ten (10) days from the date the notice is issued to cure the default or make progress satisfactory to County in curing the default, unless a different time is given in the notice.  If County determines that the default contributes to the curtailment of an essential service or poses an immediate threat to life, health or property, County may terminate this Agreement immediately upon issuing oral or written notice to the Contractor without any prior notice or opportunity to cure.  In the event of termination under this Article, all finished or unfinished documents, and other materials, prepared by Contractor under this Agreement shall become the sole and exclusive property of County.

In the event of such termination, the County may purchase or obtain the supplies or services elsewhere, and Contractor shall be liable for the difference between the prices set forth in the terminated order and the actual cost thereof to the County. The prevailing market price shall be considered the fair repurchase price. Notwithstanding the above, Contractor shall not be relieved of liability to County for damages sustained by County by virtue of any breach of this Agreement by Contractor, and County may withhold any reimbursement to Contractor for the purpose of off-setting until such time as the exact amount of damages due County from Contractor is determined.

If, after notice of termination of this Agreement under the provisions of this clause, it is determined for any reason that the Contractor was not in default under the provisions of this clause, the rights and obligations of the parties shall, if this Agreement contains a clause providing for termination for convenience of the County, be the same as if the notice of termination had been issued pursuant to such clause.

7.2   Damages For Delay.  If Contractor refuses or fails to prosecute the work, or any separable part thereof, with such diligence as shall ensure its completion within the time specified in this Agreement, or any extension thereof, or fails to complete said work within such time, County will be entitled to the resulting damages caused by the delay. Damages will be the cost to County incurred as a result of continuing the current level and type of service over that cost that would be incurred had the Agreement segments been completed by the time frame stipulated and any other damages suffered by County.

7.3   County Exemption From Liability.  In the event there is a reduction of funds made available by County to Contractor under this or subsequent Agreements, the County of San Diego and its Departments, officers and employees shall incur no liability to Contractor and shall be held harmless from any and all claims, demands, losses, damages, injuries, or liabilities arising directly or from such action.

7.4   Full Cost Recovery Of Investigation And Audit Costs.  Contractor shall reimburse County of San Diego for all direct and indirect expenditures incurred in conducting an audit/investigation when Contractor is found in violation (material breach) of the terms of the Agreement.  Reimbursement for such costs shall be withheld from any amounts due to Contractor pursuant to the payment terms of the Agreement, or from any other amounts due to Contractor from County.

7.5   Termination For Convenience.  The County may, by written notice stating the extent and effective date terminate this Agreement for convenience in whole or in part, at any time.  The County shall pay the Contractor as full compensation for work performed in accordance with the terms of this Contract until such termination:

7.5.1   The unit or pro rata price for any delivered and accepted portion of the work.

7.5.2   A reasonable amount, as costs of termination, not otherwise recoverable from other sources by the Contractor as approved by the County, with respect to the undelivered or unaccepted portion of the order, provided compensation hereunder shall in no event exceed the total price.

7.5.3   In no event shall the County be liable for any loss of profits on the resulting order or portion thereof so terminated.

7.5.4   County's termination of this Agreement for convenience shall not preclude County from taking any action in law or equity against Contractor for:

7.5.4.1   Improperly submitted claims, or

7.5.4.2   Any failure to perform the work in accordance with the Statement of Work, or

7.5.4.3   Any breach of any term or condition of the Agreement, or

CSD000188
CPMG 000042

7.5.4.4  Any actions under any warranty, express or implied, or

7.5.4.5  Any claim of professional negligence, or

7.5.4.6  Any other matter arising from or related to this Agreement, whether known, knowable or unknown before, during or after the date of termination.

7.6  County reserves the right to terminate and/or prohibit, without prior notice, contractor and contractor's employees, subcontractors, or consultants from accessing County data systems, County owned software applications, including websites, domain names, platforms, physical files, and/or treating patients/clients.

7.7  Suspension Of Work. The Contracting Officer may order the Contractor, in writing, to suspend, delay, or interrupt all or any part of the work of this contract for the period of time that the Contracting Officer determines appropriate for the convenience of the Government.

7.8  Remedies Not Exclusive. The rights and remedies of County provided in this article shall not be exclusive and are in addition to any other rights and remedies provided by law or under resulting order.

**ARTICLE 8**
**COMPLIANCE WITH LAWS AND REGULATIONS**

8.1  Compliance with Laws and Regulations. Contractor shall at all times perform its obligations hereunder in compliance with all applicable Federal, State, County, and local laws, rules, and regulations, current and hereinafter enacted, including facility and professional licensing and/or certification laws and keep in effect any and all licenses, permits, notices and certificates as are required. Contractor shall further comply with all laws applicable to wages and hours of employment, occupational safety, and to fire safety, health and sanitation.

8.2  Contractor Permits and License. Contractor certifies that it possesses and shall continue to maintain or shall cause to be obtained and maintained, at no cost to the County, all approvals, permissions, permits, licenses, and other forms of documentation required for it and its employees to comply with all existing foreign or domestic statutes, ordinances, and regulations, or other laws, that may be applicable to performance of services hereunder. The County reserves the right to reasonably request and review all such applications, permits, and licenses prior to the commencement of any services hereunder.

8.3  Equal Opportunity. Contractor shall comply with the provisions of Title VII of the Civil Rights Act of 1964 in that it will not discriminate against any individual with respect to his or her compensation, terms, conditions, or privileges of employment nor shall Contractor discriminate in any way that would deprive or intend to deprive any individual of employment opportunities or otherwise adversely affect his or her status as an employee because of such individual's race, color, religion, sex, national origin, age, handicap, medical condition, sexual orientation or marital status.

8.4  Affirmative Action. Each Contractor of services employing fifteen (15) or more full-time permanent employees, shall comply with the Affirmative Action Program for Vendors as set forth in Article IIIk (commencing at Section 84) of the San Diego County Administrative Code, which program is incorporated herein by reference. A copy of this Affirmative Action Program will be furnished upon request by COR or from the County of San Diego Internet web-site (www.co.san-diego.ca.us).

8.5  Non-Discrimination. Contractor shall ensure that services and facilities are provided without regard to ethnic group identification, race, color, nation origin, creed, religion, age, sex, or physical, mental disability, political affiliation and marital status in accordance with Title IX of the Education Amendments of 1972; Title VII of the Civil Rights Act of 1964 (42 U.S.C. 2000-d), the Age Discrimination of 1975 (42 t. S.C. 6101), Article 9.5, Chapter 1, Part 1, Division 2, Title 2 (Section 11135, et seq.) of the California Government Code, Title 9, Chapter 4, Subchapter 6 (Section 10800, et seq.) of the CCR and California Dept of Social Services Manual of Policies and Procedures (CDSS MPP) Division 21.

8.6  AIDS Discrimination. Contractor shall not deny any person the full and equal enjoyment of, or impose less advantageous terms, or restrict the availability of, the use of any County facility or participation in any County funded or supported service or program on the grounds that such person has Acquired Immune Deficiency Syndrome, AIDS-related complex (ARC), or AIDS-related status (ARS), as those terms are defined in Chapter 1, Section 32.1203, San Diego County Code of Regulatory Ordinances.

8.7  American With Disabilities Act (ADA) 1990. Contractor shall not discriminate against qualified people with disabilities in employment, public services, transportation, public accommodations and telecommunications services in compliance with the Americans with Disabilities Act (ADA) and California Administrative Code Title 24.

8.8  Political Activities Prohibited. None of the funds, provided directly or indirectly, under this Agreement shall be used for any political activities or to further the election or defeat of any candidate for public office. Contractor shall not utilize or

CSD000189
CPMG 000043

COUNTY CONTRACT NUMBER 549469
**AGREEMENT WITH CORRECTIONAL PHYSICIANS MEDICAL GROUP FOR ON-SITE AND TELEPSYCHIATRY SERVICES**

allow its name to be utilized in any endorsement of any candidate for elected office. Neither the Agreement nor any funds provided thereunder shall be utilized in support of any partisan political activities, or activities for or against the election of a candidate for an elected office.

8.9    Lobbying. Contractor agrees to comply with the lobbying ordinances of the County and to assure that its officers and employees comply before any appearance before the County Board of Supervisors. Except as required by this Agreement, none of the funds provided under this Agreement shall be used for publicity or propaganda purposes designed to support or defeat any legislation pending before State and Federal Legislatures, the Board of Supervisors of the County, or before any other local governmental entity. This provision shall not preclude Contractor from seeking necessary permits, licenses and the like necessary for it to comply with the terms of this Agreement.

8.10   Religious Activity Prohibited. There shall be no religious worship, instructions or proselytization as part of or in connection with the performance of this Agreement.

8.11   Drug and Alcohol-Free Workplace. The County of San Diego, in recognition of individual rights to work in a safe, healthful and productive work place, has adopted a requirement for a drug and alcohol free work place, County of San Diego Drug and Alcohol Use Policy C-25. This policy provides that all County-employed Contractors and Contractor employees shall assist in meeting this requirement.

    8.11.1  As a material condition of this Agreement, the Contractor agrees that the Contractor and the Contractor employees, while performing service for the County, on County property, or while using County equipment:

        8.11.1.1  Shall not be in any way impaired because of being under the influence of alcohol or a drug.

        8.11.1.2  Shall not possess an open container of alcohol or consume alcohol or possess or be under the influence of an illegal drug.

        8.11.1.3  Shall not sell, offer, or provide alcohol or an illegal drug to another person; provided, however, that the foregoing restriction shall not be applicable to a Contractor or Contractor employee who as part of the performance of normal job duties and responsibilities prescribes or administers medically prescribed drugs.

    8.11.2  Contractor shall inform all employees who are performing service for the County on County property or using County equipment of the County objective of a safe, healthful and productive work place and the prohibition of drug or alcohol use or impairment from same while performing such service for the County.

    8.11.3  The County may terminate for default or breach this Agreement, and any other Agreement the Contractor has with the County, if the Contractor, or Contractor employees are determined by the Contracting Officer not to be in compliance with the conditions listed herein.

8.12   Board of Supervisors' Policies. Contractor represents that it is familiar, and shall use its best efforts to comply, with the following policies of the Board of Supervisors:

    8.12.1  Board Policy B-67, which encourages the County's Contractors to offer products made with recycled materials, reusable products, and products designed to be recycled to the County in response to the County's requirements; and

    8.12.2  Board Policies B-53 and B-39a, which encourage the participation of small and disabled veterans' business enterprises in County procurements; and

    8.12.3  Zero Tolerance For Fraudulent Conduct In County Services. Contractor shall comply with County of San Diego Board of Supervisors Policy A-120 "Zero Tolerance for Fraudulent Conduct in County Services." There shall be "Zero Tolerance" for fraud committed by Contractors in the administration of County programs and the provision of County services. Upon proven instances of fraud committed by independent Contractors in connection with their performance under the Agreement, said Agreement shall be terminated; and

    8.12.4  Interlocking Directorate. In recognition of County Policy A-79, not-for-profit Contractors shall not subcontract with related for-profit subcontractors for which an interlocking relationship exist unless specifically authorized in writing by the Board of Supervisors; and

    8.12.5  Zero Tolerance In Coaching Medi-Cal Or Welfare Clients (Including Undocumented Immigrants). The County of San Diego in recognition of its unique geographical location and the utilization of Welfare and Medi-Cal system by foreign nationals who are not legal residents of this county or country, has adopted a Zero Tolerance policy and shall aggressively prosecute employees and Contractors who coach Medi-Cal or Welfare clients (including undocumented immigrants), to obtain services for which they are not otherwise entitled.

CSD000190

CPMG 000044

COUNTY CONTRACT NUMBER 549469
AGREEMENT WITH CORRECTIONAL PHYSICIANS MEDICAL GROUP FOR ON-SITE AND
TELEPSYCHIATRY SERVICES

As a material condition of this Agreement, Contractor agrees that the Contractor and Contractor's employees, while performing service for the County, on County property or while using County equipment shall not:

(a) in any way coach, instruct, advise, or guide any Medi-Cal or Welfare clients or prospective clients who are undocumented immigrants on ways to obtain or qualify for Medi-Cal assistance, for which they are not otherwise entitled.

(b) support or provide funds to any organization engaged directly or indirectly in advising undocumented immigrants on ways to obtain or qualify for Medi-Cal assistance, for which they are not otherwise entitled.

Contractor shall inform all employees that are performing service for the County on County property or using County equipment of County's Zero Tolerance Policy as referenced herein.

County may terminate for default or breach this Agreement and any other Agreement County has with County, if Contractor or Contractor employees are determined not to be in compliance with the conditions stated herein.

8.13 Cartwright Act. Following receipt of final payment under the Agreement, Contractor assigns to the County all rights, title and interest in and to all causes of action it may have under Section 4 of the Clayton Act (15 U.S.C. Sec. 15) or under the Cartwright act (Chapter 1) (commencing with Section 16700) of Part 2 of Division 7 of the Business and Professions Code), arising from purchases of goods, materials, or services by the Contractor for sale to the County under this Agreement.

8.14 Hazardous Materials. Contractor shall comply with all Environmental Laws and all other laws, rules, regulations, and requirements regarding Hazardous Materials, health and safety, notices, and training. Contractor agrees that it will not store any Hazardous Materials at any County Facility for periods in excess of ninety (90) days or in violation of the applicable site storage limitations imposed by Environmental Law. Contractor agrees to take, at its expense, all actions necessary to protect third parties, including, without limitation, employees and agents of the County, from any exposure to Hazardous Materials generated or utilized in its performance under this Agreement. Contractor agrees to report to the appropriate governmental agencies all discharges, releases, and spills of Hazardous Materials that are required to be reported by any Environmental Law and to immediately notify the County of it. Contractor shall not be liable to the County for the County's failure to comply with, or violation of, any Environmental Law. As used in this section, the term "Environmental Laws" means any and all federal, state or local laws or ordinances, rules, decrees, orders, regulations or court decisions (including the so-called "common law"), including, but not limited to, the Resource Conservation and Recovery Act, relating to hazardous substances, hazardous materials, hazardous waste, toxic substances, environmental conditions or other similar substances or conditions. As used in this section the term "Hazardous Materials" means any chemical, compound, material, substance or other matter that: (a) is a flammable, explosive, asbestos, radioactive nuclear medicine, vaccine, bacteria, virus, hazardous waste, toxic, overtly injurious or potentially injurious material, whether injurious or potentially injurious by itself or in combination with other materials; (b) is controlled, referred to, designated in or governed by any Environmental Laws; (c) gives rise to any reporting, notice or publication requirements under any Environmental Laws, or (d) is any other material or substance giving rise to any liability, responsibility or duty upon the County or Lessee with respect to any third person under any Environmental Laws.

8.15 Debarment And Suspension. As a sub-grantee of federal funds under this Agreement, Contractor certifies that it, its principals, its employees and its subcontractors:

8.15.1 Are not presently debarred, suspended, proposed for debarment, declared ineligible or voluntarily excluded from covered transactions by any Federal Department or agency;

8.15.2 Have not within a 3-year period preceding this Agreement been convicted of or had a civil or administrative judgment rendered against them for the commission of fraud or a criminal offense or civil action in connection with obtaining, attempting to obtain, or performing a public (Federal, State, or local) transaction; violation of Federal or State anti-trust statutes or commission of embezzlement, theft, forgery, bribery, falsification or destruction of records, making false statements, receiving stolen property; physical, financial or sexual abuse or misconduct with a patient or client, or medical negligence or malpractice;

8.15.3 Are not presently indicted or otherwise criminally, civilly or administratively charged by a government entity (Federal, State, or local) with commission of any of the offenses enumerated in the paragraph above; and

8.15.4 Have not within a 3-year period preceding this Agreement had one or more public transaction (Federal, State, or local) terminated for cause or default.

8.16 Display of Fraud Hotline Poster(s). As a material term and condition of this contract, Contractor shall:

8.16.1 Prominently display in common work areas within all business segments performing work under this contract County of San Diego Office of Ethics and Compliance Ethics Hotline posters;

CSD000191

CPMG 000045

COUNTY CONTRACT NUMBER 549469
AGREEMENT WITH CORRECTIONAL PHYSICIANS MEDICAL GROUP FOR ON-SITE AND
TELEPSYCHIATRY SERVICES

8.16.2 Posters may be downloaded from the County Office of Ethics and Compliance http://www.sdcounty.ca.gov/cao/oin.html

8.16.3 Additionally, if Contractor maintains a company website as a method of providing information to employees, the Contractor shall display an electronic version of the poster(s) at the website

8.16.4 If the Contractor has implemented a business ethics and conduct awareness program, including a reporting mechanism, the Contractor need not display the County poster;

8.16.5 In the event Contractor subcontracts any of the work performed under this contract, Contractor include this clause in the subcontract(s) and shall take appropriate steps to ensure compliance by the subcontractor(s).

8.17 False Claims Acts: Contractor and all Subcontractors shall provide information on the Federal and State Claims Acts information annually to their employees providing services under this contract. The minimum acceptable information in may be found at www.cosdcompliance.org

ARTICLE 9
CONFLICTS OF INTEREST; CONTRACTOR'S CONDUCT

9.1 Conflicts of Interest. Contractor presently has no interest, including but not limited to other projects or independent Agreements, and shall not acquire any such interest, direct or indirect, which would conflict in any manner or degree with the performance of services required to be performed under this Agreement. The Contractor shall not employ any person having any such interest in the performance of this Agreement. Contractor shall not hire County's employees to perform any portion of the work or services provided for herein including secretarial, clerical and similar incidental services except upon the written approval of County. Without such written approval, performance of services under this Agreement by associates or employees of County shall not relieve Contractor from any responsibility under this Agreement.

9.1.1 California Political Reform Act and Government Code Section 1090 Et Seq. Contractor acknowledges that the California Political Reform Act ("Act"), Government Code section 81000 et seq., provides that Contractors hired by a public agency, such as County, may be deemed to be a "public official" subject to the Act if the Contractor advises the agency on decisions or actions to be taken by the agency. The Act requires such public officials to disqualify themselves from participating in any way in such decisions if they have any one of several specified "conflicts of interest" relating to the decision. To the extent the Act applies to Contractor, Contractor shall abide by the Act. In addition, Contractor acknowledges and shall abide by the conflict of interest restrictions imposed on public officials by Government Code section 1090 et seq.

9.2 Conduct of Contractor; Confidential Information.

9.2.1 Contractor shall inform the County of all the Contractor's interests, if any, which are or which the Contractor believes to be incompatible with any interests of the County.

9.2.2 The Contractor shall not, under circumstances that might reasonably be interpreted as an attempt to influence the recipient in the conduct of his duties, accept any gratuity or special favor from individuals or organizations with whom the Contractor is doing business or proposing to do business, in accomplishing the work under this Agreement.

9.2.3 Contractor shall not use for personal gain or make other improper use of confidential information, which is acquired in connection with his employment. In this connection, the term "confidential information" includes, but is not limited to, unpublished information relating to technological and scientific development; medical, personnel, or security records of the individuals; anticipated materials requirements or pricing actions; and knowledge of selections of Contractors or subcontractors in advance of official announcement.

9.2.4 The Contractor, or employees thereof, shall not offer directly or indirectly gifts, gratuity, favors, entertainment, or other items of monetary value to an employee or official of the County.

9.2.5 Referrals. Contractor further covenants that no referrals of clients through Contractor's intake or referral process shall be made to the private practice of any person(s) employed by the Contractor.

9.3 Prohibited Agreements. As required by Section 67 of the San Diego County Administrative Code, Contractor certifies that it is not in violation of the provisions of Section 67, and that Contractor is not, and will not subcontract with, any of the following:

9.3.1. Persons employed by County or of public agencies for which the Board of Supervisors is the governing body;

CSD000192

CPMG 000046

COUNTY CONTRACT NUMBER 549469
AGREEMENT WITH CORRECTIONAL PHYSICIANS MEDICAL GROUP FOR ON-SITE AND
TELEPSYCHIATRY SERVICES

9.3.2. Profit-making firms or businesses in which employees described in sub-section 9.3.1, above, serve as officers, principals, partners, or major shareholders;

9.3.3. Persons who, within the immediately preceding twelve (12) months came within the provisions of the above sub-sections and who (1) were employed in positions of substantial responsibility in the area of service to be performed by the Agreement, or (2) participated in any way in developing the Agreement or its service specifications; and

9.3.4. Profit-making firms or businesses, in which the former employees described in sub-section 9.3.3 above, serve as officers, principals, partners, or major shareholders.

9.4 Limitation Of Future Agreements Or Grants. It is agreed by the parties to the Agreement that Contractor shall be restricted in its future Contracting with the County to the manner described below. Except as specifically provided in this clause, Contractor shall be free to compete for business on an equal basis with other companies.

9.4.1 If Contractor, under the terms of the Agreement, or through the performance of tasks pursuant to this Agreement, is required to develop specifications or statements of work and such specifications or statements of work are to be incorporated into a solicitation, Contractor shall be ineligible to perform the work described within that solicitation as a prime or subcontractor under an ensuing County Agreement. It is further agreed, however, that County will not, as additional work, unilaterally require Contractor to prepare such specifications or statements of work under this Agreement.

9.4.2 Contractor may not apply for nor accept additional payments for the same services contained in the Statement of Work.

## ARTICLE 10
## INDEMNITY AND INSURANCE

10.1 Indemnity. County shall not be liable for, and Contractor shall defend and indemnify County and the employees and agents of County (collectively "County Parties"), against any and all claims, demands, liability, judgments, awards, fines, mechanics' liens or other liens, labor disputes, losses, damages, expenses, charges or costs of any kind or character, including attorneys' fees and court costs (hereinafter collectively referred to as "Claims"), related to this Agreement or the work covered by this Agreement and arising either directly or indirectly from any act, error, omission or negligence of Contractor or its Contractors, licensees, agents, servants or employees, including, without limitation, Claims caused by the sole passive negligent act or the concurrent negligent act, error or omission, whether active or passive, of County Parties. Contractor shall have no obligation, however, to defend or indemnify County Parties from a Claim if it is determined by a court of competent jurisdiction that such Claim was caused by the sole negligence or willful misconduct of County Parties.

10.2 Insurance. Prior to execution of this Agreement, Contractor must obtain at its own cost and expense, and keep in force and effect during the term of this Agreement, including all extensions, the insurance specified in Exhibit "B," "Insurance Requirements," attached hereto.

## ARTICLE 11
## AUDIT AND INSPECTION OF RECORDS

The County shall have the audit and inspection rights described in this section.

11.1 Audit And Inspection. Contractor agrees to maintain and/or make available within San Diego County accurate books and accounting records relative to all its activities under this Agreement. Authorized Federal, State or County representatives shall have the right to monitor, assess, or evaluate Contractor's performance pursuant to this Agreement, said monitoring, assessments, or evaluations to include but not limited to audits, inspection of premises, reports, and interviews of project staff and participants.

At any time during normal business hours and as often as County may deem necessary, Contractor shall make available to County, State or Federal officials for examination all of its records with respect to all matters covered by this Agreement and will permit County, State or Federal officials to audit, examine and make excerpts or transcripts from such records, and to make audits of all invoices, materials, payrolls, records of personnel, information regarding clients receiving services, and other data relating to all matters covered by this Agreement. If an audit is conducted, it will be done in accordance with generally accepted government auditing standards as described in "Government Auditing Standards," published for the United States General Accountability Office or the Institute of Internal Auditors International Standards for the Professional Practice of Internal Auditing.

CSD000193

CPMG 000047

If any services performed hereunder are not in conformity with the specifications and requirements of this Agreement, County shall have the right to require the Contractor to perform the services in conformity with said specifications and requirements at no additional increase in total Agreement amount.  When the services to be performed are of such nature that the difference cannot be corrected, County shall have the right to (1) require Contractor immediately to take all necessary steps to ensure future performance of the services in conformity with requirements of the Agreement, and (2) reduce the Agreement price to reflect the reduced value of the services performed.  In the event Contractor fails to perform the services promptly or to take necessary steps to ensure future performance of the service in conformity with the specifications and requirements of the Agreement, County shall have the right to either (1) by Agreement or to otherwise have the services performed in conformity with the Agreement specifications and charge to Contractor any cost occasioned to County that is directly related to the performance of such services, or (2) terminate this Agreement for default as provided in the Termination clause.

11.2   External Audits. Health and Human Services (HHSA) Contractors shall advised and provide the electronic audit copies to Agency Contract Support (ACS) at ACS.HHSA@sdcounty.ca.gov.  All other contractors will provide the following to their COR:

    11.2.1   COR shall be advised of all pending audits by Federal or State representatives regarding Contracted services identified in this Agreement within seventy-two (72) or the Contractor receiving notice of the audit.

    11.2.2   Contractor shall provide COR with a copy of the draft and final State or Federal audit reports within twenty four (24) hours of receiving them.

    11.2.3   Contractor shall provide COR a copy of the contractor's response to the draft and final State or Federal audit reports at the same time as response provided to the State or Federal representatives.

    11.2.4   Contractor shall provide COR a copy of the State or Federal audit's representative's response to the contractors' response within forty-eight (48) hours of receiving it. This will continue until the State or Federal auditors have accepted and closed the audit.

11.3   Cost or Pricing Data.  If the Contractor submitted cost or pricing data in connection with the pricing of this Agreement or any change or modification thereto, unless such pricing was based on adequate price competition, established catalog or market prices of commercial items sold in substantial quantities of the general public, or prices set by law or regulation, the Contracting Officer or his representatives who are employees of the County or its agent shall have the right to examine all books, records, documents and other data of the Contractor related to the negotiation pricing or performance of such Agreement, change or modification, for the purpose of evaluating the accuracy, completeness and currency of the cost or pricing data submitted.

11.4   Availability.  The materials described above shall be made available at the office of the Contractor, at all reasonable times, for inspection, audit or reproduction, until the expiration of three (3) years from the date of final payment under this Agreement, or by section 11.4.1 and 11.4.2, below:

    11.4.1   If this Agreement is completely or partially terminated, the records relating to the work terminated shall be made available for a period of three (3) years from the date of any resulting final settlement.

    11.4.2   Record which relate to appeals under the "Disputes" clause of this Agreement, or litigation or the settlement of claims arising out of the performance of this Agreement, shall be made available until such appeals, litigation, or claims have been disposed of, or three years after Agreement completion, whichever is longer.  County shall keep the materials described above confidential unless otherwise required by law.

11.5   Subcontract.  The Contractor shall insert a clause containing all the provisions of this Article 11 in all subcontract hereunder except altered as necessary for proper identification of the Contracting parties and the Contracting officer under the County's prime Agreement.

## ARTICLE 12
## INSPECTION OF SERVICE

12.1   Subject to Inspection.  All performance (including services, materials, supplies and equipment furnished or utilized in the performance of this Agreement, and workmanship in the performance of services) shall be subject to inspection and test by the County at all times during the term of this Agreement.  Contractor shall cooperate with any inspector assigned by the County to permit the inspector to determine whether Contractor's performance conforms to the requirements of this Agreement.  County shall perform such inspection in a manner as not to unduly interfere with Contractor's performance.

12.2   Specification and Requirements.  If any services performed by Contractor do not conform to the specifications and requirements of this Agreement, County may require Contractor to re-perform the services until they conform to said specifications and requirements, at no additional cost, and County may withhold payment for such services until Contractor correctly performs them.  When the services to be performed are of such nature that Contractor's cannot correct its

CSD000194

CPMG 000048

COUNTY CONTRACT NUMBER 549469
AGREEMENT WITH CORRECTIONAL PHYSICIANS MEDICAL GROUP FOR ON-SITE AND
TELEPSYCHIATRY SERVICES

performance, the County shall have the right to (1) require the Contractor to immediately take all necessary steps to ensure future performance of services conforms to the requirements of this Agreement, and (2) reduce the Agreement price to reflect the reduced value of the services received by County. In the event Contractor fails to promptly re-perform the services or to take necessary steps to ensure that future performance of the service conforms to the specifications and requirements of this Agreement, the County shall have the right to either (1) without terminating this Agreement, have the services performed, by Agreement or otherwise, in conformance with the specifications of this Agreement, and charge Contractor, and/or withhold from payments due to Contractor, any costs incurred by County that are directly related to the performance of such services, or (2) terminate this Agreement for default.

## ARTICLE 13
### USE OF DOCUMENTS AND REPORTS

13.1 Findings Confidential. Any reports, information, data, etc., given to or prepared or assembled by Contractor under this Agreement which the County requests to be kept as confidential shall not be made available to any individual or organization by the Contractor without the prior written approval of the County.

13.2 Ownership, Publication, Reproduction And Use Of Material. All reports, studies, information, data, statistics, forms, designs, plans, procedures, systems, and any other material or properties produced under this Agreement shall be the sole and exclusive property of County. No such materials or properties produced in whole or in part under this Agreement shall be subject to private use, copyright or patent right by Contractor in the United States or in any other country without the express written consent of County. County shall have unrestricted authority to publish, disclose, distribute and otherwise use, copyright or patent, in whole or in part, any such reports, studies, data, statistics, forms or other materials or properties produced under this Agreement.

13.3 Confidentiality. County and Contractor agree to maintain the confidentiality of and take industry appropriate and legally required measures to prevent the unlawful disclosure of any information that is legally required to be kept confidential. Except as otherwise allowed by local, State or federal law or regulation and pursuant to this Section 13.3, County and Contractor agree to only disclose confidential records where the holder of the privilege, whether the County, the Contractor or a third party, provides written permission authorizing the disclosure. Contractor understands that County must disclose certain records pursuant to the California Public Records Act ("the Act"). If Contractor demands that County not disclose requested records Contractor believes qualify for exception or exemption from disclosure pursuant to the Act, County will comply with Contractor's demand if Contractor identifies those records and the applicable exception(s) or exemption(s), in writing, within five (5) business days from receipt of County's notice to Contractor of the request for disclosure of records. If Contractor does not identify the records and reason(s) that it deems some or all of the records to be confidential, County may disclose those records at its sole discretion. Contractor agrees that its defense and indemnification obligations set forth in Section 10.1 of this Agreement extend to any Claim (as defined in Section 10.1) against the County Parties (as defined in Section 10.1) for records the County withholds from disclosure at Contractor's direction. This Section 13.3 shall not prevent the County or its agents or any other governmental entity from accessing the confidential records for the purpose of audits or program reviews if that access is legally permissible under the applicable local, State or federal laws or regulations. Similarly, County or its agent or designee may take possession of the record(s) where legally authorized to do so.

County may identify, for purposes of clarification, certain laws and regulations that are specifically applicable to Contractor's work under this Agreement. Those laws and regulations may be set forth in Exhibit A   Statement of Work. County, however, is under no obligation to identify all applicable laws and regulations and assumes no liability for identifying confidentiality laws and regulations, if any, applicable to the work under this Agreement.

13.4 Maintenance Of Records. Contractor shall maintain all records and make them available within San Diego County for a minimum of three (3) years from the ending date of this Agreement unless County agrees in writing to an earlier disposition or longer where legally required or while under dispute. Contractor shall provide any requested records to County within 48-hours of the request.

13.5 Custody Of Records. County, at its option, may take custody of Contractor's client records upon Agreement termination or at such other time as County may deem necessary. County agrees that such custody will conform to applicable confidentiality provisions of State and Federal law. Said records shall be kept by County in an accessible location within San Diego County and shall be available to Contractor for examination and inspection.

13.6 Audit Requirement. Contractor shall annually engage a Licensed Certified Public Accountant to conduct an annual audit of their agency's operations. Contractors that expend $500,000 or more of federal grant funds per year shall also have an audit conducted in compliance with Government Auditing Standards, which includes Single Audit Act Amendments, Public Law 104-156, and OMB Circular A-133 and 45 CFR part 74.26. Contractors that are commercial organizations (for-profit) are required to have a non-Federal audit if, during its fiscal year, it expended a total of $500,000 or more under one

CSD000195

CPMG 000049

COUNTY CONTRACT NUMBER 549469
AGREEMENT WITH CORRECTIONAL PHYSICIANS MEDICAL GROUP FOR ON-SITE AND
TELEPSYCHIATRY SERVICES

or more HHS awards. 45 CFR part 74.26(d) incorporates the threshold and deadlines of OMB Circular A-133 but provides for-profit organizations two options regarding the type of audit that will satisfy the audit requirements. Contractor shall include a clause in any Agreement or Agreement Contractor enters into with an audit firm to provide access by the County, State, Federal Government to the working papers of the independent auditor who prepare the audit for Contractor. Contractor shall submit two (2) copies of the annual audit report, the audit performed in accordance with OMB Circular A-133, and the management letter to the County fifteen (15) days after receipt from the independent Certified Public Accountant but no later than nine (9) months after the Contractor's fiscal year end.

13.7  Reports. Contractor shall submit reports required in Exhibit A and additional reports as may be requested by the COR and agreed to by the Contractor. Format for the content of such reports may be developed by County. The timely submission of these reports is a necessary and material term and condition of this Agreement and Contractor agrees that failure to meet specified deadlines will be sufficient cause to withhold payment. Contractor shall submit to County within thirty (30) days of the termination of this Agreement a report detailing all work done pursuant to this Agreement by Contractor.

13.8  Evaluation Studies. Contractor shall participate as requested by the County in research and/or evaluative studies designed to show the effectiveness and/or efficiency of Contractor services or to provide information about Contractor's project.

ARTICLE 14
(RESERVED)

ARTICLE 15
DISPUTES

Notwithstanding any provision of this Agreement to the contrary, the Contracting Officer shall decide any dispute concerning a question of fact arising out of this Agreement that is not otherwise disposed of by the parties within a reasonable period of time. The decision of the Contracting Officer shall be final and conclusive unless determined by a court of competent jurisdiction to have been fraudulent, capricious, arbitrary or so grossly erroneous as necessarily to imply bad faith. Contractor shall proceed diligently with its performance hereunder pending resolution by the Contracting Officer of any such dispute. Nothing herein shall be construed as granting the Contracting Officer or any other administrative official, representative or board authority to decide questions of law, or issues regarding the medical necessity of treatment or to pre-empt any medical practitioners' judgment regarding the medical necessity of treatment of patients in their care. The foregoing does not change the County's ability to refuse to pay for services rendered if County disputes the medical necessity of care.

ARTICLE 16
GENERAL PROVISIONS

16.1  Assignment and Subcontracting. Contractor shall not assign any interest in this Agreement, and shall not transfer any interest in the same (whether by assignment or novation), without the prior written consent of the County; County's consent shall not be unreasonably withheld. The Contractor shall make no Agreement with any party for furnishing any of the work or services herein contained without the prior written consent of the COR, pursuant to Paragraph 1.4.

16.2  Contingency. This Agreement shall bind the County only following its approval by the Board of Supervisors or when signed by the Purchasing and Contracting Director.

16.3  Entire Agreement. This Agreement, together with all Exhibits attached hereto and other agreements expressly referred to herein, constitute the entire agreement between the parties with respect to the subject matter contained herein. All prior or contemporaneous agreements, understandings, representations, warranties and statements, oral or written, including any proposals from Contractor and requests for proposals from County, are superseded.

16.4  Sections and Exhibits. All sections and exhibits referred to herein are attached hereto and incorporated by reference.

16.5  Further Assurances. Parties agree to perform such further acts and to execute and deliver such additional documents and instruments as may be reasonably required in order to carry out the provisions of this Agreement and the intentions of the parties.

16.6  Governing Law. This Agreement shall be governed, interpreted, construed and enforced in accordance with the laws of the State of California.

16.7  Headings. The Article captions, Clause and Section headings used in this Agreement are inserted for convenience of reference only and are not intended to define, limit or affect the construction or interpretation of any term or provision hereof.

CSD000196

CPMG 000050

**COUNTY CONTRACT NUMBER 549469**
**AGREEMENT WITH CORRECTIONAL PHYSICIANS MEDICAL GROUP FOR ON-SITE AND**
**TELEPSYCHIATRY SERVICES**

16.8    Modification Waiver.  Except as otherwise provided in Article 6, "Changes," above, no modification, waiver, amendment or discharge of this Agreement shall be valid unless the same is in writing and signed by both parties.

16.9    Neither Party Considered Drafter.  Despite the possibility that one party may have prepared the initial draft of this Agreement or played the greater role in the physical preparation of subsequent drafts, neither party shall be deemed the drafter of this Agreement and that, in construing this Agreement in case of any claim that any provision hereof may be ambiguous, no such provision shall be construed in favor of one party on the ground that such provision was drafted by the other.

16.10   No Other Inducement.  The making, execution and delivery of this Agreement by the parties hereto has been induced by no representations, statements, warranties or agreements other than those expressed herein.

16.11   Notices.  Notice to either party shall be in writing and either personally delivered or sent by certified mail, postage prepaid, return receipt requested, addressed to the party to be notified at the address specified herein.  Any such notice shall be deemed received on the date of personal delivery to the party (or such party's authorized representative) or three (3) business days after deposit in the U.S. Mail or by email, as the case may be to the COR and Contractor's Representative identified on the signature page.

16.12   Severability.  If any term, provision, covenant or condition of this Agreement is held to be invalid, void or otherwise unenforceable, to any extent, by any court of competent jurisdiction, the remainder of this Agreement shall not be affected thereby, and each term, provision, covenant or condition of this Agreement shall be valid and enforceable to the fullest extent permitted by law.

16.13   Successors.  Subject to the limitations on assignment set forth in Clause 16.1 above, all terms of this Agreement shall be binding upon, inure to the benefit of, and be enforceable by the parties hereto and their respective heirs, legal representatives, successors, and assigns.

16.14   Time.  Time is of the essence of each provision of this Agreement.

16.15   Time Period Computation.  All periods of time referred to in this Agreement shall include all Saturdays, Sundays and state or national holidays, unless the period of time specifies business days, provided that if the date or last date to perform any act or give any notice or approval shall fall on a Saturday, Sunday or State or national holiday, such act or notice may be timely performed or given on the next succeeding day which is not a Saturday, Sunday or State or national holiday.

16.16   Waiver.  The waiver by one party of the performance of any term, provision, covenant or condition shall not invalidate this Agreement, nor shall it be considered as a waiver by such party of any other term, provision, covenant or condition.  Delay by any party in pursuing any remedy or in insisting upon full performance for any breach or failure of any term, provision, covenant or condition shall not prevent such party from later pursuing remedies or insisting upon full performance for the same or any similar breach or failure.

16.17   Third Party Beneficiaries Excluded.  This agreement is intended solely for the benefit of the County and its Contractor. Any benefit to any third party is incidental and does not confer on any third party to this Agreement any rights whatsoever regarding the performance of this Agreement.  Any attempt to enforce provisions of this Agreement by third parties is specifically prohibited.

16.18   Publicity Announcements and Materials.  All public announcements, including those issued on Contractor letterhead, and materials distributed to the community shall identify the County of San Diego as the funding source for Contracted programs identified in this Agreement.  Copies of publicity materials related to Contracted programs identified in this Agreement shall be filed with the COR.  County shall be advised at least twenty four (24) hours in advance of all locally generated press releases and media events regarding Contracted services identified in this Agreement. Alcohol and Drug Prevention Services Contractors shall notify COR or designee at least five (5) business days in advance of all Contractor generated media releases and media events regarding Contracted services identified in this Agreement.

16.19   Critical Incidents.  Contractor shall have written plans or protocols and provide employee training for handling critical incidents involving instances of violence or threat of violence directed toward staff or clients, breach of confidentiality, fraud, unethical conduct, or instances of staff or client drug and/or alcohol use at the program.  Contractor shall report all such incidents to the COR within one week day of their occurrence.

16.20   Responsiveness to Community Concerns.  Contractor shall notify County within forty eight (48) hours of receipt of any material complaints including but not limited to complaints referring to issues of abuse or quality of care, submitted to Contractor verbally or in writing, regarding the operation of Contractor's program or facility under this agreement.  Contractor shall take appropriate steps to acknowledge receipt of said complaint(s) from individuals or organizations.  Contractor shall take appropriate steps to utilize appropriate forums to address or resolve any such

CSD000197

CPMG 000051

COUNTY CONTRACT NUMBER 549469
AGREEMENT WITH CORRECTIONAL PHYSICIANS MEDICAL GROUP FOR ON-SITE AND
TELEPSYCHIATRY SERVICES

complaints received. Nothing in this provision shall be interpreted to preclude Contractor from engaging in any legally authorized use of its facility, property or business as approved, permitted or licensed by the applicable authority.

16.21  Criminal Background Check Requirements.  Contractor shall ensure that criminal background checks are required and completed prior to employment or placement of contractor staff and volunteers in compliance with any licensing, certification, or funding requirements, which may be higher than the minimum standard described herein. At a minimum, background checks shall be in compliance with Board of Supervisors policy C-28 and are required for any contractor staff or volunteer assigned to sensitive positions funded by this contract. Sensitive positions are those that: (1) physically supervise minors or vulnerable adults; (2) have unsupervised physical contact with minors or vulnerable adults; and/or (3) have a fiduciary responsibility to any County client, or direct access to, or control over, bank accounts or accounts with financial institutions of any client.

16.21.1  Criminal Background Check.  Contractor shall have a documented process to review criminal history of candidates for employment or volunteers under this Agreement that will be in sensitive positions as defined in paragraph 16.21.4.  At a minimum, Contractor shall check the California criminal history records, or state of residence for out-of-state candidates.  Contractor shall review the information and determine if criminal history demonstrates behavior that could create an increased risk of harm to clients. Contractor shall document review of criminal background findings and consideration of criminal history in the selection of a candidate.  (Example: Documented consideration of factors such as: If there is a conviction in the criminal history, how long ago did it occur?  What were the charges?  What was the individual convicted of and what was the level of conviction?  If selected, where would the individual work and is the conviction relevant to the position?).

16.21.2  Contractor shall either utilize a subsequent arrest notification service during employee or volunteers' tenure or perform criminal history annually.

16.21.3  Contractor shall keep the documentation of their review and consideration of the individual's criminal history on file in accordance with paragraph 13.3 "Maintenance of Records."

16.21.4  Definitions

A.  Activities of Daily Living:  The basic tasks of everyday life, such as eating, bathing, dressing, toileting, and transferring.

B.  Minor:  Individuals under the age of eighteen (18) years old.

C.  Sensitive Position:  A job with responsibilities that can be criminally abused at great harm to the contract or the clients served.  All positions that (1) physically supervise minors or vulnerable adults, (2) have unsupervised physical contact with minors or vulnerable adults, or (3) have fiduciary responsibility to a County client or direct access to, or control over client bank accounts, or serve in a financial capacity to the County client.

D.  Vulnerable Adult:  (1) Individuals age eighteen (18) years or older, who require assistance with activities of daily living and who may be put at risk of abuse during service provision; (2) Individuals age eighteen (18) years or older who have a permanent or temporary limited physical and/or mental capacity that which may put them at risk of abuse during service provision because it renders them: unable to make decisions for themselves, unable to physically defend themselves, or unaware of physical abuse or other harm that could be perpetrated against them.

E.  Volunteer:  A person who performs a service willingly and without pay.

CSD000198

CPMG 000052

COUNTY CONTRACT NUMBER 549469
AGREEMENT WITH CORRECTIONAL PHYSICIANS MEDICAL GROUP FOR ON-SITE AND
TELEPSYCHIATRY SERVICES

## SIGNATURE PAGE

**AGREEMENT TERM.** This Agreement shall be effective this 1st day of October 2014 ("Effective Date") and end on June 30th 2015 ("Initial Term") for a total Agreement period of 9 months.

**OPTION TO EXTEND.** The County's option to extend is for 4 increments of 1 year each for a total of 4 years beyond the expiration of the Initial Term, not to exceed June 30th, 2019, pursuant to Exhibit C Payment Schedule. Unless County notifies Contractor in writing, not less than thirty (30) days prior to the expiration date that they do not intend to renew the Agreement, the Agreement will be automatically renewed for another year.

Options To Extend For One To Six Additional Months At End Of Agreement. County shall also have the option to extend the term of this Agreement in one or more increments for a total of no less than one (1) and no more than six (6) calendar months at the discretion of the County Purchasing and Contracting Director. Each extension shall be effected by written notice delivered to Contractor no less than fifteen (15) calendar days prior to expiration of any Agreement term.

The rates set forth in Article 4, Exhibit C, or other pricing section of this Agreement shall apply to any option exercised pursuant to this option clause unless provision for appropriate price adjustment has been made elsewhere in this Agreement or by Agreement amendment. All payments are subject to "Availability of Funds."

**COMPENSATION:** Pursuant to Exhibit C, County agrees to pay Contractor a sum of Three Million Two Hundred and Thirty Nine Thousand Nine Hundred and Thirty One Dollars ($3,239,931) for the initial term of this Agreement Four Million Three Hundred Nineteen Thousand Nine Hundred and Eight Dollars ($4,319,908) for option periods 1 and 2 and Four Million Four Hundred Four Thousand Seven Hundred Dollars ($4,404,700) for option periods 3 and 4, for a maximum Agreement amount of Twenty Million Six Hundred Eighty Nine Thousand One Hundred Forty Seven Dollars ($20,689,147), in accordance with the method of payment stipulated in Article 4. It is understood that the parties will meet and confer on the contract price if adjustments are made to the scope of work for an extension of the term or terms. These discussions shall not obligate either party to make a requested adjustment to the scope of work or price except as otherwise set forth in this Agreement, nor shall it relieve either party of its obligations under the Agreement.

**COR.** The County has designated the following individual as the Contracting Officer's Representative ("COR")

Jose Abellar
5530 Overland Avenue, Suite 370
San Diego, CA 92123
Phone 858-974-5975, FAX 858-974-5870 and email Jose.Abellar@sdcounty.ca.gov

**CONTRACTOR'S REPRESENTATIVE.** The Contractor has designated the following individual as the Contractor's Representative.

Steven Mannis, President
3525 Del Mar Heights Road, #213
San Diego, CA 92067
Phone 619-885-3907, FAX 858-756-5198 and email SHMannis@gmail.com

IN WITNESS WHEREOF, County and Contractor have executed this Agreement effective as of the date first set forth above

COUNTY OF SAN DIEGO

By: _____
JOHN M. PELLEGRINO, Director
Department of Purchasing and Contracting

Date: 9-4-14

CORRECTIONAL PHYSICIANS MED. GROUP

By: _____
STEVEN MANNIS, President
Correctional Physicians Medical Group

Date: 9/4/14

CSD000199

CPMG 000053

**COUNTY CONTRACT NUMBER 549469**
**AGREEMENT WITH CORRECTIONAL PHYSICIANS MEDICAL GROUP FOR ON-SITE AND TELEPSYCHIATRY SERVICES**
**EXHIBIT A – STATEMENT OF WORK**

**1. BACKGROUND AND OVERVIEW**

1.1. The San Diego County Sheriff's Department has the responsibility for providing inmate psychiatric services in the Sheriff's Detention Facilities. The psychiatric services have been combined with the Sheriff's medical services to form an integrated inmate medical and mental health delivery system.

1.2. The Sheriff's Department is seeking a psychiatrist physician group that shall provide full staffing requirement for on-site psychiatric services in detention facilities for inmates in Sheriff's custody, as well as capability with Telepsychiatry services. The Sheriff's Department currently has three detention facilities that are equipped with Telepsychiatry equipment.

1.3. Contract psychiatrists shall be assigned to designated detention facilities on an on-going basis and shall perform inpatient and outpatient psychiatric services as needed.

1.4. The Contractor shall report to the Sheriff's Medical Services Administrator and/or CMO. Neither the Contractor nor the County shall supervise the staff of the other party.

**2. SCOPE**

2.1. Contractor shall, at the Contractor's own proper cost and expense, complete all work in compliance with the requirements of the County.

2.2. Contractor shall provide the following services at the designated detention facilities in accordance with all Federal and CA State Privacy and Confidentiality Laws and relevant California Code of Regulation (CCR), Title 15 requirements, including the Sheriff's Medical Services Policies and Procedures and current Sheriff's Pharmacy Formulary.

2.3. Provide up to one hundred fifty (150) hours of psychiatric services each week at the San Diego Central Jail (SDCJ).

2.4. Provide up to one hundred ten (110) hours of psychiatric services each week at the Las Colinas Detention & Reentry Facility (LCDRF).

2.5. Provide up to seventy (70) hours of psychiatric services each week at the George Bailey Detention Facility (GBDF).

2.6. Provide up to seventy (70) hours of psychiatric services each week at the Vista Detention Facility (VDF).

2.7. Provide up to sixteen (16) hours of psychiatric services each week at the East Mesa Re-Entry Facility (EMRF).

2.8. Provide Telepsychiatry services at designated facilities as may be required. Telepsychiatry services when provided shall be for inmates housed in Sheriff's designated locations that are equipped with Polycom HDX 4002 Series video teleconferencing equipment or similar equipment.

2.9. Psychiatrists performing Telepsychiatry shall be located in a Sheriff designated Sheriff's facility (hub site) which is currently at 5530 Overland Dr., Suite 370, San Diego CA 92123.

2.10. The Sheriff's Department currently has three detention facilities (GBDF/EMRF, LCDRF, VDF) that are equipped with Telepsychiatry equipment but may have more or all facilities equipped with Telepsychiatry in the future.

2.11. Telepsychiatry patient encounters shall be primarily use for follow-ups patients only. Use of Telepsychiatry for new and initial patient encounters shall be at the sole discretion of the Sheriff's CMO or his designee.

CSD000200

CPMG 000054



**COUNTY CONTRACT NUMBER 549469**
**AGREEMENT WITH CORRECTIONAL PHYSICIANS MEDICAL GROUP FOR ON-SITE AND**
**TELEPSYCHIATRY SERVICES**
**EXHIBIT A – STATEMENT OF WORK**

2.12. Estimated annualized total hours by facility:

| PSYCHIATRIC SERVICE | SDCJ | GBDF | LCDRF | VDF | EMRF | ESTIMATED ANNUALIZED # HRS |
|---|---|---|---|---|---|---|
| ESTIMATED ANNUALIZED SERVICE REQUIREMENTS | 7,800 | 3,640 | 5,720 | 3,640 | 832 | 21,632* |

*Estimated number of hours indicated above includes the aggregate total of Psych, MD, NP, and Telepsychiatry for all facilities. It denotes anticipated contract aggregate annualized total.

2.13. Above number of clinic hours are best estimates based on current anticipated maximum need of each facility, however they may increase or decrease at any time in the future as the need arise. Actual number of service hours provided by the contractor may vary (higher or lower) depending on actual need of each facility. If actual number of hours does not reach the annual estimates provided, the Sheriff is not responsible for any year-end variance.

2.14. The clinic shall be pre-scheduled in each respective facility in accordance with the each facility need and shall be integrated into the daily jail evolution and shall be established in collaboration with the deputy staff of the facility. Service schedule shall be daily including weekends and holidays as necessary.

2.15. Designated clinic schedules as outlined in Attachment No. 1 may be subject to change at the sole discretion of the Sheriff as the need of the facilities changes with adequate notice to the contractor. These facility schedule are the current requirements based on current need.

## 3. STATEMENT WORK RELATED DEFINITIONS

3.1. "Detention Facility" also known as jails.

3.2. "Inmate or Patient" herein called are persons incarcerated in the detention facilities who require services.

## 4. WORK REQUIREMENTS

4.1. Contractor shall provide psychiatric clinical services which include but not limited to initial psychiatric/medical evaluation, diagnosis, treatment, emergency medication orders, medication evaluation and prescription.

4.2. Perform psychiatric assessments on designated psychiatric inmates/patients. Psychiatric assessments shall be completed within thirty (30) minutes for first-time patients and fifteen (15) minutes for follow-up patients. This productivity standard applies for both psychiatrist and psychiatric nurse practitioners.

4.3. Identify inmate/patient who need medical evaluations on designated psychiatric inmates/patients, and obtain a medical consultation when necessary.

4.4. Clear Safety Cells within a twenty-four (24) hour period on an as needed basis. Safety Cell clearances shall be completed within 30 minutes for each patient.

4.5. Contractor will ensure the participation of psychiatrists in the assessment of inmates in the Sobering Cells as well, after inmate has been medically assessed by medical physician and has submitted a psychiatric referral.

4.6. Provide staff psychiatric training and education as needed.

CSD000201
CPMG 000055

**COUNTY CONTRACT NUMBER 549469**
**AGREEMENT WITH CORRECTIONAL PHYSICIANS MEDICAL GROUP FOR ON-SITE AND**
**TELEPSYCHIATRY SERVICES**
**EXHIBIT A – STATEMENT OF WORK**

4.7. Provide Court Reports as needed, including but not limited to California Penal Code (P.C.) 4011.6 evaluations.

4.8. Psychiatrists will not conduct Forensic Evaluations for the Court.

4.9. Provide chart checks on inmate/patients as needed. Chart checks shall be completed within five (5) minutes for each patient. Medication renewals shall be completed within five (5) minutes for each patient.

4.10. Provide inpatient services on the Psychiatric Security Units (PSU) seven (7) days per week. These services shall be completed within the designated time frames at San Diego Central Jail (SDCJ) and Las Colinas Detention & Reentry Facility (LCDRF) as determined by Sheriff's Medical Staff and the Contractor.

4.11. Required weekend coverage includes PSU coverage, safety cell clearances and outpatient clinics, medication renewals, and chart checks in accordance with the standards stated above.

4.12. All psychiatrists employed by the contractor shall participate in the Sheriff's orientation program and meet these performance standards.

4.13. All exceptions to these standards shall be subject to a quality assurance quality improvement review.

4.14. The Contractor shall be responsible for establishing an audit system to make certain of the following:

    4.14.1.    That the quality of the contractor's physicians' work meets standards outlined in the Statement of Work (SOW).

    4.14.2.    That the contractor's physicians are following the medication guidelines established jointly by the Contractor and the Sheriff's CMO.

    4.14.3.    That the results of the audit system shall be provided to the Sheriff's Chief's Medical Officer on a periodic basis, which based on need, shall be jointly determined by the Contractor and the Sheriff's CMO.

    4.14.4.    Contractor's physicians and/or staff's failure to comply with the established audit system, productivity measures, including the medication guidelines, and any other standards outlined in this SOW may, and shall be sufficient cause for removal of such physicians and/or staff.

    4.14.5.    Contractor shall ensure that any physician and/or staff removed shall be replaced so as to ensure the contractor maintains adequate number of staff to cover all service requirements. In addition, failure to meet service requirements may result in a corrective action for non-compliance in a form of cure notice which may result in contract termination under the contract termination clause. The Contractor administrator shall work with Sheriff's CMO to provide the corrective action.

4.15. The Sheriff's Department may during this contract period implement an electronic health record system for psychiatric services. Contractor and its assigned staff shall be required to enter, retrieve, or query patient information into the system. The Sheriff's Department medical services staff shall provide the necessary training required for the contractor and its physicians to utilize this electronic health record system.

4.16. The Contractor shall provide Telepsychiatry services where the psychiatrist or nurse practitioner may see patients from a remote location. This will be at the request of the Sheriff's department and a schedule established and agreed upon.

CSD000202

CPMG 000056

**COUNTY CONTRACT NUMBER 549469**
**AGREEMENT WITH CORRECTIONAL PHYSICIANS MEDICAL GROUP FOR ON-SITE AND**
**TELEPSYCHIATRY SERVICES**
**EXHIBIT A - STATEMENT OF WORK**

4.17. Contractor's physician performing Telepsychiatry is still to adhere to all Sheriff's policies, procedures, medication formulary, and productivity standards.

4.18. The contractor shall provide a physician schedule that emphasizes stability in specific providers at designated facilities. It is the expectation that any changes in the schedule will be communicated immediately to facility supervisors, Medical Services Administrator, and CMO.

5. **STAFFING**

5.1. Contractor shall provide staffing composed of psychiatrists and nurse practitioners to perform on-site and/or Telepsychiatry services for inmates in the Sheriff's detention facilities.

5.2. Contractor shall provide adequate number of qualified staffing at contractor's expense to perform required services described in the SOW and the required number of hours of services required.

5.3. Psychiatric Nurse Practitioner (NP) can be used by the contractor to see only follow-up psychiatric patients provided they are under the direct supervision of a psychiatrist as defined by the Sheriff's Medical Services Division.

5.4. Orientation training prior to commencement of any work by contractor and his staff in the jail under this contract shall be provided by the Sheriff's CMO and Sheriff's Medical Services Division training unit at no cost to the contractor.

5.5. Contractor shall provide the Sheriff a listing of its staff that will provide the necessary coverage for the services as outlined in this SOW based on the number of hours outlined in the schedule requirements (per attachment #1 of this SOW) for all the detention facilities.

5.6. The contractor shall designate a Lead Psychiatrist to perform the following duties and responsibilities:

5.6.1. Assist in the orientation and education of the contractor's psychiatrist who are working in their respective facilities on all facets of their duties and responsibilities as set forth in this SOW.

5.6.2. Perform Quality Assurance/Quality Inspections (QA/QI) on new resident's charts, as well as performing a quarterly review of charts of all assigned psychiatrists; keep the Sheriff's CMO and/or his designee apprised of QA/QI results.

5.6.3. Shall ensure that the Nurse Practitioner performing services are under the supervision of a psychiatrist as required and make assessment of work completed.

5.6.4. Shall conduct a periodic review of medication prescribed and shall advise the Sheriff's CMO of any deviation from the current Sheriff's psychotropic medication formulary.

5.6.5. Shall make every effort to monitor psychiatrists productivity/quality standards set forth in this SOW and shall advise the Sheriff's CMO.

5.7. The contractor shall designate an Administrative Manager or Scheduler to provide administrative oversight of all psychiatrists providing services under this contract including providing the Sheriff with a schedule of coverage for the physicians a week in advance of scheduled coverage.

5.8. The assigned Administrative Manager or Scheduler shall be the main coordinator for the physician's schedule and shall directly communicate any changes of submitted schedule to the appropriate Sheriff's detention facility medical staff as necessary.

CSD000203

CPMG 000057

COUNTY CONTRACT NUMBER 549469
AGREEMENT WITH CORRECTIONAL PHYSICIANS MEDICAL GROUP FOR ON-SITE AND
TELEPSYCHIATRY SERVICES
EXHIBIT A – STATEMENT OF WORK

5.9. The assigned Administrative Manager or Scheduler shall work with the Sheriff's CMO and/or his designee to address administrative and scheduling concerns or problems identified by the Sheriff medical staff.

5.10. The contractor shall provide an organizational chart of its company to include contact numbers for its assigned Lead Psychiatrist, Administrative Manager or Scheduler, Billing Representative, and Contract Representative.

6. **LICENSURE AND POSITION REQUIREMENTS**

6.1. The Contractor shall ensure that all his/her staff has current, valid unrestricted licenses and certificates to provide care within the scope of their practice described by each particular license or certificate. A valid license to practice medicine in the State of California is required for all psychiatrists.

6.2. Psychiatric Nurse Practitioners shall hold a valid California Registered Nurse license and possess a valid certificate as a Nurse Practitioner.

6.3. The contractor shall provide the COTR with copies of current licenses and/or certification before commencement of services under this contract.

7. **SERVICE LOCATIONS AND FACILITY SCHEDULES**

| Facility | Facility Name | Address |
|---|---|---|
| EMRF | East Mesa Reentry Facility | 446 Alta Road, Suite 5200, San Diego, CA 92158 |
| GBDF | George Bailey Detention Facility | 446 Alta Road, Suite 5300, San Diego, CA 92158 |
| SDCJ | San Diego Central Jail | 1173 Front St. San Diego, Ca 92101 |
| SDCWDRF (LCDRF) | Las Colinas Detention & Reentry Facility | 451 Riverview Parkway., Santee, CA 92071 |
| VDF | Vista Detention Facility | 325 South Melrose Drive Suite 200, Vista, CA 92084 |
| COC | Medical Services Administration (hub site for Telepsychiatry) | 5530 Overland Dr., Suite 370, San Diego, CA 92127 |

**For complete Facility Schedule:  SEE ATTACHMENT #1**

8. **COUNTY FURNISHED SUPPLIES, EQUIPMENT AND FACILITIES**

8.1. County shall provide all supplies, equipment, and facilities it deems necessary and/or proper for the contractor to perform and complete the services required by this contract at the detention facilities.

9. **STANDARDS FOR PRIVACY**

9.1. Confidentiality of medical records information is essential and is required under the Health Insurance Portability and Accounting Act of 1996, Public Law 104-191 (HIPAA). Contractor shall conform to the applicable provisions of HIPAA and the Health Information Technology for Economic and Clinical Health Act (HITECH) in the handling of electronic records including the reporting breaches as defined in 45 Code of Federal Regulations (CFR), 164.402 to the County.

9.2. Contractor shall obtain expressed prior written consent of the Sheriff for use of any confidential information received from the County for any purpose other than the performance of this agreement and understands that contract may be terminated for cause if unauthorized confidential information is released.

CSD000204

CPMG 000058

**COUNTY CONTRACT NUMBER 549469**
**AGREEMENT WITH CORRECTIONAL PHYSICIANS MEDICAL GROUP FOR ON-SITE AND**
**TELEPSYCHIATRY SERVICES**
**EXHIBIT A – STATEMENT OF WORK**

**10. SPECIAL REQUIREMENTS**

10.1. The Contractor, and all of his employees, including future employees hired during the term of this contract, who perform services at any County Detention Facilities will be required to undergo full background checks with favorable results before they can perform such services.

10.2. These full background checks may include a Computerized Voice Stress Analysis (CVSA) test to allow Level 1 clearance for unescorted facility access.

10.3. Contract employees are issued a Sheriff's temporary ID badge which is renewable every year. Contract employees are responsible to make sure they surrender the temporary badge at termination of their service or at the end of the contract to the Sheriff's Department.

10.4. Contractor staff that does not possess a Level I clearance shall be escorted either physically or electronically at the facility.

**11. PRICING AND INVOICING REQUIREMENTS**

11.1. All pricing shall be quoted accordingly using the attached pricing schedule in the Request for Bid (RFB). No premium for night or weekend services shall be allowed.

11.2. All prices shall be firm and fixed for the life of the contract.

11.3. Contractor shall submit monthly invoice to the County and shall include documentation of a validated sign-in and sign-out log maintained by the facility for the monthly service performed by the contractor within five days after completion of the last day of service for the month. Invoice shall be submitted to the following address:

> San Diego Sheriff's Department
> Medical Services Division (Claims Unit)
> 5530 Overland Ave., Suite 370
> San Diego, CA 92123

11.4. The County shall make payment only in arrears for services based on actual number of hours of services performed after invoice verification by the Claims Unit staff.

CSD000205

CPMG 000059



COUNTY CONTRACT NUMBER 549469
AGREEMENT WITH CORRECTIONAL PHYSICIANS MEDICAL GROUP FOR ON-SITE AND
TELEPSYCHIATRY SERVICES
EXHIBIT A – STATEMENT OF WORK

ATTACHMENT 1
CLINIC SCHEDULE BY FACILITY

**EMRF**

| | Sun | Mon | Tue | Wed | Thu | Fri | Sat |
|---|---|---|---|---|---|---|---|
| Outpatient or | None | None | None | 0800 - 1630 | None | None | None |
| Tele-psychiatry when needed | | | | | | | |

**GBDF**

| | Sun | Mon | Tue | Wed | Thu | Fri | Sat |
|---|---|---|---|---|---|---|---|
| Outpatient | 0800 - 1630 | 0800 - 1630 | 0800 - 1630 | 0800 - 1630 | 0800 - 1630 | 0800 - 1630 | 0800 - 1630 |
| Tele-psychiatry when needed | None | None | 0800 - 1200 | 0800 - 1200 | 0800 - 1200 | None | None |
| | *** Telepsych 8-12 Tue, Wed, Thu- as needed  *** Male Psych MD at least once a week (For House 5)       ***  On call Psych MD for safety cell clearances | | | | | | |

**VDF**

| | Sun | Mon | Tue | Wed | Thu | Fri | Sat |
|---|---|---|---|---|---|---|---|
| Outpatient | 0730 - 1600 | 0730 - 1600 | 0730 - 1600 | 0730 - 1600 | 0730 - 1600 | 0730 - 1600 | 0730 - 1600 |
| Tele-psychiatry when needed | 1200 - 1600 | 1700 - 2100 | None | None | None | None | 1200 - 1600 |
| Sobering, Safety Cells, and emergency evaluations included integrated in the outpatient clinic. | | | | | | | |
| No clinics on the following Holidays: Thanksgiving Day, Christmas Day, New Year's Day | | | | | | | |

**SDCJ**

| Assignment | Sun | Mon | Tue | Wed | Thu | Fri | Sat |
|---|---|---|---|---|---|---|---|
| Out-Patient | 0800 - 1630 | 1000 - 1830 | 0800 - 1630 | 0800 - 1630 | 0800 - 1630 | 0800 - 1630 | 0800 - 1630 |
| PSU | 1100 - 1300 | 0800 - 1630 | 0800 - 1630 | 0800 - 1630 | 0800 - 1630 | 0800 - 1630 | 1100 - 1300 |
| Safety Cells / Sobering Cells | 0800 - 1100 | 0800 - 1200 | 0800 - 1200 | 0800 - 1200 | 0800 - 1200 | 0800 - 1200 | 0800 - 1100 |
| Tele-Psychiatry | TBD | TBD | TBD | TBD | TBD | TBD | TBD |

**LCDRF**

| Assignment | Sun | Mon | Tue | Wed | Thu | Fri | Sat |
|---|---|---|---|---|---|---|---|
| Out-Patient | 0800 - 1630 | 0800 – 1630 | 0800 – 1630 | 0800 - 1630 | 0800 – 1630 | 0800   1630 | 0800   1630 |
| WPSU | 0800 - 1200 | 0800 - 1500 | 0800 - 1500 | 0800 - 1500 | 0800 - 1500 | 0800 - 1500 | 0800 - 1200 |
| Safety Cells / Sobering Cells | 0700-0800 | 0700-0800 | 0700-0800 | 0700-0800 | 0700-0800 | 0700-0800 | 0700-0800 |
| Tele-Psychiatry | TBD | TBD | TBD | TBD | TBD | TBD | TBD |

Notes:
- Times indicated using 24-hour clock system.
- Telepsychiatry clinics shall be pre-scheduled and To Be Determined (TBD) for each respective facility with capability (GBDF/FMRF, LCDRF, VDF) on an as needed basis primarily for follow up patients subject to mutual agreement between the Sheriff and the contractor. Tele-psychiatry if used for new and initial encounters shall be at the discretion of the Sheriff's CMO.
- Outpatient Clinics – regular psychiatric clinics held on-site in the facility.
- Inpatient Clinics (SDCJ PSU and LCDRF WPSU only are classified as Inpatient clinics) for patient held in Psych Security Units located at SDCJ and LCDRF.
- Above schedules may be subject to change as warranted by the need in each facility and shall be at the sole discretion of the Sheriff with adequate notice to the contractor.

CSD000206

CPMG 000060



**COUNTY CONTRACT NUMBER 549469**
**AGREEMENT WITH CORRECTIONAL PHYSICIANS MEDICAL GROUP FOR ON-SITE AND**
**TELEPSYCHIATRY SERVICES**
**EXHIBIT B – INSURANCE REQUIREMENTS**

Without limiting Contractor's indemnification obligations to County, Contractor shall provide at its sole expense and maintain for the duration of this contract, or as may be further required herein, insurance against claims for injuries to persons or damages to property which may arise from or in connection with the performance of the work hereunder and the results of the work by the Contractor, his agents, representatives, employees or subcontractors.

1.  **Minimum Scope of Insurance**
    Coverage shall be at least as broad as:
    A.  Commercial General Liability, Occurrence form, Insurance Services Office form CG0001.

    B.  Automobile Liability covering all owned, non-owned, hired auto Insurance Services Office form CA0001.

    C.  Workers' Compensation, as required by State of California and Employer's Liability Insurance.

    D.  Professional Liability required if Contractor Provides or engages in any type of professional services, including but not limited to medical professional, counseling services or legal services.

2.  **Minimum Limits of Insurance**
    Contractor shall maintain limits no less than:
    A.  Commercial General Liability including Premises, Operations, Products and Completed Operations, Contractual Liability, and Independent Contractors Liability: $1,000,000 per occurrence for bodily injury, personal injury and property damage. The General Aggregate limit shall be $2,000,000.

    B.  Automobile Liability: $1,000,000 each accident for bodily injury and property damage.

    C.  Employer's Liability: $1,000,000 each accident for bodily injury or disease. Coverage shall include waiver of subrogation endorsement in favor of County of San Diego.

    D.  Professional Liability: $1,000,000 per claim with an aggregate limit of not less than $2,000,000. Any self-retained limit shall not be greater than $25,000 per occurrence/event without County Risk Management approval. If policy contains one or more aggregate limits, a minimum of 50% of any such aggregate limit must remain available at all times; if over 50% of any such aggregate limit has been paid or reserved, County will require additional coverage to be purchased by Contractor to restore the required limits. This coverage shall be maintained for a minimum of two years following termination of completion of Contractor's work pursuant to the Contract.

3.  **Deductibles and Self-Insured Retentions**
    Any deductible or self-insured retention must be declared to and approved by County Risk Management. At the option of the County, either: the insurer shall reduce or eliminate such deductibles or self-insured retentions as respects the County, the members of the Board of Supervisors of the County and the officers, agents, employees and volunteers; or the Contractor shall provide a financial guarantee satisfactory to the County guaranteeing payment of losses and related investigations, claim administration, and defense expenses.

4.  **Other Insurance Provisions**
    The general liability and automobile liability policies are to contain, or be endorsed to contain the following provisions:
    A.  Additional Insured Endorsement
        Any general liability policy provided by Contractor shall contain an additional insured endorsement applying coverage to the County of San Diego, the members of the Board of Supervisors of the County and the officers, agents, employees and volunteers of the County, individually and collectively.

CSD000207

CPMG 000061

COUNTY CONTRACT NUMBER 549469
AGREEMENT WITH CORRECTIONAL PHYSICIANS MEDICAL GROUP FOR ON-SITE AND
TELEPSYCHIATRY SERVICES
EXHIBIT B – INSURANCE REQUIREMENTS

**B.** Primary Insurance Endorsement
For any claims related to this Contract, the Contractor's insurance coverage shall be primary insurance as respects the County, the members of the Board of Supervisors of the County and the officers, agents, employees and volunteers of the County, individually and collectively. Any insurance or self-insurance maintained by the County, its officers, officials, employees, or volunteers shall be excess of the Contractor's insurance and shall not contribute with it.

**C.** Notice of Cancellation
Notice of Cancellation shall be provided in accordance with policy provisions.

**D.** Severability of Interest Clause
Coverage applies separately to each insured, except with respect to the limits of liability, and that an act or omission by one of the named insureds shall not reduce or avoid coverage to the other named insureds.

**General Provisions**

**5.** **Qualifying Insurers**
All required policies of insurance shall be issued by companies which have been approved to do business in the State of California by the State Department of Insurance, and which hold a current policy holder's alphabetic and financial size category rating of not less than A-, VII according to the current Best's Key Rating guide, or a company of equal financial stability that is approved in writing by County Risk Management.

**6.** **Evidence of Insurance**
Prior to commencement of this Contract, but in no event later than the effective date of the Contract, Contractor shall furnish the County with certificates of insurance and amendatory endorsements effecting coverage required by this clause. Renewal certificates and amendatory endorsements shall be furnished to County within thirty days of the expiration of the term of any required policy. Contractor shall permit County at all reasonable times to inspect any required policies of insurance.

**7.** **Failure to Obtain or Maintain Insurance; County's Remedies**
Contractor's failure to provide insurance specified or failure to furnish certificates of insurance and amendatory endorsements or failure to make premium payments required by such insurance, shall constitute a material breach of the Contract, and County may, at its option, terminate the Contract for any such default by Contractor.

**8.** **No Limitation of Obligations**
The foregoing insurance requirements as to the types and limits of insurance coverage to be maintained by Contractor, and any approval of said insurance by the County are not intended to and shall not in any manner limit or qualify the liabilities and obligations otherwise assumed by Contractor pursuant to the Contract, including, but not limited to, the provisions concerning indemnification.

**9.** **Review of Coverage**
County retains the right at any time to review the coverage, form and amount of insurance required herein and may require Contractor to obtain insurance reasonably sufficient in coverage, form and amount to provide adequate protection against the kind and extent of risk which exists at the time a change in insurance is required.

**10.** **Self-Insurance**
Contractor may, with the prior written consent of County Risk Management, fulfill some or all of the insurance requirements contained in this Contract under a plan of self-insurance. Contractor shall only be permitted to utilize such self-insurance if in the opinion of County Risk Management, Contractor's (i) net worth, and (ii) reserves for payment of claims of liability against Contractor, are sufficient to adequately compensate for the lack of other insurance coverage required by this Contract. Contractor's utilization of self-insurance shall not in any way limit liabilities assumed by Contractor under the Contract.

CSD000208

CPMG 000062

COUNTY CONTRACT NUMBER 549469
AGREEMENT WITH CORRECTIONAL PHYSICIANS MEDICAL GROUP FOR ON-SITE AND
TELEPSYCHIATRY SERVICES
EXHIBIT B – INSURANCE REQUIREMENTS

**11. Claims Made Coverage**

If coverage is written on a "claims made" basis, the Certificate of Insurance shall clearly so state. In addition to the coverage requirements specified above, such policy shall provide that:

A. The policy retroactive date coincides with or precedes Contractor's commencement of work under the Contract (including subsequent policies purchased as renewals or replacements).

B. Contractor will make every effort to maintain similar insurance during the required extended period of coverage following expiration of the Contact, including the requirement of adding all additional insured's.

C. If insurance is terminated for any reason, Contractor shall purchase an extended reporting provision of at least two years to report claims arising in connection with the Contract.

D. The policy allows for reporting of circumstances or incidents that might give rise to future claims.

**12. Subcontractors' Insurance**

Contractor shall require that any and all Subcontractors hired by Contractor are insured in accordance with this Contract. If any Subcontractors coverage does not comply with the foregoing provisions, Contractor shall defend and indemnify the County from any damage, loss, cost or expense, including attorney fees, incurred by County as a result of Subcontractors failure to maintain required coverage.

**13. Waiver of Subrogation**

Contractor and County release each other, and their respective authorized representatives, from any Claims (as defined in the Article entitled "Indemnity" of the Contract), but only to the extent that the proceeds received from any policy of insurance carried by County or Contractor, other than any self-insurance, covers any such Claim or damage. Included in any policy or policies of insurance provided by Contractor hereunder shall be a standard waiver of rights of Subrogation against County by the insurance company issuing said policy or policies.

CSD000209

CPMG 000063

COUNTY CONTRACT NUMBER 549469
AGREEMENT WITH CORRECTIONAL PHYSICIANS MEDICAL GROUP FOR ON-SITE AND
TELEPSYCHIATRY SERVICES
EXHIBIT C – PRICING SCHEDULE

| Item | Estimated Quantity | UOM | Description | INITIAL PERIOD 10-1-14 TO 6-30-15 | |
|---|---|---|---|---|---|
| | | | | Unit Price | Extended Price |
| 1 | 10,599 | HOUR | PSYCHIATRIST, ON-SITE | $219 | 2,321,181 |
| 2 | 3,750 | HOUR | PSYCHIATRIST, TELEPSYCHIATRY | $185 | 693,750 |
| 3 | 1,875 | HOUR | NURSE PRACTITIONER, ON-SITE OR TELEPSYCHIATRY | $120 | 225,000 |
| TOTAL | 16,224 | | | | $   3,239,931 |

| Item | Estimated Quantity | UOM | Description | 1ST OPTION PERIOD 7-1-15 TO 6-30-16 | |
|---|---|---|---|---|---|
| | | | | Unit Price | Extended Price |
| 1 | 14,132 | HOUR | PSYCHIATRIST, ON-SITE | $219 | 3,094,908 |
| 2 | 5,000 | HOUR | PSYCHIATRIST, TELEPSYCHIATRY | $185 | 925,000 |
| 3 | 2,500 | HOUR | NURSE PRACTITIONER, ON-SITE OR TELEPSYCHIATRY | $120 | 300,000 |
| TOTAL | 21,632 | | | | $   4,319,908 |

| Item | Estimated Quantity | UOM | Description | 2ND OPTION PERIOD 7-1-16 TO 6-30-17 | |
|---|---|---|---|---|---|
| | | | | Unit Price | Extended Price |
| 1 | 14,132 | HOUR | PSYCHIATRIST, ON-SITE | $219 | 3,094,908 |
| 2 | 5,000 | HOUR | PSYCHIATRIST, TELEPSYCHIATRY | $185 | 925,000 |
| 3 | 2,500 | HOUR | NURSE PRACTITIONER, ON-SITE OR TELEPSYCHIATRY | $120 | 300,000 |
| TOTAL | 21,632 | | | | $   4,319,908 |

| Item | Estimated Quantity | UOM | Description | 3RD OPTION PERIOD 7-1-17 TO 6-30-18 | |
|---|---|---|---|---|---|
| | | | | Unit Price | Extended Price |
| 1 | 14,132 | HOUR | PSYCHIATRIST, ON-SITE | $225 | 3,179,700 |
| 2 | 5,000 | HOUR | PSYCHIATRIST, TELEPSYCHIATRY | $185 | 925,000 |
| 3 | 2,500 | HOUR | NURSE PRACTITIONER, ON-SITE OR TELEPSYCHIATRY | $120 | 300,000 |
| TOTAL | 21,632 | | | | $   4,404,700 |

| Item | Estimated Quantity | UOM | Description | 4TH OPTION PERIOD 7-1-18 TO 6-30-19 | |
|---|---|---|---|---|---|
| | | | | Unit Price | Extended Price |
| 1 | 14,132 | HOUR | PSYCHIATRIST, ON-SITE | $225 | 3,179,700 |
| 2 | 5,000 | HOUR | PSYCHIATRIST, TELEPSYCHIATRY | $185 | 925,000 |
| 3 | 2,500 | HOUR | NURSE PRACTITIONER, ON-SITE OR TELEPSYCHIATRY | $120 | 300,000 |
| TOTAL | 21,632 | | | | $   4,404,700 |

| TOTAL OF ALL YEARS (BASIS OF CONTRACT AWARD) | $   20,689,147 |
|---|---|

CSD000210

CPMG 000064

# **<u>Exhibit B</u>**

IN THE UNITED STATES DISTRICT COURT FOR

THE SOUTHERN DISTRICT OF CALIFORNIA

MICHELLE MORIARTY, an individual, as Successor in Interest to the ESTATE OF HERON MORIARTY and as GUARDIAN AD LITEM to ALEXANDRIA MORIARTY, ELIJAH MORIARTY, and ETERNITY MORIARTY,

                 Plaintiff,

v.

COUNTY OF SAN DIEGO, and DOES 1 through 10, Inclusive,

                 Defendants.

Case No.: 3:17-cv-01154-LAB-AGS

**PRETRIAL CONFERENCE ORDER**

Pre-Trial Conf. Date: **January 21, 2019**
Time:   **12:00 p.m.**
Dept:   **Courtroom 14A**
Judge:  **Hon. Larry A. Burns**

Pursuant to Rule 16 of the Federal Rules of Civil Procedure, Civil Local Rule 16, and this Court's Standing Order in Civil Cases.  **IT IS SO ORDERED:**

## I.

## STATEMENT OF THE CASE

On the night of May 31, 2016, Heron Moriarty, age 43, committed suicide while he was an inmate in the Vista jail.  The case is brought by the Plaintiffs: Mr. Moriarty's wife Michelle and their three children Alexandria, Elijah and Eternity. Mr. Moriarty's Estate is also a Plaintiff in this matter. Plaintiffs contend Mr. Moriarty's suicide was foreseeable and preventable. They seek monetary damages for his death.

Plaintiffs allege that the following defendants failed to take appropriate steps to prevent Mr. Moriarty from committing suicide:

County of San Diego – the owner of the County jail system;

Dale Weidenthaler – a sergeant in the jail;

Ralph Lissaur, M.D. – a psychiatrist that contracted with CPMG to provide psychiatric services on the weekend and who evaluated Moriarty at the jail twice, on May 28, 2016 and May 30, 2016; and

Amanda Daniels – a CPMG mental health nurse practitioner (herein "NP") who evaluated Moriarty at the jail on May 31, 2016, the day Mr. Moriarty committed suicide;

CPMG – the private entity that contracted with the county to provide psychiatric services for inmates at the jail. CPMG is the employer of NP Daniels and Dr. Lissaur.

The Parties agree to the following facts:

1.      Moriarty was 44 years old. He was married to his wife Michelle. They had three children, Alexandria, Elijah, and Eternity.

2.      In the weeks leading up to his death, Moriarty began to exhibit signs of mental illness and had two psychiatric hospitalizations. During the first

2

hospitalization, he was placed on a "5150" hold for three days. 5150 is a section of the California Welfare and Institutions Code that provides adults who are considered a "danger to themselves or others, or who are gravely disabled" may be placed on an involuntary hold for up to 72-hours.  During the second hospitalization, on May 1, 2016, he was put on a 14-day hold. During these episodes, Moriarty was acting bizarre and manic. He made threats to harm himself and others.

3.     On the evening of May 25, 2016, San Diego Sheriff Deputies were dispatched to an address in Jamul in response to a report of vandalism, which they learned had been committed by Moriarty; he reportedly threw a chair through his brother's patio door and drove away. A short while later, the deputies were sent to another address two miles away, in response to a report of a man threatening suicide. En route to that call, they heard a call requesting assistance; a man had crashed into several parked cars and was standing in the street, attempting to get hit by passing cars. When Deputies arrived and compared descriptions of the suspects, they realized Moriarty was involved in all three incidents. While on scene, Moriarty made several remarks suggesting he would provoke the Deputies to shoot him. Moriarty was arrested for vandalism.

4.     Following his arrest, Moriarty was transported to the Rancho San Diego holding station. While at the holding station, Moriarty made more remarks about provoking the Deputies to kill him, and violently kicked his cell door. The Deputies realized Moriarty was having a mental breakdown, put him in restraints, and transferred him to Central Jail. Because of the County's temporary policy then in place (known as the Pilot Program), the Deputies did not take Moriarty for psychological clearance before transporting him to Central jail.

5.     At Central Jail, Moriarty was asked if he was suicidal. He answered "no," then "yes." The sergeant on duty refused to accept him, because the Central Jail did not have a safety cell available. The sergeant confirmed that a safety cell

3

was available at Vista Detention Facility (herein "VDF"), and told a VDF sergeant that Moriarty was en route to VDF. A "safety cell" is a secured cell meant to prevent an inmate from harming himself or others but not meant for long-term confinement.

6.      The Deputies transported Moriarty to VDF. Because of the policy then in place, he was not taken for psychological evaluation and clearance before being transferred to VDF.

7.      On the early hours of May 26, 2016, when the two initial Deputies arrived at VDF, they were contacted by a VDF intake deputy. As soon as they arrived to VDF, the arresting Deputy told the VDF intake deputy about Moriarty's admission to feeling suicidal. The VDF intake deputy did not relay that information to the medical staff. The medical intake nurse denies being informed Moriarty was suicidal or in need of a safety cell. Moriarty was sent through the routine booking process.

8.      Later that day, Moriarty was going to be transferred back to Central Jail.  Before the transfer, Moriarty made bizarre and threatening comments to other inmates.  A decision was made to keep Moriarty at VDF and he was placed in an administrative-segregation cell ("ad-seg"), which is a single occupant cell for assaultive/homicidal inmates.

9.      On Saturday, May 28, 2016, Mr. Moriarty was evaluated by CPMG psychiatrist Ralph Lissaur, M.D. His assessment was that Moriarty was not suicidal. Dr. Lissaur determined Moriarty was bipolar, and was currently exhibiting manic behavior with psychotic features.

10.     Dr. Lissaur evaluated Moriarty again on May 30, 2016.  As he had previously, Dr. Lissaur determined that Heron Moriarty was experiencing a bipolar/manic episode.  Dr. Lissaur recommended that if Moriarty were to be released the next day, he should be taken to a hospital and placed on an involuntary

4

psychiatric 72-hour hold for evaluation, which is commonly called a "5150 hold." Moriarty returned to the ad-seg cell after this evaluation with Dr. Lissaur.

11.     During Moriarty's detainment at VDF, his wife, Michelle, called VDF 31 times out of concern for her husband. The Parties do not agree whether Michelle advised jail personnel that Moriarty was suicidal. Due in part to Michelle's continued concern, VDF officials asked NP Daniels to evaluate Moriarty on the morning of May 31, 2016, so that she could present her findings to the Multi-Disciplinary Group meeting, which took place later that morning at 10:00 a.m. The Multi-Disciplinary Group meeting is a designated meeting to discuss select inmates' medical, psychiatric, and housing needs.  Present at the meeting were NP Daniels, Captain Schroeder, Lt. Mitchell, Dr. Goldstein, and Arnold Fajayan.

12.     NP Daniels did not believe Moriarty was suicidal, but she did determine that Moriarty was psychotic and homicidal because he threatened to kill anyone who came into his cell to try to move him to a psychiatric hospital.  NP Daniels recommended that Mr. Moriarty be placed in a Safety Cell.

13.     Sgt. Weidenthaler was told that NP Daniels recommended Moriarty be placed in a safety cell because he was homicidal.  Sgt. Weidenthaler denied the recommendation.

14.     At one point that day, Sgt. Weidenthaler told nursing staff it was his "Friday" and he was planning to leave early.  The Parties disagree as to the timing of Sgt. Weidenthlaer's comment.

15.     Four days prior, on May 27, 2016, Sgt. Weidenthlaer was briefed by Sgt. Hightower and Sgt. McNeely regarding certain events surrounding Moriarty's intake.

16.     Approximately an hour and half after Nurse Daniels' evaluation on May 31, 2016, Moriarty's treatment was discussed in a multi-disciplinary group meeting.  The Parties disagree whether NP Daniels' recommendation and Weidenthlaer's denial was discussed during the meeting. NP Daniels does not recall

5

whether or not she told the MDG participants about her safety cell recommendation and Weidenthaler's denial. NP Daniels believed that the other committee members knew her recommendation had been overruled and that the MDG was merely considering alternatives. Plaintiffs contend other participants in the meeting testified NP Daniels did not relay that information.  Placement of Moriarty in the "Psychiatric Stabilization Unit" ("PSU") was discussed during the multi-disciplinary group meeting.  Ultimately, because Moriarty promised to take prescribed medication, a decision was made to keep Moriarty in ad-seg.

17.    During the meeting, NP Daniels recommended keeping Mr. Moriarty at VDF instead of transferring him to the downtown San Diego "Psychiatric Stabilization Unit" since Moriarty was now agreeing to take the medication prescribed by the psychiatrist.  The decision was made by the MDG to keep Moriarty in ad-seg.

18.    About 12 hours later, Moriarty was found dead in his cell from an apparent suicide.

## EXPLANATION OF CLAIMS

Specifically, Plaintiffs claim that Dr. Lissaur was objectively indifferent when he failed to recognize Moriarty's suicidal ideations and warning signs; and thereby denied Moriarty adequate medical care. By causing Moriarty's suicide, Plaintiffs claim Dr. Lissaur deprived them of a familial relationship. Based on these same facts, Plaintiffs allege Dr. Lissaur was also negligent. CPMG is being sued vicariously, for contracting with Dr. Lissaur for his services. Dr. Lissaur claims that in his professional judgment, Moriarty was experiencing a bipolar/manic episode but was not suicidal.  Dr. Lissaur evaluated Moriarty as being potentially homicidal but not suicidal, and asserts he did not act with deliberate indifference to a substantial risk Moriarty was suicidal.   Dr. Lissaur also maintains he complied with the standard of care.  He further asserts that the intervening and superseding

/ / /

6

1    acts of Nurse Daniels, Sgt. Weidenthaler, and the MDG meeting on the day after

2    Dr. Lissaur's last evaluation of Moriarty break the chain of proximate cause. .

3        Plaintiffs claim that Nurse Daniels failed to recognize Moriarty's suicidal

4    ideations and warning signs; and failed to present an accurate clinical presentation

5    to the MDG officials. Nurse Daniels also failed to advocate for her patient by not

6    sending Moriarty to the Psychiatric Stabilization Unit.  CPMG is being sued

7    vicariously, as the employer of Nurse Daniels. CPMG and Nurse Daniels claim that

8    they complied with the standard of care and did not cause or contribute to the

9    suicide.

10       Plaintiffs claim that Sgt. Weidenthaler improperly rejected Nurse Daniels'

11    recommendation to transfer Heron Moriarty to a safety cell because it was his

12    "Friday" and he planned to leave early.  Sgt. Weidenthaler claims that he is immune

13    from liability, complied with the standard of care, and did not cause the suicide.

14       Lastly, Plaintiff alleges the County of San Diego is responsible for Mr.

15    Moriarty's death because it maintained an inadequate suicide prevention policy and

16    training program. Plaintiff also alleges the Pilot Program policy which directed

17    Deputies not to take suicidal inmates to CMH for psychiatric clearance prior to

18    being booked in jail, also caused Moriarty's suicide.

19                   **II.**

20         **<u>SUMMARY OF CLAIMS, DAMAGES AND DEFENSES</u>**

21    **<u>First Claim – Section 1983 Objective Indifference Against Dr. Lissaur –</u>**

22    <u>Brought by Michelle Moriarty as Successor in Interest to Mr. Moriarty:</u>

23    <u>Elements:</u>

24       1.      Defendant made an intentional decision regarding the denial of needed

25              medical care;

26       2.      The denial of needed medical care put Mr. Moriarty at a substantial

27              risk of suffering serious harm;

28    / / /

<div align="center">7</div>

3.   Defendant did not take reasonable available measures to abate or reduce the risk of serious harm, even though a reasonable provider under the circumstances would have understood the high degree or risk involved – making the consequences of Defendant's conduct obvious; and

4.   By not taking such measures Defendant caused Mr. Moriarty's injuries.

With respect to the third element, Defendant's conduct must be objectively unreasonable.

See Ninth Circuit Manuel of Model Civil Jury Instructions, Civil Rights Actions section 9.30 (2019).

Damages:

On behalf of Mr. Moriarty, his Successor in Interest is entitled to recover compensatory and punitive damages. Compensatory damages in this case includes lost wages, physical pain and suffering, and emotional pain and suffering. Under federal law, Mr. Moriarty's Successor in Interest is also entitled to pre-death pain and suffering as well as loss of life damages. *Chaudhry v. City of Los Angeles*, 751 F.3d 1096, 1003 (9th Cir. 2014).  Further, upon prevailing at trial, the Civil Rights Attorney's Fee Award Act of 1976, 42 U.S.C. section 1988, allows a court, in its discretion, to award reasonable attorneys' fees as part of costs to a prevailing party in federal civil rights lawsuits, including cases brought under 42 U.S.C. section 1983.

Defendant's Defenses:

Defendant Dr. Lissaur did not make an intentional decision regarding the denial of needed medical care.  The Court's prior orders (Dkt. Nos. 87 and 123) are the law of the case with binding effect on the remaining triable issues and Plaintiffs cannot sustain their burden to satisfy any of the elements of this claim.  Moreover, Plaintiffs cannot demonstrate any actions of Defendant Dr. Lissaur proximately

8

caused Moriarty's death as there were superseding intervening causes.

**<u>Second Claim – Section 1983 Policy/Custom Relating to Inadequate Suicide Prevention Program Against the County –</u>** <u>Brought by Michelle Moriarty as Successor in Interest to Mr. Moriarty:</u>

<u>Elements:</u>

    1.    The County's employees acted under color of law;

    2.    The acts of the County's employees deprived Mr. Moriarty of his particular rights under the United States Constitution as explained in later instructions;

    3.    The County's employees acted pursuant to the County's longstanding policy or custom; and

    4.    The County's inadequate suicide prevention program caused the deprivation of Mr. Moriarty's rights; that is, the County's inadequate suicide prevention policy is so closely related to the deprivation of the Mr. Moriarty's rights as to be the moving force that caused his ultimate injury.

See Ninth Circuit Manuel of Model Civil Jury Instructions, Civil Rights Actions section 9.5 (2019).

<u>Damages:</u>

On behalf of Mr. Moriarty, his Successor in Interest is entitled to recover compensatory damages. Compensatory damages in this case includes lost wages, loss of future job opportunities, physical pain and suffering, and emotional pain and suffering. Under federal law, Mr. Moriarty's Successor in Interest is also entitled to pre-death pain and suffering as well as loss of life damages. *Chaudhry v. City of Los Angeles*, 751 F.3d 1096, 1003 (9th Cir. 2014). Further, upon prevailing at trial, the Civil Rights Attorney's Fee Award Act of 1976, 42 U.S.C. section 1988, allows a court, in its discretion, to award reasonable attorneys' fees as part of costs to a

/ / /

9

prevailing party in federal civil rights lawsuits, including cases brought under 42 U.S.C. section 1983.

Defendant's Defenses:

The COUNTY and/or Defendant Weidenthaler intend to raise the following affirmative defenses:

1.    Qualified immunity;

2.    Contributory fault of other parties and non-parties;

3.    Comparative fault of decedent, Heron Moriarty;

4.    Immunity from liability for any state law wrongful death or negligence claims pursuant to Government Code section 855.6

5.    Immunity from liability for any state law wrongful death or negligence claims

6.    Immunity from liability for any state law wrongful death or negligence claims pursuant to Government Code section 820.2

7.    Immunity from liability for any state law wrongful death or negligence claims pursuant to Government Code section 845.6

8.    Immunity from liability for any state law wrongful death or negligence claims pursuant to Government Code section 856.4 pursuant to Government Code section 855.8

9.    "Pursuant to Rule 16 of the Federal Rules of Civil Procedure, at any pretrial conference, the court may take the appropriate action to eliminate frivolous claims or defenses and otherwise consider the appropriateness of summary adjudication under Rule 56.  Fed. R. Civ. P. 16(c)(2)(A), (E), (L), (N) and (P). Applicable local rules also authorize the court to consider all matters referred to in Rule 16 and other "matters which may be presented concerning parties, process, pleading or proof with a view to simplifying issues and bringing about a just, speedy and inexpensive determination of the matter."  Local Rule 16.1(f)(5)(a) and (c).  As such, the County will request a briefing schedule to address those issues; in

10

particular, the viability of plaintiffs' claims against the County given that there are no longer any surviving constitutional claims against any of the individual defendants employed by the County."

**Third Claim – Section 1983 Policy/Custom Relating to the Pilot Program Against the County–** Brought by Michelle Moriarty as Successor in Interest to Mr. Moriarty:

Elements:

    1.    The County's employees acted under color of law;

    2.    The acts of the County's employees deprived Mr. Moriarty of his particular rights under the United States Constitution as explained in later instructions;

    3.    The County's employees acted pursuant to the County's longstanding policy or custom; and

    4.    The County's Pilot Program caused the deprivation of Mr. Moriarty's rights; that is, the County's Pilot Program is so closely related to the deprivation of the Mr. Moriarty's rights as to be the moving force that caused his ultimate injury.

See Ninth Circuit Manuel of Model Civil Jury Instructions, Civil Rights Actions section 9.5 (2019).

Damages:

    On behalf of Mr. Moriarty, his Successor in Interest is entitled to recover compensatory damages. Compensatory damages in this case includes lost wages, loss of future job opportunities, physical pain and suffering, and emotional pain and suffering. Under federal law, Mr. Moriarty's Successor in Interest is also entitled to pre-death pain and suffering as well as loss of life damages. *Chaudhry v. City of Los Angeles*, 751 F.3d 1096, 1003 (9th Cir. 2014).  Further, upon prevailing at trial, the Civil Rights Attorney's Fee Award Act of 1976, 42 U.S.C. section 1988, allows a court, in its discretion, to award reasonable attorneys' fees as part of costs to a

prevailing party in federal civil rights lawsuits, including cases brought under 42 U.S.C. section 1983.

<u>Defendant's Defenses:</u>

The COUNTY and/or Defendant Weidenthaler intend to raise the following affirmative defenses:

1.      Qualified immunity;

2.      Contributory fault of other parties and non-parties;

3.      Comparative fault of decedent, Heron Moriarty;

4.      Immunity from liability for any state law wrongful death or negligence claims pursuant to Government Code section 855.6

5.      Immunity from liability for any state law wrongful death or negligence claims

6.      Immunity from liability for any state law wrongful death or negligence claims pursuant to Government Code section 820.2

7.      Immunity from liability for any state law wrongful death or negligence claims pursuant to Government Code section 845.6

8.      Immunity from liability for any state law wrongful death or negligence claims pursuant to Government Code section 856.4 pursuant to Government Code section 855.8

9.      "Pursuant to Rule 16 of the Federal Rules of Civil Procedure, at any pretrial conference, the court may take the appropriate action to eliminate frivolous claims or defenses and otherwise consider the appropriateness of summary adjudication under Rule 56.  Fed. R. Civ. P. 16(c)(2)(A), (E), (L), (N) and (P). Applicable local rules also authorize the court to consider all matters referred to in Rule 16 and other "matters which may be presented concerning parties, process, pleading or proof with a view to simplifying issues and bringing about a just, speedy and inexpensive determination of the matter."  Local Rule 16.1(f)(5)(a) and (c).  As such, the County will request a briefing schedule to address those issues; in

12

particular, the viability of plaintiffs' claims against the County given that there are no longer any surviving constitutional claims against any of the individual defendants employed by the County."

**Fourth Claim – Section 1983 Failure to Train on Suicide Prevention Against the County–** Brought by Michelle Moriarty as Successor in Interest to Mr. Moriarty:

Elements:

1.   The failure to act by the County's employees deprived Mr. Moriarty of his particular rights under the United States Constitution as explained in later instructions;

2.   The County's employees acted under the color of state law;

3.   The County's training policies were not adequate to train its jail staff to handle the usual and recurring situations with which they must deal;

4.   The County was deliberately indifferent to the known or obvious consequences of its failure to train its jail staff adequately; and

5.   The failure of the County to provide adequate training caused the depravation of Mr. Moriarty's rights by the County's employees; that is, the County's failure to train is so closely related to the depravation of Mr. Moriarty's rights as to be the moving force that caused the ultimate injury.

See Ninth Circuit Manuel of Model Civil Jury Instructions, Civil Rights Actions section 9.8 (2017).

Damages:

On behalf of Mr. Moriarty, his Successor in Interest is entitled to recover compensatory damages. Compensatory damages in this case includes lost wages, loss of future job opportunities, physical pain and suffering, and emotional pain and suffering. Under federal law, Mr. Moriarty's Successor in Interest is also entitled to pre-death pain and suffering as well as loss of life damages. *Chaudhry v. City of*

13

*Los Angeles*, 751 F.3d 1096, 1003 (9th Cir. 2014).  Further, upon prevailing at trial, the Civil Rights Attorney's Fee Award Act of 1976, 42 U.S.C. section 1988, allows a court, in its discretion, to award reasonable attorneys' fees as part of costs to a prevailing party in federal civil rights lawsuits, including cases brought under 42 U.S.C. section 1983.

<u>Defendant's Defenses:</u>

The COUNTY and/or Defendant Weidenthaler intend to raise the following affirmative defenses:

1.      Qualified immunity;

2.      Contributory fault of other parties and non-parties;

3.      Comparative fault of decedent, Heron Moriarty;

4.      Immunity from liability for any state law wrongful death or negligence claims pursuant to Government Code section 855.6

5.      Immunity from liability for any state law wrongful death or negligence claims

6.      Immunity from liability for any state law wrongful death or negligence claims pursuant to Government Code section 820.2

7.      Immunity from liability for any state law wrongful death or negligence claims pursuant to Government Code section 845.6

8.      Immunity from liability for any state law wrongful death or negligence claims pursuant to Government Code section 856.4 pursuant to Government Code section 855.8

9.      "Pursuant to Rule 16 of the Federal Rules of Civil Procedure, at any pretrial conference, the court may take the appropriate action to eliminate frivolous claims or defenses and otherwise consider the appropriateness of summary adjudication under Rule 56.  Fed. R. Civ. P. 16(c)(2)(A), (E), (L), (N) and (P). Applicable local rules also authorize the court to consider all matters referred to in Rule 16 and other "matters which may be presented concerning parties, process,

14

pleading or proof with a view to simplifying issues and bringing about a just, speedy and inexpensive determination of the matter."  Local Rule 16.1(f)(5)(a) and (c).  As such, the County will request a briefing schedule to address those issues; in particular, the viability of plaintiffs' claims against the County given that there are no longer any surviving constitutional claims against any of the individual defendants employed by the County."

**Fifth Claim – Depravation of Familial Relationship Against Defendant Lissaur–** Brought by Michelle Moriarty as Successor in Interest to Mr. Moriarty:

"Parents and children may assert Fourteenth Amendment substantive due process claims if they are deprived of their liberty interest in the companionship and society of their child or parent through official conduct. Only official conduct that shocks the conscience is cognizable as a due process violation.  Just as the deliberate indifference of prison officials to the medical needs of prisoners may support Eighth Amendment liability, such indifference may also rise to the conscience-shocking level required for a substantive due process violation.  A prison official's deliberately indifferent conduct will generally shock the conscience so as long as the prison official had time to deliberate before acting or failing to act in a deliberately indifferent manner." *Lemire v. Cal. Dep't of Corr. & Rehab.*, 726 F.3d 1062, 1068 (9th Cir. 2013)

See Ninth Circuit Manuel of Model Civil Jury Instructions, Civil Rights Actions section 9.32 (2019).

Damages:

On behalf of Mr. Moriarty, his Successor in Interest is entitled to recover compensatory and punitive damages. Compensatory damages in this case includes lost wages, physical pain and suffering, and emotional pain and suffering. Under federal law, Mr. Moriarty's Successor in Interest is also entitled to pre-death pain and suffering as well as loss of life damages. *Chaudhry v. City of Los Angeles*, 751 F.3d 1096, 1003 (9th Cir. 2014).  Further, upon prevailing at trial, the Civil Rights

15

Attorney's Fee Award Act of 1976, 42 U.S.C. section 1988, allows a court, in its discretion, to award reasonable attorneys' fees as part of costs to a prevailing party in federal civil rights lawsuits, including cases brought under 42 U.S.C. section 1983.

Defendant's Defenses:

Defendant Lissaur did not make an intentional decision regarding the denial of needed medical care.  The Court's prior orders (Dkt. Nos. 87 and 123) are the law of the case with binding effect on the remaining triable issues and Plaintiffs cannot sustain their burden to satisfy any of the elements of this claim.  Moreover, Plaintiffs cannot demonstrate any actions of Defendant Lissaur proximately caused Moriarty's death as there were superseding intervening causes.

**Sixth Claim – Negligence Against Defendant Weidenthaler, Daniels, Lissaur and CPMG –** Brought by Michelle Moriarty as Successor in Interest to Mr. Moriarty:

Elements:

    1.    That Defendants were negligent;

    2.    That Mr. Moriarty was harmed; and

    3.    That Defendants' negligence was a substantial factor in causing Mr. Moriarty's harm.

See CACI No. 400. (2017)

Damages:

On behalf of Mr. Moriarty, his Successor in Interest is entitled to recover the financial loss or damage that the decedent sustained or incurred before death, as well as punitive damages. (§ 377.34)

Defendants' Defenses:

Defendants Weidenthaler, Dr. Lissaur and Daniels did not owe any legal duties to plaintiffs Michelle, Alexandria, Elijah, and Eternity Moriarty under State Law.  Said Plaintiffs do not have any standing to recover general, compensatory or

16

punitive damages for alleged harm caused to them.  The Sixth Cause of Action is plead as a claim for "ordinary negligence" under the survival statute. (California *Code of Civil Procedure, §377.30 et seq*).  The damages recoverable by the estate are limited to "the loss or damage that the decedent sustained or incurred before death, including any penalties or punitive or exemplary damages that the decedent would have been entitled to recover had the decedent lived, and do not include damages for pain, suffering, or disfigurement."  (*id. at § 377.34*)

A claim for punitive damages is not available in claims for ordinary negligence under California *Civil Code, § 3294.*

Defendants Weidenthaler, Dr. Lissaur and Daniels complied with the applicable standard of care and their conduct was not a legal or proximate cause of the death of Heron Moriarty.

The Court's order partially granting Weidenthaler's and Daniels' Motion for Summary Judgment (Doc. 123) is the law of the case with binding effect on the remaining triable issues. The court's finding, among others, that Weidenthaler and Daniels "reasonably… believed" that they did not ignore a serious risk of suicide (pg. 15) is binding upon the trier of fact.

Plaintiffs' claims of negligence against Defendants Daniels and Dr. Lissaur involve allegations solely relating to their provision of professional services as a Nurse Practitioner and Psychiatrist, respectively, and are therefore encompassed in the Seventh cause of action for Medical Negligence and subject to the defenses and limitations of a Medical Negligence claim.  California *Civil Code § 3333.1, 29 CFR § 825.125 (b) (2).  It is also therefor barred by the Statute of limitations (California Code of Civil Procedure § 340.5)* as the lawsuit against Daniels and Dr. Lissaur was filed more than one year after Mr. Moriarty's death.

1.      Qualified immunity;

2.      Contributory fault of other parties and non-parties;

3.      Comparative fault of decedent, Heron Moriarty;

17

4.      Immunity from liability for any state law wrongful death or negligence claims pursuant to Government Code section 855.6

5.      Immunity from liability for any state law wrongful death or negligence claims.

6.      Immunity from liability for any state law wrongful death or negligence claims pursuant to Government Code section 820.2

7.      Immunity from liability for any state law wrongful death or negligence claims pursuant to Government Code section 845.6

8.      Immunity from liability for any state law wrongful death or negligence claims pursuant to Government Code section 856.4 pursuant to Government Code section 855.8

9.      Immunity from liability for any state law wrongful death or negligence claims pursuant to Government Code section 844.6.

10.     Immunity from liability for any state law wrongful death or negligence claims pursuant to Government Code section 855.8.

Defendants Weidenthaler, Dr. Lissaur and Daniels did not owe any legal duties to plaintiffs Michelle, Alexandria, Elijah, and Eternity Moriarty under State Law. Said Plaintiffs do not have any standing to recover general, compensatory or punitive damages for alleged harm caused to them. The Sixth Cause of Action is plead as a claim for "ordinary negligence" under the survival statute. (California Code of Civil Procedure, §377.30 et seq).

The damages recoverable by the estate are limited to "the loss or damage that the decedent sustained or incurred before death, including any penalties or punitive or exemplary damages that the decedent would have been entitled to recover had the decedent lived, and do not include damages for pain, suffering, or disfigurement." (id. at § 377.34)

A claim for punitive damages is not available in claims for ordinary negligence under California Civil Code, § 3294.

18

Defendants Weidenthaler, Dr. Lissaur and Daniels complied with the applicable standard of care and their conduct was not a legal or proximate cause of the death of Heron Moriarty.

The Court's order partially granting Weidenthaler's and Daniels' Motion for Summary Judgment (Doc. 123) is the law of the case with binding effect on the remaining triable issues. The court's finding, among others, that Weidenthaler and Daniels "reasonably… believed" that they did not ignore a serious risk of suicide (pg. 15) is binding upon the trier of fact.

*Chaudry vs. City of Los Angeles,* 751 F3d 1096 (9th Cir. 2014) does not apply to claims arising under state law.

**Seventh Claim – Medical Malpractice Against Defendants Daniels, Lissaur, and CPMG –** Brought by Michelle Moriarty as Successor in Interest to Mr. Moriarty:

Elements:

1.   That Defendants were medically negligent;

2.   That Mr. Moriarty was harmed; and

3.   That Defendants' medical negligence was a substantial factor in causing Mr. Moriarty's harm.

See CACI No. 400. (2017); See CACI No. 500. (2017)

Damages:

Pursuant to Code of Civil Procedure section 377.30, on behalf of Mr. Moriarty, his Successor in Interest is entitled to recover lost wages, lost earning capacity, pain and suffering, loss of life enjoyment, and punitive damages.

Defendants' Defenses:

Defendant Daniels and Dr. Lissaur did not owe any legal duties to plaintiffs Michelle, Alexandria, Elijah, and Eternity Moriarty under State Law.   Said plaintiffs do not have any standing to recover general, compensatory or punitive damages for alleged harm caused to them.  The Seventh Cause of Action is plead as

19

a claim for "medical negligence" under the survival statute. (California *Code of Civil Procedure, §377.30 et seq*).   The damages recoverable by the estate are limited to "the loss or damage that the decedent sustained or incurred before death, including any penalties or punitive or exemplary damages that the decedent would have been entitled to recover had the decedent lived, and do not include damages for pain, suffering, or disfigurement." (*id. at § 377.34*)

A claim for punitive damages is not available in claims for medical negligence under California *Civil Code, §3294 and California Code of Civil Procedure §377.42.*

Defendants Daniels and Dr. Lissaur complied with the applicable standard of care and their conduct was not a legal or proximate cause of the death of Heron Moriarty.

Defendant Daniels and Dr. Lissur's responsibility or contribution to any damages award, if any, is limited by California *Civil Code § 3333.2*

Plaintiffs' claim for Medical Negligence is barred by California *Code of Civil Procedure § 340.5* as the lawsuit against Dr. Lissuar, Daniels and/or CPMG was filed more than one year after Mr. Moriarty's death.

**Eighth Claim - Wrongful Death Against Defendant Weidenthaler, Daniels, Lissaur, and CPMG-** Brought By Michelle Moriarty, Individually and as Guardian Ad Litem to Eternity Moriarty, Alexandria Moriarty, Individually, and Elijah Moriarty, Individually

Elements:

1.     Mr. Moriarty's death was caused by the negligent act of Defendants; and

2.     Mr. Moriarty's death caused Plaintiff's injury.

See Code of Civil Procedure section 377.60, CACI No. 3921. (2017); *Quiroz v. Seventh Ave. Center,* 140 Cal. App. 4th 1256, 1257 (Cal. App. 6th Dist. 2006)

Damages:

20

Pursuant to Code of Civil Pros=cedure section 377.60, Plaintiffs Michelle, Alexandria, Elijah, and Eternity Moriarty are entitled to recover the financial support that Mr. Moriarty would have contributed; the loss of gifts and benefits the Family would have received, as well as burial expenses and the reasonable value of household services. The Family also seeks to recover damages based on the loss of love, companionship, comfort, care, assistance, protection, affection, society, moral support, training and guidance. Additionally, Michelle Moriarty seeks the loss of enjoyment of sexual relations.

Defendants' Defenses:

Defendants Weidenthaler, Dr. Lissaur and Daniels complied with the applicable standard of care and their conduct was not a legal or proximate cause of the death of Heron Moriarty.

Plaintiffs are not entitled to punitive damages under the California wrongful death statute (California *Code of Civil Procedure, § 377.61*).  Moreover, plaintiffs do not plead entitlement to punitive damages under their cause of action for wrongful death.  (FAC at paragraphs 163-167)

Defendant Daniels and Dr. Lissaur's responsibility or contribution to any damages award, if any, is limited by California *Civil Code § 3333.2*

Plaintiffs' claim for Wrongful Death is barred by California *Code of Civil Procedure § 340.5* as the lawsuit against Dr. Lissaur, Daniels and/or CPMG was filed more than one year after Mr. Moriarty's death.

1.      Qualified immunity;

2.      Contributory fault of other parties and non-parties;

3.      Comparative fault of decedent, Heron Moriarty;

4.      Immunity from liability for any state law wrongful death or negligence claims pursuant to Government Code section 855.6

5.      Immunity from liability for any state law wrongful death or negligence claims.

21

6.      Immunity from liability for any state law wrongful death or negligence claims pursuant to Government Code section 820.2

7.      Immunity from liability for any state law wrongful death or negligence claims pursuant to Government Code section 845.6

8.      Immunity from liability for any state law wrongful death or negligence claims pursuant to Government Code section 856.4 pursuant to Government Code section 855.8

9.      Immunity from liability for any state law wrongful death or negligence claims pursuant to Government Code section 844.6.

10.      Immunity from liability for any state law wrongful death or negligence claims pursuant to Government Code section 855.8.

Defendants Weidenthaler, Dr. Lissaur and Daniels complied with the applicable standard of care and their conduct was not a legal or proximate cause of the death of Heron Moriarty.

Plaintiffs are not entitled to punitive damages under the California wrongful death statute (California Code of Civil Procedure, § 377.61). Moreover, plaintiffs do not plead entitlement to punitive damages under their cause of action for wrongful death. (FAC at paragraphs 163-167)

The Court's order partially granting Weidenthaler's and Daniels' Motion for Summary Judgment (Doc. 123) is the law of the case with binding effect on the remaining triable issues. The court's finding, among others, that Weidenthaler and Daniels "reasonably… believed" that they did not ignore a serious risk of suicide (pg. 15) is binding upon the trier of fact.

*Chaudry vs. City of Los Angeles*, 751 F3d 1096 (9th Cir. 2014) does not apply to claims arising  under state law.

/ / /

/ / /

/ / /

22

# III.

## JOINT WITNESS LIST

A.     Witnesses to be Called at Trial by both Plaintiffs and Defendants:

| No. | Name | Date Called to Testify | Qualifications |
|---|---|---|---|
| 1. | Michelle Moriarty | | Michelle Moriarty was Mr. Moriarty's wife and is a named Plaintiff.  She will testify to their relationship, as well as Mr. Moriarty's relationship with his children. She will also testify generally to Mr. Moriarty's financial and emotional support, as well as his overall health. Michelle will testify about her efforts to warn that jail that Mr. Moriarty was suicidal and in need of psychiatric intervention. Michelle Moriarty may provide rebuttal testimony if necessary. |
| 2. | Alexandria Moriarty | | Alexandria Moriarty was Mr. Moriarty's first daughter and is a named Plaintiff.  She will testify about her relationship with her father, as well as Mr. Moriarty's relationship with Elijah, Eternity, and Michelle Moriarty.  She will also testify generally to Mr. Moriarty's financial and emotional support, as well as his overall health.  Alexandria Moriarty may provide rebuttal testimony if necessary. |

23

| No. | Name | Date Called to Testify | Qualifications |
|---|---|---|---|
| 3. | Elijah Moriarty | | Elijah Moriarty was Mr. Moriarty's son and is a named Plaintiff.  He will testify about his relationship with his father, as well as Mr. Moriarty's relationship with Alexandria, Eternity, and Michelle Moriarty.  He will also testify generally to Mr. Moriarty's financial and emotional support, as well as his overall health.  Elijah Moriarty may provide rebuttal testimony if necessary. |
| 4. | Eternity Moriarty | | Eternity Moriarty was Mr. Moriarty's second daughter and is a named Plaintiff.  She will testify about her relationship with her father, as well as Mr. Moriarty's relationship with Alexandria, Elijah, and Michelle Moriarty.  She will also testify generally to Mr. Moriarty's financial and emotional support, as well as his overall health.  Alexandria Moriarty may provide rebuttal testimony if necessary. |
| 5. | Chris Larkin | | Mr. Larkin is expected to testify about his business relationship with Mr. Moriarty.  He is expected to provide some information regarding Mr. Moriarty's financial condition and earning capacity.  He will also testify regarding Mr. Moriarty's behavior prior to his arrest. |

24

PRETRIAL CONFERENCE ORDER

Case No.: 3:17-cv-01154-LAB-AGS

| No. | Name | Date Called to Testify | Qualifications |
|---|---|---|---|
| 6. | Ralph Lissaur, M.D. | | Dr. Lissaur is a Defendant in this case. He is expected to testify regarding his medical background, his training regarding suicide prevention and is outlook on suicide prevention. Dr. Lissaur is also expected to testify about his care and treatment of Mr. Moriarty, as well as his understanding of relevant county policies. |
| 7. | Earl Goldstein | | Dr. Goldstein will testify regarding the MDG meetings, in general and specific to Mr. Moriarty.  He will testify regarding his information about Mr. Moriarty.  He will testify regarding his interactions with PNP Daniels and other MDG members with regards to Mr. Moriarty.  He will testify regarding County of San Diego policies and procedures, including his expectation that the recommendation of a psychiatric provider would be followed. |
| 8. | Amanda Daniels | | Amanda Daniels is a Defendant in this case. Psychiatric Nurse Practitioner Daniels is expected to testify regarding her care and treatment of Mr. Moriarty, including her recommendation and involvement in the Multi-Disciplinary Group meeting and interaction with others involved in his care and |

25

| No. | Name | Date Called to Testify | Qualifications |
|-----|------|------------------------|----------------|
| | | | housing.  She is further expected to testify regarding the County Policies and Procedures applicable to her and her compliance with the foregoing.  She will testify regarding the training provided by CPMG and the County of San Diego relevant to her interactions with Mr. Moriarty.  She will also testify regarding appropriate placement of inmates who meet 5150 criteria based on grave disability and homicidal ideations. |
| 9. | Lois Guillory | | Deputy Guillory is expected to testify regarding her observations and interaction with Mr. Moriarty.  She is will testify regarding her interactions with PNP Daniels and Dr. Lissaur as it relates to Mr. Moriarty.  She will testify regarding the MDG meeting.  She will testify regarding her role as a psychiatric liaison deputy and the County of San Diego policies and procedures. |
| 10. | Dale Weidenthaler | | Dale Weidenthaler is a Defendant in this case.  Defendant Weidenthaler will testify regarding the scope of his authority related to housing and recommendations from psychiatric providers.  He will testify regarding the information he knew relevant to Mr. Moriarty, including his |

26

PRETRIAL CONFERENCE ORDER                    Case No.: 3:17-cv-01154-LAB-AGS

| No. | Name | Date Called to Testify | Qualifications |
|-----|------|------------------------|----------------|
|  |  |  | interactions and observations with Mr. Moriarty and others. |

B.    Witnesses to be Called at Trial by Plaintiffs

| No. | Name | Date Called to Testify | Qualifications |
|-----|------|------------------------|----------------|
| 11. | Kevin McNeeley |  | Lieutenant McNeely is expected to testify regarding his duties as watch commander, including involvement in housing decisions and the MDG meeting.  He will also testify regarding his knowledge of and involvement with Mr. Moriarty.  He will testify regarding County of San Diego policies and procedures. |
| 12. | Arnold Fajayan |  | Fajayan is expected to testify regarding Michelle Moriarty's efforts to contact the jail, the information he learned about Mr. Moriarty, and the information that what was discussed at the MDG meeting. He is expected to testify regarding the chain of command and housing recommendations made by nursing, including psychiatric providers. |
| 13. | Alfred Joshua |  | Dr. Joshua is expected to testify regarding the review of Mr. Moriarty's suicide. He is also expected to testify about the history of in-custody suicides, the existing and |

27

| No. | Name | Date Called to Testify | Qualifications |
|---|---|---|---|
| | | | amended San Diego County policies and procedures; the strained relationship between the county and CPMG; the communications and expectation of CPMG; as well as previous preventable suicides and communications thereon. |
| 14. | Rule 60 re Suicides | | Plaintiffs will subpoena the person(s) most knowledgeable about previous preventable suicides, the county's previous suicide prevention policies and training, the need and implementation of a change in policy, and the impact of public calls for an improved suicide prevention program. |
| 15. | Rule 60 re Foundation and Authentication | | Plaintiffs will subpoena the person(s) necessary to authenticate and provide any necessary foundation for documents generated by county employees/agents. |
| 16. | Steve Mannis | | Dr. Mannis is expected to testify regarding the role of psychiatric practitioners in the jail setting including the MDG meeting and PSU admission. He will testify regarding CPMG's relationship with the County of San Diego, and the expectations thereof. He will further testify regarding the |

28

| No. | Name | Date Called to Testify | Qualifications |
|-----|------|------------------------|----------------|
|  |  |  | review of Mr. Moriarty's suicide, and the eventual termination of CPMG's contract with the county. |

C.   <u>Expert Witnesses to be Called at Trial by Plaintiffs</u>

| No. | Name | Date Called to Testify | Qualifications |
|-----|------|------------------------|----------------|
| 17. | Richard Lichten | | Mr. Lichten is Plaintiffs' police procedures expert. He will testify in accordance with the opinions set forth in his Rule 26 reports. He will also provide necessary rebuttal testimony. |
| 18. | Jeffrey Metzner | | Dr. Metzner is Plaintiffs' correctional-psychiatry expert. He will testify in accordance with the opinions set forth in his Rule 26 reports. He will also provide necessary rebuttal testimony. |
| 19. | Michael McMunn | | Mr. McMunn in Plaintiffs' correctional-psychiatric-nursing expert. He will testify in accordance with the opinions set forth in his Rule 26 reports. He will also provide necessary rebuttal testimony. |
| 20. | Kaycea Campbell | | Ms. Campbell is Plaintiffs' economist. She will testify in accordance with the opinions set forth in her Rule 26 reports. She will also provide necessary rebuttal testimony. |
| 21. | Robert Canning | | Dr. Canning is Plaintiffs' correctional-suicide expert. He will testify in accordance with the opinions set forth in his |

29

| No. | Name | Date Called to Testify | Qualifications |
|---|---|---|---|
| | | | Rule 26 reports. He will also provide necessary rebuttal testimony. |
| 22. | Othon Mena | | Dr. Mena is expect to testify regarding his investigation, autopsy, and opinions thereto related to Mr. Moriarty's death. Dr. Mena is also expected to testify regarding the pain and suffering associated with asphyxiation. |

D.   Reserved Witnesses by Plaintiffs

| No. | Name | Date Called to Testify | Qualifications |
|---|---|---|---|
| 23. | Ruby Banks | | Lieutenant Banks is expected to testify regarding her duties as watch commander, in particular to the night of Mr. Moriarty's arrest. She will also testify regarding her knowledge of and involvement with Mr. Moriarty and others. She will also testify regarding County of San Diego policies and procedures. |
| 24. | Nicholas Badre | | Dr. Badre is expected to testify regarding CPMG, including training for providers.  He will testify regarding the relationship between the County of San Diego and CPMG.  He will testify regarding his communications with Steve Mannis, Dr. Joshua and others. He will also testify regarding the County of San Diego Policies and procedures, including admission to the PSU. |

PRETRIAL CONFERENCE ORDER                    Case No.: 3:17-cv-01154-LAB-AGS

| 25. | Miles Lelevier | | Deputy Escobar was an arresting deputy and is expected to testify regarding the events and circumstances related to his interaction with Mr. Moriarty, at the Rancho San Diego Police Station, San Diego Central Jail and Vista Detention Facility.  He is also expected to testify regarding relevant policies and procedures. |
| 26. | Aliso Moriarty | | Aliso Moriarty was Mr. Moriarty's brother. He may testify regarding the relationship between Mr. Moriarty and his wife and children. |
| 27. | Mesquite Moriarty | | Aliso Moriarty was Mr. Moriarty's brother. He may testify regarding the relationship between Mr. Moriarty and his wife and children. |
| 28. | Barbara Lee | | Ms. Lee is expected to testify regarding the review of Mr. Moriarty's suicide, as well as San Diego County policies and procedures.  She will testify regarding the County of San Diego's relationship with CPMG, including the training of CPMG providers, and the expectations thereof. She will also testify regarding the efforts to address the county's inadequate suicide prevention program. |

31

| | | | | |
|---|---|---|---|---|
| 29. | Sanjay Rao | | | Dr. Rao is expected to testify regarding CPMG, including training for providers.  He will testify regarding the relationship between the County of San Diego and CPMG, as well as the conversations with others regarding the relationship.  He will also testify regarding County of San Diego Policies and procedures, and changes thereto. |
| 36. | Lizzie Womack | | | Ms. Womack is expected to testify regarding the review of Mr. Moriarty's suicide, as well as San Diego County policies and procedures.  She will testify regarding the County of San Diego's relationship with CPMG, including the training of CPMG providers, and the expectations thereof. She will also testify regarding the efforts to address the county's inadequate suicide prevention program. |
| 30. | Luis Escobar (pending further stipulations) | | | Deputy Escobar was an arresting deputy and is expected to testify regarding the events and circumstances related to his interaction with Mr. Moriarty, at the Rancho San Diego Police Station, San Diego Central Jail and Vista Detention Facility.  He is also expected to testify regarding relevant policies and procedures. |

PRETRIAL CONFERENCE ORDER                    Case No.: 3:17-cv-01154-LAB-AGS

| 31. | Stanley Snyder (pending further stipulations) | | Lieutenant Snyder is expected to testify regarding the events and circumstances surrounding Mr. Moriarty's suicidal admission at Central jail. He will also testify to his efforts to notify Vista Detention Facility, and the transfer from Central Jail to Vista Detention Facility. Lieutenant Snyder is also expected to testify about the impact of the County of San Diego's Pilot Program had on Mr. Moriarty's treatment and housing. |
| 32. | Sean Dwyer (pending further stipulations) | | Deputy Dwyer is expected to testify regarding his involvement with Mr. Moriarty's detention, as well as his interactions with others regarding Mr. Moriarty. He is further expected to testify regarding the County of San Diego policies and procedures. |
| 33. | Jamie Preechar (pending further stipulations) | | Nurse Preechar is expected to testify regarding her care and treatment of Mr. Moriarty and any interactions with others regarding Mr. Moriarty. |
| 34. | Duane Johnson – (pending further stipulations) | | Deputy Johnson is expected to testify regarding his role as a psychiatric liaison deputy. He will testify regarding his text messages with PNP Daniels. He will testify regarding County of San Diego Policies and Procedures, and previous |

33

PRETRIAL CONFERENCE ORDER                     Case No.: 3:17-cv-01154-LAB-AGS

| | | | preventable suicides. |
|---|---|---|---|
| 35. | Judi Lefter (pending further stipulations) | | Judi Lefter was the PERT clinician that evaluated Mr. Moriarty on May 1, 2016. She is expected to testify about her evaluation and findings. |

E.    Reserved Expert/Percipient Witnesses by Plaintiffs

| No. | Name | Date Called to Testify | Qualifications |
|---|---|---|---|
| 36. | Other Treating Physicians | | Other Treating Physicians needed for rebuttal purposes. |

F.    Witnesses to be Called at Trial by CPMG and Daniels

| No. | Name | Date Called to Testify | Qualifications |
|---|---|---|---|
| 37. | Mark Kalish, M.D. | | Dr. Kalish is expected to testify to the matters in his reports. Dr. Kalish will testify that PNP Daniels complied with the standard of care and did not cause or contributed to Plaintiffs' claimed injuries or damages.  Dr. Kalish will testify that PNP Daniels recommendations and advocacy for Mr. Moriarty met the standard of care. |
| 38. | Dominick Addario, M.D | | Dr. Addario is expected to testify to the matters in his reports as well as regarding the results of his IME's.  Dr. Addario will testify regarding Plaintiffs' damages. |
| 39. | Steven Elig, M.D. | | Dr. Elig is expected to testify as to the matters in his reports |

34

| | | | |
|---|---|---|---|
| | | | and well as regarding the results of his IME.  Dr. Elig will testify regarding Plaintiff's damages. |
| 40. | Robert Taylor, CPA/ABV | | Mr. Taylor is expected to testify regarding the matters in his reports.  He will testify regarding Plaintiffs' economic damages. |

G.    Reserved Witnesses by CPMG and Daniels

| No. | Name | Date Called to Testify | Qualifications |
|---|---|---|---|
| 41. | Yoko Larkin | | Mrs. Larkin is expected to testify regarding Mr. Moriarty's behavior prior to his arrest. |
| 42. | Deputy Lois Guillory | | Deputy Guillory is expected to testify regarding her observations and interaction with Mr. Moriarty.  She is will testify regarding her interactions with PNP Daniels.  She will testify regarding the MDG meeting.  She will testify regarding her role as a psychiatric liaison deputy and the County of San Diego policies and procedures. |
| 43. | Arnold Fajayan | | Mr. Fajayan is expected to testify regarding the information he learned about Mr. Moriarty including what was discussed at the MDG meeting.  He is expected to testify regarding the chain of command and housing recommendations made by |

35

| | | | |
|---|---|---|---|
| | | | nursing, including psychiatric providers. |
| 44. | Christopher Larkin | | Mr. Larkin is expected to testify about his business relationship with Mr. Moriarty. He will provide some information regarding Mr. Moriarty's financial condition. He will also testify regarding Mr. Moriarty's behavior prior to his arrest. |
| 45. | Sergeant Dale Weidenthaler | | Sergeant Weidenthaler will testify regarding the scope of his authority related to housing and recommendations from psychiatric providers.  He will testify regarding information relevant to Mr. Moriarty, including his interactions and observations with Mr. Moriarty and others. |
| 46. | Deputy Duane Johnson | | Deputy Johnson is expected to testify regarding his role as a psychiatric liaison deputy.  He will testify regarding his text messages with PNP Daniels. He will testify regarding County of San Diego Policies and Procedures. |
| 47. | Earl Goldstein, M.D | | Dr. Goldstein will testify regarding the MDG meetings, in general and specific to Mr. Moriarty.  He will testify regarding his information about Mr. Moriarty.  He will testify regarding his interactions with PNP Daniels regarding Mr. Moriarty.  He will testify regarding County of San Diego |

36

PRETRIAL CONFERENCE ORDER

Case No.: 3:17-cv-01154-LAB-AGS

| | | | |
|---|---|---|---|
| | | | policies and procedures, including his expectation that the recommendation of a psychiatric provider would be followed. |
| 48. | Jamie Preechar, BSN | | Nurse Preechar is expected to testify regarding her care and treatment of Mr. Moriarty and any interactions with others regarding Mr. Moriarty |
| 49. | Lieutenant Kevin McNeely | | Lieutenant McNeely is expected to testify regarding his duties as watch commander, including involvement in housing decisions and the MDG meeting. He will also testify regarding his knowledge of and involvement with Mr. Moriarty. He will testify regarding County of San Diego policies and procedures. |
| 50. | Lieutenant Stanley Snyder | | Lieutenant Snyder is expected to testify regarding the County of San Diego Pilot Program. He will also testify regarding the events and circumstances surrounding Mr. Moriarty being transferred from San Diego Central Jail to Vista Detention Facility. |

| | | | | |
|---|---|---|---|---|
| 51. | Deputy Luis Escobar | | | Deputy Escobar is expected to testify regarding the events and circumstances related to his interaction with Mr. Moriarty, at the Rancho San Diego Police Station, San Diego Central Jail and Vista Detention Facility. He is also expected to testify regarding relevant policies and procedures. |
| 52. | Othon Mena, M.D | | | Dr. Mena is expected to testify regarding his investigation, autopsy, and opinions thereto related to Mr. Moriarty's death. |
| 53. | Ralph Lissaur, M.D | | | Dr. Lissaur is expected to testify regarding his care and treatment of Mr. Moriarty. |
| 54. | Lieutenant Ruby Banks | | | Lieutenant Banks is expected to testify regarding her duties as watch commander. Se will also testify regarding her knowledge of and involvement with Mr. Moriarty. She will testify regarding County of San Diego policies and procedures. |
| 55. | Deputy Sean Dwyer | | | Deputy Dwyer is expected to testify regarding his involvement with Mr. Moriarty's detention. He is further expected to testify regarding the County of San Diego policies and procedures. |
| 56. | Alfred Joshua, M.D | | | Dr. Joshua is expected to testify regarding San Diego County policies and procedures. |

38

| 57. | Barbara Lee | | Ms. Lee is expected to testify regarding San Diego County policies and procedures. She will testify regarding the County of San Diego's relationship with CPMG, including the training of CPMG providers. |
| 58. | Sanjay Rao, M.D. | | Dr. Rao is expected to testify regarding CPMG, including training for providers. He will testify regarding the relationship between the County of San Diego and CPMG. He will testify regarding County of San Diego Policies and procedures, including admission to the PSU. |
| 59. | Nicholas Badre, M.D | | Dr. Rao is expected to testify regarding CPMG, including training for providers. He will testify regarding the relationship between the County of San Diego and CPMG. He will testify regarding County of San Diego Policies and procedures, including admission to the PSU. |

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

39

## H. Witnesses to be Called at Trial by County of San Diego

| No. | Name | Date Called to Testify | Qualifications |
|---|---|---|---|
| 60. | Dominick Addario | | Dr. Addario is expected to testify to the matters set forth in the County's expert witness disclosure, including but not limited to his reports as well as regarding the results of his IME's.  Dr. Addario will testify regarding Plaintiffs' damages and Heron Moriarty's behavioral history. |
| 61. | Ruby Banks | | Ms. Banks is expected to testify regarding her knowledge of and/or involvement with Heron Moriarty or other persons.  Ms. Banks may express opinions related to her area of expertise as an employee of the San Diego Sheriff's Department and/or her conduct related to plaintiffs' allegations. |
| 62. | Nicholas Badre | | Dr. Badre is expected to testify regarding training for providers and the relationship between the County of San Diego and CPMG.  Dr. Badre may express opinions related to his area of expertise and/or his conduct related to plaintiffs' allegations. |

40

PRETRIAL CONFERENCE ORDER                                Case No.: 3:17-cv-01154-LAB-AGS

| No. | Name | Date Called to Testify | Qualifications |
|-----|------|------------------------|----------------|
| 63. | Hsien Chiang | | Dr. Chiang is expected to testify to the matters set forth in the County's expert witness disclosure, including but not limited to Sheriff's Department medical and mental health policies and procedures, standards of care. Dr. Chiang may also testify in rebuttal to expert or opinion testimony in his area of expertise |
| 64. | Steven Elig | | Dr. Elig is expected to testify to the matters set forth in the County's expert witness disclosure, including but not limited to the matters in his reports and well as regarding the results of his IME.  Dr. Elig will testify regarding Plaintiff's damages.  Dr. Elig may also testimony in rebuttal to expert or opinion testify in his area of expertise |
| 65. | Dennis Flynn | | Mr. Flynn is expected to testify to the matters set forth in the County's expert witness disclosure, including but not limited to County of San Diego jail practices.  Mr. Flynn may also testify in rebuttal to expert or opinion testimony in his area of expertise. |

41

| No. | Name | Date Called to Testify | Qualifications |
|---|---|---|---|
| 66. | Todd Kilmade | | Mr. Kilmade may testify regarding his knowledge of and/or involvement with Heron Moriarty and others. |
| 67. | Yoko Larkin | | Ms. Larkin may testify regarding her knowledge of and/or involvement with Heron Moriarty and others. |
| 68. | Miles Lelevier | | Mr. Lelevier is expected to testify regarding his knowledge of and/or involvement with Heron Moriarty or other persons.  Mr. Lelevier may express opinions related to his area of expertise as an employee of the San Diego Sheriff's Department and/or his conduct related to plaintiffs' allegations. |
| 69. | Aliso Moriarty | | Mr. Moriarty may testify regarding his knowledge of and/or involvement with Heron Moriarty and others. |
| 70. | Mesquite Moriarty | | Mr. Moriarty may testify regarding his knowledge of and/or involvement with Heron Moriarty and others. |

PRETRIAL CONFERENCE ORDER                    Case No.: 3:17-cv-01154-LAB-AGS

| No. | Name | Date Called to Testify | Qualifications |
|---|---|---|---|
| 71. | Robert Taylor | | Mr. Taylor is expected to testify to the matters set forth in the County's expert witness disclosure, including but not limited to the matters in his reports.  He will testify regarding Plaintiffs' economic damages.  Mr. Taylor may also testify in rebuttal to expert or opinion testimony in his area of expertise |

I.   <u>Reserved Witnesses by County of San Diego</u>

| No. | Name | Date Called to Testify | Qualifications |
|---|---|---|---|
| 72. | Deputy Asannish | | Mr. Asannish is expected to testify regarding his knowledge of and/or involvement with Heron Moriarty or other persons.  Mr. Asannish may express opinions related to his area of expertise as an employee of the San Diego Sheriff's Department and/or his conduct related to plaintiffs' allegations. |
| 73. | Officer Cravener | | Mr. Cravener is expected to testify regarding his knowledge of and/or involvement with Heron Moriarty or other persons.  Mr. Cravener may express opinions related to his area of expertise as law enforcement officer and/or his |

43

| | | | |
|---|---|---|---|
| | | | conduct related to plaintiffs' allegations. |
| 74. | Sean Dwyer | | Mr. Dwyer is expected to testify regarding his knowledge of and/or involvement with Heron Moriarty or other persons.  Mr. Dwyer may express opinions related to his area of expertise as an employee of the San Diego Sheriff's Department and/or his conduct related to plaintiffs' allegations. |
| 75. | Luis Escobar | | Mr. Escobar is expected to testify regarding his knowledge of and/or involvement with Heron Moriarty or other persons.  Mr. Escobar may express opinions related to his area of expertise as an employee of the San Diego Sheriff's Department and/or his conduct related to plaintiffs' allegations. |
| 76. | Arnold Fajayan | | Mr. Fajayan is expected to testify regarding his knowledge of and/or involvement with Heron Moriarty or other persons.  Mr. Fajayan may express opinions related to his area of expertise as an employee of the San Diego Sheriff's Department and/or his conduct related to plaintiffs' allegations. |

44

PRETRIAL CONFERENCE ORDER                    Case No.: 3:17-cv-01154-LAB-AGS

| 77. | Robert Fonzi | | Mr. Fonzi is expected to testify to the matters set forth in the County's expert witness disclosure, including but not limited to the matters in his reports, use of force, jail procedures and housing.  Mr. Fonzi may also testify in rebuttal to expert or opinion testimony in his area of expertise. |
| 78. | Alfred Joshua | | Dr. Joshua is expected to testify to the matters set forth in the County's expert witness disclosure, including but not limited to San Diego County Sheriff's Department medical and mental health programs, policies, procedures and training. Dr. Joshua may also testify in rebuttal to expert or opinion testimony in his area of expertise. |
| 79. | Colleen Kelly | | Ms. Kelly is expected to testify to the matters set forth in the County's expert witness disclosure, including but not limited to the matters in her reports, statistical analysis of suicides within San Diego County jails and other correctional facilities.  Ms. Kelly may also testify in rebuttal to expert or opinion testimony in her area of expertise. |

45

| 80. | Judy Lefter | | Ms. Lefter is expected to testify regarding her knowledge of and/or involvement with Heron Moriarty or other persons.  Ms. Lefter may express opinions related to her area of expertise as a PERT clinician and/or his conduct related to plaintiffs' allegations. |
|---|---|---|---|
| 81. | Christopher McClean | | Mr. McClean is expected to testify to the matters set forth in the County's expert witness disclosure, including but not limited to inmate suicide and jail statistics.  Mr. McClean may also testify in rebuttal to expert or opinion testimony in his area of expertise |
| 82. | Kevin McNeeley | | Mr. McNeeley is expected to testify regarding his knowledge of and/or involvement with Heron Moriarty or other persons.  Mr. McNeeley may express opinions related to his area of expertise as an employee of the San Diego Sheriff's Department and/or his conduct related to plaintiffs' allegations. |
| 83. | Deputy Mangulsh | | Mr. Mangulsh is expected to testify regarding his knowledge of and/or involvement with Heron Moriarty or other persons.  Mr. Mangulsh may express opinions related to his area of expertise as an employee of the San Diego |

| | | | |
|---|---|---|---|
| | | | Sheriff's Department and/or his conduct related to plaintiffs' allegations. |
| 84. | Rob Mitchell | | Mr. Mitchell is expected to testify regarding his knowledge of and/or involvement with Heron Moriarty or other persons.  Mr. Mitchell may express opinions related to his area of expertise as an employee of the San Diego Sheriff's Department and/or his conduct related to plaintiffs' allegations. |
| 85. | Dan Murtaugh | | Mr. Murtaugh is expected to testify regarding his knowledge of and/or involvement with Heron Moriarty or other persons.  Mr. Murtaugh may express opinions related to his area of expertise as an employee of the San Diego Sheriff's Department and/or his conduct related to plaintiffs' allegations. |
| 86. | Deputy Olsen | | Mr. Olsen is expected to testify regarding his knowledge of and/or involvement with Heron Moriarty or other persons.  Mr. Olsen may express opinions related to his area of expertise as an employee of the San Diego Sheriff's Department and/or his conduct related to plaintiffs' allegations. |

47

| 87. | Jaime Preechar | | Ms. Preechar is expected to testify regarding her knowledge of and/or involvement with Heron Moriarty or other persons.  Ms. Preechar may express opinions related to her area of expertise as an employee of the San Diego Sheriff's Department and/or her conduct related to plaintiffs' allegations. |
| 88. | Scott Seaman | | Mr. Seaman is expected to testify regarding his knowledge of and/or involvement with Heron Moriarty or other persons.  Mr. Seaman may express opinions related to his area of expertise as an employee of the San Diego Sheriff's Department and/or his conduct related to plaintiffs' allegations. |
| 89. | Edwin Schroeder | | Mr. Schroeder is expected to testify regarding his knowledge of and/or involvement with Heron Moriarty or other persons.  Mr. Schroeder may express opinions related to his area of expertise as an employee of the San Diego Sheriff's Department and/or his conduct related to plaintiffs' allegations. |

PRETRIAL CONFERENCE ORDER                    Case No.: 3:17-cv-01154-LAB-AGS

| No. | Name | Date Called to Testify | Qualifications |
|---|---|---|---|
| 90. | Lizzie Womack | | Ms. Womack is expected to testify regarding her knowledge of and/or involvement with Heron Moriarty or other persons.  Ms. Womack may express opinions related to her area of expertise as an employee of the San Diego Sheriff's Department and/or her conduct related to plaintiffs' allegations. |
| 91. | Deputy Wynn | | Mr. Wynn is expected to testify regarding his knowledge of and/or involvement with Heron Moriarty or other persons.  Mr. Wynn may express opinions related to his area of expertise as an employee of the San Diego Sheriff's Department and/or his conduct related to plaintiffs' allegations. |

J.   Witnesses to be called at trial by Weidenthaler

| No. | Name | Date Called to Testify | Qualifications |
|---|---|---|---|
| 92. | Dale Weidenthaler | | Dale Weidenthaler is a defendant in this case. Weidenthaler will testify regarding his duties and responsibilities at the Vista Detention Facility and the housing placement decision concerning Heron Moriarty. |

49

| | 93. | Amanda Daniels | | Amanda Daniels is a defendant in this case.  Daniels will testify regarding her care and treatment of Mr. Moriarty, including her housing recommendation and involvement in the Multi-Disciplinary Group meeting and interaction with others involved in his care and housing. |
| | 94. | Deputy Lois Guillory | | Deputy Guillory is expected to testify regarding her observations and interaction with Mr. Moriarty.  She is will testify regarding her interactions with Dale Weidenthaler, PNP Daniels and Dr. Lissaur as it relates to Mr. Moriarty.  She will testify regarding the MDG meeting. |
| | 95. | Dr. Ralph Lissaur | | Dr. Lissaur is a Defendant in this case. He is expected to testify regarding his medical background, his training regarding suicide prevention and is outlook on suicide prevention. Dr. Lissaur is also expected to testify about his care and treatment of Mr. Moriarty. |
| | 96. | Ruby Banks | | Ms. Banks is expected to testify regarding her knowledge of and/or involvement with Heron Moriarty or other persons.  Ms. Banks may express opinions |

50

| | | | related to her area of expertise as an employee of the San Diego Sheriff's Department and/or her conduct related to plaintiffs' allegations. |
|---|---|---|---|
| 97. | Robert Fonzi (Expert) | | Mr. Fonzi is expected to testify to the matters set forth Weidenthaler's expert witness disclosure, including but not limited to the matters in his reports, jail procedures and housing.  Mr. Fonzi may also testify in rebuttal to expert or opinion testimony in his area of expertise |
| 98. | Dominick Addario, M.D. (Expert) | | Dr. Addario is expected to testify to the matters set forth in Weidenthaler's expert witness disclosure, including but not limited to his reports as well as regarding the results of his IME's.  Dr. Addario will testify regarding Plaintiffs' damages and Heron Moriarty's behavioral history. |
| 99. | Stephen Elig, M.D. (Expert) | | Dr. Elig is expected to testify to the matters set forth in Weidenthaler's expert witness disclosure, including but not limited to the matters in his reports and well as regarding the results of his IME.  Dr. Elig will testify regarding Plaintiff's damages.  Dr. Elig may also testimony in rebuttal to expert or opinion testify in his area of expertise |

51

| No. | Name | Date Called to Testify | Qualifications |
|---|---|---|---|
| 100. | Robert Taylor, CPA (Expert) | | Mr. Taylor is expected to testify to the matters set forth in Weidenthaler's expert witness disclosure, including but not limited to the matters in his reports. He will testify regarding Plaintiffs' economic damages. Mr. Taylor may also testify in rebuttal to expert or opinion testimony in his area of expertise. |
| 101. | William Nagy | | Nagy was employed by the Sheriff's Department at VDF and will testify regarding his knowledge of the relevant events and circumstances in the Ad-Seg unit on the morning of May 31, 2016. |

K.  Witnesses to be called by Dr. Lissaur

| No. | Name | Date Called to Testify | Qualifications |
|---|---|---|---|
| 102. | Ralph Lissaur, M.D. | | Dr. Lissaur is a defendant in this case. He will testify regarding his training, education and background as well as his care and treatment of decedent. |
| 103. | Zachary D. Torry, M.D. (expert) | | Dr. Torry is an expert witness and is expected to testify as to the matters set forth in the Dr. Lissaur's expert witness disclosure, including but not limited to his reports. Dr. Torry will testify as to the standard of care and in rebuttal of plaintiffs' expert. |

| 104. | Robert Taylor, CPA (Expert) | | Mr. Taylor is expected to testify to the matters set forth in Dr. Lissaur's expert witness disclosure, including but not limited to the matters in his reports.  He will testify regarding Plaintiffs' economic damages.  Mr. Taylor may also testify in rebuttal to expert or opinion testimony in his area of expertise. |

## IV.

## JOINT EXHIBIT LIST

| Exhibit No. | Date Marked | Date Admitted | Description |
|---|---|---|---|
| 1. | | | May 28, 2016 Fax to County from Michelle – (MM10340-0343) |
| 2. | | | May 30, 2016 Fax to County from Michelle – 4 pages (MM10322-0327) |
| 3. | | | Incident Reports (SDSO0015-025) |
| 4. | | | Medical Intake Form (SDSO00127-0136) |
| 5. | | | Medical Chart (SDSO00137-0181,0550-0560) |
| 6. | | | Fax from Sharp Mesa Vista to VDF - May 31, 2016 (SDSO00184-207, 183) |
| 7. | | | MAR – Refusal of Meds (SDSO00208-0209) |
| 8. | | | Refusal Forms – (SDSO00217-0220) |
| 9. | | | Faxes from Michelle to VDF – produced by County (SDSO00223-231) |
| 10. | | | March 2016 – J.1 Safety Cells (SDSO00487-0490) |
| 11. | | | March 2016 – J.5 Inmate Suicide Prevention (SDSO00491-0494) |

53

| Exhibit No. | Date Marked | Date Admitted | Description |
|---|---|---|---|
| 12. | | | March 2016 – J.5.V Inmate Safety Program (SDSO001342-01344) |
| 13. | | | November 2015 – J.4 EOH (SDSO00502-0505) |
| 14. | | | M.25 – Psychiatric Security Unit (SDSO001102-01105) |
| 15. | | | January 2016 – M.25 – Psychiatric Security Unit (SDSO001354-01357) |
| 16. | | | MSD.P.8 – Psychiatric Security Unit (SDSO001114-01124) |
| 17. | | | MSD.S.10 – Suicide Prevention and Inmate Safety (12/10/15) (SDSO001135-01141) |

## **PLAINTIFFS' EXHIBIT LIST**

| Exhibit No. | Date Marked | Date Admitted | Description |
|---|---|---|---|
| 18. | | | Calendar Entries (MM1001-MM002) |
| 19. | | | Verizon Call Log (MM1003-011) |
| 20. | | | Family Photos (MM10453-514) |
| 21. | | | Family Disneyland Photo Used in Complaint |
| 22. | | | May 30, 2016 Fax – 1 page (MM10328) |
| 23. | | | Arrest Reports (SDSO001-014) |
| 24. | | | Follow-Up Investigative Report (SDSO0026-046 & SDSO00335-0374) |
| 25. | | | Segregated Housing Order (SDSO00320) |
| 26. | | | January 2016 – J.4 EOH (SDSO001345-01348) |

54

| Exhibit No. | Date Marked | Date Admitted | Description |
|---|---|---|---|
| 27. | | | March 2015 – EOH Sworn Staff (SDSO00827-0829) |
| 28. | | | Decision Tree (SDSO00985-0987) |
| 29. | | | Amended Grand Jury Report re Suicides (SDSO00904-0914) |
| 30. | | | June 2017 Response to Grand Jury Report (SDSO0561-0564) |
| 31. | | | In-Custody Suicide Data (SDSO00582-0587; 0816-0825; 0830-0836) |
| 32. | | | PPT: MDG in Detentions (SDSO00838-0852) |
| 33. | | | PPT: Suicide Prevention – YES, it's a problem (SDSO00853-0871) |
| 34. | | | Hernandez Email re Pilot Program (SDSO00978-0979) |
| 35. | | | Johnson Texts (SDSO001041-00) |
| 36. | | | Weidenthaler May 31, 2016 Timecard (SDSO001358) |
| 37. | | | Previous In-Custody Suicide Investigations (SDSO001359-01476) |
| 38. | | | November 2016 – New Suicide Procedures (SDSO001483-01487) |
| 39. | | | CPMG and County Contract (CPMG0036-064) |
| 40. | | | Psych Provider Termination (EMAIL0118-0122) |
| 41. | | | Termination for Cause (EMAIL0515-0516) |
| 42. | | | Notice of Termination for Convenience |
| 43. | | | CPMG – Psychiatrist Orientation (CPMG0028-0034) |

55

PRETRIAL CONFERENCE ORDER                    Case No.: 3:17-cv-01154-LAB-AGS

| Exhibit No. | Date Marked | Date Admitted | Description |
|---|---|---|---|
| 44. | | | April 22, 2015 – Email to Mannis re New Policies (055-085) |
| 45. | | | December 23, 2015 – Email to Mannis re New Policies (156-215) |
| 46. | | | Pattern/Notice Emails (EMAIL-001-1118) |
| 47. | | | DRC Report |
| **PLAINTIFFS' RESERVED EXHIBITS** | | | |
| 48. | | | Tax Documents (MM10026-0257) |
| 49. | | | April 2016, Sharp Vista Medical Records |
| 50. | | | May 2016, County of San Diego Behavioral Assessment |
| 51. | | | Scene Photos (SDSO379, 393, 399-400, 410, 425, 431, 437, 447, 453, 460, ) |
| 52. | | | Booking Intake (SDSO00313) |
| 53. | | | Autopsy, Investigative, and Toxicology Report (SDSO00 (SDSO0056-068)(may remove pending stipulation) |
| 54. | | | Laboratory Crime Report (SDSO0069-0110) (may remove pending stipulation) |
| 55. | | | Schematic of South House (SDSO0325) |
| 56. | | | Housing Report (SDSO00329-0332) |
| 57. | | | Central Incident Reports – May 25, 2016 (SDSO00477-0483) |
| 58. | | | 2014 Training Bulletin: Consideration when dealing with armed or unarmed suicidal subjects |
| 59. | | | March 2016 Training Bulletin: In-custody Death/Suicide Prevention |

56

| Exhibit No. | Date Marked | Date Admitted | Description |
|---|---|---|---|
| 60. | | | July 2015 Training Bulletin: Suicide Prevention and Awareness for Inmates (SDSO00506-0509) |
| 61. | | | July 2014 Training Bulletin: The Role of Adult Correctional Officers in Preventing Suicide (SDSO00510-0512) |
| 62. | | | March 2016 Training Bulletin: Intensified Format Training Suicide Awareness and Prevention (SDSO00513-0514) |
| 63. | | | Cord Cuff Restraint (SDSO00515-0517) (may remove pending stipulation) |
| 64. | | | October 2014 – I.93 Use of Restraint Equipment (SDSO00518-0523) (may remove pending stipulation) |
| 65. | | | March 2016 – I.93v Use of Restraint Equipment (SDSO00526) (may remove pending stipulation) |
| 66. | | | MSD.I.3 – Intake Receiving/Screening Assessment (SDSO001106-01113) |
| 67. | | | August 2005 Bureau of Justice Statistics: Suicide and Homicide in State Prisons and Local Jails (SDSO00570-0581) |
| 68. | | | PPT: Preventing Suicide in Correctional Facilities (general) (SDSO00588-0616) |
| 69. | | | JPMU Training Manual (SDSO00681-683) |
| 70. | | | Title 15 Minimum Standards for Local Detention Facilities (SDSO0723-725, 735, 739-740) |
| 71. | | | Detention Risk Assessment Committee (DRAC) Suicide Prevention Implementation Plan (SDSO00872-0875) |
| 72. | | | PPT: Suicide Prevention in Custody (SDC) (SDSO00876-0888) |

57

| Exhibit No. | Date Marked | Date Admitted | Description |
|---|---|---|---|
| 73. | | | PPT: Detention Services Bureau (SDSO00938, 0949-0958 |
| 74. | | | Emails to Moriarty (SDSO00967-00975) |
| 75. | | | Suicide Training by Year (SDSO00992-0993) |
| 76. | | | MDG Roster for May 31, 2016 (SDSO001001-01007) |
| 77. | | | Arrest/Contact Report re May 1, 2016 Suicidal Behavior (SDSO001063-01066) (may remove pending stipulation) |
| 78. | | | New Medical Intake Questions (SDSO001496-01505) |
| 79. | | | Meeting Minutes re Pilot Program (PP002-PP061 |
| 80. | | | CPMG Psych Jail Orientation (001-022) |
| 81. | | | CPMG and County Communications (034-042; 051) |
| 82. | | | CPMG SAFETY (052-053) |
| 83. | | | Lissaur JIMS Training – (217-218) |
| 84. | | | CPMG Meeting Minutes (221; 227-232) |
| 85. | | | CPMG Journal Club (233-259) |
| 86. | | | November 2014 – Psych Orientation Training re Scheduling (260-261) |
| 87. | | | January 2016 – Orientation for New Providers(222-226) |
| 88. | | | CPMG Decision Tree (CPMG008-0010) |
| 89. | | | CPMG Acuity Guidelines (CPMG0011-0012) |
| 90. | | | Email re Moriarty and moving I/Ps out of AdSeg (CPMG0014-015) |

58

| Exhibit No. | Date Marked | Date Admitted | Description |
|---|---|---|---|
| 91. | | | Fajayan Complaint re Lissaur (CPMG0025-0026) |
| 92. | | | Documents from Subpoena to Chase Bank for Heron Moriarty Accounts |
| 93. | | | Documents from Subpoena to California Highway Patrol (08-12) |
| 94. | | | Documents from Subpoena to El Cajon Police Department (03-12) |
| 95. | | | Documents from Subpoena to PERT |
| 96. | | | Documents from Subpoena to Sharp Mesa Vista Hospital (may remove pending stipulation) |
| 97. | | | Documents from Subpoena to Union Bank re Comfort Air and Electric |
| 98. | | | Documents from Subpoena to Union Bank re Heron Moriarty |
| 99. | | | County Audio Interviews |
| 100. | | | SDCJ Videos |
| 101. | | | RSD Videos |
| 102. | | | VDF Intake Videos |
| 103. | | | County Radio Audios |
| 104. | | | Audio re Uncooperative Inmate |
| 105. | | | Audio re 911 Calls |
| 106. | | | Audio of Voicemail from VDF Nurse to Michelle Moriarty |
| 107. | | | Report of Defense Expert Dominick Addario |
| 108. | | | Report of Defense Expert C. Hsien Chiang |

59

| Exhibit No. | Date Marked | Date Admitted | Description |
|---|---|---|---|
| 109. | | | Report of Defense Expert Steven Elig |
| 110. | | | Report of Defense Expert Robert Fonzi |
| 111. | | | Report of Defense Expert Colleen Kelly |
| 112. | | | Report of Defense Expert Dennis Flynn |
| 113. | | | Report of Defense Expert Robert Taylor |
| 114. | | | Report of Defense Expert Mark Kalish |
| 115. | | | Report of Defense Expert Zachary Torry |
| 116. | | | Report of Plaintiff Expert Richard Lichten |
| 117. | | | Report of Plaintiff Expert Michael McMunn |
| 118. | | | Report of Plaintiff Expert Robert Canning |
| 119. | | | Report of Plaintiff Expert Kaycea Campbell |
| 120. | | | Report of Plaintiff Expert Jeffrey L. Metzner |
| 121. | | | Any documents needed for rebuttal or impeachment purposes |
| 122. | | | Any document needed to lay a foundation or authentication for any exhibit |
| 123. | | | Any Exhibit or document identified by any other party |
| 124. | | | Any deposition exhibit not identified herein |

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

60

# V.

## DEFENDANTS' JOINT EXHIBIT LIST

| Exhibit No. | Date Marked | Date Admitted | Description |
|---|---|---|---|
| 201. | | | Jail Incident Report (Inmate Status Report) by M. Angulo – 5/26/16 - Incident #164020165 |
| 202. | | | 3/11/16 Detentions P&P – J.1 re Safety Cells |
| 203. | | | 3/11/16 Detentions P&P – J.5 re Inmate Suicide Prevention (also Exhibit 11 to deposition of Ralph Lissaur) |
| 204. | | | 11/20/15 Sheriff's Detentions policy J.4 re enhanced observation housing |
| 205. | | | CAD Event E3323237 - 5/1/16 (also Exhibit 4 to Todd Kilmade deposition) |
| 206. | | | 1/28/16 Detention Services policy M.25 re Psychiatric Security Unit |
| 207. | | | 12/31/14 Medical Services Division policy MSD.I.3 re Intake Receiving/Screening Assessment |
| 208. | | | 12/23/15 Medical Services Division policy MSD.P.8 re Psychiatric Security Unit |
| 209. | | | 4/30/15 Medical Services Division policy MSD.S.1 re Safety Cell Use |

61

PRETRIAL CONFERENCE ORDER               Case No.: 3:17-cv-01154-LAB-AGS

| Exhibit No. | Date Marked | Date Admitted | Description |
|---|---|---|---|
| 210. | | | 12/10/15 Medical Services Division policy MSD.S.10 re Suicide Prevention & Inmate Safety Program |
| 211. | | | 3/14/16 VDF green sheet J.5.V re Inmate Safety Program |
| 212. | | | 1/28/16 Detentions Services policy M.25 re Psychiatric Security Unit |
| 213. | | | Machete |
| 214. | | | Exhibit 11 to deposition of Arnold Fajayan – MSD.P.15 |
| 215. | | | Exhibit 12 to deposition of Arnold Fajayan – MSD.S.10 |
| 216. | | | Exhibit 1 to deposition of Earl Goldstein – MDG in Detentions |
| 217. | | | Exhibit 3 to deposition of Earl Goldstein – Bates SDSO 000541 – SDSO 000560 |
| 218. | | | Exhibit 5 to deposition of Earl Goldstein – Bates SDSO 000187 – SDSO 000207 – Sharp Hospital records |
| 219. | | | Exhibit 6 to deposition of Earl Goldstein – Bates SDSO 000127 – SDSO 000158, 000165, 000183 – 000241 |
| 220. | | | Exhibit 7 to deposition of Earl Goldstein – screen shot Bates SDSO 000560 |

62

| Exhibit No. | Date Marked | Date Admitted | Description |
|---|---|---|---|
| 221. | | | CPMG's 7/19/18 Response to Michelle Moriarty's Request for Production of Documents (Set One) |
| 222. | | | Exhibit 1 to deposition of Mesquite Moriarty - photos |
| 223. | | | Exhibit 2 to deposition of Mesquite Moriarty - email |
| 224. | | | Exhibit 3 to deposition of Alexandria Moriarty - photo |
| 225. | | | Exhibit 4 to deposition of Alexandria Moriarty - photo |
| 226. | | | Exhibit 5 to deposition of Alexandria Moriarty - photo |
| 227. | | | Exhibit 6 to deposition of Michelle Moriarty, volume 1 – aerial photo |
| 228. | | | Exhibit 7 to deposition of Michelle Moriarty, volume 2 – handwritten Letter |
| 229. | | | Exhibit 8 to deposition of Michelle Moriarty, volume 2 – handwritten Letter |
| 230. | | | Exhibit 9 to deposition of Michelle Moriarty, volume 2 – handwritten Letter |
| 231. | | | Exhibit 10 to deposition of Michelle Moriarty, volume 2 – Email |

63

| Exhibit No. | Date Marked | Date Admitted | Description |
|---|---|---|---|
| 232. | | | Exhibit 11 to deposition of Michelle Moriarty, volume 2 – Email |
| 233. | | | Exhibit 12 to deposition of Michelle Moriarty, volume 2 – Email |
| 234. | | | Exhibit 13 to deposition of Michelle Moriarty, volume 2 – email |
| 235. | | | Exhibit 14 to deposition of Michelle Moriarty, volume 2 – email |
| 236. | | | Exhibit 15 to deposition of Michelle Moriarty, volume 2 – facebook post |
| 237. | | | Exhibit 17 to deposition of Michelle Moriarty, volume 2 – facebook post |
| 238. | | | Exhibit 19 to deposition of Michelle Moriarty, volume 2 – facebook post |
| 239. | | | Exhibit 20 to deposition of Michelle Moriarty, volume 2 – facebook post |
| 240. | | | Exhibit 22 to deposition of Michelle Moriarty, volume 2 – Declaration of Michelle Moriarty |
| 241. | | | Exhibit 23 to deposition of Michelle Moriarty, volume 2 – Request for Domestic Violence Restraining Order |

64

| Exhibit No. | Date Marked | Date Admitted | Description |
|---|---|---|---|
| 242. | | | Exhibit 24 to deposition of Michelle Moriarty, volume 2 – photos |
| 243. | | | Exhibit 26 to deposition of Michelle Moriarty, volume 2 – Application for Assessment, Evaluation, and Crisis Intervention or Placement for Evaluation and Treatment |
| 244. | | | Documents regarding communications between Michelle Moriarty and County of San Diego/jail staff |
| 245. | | | 2009 Tax records |
| 246. | | | 2012 Tax records |
| 247. | | | 2013 Tax records |
| 248. | | | 2014 Tax records |
| 249. | | | 2015 Tax records |
| 250. | | | Exhibit 3 to deposition of Richard Lichten – trial testimony |
| 251. | | | Exhibit 4 to deposition of Richard Lichten – Lichten's response to plaintiff Susan Barden's Request for Admissions |
| 252. | | | Exhibit 6 to deposition of Richard Lichten – deposition excerpt Motion in Limine Curry v City of Los Angeles |

| Exhibit No. | Date Marked | Date Admitted | Description |
|---|---|---|---|
| 253. | | | Exhibit 7 to deposition of Richard Lichten – deposition excerpt |
| 254. | | | Exhibit 8 to deposition of Richard Lichten – Order re Motions in Limine, Objections to classes of exhibits and jury questionnaire |
| 255. | | | Exhibit 5 to deposition of Ralph Lissaur – MSD.P.15 |
| 256. | | | Exhibit 8 to deposition of Ralph Lissaur – Officer Report of Deputy Escobar Bates 000008 - 000010 |
| 257. | | | Exhibit 1 to deposition of Amanda Daniels – 5/31/16 medical chart |
| 258. | | | Exhibit 2 to deposition of Amanda Daniels – 5/31/16 medical chart |
| 259. | | | Exhibit 3 to deposition of Amanda Daniels – 5/30/16 medical chart |
| 260. | | | Exhibit 6 to deposition of Amanda Daniels – 5/28/16 medical chart |
| 261. | | | Exhibit 1 to Deposition of Todd Kilmade (photo) |
| 262. | | | Exhibit 2 to Deposition of Todd Kilmade (photo) |
| 263. | | | Exhibit 5 to Deposition of Todd Kilmade - El Cajon Police Department records |
| 264. | | | Exhibit 2 to deposition of Lizzie Womack – flowsheet |
| 265. | | | Timeline |

66

| Exhibit No. | Date Marked | Date Admitted | Description |
|---|---|---|---|
| 266. | | | Heron Moriarty Medical Records from San Diego County Jail |
| 267. | | | Text Message between Amanda Daniels and Deputy Johnson |
| 268. | | | Medical Records of Heron Moriarty including his autopsy report |
| 269. | | | San Diego County Sheriff s Incident Reports for May 26,27, and 31 2016 |
| 270. | | | Multidisciplinary Group Meeting Notes dated May 31,2016 |
| 271. | | | March 2016 J.1 Safety Cells (SDSO 00487-0490 |
| 272. | | | March 2016 J.5 Inmate Suicide Prevention (SDSO 00491-0494) |
| 273. | | | March 2016 J.5 Inmate Safety Program (SDSO 001342-01344) |
| 274. | | | Diagram of South House – Vista Detention Facility |
| 275. | | | Photo of Weidenthaler Office |
| 276. | | | Diagram of Vista Detention Center |
| 277. | | | Expert Report (Robert Fonzi) |
| 278. | | | Expert Report (Dr. Addario) Eternity Moriarty |
| 279. | | | Expert Report (Dr. Addario) Alexandria Moriarty |
| 280. | | | Expert Report (Dr. Addario) Elijah Moriarty |
| 281. | | | Expert Report (Dr. Addario) Michelle Moriarty |

67

| Exhibit No. | Date Marked | Date Admitted | Description |
|---|---|---|---|
| 282. | | | Expert Report (Elig) |
| 283. | | | Expert Report (Taylor) |
| 284. | | | Weidenthaler timecard |
| 285. | | | Daniels progress note 000158 |
| 286. | | | Jail Incident Report (Admin Seg ISR) by L. Guillory – 5/31/16 - Incident # 164020770 |
| **DEFENDANT COUNTY OF SAN DIEGO'S RESERVED EXHIBITS** | | | |
| 301. | | | Arrest Report by Miles Lelevier – 5/25/16 – Case #16126588, SDSO 000001 – SDSO 000007 |
| 302. | | | Officer Report by Deputy Luis Escobar – 5/26/16 – Case #16126588, SDSO 000008 – SDSO 000010 |
| 303. | | | Property and Evidence Report by Miles Lelevier – Case #16126588, SDSO 000011 |
| 304. | | | Statement of Case form – 5/25/16, SDSO 000012 – SDSO 000013 |
| 305. | | | Witness List by Miles Lelevier – 5/25/16 - Case #16126588, SDSO 000014 |
| 306. | | | Follow-up Investigative Report by W, Altenhof re statement of Ruby Banks on 7/13/16, SDSO 000026 – SDSO 000027 |
| 307. | | | Follow-up Investigative Report by W. Altenhof re statement of Sean Dwyer on 7/13/16, SDSO 000028 – SDSO 000029 |
| 308. | | | Follow-up Investigative Report by Felix Santiesteban re statement of Luis Escobar on 7/6/16, SDSO 000030 – SDSO 000031 |

PRETRIAL CONFERENCE ORDER                     Case No.: 3:17-cv-01154-LAB-AGS

| Exhibit No. | Date Marked | Date Admitted | Description |
|---|---|---|---|
| 309. | | | Follow-up Investigative Report by L, Brannan re statement of Lois Guillory on 7/12/16, SDSO 000032 – SDSO 000033 |
| 310. | | | Follow-up Investigative Report by W, Altenhof re statement of Bruce Hightower on 7/13/16, SDSO 000034 – SDSO 000035 |
| 311. | | | Follow-up Investigative Report by D. Murtaugh re statement of Joshua Hoodenpyle on 6/1/16, SDSO 000036 – SDSO 000038 |
| 312. | | | Follow-up Investigative Report by Det. Santiesteban re statement of Miles Lelevier on 7/6/16, SDSO 000039 – SDSO 000040 |
| 313. | | | Follow-up Investigative Report by D. Murtaugh re statement of  Christopher Olsen on 6/1/16, SDSO 000041 – SDSO 000043 |
| 314. | | | Follow-up Investigative Report by D. Murtaugh re statement of Anthony White on 6/1/16, SDSO 000044 – SDSO 000046 |
| 315. | | | Officer Report by Thomas Browning – 5/31/16 – Case #16127463, SDSO 000047 |
| 316. | | | Crime/Incident Report by  Alejandro Sanchez – 5/31/16 – Case #16127463, SDSO 000048 |
| 317. | | | Officer Report by Joshua Hoodenpyle – 5/31/16 - Case #16127463, SDSO 000049 |
| 318. | | | Officer Report by Salvador Moreno – 5/31/16 - Case #16127463, SDSO 000050 |
| 319. | | | Officer Report by Nicholas Morgan – 5/31/16 - Case #16127463, SDSO 000051 |
| 320. | | | Officer Report by Jon Nuqui – 5/31/16 - Case #16127463, SDSO 000052 |

69

PRETRIAL CONFERENCE ORDER                    Case No.: 3:17-cv-01154-LAB-AGS

| Exhibit No. | Date Marked | Date Admitted | Description |
|---|---|---|---|
| 321. | | | Officer Report by Alejandro Sanchez – 5/31/16 - Case #16127463, SDSO 000053 – SDSO 000055 |
| 322. | | | Investigative Report by Medical Examiner Investigator Susan Stolberg – 7/31/16, SDSO 000064 – SDSO 000067 |
| 323. | | | Office of the Medical Examiner Toxicology Report by Iain McIntyre – 6/27/16, SDSO 000068 |
| 324. | | | Crime Laboratory Service Report – Event 1 - by Doree Racicot, SDSO 000069 – SDSO 000073; SDSO 000080 – SDSO 000081 |
| 325. | | | Crime Laboratory Service Report –  Event 2 – by Monica Stanton, SDSO 000082 – SDSO 000087 |
| 326. | | | Crime Laboratory Service Report –Event 3 – by Doree Racicot, SDSO 000088 – SDSO 000102 |
| 327. | | | Crime Laboratory Service Report – Event 4 – by Linda Wright, SDSO 000103 – SDSO 000106 |
| 328. | | | Crime Laboratory Service Report –Event 5 – by David Martinez, SDSO 000107 – SDSO 000109 |
| 329. | | | Property/Evidence Form by Santiesteban, SDSO 000110 |
| 330. | | | CAD Report – Event No. 3378446, SDSO 000111 – SDSO 000113 |
| 331. | | | CAD Report – Event No. 3378475, SDSO 000114 – SDSO 000121 |
| 332. | | | CAD Report – Event No. 3378490, SDSO 000122 – SDSO 000123 |
| 333. | | | CAD Report – Event No. 3378509, SDSO 000124 – SDSO 000125 |
| 334. | | | Vista Fire Department records of Heron Moriarty, SDSO 000243 – SDSO 000254 |

70

| Exhibit No. | Date Marked | Date Admitted | Description |
|---|---|---|---|
| 335. | | | Jail Area Activities Summary Report for 5/31/16, SDSO 000255 – SDSO 000267 |
| 336. | | | Jail Area Activity Report – 5/25/16 - 6/1/16, SDSO 000268 – SDSO 000310 |
| 337. | | | Booking Jacket of Heron Moriarty – Booking #16133045, SDSO 000311 – SDSO 000323 |
| 338. | | | Homicide Briefing Roster – 5/31/16, SDSO 000324 |
| 339. | | | DOJ Death In Custody Reporting Form, SDSO 000326 |
| 340. | | | Inmate Death Notification Check List – 5/31/16, SDSO 000327 |
| 341. | | | Heron Moriarty Inmate Detail print-out, SDSO 000328 |
| 342. | | | Jail Inmate History Report for Heron Moriarty, SDSO 000329 – SDSO 000331 |
| 343. | | | Jail Inmate History Report for Heron Moriarty re Housing Movement, SDSO 000332 |
| 344. | | | Crime/Incident Report by Joshua Hoodenpyle – 6/1/16 – Case #16127655, SDSO 000333 – SDSO 000334 |
| 345. | | | Follow-up Investigative Report by W. Altenhof – 6/2/16 – Case #16127655, SDSO 000335 |
| 346. | | | Follow-up Investigative Report by W. Altenhof – 8/8/16 – Case #16127655, SDSO 000336 |
| 347. | | | Follow-up Investigative Report by L. Brannan – 7/6/16 – Case #16127655, SDSO 000337 – SDSO 000338 |
| 348. | | | Officer Report by Sean Dwyer – 6/1/16 - Case #16127655, SDSO 000339 |

71

| Exhibit No. | Date Marked | Date Admitted | Description |
|---|---|---|---|
| 349. | | | Follow-up Investigative Report by D. Murtaugh – 6/14/16 - Case #16127655, SDSO 000340 – SDSO 000341 |
| 350. | | | Officer Report by Steven Frazier – 6/1/16 - Case #16127655, SDSO 000342 |
| 351. | | | Officer Report by Scott Paris – 6/1/16 Case #16127655, SDSO 000343 – SDSO 000345 |
| 352. | | | Officer Report by Joanna Perez – 6/1/16 - Case #16127655, SDSO 000346 |
| 353. | | | Follow-up Investigative Report by B. Powell – 6/3/16 - Case #16127655, SDSO 000347 – SDSO 000348 |
| 354. | | | Officer Report by Alejandro Sanchez – 6/1/16 - Case #16127655, SDSO 000349 |
| 355. | | | Follow-up Investigative Report by Det. Santiesteban – 6/15/16 - Case #16127655, SDSO 000350 |
| 356. | | | Follow-up Investigative Report by Det. Santiesteban – 7/21/16 - Case #16127655, SDSO 000351 |
| 357. | | | Follow-up Investigative Report by B. Patterson – 9/19/16 - Case #16127655 with redacted photos, SDSO 000352 – SDSO 000367 |
| 358. | | | Officer Report by Stanley Snyder – 6/1/16 - Case #16127655, SDSO 000368 |
| 359. | | | Officer Report by James Stathes – 6/1/16 - Case #16127655, SDSO 000369 – SDSO 000371 |
| 360. | | | Follow-up Investigative Report re Synopsis by B. Patterson – 6/2/16 - Case #16127655, SDSO 000372 – SDSO 000373 |
| 361. | | | Witness list by Joshua Hoodenpyle – 6/1/16 - Case #16127655, SDSO 000374 |

72

| Exhibit No. | Date Marked | Date Admitted | Description |
|---|---|---|---|
| 362. | | | Photos of scene and Moriarty for Incident #16127463, SDSO 000375 – SDSO 000379 |
| 363. | | | SDCJ Team 4 Roster, SDSO 000476 |
| 364. | | | Officer Report by Joseph Andali – 7/6/16 - Case #16127655, SDSO 000477 |
| 365. | | | Officer Report by Carl Fielstra – 7/6/16 - Case #16127655, SDSO 000478 |
| 366. | | | Officer Report by Nicholas Gaspar – 7/6/16 - Case #16127655, SDSO 000479 |
| 367. | | | Officer Report by Joseph Navarro – 7/6/16 - Case #16127655, SDSO 000480 – SDSO 000481 |
| 368. | | | Officer Report by Anthony Oliver – 7/7/16 - Case #16127655, SDSO 000482 |
| 369. | | | Officer Report by Stanley Snyder – 7/6/16 - Case #16127655, SDSO 000483 |
| 370. | | | March 2016 Training Bulletin re In-Custody Death/Suicide Prevention, SDSO 000486 |
| 371. | | | Audio recording of statement of Michelle Moriarty on 6/6/16 |
| 372. | | | Video – Rancho San Diego Sheriff's substation on 5/25/16 |
| 373. | | | Video – Rancho San Diego Sheriff's substation on 5/25/16 |
| 374. | | | Video - Rancho San Diego Sheriff's substation on 5/25/16 – Cell 3 |
| 375. | | | Video - SDCJ Sally port – west view on 5/25/16 |
| 376. | | | Video - SDCJ Sally port – east view on 5/25/16 |

73

| Exhibit No. | Date Marked | Date Admitted | Description |
|---|---|---|---|
| 377. | | | Video - VDF Intake video CAM 9 on 5/25/16 – 5/26/16 |
| 378. | | | Video - VDF Intake video CAM 8 on 5/25/16 – 5/26/16 |
| 379. | | | Video - VDF Intake sally port video CAM 3 on 5/25/16 – 5/26/16 |
| 380. | | | Video - VDF Intake sally port video CAM 5 on 5/25/16 – 5/26/16 |
| 381. | | | Video - VDF Intake video CAM 2 on 5/25/16 – 5/26/16 |
| 382. | | | Video - VDF Intake video CAM 3 on 5/25/16 – 5/26/16 |
| 383. | | | Video - VDF Ad Seg video CAM 12 on 5/31/16 |
| 384. | | | Audio recording of call to VDF re uncooperative prisoner |
| 385. | | | Audio recording of radio traffic - E3378475, 2231-2350 HRS |
| 386. | | | Audio recording of radio traffic - E3378475 |
| 387. | | | Audio recording of 911 call - E3378446 PH11 |
| 388. | | | Audio recording of 911 call - E3378446 PH17 |
| 389. | | | Audio recording of 911 call - E3378475 PH18 |
| 390. | | | Audio recording of 911 call - E3378475 PH19 |
| 391. | | | Audio recording of 911 call - E3378490 PH17 |
| 392. | | | Audio recording of 911 call - E3378509 PH11 |

74

| Exhibit No. | Date Marked | Date Admitted | Description |
|---|---|---|---|
| 393. | | | 6/1/16 Email from Stanley Snyder to Edwin Schroeder re Heron Moriarty/ timeline/ handwritten notes, SDSO 000495 – SDSO 000500 |
| 394. | | | Sheriff's Department policy 25 re prisoner transportation to Patrol Procedures Manual, SDSO 000495 – SDSO 000499 |
| 395. | | | 11/20/15 Sheriff's Detentions policy I.21 re Housing Unit Area Activity Log, SDSO 000500 – SDSO 000501 |
| 396. | | | 7/6/15 Training bulletin re Suicide prevention and awareness for inmates, SDSO 000506 – SDSO 000509 |
| 397. | | | July 2014 Training Bulletin re The Role of Adult Correctional Officers in Preventing Suicide, SDSO 000510 – SDSO 000512 |
| 398. | | | Training Bulletin re Suicide Awareness and Prevention, SDSO 000513 |
| 399. | | | 3/2/16 Use of Force Guidelines Addendum F page 13, SDSO 000514 |
| 400. | | | Training bulletin re Cord Cuff Maximum Restraint Technique Application, SDSO 000515 – SDSO 000517 |
| 401. | | | 10/3/14 Sheriff's Detentions policy I.93 re Use of Restraint Equipment, SDSO 000518 – SDSO 000523 |
| 402. | | | 3/14/16 VDF green sheet I.51.V re Inmate Movements, SDSO 000524 – SDSO 000525 |
| 403. | | | 3/14/16 VDF green sheet I.93.V re Use of Restraint Equipment, SDSO 000526 |
| 404. | | | May 2016 Training Bulletin re Use of Force and Handcuffed Prisoners, SDSO 000527 |

75

| Exhibit No. | Date Marked | Date Admitted | Description |
|---|---|---|---|
| 405. | | | VDF Deployment logs from 5-25-16 to 5-31-16, SDSO 000528 – SDSO 000540 |
| 406. | | | 6/29/17 Response to Grand Jury Report re Suicides in San Diego Jails dated 5/4/17, SDSO 000561 – SDSO 000564 |
| 407. | | | October 2016 Sheriff's Medical Services Division policy and procedure table of contents, SDSO 000565 – SDSO 000569 |
| 408. | | | August 2005 DOJ Suicide Rates report, SDSO 000570 – SDSO 000581 |
| 409. | | | Spreadsheet data from US DOJ website, SDSO 000582 – SDSO 000584 |
| 410. | | | 2011-2016 Jail Stats, SDSO 000585 |
| 411. | | | Completed Suicides 2000-2017, SDSO 000586 – SDSO 000587 |
| 412. | | | Inmate suicide statistics, SDSO 000957 – SDSO 000958 |
| 413. | | | Court documents re People v. Heron Moriarty Case Nol. MH112634, SDSO 000959 – SDSO 000966 |
| 414. | | | Inmate emails of Heron Moriarty from 5/27/16 – 5/31/16, SDSO 000967 – SDSO 000975 |
| 415. | | | Documents re suicide prevention and training, SDSO 000976 – SDSO 000999 |
| 416. | | | Tracking report re multi-disciplinary group meeting for 5/31/16, SDSO 001000 – SDSO 001007 |
| 417. | | | Court documents re Case No. EV24964, SDSO 001008 – SDSO 001023 |
| 418. | | | Court documents re Case No. EV25070, SDSO 001024 – SDSO 001039 |

PRETRIAL CONFERENCE ORDER                    Case No.: 3:17-cv-01154-LAB-AGS

| Exhibit No. | Date Marked | Date Admitted | Description |
|---|---|---|---|
| 419. | | | Deputy Report re 5/25/16 incident at Rancho San Diego station, SDSO 001058 |
| 420. | | | Officer Report by Travis Womack – 5/26/16 – Case #16126588, SDSO 001059 |
| 421. | | | Timeline of Events re Case #16127655, SDSO 001060 |
| 422. | | | Officer report by Nicolas Gowanlock – 5/1/16 – Case #16122131, SDSO 001061 – SDSO 001062 |
| 423. | | | Arrest/Juvenile Contact Report by Scott Seaman – 5/1/16 – Case #16122131, SDSO 001063 – SDSO 001066 |
| 424. | | | CAD Event E3323508 - 5/1/16, SDSO 001077 |
| 425. | | | CAD Event E3323531 - 5/1/16, SDSO 001078 – SDSO 001079 |
| 426. | | | CAD Event E3323564 - 5/1/16, SDSO 001080 – SDSO 001084 |
| 427. | | | CAD Event E3334801 - 5/6/16, SDSO 001085 |
| 428. | | | CAD Event E3339631 - 5/9/16, SDSO 001086 |
| 429. | | | CAD Event E3339655 - 5/9/16, SDSO 001087 – SDSO 001088 |
| 430. | | | CAD Event E3358384 - 5/17/16, SDSO 001089 – SDSO 001090 |
| 431. | | | CAD Event E3373642 - 5/24/16, SDSO 001091 – SDSO 001095 |
| 432. | | | CAD Event E3375892 - 5/24/16, SDSO 001096 – SDSO 001097 |
| 433. | | | CAD Event E3376539 - 5/25/16, SDSO 001098 – SDSO 001099 |
| 434. | | | CAD Event E2597882 - 6/18/15, SDSO 001100 – SDSO 001101 |

77

| Exhibit No. | Date Marked | Date Admitted | Description |
|---|---|---|---|
| 435. | | | Body worn camera video footage referenced in Arrest/Juvenile Contact Report by Scott Seaman – 5/1/16 – Case #16122131, SDSO 001142 |
| 436. | | | 1/1/06 – 12/31/16 Inmate Population Summary, SDSO 001143 |
| 437. | | | 3/2/16 Use of Force Guidelines – Addendum F, SDSO 001144 – SDSO 001163 |
| 438. | | | 11/4/15 Training outlines re Use of Force, SDSO 001164 – SDSO 001180 |
| 439. | | | 9/2/14 Training bulletin re Weapons Systems, SDSO 001181 – SDSO 001187 |
| 440. | | | Chemical Agent Types PPT, SDSO 001188 – SDSO 001229 |
| 441. | | | Chemical Agents Training Outline, SDSO 001230 – SDSO 001231 |
| 442. | | | Chemical Agents PPT, SDSO 001232 – SDSO 001241 |
| 443. | | | Chemical Agent Handbook, SDSO 001242 – SDSO 001256 |
| 444. | | | The History of Chemical Agent PPT, SDSO 001257 – SDSO 001272 |
| 445. | | | Chemical Agent Laws PPT, SDSO 001273 – SDSO 001295 |
| 446. | | | Methods of Delivery PPT, SDSO 001296 – SDSO 001338 |
| 447. | | | Most Often Asked Questions About Chemical Agents and OC in California, SDSO 001339 – SDSO 001341 |
| 448. | | | 1/28/16 Detentions Services policy J.4 re Enhanced Observation Housing, SDSO 001345 – SDSO 001348 |

78

| Exhibit No. | Date Marked | Date Admitted | Description |
|---|---|---|---|
| 449. | | | 1/12/16 VDF green sheet L.1.V re Laundry Schedule, SDSO 001349 – SDSO 001350 |
| 450. | | | 4/8/16 Detentions Services policy L.1 re Laundry Schedule, SDSO 001351 – SDSO 001353 |
| 451. | | | Subpoenaed records from East County Mental Health Clinic |
| 452. | | | Subpoenaed records from Sharp Mesa Vista Hospital |
| 453. | | | Subpoenaed records from Sharp Coronado Hospital |
| 454. | | | Subpoenaed records from PERT (Psychiatric Emergency Response Team) |
| 455. | | | Subpoenaed records from United Contractor Alliance, Inc./United Plumbing |
| 456. | | | Subpoenaed records from NASSCO |
| 457. | | | Subpoenaed records from F. Anne Truschmann |
| 458. | | | Subpoenaed records from El Cajon Police Department |
| 459. | | | Subpoenaed records from California Highway Patrol |
| 460. | | | Subpoenaed records from Norman High School re Elijah Moriarty |
| 461. | | | Subpoenaed records from Steele Canyon High School re Elijah Moriarty |
| 462. | | | Subpoenaed records from Norman High School re Eternity Moriarty |
| 463. | | | Subpoenaed records from Christian Unified Schools re Eternity Moriarty |
| 464. | | | Subpoenaed records from Steele Canyon High School re Alexandria Moriarty |

79

| Exhibit No. | Date Marked | Date Admitted | Description |
|---|---|---|---|
| 465. | | | Subpoenaed records from JPMorgan Chase Bank c/o CT Corp. re Heron Moriarty (3 volumes) |
| 466. | | | Subpoenaed records from Union Bank re Heron Moriarty |
| 467. | | | Juvenile Court records re Alexandria, Elijah, Eternity Moriarty (Vol. 1 of 2) |
| 468. | | | Juvenile Court records re Alexandria, Elijah, Eternity Moriarty (Vol. 2 of 2) |
| 469. | | | Intentionally omitted |
| 470. | | | Robert Taylor economic analysis |
| 471. | | | Deposition with exhibits of Robert Canning re Rochelle Nishimoto, et al. v. County of San Diego |
| 472. | | | Michelle Moriarty's responses to special interrogatories (set one) propounded by the County of San Diego |
| 473. | | | Michelle Moriarty's responses to request for production of documents (set one) propounded by the County of San Diego |
| 474. | | | Michelle Moriarty's responses to request for production of documents (set two) propounded by the County of San Diego |
| 475. | | | Michelle Moriarty's responses to special interrogatories (set two) propounded by the County of San Diego |
| 476. | | | Michelle Moriarty's responses to request for production of documents (set three) propounded by the County of San Diego |
| 477. | | | Michelle Moriarty's responses to special interrogatories (set one) propounded by Weidenthaler |
| 478. | | | Michelle Moriarty's responses to request for production of documents (set one) propounded by Weidenthaler |

80

PRETRIAL CONFERENCE ORDER                          Case No.: 3:17-cv-01154-LAB-AGS

| Exhibit No. | Date Marked | Date Admitted | Description |
|---|---|---|---|
| 479. | | | Michelle Moriarty's responses to special interrogatories (set one) propounded by CPMG |
| 480. | | | Michelle Moriarty's responses to request for production of documents (set two) propounded by Weidenthaler |
| 481. | | | Michelle Moriarty's responses to requests for admission (set one) propounded by CPMG |
| 482. | | | Michelle Moriarty's supplemental responses to requests for admission (set one) propounded by CPMG |
| 483. | | | Michelle Moriarty's responses to special interrogatories (set one) propounded by Amanda Daniels |
| 484. | | | Michelle Moriarty's supplemental responses to special interrogatories (set one) propounded by Amanda Daniels |
| 485. | | | Michelle Moriarty's responses to requests for admission (set one) propounded by Amanda Daniels |
| 486. | | | Michelle Moriarty's supplemental responses to requests for admission (set one) propounded by Amanda Daniels |

## VI.

## **STIPULATIONS**

The parties have agreed to the following stipulations:

1.     Moriarty was a 44 years old. He was married to his wife Michelle. They had three children, Alexandria, Elijah, and Eternity.

2.     The Parties stipulate that Defendant Weidenthaler was as working under his course and scope of employment at all times relevant to the claims alleged against him.

/ / /

81

PRETRIAL CONFERENCE ORDER                    Case No.: 3:17-cv-01154-LAB-AGS

3.     According to the medical examiner, Dr. Mena, the cause of death was asphyxia.  The manner of death was a suicide.

4.     Plaintiffs' initial complaint was filed on June 9, 2017 against the County of San Diego, Dr. Alfred Joshua, and DOES 1 through 10, inclusive.

5.     Plaintiffs' first amended complaint was filed on March 21, 2018.  The defendants named in the first amended complaint included the County of San Diego, Sgt. Weidenthaler, Dr. Lissaur, nurse practitioner Daniels, and CPMG.

6.     On May 26, 2016, Heron Moriarty was arrested and transferred to Central Jail.  At Central Jail, Moriarty was asked if he was suicidal.  He answered "no," then "yes."  The sergeant on duty refused to accept him because the Central Jail did not have a safety cell available.  The sergeant confirmed that a safety cell was available at Vista Detention Facility.

7.     A "safety cell" is a secured cell meant to prevent an inmate from harming himself or others.

8.     Moriarty was transferred to Vista Detention Facility.  Later that day, Moriarty was going to be transferred back to Central Jail. Before the transfer, Moriarty made bizarre and threatening comments to other inmates.  A decision was made to keep Moriarty at Vista Detention Facility and he was placed in an administrative-segregation cell ("ad-seg"), which is a single occupant cell for assaultive/homicidal inmates.

9.     Dr. Lissaur evaluated Moriarty on May 28, 2016.  Dr. Lissaur is a psychiatrist.  Dr. Lissaur did not believe Moriarty was suicidal.  Dr. Lissaur determined Moriarty was bipolar and was currently acting manic with psychotic features.

10.    Dr. Lissaur evaluated Moriarty again on May 30, 2016.  Dr. Lissaur determined that Moriarty was experiencing a bipolar/manic episode.  Dr. Lissaur recommended that if Moriarty were to be released the next day, he should be taken to a hospital and placed on an involuntary psychiatric 72-hour hold for evaluation,

82

which is commonly called a "5150 hold." 5150 is a section of the California Welfare and Institutions Code that provides adults who are considered a "danger to themselves or others, or who are gravely disabled" may be placed on an involuntary hold for up to 72-hours. Moriarty returned to the ad-seg cell, after this evaluation with Dr. Lissaur.

11. During Moriarty's detainment at Vista Detention Facility, his wife, Michelle, called Vista Detention Facility 31 times and sent multiple faxes. Some of the phone calls were with nurses at Vista Detention Facility. Michelle Moriarty believed that Heron Moriarty was suicidal while he was at Vista Detention Facility. The purpose of some of Michelle Moriarty's phone calls or faxes were to get someone at Vista Detention Facility to get Heron Moriarty sent to a hospital or be placed on a 5150 hold after his release since she was afraid for his life.

12. Vista Detention Facility officials asked NP Daniels to evaluate Moriarty on the morning of May 31, 2016 so that she could present her findings to the Multi-Disciplinary Group meeting, which took place later that morning at 10:00 a.m. Psychiatric Liaison Deputy, Lois Guillory, escorted NP Daniels to Moriarty's cell.

13. NP Daniels was qualified as a psychiatric nurse practitioner to evaluate Heron Moriarty. NP Daniels' custom and practice was to review at least the last psychiatric note prior to evaluating an inmate/patient.

14. NP Daniels documented her evaluation of Moriarty in an evaluation note at 8:55 a.m. on May 31, 2016. NP Daniels did not believe Moriarty was suicidal, but she did believe that Moriarty was psychotic and homicidal because he threatened to kill anyone who came into his cell to try to move him to a psychiatric hospital. NP Daniels recommended that Moriarty be placed in a safety cell.

/ / /

/ / /

/ /

83

15.     NP Daniels' recommendation that Moriarty be placed in a safety cell for homicidal ideations was relayed to Sgt. Weidenthaler through Psychiatric Liaison Deputy, Louis Guillory.  Sgt. Weidenthaler declined to follow NP Daniels' recommendation to place Moriarty in a safety cell.

16.     Approximately an hour and half after Nurse Daniels' evaluation on May 31, 2016, Moriarty's treatment was discussed in a multi-disciplinary group meeting.  The Parties disagree whether NP Daniels' recommendation and Weidenthlaer's denial was discussed during the meeting. NP Daniels believed that the other committee members knew her recommendation had been overruled and that the MDG was merely considering alternatives. Plaintiffs contend other participants in the meeting testified NP Daniels did not relay that information. Placement of Moriarty in the "Psychiatric Stabilization Unit" ("PSU") was discussed during the multi-disciplinary group meeting.  Ultimately, because Moriarty promised to take prescribed medication, a decision was made to keep Moriarty in ad-seg.

17.     The criteria to place an inmate in the PSU reflects the same criteria as defined by the California Welfare and Institution Code 5150.

18.     Moriarty committed suicide at 9:15 p.m. on May 31, 2016.

19.     On June 6, 2016, Michelle Moriarty was interviewed by an investigator pertaining to Moriarty's death.  During this interview, Michelle Moriarty told the investigator that she told the jail that Moriarty was a suicide risk while he was at Vista Detention Facility and that she was worried about his life. Michelle Moriarty told the investigator that Heron Moriarty should have been put on suicide watch or something to that affect.  The investigator told Michelle Moriarty that Moriarty was talking to doctors.  In response to that statement from the investigator, Michelle Moriarty told the investigator that they could have done more.

/ / /

84

# VII.

## <u>DEPOSITIONS IN LIEU OF TESTIMONY</u>

At the current time, the parties do not anticipate using deposition testimony. However in the event a witness becomes unavailable, parties reserve the right to amend this section of the Order.

# VIII.

## <u>JURY TRIAL</u>

Parties are invoking their right to a trial by jury.

# IX.

## <u>TRIAL ESTIMATE</u>

Parties estimate a fourteen (14) day trial by jury.  Each side should be given equal amount of time for opening statements, closing arguments, and all witnesses and evidentiary testimony.

The parties agree to the foregoing Pretrial Conference Order in its form and substance.

**IT IS SO ORDERED**

Dated: _____, 2020       _____
                                     HON. LARRY A. BURNS
                                     UNITED STATES DISTRICT JUDGE

# **<u>Exhibit C</u>**



# County of San Diego

**JOHN M. PELLEGRINO**
DIRECTOR

**DEPARTMENT OF PURCHASING AND CONTRACTING**
5560 OVERLAND AVENUE, SUITE 270, SAN DIEGO, CALIFORNIA 92123-1204
Phone (858) 505-6387          Fax (858) 715-6452

**ALLEN R. HUNSBERGER**
ASSISTANT DIRECTOR

November 18, 2016

Steven Mannis
Correctional Physicians Medical Group
3525 Del Mar Heights Rd #213
San Diego, CA 92067

## NOTICE OF TERMINATION FOR CONVENIENCE – CONTRACT 549469

The County of San Diego is exercising its option to terminate contract number 549469 for On-Site and Tele psychiatry Services pursuant to Paragraph 7.5 of the agreement. This contract is being terminated effective January 31st, 2017.  Staff from the Sheriff's Medical Services Division will be contacting you regarding any contract close-out issues.

If you have any contractual questions, please contact Richard McCarvell Sr. Procurement Contracting Officer at (858) 505-6566, or by email at Richard.Mccarvell@sdcounty.ca.gov.

**RICHARD MCCARVELL,** Senior Procurement Contracting Officer
Department of Purchasing and Contracting

cc:      DPC Correspondence File