Christopher S. Morris, Esq., SBN 163188
cmorris@morrislawfirmapc.com
Danielle R. Pena, Esq., SBN 286002
dpena@morrislawfirmapc.com
MORRIS LAW FIRM, APC
501 West Broadway, Suite 1480
San Diego, CA 92101
Telephone: (619) 826-8060
Facsimile: (619) 826-8065

Attorneys for Plaintiffs

SUPERIOR COURT OF THE STATE OF CALIFORNIA

COUNTY OF SAN DIEGO

| | |
|---|---|
| MICHELLE MORIARTY, an individual, as Successor in Interest to the ESTATE OF HERON MORIARTY and as GUARDIAN AD LITEM to ALEXANDRIA MORIARTY, ELIJAH MORIARTY, and ETERNITY MORIARTY,<br><br>Plaintiff,<br><br>v.<br><br>COUNTY OF SAN DIEGO, and DOES 1 through 10, Inclusive,<br><br>Defendants. | Case No.: 3:17-cv-01154-LAB-AGS<br><br>**OPPOSITION TO DEFENDANT DALE WEIDENTHALER'S MOTION IN LIMINE #3 TO EXCLUDE EVIDENCE OF POST INCIDENT TEXT MESSAGES BETWEEN NURSE DANIELS AND DEPUTY JOHNSON**<br><br>(MOTION IN LIMINE 3 OF 5)<br><br>Date: June 12, 2020<br>Time: 2:00 p.m.<br>Dept: 1410<br>Judge: Hon. Larry A. Burns |

# I.

## <u>INTRODUCTION TO THE MOTION</u>

Defendant Weidenthaler moves this Court to preclude from evidence a text chain between a county employee, Deputy Johnson, and Defendant Daniels, a Correction Physician's Medical Group ("CPMG") contracted psychiatric provider.[1] Defendant Weidenthaler contends "because this document is hearsay… it shall not be displayed to the jury…"  For several reasons analyzed below, Defendant Weidenthaler is wrong.  The text chain is not hearsay because it is a party admission.  Assuming *pro arguendo* it is hearsay, the text chain meets the standards of two hearsay exceptions.

# II.

## <u>PERTINENT FACTUAL BACKGROUND</u>

The text chain starts at 11:52 p.m. on May 31, 2016, two hours after Heron Moriarty was found dead in his cell.  Deputy Johnson exudes sorrow for what he thought was a preventable suicide.  Deputy Johnson stated, "It looks bad because rigormortis already set in," and said "everyone else dropped the ball…"  In response, 40 minutes later, Defendant Daniels was most concerned that her note, which documented her recommendation for a safety cell, would be destroyed because the county needed a "scapegoat."  Johnson goes on to compare Heron Moriarty's suicide to another preventable suicide that occurred in 2015 in which a safety cell recommendation was also overruled.  (Exhibit 1, 107:15-108:6.) Johnson then states, "yea this one is gonna cost the county."  (Exhibit 2.)

These statements are made by employees and agents of the county. Defendant Daniels is defendant in this action.  As such, they are party admissions. These statements are present sense impressions, and excited utterances.  Both of

/ / /

_____

[1] Deputy Johnson was a psychiatric liaison deputy, which means he escorted the psychiatrists around the jail during their clinical evaluations.

1  these witnesses can be thoroughly examined regarding their text messages and the

2  underlying context.  Accordingly, these messages should be admitted into evidence.

3  ## II.

4  ## THE TEXT CHAIN IS NOT HEARSAY

5  Federal Rule of Evidence 801(d) lists types of statements that are "not

6  hearsay."  These include party admissions and employee party admissions.  *Id*.

7  801(d)(2); *Oracle U.S.A. v. SAP AG*, 2012 U.S. Dist. LEXIS 107147, *6 (Cal. N.D.

8  2012).  An employee party admission is a statement offered against an opposing

9  party, made by a declarant who was an employee of the party at the time the

10  statement was made, and which concerns a matter "within the scope of the agency

11  or employment."  See *Sea-Land Serv., Inc. v. Lozen Int'l*, LLC, 285 F.3d 808, 821

12  (9th Cir. 2002).  The term "[W]ithin the scope of the agency or employment" is

13  generally interpreted as meaning that the statement is "related to the declarant's

14  duties."  5 Weinstein's Federal Evidence § 801.33[2][c]; *Oracle U.S.A. v. SAP AG*,

15  2012 U.S. Dist. LEXIS 107147, *6 (Cal. N.D. 2012).  Admissions by a party-

16  opponent are excluded from the category of hearsay, and no guarantee of

17  trustworthiness is required in the case of an admission.  *Id*.

18  Here, it is undisputed that Deputy Johnson was an employee of the county at

19  the time these text messages were generated and sent.  The messages involve

20  matters regarding Deputy Johnson's duties as a psychiatric liaison at Vista

21  Detention Facility and inmate that was found dead.  His messages (and testimony

22  relating to the messages) are relevant to the claims against Weidenthaler as well as

23  the municipal claims in that it helps to establish a pattern of similar occurrences.

24  Clearly, Defendant Daniels' statements are party admissions and should be

25  admitted into evidence because it shows not only her flippant response, but also her

26  lack of shock, and stronghold belief that Heron Moriarty's denial was the end-all-

27  be-all.

28  / / /

# III.

## EXCEPTIONS TO THE HEARSAY RULE APPLY TO THE TEXT CHAIN

Assuming *pro arguendo* that this Court is convinced these statements are hearsay, the statements apply to two hearsay exceptions.  Rule 803(1) permits admission of statements that are otherwise hearsay if the statements reveal the present sense impression of the declarant.  See Fed. R. Evid. 803(1).  One of the key components of this exception is that the statement be made nearly contemporaneously with the happening of the event or condition.  See *Bemis v. Edwards*, 45 F.3d 1369, 1372 (9th Cir. 1995).  Similarly, Rule 803(2) permits statements made under excitement and stress. In fact, the Supreme Court has held that hearsay statements characterized as "excited utterances" or "spontaneous declarations" are "firmly rooted" exceptions to hearsay.  See *Idaho v. Wright*, 497 U.S. 805, 820 (1990); *White v. Illinois*, 502 U.S. 346, 355-56 (1992).  The reasoning for the exception is that such statements are "given under circumstances that eliminate the possibility of fabrication, coaching, or confabulation," so that "the circumstances surrounding the making of the statement provide sufficient assurance that the statement is trustworthy."  *Winzer v. Hall*, 494 F.3d 1192, 1197 (9th Cir. 2007).

Here, Johnson was not involved with Moriarty.  (Exhibit 1, 31:23-32:2; 53:11-17.)  He was working on the day of Moriarty's suicide and heard through "the grapevine" that he killed himself.  (Exhibit 1, 44:6-18.)  Johnson could not recall when exactly he learned of the suicide, but it cannot be more than two hours because Moriarty was discovered at 9:15 p.m., which Johnson was not present for.  Johnson texted Defendant Daniels at 11:42 p.m.  But, it is apparent from the messages that Deputy Johnson was under the excitement and stress of just learning that Moriarty had died.  Deputy Johnson was so upset, he breached protocol and

/ / /

/ / /

OPPOSITION TO WEIDENTHALER'S MOTION IN LIMINIE #3      3:17-cv-01154-LAB-AGS

made statements against his employer's interest.  This, in and of itself, is evidence of trustworthiness.[2]

As for Defendant Daniels, her statements clearly fall under both exceptions because her statements were made contemporaneously when she was notified that Moriarty killed himself.  This is evidenced by Defendant Daniels' "OMG" statement.

## IV.

## CONCLUSION

Defendant Weidenthaler's motion should be denied because the text chain is not hearsay.  Rather, they are party admission.  However, assuming this Court classifies the text chain as hearsay, both the excited utterance and present sense impression exceptions apply.

MORRIS LAW FIRM, APC

Dated: May 29, 2020          By: __s/ Christopher S. Morris_____
                                    Christopher S. Morris, Esq.
                                    Danielle R. Pena, Esq.
                                    Attorney for Plaintiffs

---

[2] Even assuming Johnson waited two hours to notify Defendant Daniels, courts have routinely found that statement made within two hours of the event, fall within the exception. *United States v. George*, 291 Fed. Appx. 803 (9th Cir.), cert. denied, 555 U.S. 1060 (2008); See *Morgan v. Foretich*, 846 F.2d 941, 25 Fed. R. Evid. Serv. (CBC) 881 (4th Cir. 1988); *People v. Stewart*, 39 Colo. App. 142, 568 P.2d 65 (Colo. Ct. App. 1977); *United States v. Smith*, 606 F.3d 1270 (10th Cir. 2010).

OPPOSITION TO WEIDENTHALER'S MOTION IN LIMINIE #3      3:17-cv-01154-LAB-AGS

## <u>INDEX OF EXHIBITS TO OPPOSITION TO DEFENDANT DALE WEIDENTHALER'S MOTION IN LIMINE #3 TO EXCLUDE EVIDENCE OF POST INCIDENT TEXT MESSAGES BETWEEN NURSE DANIELS AND DEPUTY JOHNSON</u>

| Exhibit | Description | Pages |
|---------|-------------|-------|
| 1 | Pertinent Portions of the Deposition of Duane Johnson | 7-16 |
| 2 | Text Messages Between Amanda Daniels and Duane Johnson | 17-21 |

OPPOSITION TO WEIDENTHALER'S MOTION IN LIMINIE #3   3:17-cv-01154-LAB-AGS

# EXHIBIT 1

Duane Johnson  12/12/2018

1              IN THE UNITED STATES DISTRICT COURT

2            FOR THE SOUTHERN DISTRICT OF CALIFORNIA

3

4   MICHELLE MORIARTY, an individual as  )
    Successor in Interest to the Estate  )
5   of HERON MORIARTY, and as Guardian Ad)
    Litem to ALEXANDRIA MORIARTY, ELIJAH )
6   MORIARTY, and ETERNITY MORIARTY,     )
                                         )
7            Plaintiffs,                 )
                                         )
8       v.                               )
                                         )Case No.:
9                                        )No. 17cv1154-LAB(AGS)
    COUNTY OF SAN DIEGO, DR. ALFRED      )
10  JOSHUA, individually, and DOES 1     )
    through 10, Inclusive,               )
11                                       )
             Defendants.                 )
12  _____ )

13

14              DEPOSITION OF DUANE JOHNSON

15                 SAN DIEGO, CALIFORNIA

16                  December 12, 2018

17

18  REPORTED BY BRIDGET L. MASTROBATTISTA, CSR NO. 7715,
             REGISTERED PROFESSIONAL REPORTER
19              REGISTERED MERIT REPORTER
              CERTIFIED REALTIME REPORTER
20

21

22

23

24

25

Duane Johnson  12/12/2018

1          Be that as it may, we just got these on

2   Thursday, so sort of puts me behind the eight ball

3   to ask questions that are relevant.  But I will ask

4   him if he knows and if he does know, then we'll deal

5   with it there.

6   BY MR. MORRIS:

7        Q    Do you know of any other situation

8   regarding Nurse Brantman where her standard

9   provision of care was called into question?

10       A    No.

11       Q    Which brings us down to Moriarty.  The

12   document related to Moriarty states:  Patient was

13   seen by Dr. Lissaur two times and then by NP Daniels

14   (all within 5 days prior to inmate suicide) who did

15   not place the patient in PSU or Inmate Safety

16   Program even though all of the information was

17   provided to them as per their own documentation.

18   This was reviewed by your medical director who

19   stated that the patient should have been admitted to

20   PSU."

21            Do you see that?

22       A    Yes.

23       Q    Okay.  Now, this brings us to Moriarty,

24   sir.  Were you involved at all in any interaction

25   with Inmate Moriarty prior to your notification to

Duane Johnson  12/12/2018

1   Nurse Daniels that Moriarty had passed?

2          A    No.

3          Q    Had you heard anybody -- prior to today

4   and reading this email, have you heard any talk that

5   Dr. Lissaur or Nurse Daniels -- well, let's focus on

6   Dr. Lissaur first.

7               This email seems to be -- and I don't want

8   to mischaracterize it but seems to be taking issue

9   with Dr. Lissaur's care.

10              Have you heard any talk, other -- outside

11  anything that you may have had with your lawyer in

12  and around that time related to Dr. -- the level of

13  care provided by Dr. Lissaur to Mr. Moriarty?

14         A    No.

15         Q    And let's talk about Nurse Daniels a

16  little bit.  Could you describe for us your

17  relationship with Nurse Daniels at the time of

18  Mr. Moriarty's death --

19         A    She was the --

20         Q    -- in and around May 31st, 2006.

21         A    She was one of the mental health providers

22  that would work on certain days of the week and then

23  the other mental health professional would work on

24  some of the other days of the week.

25         Q    And harkening back to 2016, can you tell

Duane Johnson  12/12/2018

1       A    I would have worked -- if it was just the

2    two days, I would have worked the 25th and the 26th.

3       Q    And then would you have been off Friday,

4    Saturday, Sunday, Monday, Tuesday?

5       A    Correct.

6       Q    We know that you were working Tuesday --

7    oh, maybe not.  The text exchange related to

8    Mr. Moriarty's death that you sent to Amanda Daniels

9    came at like 11:00 at night.

10           Do you remember the circumstances in which

11   you found out that Mr. Moriarty had passed in

12   custody?

13      A    I don't remember -- excuse me.  I don't

14   remember the exact circumstances.  I can't remember

15   if I was working overtime on Tuesday or not.  I may

16   have simply heard through the grapevine or at a

17   briefing that inmate -- you know, we had an inmate

18   death in custody.

19      Q    Okay.  Confusing to me, because you didn't

20   have a mental health liaison deputy at night.  If

21   you were working overtime, then would you have not

22   been working in the mental health liaison deputy

23   capacity?

24      A    If I was working overtime at that time at

25   night, no, I would be regular line staff.

Duane Johnson  12/12/2018

1   person who found him?  And it's says Brafaish,

2   Rafail, but we all know that is a combination of the

3   two names.

4          Do you know who that might be referring

5   to?

6      A   I have no idea who that is.

7      Q   At any rate, it details this person

8   finding what they found when they encountered

9   Mr. Moriarty.  In fact, he had a T-shirt shoved in

10  his mouth.

11         That is also something that you put into

12  your text message.  Did you arrive at any time to --

13  at the man down with Mr. Moriarty?

14     A   No.

15     Q   And do you know from where you obtained

16  the information that he had a T-shirt in his mouth?

17     A   Just word of mouth.

18     Q   And given that you had achieved or

19  obtained this information via word of mouth, are we

20  safe to assume then that you were working the night

21  of May 31st, 2016?

22     A   I can't recall if I was actually working

23  overtime or not.

24     Q   But it would have been strange for

25  somebody to call you and give you details like this

Duane Johnson  12/12/2018

1      Q    You just heard talk of it at the jail?

2      A    Yes.

3      Q    You don't remember who told you?

4      A    No.

5      Q    And the information that you had been told

6  at the jail previous to texting Ms. Daniels was that

7  she had recommended a safety cell but had been

8  overruled, right?

9      A    Correct.

10     Q    She writes, "Oh, my God.  Thank you for

11  letting me know.  Yes, I asked but the sergeant said

12  no.  He denied SI."

13          Do you know what that means there?

14     A    Suicidal ideations.

15     Q    And then you write, "This was Nishimoto

16  all over again," right?

17     A    Yes.

18     Q    That's your testimony.  That's your

19  statement there, right?

20     A    Yes.

21     Q    And in Nishimoto we know that

22  Nurse Brantman had recommended a med ISO cell but

23  had been overruled, right?

24     A    Well, I wouldn't say overruled.  I just

25  say that that was the decision that was made by

Duane Johnson  12/12/2018

```
 1    supervisory at the time.  Yeah, I guess you could

 2    say overruled.

 3        Q    Okay.  And in this case the similarities

 4    being that Nurse Daniels had recommended a safety

 5    cell but had been similarly overruled, right?

 6        A    Correct.

 7        Q    And then she writes:  "Ugh, I feel sick."

 8             Do you see that?

 9        A    Yes.

10        Q    Sir, do you have an opinion as to whether

11    or not when it comes to Nishimoto, that the staff

12    had discretion to follow -- or, excuse me, follow or

13    not follow Nurse Brantman's recommendation in that

14    case?

15             MR. WELSH:  Objection.  It's vague and

16    ambiguous.  Incomplete.  And it's kind of going

17    against the agreement that you had in the Nishimoto

18    deposition about not asking specific opinions to

19    Moriarty.  Now we're in the Moriarty deposition and

20    you're asking specific opinions as to Nishimoto.

21             MR. MORRIS:  Well, I'm trying to draw the

22    similarities because he says "all over again," and

23    I'm trying to figure out what are the other

24    similarities.

25             MR. KUTYLA:  You also asked him -- and I'm
```

Duane Johnson  12/12/2018

1      I, DUANE JOHNSON, declare under

2  penalty of perjury under the laws of the State of

3  California that the foregoing is true and correct;

4  that I have read my deposition and have made the

5  necessary corrections, additions or changes to my

6  answers I deem necessary.

7

8  Executed on this_____day of_____,

9  2018.

10

11                    _____

12                         DUANE JOHNSON

13

14

15

16

17

18

19

20

21

22

23

24

25

Duane Johnson  12/12/2018

1                    C E R T I F I C A T E

2

3    STATE OF CALIFORNIA

4    COUNTY OF SAN DIEGO

5

6                        I, Bridget Lynn
     Mastrobattista, Certified Shorthand Reporter, in and
7    for the State of California, Certificate No. 7715,
     do hereby certify:

8
                         That the witness in
9    the foregoing  deposition was by me first duly sworn
     to testify to the truth, the whole truth, and
10   nothing but the truth in the foregoing cause; that
     the deposition was then reported by me in shorthand
11   and transcribed, through computer-aided
     transcription, under my direction; and that the
12   above and foregoing transcript, is a true record of
     the testimony elicited and proceedings had at said
13   deposition.

14                        I do further certify
     that I am a disinterested person and am in no way
15   interested in the outcome of this action or
     connection with or related to any of the parties in
16   this action or to their respective counsel.

17
                         In witness whereof, I
18   have hereunto set my hand this      day of         ,
     2018.
19

20

21            _____

22            Bridget Lynn Mastrobattista, CSR No. 7715,
                      RPR, CRR, RMR
23

24

25

# EXHIBIT 2



**Johnson**

Tuesday, May 31, 2016

J — Sorry for the lateness. Just heads up. Moriarty killed himself tonight.
11:42 PM

J — You saw him today?
11:43 PM

Yes . How
11:44 PM

J — He stuffed his thirty down his throat and choked

I heard you had recommended safety cell but we're overruled?
11:45 PM

Omg. Thank you for letting me know

Yes
11:45 PM

I asked but sergeant said no
11:46 PM

He denied si
11:47 PM

J — This was Nishimoto all over again.
11:47 PM

Ughh. I feel sick.
11:48 PM

Enter message

**SDSO 001041**



SDSO 001042

< **Johnson**

J — I can't right now. I'll talk to jeanette when she come in and have her get it.
*1:45 AM*

J — I read the whole history with this guy. He was supposed to go into a safety cell at CJ. Bit they were full that Thursday night so he was brought here to VDF. And I don't know why he never went into the safety cell or at least EOH.
*1:55 AM*

J — Jeanette has all your notes printed and saved in her office.
*5:07 AM*

*5:08 AM* Awesome thank u 

J — Yep right at the bottom is your note about discussing with the sgt. About the safety cell and he said no.
*5:10 AM*

*5:11 AM* K good 

J — Try to have a nice day. Don't worry as usual everyone else dropped the ball not you.
*5:13 AM*

Thank you.  I just know they need a scapegoat....
*5:14 AM*

+ Enter message  

SDSO 001043

📱 📌 ∞ ☎ ✂ 📧 📶 📧 ⋯ ⚹ ⏰ 📶 85% 🔋 10:46 AM

⟨   **Johnson**          📞   🔍   ⋮

5:08 AM  Awesome thank u 

(J) Yep right at the bottom is your note about discussing with the sgt. About the safety cell and he said no.
5:10 AM

5:11 AM  K good 

(J) Try to have a nice day. Don't worry as usual everyone else dropped the ball not you.
5:13 AM

Thank you. I just know they need a scapegoat.... 
5:14 AM

(J) EOH is a good thing but they have to use it.
5:53 AM

(J) There was no reason he should have not gone in. I was working when he was brought in and they stuck into S5
5:54 AM

5:54 AM  Who decided that 

(J) Lt banks and sgt. Estrada    6:53 AM

+    Enter message            

21

SDSO 001044