THOMAS E. MONTGOMERY, County Counsel
County of San Diego
By CHRISTOPHER J. WELSH, Senior Deputy (SBN 120766)
   E-mail: Christopher.Welsh@sdcounty.ca.gov
   FERNANDO KISH, Senior Deputy (SBN 236961)
   E-mail: Fernando.Kish@sdcounty.ca.gov
1600 Pacific Highway, Room 355
San Diego, California 92101-2469
Telephone: (619) 531-4860; Fax: (619) 531-6005

Attorneys for Defendant County of San Diego

## IN THE UNITED STATES DISTRICT COURT

## FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MICHELLE MORIARTY, an individual, as Successor in Interest to the Estate of HERON MORIARTY and as Guardian Ad Litem to ALEXANDRIA MORIARTY, ELIJAH MORIARTY, and ETERNITY MORIARTY, | No. 17cv1154-LAB(AGS) |
| Plaintiffs, | **COUNTY OF SAN DIEGO'S RESPONSE TO PLAINTIFFS' MOTION TO TAKE MS. WERNER'S DEPOSITION; LIST WERNER AS A WITNESS; AND COMPEL PRODUCTION OF STATEMENTS OBTAINED FROM MS. WERNER** |
| v. | |
| COUNTY OF SAN DIEGO, DR. ALFRED JOSHUA, individually, and DOES 1 through 10, Inclusive, | |
| Defendants. | Magistrate: Hon. Andrew G Schopler<br>Judge: Hon. Larry A. Burns |

## INTRODUCTION

The County is not opposing Plaintiffs' effort to take the deposition of Ms. Werner. Further, there are no unprivileged witness statements from Ms. Werner to produce. Still, the misstatements and incorrect assumptions made by Plaintiffs in their motion need to be addressed. Finally, the County asks the Court to preclude Plaintiffs from benefiting from their improper questioning of Ms. Werner, ignoring the attorney-client privilege, about her communications with County Counsel's office.

/ / /

## I.  There was no written or recorded statement from the 2018 interview of Werner in the Nishimoto case.

This is not a formal discovery motion, yet Plaintiffs seek an order requiring the County to produce witness statements.  The motion should be denied on that basis.  In addition, any statement obtained by County Counsel from a County employee like Ms. Werner is protected from disclosure by the attorney-client and work product privileges. Plaintiffs cannot claim any good cause to pierce the privileges.

## II.  Plaintiffs make numerous inaccurate accusations and misstatements.

Plaintiffs claim that medical records clerk Werner gave her account of the events leading to Mr. Moriarty's suicide to County Counsel as of March 2018, but that her identity was withheld despite on-point discovery requests propounded by Plaintiffs. Specifically, Plaintiffs assert that Ms. Werner should have been identified in July of 2018 in response to Interrogatory No. 29.  That interrogatory asks whether anyone "recommend[ed]" Mr. Moriarty be placed in a safety cell.

These allegations are mistaken and unfounded.  First, Ms. Werner and her recollection about the events leading up to Mr. Moriarty's suicide were not known to County Counsel in March of 2018, and were not known to County Counsel when the response to Interrogatory 29 was provided.  (Declaration of Welsh.)

After the County responded to Interrogatory No. 29 in the Moriarty case, Ms. Werner was interviewed in a separate case, the Nishimoto case.  During that interview she mentioned being present at Vista jail the morning before Mr. Moriarty's suicide.  At the time, different attorneys from the Office of County Counsel were assigned to the Nishimoto and Moriarty cases, and County Counsel assigned to the Moriarty case did not connect Ms. Werner's statement in the Nishimoto case as being responsive to Interrogatory No. 29 in the Moriarty case and did not supplement the County's response. (Declaration of Welsh.)

/ / /

/ / /

17cv1154-LAB(AGS)

In addition, the County's response to Interrogatory No. 29 was proper because it listed CPMG Nurse-Practitioner Amanda Daniels as the person who recommended safety cell placement. As a records clerk, Ms. Werner was not in a position to "recommend" placement of an inmate in any psychiatric housing. She did not have a medical or psychiatric background, and had no authority to make any such recommendation. It appears Ms. Werner's concerns may have led Nurse-Practitioner Daniels to evaluate Moriarty that morning and make the safety cell recommendation, but it was up to the psychiatric professional, not records clerk Werner, to make a recommendation.

Details of Ms. Werner's communication with County Counsel are protected by the attorney-client privilege and/or the attorney work-product doctrine, and the County does not waive those privileges. County Counsel is informed and believes that if she is called as a witness, Ms. Werner is expected to testify:

-    She worked 50 feet away from Mr. Moriarty's cell and never met or even saw him;

-    While she at one point mentioned asking Sgt. Weidenthaler whether Mr. Moriarty could be placed in a safety cell because she could hear him bellowing, she later corrected this and now specifically recalls that when she asked Sgt. Weidenthaler about Mr. Moriarty she was <u>not</u> raising a question about placing him in a safety cell;

-    She was not a psychiatric professional or a member of the sworn staff. Rather, she was a medical records clerk whose job duties and role did not involve determining whether an inmate would be placed in a safety cell;

(Declaration of Welsh.)

Ms. Werner's role as a medical records clerk must be viewed in the context of the basic facts that investigation and discovery have established:

a)    Mr. Moriarty was in an Administrative Segregation cell, which is the type of cell used to isolate inmates who threaten to harm others. During the three days leading up to the day of his suicide, Mr. Moriarty was evaluated

- 3 -

17cv1154-LAB(AGS)

twice by a Psychiatrist employed by Defendant Correctional Physicians Medical Group ("CPMG"), Dr. Lissaur, and found not to be suicidal. (Exhibit A, excerpts from Deposition of Ralph Lissaur taken on August 21, 2018, hereinafter "Lissaur Depo." at pages 213:17-18, 217:7-15, 121:12-23, 122:3-4, 137:23-24, 139:21-23, 140:5-12)

b)     Ms. Werner reportedly says that the morning before Mr. Moriarty's suicide, she was at the nurses' station questioning the need to do something for Moriarty because she could hear him making loud noises.

c)     Later that morning, the jail Nursing Supervisor asked Dr. Goldstein (the former Medical Director for the jails who facilitated Multidisciplinary Group Meetings) if Mr. Moriarty's situation could be reviewed by the Multidisciplinary Group.  Dr. Goldstein agreed, and asked that the CPMG psychiatric professional on duty evaluate Mr. Moriarty so she could provide information to the Multidisciplinary Group later that very morning.  (Exhibit B, excerpts from Deposition of Earl Goldstein M.D., taken on July 18, 2018, hereinafter "Goldstein Depo." at pages 67:12-68:2)

d)     Nurse-Practitioner Daniels then evaluated Mr. Moriarty.  She, too, determined that Mr. Moriarty was not suicidal.  However, because he was threatening to kill anyone who came into his cell to move him to a psychiatric unit, Daniels recommended that he be moved to a safety cell because of his homicidal statements.  (Exhibit C, excerpts from Deposition of Amanda Daniels, taken on August 24, 2018, hereinafter "Daniels Depo." at pages 52:15-53:24; 76:2-86:17)

e)     Nurse-practitioner Daniel's recommendation was conveyed to Sgt. Weidenthaler by Deputy Guillory. (Exhibit D, excerpts from Deposition of Lois Guillory, taken on August 14, 2018, hereinafter "Guillory Depo." at pages 157:7-17)

/ / /

- 4 -

f)      Sgt. Weidenthaler did not have Mr. Moriarty moved to a safety cell, reportedly because the psychiatric professionals said he was not suicidal, he was already in a cell for homicidal inmates, and he had threatened to kill anyone who entered his cell to try to move him to a psychiatric unit. (Exhibit E, excerpts from Deposition of Dale A. Weidenthaler taken on August 29, 2018, hereinafter "Weidenthaler Depo." at pages 130:20-131:11)

g)      Nurse-practitioner Daniels attended the Multidisciplinary Group Meeting later that morning and declined the suggestion to consult with the CPMG psychiatrist about whether Mr. Moriarty should be moved to Central Jail's psychiatric unit.  Nurse-Practitioner Daniels informed the group that she was developing a rapport with Mr. Moriarty, he had agreed to take his medicine, and she felt she could handle him at VDF.  (Exhibit B, excerpts from Deposition of Earl Goldstein M.D., taken on July 18, 2018, hereinafter "Goldstein Depo." at pages 43:5-21)

h)      Mr. Moriarty's situation was not ignored.  Rather the Nursing Supervisor activated the chain of events leading Nurse-Practitioner Daniels to evaluate Mr. Moriarty and present Mr. Moriarty's situation to the Multidisciplinary Group that same morning.

## III.   Plaintiffs knew of Ms. Werner in 2018.

Plaintiffs claim that they were not aware of the existence of Ms. Werner until recently.  In fact, all counsel in this case knew Ms. Werner was present at Vista jail near the time that Mr. Moriarty killed himself, and knew she communicated with others about his death.  Discovery in 2018 included production of a series of text messages from the night Mr. Moriarty killed himself.  These text messages were between Deputy Johnson and Nurse-Practitioner Daniels.  They mention Ms. Werner being present.  Plaintiffs' counsel were not only provided with these text messages; they were provided with Ms. Werner's job title and her first and last name to clarify that she was the subject of the texts.  Plaintiffs' counsel also had the opportunity to depose Deputy Johnson, Deputy

- 5 -

Guillory, jail Nursing Supervisor Arnold Fajayan and Nurse-Practitioner Daniels about the texts and about Ms. Werner's role on the morning of Mr. Moriarty's suicide.  (Exhibit F, excerpts of Amanda Daniels taken on August 24, 2018, hereinafter "Daniels Depo." at pages 108:19);  (Exhibit G, excerpts from Deposition of Arnold Fajayan, taken on March 18, 2019, hereinafter "Fajayan Depo." at pages 50:5);  (Exhibit H, excerpts of Duane Johnson, taken on December 12, 2018, hereinafter "Duane Depo" at pages 123:19-124:2.)

For example, in her deposition, with Plaintiffs' counsel present, Deputy Guillory testified:

> **Q**   He writes, Deputy Johnson, "I can't right
> now. I'll talk to Jeanette." Do you know the Jeanette
> he's referring to?
>
> **A**   Yes.
>
> **Q**   Who is that?
>
> **A**   Medical records clerk.
>
> **Q**   What's her last name?
>
> **A**   Warner.

(Exhibit I, excerpts from Deposition of Louis Guillory taken on August 14, 2018, hereinafter "Guillory Depo." at pages 192:19-193:1.)

Plaintiffs cannot complain about not being provided with Ms. Werner's identity; the fact that they chose not to follow up by taking Ms. Werner's deposition is not the County's fault.

**IV.   Plaintiffs' Counsel acted inappropriately by interviewing Werner about her prior meeting with County Counsel, instructing her not to communicate further with County Counsel even though she is a County employee, and then advising her to retain private counsel who they selected.**

Plaintiffs argue that in taking issue with Plaintiffs counsel's repeated communications with Ms. Werner, the County is just creating a "distraction bomb".  In

- 6 -

17cv1154-LAB(AGS)

making their argument, Plaintiffs misconstrue the privilege concerns that their conduct implicates.  Contrary to Plaintiffs' intimations, California Rule of Professional Conduct 4.2 is not the be-all and end-all of their ethical obligations in litigation.  *See Triple A Mach. Shop, Inc. v. Calif.,* 213 Cal. App. 3d 131, 140–41 (1989) ("Rule[4.2] does not define the scope of the attorney-client privilege; rather, it bars ex parte communications with opposing parties regardless of whether the information sought, obtained or conveyed is privileged from disclosure. . . [I]t is possible in any given case that . . . a lower level employee who is not shielded from contact under rule [4.2] may be in possession of substantial privileged information.").

To clarify, the County does not assert that in all cases, all County employees are automatically off-limits from opposing counsel as "represented parties."  Instead, the County's point is that Ms. Werner, by virtue of her prior meeting and interview with an attorney and an investigator from County Counsel, was privy to attorney-client protected communications.  *See Upjohn Co. v. United States*, 449 U.S. 383, 390–93 (1981); *Galarza v. United States*, 179 F.R.D. 291, 295 (S.D. Cal. 1998) ("The case is similar to that of a corporation whose employees are alleged wrongdoers or know of relevant facts of the alleged wrongdoing.  The Government functions through its employees; it lives or dies by the acts of its employees.").  Ms. Werner, moreover, lacked authority to waive the County's privilege, as it belongs to the County alone.  *See United States v. Chen*, 99 F.3d 1495, 1502 (9th Cir. 1996) ("[A] corporate employee cannot waive the corporation's privilege.").

Accordingly, Plaintiffs' counsel's decision to interact with Ms. Werner after knowing she had met with and been interviewed by County Counsel in connection with litigation plainly raises privilege concerns.

Plaintiffs' counsel's conduct with respect to Ms. Werner also marks a notable departure from the conduct of counsel for all parties to this case with regard to every other County employee with relevant information.  In every other instance, contact with County employees was made only through properly noticed depositions, as all counsel

- 7 -

recognized that County Counsel would be representing each employee at their depositions.  (Welsh Declaration.)

It is alarming that Plaintiffs' counsel ignored the ethical implications of proceeding to interview Ms. Werner specifically about her communications with her attorney, County Counsel, in connection with the *Nishimoto and Moriarty* matters.  Our courts discourage such conduct:

> "[T]o avoid potential violations of the attorney-client privilege, an attorney contacting an employee of a represented organization should question the employee at the beginning of the conversation, before discussing substantive matters, about . . . whether the employee has spoken to the organization's counsel concerning the matter at issue. If a question arises concerning whether the employee would be covered by rule [4.2] or is in possession of privileged information, the communication **should be terminated**.".  *See Snider v. Superior* Ct., 113 Cal. App. 4th 1187, 1212–13 (2003) (emphasis added).

It is equally alarming that Plaintiffs' counsel, who admit that they told Ms. Werner she should not communicate with County Counsel any further, attempts to claim the moral high-ground while actively interfering with County Counsel's ability to communicate with a witness who is a County employee.  (Welsh Declaration.)  Finally, Plaintiffs' counsel compounded their interference by advising Ms. Werner to retain personal counsel to protect her from the County, and then referring her to an attorney who they – Plaintiffs' counsel – selected.  To put it lightly, this was an inappropriate role for Plaintiffs' counsel to take.

**V.     If the court allows Werner's deposition, Plaintiffs' counsel should not be allowed to ask any questions about what she discussed with County Counsel's office at any time**

Plaintiffs' counsel crossed ethical boundaries in talking to a County employee

- 8 -

about discussions she had when she met with an attorney and an investigator from the office of County Counsel in the Nishimoto case.  A variety of remedies are possible for such misconduct.  One solution is to preclude Ms. Werner from testifying on behalf of Plaintiffs.  Another measure would be to prevent Plaintiffs' counsel from using any information they obtained in their interviews and communications with Ms. Werner.  At the very least, the County requests this Court to issue an order precluding any evidence, testimony or argument regarding the content of communications Ms. Werner had with County Counsel's office.  Plaintiffs should not be allowed to ask Ms. Werner questions about this issue at deposition.

## CONCLUSION

The County does not oppose taking the deposition of Ms. Werner, if  this Court sees fit to re-open discovery.  However, the County does not agree that Plaintiffs' counsel can appropriately interview County employees about their discussions with County Counsel, or advise employees not to speak to County Counsel about litigation.  In doing so, Plaintiffs' counsel have crossed the line by invading the attorney-client privilege and interfering with County Counsel's ability to communicate with County employees.  Consequently, the County requests this Court to issue an order precluding Plaintiffs from offering any evidence, testimony or argument regarding the content of communications Ms. Werner had with County Counsel's office.


DATED:  September 4, 2020     THOMAS E. MONTGOMERY, County Counsel


By: s/ CHRISTOPHER J. WELSH, Senior Deputy
Attorneys for Defendant County of San Diego
E-mail: Christopher.Welsh@sdcounty.ca.gov

- 9 -

17cv1154-LAB(AGS)