# EXHIBIT A

Ralph Lissaur, M.D.  8/21/2018

```
 1              IN THE UNITED STATES DISTRICT COURT

 2           FOR THE SOUTHERN DISTRICT OF CALIFORNIA

 3

 4   MICHELLE MORIARTY, an individual, As )
     Successor in Interest to the Estate  )
 5   of HERON MORIARTY and as Guardian Ad )
     Litem to ALEXANDRIA MORIARTY, ELIJAH )
 6   MORIARTY, and ETERNITY MORIARTY,     )
                                          )
 7              Plaintiffs,               )
                                          )
 8        vs.                             ) Case No.: 17-cv1154-
                                          ) LAB(AGS)
 9   COUNTY OF SAN DIEGO, DR. ALFRED      )
     JOSHUA, individually, and DOES 1     )
10   through 10, Inclusive,               )
                                          )
11              Defendants.               )
     _____)
12

13

14

15           DEPOSITION OF RALPH LISSAUR, M.D.

16                 SAN DIEGO, CALIFORNIA

17                   AUGUST 21, 2018

18

19

20

21

22      REPORTED BY:  Kathryn L. Edwards, CSR No. 7288

23

24

25
```

Peterson Reporting Video & Litigation Services

EXHIBIT A

Ralph Lissaur, M.D.  8/21/2018

1  desire to kill himself, would you have assessed him

2  differently for his suicide risk, given that

3  information?

4         MR. WELSH:  Incomplete hypothetical.

5         MR. HARRISON:  Join.  Lacks foundation.  Calls

6  for speculation.

7  BY MR. MORRIS:

8     Q    Would this have been important information for

9  you to know?

10    A    It would be information that I would take into

11  account.

12    Q    And I know armchair quarterback is difficult

13  to assess, but had you known this information, what

14  would you have done differently, had you known that he'd

15  been sent away from Central because they didn't have any

16  safety cells, and he said he wanted to kill himself two

17  days earlier?  What would you have done differently, had

18  you been privy to this information?

19         MR. HARRISON:  Lacks foundation.  Calls for

20  speculation.  Assumes facts not in evidence, that he

21  would have done anything differently.

22         THE WITNESS:  Right.  I'm assuming nothing.  I

23  would have done nothing differently.

24  BY MR. MORRIS:

25    Q    You wouldn't have taken more suicide

EXHIBIT A

Ralph Lissaur, M.D.  8/21/2018

1   precautions, had you known that he'd been sent away

2   because the safety cells were full?

3        A    My assessment of the patient was he was not

4   suicidal.

5        Q    Right.  But had you known that he had, just

6   two days earlier, less than 48 hours earlier, expressed

7   suicidal ideations, such that he had to be sent to a

8   place where there was a safety cell, wouldn't that have

9   changed your opinion as to his suicidal risk, I imagine?

10       A    Not necessarily.  This is another piece of

11  information that I would take into account, with all of

12  the other information.  And so it's still my job to make

13  an assessment of the patient and to determine whether

14  the patient is suicidal or not, regardless of what a

15  custody person says about the patient, or any other

16  clinician.  It's --  I still have to have an independent

17  judgment of that patient.

18       Q    So based on everything that you saw from what

19  you're able to determine from your note, the fact that

20  he was manic and delusional and had been recently

21  released from a hospital and you knew that he had

22  threatened to kill his wife and threatened to kill

23  himself, had you also known that he was sent away from

24  Central, because he said that right then he was

25  suicidal, would you have done -- would you have placed

Ralph Lissaur, M.D.  8/21/2018

```
 1            MR. MORRIS:  Those are the ones that he agreed
 2   to.  So I counted and ticked them off, but whatever.
 3   BY MR. MORRIS:
 4        Q    So assuming he's got all these risk factors we
 5   talked about, how is it, sir, that you didn't diagnose
 6   this person as being at risk for suicide?
 7        A    Yeah, being at risk for suicide is not a
 8   diagnosis.  It will be a symptom.
 9            But many patients in inpatient settings --
10   Many patients, that I've seen in inpatient settings, are
11   significantly decompensated with many symptoms.  And
12   just the presence of many symptoms doesn't mean, by
13   definition, that a patient is suicidal.  In fact, most
14   of those patients are not suicidal.  It's only a very
15   small minority of patients that are actually suicidal.
16   So --
17        Q    In this case he was.
18            MR. HARRISON:  Objection.
19            MR. KUTYLA:  Could you let the witness finish
20   his answer?  It's an important answer.
21   BY MR. MORRIS:
22        Q    In this case he was; right?
23        A    My assessment was he's not suicidal at the
24   time that I saw him.
25        Q    What --  And now that you know that he killed
```

Ralph Lissaur, M.D.  8/21/2018

1    A    He was not.

2    Q    **But there are gradations of suicide risk,**

3    **short of actively in the act of trying to commit**

4    **suicide; right?**

5         MR. HARRISON:  Vague and ambiguous.  In fact,

6    it makes no sense.

7         MR. MORRIS:  Well, he's shaking his head yes.

8    So clearly he and I are communicating.

9         THE WITNESS:  May I answer that, sir?

10        MR. MORRIS:  Yeah.

11        THE WITNESS:  The way I would describe that is

12   a little bit differently.  I would say a patient is

13   either suicidal or not suicidal.

14   BY MR. MORRIS:

15   Q    **One or the other?**

16   A    One or the other.

17        And if a patient ends up killing themselves in

18   a suicide attempt, then at some point they cross the

19   line from being not suicidal to being suicidal.

20   Q    **Okay.**

21   A    ==I'm saying, when I saw him, he was not==

22   ==suicidal.  If he killed himself sometime after I saw==

23   ==him, then he crossed that line after I saw him.==

24   Q    **So when you say, "not suicidal," do you mean**

25   **he wasn't actively engaged in trying to commit suicide?**

Ralph Lissaur, M.D.  8/21/2018

```
 1     A    He was, in my judgment --
 2          MR. WELSH:  Argumentative.  Misstates
 3   testimony.
 4          MR. HARRISON:  Join.
 5          THE WITNESS:  He was, in my judgment, not
 6   suicidal.  He wasn't --
 7   BY MR. MORRIS:
 8     Q    What do you mean by that?  When you say, "not
 9   suicidal"?
10     A    My judgment was that, at the time that I saw
11   him, I did not think this person was going to kill
12   himself.
13     Q    Right then and there?
14          MR. WELSH:  Argumentative.  Misstates his
15   testimony.
16   BY MR. MORRIS:
17     Q    Or did you think he was at risk --
18          MR. WELSH:  Vague and ambiguous.
19   BY MR. MORRIS:
20     Q    Or did you think he was at risk for suicide at
21   any time?  Did you think he was a suicide risk, at all?
22          MR. WELSH:  Vague and ambiguous.
23          THE WITNESS:  I think there were risk factors.
24   BY MR. MORRIS:
25     Q    Okay.  And he certainly checked off those risk
```

EXHIBIT A

Ralph Lissaur, M.D.  8/21/2018

```
 1   BY MR. MORRIS:
 2       Q    So the encounter there, type is psychiatric
 3   sick call, and that was what you did, though; right?
 4       A    Yes.
 5       Q    You visited him?
 6       A    Yes.
 7       Q    It listed you as the resource.
 8            It says, "Note:  Level 2."  Do you know what
 9   "Level 2" means in this context?
10       A    I don't.
11       Q    Are there certain levels under the CPMG
12   psychiatric assessment policy, that you're aware of?
13       A    I'm not aware of.
14            MR. BLOODWORTH:  Speculation.  Lacks
15   foundation.
16   BY MR. MORRIS:
17       Q    And then 5/28/16 was that date; right?
18       A    Yes.
19       Q    Okay.  It says, "One week."  Dot, dot, dot,
20   dot, "One week."
21       A    Yes.
22       Q    Do you know what that means in --  Can you
23   interpret that note for me?
24       A    Well, my -- my -- my note of the 28th ended
25   with "Return to clinic one week."  The patient should be
```

Ralph Lissaur, M.D.  8/21/2018

```
 1        Q    And you can't tell, from this note, whether or
 2   not you weighed in about whether that could or should be
 3   done; right?
 4        A    That's right.
 5        Q    I'm only looking now at Exhibit 14.  We'll get
 6   to exhibit -- the other note.  Okay?
 7             And let's look at the next note, which is your
 8   note on 5/30, which is --  We'll just use that one from
 9   Exhibit 14, the next two pages.
10             Now if he was scheduled to be followed up in a
11   week, do you know what circumstances led you to see him
12   two days later, on 5/30?
13        A    Yeah.  They would have placed him on my
14   schedule for that day.  So people would have concluded
15   that it was important for him to be seen sooner.
16        Q    Do you know who?
17        A    I do not.
18        Q    And have you seen any records indicating such
19   a request being made?
20        A    I have not.
21        Q    All right.  If we could go ahead and start
22   looking through your report.  Let me ask, before we
23   start going through your report, the fact that you had
24   scheduled him to be seen in a week, and you ended up
25   seeing him again in two days, what, if anything, would
```

EXHIBIT A

Ralph Lissaur, M.D.  8/21/2018

```
 1      A    I don't, but I can assume that --
 2           MR. HARRISON:  We don't assume.
 3           THE WITNESS:  Sorry.
 4           MR. HARRISON:  Okay.
 5  BY MR. MORRIS:
 6      Q    Did you know what the multidisciplinary group
 7  was?
 8      A    No, sir.
 9      Q    Had you ever participated in the
10  multidisciplinary group meeting?
11      A    At the jail?
12      Q    Yes, sir.
13      A    No.
14      Q    At any location?
15      A    Actually, let me, please.
16           I may have.  I may have, but I can't say with
17  certainty.
18      Q    Did anybody tell you about anything that was
19  done subsequent to your interaction?  And what I'm
20  referring to, anybody let you know that Nurse Daniels
21  had made a recommendation for him to be moved?
22      A    No.
23      Q    The testimony in this case so far has been
24  that Nurse Daniels made this recommendation for him to
25  be moved, after seeing him later that day, on May 30th.
```

EXHIBIT A

Ralph Lissaur, M.D.  8/21/2018

```
 1              MR. HARRISON:  Misstates the evidence.
 2              MR. MORRIS:  Am I misstating it?
 3              MS. PENA:  31st.
 4              MR. MORRIS:  Sorry.
 5    BY MR. MORRIS:
 6         Q    That Nurse Daniels saw him May 31st, the next
 7    day, and made a recommendation for him to be moved, but
 8    that recommendation was overruled or not followed by
 9    custodial staff.
10              Had you ever encountered that particular
11    circumstance, where you had made a housing
12    recommendation and, for whatever reason, it was not
13    followed by custodial staff?
14         A    Not that I recall.
15         Q    Do you have an opinion as to whether or not it
16    would be appropriate for custodial staff to overrule a
17    medical housing recommendation from a psychiatric
18    provider?
19              MR. HARRISON:  Lacks foundation.  Calls for
20    speculation.  It also is seeking expert opinion from
21    this witness who is a party to the litigation.
22              MR. WELSH:  Incomplete hypothetical.
23              MR. KUTYLA:  Join in those objections.
24              MR. MORRIS:  You can answer.
25              THE WITNESS:  I do not.
```

EXHIBIT A