# EXHIBIT C

Amanda Daniels  8/24/2018

```
 1              IN THE UNITED STATES DISTRICT COURT

 2             FOR THE SOUTHERN DISTRICT OF CALIFORNIA

 3
    _____
 4                                                 )
    MICHELLE MORIARTY, AN INDIVIDUAL, AS           )
 5  SUCCESSOR IN INTEREST TO THE ESTATE            )
    OF HERON MORIARTY AND AS GUARDIAN AD           )
 6  LITEM TO ALEXANDRIA MORIARTY, ELIJAH           )
    MORIARTY, AND ETERNITY MORIARTY,               )
 7                                                 ) CASE NO.
                                                   ) 3:17-CV-01154-LAB-
 8                       Plaintiffs,               ) AGS
                                                   )
 9              vs.                                )
                                                   )
10  COUNTY OF SAN DIEGO, DR. ALFRED                )
    JOSHUA, INDIVIDUALLY, AND DOES 1               )
11  THROUGH 10, INCLUSIVE,                         )
                                                   )
12                       Defendants.               )
    _____)
13

14

15

16              DEPOSITION OF AMANDA DANIELS

17                   TEMECULA, CALIFORNIA

18                     AUGUST 24, 2018

19

20

21

22

23  REPORTED BY SANDRA NALLEY, CSR NO. 13607

24

25
```

EXHIBIT C

Amanda Daniels  8/24/2018

```
 1   the criteria for 5150?
 2           MR. DOGGETT:  At the time of your assessment.
 3           MR. MORRIS:  Yeah.
 4           THE WITNESS:  At the time of my assessment?
 5           MR. WELSH:  Excuse me.  Objection.  Assumes
 6   facts not in evidence.  Vague and ambiguous.
 7           THE WITNESS:  At the time of my assessment, I
 8   recommended the safety cell.
 9   BY MR. MORRIS:
10       Q.  Okay.
11       A.  For homicidal ideation.
12       Q.  Correct.  And being that that's one prong of
13   the 5150, I take it you would have been also onboard with
14   him being declared 5150?
15       A.  Correct.
16       Q.  Can you tell me what led you to -- as you sit
17   here today, what leads you to conclude that you had begun
18   to develop a rapport with him?
19       A.  The first thing that sticks out is that he
20   agreed to take medications.  And it was my understanding
21   he had not prior to my assessment.
22       Q.  Okay.  Anything else?  Did he seem to
23   communicate freely with you and...
24       A.  He was open to the assessment.
25       Q.  And then as that assessment proceeded, you
```

EXHIBIT C

Amanda Daniels  8/24/2018

1   brought up the notion of hospitalization, and that's when
2   he got agitated?
3        A.   Yes.
4        Q.   And then said, if anybody comes to try to take
5   me out, I'm going to kill them?
6        A.   Yes.
7        Q.   And had you already asked him at that point if
8   he had any homicidal or suicidal ideations?
9        A.   Yes.
10       Q.   And he had denied homicidal ideations, right?
11       A.   He denied both.
12       Q.   And that's what's in your note?
13       A.   Yes.
14       Q.   And that's why your note says, "Denied
15  homicidal ideation"?
16       A.   Yes.
17       Q.   But as your interaction with him progressed, he
18  said, anybody comes in here, I'm going to kill them?
19       A.   Yes.
20       Q.   And as soon as he said -- strike that.
21            What did you do upon hearing Mr. Moriarty's
22  statement that anybody comes in here, I'm going to kill
23  them?
24       A.   I recommended a safety cell.
25       Q.   And you turned -- how did you do that,

Amanda Daniels  8/24/2018

```
 1   BY MR. MORRIS:
 2        Q.   Okay.  Let's go ahead and look through your
 3   note if we could, entry date 5/31/2016, 8:55, right, at
 4   the top?
 5        A.   Correct.
 6        Q.   And entered by you, A. Daniels?
 7        A.   Correct.
 8        Q.   And your married name is Martin?
 9        A.   Yes.
10        Q.   Great.  You wrote -- and this is your note,
11   right?  You wrote this?
12        A.   Yes.
13        Q.   "Forty-three-year-old Caucasian male diagnosed
14   with bipolar," right?
15        A.   Correct.
16        Q.   And "DO" would be disorder?
17        A.   Correct.
18        Q.   I'm getting better.  I actually -- don't laugh,
19   because I'm always a mess when it comes to the shorthand
20   medical verbiage.  "Prescribed Risperdal."  What is
21   Risperdal?
22        A.   An antipsychotic.
23        Q.   LiC03 is?
24        A.   Lithium.
25        Q.   And Benadryl.  What is the difference
```

1  between -- I understand lithium is an antipsychotic as
2  well.  What's the difference between Risperdal and
3  lithium?
4       A.   Lithium is a mood stabilizer.
5       Q.   And Risperdal does what?
6       A.   Is an antipsychotic.
7       Q.   Help me understand how they're different.
8       A.   Lithium is not an antipsychotic.  It's a mood
9  stabilizer, so it -- when people have moodability [sic],
10 it evens them out.
11      Q.   So --
12      A.   Risperdal, there's a lot of different purposes
13 for Risperdal, but it's mostly for psychosis, like
14 delusions or hallucinations or paranoia.
15      Q.   Got you.  So one stabilizes the mood, the other
16 one stops you from having delusions?
17      A.   Layman's, yes.
18      Q.   Okay.  And I'm a layman, so --
19           MR. DOGGETT:  Not completely wrong.
20           MR. MORRIS:  Not completely wrong, but it's
21 pretty rudimentary.
22 BY MR. MORRIS:
23      Q.   Okay.  And Benadryl, I don't think you were
24 treating his -- he wasn't --
25      A.   Allergies?  No.

Amanda Daniels  8/24/2018

```
 1       Q.   Allergies, right?  This is to help him sleep,
 2   keep him calm?
 3       A.   Benadryl has a lot of different uses.
 4   Sometimes we pair it with antipsychotics to prevent side
 5   effects.
 6       Q.   Got you.  This says he was arrested on May 26th
 7   for terrorist threats to cause death or great bodily
 8   injury and vandalism.  From where would you have gotten
 9   the information?
10       A.   Either JIMS or the deputy.
11       Q.   Got you.  It says, "This is inmate's first
12   arrest."  Where did you get that information from?
13       A.   Same.
14       Q.   "Inmate seen in South House cell and noted to
15   be anxious," and it says, "Has his feet," plural, "in his
16   toilet," so --
17       A.   Okay.
18       Q.   Does that refresh your recollection that there
19   were both feet in the toilet or are we just going to go
20   on the note, assume that --
21       A.   If I wrote that, it's probably he had both feet
22   in the toilet.
23       Q.   That indicates to you plurality of feet in the
24   toilet?
25       A.   Yes.
```

Amanda Daniels  8/24/2018

1    Q.  Okay.  "States he needs to be in solitary
2 confinement, that he will kill someone if they come into
3 his cell tonight."  Did he use those words, "I need to be
4 in solitary confinement," or did he say something like, I
5 need to be alone, or do you recall?
6    A.  I'm not sure if he used those exact words, but
7 he indicated he needed to be alone.
8    Q.  Okay.  In other parts of your report, it looks
9 like when somebody says something that's a direct quote,
10 you put it in quotes.  Is that your custom and practice?
11    A.  I try to quote them.
12    Q.  Okay.
13    A.  Correct.
14    Q.  And there's no quotes around the words
15 "solitary confinement," right?
16    A.  Correct.
17    Q.  Okay.  And then it says, "that he will kill
18 someone if they come into his cell tonight."  It states,
19 "He has been agitated and banging in his cell."  That's
20 what -- his words to you?
21    A.  Yes.
22    Q.  Okay.  "Reports racing thoughts."  What are
23 those?
24    A.  Just mind racing.
25    Q.  Noncoherent thought process?

EXHIBIT C

Amanda Daniels  8/24/2018

1     A.    Not necessarily noncoherent, just that you have
2  a lot of thoughts.
3     Q.    Consistent with mania --
4     A.    It can be.
5     Q.    -- racing thoughts?  "Not sleeping times
6  12 days."  The "Not sleeping times 12 days," is -- that's
7  also consistent with mania?
8     A.    Can be.  Yes.
9     Q.    And then it says, "Denies SI," denies suicidal
10 ideation, right?
11    A.    Yes.
12    Q.    You asked him, he said, no, I don't want to
13 kill myself?
14    A.    Correct.
15    Q.    "Reports he wants to now take his meds because
16 'I know I need them,'" in quotes -- or -- yeah.  So do
17 you recall -- that indicates from your report that that's
18 exact verbiage from him?
19    A.    Yes.
20    Q.    "MSE" is medical -- or mental status
21 evaluation?
22    A.    Mental status.
23    Q.    "Caucasian male whose appearance is in no acute
24 distress.  Maintains eye contact.  Speech is regular rate
25 and volume, spontaneous and fluent, moves anxious, affect

Amanda Daniels  8/24/2018

1   is congruent with mood, thought process is linear."  What
2   does that mean?
3        A.   It means that he was speaking clearly.
4        Q.   Got you.  "Coherent, goal directed, denies
5   suicidal ideation."  So he wasn't babbling incoherently,
6   in front of you at least?
7        A.   No.
8        Q.   "Denies homicidal ideation."  So this, I take
9   it, was written -- well, explain to me how you can say
10  "denies homicidal ideation," but then "expresses
11  homicidal ideation" up top?
12       A.   When I asked him directly, he denied homicidal
13  ideation.
14       Q.   But then spontaneously, he said --
15       A.   Yes.  At the end of this assessment.
16       Q.   Got you.  "Denies auditory visual
17  hallucinations.  No psychosis noted."  What does that
18  mean?  What do you mean, "no psychosis" --
19       A.   He -- he wasn't actively delusional or
20  paranoid.
21       Q.   "Concentration attention impaired."  What --
22  what does that mean?
23       A.   He was -- "attention impaired" just means that
24  his -- it may have been that he was not attending --
25  like, he may have been looking around.  There was

Amanda Daniels  8/24/2018

1  something that he did that it indicated that he was not
2  attending the entire session.
3       Q.   Got you.  "Insight and judgment poor."
4       A.   Correct.
5       Q.   Just that he wasn't thinking ahead?
6       A.   Given what he was doing, yes, he did not have
7  the insight or the judgement for the severity of his
8  illness, although in this meeting, compared to other
9  assessments, he was more fluid -- or fluent.
10      Q.   Yeah.  Other notes indicate that he was
11 rambling incoherently, babbling, not making any sense,
12 talking about seeing Jesus and stuff.  You didn't see any
13 of that?
14      A.   Correct.
15      Q.   More likely than not, you had read
16 Dr. Lissaur's previous note where things had been
17 indicated to that effect?
18      A.   Correct.
19      Q.   So when you saw him, you thought maybe he had
20 been making a little progress?
21      A.   He seemed better when I saw him than what I had
22 read about him.
23      Q.   Even so, based on the history you had, your
24 recommendation was safety cell based on homicidal
25 ideations?

EXHIBIT C

Amanda Daniels  8/24/2018

1  A.  Correct.  It's not uncommon for people to have
2  moments of clarity.
3  Q.  Okay.
4  A.  Correct.
5  Q.  Especially because he hadn't been taking his
6  meds?
7  A.  Right.
8  Q.  Your diagnosis is "Bipolar.  Current episode
9  manic with psychotic features."  That was based on what
10  you saw, and I imagine based also on your reading of
11  Lissaur's note?
12  A.  Right.  That was his diagnosis that was given
13  to him.
14  Q.  Was that your diagnosis or Dr. Lissaur's
15  diagnosis that you adopted?
16      MR. DOGGETT:  Or maybe someone else's?
17      THE WITNESS:  I'm not sure whose diagnosis it
18  was, but that was the diagnosis that was listed on his
19  chart.
20  BY MR. MORRIS:
21  Q.  Okay.  And that's a diagnosis that you adopted
22  after your interaction with him?
23  A.  I continued it.
24  Q.  You didn't change it?
25  A.  Right.

EXHIBIT C

```
 1        Q.    Fair enough.   The Plan is "Continue current
 2   meds.   Please offer this morning as inmate states he will
 3   take them."   So that was your note to the nurse?
 4        A.    Correct.
 5        Q.    You don't administer meds typically?   You have
 6   the nurses do it, right?
 7        A.    No.   Right.
 8        Q.    "Discussed safety cell placement for homicidal
 9   ideations with deputy, who in turn spoke to sergeant.
10   Decision was made to continue in current housing.   Psych
11   to follow up in a.m."   So that was the discussion that we
12   talked about here today?
13        A.    Yes.
14        Q.    You didn't go into great detail, sort of -- and
15   I don't mean it disparagingly at all, but sort of a
16   glossed over assessment of what happened.   Can you tell
17   me why you left some of this detail that we discussed
18   today out of your note?
19              MR. WELSH:   It's argumentative.
20              MR. KUTYLA:   Objection.   Vague and ambiguous as
21   to what was left out.
22              MR. DOGGETT:   Join.   You mean this last
23   paragraph that you just talked about?
24              MR. MORRIS:   Yeah.
25              THE WITNESS:   What detail?
```

Amanda Daniels  8/24/2018

```
 1              MR. KUTYLA:  I don't understand the question.
 2   BY MR. MORRIS:
 3       Q.   You know, like, hey, I said this and this, and
 4   I was in shock, you know, everyone was -- that sort of
 5   detail, like, you know, he said it was his Friday, and
 6   kind of --
 7       A.   I didn't hear any of that.  I just documented
 8   what I participated in.
 9       Q.   But what I'm afraid of is that other lawyers
10   may consider this sort of inconsistent.  So what I'm
11   trying to get out from you is that this was sort of a
12   light version of what we've talked about today.  You
13   weren't trying -- you consider this note consistent with
14   what we talked about today, right?
15              MR. KUTYLA:  Objection.  It's vague and
16   ambiguous.  It assumes facts not in evidence that this
17   note was written at the time of these events --
18              MR. MORRIS:  That's the sergeant's lawyer.
19              MR. KUTYLA:  -- that she related before -- you
20   get to give your speaking questions.  I'll give my
21   speaking objections --
22              MR. MORRIS:  No.  That's not how it works.
23   That's not how it works.  You --
24              MR. KUTYLA:  Well, I was talking and now I got
25   interrupted.
```

```
 1            MR. MORRIS:  Okay.  Because you're supposed to
 2   give legal objections.  Not this diatribe.
 3            MR. KUTYLA:  That's my objection.
 4            MR. DOGGETT:  And let me just add
 5   argumentative.  And also asked and answered.
 6   BY MR. MORRIS:
 7       Q.   So --
 8       A.   I documented that my recommendation is the
 9   safety cell.
10       Q.   And it says, "Psych to follow up in the a.m."?
11       A.   Yes.
12       Q.   So that would have been the psych the next
13   morning?
14       A.   Yes.
15       Q.   That was your recommendation, that he be seen
16   again?
17       A.   Yes.
18       Q.   Take a look at Dr. Lissaur's note real quick.
19   You have that in front of you as well, right?
20            MS. PENA:  5/31 or the 5/28 one?
21            MR. MORRIS:  The 5/30.
22            MS. PENA:  It's going to be an exhibit.
23            MR. MORRIS:  We'll mark this as Exhibit 2.  I
24   imagine everyone has a copy, but if you don't, I'd be
25   more than happy to hand one out.
```

Amanda Daniels  8/24/2018

```
 1        I, SANDRA NALLEY, Certified Shorthand Reporter
 2   for the State of California, do hereby certify:
 3
 4   That the witness in the foregoing deposition was by me
 5   first duly sworn to testify to the truth, the whole truth
 6   and nothing but the truth in the foregoing cause; that
 7   the deposition was taken by me in machine shorthand and
 8   later transcribed into typewriting, under my direction,
 9   and that the foregoing contains a true record of the
10   testimony of the witness.
11
12   Dated:    This   th day of September, 2018, at Temecula,
13   California.
14
15
16
17
18                        _____
                                   SANDRA NALLEY
19                                 CSR NO. 13607
20
21
22
23
24
25
```

EXHIBIT C