UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MICHELLE MORIARTY,<br><br>　　　　　　　　　Plaintiff,<br><br>v.<br><br>COUNTY OF SAN DIEGO, et al.,<br><br>　　　　　　　　　Defendant. | Case No.: 17cv1154-LAB (AGS)<br><br>**ORDER DENYING MOTION FOR LEAVE TO SEEK RECONSIDERATION** |

Having located a new witness, Plaintiffs now seek leave to file an untimely motion for reconsideration of the Court's September 24, 2019 order granting summary judgment on § 1983 claims against Defendants Sgt. Dale Weidenthaler and Nurse Practitioner Amanda Daniels.

**Standard for Reconsideration**

Ordinarily motions for reconsideration are not granted absent new evidence, clear error, or an intervening change in controlling law. *See School Dist. No. 1J, Multnomah Cnty., Or. v. ACandS, Inc.*, 5 F.3d 1255, 1263 (9th Cir. 1993). Plaintiffs rely on the "new evidence" prong of this standard, arguing that the testimony their new witness would be prepared to offer would revive their claims that Defendants Daniels and Weidenthaler were deliberately indifferent to the decedent Heron Moriarty's risk of suicide. "Evidence is not

1  newly discovered if it . . . could have been discovered with reasonable diligence." *Wallis
2  v. J.R. Simplot Co.,* 26 F.3d 885, 892 n.6 (9th Cir. 1994).

3  Plaintiffs argue that Defendants hid this new witness from them, by failing to
4  disclose her in response to an interrogatory.

**Discussion**

6  The new witness, Jeannette Werner, is a medical records clerk at the Vista Detention
7  Facility where Mr. Moriarty was being held at the time of his death. She came to Plaintiffs'
8  counsel's attention when she was meeting with them in connection with a related matter,
9  and happened to mention the matter of Mr. Moriarty's suicide. Her declaration gives the
10 testimony she would be prepared to offer, and the basis for that testimony.

11 Werner is not a supervisor or manager, but was present during part of Moriarty's
12 confinement, including on May 31, 2016. According to Werner, Moriarty was distraught
13 and could be heard howling "like a wounded animal crying for help" throughout the mail
14 for at least two days. She found the howling disturbing, and plugged her ears during work
15 hours. She also says it was well known throughout the nurses' station that Moriarty was
16 refusing medication and decompensating. After being informed that Sgt. Weidenthaler had
17 overruled Nurse Daniels' recommendation that Moriarty be housed in a safety cell. She
18 approached Weidenthaler and told him that Moriarty needed to be housed in a safety cell.
19 Weidenthaler rejected her arguments, and told her to "stand down." Werner says that he
20 said that he did not want to complete the paperwork for this recommendation, because he
21 was about to go off duty. A few days after Moriarty's suicide, Weidenthaler privately told
22 her she "should not talk about what transpired to anyone." Werner feels haunted by her
23 memories of these events.

24 Werner's declaration also offers her own speculation about other matters:

25 Myself, and several other medical staff members, knew Mr. Moriarty was a
26 high risk of suicide on May 31, 2016.

27 (Werner Decl., ¶ 6.)
28 ///

> Based on my conversation with Sgt. Weidenthaler there is no doubt in my mind that he knew Mor. Moriarty was suicidal because I mentioned it when we were arguing. There was no discussion, at any time, regarding Mr. Moriarty's homicidal ideations.

(*Id.*, ¶ 10.)

Plaintiffs' counsel say they were unaware of Werner's identity until recently, because her name did not appear in any of the medical, correctional, or death-investigation documents the County of San Diego produced, though over 300 other county employees were mentioned by name in documents or depositions. In fact, they were aware of a "Jeanette," mentioned in a text chain between Defendant Daniels and Deputy Johnson, in connection with the preservation of records. Deputy Johnson promised to "talk to Jeanette" about preserving Daniels' recommendation about Moriarty's housing. When asked who Jeanette was, Daniels (accurately) said "an admin person."

**Reasonable Diligence**

As evidence of their diligence, Plaintiffs' counsel point to Special interrogatory 29, asking who if anyone recommended that Moriarty be housed in a safety cell, to which Defendants responded that Nurse Daniels made this recommendation.

Plaintiffs argue that Defendants' answer of "Nurse Daniels" without also mentioning Werner, was incomplete if not fraudulent. They argue that the interrogatory did not quote the word recommend or focus on recommendation as a medical term of art. Defendants' position is that Werner did not make a recommendation as they understood it.

The interrogatory does not reasonably ask Defendants to identify anyone who expressed an opinion, but rather focused on recommendations. Special Interrogatory 29, as well as the surrounding interrogatories, focus on people with authority to make or influence decisions at VDF. Werner had no administrative authority and no medical or psychological expertise, and her argument with Weidenthaler about whether Moriarty needed to be housed in a safety cell was not a recommendation as contemplated by the interrogatory. Plaintiffs' counsel also knew that other similar opinions about safety cell placement had

not been disclosed as "recommendations." (*See* First Amended Complaint, ¶ 61 (opinion by Sgt. Sawyer at Central Jail, that Moriarty needed to be housed in a safety cell.)[1]

### Effect of New Evidence

Even assuming Werner's evidence amounted to "new evidence," it would not have changed the ruling on the motion. Most of her testimony would not have been admissible, and the portion that is admissible went to matters that were either undisputed or immaterial.

The Court granted summary judgment on the § 1983 deliberate indifference claim against Weidenthaler on the basis of qualified immunity. Weidenthaler and others knew Moriarty was experiencing serious mental problems and refusing his medication, and it would have been clear to a reasonable officer in Weidenthaler's position that Moriarty was unbalanced and experiencing psychological problems. But that is not the end of the analysis. For purposes of qualified immunity, the question is whether a reasonable officer in Weidenthaler's position would have known Moriarty was at risk of suicide.

Nurse Practitioner Daniels, a psychiatric nurse who had examined Moriarty, had told Weidenthaler that Moriarty was homicidal but not suicidal. Daniels' notes confirmed that this is what she believed, and Plaintiffs agreed that is what she believed. (Docket no. 123 (Order of Sept. 24, 2019), at 15:3–16:6; *see also id.* at 4:22–23 (Moriarty's statement to Daniels, when she evaluated him, that he might become violent and kill anyone who entered his cell).) An officer in Weidenthaler's position was entitled to rely on what Nurse Daniels told him. Because a reasonable officer in Weidenthaler's position could have believed he was not ignoring a serious risk that Moriarty would kill himself, the Court found Weidenthaler was entitled to qualified immunity. *See Mueller v. Auker*, 700 F.3d 1180, 1188 (9th Cir. 2012) (detective was entitled to rely on doctor's medical opinion, even if it later turned out to be wrong).

---

[1] Similarly, Special Interrogatory 30 asks whether, during his incarceration, anyone recommended that Moriarty be placed in the psychiatric unit, to which Defendants replied "No." In fact, Michelle Moriarty had called VDF repeatedly, recommending that he be sent to a psychiatric hospital. (*See* First Amended Complaint, ¶¶ 17–19, 67–69.)

The Court's decision, as is required, was based on what Weidenthaler knew at the time, without the benefit of hindsight. *See Cox v. Dept. of Soc. & Health Servs.*, 913 F.3d 831, 838 (9th Cir. 2019) (explaining that entitlement to qualified immunity turns on facts as known to the officer at the time, not as they later turned out to be). The Court's decision took into account the possibility that Weidenthaler was motivated by a desire to leave work early, and that he was violating local policy by overruling Nurse Daniels' recommendation that Moriarty be housed in safety cell.[2] The Court denied summary judgment on a negligence claim against Weidenthaler, however, and that claim is set to be tried.

While a party opposing summary judgment need not necessarily produce evidence in a *form* that would be admissible at trial, the *content* of the evidence must be admissible. *See Fraser v. Goodale*, 342 F.3d 1032, 1036 (9th Cir. 2003). Under Fed. R. Evid. 602, a percipient witness' testimony must be based on personal knowledge, not speculation or conjecture. A witness' speculation about matters she had no personal knowledge of cannot create a genuine dispute of material fact sufficient to withstand summary judgment. *Lawrence v. City & Cnty. of San Francisco*, 258 F. Supp. 3d 977, 993 (N.D. Cal., 2017) (citing *Loomis v. Cornish*, 836 F.3d 991, 997 (9th Cir. 2016)) (holding that witness' belief about what an officer must have been thinking was "simply speculation" and could not create a genuine dispute of material fact).

Werner says she was present "certain days of Mr. Moriarty's detainment," including May 31, the day he committed suicide. (Werner Decl., ¶ 3.) During this time, she said she heard him howling "like a wounded animal crying out for help" for two days, which she found extremely disturbing. She says it was "well known throughout the nurses' station that Moriarty was refusing medication and decompensating." (*Id.*, ¶ 5.) The fact that Moriarty was in distress and refusing medication was already known, however, and was

---

[2] Moriarty was housed in an ad-seg cell, which would have been standard for an inmate who posed a danger to others. Safety cells are reserved for inmates who are a danger to themselves, and are not intended for long-term confinement. (*See* Docket no. 123 at 3 n.1.)

part of the reason Defendant Daniels met with him.  Werner also declares, without any foundation, that "Myself, and several other medical staff members, knew Mr. Moriarty was a high risk of suicide on May 31, 2016." (*Id.*, ¶ 6.) Werner, however, had no medical or psychological expertise, and gives no basis for her conclusions. Furthermore, the reason she gave Weidenthaler for thinking that Moriarty was suicidal was that he had been howling for two days. (*Id.*, ¶ 9.) Based on this conversation, she concludes, "there is no doubt in my in my mind that he knew Mr. Moriarty was suicidal because I mentioned it when we were arguing." (*Id.*, ¶ 10.)  She says neither she nor Weidenthaler mentioned Moriarty's homicidal ideations during the argument. (*Id.*)  A few days later, she says, Weidenthaler told her not to talk to anyone about what had happened. (*Id.*, ¶ 11.) Werner does not claim to have been privy to any conversations between Weidenthaler and Daniels, or anyone else. The remainder of Werner's testimony concerns her own thoughts about the matter, and her communications with Plaintiffs' counsel. (*Id.*, ¶ 12–18.) Werner had nothing to add about Defendant Daniels.

The fact that Moriarty was unstable and refusing was already known—in fact, it was the reason he was evaluated both by a psychiatrist and by Daniels. But what a reasonable officer in Weidenthaler's position would have done in response goes to the heart of qualified immunity.  As the Court determined earlier:

> Plaintiffs correctly point out that Weidenthaler had no particular medical or psychological expertise, and had to rely on the advice of others who did. As a layman,
> Weidenthaler was not responsible for making a diagnosis or attempting to confirm or rebut Daniels'. Once a psychiatric nurse gave him to understand that Moriarty was not at that time a suicide risk, he could reasonably have believed it, and no clearly established law would have told him otherwise.

(Docket no. 123 at 15:14–19.)  Just as Weidenthaler had no particular expertise in distinguishing suicidal ideations from homicidal ideations (or other psychological or

///

///

///

emotional problems),[3] Werner had no particular expertise either. Once a qualified psychiatric nurse who had examined Moriarty told Weidenthaler that Moriarty was not suicidal, Weidenthaler was entitled to accept it. He was not required to accept the opinion of a layperson, whether his own opinion or Werner's. *See Mueller*, 700 F.3d at 1188 (because it was objectively reasonable to accept doctor's medical opinion over a child's mother's opinion about a child's health, detective was entitled to qualified immunity).

Werner's beliefs about what Weidenthaler "must have known" are pure speculation. Even assuming there were some objective basis for her conclusion that various unnamed medical personnel knew Moriarty was suicidal, there is no evidence any of them ever told Weidenthaler that.

Plaintiffs also seek reconsideration of summary judgment on the § 1983 claim against Daniels, but Werner has nothing to add about what Daniels knew or did.

In short, Werner's testimony adds nothing to the analysis. Even in light of the competent portion of Werner's testimony, Defendants Weidenthaler and Daniels would be entitled to qualified immunity on the § 1983 claims against them.

**Conclusion and Order**

Even assuming Werner's testimony could be considered newly-discovered evidence for purpose of a motion for reconsideration, it would not change the analysis or outcome of the two portions of the Court's September 24, 2019 order which Plaintiffs believe the Court should reconsider. Much of the evidence is not based on speculation, not personal

/ / /
/ / /
/ / /
/ / /
/ / /

---

[3] Dr. Lissaur, a psychiatrist who is also a Defendant in this case, earlier concluded that Moriarty was experiencing a bipolar/manic episode.

knowledge. The remainder would have no effect on qualified immunity, which was the basis of the Court's ruling.  The motion is **DENIED**.

**IT IS SO ORDERED.**

Date: September 23, 2020

*[signature]*
Hon. Larry A. Burns
Chief United States District Judge