1  Christopher S. Morris, Esq., SBN 163188
   cmorris@morrislawfirmapc.com
2  Danielle R. Pena, Esq., SBN 286002
   dpena@morrislawfirmapc.com
3  MORRIS LAW FIRM, APC
   501 West Broadway, Suite 1480
4  San Diego, CA 92101
   Telephone:  (619) 826-8060
5  Facsimile:  (619) 826-8065

6  Attorneys for Michelle Moriarty, as
   Successor in Interest and *Guardian Ad Litem*
7  to Alexandria, Elijah and Eternity Moriarty

8

9              IN THE UNITED STATES DISTRICT COURT

10            FOR THE SOUTHERN DISTRICT OF CALIFORNIA

11 MICHELLE MORIARTY, an individual,      Case No.: 3:17-cv-01154-TWR-AGS
   as Successor in Interest to the ESTATE
12 OF HERON MORIARTY and as              **PLAINTIFFS' DESIGNATION OF**
   GUARDIAN AD LITEM to                 **DEPOSITION EXCERPTS IN LIEU**
13 ALEXANDRIA MORIARTY, ELIJAH          **OF TRIAL TESTIMONY**
   MORIARTY, and ETERNITY
14 MORIARTY,                             Magistrate:  Hon. Andrew G. Schopler
                                          Judge:       Hon. Todd W. Robinson
15      Plaintiffs,

16          v.

17 COUNTY OF SAN DIEGO, DR.
   ALFRED JOSHUA, individually, and
18 DOES 1 through 10, Inclusive,

19      Defendants.

20

21

22

23

24

25

26

27

28

                                  1

1   Pursuant to this Court's Jury Trial Preparation and Scheduling Order [Dkt.
2   296], Plaintiffs submit the following excerpts to be read into the record during trial.
3   Plaintiffs have served a trial subpoena on Lois Guillory but in the event that
4   Ms. Guillory is unable to attend trial, Plaintiffs submit the following experts from
5   her deposition to read into the record at trial: 7:9-21; 10:7-14; 11:5-8; 11:12-12:4;
6   13:8-15; 14:15-25; 15:12-20; 16:12-17:18; 19:7-15; 20:13-18; 21:4-5; 21:19-22:4;
7   22:19-23:3; 23:21-24:11; 24:25-25:15; 26:5-16; 26:22-27:2; 27:16-21; 28:16-19;
8   31:3-25; 32:5-33:12; 33:18-19; 33:22-34:23; 36:1-7; 36:17-22; 36:25-37:18; 38:1-
9   39:1; 39:12-40:13; 40:18-22; 41:10-42:16; 43:8-15; 43:22-44:9; 45:2-11; 48:6-8;
10  48:16-22; 49:6-11; 50:4-19; 52:2-5; 53:6-11; 53:17-23; 55:22-56:20; 57:12-23;
11  58:11-59:16; 59:24-60:3; 60:9-63:9; 64:25-65:17; 66:2-11; 66:17-67:25; 68:10-19;
12  71:3-16; 72:10-18; 73:15-76:4; 76:11-18; 76:24-78:1; 78:17-21; 79:1-5; 80:6-12;
13  80:20-23; 81:6-11; 81:21-82:2; 82:17-84:23; 86:4-21; 87:10-12; 89:9:10; 89:24-
14  90:13; 91:6-11; 92:3-93:15; 93:24-94:6; 95:9-96:18; 98:4-22; 99:1-15; 100:24-
15  101:19; 102:3-6; 102:21-103:3; 103:13-104:17; 104:22-105:10; 105:15-106:8;
16  107:1-4; 107:14-19; 108:1-6; 108:24-109:4; 110:5-13; 110:20-111:5; 111:14-
17  112:23; 113:13-23; 114:23-115:1; 115:10-23; 116:6-10; 116:17-19; 117:25-118:6;
18  119:1-4; 119:20-23; 120:4-8; 120:17-20; 121:16-122:4; 122:18-22; 123:2-6;
19  123:20-124:12; 124:22-128:12; 129:13-20; 130:23-131:4; 131:14-21; 132:8-21;
20  1331-134:5; 134:12-25; 135:6-13; 137:1-24; 138:25-139:9; 140:4-16; 141:8-13;
21  143:12-21; 144:11-145:7; 147:1-8; 149:1-17; 150:24-151:5; 151:21-152:5; 153:2-
22  14; 153:19-154:4; 155:4-7; 155:12-156:1; 156:9-157:20; 158:11-20; 159:24-160:5;
23  160:12:17; 161:19-162:13; 162:22-164:10; 164:17-24; 165:8-16; 166:2-21; 166:25-
24  167:7; 167:12-17; 167:21-25; 168:6-169:11; 169:18-25; 170:6-11; 171:9-19; 172:5-
25  24; 173:7-9; 174:6-8; 174:13-15; 174:19-175:23; 176:17-177:1; 177:6-13; 178:9-
26  179:19; 180:2-181:2; 182:8-15; 183:8-17; 185:19-186:11; 187:8-22; 188:4-189:3;
27  189:18-190:3; 190:8-11; 190:25-191:6; 192:4-7; 192:19-193:14; 194:3-5; 195:2-23;
28  196:21-197:8; 199:1-6; 200:16-20; 201:9-203:9; 203:18-22; 204:12-206:2; 207:22-

2

1   208:1; 208:5-15; 208:20-209:22; 211:19-212:11; 212:25-213:21; 214:5-15; 214:22-

2   215:5; 216:19-217:6; 217:17-:218:7; 218:22-219:7; 223:13-22; 225:13-18; 226:22-

3   227:15 and attach them hereto as Exhibit 1.

4                                          Respectfully submitted,

5                                          MORRIS LAW FIRM, APC

6   Dated:  February 16, 2022              s/ Danielle R. Pena

7                                          Danielle R. Pena, Esq.
                                           Attorneys for Plaintiffs

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PLAINTIFFS' DEPOSITION EXCERPTS                    3:17-cv-01154-TWR-AGS

EXHIBIT 1

Lois Guillory  8/14/2018

```
 1              IN THE UNITED STATES DISTRICT COURT

 2            FOR THE SOUTHERN DISTRICT OF CALIFORNIA

 3

 4

 5

 6   MICHELLE MORIARTY, an individual
     as Successor in Interest to the
 7   Estate of HERON MORIARTY and as
     GUARDIAN AD LITEM to ALEXANDRIA
 8   MORIARTY, ELIJAH MORIARTY and
     ETERNITY MORIARTY,
 9
             Plaintiff,
10

11          vs.                      NO. 3:17-cv-01154-LAB

12   COUNTY OF SAN DIEGO, DR. ALFRED
     JOSHUA, individually, and DOES
13   1 through 10, inclusive,

14
             Defendants.
15   _____

16

17              DEPOSITION OF LOIS GUILLORY

18              San Diego, California

19              August 14, 2018

20

21   Reported by:
     Annette Moore
22   CSR No. 2648

23

24

25
```

Lois Guillory  8/14/2018

1    trial.  Okay?

2              A   Okay.

3              Q   Is there any reason why you can't give me

4    your best testimony here today?  Do you feel okay as

5    far as get enough sleep, not on any medication that

6    would impede your ability to testify, that kind of

7    thing?

8              A   No, I should be fine.

9              Q   Okay, great.  Tell me a little bit about

10   yourself, ma'am.  How long have you been at the

11   county?

12             A   Twenty years.

13             Q   You began in what, 1998?

14             A   '97.

15             Q   Has it always been in detentions?

16             A   Yes.

17             Q   You attended the academy where?

18             A   Miramar College.

19             Q   Was that the three-month detention

20   academy?

21             A   Yes.

22             Q   One thing I forgot to mention.  In normal

23   speech we tend to talk over one another.  I can tell

24   you're a witness who is not going to shy away from

25   answering the questions, which is great.  You just need

Lois Guillory  8/14/2018

1    you a perfect detentions deputy.  In this setting

2    everybody needs to hear our give and take.  Okay?

3          A   Okay.

4          Q   Tell me about the career you've had at the

5    San Diego Sheriff's Department in the detentions side.

6          A   The career, like?

7          Q   Yeah.  Where did you get assigned, what

8    jobs have you had?

9          A   I initially got assigned to Las Colinas in

10   Santee when I first got out of the academy.  I was

11   there until 2003, then I got transferred up to Vista.

12         Q   In Las Colinas were you just a line

13   deputy?

14         A   Yes, just on the line.

15         Q   Were you given one assignment more often

16   than another, like I was always put in intake or

17   transportation, anything like that?

18         A   No, pretty much spread around the

19   facility.

20         Q   How many inmates are in Las Colinas?

21         A   Wow, back then I don't recall.  I don't

22   remember exact number.  Maybe six, seven hundred.

23         Q   Did they have a psych unit like they

24   have -- that you were assigned to in Vista, the psych

25   liaison?  Was there any position like that that you

Lois Guillory  8/14/2018

1    **were aware of in Las Colinas?**

2                A  Back then I don't think there was an

3    actual position.  They just placed certain deputies at

4    that day and time in that position.  It changed.

5                Q  **Were you ever the psych liaison, like you**

6    **were in Vista when this happened, in Las Colinas?**

7                A  Never the psych liaison.  I did work in

8    the psychiatric unit as a deputy behind the desk there.

9                Q  **Tell me how the psychiatric unit is set up**

10   **in Las Colinas.**

11               A  Back then or now?

12               Q  **Back then.  Like how many beds, what kind**

13   **of monitoring they had, that kind of thing?**

14               A  Usually there was one deputy that I can

15   remember in the housing position in the building.

16   There was at least, I want to say, eight rooms, if not

17   more.  I'm not sure.  Each cell had one individual

18   inmate in it at the time.

19               Pretty much they did activities while we

20   stood by for security, you know.  Whatever they did, if

21   it was aerobics back then, or arts and craft, or just

22   having a conversation, you know, with the nurses or

23   whoever the people that came in and helped with the

24   mental health situation.

25               Also there was a doctor, a psychiatrist

Lois Guillory  8/14/2018

 1     there during the day as well.

 2                   Q   Was that psychiatrist there full time

 3     during the day?

 4                   A   Yes.   She was there for a long time.

 5                   MR. WELSH:  Full time was his question.

 6     You are saying for a long time, which isn't exactly

 7     what he was asking you.

 8                   THE WITNESS:  Was the doctor there full

 9     time?

10                   MR. WELSH:  Yes.

11                   THE WITNESS:  Yes, she was there every

12     day.  She was there every day.  Sorry.

13     BY MR. MORRIS:

14                   Q   No problem.  You transferred to Vista in

15     2003, right?

16                   A   Yes.

17                   Q   At that point in time in Vista my

18     understanding is there's three MOBs?

19                   A   Three MOBs?

20                   Q   Right.  Three MOB dorm-type setting?

21                   A   Yes.  In the medical ward, you mean?

22                   Q   Yes.

23                   A   Back then we had a medical female, we had

24     medical isolation cells and then we had a med ward one

25     and then med ward two.

Lois Guillory  8/14/2018

| | | |
|---|---|---|
| 1 | Q | There's med female, med one and med two? |
| 2 | A | Yes. |
| 3 | Q | One of those became an EOH? |
| 4 | A | Yes, med ward one became the EOH. |
| 5 | Q | When did that happen? |
| 6 | A | I want to say 2016, maybe a little prior |

7   to that.

8       Q  The EOH was in existence at the time that

9   Mr. Moriarty killed himself, right?

10      A  Yes.

11      Q  When they made one of the meds an EOH, did

12  they get rid of the female medical unit there?

13      A  Yes.  I can't exactly remember the date

14  and year they got rid of the female.  It's been missing

15  for a while.

16          Can I go back?  Med ward one is not -- was

17  not and is not the only EOH cell there.  The medical

18  isolation cells were also used as EOH cells.

19      Q  The med iso cells were?

20      A  Yes, for individual single med cells.

21      Q  If a person was both suicidal and needed

22  to be in medical, your understanding is they would go

23  to med iso?

24          MR. WELSH:  Incomplete hypothetical, vague

25  and ambiguous.

Lois Guillory  8/14/2018

```
 1   BY MR. MORRIS:
 2           Q  Let me ask it this way:  How would a
 3   person -- under what circumstances or what types of
 4   inmates would go to the med iso that had -- where med
 5   iso was also considered an EOH cell?
 6           A  An EOH patient?
 7           Q  Yes.
 8           A  Mainly for protective custody inmates, PC
 9   inmates.  They have to be kept separate from mainline
10   inmates, so they would be placed in there.  A green
11   bander, who was an escapee or violent, he has to be on
12   the safe side, he or she could be placed in there.  Or
13   someone that is homicidal that can't be alone with
14   others, they can be placed in the med iso cell EOH.
15           Q  Under what circumstances is an inmate --
16   what types of inmates were placed in the EOH, as far as
17   you understood?  Now we're talking about in and around
18   2015-16, this time frame.
19           A  In the mainline EOH, what type?
20           Q  Yes.
21           A  Someone that basically came from the
22   suicide cells, safety cell.  If they were already in
23   the safety cell and the mental health provider cleared
24   them to go to a step-down unit, they would be placed in
25   the EOH unit.
```

Lois Guillory  8/14/2018

```
 1              MR. WELSH:  Can I make a suggestion.  I
 2    don't know if Bob Harrison wants to hear this part.
 3    We're getting to the nuts and bolts.  Do you want to
 4    wait or should we just keep going?
 5              MR. MORRIS:  I feel bad for him.  I don't
 6    mind waiting a minute.  Let's go off the record for a
 7    couple minutes.
 8              (The proceedings were recessed at 10:27
 9    a.m. and reconvened at 10:31 a.m., at which time Mr.
10    Harrison was present.)
11    BY MR. MORRIS:
12         Q  Let's talk just a little bit about the
13    enhanced observation housing unit.  That was med one
14    became EOH, right?
15         A  Yes.
16         Q  I think your testimony was right around
17    2015, 2016?
18         A  I'm not exactly sure when they started,
19    but I became the psych liaison in 2016, so it was
20    around that time.
21         Q  It was in existence when you became psych
22    liaison, though?
23         A  I'm trying to remember.  I believe so.
24         Q  Putting aside safety cells and med iso, I
25    just want to know mainline EOH.  What are the criteria
```

Lois Guillory  8/14/2018

1    **for an inmate to be placed in mainline EOH?**

2            A   Basically, a mainline inmate is one that

3    can get along with the other inmates prior to being in

4    a safety cell.  If they go into a safety cell, the

5    psych provider will see them.  They can be either a low

6    level or a high level, either/or, they can go into EOH

7    unit if the provider recommends that.

8            Q   **When you say low level, high level, level**

9    **of what?  Suicide risk?**

10           A   Suicide risk, yes.  If they still have the

11   feelings or they say they are suicidal.

12           Q   **Your testimony was that in order to get to**

13   **the EOH, you start at the safety cell first, are**

14   **transferred from safety cell to EOH?**

15           A   That could be one way.  If they come

16   straight from housing or straight from the intake

17   process, they can go into EOH as well.

18           Q   **Either can be moved from a safety cell or**

19   **direct placement into the EOH from either intake or**

20   **mainline housing?**

21           A   Yes.

22           Q   **EOH is for inmates displaying suicidal**

23   **risk?**

24           A   Yes, or homicidal.

25           Q   **Homicidal, suicidal.  How about somebody**

Lois Guillory  8/14/2018

1   who may damage county property?

2        A   EOH, normally they can put them in there

3   but they wouldn't because, like you say, they can

4   damage property.   In the med ward one cell -- I mean

5   module, it's all glass.   If they wanted to try to break

6   it -- they have nothing in there they can use to break

7   it.   But if they hit their head on it or something like

8   that.

9             The medical isolation cell, there's a nice

10  big window as well.   I guess they really couldn't

11  damage anything.   If they wanted to hit the window with

12  their head, they could hurt theirself.   Other than

13  that, there's really nothing they can damage.

14        Q   An inmate who wants to damage property,

15  maybe not EOH, where would they be placed?

16        A   I know in the past they've been placed,

17  like if they are destructive to themself or other

18  property, they can go in a safety cell.

19        Q   One thing that you said in your interview,

20  just so you know, probably all of us here have heard

21  it, you said something about safety cells were for

22  inmates that were actively combative or wanting to kill

23  themself, whereas EOH is for somebody who is no longer.

24             And the way you said it in the interview

25  led me to believe that there may have been some sort of

Lois Guillory  8/14/2018

1          Q  Yes.

2          A  Policy changes all the time, whether it's

3  documented change or just change through supervisors.

4  I know in the past anyone that is actively violent,

5  come in in four-point restraints, they normally went

6  into the safety cell.

7          Q  Has that changed over time where somebody

8  who is actively violent, in four-point restraints,

9  would no longer be automatic safety cell, maybe placed

10  someplace else?

11          A  Honestly, that would be the decision of

12  the supervisors, which is the lieutenant.  I don't

13  remember exact dates or time or who, but they have

14  been, most of the time I've been there, they have been

15  placed in a safety cell.

16          Q  Under what criteria would somebody who was

17  an EOH person get moved to one of the med isos?

18          A  One more time, please.

19          Q  Somebody who is EOH, fits that criteria,

20  suicidal or homicidal, would be moved to the isolation,

21  the med iso as an EOH inmate?

22          A  If they were moved from the safety cell

23  into the EOH?

24          Q  No.  You talked about EOH.  Then you said

25  that sometimes the medical iso cells can be used as EOH

Lois Guillory  8/14/2018

1   cells as well?

2           A  Yes.

3           Q  Under what circumstances would somebody

4   who is an EOH inmate be moved to a med iso?  Or what is

5   the criteria to get an EOH inmate into med iso?

6           A  As an EOH inmate as well?

7           Q  Correct.

8           A  Someone that says they can't be around

9   others, they are homicidal, say that they are

10  homicidal.  Or, like I said, either PC or green bander,

11  or some kind of high-profile cases, they have to be in

12  EOH or medical isolation.

13          Q  Somebody who is in protective custody who

14  can't be in general population, who also is an EOH, who

15  also is suicidal, somebody who is homicidal and

16  suicidal, or somebody who is a green bander may be sent

17  to the med iso as an EOH inmate?

18          A  Yes.

19          Q  Thank you.  In addition to the EOH cells

20  at Vista, was there anything similar to a psych safety

21  unit that they have down in Central?  Do you know what

22  I'm talking about?  Are you familiar with the psych

23  safety, the PSU?

24          A  We don't have anything like that at Vista.

25          Q  Are you familiar with the PSU in

Lois Guillory  8/14/2018

```
 1   Central?
 2              A   I've never worked there, no.   I'm a little
 3   familiar, but I've never worked there.
 4              Q   Nothing like PSU in Vista, true?
 5              A   Nothing.
 6              Q   There is the safety cells, MOBs we talked
 7   about, MOB isos.   I want to ask you a few questions
 8   about the ad seg cells.   Under what criteria do inmates
 9   get placed in ad seg?   What are some of the things that
10   can lead somebody being placed in ad seg?
11              A   People that come from Northern California,
12   that's a norteno, usually from norteno gang related,
13   they have to be kept separate, they have to be placed
14   in ad seg.   Someone that is associated with the inmate
15   Mexican Mafia, they'll be ad seg.   Sometimes people
16   that are mentally -- have mental issues that are not
17   necessarily violent or suicidal, they can get along
18   with others, they'll be placed in ad seg unit.
19              Q   Somebody that comes in and they have a
20   gang dispute or somebody from the Mexican Mafia, they
21   are in ad seg?
22              A   Yes.
23              Q   Somebody that is RCC?
24              A   Yes.
25              Q   When you were talking about has mental
```

Lois Guillory  8/14/2018

1    **issues, were you talking about RCC inmates?**

2         **A   Yes.**

3         **Q   What's RCC?   Tell us what RCC is.**

4         **A   Regional client center.**

5         Q   What kind of patients are we talking about

6    that are RCC inmates

7         A   Normally have a mental capacity of a

8    child.

9         Q   What about somebody who is bipolar,

10   schizophrenic, could that also be an RCC patient?

11             MR. WELSH:  Lacks foundation.

12             MR. MORRIS:  If you know.

13             MR. WELSH:  You are saying an RCC patient,

14   is that correct?

15   BY MR. MORRIS:

16        Q   RCC inmate.  Sorry.  Somebody who fits the

17   criteria of RCC.

18        A   What's the question?

19        **Q   Somebody who is bipolar, schizophrenic,**

20   **hears voices, that kind of thing --**

21        **A   Yes.**

22        **Q   -- that's also RCC?**

23        **A   Yes.**

24        **Q   RCC is not necessarily -- the way you guys**

25   **use it in the jail, my understanding is RCC broadly**

Lois Guillory  8/14/2018

1    refers to people with mental issues, not necessarily

2    those that are just from the regional center?

3            A  Yes.

4            Q  What would lead somebody to getting

5    placed -- let me ask you this:  How many ad seg cells

6    are there?

7            A  We just changed some housing units prior

8    to this.

9            MR. WELSH:  Give him a time frame.  2016

10   time frame, is that what you want?

11   BY MR. MORRIS:

12           Q  You can tell me how that's been modified

13   over time.

14           A  In 2016 in north male side, we had at

15   least three housing units that occupied sixteen cells.

16   They would be individual cells because they were all ad

17   seg, meaning they had to be by themselves.  Sixteen

18   times three on that side.  East house, E1 and E6 were

19   considered ad seg as well.  E6 has, I think, nine

20   cells.  E1 has seven cells.

21           Q  You had sixteen times three, plus seven,

22   plus nine?

23           A  Yes.

24           Q  Sixteen times three cells, I take it that

25   those are located kind of interspersed through mainline

Lois Guillory  8/14/2018

1    housing?

2               A   No, they were on their own floor, north 1,

3    2 and 3 is what they were called.

4               Q   Those were all ad seg cells?

5               A   Yes, at that time.

6               Q   When an individual was in ad seg, that's

7    the twenty-three hours in, one hour out routine?

8               A   Yes.

9               Q   When they are out, they are by themselves

10   typically?

11              A   Yes.

12              Q   At any time during your time that you've

13   been in Vista, did anybody ever teach you or were you

14   ever trained on the dangers associated with placing

15   inmates that had mental instability issues in ad seg?

16   Anybody ever tell you how that may increase risks

17   associated with mentally unstable inmates?

18              MR. WELSH:  Vague and ambiguous, lacks

19   foundation.

20              MS. HARDISTY:  Also overbroad.

21   BY MR. MORRIS

22              Q   Those are all objections down the way.

23   You and I just carry on.

24              A   Was I ever taught --

25              Q   Like as part of a training, like, hey,

Lois Guillory  8/14/2018

 1    these are -- if you place somebody who is mentally

 2    unstable in an ad seg cell, you need to be careful

 3    because it can increase risks associated with suicide,

 4    or homicide, or that kind of thing?

 5              MR. WELSH:  Same objections.

 6              THE WITNESS:  I was never taught anything.

 7    Years down the line -- I shouldn't say years down the

 8    line.  You hear -- I've heard that from being a psych

 9    liaison for two years that it's not good for their

10    health or anyone's health to be in ad seg for a long

11    period of time.

12    BY MR. MORRIS:

13         Q  You picked up on that point during your

14    time as psych liaison, right?

15         A  Yes.

16              MR. WELSH:  Vague and ambiguous.

17    BY MR. MORRIS:

18         Q  As far as like formal training, sit down

19    in a classroom setting and listen to Dr. Goldstein or

20    Dr. Joshua, or some other medical provider, do you

21    recall any training on that?

22         A  I did go through the PERT class, yes.  I

23    think that was before I became the psych liaison.  I

24    can't remember exactly when.

25              MR. WELSH:  You need to be careful and

Lois Guillory  8/14/2018

1    answer his questions.  You sound like you are answering

2    something about training.  He's asking for training on

3    that specific point he was asking about.

4    BY MR. MORRIS:

5            Q  I'll follow up and ask you.  In that PERT

6    training that you attended, did they talk to you about

7    the dangers associated with placing mentally unstable

8    inmates in an isolation cell?

9            MR. WELSH:  Vague, ambiguous, lacks

10    foundation.

11            THE WITNESS:  I'm trying to remember.

12    That was many years ago I went to that training.  I

13    recall, like I said, hearing that being placed in ad

14    seg, stuff like that, it can wear on the mind.  I'm not

15    sure if that's where I heard it, the PERT class or

16    after that.

17    BY MR. MORRIS:

18            Q  Fair enough.  I appreciate your candor.

19    Give me your best recollection.  That's all I can ask

20    for.  Okay?

21            A  Okay.

22            Q  I want to switch gears just a little bit

23    and talk about the information that is passed down from

24    medical staff to line staff.  My understanding is sworn

25    correctional staff, you don't have access to the

Lois Guillory  8/14/2018

1   medical information in the JIMS system, true?

2          A   True.

3          Q   How is relevant medical information

4   typically passed down from medical staff to

5   correctional staff?

6          A   In a psych liaison position, we are with

7   the provider, whether it's a nurse practitioner or a

8   psychiatrist or a psychologist.  We technically are

9   with them as they are interviewing patients.

10  Basically, if something comes about to where they are

11  homicidal or suicidal, then we are notified.  We are

12  supposed to relay it to our supervisors.

13         Q   When you say supervisors, you mean

14  correctional staff or medical staff?

15         A   Correctional staff.

16         Q   In your role as a psych liaison, if you

17  were privy to information that somebody was suicidal or

18  homicidal, that would be the type of information that

19  you as the psych liaison would then pass up the chain

20  of command to your supervisor?

21         A   Yes.

22         Q   I'm more curious about like in this

23  situation where there was this past suicidal stuff that

24  happened in the field, stuff we all know about.  I

25  heard your interview, you talked about you learned it

Lois Guillory  8/14/2018

1    after the fact.

2              Under what conditions is that type of

3    information, that medical suicidal type information,

4    relayed from the medical realm to the corrections

5    deputies?

6              MR. KUTYLA:  Asked and answered.

7    BY MR. MORRIS:

8         Q  Under what conditions is that relayed?

9              MR. WELSH:  You lost me.  Can you ask it

10   again?

11   BY MR. MORRIS:

12        Q  Sure.  You know what we're talking about

13   in this case, all that past suicide stuff that we know

14   about with Moriarty?

15        A  Yes.

16        Q  In your interview you talked about how

17   that wasn't ever relayed to you.  You didn't know about

18   it until after the fact, right?

19        A  Yes.

20        Q  How is that information relayed, if at

21   all, things like that, like past suicidal behavior,

22   things like that, relayed to the people that are

23   working day-to-day in the jail and interacting with the

24   inmates?  How are you getting that information, if at

25   all?

Lois Guillory  8/14/2018

1    watch commander.

2    BY MR. MORRIS:

3         Q   Whether they communicate watch commander

4    to watch commander or medical staff to watch commander,

5    you would expect the watch commander at the incoming

6    jail to be aware of the inmate who is being

7    transferred?

8         MR. WELSH:   Lacks foundation, calls for

9    speculation.

10        THE WITNESS:   Yes.

11   BY MR. MORRIS:

12        Q   Under what conditions does an inmate end

13   up getting placed in a disciplinary cell?

14        A   People that break the rules in the jail,

15   whether they are fighting, disrespecting staff, they

16   would be placed in the disciplinary isolation cell.

17        Q   How many disciplinary cells are there?

18        A   We have five designated ones.   We also

19   have -- like if there's no space in that particular

20   designated, they can be used in a regular housing unit,

21   kept by themselves, locked down.

22        Q   What are the five designated cells

23   called?

24        A   In south house, south one -- the housing

25   unit is south 5.   Cell S1, S2, S3, S4 and S5.

Lois Guillory  8/14/2018

1        Q  S5 is the overall unit?

2        A  South 5, yes.

3        Q  Within there you have S1, 2, 3, 4, 5?

4        A  Five cells.

5        Q  In this case there's reference to him

6   being in S5, Mr. Moriarty, right?

7        A  Yes.

8        Q  Is that just a general S5 being

9   disciplinary housing or was the reference made to a

10  particular cell, like S5 cell, do you know?

11          MR. WELSH:  Calls for speculation.

12          THE WITNESS:  One more time, please.

13  BY MR. MORRIS:

14       Q  My understanding from your testimony is S5

15  can refer to disciplinary housing generally, all five

16  cells, like he's in S5, right?

17       A  Yes.

18       Q  S5 can also refer to the fifth cell within

19  S5, can also be called S5, right?

20       A  Yes.

21       Q  When we talk about Mr. Moriarty having

22  been in S5, are we talking about him being just

23  generally in disciplinary housing or actually that

24  particular S5 cell within disciplinary housing?

25       A  He was in --

Lois Guillory  8/14/2018

 1                    MR. WELSH:  That's going to require you to

 2     remember, if you do remember, which cell he was in.

 3                    THE WITNESS:  I do remember.  He was in

 4     S1.

 5     BY MR. MORRIS:

 6          Q  S1 within S5?

 7          A  Yes.

 8          Q  How are the disciplinary cells different

 9     from the ad seg cells?

10          A  There's only one bed in the disciplinary

11     isolation cell.  The ad seg cells have a lower bunk and

12     a top bunk.  There's two bunks.

13          Q  Ad seg usually, even though there may be

14     two bunks, my understanding is there are not usually

15     two inmates within an ad seg cell, right?

16          A  There have been times when there has been

17     two inmates, but normally just one inmate.

18          Q  S5 cells have one bunk, right?

19          A  Yes.

20          Q  Physically any other differences between

21     ad seg cells and the S5 cells?

22          A  The windows are different.

23          Q  In what way?

24          A  On the top you have a little square

25     window.  I'm not sure of the size.

Lois Guillory  8/14/2018

1                    MR. WELSH:  You need to tell us which one

2    you are describing, either ad seg or disciplinary.

3                    THE WITNESS:  The disciplinary isolation

4    cells have two small windows, one on the top, I'm not

5    sure of the size.  They also have a flap where you can

6    close the window.  On the bottom of the cell door

7    there's also a little window.

8                    Every ad seg and disciplinary isolation

9    cells has a food slot where it's keyed open and we can

10   open up that little door to either do medication or to

11   have the psych provider talk to them through that door.

12   Same as the ad seg cells, one single toilet, one single

13   sink.

14   BY MR. MORRIS:

15                    Q  How about as far as time out, is that the

16   same, one hour, both in ad seg and disciplinary

17   cells?

18                    A  If you're ad seg in that cell, you are

19   technically out one hour.  If you are disciplinary

20   isolation in that cell, you get no dayroom, you get a

21   shower every forty-eight hours.

22                    Q  Do they still call it the hole?

23                    A  I've heard it called that, yes.

24                    Q  Is there a limit to how long somebody can

25   spend in the disciplinary cells?

Lois Guillory  8/14/2018

1           Q  The fish lip is like the identification

2    paperwork that's got his charges, a little bit of

3    history on him, the paperwork that kind of travels

4    around.  You usually stick them on the outside of a

5    door somewhere.  Is there a fish lip slot in both the

6    ad seg and the disciplinary cells?

7           A  No, just the disciplinary isolation cells.

8           Q  Do you know why that is, why there's no

9    fish lip in ad seg but a fish lip slot in the isolation

10   disciplinary cells?

11              MR. WELSH:  Calls for speculation, lacks

12   foundation.

13              THE WITNESS:  I do not.

14   BY MR. MORRIS:

15           Q  That was one thing I noticed and I was

16   like that's odd.

17              Do you know why Heron Moriarty was placed

18   in the disciplinary cell?

19           A  Do I know?  I believe he was placed in

20   there because that was the closest spot for him to go

21   to from being taken off the bus.  That's the only thing

22   I can think of.

23           Q  Has anybody told you that?

24           A  No.

25           Q  Do you have an opinion as to whether or

Lois Guillory  8/14/2018

1    not Heron Moriarty had done any sort of underlying

2    offense that would make him an appropriate candidate

3    for the disciplinary cell?

4                    MR. WELSH:   Incomplete hypothetical, calls

5    for speculation.

6                    MR. KUTYLA:   Vague and ambiguous, lacks

7    foundation.

8                    THE WITNESS:   I don't think he was placed

9    in there for discipline isolation purposes.   He was

10   placed there because of his actions, from the email and

11   ISR that I got.   Basically, he was acting bizarre and

12   the transportation deputies would not transport him to

13   Central.

14                   Like I said, the disciplinary isolation

15   cell is real close to the court holding side.   He could

16   have been placed in that particular cell for that

17   reason or because ad seg was full that day, which I do

18   not know.

19   BY MR. MORRIS:

20        Q  You said that you got an email -- you

21   mentioned an email and ISR.  Explain to me what those

22   two documents are.  I know what an email is.  What

23   email are you referencing?

24                   MR. WELSH:  Let me show you.  Tell him

25   what you recall.

Lois Guillory  8/14/2018

1              MR. MORRIS:  For the record, we're going

2     to mark this as Exhibit Number 1.  For the record, it's

3     Bates number SDSO 1040.

4              MR. WELSH:  Don't do that one.

5              THE WITNESS:  An email or an ISR, they

6     normally, as a psych liaison deputy, when someone was

7     placed --

8              MS. PENA:  What's the Bates number there?

9              MR. WELSH:  It's a two-pager.

10             MR. MORRIS:  Let me see that real quick.

11    We removed the stickie from Exhibit Number 1, which was

12    SDSO 1040, and placed Exhibit Number 1 stickie on SDSO

13    015 and 016.

14             (Exhibit 1 was marked.)

15             MR. WELSH:  Let me speed it up a little.

16    If you look at the second page of Exhibit 1, this is

17    information that she got.  She might have had this as

18    an enclosure in an email.

19             MS. PENA:  Oh, there wasn't a separate

20    email?

21             MS. WELSH:  If there was an email, we

22    don't have it.

23             THE WITNESS:  If there was an email, it

24    was sent in the ISR like this, pretty much, to me

25    letting me know why he was placed in the cell and that

Lois Guillory  8/14/2018

1    he needed to be seen by a psychiatrist.

2    BY MR. MORRIS:

3         Q  Let's look at Exhibit Number 1.  Does

4    everybody have it?

5              MR. WELSH:  Page 15 and 16 are the ones in

6    your packet.

7    BY MR. MORRIS:

8         Q  My understanding, from listening to your

9    interview, was that your recollection was that you

10   received an email from a Deputy Angulo, right?

11        A  Yes.

12        Q  Can you tell me what you recall, without

13   looking at the document, as far as the content of the

14   email you received from Deputy Angulo?

15             MR. WELSH:  She already looked at the

16   document so she can't tell you that.

17             THE WITNESS:  That day when I came in the

18   morning to start my shift, there was an email from

19   Deputy Angulo, who was the court deputy at that time.

20   He informed me that there was an inmate, Mr. Moriarty,

21   he was on the bus to be transferred back to Central.

22             Apparently, he was up on the court side.

23   There was an incident between him and the transporting

24   deputies, whether his behavior -- he was bizarre.  They

25   refused to transport him.

Lois Guillory  8/14/2018

1                    Deputy Angulo went to retrieve

2    Mr. Moriarty, bring him back to the jail side.  Then at

3    that time he placed him into the disciplinary isolation

4    cell.  The ISR email that emailed me basically said

5    that he needed to be seen by the psychiatrist.

6    BY MR. MORRIS:

7            Q   Thank you so much.  Did Deputy Angulo

8    relate to you in any way that there had been a hands-on

9    use of force with Mr. Moriarty that day?

10           A   No.

11           Q   He just said Mr. Moriarty was acting

12   bizarre on the bus itself?

13           A   Yes, I believe so.

14           MS. HARDISTY:  Just to clarify for the

15   record, when you say "on that day," what day are we

16   talking about?

17   BY MR. MORRIS:

18           Q   Just for the record, when we talk about

19   that day, my records indicate that day would have been

20   May 26.  Is that your understanding?

21           A   That's the day that the ISR is written,

22   yes.

23           Q   When you say ISR, that's an acronym for

24   what?

25           A   Inmate -- let me try to think.  Excuse me.

Lois Guillory  8/14/2018

1    Incident report, inmate incident report.

2         **Q   Status report?**

3         A   Yes, inmate status report.   Basically just

4    information only report on inmates.

5         **Q   Perfect.   Thank you.   Deputy Angulo was**

6    **acting as court liaison deputy?**

7         A   Yes.

8         **Q   He's a line deputy or is he a sergeant?**

9         A   Line deputy.

10        **Q   Deputy Angulo removed Mr. Moriarty from**

11   **the bus because he was acting bizarrely, was your**

12   **understanding, right?**

13        **A   Yes.**

14        **Q   And placed him into the disciplinary cell**

15   **S1?**

16        **A   Yes.**

17        **Q   He sent you an email -- did he communicate**

18   **with you that Mr. Moriarty needed to be seen by a**

19   **psych?**

20        **A   Basically, he was acting bizarre and**

21   **needed to be seen by the psych.**

22        **Q   Is that the first time Mr. Mortiarty had**

23   **come to your attention?**

24        **A   Yes.**

25        **Q   How would you have known to look up within**

Lois Guillory  8/14/2018

 1   JIMS regarding a need for a psych?  Would they send

 2   some sort of ping to you as the psych liaison deputy?

 3   Are you given information when another deputy thinks

 4   somebody needs to see a psych?  How does that come to

 5   you?  That's like four questions.

 6                MR. WELSH:  Incomplete hypothetical, vague

 7   and ambiguous.  If the answer is he sent an email

 8   directly to you, remind him about that.

 9                THE WITNESS:  Yes, they can either send me

10   an email or speak to me face to face and let me know.

11   BY MR. MORRIS:

12          Q   There's no way they could like upload

13   something into JIMS that you as the psych liaison would

14   get an automatic notification regarding a psych need,

15   the deputies have to contact you directly, true?

16          A   True.

17          Q   When we look at Exhibit 1, and let's go

18   through this real quick.  This is an incident status

19   report, an ISR, entered by Deputy Angulo, right?

20          A   Yes.

21          Q   What are we looking at on page one of

22   Exhibit Number 1?

23          A   That's just basically like a face sheet.

24   It says who wrote the report, what supervisor approved

25   the report.  It has Mr. Mortiarty's name, his housing

Lois Guillory  8/14/2018

1    area, where he was assigned.  The action taken,

2    basically placed him in the S5 lockdown pending psych

3    evaluation.

4              **Q  Does it tell you from this the housing**

5    **unit where he was prior to being placed into S5 after**

6    **being taken off the bus?**

7              A  Not on the first sheet, no.

8              Q  Do you have any understanding of where he

9    was housed before this incident on the bus had

10   happened?

11              MR. WELSH:  Calls for speculation.

12              THE WITNESS:  After getting the

13   information from Mr. Moriarty, he was in intake from

14   the time he arrived from Central until he got placed on

15   that bus.

16   BY MR. MORRIS:

17              **Q  He was no longer in street clothes,**

18   **though, right?**

19              A  I don't know that.

20              **Q  You weren't there?**

21              A  No, I was not.

22              Q  Do you have any understanding, ma'am, as

23   to why Mr. Moriarty was on that bus that morning?

24              MR. WELSH:  Calls for speculation, lacks

25   foundation.

Lois Guillory  8/14/2018

1                    MR. HARRISON:   Join.

2                    THE WITNESS:   To be transferred back to

3    Central.

4    BY MR. MORRIS:

5            Q   Do you know if he was being transferred to

6    be placed back in a safety cell in Central or was he

7    going to court, do you know?

8                    MR. WELSH:   Calls for speculation.

9                    THE WITNESS:   No, I do not know.

10   BY MR. MORRIS:

11           Q   When Deputy Angulo sent you that email,

12   did you then read the ISR that we have here as Exhibit

13   1?

14           A   Yes, the email was the basic ISR.  It was

15   sent in an email to me.

16           Q   Did he attach it or did he cut and paste,

17   do you recall?

18           A   I don't recall.

19           Q   In this report Deputy Angulo documents

20   some of the bizarre behavior, some of the challenging

21   to other inmates, some of the threats to other inmates.

22   Did you ever have any follow-up communication with

23   Deputy Angulo where any of this was explained to you in

24   further detail than we see here in the email -- excuse

25   me -- in this ISR?

Lois Guillory  8/14/2018

1        A  I don't remember.

2             Q  **When you read this report about what had**

3    **happened on the bus, what did you do?**

4             A  **It was the beginning of my shift when I**

5    **read it.  I just basically -- I don't remember if I**

6    **printed it out for the doctor or just explained when he**

7    **came to work.  I can't remember if I verbally told him**

8    **or printed it out for him.  I don't recall.**

9             Q  **When you say for the doctor, is that Dr.**

10   **Lissaur we're talking about?**

11            A  **Yes.**

12            MR. MORRIS:  For the court reporter,

13   that's L-i-s-s-a-u-r.

14            MR. WELSH:  Calls for speculation, assumes

15   facts not in evidence.  I don't want you to guess as to

16   whether Dr. Lissaur was there on this day.  If you

17   know, you can say that you know.

18            MR. HARRISON:  Join.

19   BY MR. MORRIS:

20        Q  **I totally get it.  You said that you**

21   **printed it out -- tell me what you did with it.  If you**

22   **talked to Dr. Lissaur, you left it in the slot, if you**

23   **didn't do anything like that, just let me know.**

24        A  He is right, Dr. Lissaur was only on

25   weekends at the time.  I know that was the first time

Lois Guillory  8/14/2018

1                    MR. WELSH:  Let me say something.  Every

2     other weekend would be every other Friday, Saturday and

3     Sunday?

4                    THE WITNESS:  Yes.

5     BY MR. MORRIS:

6            Q  Every other Friday, Saturday, Sunday you

7     are the psych liaison deputy?

8            A  Yes.

9            Q  Taking you back to May of 2016, tell me

10    how many hours in a two-week period did you work?

11           A  Eighty-five straight.

12           Q  Those eighty-five hours were in how many

13    shifts in a two-week period?

14           A  One shift.  We worked two days, we're off

15    two days, we work five days, off five days.

16           Q  You worked two days?

17           A  Monday, Tuesday.  Every Monday, Tuesday.

18           Q  Then you are off two days?

19           A  Yes.  Then a five day start, so Friday

20    through Tuesday.

21           Q  Friday through Tuesday every other week?

22           A  Yes.

23                    MR. WELSH:  I don't understand why you

24    said one shift.

25                    MR. MORRIS:  I think she's taking the

Lois Guillory  8/14/2018

```
 1    entire context is one shift.
 2              MR. WELSH:  It's a week-long schedule or
 3    two-week long schedule?
 4              THE WITNESS:  Yes.
 5    BY MR. MORRIS:
 6          Q   It's a two-week long schedule.  Two on,
 7    two off, five on, five off?
 8          A   Yes.
 9          Q   That's a pretty good schedule.  Are your
10    shifts eight hours, ten hour shifts?
11          A   Twelve and a half.
12          Q   Your counterpart at Vista would do the
13    opposite?
14          A   Yes.
15          Q   Same two on, two off, five on, five off,
16    but just the opposite of you?
17          A   Yes.
18          Q   That was Deputy Johnson?
19          A   Yes.
20          Q   When Deputy Angulo sent you an email
21    notifying you about Mr. Moriarty, he would also send
22    that to Deputy Johnson?
23              MR. WELSH:  Calls for speculation.
24              THE WITNESS:  I don't recall if Johnson
25    received this.  He got the ISR because everyone can
```

Lois Guillory  8/14/2018

1   read the ISR if you can look it up.  I don't think he

2   got an email.

3   BY MR. MORRIS:

4              Q  Do you know why it was that you were

5   notified -- assuming that this is true, that Johnson

6   didn't get it but you did.  Do you know why Angulo

7   emailed you directly and not Johnson?

8              MR. WELSH:  Calls for speculation, lacks

9   foundation and assumes facts.

10             THE WITNESS:  Because we do the psych

11  liaison position during the day, which is from six in

12  the morning to six thirty in the evening.  This is

13  timed at 1910.  I'm assuming Johnson was gone for the

14  day and I was coming on that weekend, I believe.

15  BY MR. MORRIS:

16             Q  The deputies would be able to look at a

17  schedule and see who the next oncoming psych liaison

18  deputy was?

19             A  Yes.

20             Q  Is it your understanding, as you sit here

21  today, while you were off Wednesday, Thursday, then you

22  were on the following five days?

23             MR. WELSH:  For this particular date?

24  BY MR. MORRIS:

25             Q  May 26.

Lois Guillory  8/14/2018

1    weekend.

2            Q  The email would seem to indicate that you

3    were scheduled, indicated that you were coming back and

4    not working overtime?

5            A  Yes.

6            Q  If at any time you need to break, you want

7    to talk to --

8            MR. WELSH:  Let's take a break now.  We've

9    been going for an hour.

10           (The proceedings were recessed at 11:16

11   a.m. and reconvened at 11:23 a.m.)

12   BY MR. MORRIS:

13           Q  Before we get into the actual events

14   regarding Mr. Moriarty, I want to do a little more

15   background with you.  If you could tell me -- we

16   started with Las Colinas and I know that you worked at

17   Las Colinas from 1997 to 2003.  We started talking

18   about the different psych housing options at Las

19   Colinas.  Then you were transferred from Las Colinas to

20   Vista in 2003, right?

21           A  Yes.

22           Q  Can you tell me what assignments you've

23   had since being assigned to Vista in 2003, what

24   assignments?

25           A  Just a line deputy.

Lois Guillory  8/14/2018

1          Q  Were you more likely than not to be given

2  one assignment over another, like a particular housing

3  module or a particular intake or transportation, prior

4  to becoming psych liaison?

5          A  We moved around different positions.

6          Q  What were the circumstances that led you

7  to be assigned as the psych liaison deputy?

8          A  Prior to me becoming a psych liaison

9  deputy, there was another female deputy that was on my

10  team, she was a psych deputy.  I just got to talking to

11  her and decided that's what I wanted to do.

12          Q  Was it something you had to apply for or

13  something you were assigned?

14          A  Apply.

15          Q  Did it come with an increase in pay?

16          A  No.

17          Q  Did you have to take a test or interview?

18  How did that come about?

19          A  Interview.

20          Q  When did you become the psych liaison

21  deputy?

22          A  I don't remember the exact date, but it

23  was 2015, I believe 2015.

24          Q  Who was the other psych liaison deputy at

25  the time that you became the psych liaison deputy?

Lois Guillory  8/14/2018

1          Q   You were a line deputy from 2003 up until

2   2015?

3          A   Yes.

4          Q   Is there -- there is still female housing

5   in Vista, right?

6          A   Yes.

7          Q   How many female beds are there?

8          A   A total of like ninety-two, I believe.

9          Q   That supplements the beds that are in Las

10  Colinas?

11         A   Yes.

12         Q   Are the female inmates actually housed

13  there or is that just sort of like people who have to

14  go to court in North County?

15         A   They are housed there.

16         Q   Do you work in the female detentions area

17  in Vista?

18         A   Yes.

19         Q   Did you also work in the male detentions

20  area?

21         A   Yes.

22         Q   Can you tell me what type of training was

23  given to you at the time that you became the psych

24  liaison deputy in 2015?

25         A   No particular training at that time.

Lois Guillory  8/14/2018

1          Q  Can you describe for us what your job

2     duties are as the psych liaison deputy?

3          A  When I was a psych liaison deputy, I was

4     the go-to person between the medical staff and the

5     sworn staff.

6          Q  Would you consider yourself to be the

7     conduit of important information that the correctional

8     staff needed to know about the medical or psychiatric

9     conditions?

10         A  Yes.

11         Q  I thought that's what your job was.  It

12    was difficult with the privacy laws as to what

13    information that you felt like you could relay to the

14    correctional staff.  How did you make that

15    determination as to, hey, this stuff I need to keep

16    private that I overheard versus stuff that needs to be

17    transferred to correctional staff?

18         A  Basically, if it was someone that was

19    going to hurt themselves, or possibly hurt another

20    inmate or staff, we were supposed to relay that.

21         Q  That makes sense.  Hurt themselves, hurt

22    others, hurt staff?

23         A  Yes.

24         Q  That's the same criteria for getting

25    somebody into EOH, right?

Lois Guillory  8/14/2018

```
 1              A  Yes.
 2              Q  During your time as psych liaison deputy,
 3  did you ever have occasion to transfer somebody from
 4  EOH to the PSU in Central?
 5              A  Myself?
 6              Q  Like make a determination, hey, this guy
 7  needs to go from EOH to PSU?
 8              MR. WELSH:  He's asking if you made that
 9  determination.  Go ahead and answer.
10              THE WITNESS:  No.
11  BY MR. MORRIS:
12              Q  Were you ever involved in any inmate that
13  was transferred, for whatever reason, from EOH to
14  PSU?
15              A  Yes.  If the provider recommend this
16  person go to the psychiatric unit, yes, we had to write
17  the incident report, relay it to our staff, our sworn
18  staff.
19              Q  The provider, the medical provider?
20              A  The psych provider, yes.
21              Q  That would be either the nurse
22  practitioner or the psychiatrist?
23              A  Yes.
24              Q  What is your understanding of what
25  conditions would lead either the psychologist,
```

Lois Guillory  8/14/2018

1    **psychiatrist or the nurse practitioner to recommend**

2    **movement from EOH to PSU, what kind of inmates are we**

3    **talking about?**

4                    MR. WELSH:  Calls for speculation, lacks

5    foundation.

6                    MS. HARDISTY:  Incomplete hypothetical.

7                    THE WITNESS:  That would be left up to the

8    provider.  All I did was make the call, say, hey, this

9    person, she wants him in PSU, he or she.

10   BY MR. MORRIS:

11           Q   What is your understanding of the

12   difference between EOH and PSU, the difference?  Either

13   the difference physically to the cells or the different

14   types of unit?  What is your understanding of the

15   difference between EOH and PSU?

16                   MR. WELSH:  Lacks foundation, may call for

17   speculation.

18                   THE WITNESS:  I've never worked Central

19   PSU, so I'm not sure.  They have multiple nurses there,

20   multiple deputies there.  I'm not sure what all

21   pertains there at Central.

22   BY MR. MORRIS:

23           Q   Would you consider it a step up from EOH

24   or a step down as far as psychiatric treatment?

25                   MR. WELSH:  Same objections.  Go ahead.

Lois Guillory  8/14/2018

1        THE WITNESS:  Do I think it's a step up
2   from EOH?
3   BY MR. MORRIS:
4        Q  Right.  If we go safety cell is the top
5   rung, right, people most likely to hurt themselves or
6   others?  From there at Vista we go to EOH.  Is the PSU
7   something that would fall between those two, it's not a
8   safety cell but it's not EOH?  Is it something that's
9   like less protective than EOH?
10        MR. WELSH:  Vague, ambiguous, calls for
11   speculation, assumes facts not in evidence, incomplete
12   hypothetical.
13        THE WITNESS:  I don't think it's less
14   protective.  There's more providers there, they are
15   observed and talked to every day, and they are given
16   their medications regularly.  That's all.
17   BY MR. MORRIS:
18        Q  Sounds to me like, at least in your
19   opinion, based on the limited information that I know
20   that you have, PSU would be a step up from EOH?
21        MR. WELSH:  Same objections.
22        THE WITNESS:  I don't know.
23   BY MR. MORRIS:
24        Q  They are given access to counseling and
25   medical staff more regularly at PSU than they are at

Lois Guillory  8/14/2018

1    EOH, sounds like?

2                    MR. WELSH:   Same objections.

3                    THE WITNESS:   Yes.

4    BY MR. MORRIS:

5        Q   There's something that's come up in this

6    case, albeit at Central, called a pilot program.   Do

7    you know anything about a pilot program?

8        A   No.

9        Q   Had you ever heard talk that -- let me

10   ask -- strike that.   Detainees in the field that are

11   actively suicidal, are they cleared by a mental

12   hospital before coming to jail typically?

13                   MR. WELSH:   Vague, ambiguous, may call for

14   speculation, lacks foundation.

15                   MS. HARDISTY:   Overbroad.   I'm sorry, I

16   didn't hear the whole question.   Did you designate a

17   jail?

18                   MR. MORRIS:   I said jail generally.

19                   THE WITNESS:   I know in the past they were

20   recommended to take them to county mental health, then

21   go through the psychiatrist there, then bring them to

22   the jail.

23   BY MR. MORRIS:

24       Q   You said in the past.   Is it your

25   understanding that that procedure has changed?

Lois Guillory  8/14/2018

1               MR. WELSH:   Same objections.

2               THE WITNESS:   Is that where the pilot

3    program came in?   Now I remember.   Sorry.   I was

4    thinking it was something to do with something else.

5               What I remember from the pilot program, it

6    changed.   I'm not sure if it was for all arresting

7    agencies or just the sheriff's department arresting

8    agencies.   But, like I said, in the past they were

9    recommended to take them to CMH if they were suicidal

10   out in the field.   They would take them to CMH, get the

11   recommendation from the CHM doctor, bring them to our

12   jail.   If they recommend safety cell, they were placed

13   in a safety cell.   If they provider recommended

14   anything else, then they were not placed in a safety

15   cell.

16              The pilot program, I don't know everything

17   that it entails.   I just know -- like I say, I can't

18   remember if it was the sheriff's department or all

19   agencies, they were not required to take them to CMH.

20   I believe they were able to bring them straight to the

21   jail.

22   BY MR. MORRIS:

23         Q   Under the pilot program, suicidal inmates

24   could be taken directly to the jail instead of CMH

25   first?

Lois Guillory  8/14/2018

1              MR. WELSH:  Calls for speculation, lacks

2    foundation, vague and ambiguous, incomplete

3    hypothetical.

4              THE WITNESS:  I don't remember if that was

5    the exact wording, or that was the exact purpose of the

6    pilot program, I don't remember that.

7    BY MR. MORRIS:

8         Q   That was your understanding of how it

9    worked under the pilot program?

10             MR. WELSH:  Same objections.

11             THE WITNESS:  Yes.

12   BY MR. MORRIS:

13        Q   Was it your understanding the ability to

14   bypass CMH for suicidal inmates, did that exist both at

15   Vista and Central or was that limited to just one

16   particular facility, as far as you understood?

17             MR. WELSH:  Calls for speculation, lacks

18   foundation, vague and ambiguous.

19             THE WITNESS:  As far as I understood, it

20   was all facilities that accepted safety cells.

21   BY MR. MORRIS:

22        Q   Given that suicidal inmates could bypass

23   CMH and be taken directly to one of the county jails,

24   was there anything different that you, as either a line

25   deputy or psych liaison deputy, were instructed to do

Lois Guillory  8/14/2018

1    any differently with respect to these now suicidal

2    inmates coming directly to the jail?

3                   MR. WELSH:   Compound, assumes facts not in

4    evidence, calls for speculation, lacks foundation.

5                   THE WITNESS:   No.

6    BY MR. MORRIS:

7         Q   Were you given any particularized training

8    regarding implementation of this pilot program?

9         A   No.

10        Q   Were you -- strike that.

11                  MR. WELSH:   Let me just ask a question.

12   You were not an intake deputy at Vista Detention

13   Facility when the pilot program was in effect, were

14   you?

15                  THE WITNESS:   Like I said, we switched

16   positions.   I mean, it's not every night we're in one

17   position.   One night we're in intake, next night we're

18   in housing or medical.   I'm sure I've worked it.

19   BY MR. MORRIS:

20        Q   If the pilot program was in 2016, you

21   weren't working as an intake deputy then, you were the

22   liaison, correct?

23                  MR. WELSH:   She worked overtime.

24                  THE WITNESS:   I want to go back.   I

25   believe I started in 2014 as a psych liaison.   Towards

Lois Guillory  8/14/2018

```
 1    the end of -- after this happened with Mr. Moriarty, I
 2    believe in August, my time was up.
 3              MR. WELSH:  I'm asking you because he's
 4    trying to use you to establish what intake deputies --
 5              MR. MORRIS:  Come one.
 6              MR. WELSH:  -- do at Vista Detention
 7    Facility --
 8              MR. MORRIS:  I am not.
 9              MR. WELSH:  -- during the pilot program.
10    I don't think you are someone that can say what intake
11    deputies do at the detention facility during the pilot
12    program, are you?
13              THE WITNESS:  As a psych liaison, I did
14    not work intake.
15              MR. WELSH:  Don't use her for 2016 intake
16    questions.
17              MR. MORRIS:  I'm not asking her intake
18    questions.  I'm asking as a psych liaison deputy, was
19    there anything different she was taught to do.
20              MR. WELSH:  You said as a line deputy in
21    your question, so I'm clarifying she was not a line
22    deputy during the pilot program.  She was a psych
23    liaison deputy that didn't have any involvement.
24    BY MR. MORRIS:
25         Q    Let me ask you this:  During the time that
```

Lois Guillory  8/14/2018

1    you were assigned as the psych liaison deputy, did you

2    ever have occasion to work intake?

3              A   When I worked overtime.

4              Q   Another thing I want to talk about just

5    generally before we talk about specifics is this

6    multi-disciplinary group meeting.  Can you tell me what

7    your understanding of the multi-disciplinary group

8    meeting is?

9              A   At that time we had a lot of people in our

10   jail at Vista, I know particularly as a psych deputy, a

11   lot of people with mental issues, a lot of people who

12   were suicidal, homicidal.  We had a group where we

13   would discuss every Tuesday about the individuals, the

14   inmates that needed more attention or to see if they

15   were taking their medication.  Every Tuesday we would

16   have a meeting and discuss how these inmate individuals

17   were doing.

18             Q   That was every Tuesday?

19             A   When I was a psych liaison, yes.

20             Q   You worked Monday, Tuesday?

21             A   Yes.

22             Q   Would Deputy Johnson typically attend that

23   multi-disciplinary group meeting as well?

24             A   No.

25             Q   Just you?

Lois Guillory  8/14/2018

1          A   Yes.

2               Q   How was it that an individual would end up

3      on the schedule as a topic of discussion, if you

4      know?

5               A   The medical staff would add people on the

6      list, or myself as the liaison deputy, I would add

7      people, whether I heard from the other deputies that

8      this inmate in north one is deteriorating, he's not

9      taking his meds, so I would bring him up.  Or, like I

10     said, the medical staff would bring up individuals as

11     well.

12          Q   Were inmates that were the topic of

13     discussion, could they be housed in mainline housing,

14     EOH, MOBs, or was it limited to just a specific segment

15     of inmates housed in a particular area?

16          A   Housed anywhere in the jail.

17               Q   Had this multiple-disciplinary group

18     meeting, had that been going on from the time that you

19     were appointed psych liaison deputy in 2014?

20               A   No.  I believe it started after my first

21     year.

22               Q   Who were the typical attendees of the

23     multiple-discipline group -- excuse me, I keep

24     butchering that -- multi-disciplinary group meetings?

25               A   We would have the provider.

Lois Guillory  8/14/2018

1        Q   **That would be the psychologist or the**

2   **nurse practitioner?**

3        A   On Tuesdays Amanda worked, so she would be

4   there, the psych provider.

5        Q   **Amanda Daniels?**

6        A   Yes.  Prior to her, before she worked

7   Tuesdays, we would have the doctor, the psych doctor,

8   which it was different doctors at the time.  I don't

9   recall which ones.  Towards the end, she was there on

10  Tuesdays.

11       Her, myself, the nursing supervisor, the

12  classification deputy, correctional counselor, the

13  lieutenant from -- either the line lieutenant or the

14  admin lieutenant, either/or, sometimes the captain.

15       Q   **The multi-disciplinary group meeting where**

16  **Mr. Mortiarty's well-being was discussed, do you have**

17  **an independent recollection of who attended that**

18  **meeting?**

19       A   Vaguely.  I'm remembering more and more.

20  I know the captain was there.

21       Q   **Schroeder?**

22       A   Captain Schroeder, Lieutenant Mitchell,

23  myself, Amanda, I can't recall if the nursing

24  supervisor was there or just the charge nurse that day,

25  I do not remember.

Lois Guillory  8/14/2018

1          Q   If it was a nursing supervisor in that

2   time, who would that have been?

3          A   I cannot pronounce his last name.   Arnold

4   is the first name.

5          Q   F-a --

6          A   F something, yes.

7          MR. WELSH:   I think it's Fajayan, or

8   something like that.

9   BY MR. MORRIS:

10          Q   Okay.   The charge nurse is somebody who

11   could get shifted around, right?

12          MR. WELSH:   F-a-j-a-y-a-n.

13          THE WITNESS:   If Arnold wasn't there, then

14   the charge nurse usually would take over, if the

15   supervising nurse was not there.

16   BY MR. MORRIS:

17          Q   Do you know who those potential charge

18   nurses were in and around May 2016?

19          A   Vicky Felizardo.

20          Q   Felizardo?

21          A   Felizardo.   Mostly her, she was there.

22          Q   You said there was a corrections

23   counselor?

24          A   Correctional counselor, Claudia.

25          Q   What's her job?

Lois Guillory  8/14/2018

1          Q   Monday, Tuesday are workdays, correct?

2          A   Yes.

3          Q   Would have been the 23rd, 24th, 25th.  Do

4   you know if you were working Friday, the 27th?

5          A   I believe I was.  That was my Monday.

6              MR. WELSH:  You are going to confuse us if

7   you do that.

8   BY MR. MORRIS:

9          Q   That would have been the beginning of your

10   five-day stint?

11          A   Yes.

12          Q   You would have been there Saturday, the

13   28th, and Sunday, the 29th, Monday, the 30th, and

14   Tuesday, the 31st.  That gives us five days, Friday,

15   Saturday, Sunday, Monday, Tuesday, right?

16          A   Yes.

17          Q   Great, thank you.  What was your shift,

18   what was the time that you began your shift on that

19   five-day stint?

20          A   I would come an hour early, so I would be

21   there between five in the morning to six fifteen, six

22   thirty.

23          Q   You were the daytime psych liaison?

24          A   Yes.

25          Q   Deputy Johnson was the nighttime?

Lois Guillory  8/14/2018

1          A   No.  He was also day, opposite days.

2          Q   Who was the evening?

3          A   We didn't have an evening.

4          Q   I know in the line staff there's a thing

5     called pass-down, right, when you're working in a

6     housing unit, you pass down relevant information from

7     one shift to the next.  Are you familiar with that

8     procedure?

9          A   Yes.

10          Q   Anything like that for the psych liaison

11     deputy?  Say you're taking off that Tuesday, you have

12     the next couple days off.  Do you pass down information

13     to Deputy Johnson?

14          A   Yes, we normally email each other.  I'll

15     let him know about the new patients and what happened

16     that week, if there was something important.

17          Q   You email him on your county email?

18          A   Yes, we do.

19          Q   Did you also email him using your personal

20     email?

21          A   No.

22          Q   Did you ever email Deputy Johnson about

23     Mr. Moriarty?

24          A   No, I don't think so.

25          Q   While I have you here, ask you a question.

Lois Guillory  8/14/2018

1    I have another case with Mr. Nishimoto.  Did you ever

2    email Deputy Johnson regarding Mr. Nishimoto?

3         A  Email?  I don't think so, no.

4         Q  Text?  I know there's a text in here.

5         A  No.

6         Q  From your interview, it appears you had a

7    text exchange with Deputy Johnson.  Can you tell me

8    what happened to that text exchange?  Have you been

9    able to locate that or retrieve it?

10        A  Is that the text the night of the death?

11        Q  Yes, ma'am.

12        A  I deleted it and I don't have that phone

13   anymore.  Everytime I get emails or texts, I usually

14   delete them.  I don't keep them for long.

15        Q  Can you tell me what you recall regarding

16   that text exchange with you and Deputy Johnson?

17        A  Pretty much he texted myself and Amanda

18   that Mr. Mortiarty had killed hisself that night.

19        Q  You've seen the text exchange between

20   Deputy Johnson and Amanda, as you call her, Nurse

21   Practitioner Daniels.  For sake of this deposition,

22   I'll call her Amanda.  I don't mean any disrespect to

23   Nurse Practitioner Daniels.

24        You've seen the text exchange that's been

25   produced between Deputy Johnson and Amanda in this

Lois Guillory  8/14/2018

1    case.  Was the text exchange that you had between

2    Johnson, Amanda and you, was that different from the

3    text exchange that's been produced here?

4            A   The text that I saw today was the first

5    time I saw that length of text was today.  My text was

6    maybe one or two, like I say, "He killed hisself."  I

7    probably just said, "Oh, my God," texted Johnson back,

8    but there was nothing further than that.

9            Q   Was there any indication that Deputy

10   Johnson thought there had been a -- mistakes were made

11   or screw-ups or anything, kind of like what he says in

12   this text exchange?

13           MR. KUTYLA:  Misstates testimony,

14   incomplete hypothetical, it's vague, it's improper and

15   a few other things.

16           MR. MORRIS:  You can answer.

17           MR. KUTYLA:  Incorporate the other ones.

18           THE WITNESS:  Can you repeat it again?

19   BY MR. MORRIS:

20           Q   Was there any indication in the text

21   exchange that was just between you and Johnson that

22   Johnson thought that mistakes had been made?

23           A   Mistakes as in?

24           Q   Regarding Mr. Mortiarty's treatment,

25   housing, signs that were missed, placements that should

Lois Guillory  8/14/2018

1   **have been made, anything like that.**

2                    MR. KUTYLA:   I'm sorry.   Are you talking

3   about the text between the witness and Deputy Johnson

4   or this other one?

5                    MR. MORRIS:   No, no.   The text between --

6   the one just between you and Johnson that we don't

7   have.

8                    MR. WELSH:   Let me correct one thing.   I

9   think she said there's a text between her and Amanda

10  Daniels and Deputy Johnson that we don't have.

11  BY MR. MORRIS:

12            Q   **There's a text exchange between the three**

13  **of you, right?**

14                    MR. WELSH:   You're the only one that can

15  answer.

16                    THE WITNESS:   Yeah, I know.   I'm trying to

17  remember that text.   Like I said, mine wasn't as

18  lengthy as theirs, between myself, Johnson and Amanda.

19  It was just basically, "I got the word that he killed

20  hisself, oh, my God."   Basically, I remember he said,

21  you know, "Why didn't he go in the safety cell,"

22  something to that effect.   "You recommended a safety

23  cell and he didn't get placed."

24                    I can't remember the whole -- it was like

25  two or three texts just between me and Johnson, I

Lois Guillory  8/14/2018

1    believe, nothing lengthy.

2    BY MR. MORRIS:

3              Q    You, Johnson and Amanda?

4              A    Yes.

5              Q    That was a group text the three of you

6    were on?

7              A    That's what I cannot remember.  If it was

8    a group text, I would have been on that text there.

9    And I'm not on that text.  I don't remember if it was a

10   group text or not.  I'm not on that text that you have.

11             Q    There was this text between Deputy Johnson

12   where he notified you that Mortiarty had died, right?

13             A    Yes.

14             Q    You're not sure if Amanda was on that as

15   well, as you sit here?

16             A    I don't recall.  I thought we were all in

17   a group text, but I'm not on that group text that you

18   have.

19             Q    Do you recall if there was another text

20   where it was just between you and Johnson, that you

21   have a distinct recollection it was just the two of you

22   regarding Moriarty?

23             A    No, honestly, I don't know.

24             Q    It was just one text chain that was

25   between you and Johnson or between you, Johnson and

Lois Guillory  8/14/2018

1   Amanda, that's just one text chain we're talking about,

2   right?  You're just not sure of the participants,

3   right?

4            A   I didn't text anyone else.   It was just

5   between those two.

6            Q   There's not a separate text chain that you

7   know that just occurred between you and Johnson,

8   right?

9            A   No, I don't remember, honestly.

10           Q   In that text chain that you can recall,

11  unsure about the participants, but the one you can

12  recall that you were on, in that text chain, Johnson

13  asked Daniels if she had recommended a safety cell,

14  right?  Or confirmed that she had recommended a safety

15  cell?

16               MR. WELSH:   May call for speculation.   I

17  think she just said she's not sure if Daniels was on

18  it.

19               THE WITNESS:   Like I said, I don't know if

20  it was group text at that time.   I'm not sure.

21  BY MR. MORRIS:

22           Q   Whoever were the participants of that text

23  chain, the substance of that text chain was a

24  confirmation by Deputy Johnson that Daniels had

25  requested a safety cell, true?

Lois Guillory  8/14/2018

1          A  Yes, from what I read on it, yes.

2              MR. KUTYLA:  Vague and ambiguous.  The

3      answer is vague.  You need to reask it.

4              MR. WELSH:  Keep your answers separate.

5      He's asking about the texting that we don't have and

6      your answer is about the texting that we do have.  That

7      mixes them up.

8      BY MR. MORRIS:

9          Q  I'm trying to nail down and I want to ask

10     you as much as I can about the text we don't have.

11     We'll get into the text we do have.

12             The text we don't have that existed either

13     between you and Johnson alone or between you, Johnson

14     and Amanda, that text chain, okay, the one we don't

15     have that was on your old phone.

16         A  Okay.

17         Q  In that text chain, it was my

18     understanding you testified that in that text chain

19     Deputy Johnson confirmed with Ms. Daniels that she had

20     recommended a safety cell for Moriarty?

21         A  Yes.

22             MR. WELSH:  You just confirmed that Amanda

23     Daniels was on that text chain.  Is that what you

24     meant?  The "her" was Amanda Daniels.

25     BY MR. MORRIS:

Lois Guillory  8/14/2018

1          Q   Either she confirmed it on behalf of
2    Daniels or Daniels was on the text chain.   There was
3    reference to Daniels had recommended a safety cell that
4    was confirmed in the text chain?
5          A   Yes.
6          Q   Any other particulars that you can recall
7    regarding that text chain, not the one that's in front
8    of us, but the other one that we no longer have?
9          A   No, I don't remember that text.
10         Q   You would have begun work on that Friday,
11   May 27th.  Prior to coming into work, your Thursday day
12   off, you received the email from Deputy Angulo that
13   we've already looked at, true?
14         A   Yes.
15         Q   If we can go ahead and look at Exhibit
16   Number 1.
17             MR. WELSH:  Page 15 or 16?
18             MR. MORRIS:  Page 16.
19             MR. WELSH:  Did you receive this when you
20   got to work?
21             THE WITNESS:  Yes, when I get to work.
22   BY MR. MORRIS:
23         Q   Do you have access to your county email on
24   your days off?
25         A   Now I do.

Lois Guillory  8/14/2018

1          Q  Good question.  Thank you for clarifying

2    that.  It was vague as to time.

3              In May of 2016, did you have access to

4    your county email on the days that you were off work?

5          A  No.

6          Q  You said you typically got to work around

7    five, which was an hour before your shift started,

8    right?

9          A  Yes.

10         Q  In that time, my understanding or my

11   assumption would be that you checked your email?

12         A  Yes.

13         Q  Email would contain requests for psych

14   intervention that you would be in charge of, right, as

15   far as coordinating?

16         A  Coordinating?  No.  Obviously, it would go

17   to medical staff.  I would get an email informing me of

18   this individual, what the deputy encounter was, so I

19   would know.

20         Q  When you would come in on a typical Friday

21   to start your five-day shift, how many requests for

22   psych would you typically have?

23         A  Maybe one or two at the most.

24         Q  When you got this request for psych, you

25   read Exhibit Number 1, page two, right?

Lois Guillory  8/14/2018

```
 1          A  Yes.
 2          Q  You're not sure if this was pasted into
 3   your email or whether the ISR was an attachment, but
 4   you read this text, right?
 5          A  Yes.
 6          Q  Can you tell me exactly what you did once
 7   you were in receipt of this particular information
 8   regarding Mr. Moriarty on May 26, 2016?
 9          A  Besides reading it, I looked him up on the
10   computer, basically, to see who he was.  I looked at
11   his picture.
12          MR. WELSH:  I want you to tell us if you
13   remember exactly doing that or if you are saying your
14   custom would have been to do that.
15          THE WITNESS:  That's my custom to me to do
16   that.  When I receive an email that I've never seen
17   this inmate or patient before, I will look up the
18   picture, look at the charges, see if there's any other
19   ISRs, anything written about him.
20   BY MR. MORRIS:
21          Q  In this particular case, do you have an
22   independent recollection of actually doing that or are
23   you just testifying as to your custom and practice?
24          A  I believe I would have looked at his
25   picture just to see what he looks like.  Technically, I
```

Lois Guillory  8/14/2018

1   would do that all the time.  I would hope I did the

2   same that day.  That's what I would do.

3          Q  I'm not challenging about whether you did

4   it or not.  I'm just more asking you the question

5   Mr. Welsh was asking.  Sometimes lawyers need to, oh,

6   I'm testifying this is what I always do, of course, it

7   varied, therefore I know I did it.  Or I can picture in

8   my mind's eye bringing up the report and I see his

9   picture there in my head, I can remember what I was

10   looking at.  We get to the same spot.  It's just two

11   different ways of getting there.

12              Do you have a specific independent

13   recollection of bringing that up and looking at his

14   picture or are you more testifying about what you did

15   in this case because you always do it?

16          A  Pretty much because I always do it.

17          Q  When you bring up the picture in JIMS,

18   like you did in this case, would you have been able to

19   access information about the stuff that was going on in

20   the field, about him threatening to kill himself and

21   kill others, laying in the road, and all that stuff?

22   Would you have been able to access that information?

23              MR. WELSH:  Incomplete hypothetical.

24              THE WITNESS:  No.  I didn't know how to do

25   that at the time.

Lois Guillory  8/14/2018

1   BY MR. MORRIS:

2          Q   Has that changed where you know how to do

3   that now?

4          A   I still don't.  I know people that do.

5          Q   Do line deputies have access to field

6   information like that now?

7          MR. WELSH:   Incomplete hypothetical.

8          THE WITNESS:   I believe some know how to

9   do it.  I don't know.

10  BY MR. MORRIS:

11         Q   Some that are computer wizards?

12         A   Yes.

13         Q   You don't?

14         A   No, I don't.

15         Q   How about information like, hey, he was

16  taken to Central because he said he was suicidal and

17  they ran out of safety cells and we brought him up to

18  Vista, would that type of information, was that stuff

19  accessible to you as a psych liaison?

20         MR. WELSH:   Assumes facts, calls for

21  speculation, incomplete hypothetical.

22         THE WITNESS:   When other deputies are

23  present, and then they tell me, yes.

24  BY MR. MORRIS:

25         Q   I'm talking about when you bring it up on

Lois Guillory  8/14/2018

1    JIMS, would that be there?

2         A   No.

3         Q   In this case, we know now the background,

4    but at that point in time, on May 26, 2016, safe to say

5    you didn't have any information about him being sent

6    from Central because they ran out of safety cells,

7    right?

8         A   I did not know that, no.

9         Q   When did you first learn that?

10        A   The night I was told he killed himself.

11        Q   Do you think that would have been valuable

12   information that you as a psych liaison deputy could

13   have used in determining where best -- or how best to

14   treat and where to house Mr. Moriarty?

15            MR. WELSH:   Assumes facts not in evidence,

16   lacks foundation.   Don't pretend that you determined

17   where to house someone or where to treat them unless

18   that was your job.   Go ahead.

19            THE WITNESS:   It was not my job.   I

20   definitely would have let my provider know.   I get

21   emotional on this time.   Sorry.   I would have

22   definitely let my provider know the situation if that

23   would have helped.

24   BY MR. MORRIS:

25        Q   If you want a break, just say so.

Lois Guillory  8/14/2018

1           A  Pretty much medical staff would already

2   place this person on the psych sick call list to be

3   seen.

4           Q  Understanding from your questioning,

5   Deputy Angulo's ISR would have already triggered a

6   psych sick call?

7           A  Yes, because we're required as deputies,

8   anyone besides a liaison, a line deputy, if you write

9   an incident report on any inmate that needs mental

10  evaluation, you are to call the medical staff, inform

11  them and see if they can get them scheduled.

12          Q  When you looked up Mr. Moriarty in the

13  JIMS computer, did you have access at all to any

14  references to the calls that his wife had been

15  making?

16          A  No.

17          Q  How about the faxes that she had sent, did

18  you receive any information -- did you see that in

19  JIMS?

20          A  No.  That's HIPAA.  We're not allowed to

21  have any of that on the deputy side.

22          Q  On that Friday that you got back to work

23  and you saw this, do you recall who the psych provider

24  was on that Friday?

25          A  No, I don't.

Lois Guillory  8/14/2018

1            Q  On that Friday, that was your first day

2     back on your five-hour shift, did you --

3                 MR. WELSH:  Five hour?

4     BY MR. MORRIS:

5            Q  Five day, your five-day shift.  Your

6     twelve-hour shift on your five-day stint.  On that

7     first day back, that Friday, did you have any direct

8     interaction with Mr. Moriarty?

9            A  Not that I remember, no.

10           Q  Did you have any concerns that he was

11    housed in a disciplinary cell given his condition?

12           A  At the time, no.

13           Q  You heard that he had been making --

14    excuse me.  You read that he had been making incoherent

15    statements.  I'm now referring to the second paragraph

16    down here, the one that begins "At approximately."  Do

17    you see that?

18           A  Yes, I do.

19           Q  The second sentence down there reads,

20    "While placing waist and leg chains on Moriarty, he

21    began to make incoherent statements.  Moriarty stated

22    he had just seen the devil and had challenged him.

23    Moriarty was disorganized and continued rambling

24    incoherent statements as I escorted him to the bus."

25    Did you see that?  Do you remember reading that?

Lois Guillory  8/14/2018

1          A   Because they wouldn't place someone

2    verbally in the housing unit with other inmates.   They

3    could have just placed him just in ad seg or where he

4    was, in disciplinary isolation for ad seg purposes.

5          **Q   It would have been something that --**

6    **because he was threatened other inmates, you didn't**

7    **want to put him in a group setting?**

8          A   Yes.

9          **Q   He could have gone to the med iso?**

10          A   Yes, he could have.

11          **Q   As an EOH patient?**

12          A   That would have been up to the medical

13    staff or the supervisors.

14          **Q   Because he was threatening others, he**

15    **would fit the criteria for EOH.   It was now just a**

16    **matter of where to put him, right?**

17              MR. WELSH:   Lacks foundation.

18              THE WITNESS:   If he would have been

19    placed -- possibly taken to medical first and they had

20    evaluated him, they could have made that decision.   But

21    the deputy, I'm just assuming, just placed him in that

22    cell.

23    BY MR. MORRIS:

24          **Q   I'm not here to dump on Angulo.   I'm just**

25    **here trying to figure out -- my understanding was it's**

Lois Guillory  8/14/2018

1    a threat to others, threat to harm yourself or others.

2    It seems like he's threatening others.  Assuming that

3    this was a threat to others, that would have been

4    criteria for EOH placement, right?

5              MR. WELSH:  Lacks foundation.

6    BY MR. MORRIS:

7         Q  For EOH classification?

8         A  I don't know.  I couldn't answer that.

9    Basically, because you have homicidal statements, they

10   can be placed in the safety cell or EOH if the

11   supervisors and the medical staff agree.  I wasn't

12   there.  I don't know if he was evaluated.  I don't know

13   what happened.  I wasn't there.

14        Q  I get that.  My question is your

15   understanding of EOH placement.  Is it a threat of harm

16   to others or is it a threat to kill others?  Is there a

17   gradation there?  Does it have to be only homicides

18   that will get you to EOH, "I want to kill somebody," or

19   is it, "I want to hurt somebody"?

20             MR. WELSH:  Lacks foundation.

21             THE WITNESS:  I would say homicidal.

22   BY MR. MORRIS:

23        Q  If somebody said, "I want to choke

24   somebody out, but I don't want to kill them," that

25   wouldn't get you to EOH?  You have to say, "I want to

Lois Guillory  8/14/2018

1    **choke somebody out and kill them"?**

2              MR. WELSH:  Calls for speculation, lacks

3    foundation, incomplete hypothetical.

4              THE WITNESS:  I don't know.

5    BY MR. MORRIS:

6         **Q  Do you know what the EOH policy says as**

7    **far as homicidal or threat to harm others?**

8         **A  Policy?**

9         **Q  The EOH policy.**

10        **A  Pretty much almost the same as safety**

11   **cell, if they're suicidal or homicidal.**

12             MR. WELSH:  If you need to read the policy

13   before answering, I'll show it to you.

14             MR. MORRIS:  We'll mark this one as

15   Exhibit Number 2.

16             (Exhibit 2 was marked.)

17             MR. WELSH:  Off the record.

18             MR. MORRIS:  Sure.

19             (The proceedings went off the record.)

20   BY MR. MORRIS:

21        **Q  Give you a minute to look that over.**

22        A  It says, "Inmates --

23             MR. WELSH:  He wants you to read that to

24   yourself, then he's going to ask you a question, then

25   you can answer.  Don't read it out loud.

Lois Guillory  8/14/2018

1                    THE WITNESS:  Sorry.

2     BY MR. MORRIS:

3             Q    No problem.  You honed in on the exact

4     policy, which is that second paragraph, which was,

5     "placed in a safety cell when necessary to prevent the

6     inmate from imminently inflicting physical harm on

7     themselves or others, or destroying property."  Do you

8     see that?

9             In this situation then, does that refresh

10    your recollection that placement, in this case the

11    safety cell, which is one step up from EOH, is not

12    necessarily dependent on homicidal, but on a danger of

13    inflicting harm on others?

14            A    One more time, please.

15            Q    Does this refresh your recollection that

16    in this case we're talking about a safety cell, but

17    placement in a safety cell, one of the criteria is an

18    imminent danger of inflicting harm on others, right?

19            A    Yes.

20            Q    In this situation, assuming what Deputy

21    Angulo wrote is true, that he was threatening other

22    inmates on the bus, that could have been a criteria to

23    place him in a safety cell, right?

24                 MR. WELSH:  Lacks foundation.

25    BY MR. MORRIS:

Lois Guillory  8/14/2018

1                Q  Assuming he was threatening to harm

2   others, right?

3                A  Yes.  Like I said, that falls on -- we are

4   required to let our supervisors know if we have a

5   possible safety cell or not.  I don't know what

6   Angulo's reasoning was or whatever.  Obviously, we

7   can't place an inmate, unless he's actually physically

8   hurting himself or others, without recommendation or

9   without -- you know, for his safety and other's safety,

10   immediately place him.  If he's threatening, like I

11   said, I don't know why -- technically, we're supposed

12   to let our supervisors know what the situation is.  If

13   he thought he should go in a safety cell, Angulo

14   probably would have said, "Possible safety cell

15   placement, Sarge."

16                MR. WELSH:  Listen really carefully to his

17   question.  He's not asking you what Angulo thought.

18                THE WITNESS:  I know, but I wasn't there.

19   I don't know what -- that's what I'm trying to say, I

20   know what -- I'm know what I'm reading, but I don't

21   know if he was flailing his arms or if he was doing

22   anything like that, I don't know.

23   BY MR. MORRIS:

24                Q  I'm totally with you.  The only question

25   I'm asking you is:  Assuming what Angulo wrote is true,

Lois Guillory  8/14/2018

1    that he was threatening to hurt other inmates, just

2    threatening to hurt other inmates, the way I read the

3    policy, would be enough to make you a candidate, not

4    that you have to go, but make you a candidate for

5    safety cell placement, true?

6           A  Yes.

7                MR. MORRIS:  Let's take a quick break.

8    We'll come back at one.

9                (The proceedings were recessed at 12:13

10   p.m. and reconvened at 1:04 p.m.)

11   BY MR. MORRIS:

12           Q  When we left off, we were discussing the

13   policy as it relates to safety cells.  There was a

14   momentary diversion from talking about your interaction

15   with Mr. Moriarty in this case.

16                The first interaction that we discussed --

17   excuse me.  Your first contact, exposure to the

18   Moriarty situation was the Thursday, that was your day

19   off, the email you had received and that you read

20   Friday morning when you got to work, right?

21           A  Yes.

22           Q  Your testimony was, just to recap, that

23   that would have triggered a psych sick call visit, to

24   whom you're not sure because you're not sure who was

25   working that Friday.  As far as I understood, that

Lois Guillory  8/14/2018

1    ended your involvement in action, reaction as it

2    pertained to the email from Deputy Angulo.  Fair

3    enough?

4              A  Yes.

5              Q  That Friday you don't have any specific

6    recollection of having any interaction with

7    Mr. Moriarty, true?

8              A  No.

9              Q  Let's move to the following day, Saturday.

10   Do you recall what interaction, if any, you had with

11   Mr. Moriarty the Saturday, and that would have been

12   Saturday, May 28th?

13             A  That's the day Dr. Lissaur and I saw

14   Mr. Moriarty in his cell.

15             Q  Before we look at any of the documents

16   pertaining to that interaction, can you tell me, as

17   best as you can recall, without reading from the

18   document, what it is that you can remember about that

19   interaction with Mr. Moriarty and Dr. Lissaur?

20             A  We went to his cell.  Mr. Moriarty was

21   awake.  I believe he was standing, standing, I'm not

22   sure if he was clothed at that time or not.  I don't

23   remember.  While he was talking to the doctor, he was

24   answering the doctor's questions.

25             Dr. Lissaur said he was manic and offered

Lois Guillory  8/14/2018

1    him medications.  I believe Mr. Moriarty accepted, yes,

2    he would take medications.  Dr. Lissaur recommended

3    that he stay in that cell at the time.

4          Q  Was there any discussion related to moving

5    Mr. Moriarty either to EOH or a safety cell?

6          A  That day?

7          Q  Yes, that day with Dr. Lissaur.

8          A  I don't remember that, no.

9          Q  Did you mention it to him?

10         A  No, I don't think I did.

11         Q  During that interaction with Dr. Lissaur,

12   did Mr. Moriarty mention anything about wanting to hurt

13   other inmates if they were brought into his cell?

14         A  I don't remember that day, no, not

15   specifically.

16         Q  Did he mention at all that he wanted to

17   hurt himself?

18         A  No, he didn't.

19         Q  Let's take a look at Dr. Lissaur's note.

20            MR. WELSH:  It's going to be 543 at the

21   bottom.

22            MS. PENA:  That's a different Bates number

23   than I have.  This is 5-28 Lissaur note.

24   BY MR. MORRIS:

25         Q  I'm going to mark this as Exhibit Number

Lois Guillory  8/14/2018

1    contemporaneous with what is recorded here in or around

2    May of 2016?

3              A  No.

4              Q  As a psych liaison deputy, are you given

5    access to -- would you have had access to this medical

6    note?

7              A  If I asked Dr. Lissaur what he wrote, I

8    could.  Technically, I'm not supposed to get a copy or

9    anything of these charts.

10             Q  At the time that you visited Mr. Moriarty

11   with Dr. Lissaur, were you aware that Mr. Mortiarty had

12   threatened to kill himself and his family prior to

13   coming to jail?

14             A  When I was with Dr. Lissaur?

15             Q  Yes.

16             A  No, I did not know that.

17             Q  Were you aware -- at the time that you

18   visited Mr. Moriarty with Dr. Lissaur, were you aware

19   that Mr. Mortiarty had been transferred from Central

20   for the specific reason of being placed in a safety

21   cell because he admitted to being suicidal?

22             A  I did not know that.

23             MR. WELSH:  Misstates testimony in

24   evidence, vague and ambiguous.  Go ahead.

25   BY MR. MORRIS:

Lois Guillory  8/14/2018

```
 1              Q  Did you know at the time that you visited
 2  Dr. Moriarty -- visited -- did you know at the time
 3  that you visited Mr. Moriarty with Dr. Lissaur that
 4  Mr. Mortiarty had been transferred from Central to
 5  Vista because Central didn't have a safety cell and
 6  Mr. Mortiarty had admitted to being suicidal?
 7              A  No, I did not.
 8              Q  In this note Dr. Lissaur indicates that he
 9  was aware that Mr. Mortiarty had been arrested for
10  terrorist threats and vandalism.  Do you see that at
11  the very beginning?
12              A  Yes, I do.
13              Q  Were you aware of that information as
14  well?
15              A  No, I was not at that time.
16              Q  You weren't aware of the charges he had
17  been booked on?
18              A  I saw the charges, but I didn't know the
19  extent of what it all entailed.
20              Q  Dr. Lissaur writes, "This si..." Do you
21  know what s-i stands for in the very first paragraph
22  there?
23              MR. WELSH:  Calls for speculation. I think
24  it's "is".
25              THE WITNESS:  Where it's at?  I don't know
```

Lois Guillory  8/14/2018

1    what that is.

2    BY MR. MORRIS:

3              Q   "This si..."

4              A   Probably backwards, "This is."  Probably

5    i-s.

6              Q   Not suicidal incident?

7              MR. WELSH:  That calls for speculation.

8    If you want her to testify --

9              MR. MORRIS:  I'm just joking, Counsel.

10             Q   "This is," assume that's what that is,

11   "the patient's first arrest and is occurring in the

12   context of bipolar mania."  Do you see that?

13             A   Yes.

14             Q   Was that information relayed to you by Dr.

15   Lissaur that Mr. Moriarty was in the context of bipolar

16   mania?

17             A   I just recall the word manic.  I asked him

18   basically.

19             Q   Are you drawing a distinction between

20   mania and manic or do they mean -- different words

21   saying the same thing?

22             A   I'm not a psych provider, but I'm assuming

23   it's the same thing.

24             Q   It says, "Patient was hospitalized

25   recently at San Diego County Psych Hospital."  Did you

Lois Guillory  8/14/2018

1    know that information?

2              A   No, I did not.

3              Q   It states he was hospitalized for ten

4    days.  Did you know that information?

5              A   No, I did not.

6              Q   He had a recent hospitalization at Sharp

7    Mesa Vista.  Did you know that information?

8              A   No.

9              Q   It says he was, according to the wife,

10   newly diagnosed with bipolar and has not taken his meds

11   for a week and been babbling incoherently.  I take it

12   you weren't privy to that background information

13   regarding Mr. Moriarty either?

14             A   At that time, no.

15             Q   It says on May 24, four days prior, he had

16   threatened to kill himself and his kids and reported

17   that Satan was working through his wife.  It's safe to

18   assume you didn't know that either?

19             A   I did not.

20             Q   It says he "threatened to kill his brother

21   and three cars as he drove off."

22             MR. WELSH:  You left out a word.

23             MR. HARRISON:  He was going to kill three

24   cars.

25             MR. MORRIS:  Did I say kill three cars?

Lois Guillory  8/14/2018

```
 1                 MS. PENA:  You just didn't say hit.

 2    BY MR. MORRIS:

 3          Q  "Also threatened to kill his brother and

 4    hit three cars as he drove off."  You didn't know that

 5    either, right?

 6          A  At that time, no.

 7          Q  Would this background information have

 8    been enough, if it had been known to the correctional

 9    staff, been enough to put Mr. Moriarty in the EOH?

10                 MR. WELSH:  Lacks foundation, calls for

11    speculation.  Don't guess.  I don't think you should

12    answer that question because you don't make that

13    decision.

14                 MR. MORRIS:  You can't instruct her not to

15    answer.

16          Q  As far as you know, ma'am?

17                 MR. WELSH:  Don't guess if you're not --

18                 THE WITNESS:  I couldn't have made that

19    decision.  I wasn't in the medical provider staff.

20    BY MR. MORRIS:

21          Q  Had you known this information at the

22    time, had you been privy to this background, what would

23    you have done with this information?

24          A  I would have asked or mentioned it to the

25    doctor to see if he or she knew about it.  I don't make
```

Lois Guillory  8/14/2018

1    the decision.  That's on them and the supervisors.  I

2    would have definitely made sure they knew if they did

3    not know this information.

4              Q  Why would you consider it important

5    information for the doctors to know?

6              A  One, to get a full perspective of

7    everything and better treat him.  I don't think I could

8    think of --

9              Q  How about would this information, if you

10   had known it, been something you would have passed up

11   to your supervisors on the correctional side?

12             A  Say that one more time.

13             Q  If you had known this information about

14   all this background, would that have been something

15   that you would have used to pass on to your direct

16   supervisors on the supervisory detention side, not the

17   medical side?

18             MR. WELSH:  Compound, vague and ambiguous,

19   calls for speculation.

20             THE WITNESS:  I could have.  It would have

21   been directly toward my provider and the medical staff.

22   Then yes, I'm sure I would have told my supervisor as

23   well.

24   BY MR. MORRIS:

25             Q  Dr. Lissaur wrote, "Patient seen at cell

Lois Guillory  8/14/2018

1   **front." Is what where you recall meeting with him?**

2          **A   At the cell, he was at his cell, yes.**

3          **Q   That would have been S1?**

4          **A   Yes.**

5          **Q   Was the door open or closed?**

6          **A   It was closed.**

7          **Q   Were you speaking through the flap in the**

8   **door?**

9          **A   Yes.**

10         **Q   Can you describe for me Mr. Mortiarty's**

11  **appearance?**

12         **A   When I opened the flap, I saw him standing**

13  **in the back of the cell.  He was standing next to his**

14  **toilet, I believe.**

15         **Q   I think your testimony was you don't**

16  **recall whether or not he was clothed?**

17         **A   No, I don't remember.**

18         Q   How about his overall appearance, did he

19  appear disheveled?

20         A   I really couldn't tell through the glass

21  if he was or not.

22         **Q   Was he standing next to his toilet or in**

23  **his toilet?**

24         **A   I want to say at that time he was standing**

25  **to the side of the toilet.  I'm not sure if he was**

Lois Guillory  8/14/2018

1    standing in it at that time.  I know, I can't remember

2    if it was with Amanda or with Dr. Lissaur, his feet

3    were in the toilet.  I don't remember.  I just remember

4    one of the times his feet was in the toilet.

5              Q  One of the times you contacted

6    Mr. Moriarty his feet -- when you say in the toilet,

7    was he laying on the ground with his feet in the toilet

8    or was he in the toilet?

9              A  I think he was standing.  I don't know if

10   both his feet were in there, but he was standing.

11             Q  Whether or not that was this time or the

12   time that you met him with Dr. Daniels, you're not

13   sure?

14             A  I'm not sure.

15             Q  This says, "Patient seen at cell front and

16   he is obviously manic."  Did you see anything that

17   indicated to you that he was obviously manic?

18             MR. WELSH:  Lacks foundation.

19             THE WITNESS:  Just from standing by with

20   other inmates, I could hear his voice, his non-stop

21   talking.  I'm not the provider, I'm not educated in

22   mental health.  Just from the past.

23   BY MR. MORRIS:

24             Q  Sure.  That's what I mean.  You're not in

25   a position to make that kind of diagnosis.  Any

Lois Guillory  8/14/2018

1    objective observations that you may have made that

2    indicated to you that he was consistent with what you

3    understand to be mania.  Besides talking rapidly,

4    anything else you can recall?

5         A  No.

6         Q  Was he making sense at all in what he was

7    saying?

8         A  Not really, no.

9         Q  Was he talking about hurting others at

10   that time with Dr. Lissaur?

11        A  I don't recall hearing that, no.

12        Q  Dr. Lissaur continues to write, "He is

13   hyper-verbal and has difficulty being interrupted,

14   flight of ideas and labile mood."  I take it you

15   understand, just because I understand it, hyper-verbal,

16   meaning he was speaking loud, right?

17        A  Yes.

18        Q  You've already talked about that.  He

19   wrote here he had difficulty being interrupted.  Do you

20   know what Dr. Lissaur means when he -- what he was

21   talking about?

22             MR. WELSH:  Don't get into Dr. Lissaur's

23   brain as to what he means.  You can answer if you

24   observed something.

25   BY MR. MORRIS:

Lois Guillory  8/14/2018

1        Q  Did you witness him having difficulty

2  being interrupted?

3        A  Sometimes I would hear him over speak, was

4  louder, over the doctor.

5        Q  Do you generally understand what is meant

6  by the term flight of ideas?

7        A  No.

8        Q  How about labile, labial --

9           MS. HARDISTY:  Labile.

10  BY MR. MORRIS:

11        Q  Labile.  Labile mood, do you know what

12  that means?

13        A  No.

14        Q  That makes two of us.  "Talks about being

15  in touch with Christ."  Did you hear him talk about his

16  illusions that he was talking to Jesus?

17        A  I heard the word Jesus.  Sometimes it was

18  low so I couldn't hear everything.  I did hear the word

19  Jesus.

20        Q  Did you understand Mr. Moriarty was saying

21  that he was communicating with Jesus?

22        A  Did I hear that?

23        Q  Yeah.

24        A  I heard the word Jesus.  I don't remember

25  what he said exactly.

Lois Guillory  8/14/2018

1          Q  When these interviews take place and Dr.

2    Lissaur is at the door flap, where were you physically

3    located?

4          A  Usually one to two feet maybe away.  That

5    way I'm not -- if the patient doesn't feel comfortable,

6    I'm not in his plain sight.

7          Q  I take it it's easier for you to hear the

8    questions than it is for you to hear the response?

9          A  Yes, because it's behind a closed door.

10         Q  He also writes, "One of the officers is a

11   prophet but the doctor is not, although the doctor is a

12   very good friend of mine."  Did you hear him saying

13   anything about the doctor being a good friend or one of

14   them is a prophet or anything like that?

15         A  No.

16         Q  It says, "He talks about being a

17   successful electrical contractor earning five hundred

18   thousand dollars a year."  Did you hear any of that?

19         A  No.

20         Q  Said he wanted to tell jokes to the

21   doctor.  Did you hear him tell any jokes to the

22   doctor?

23         A  No.

24         Q  It says, "He has not slept in a week."

25   Did you hear anything about him talking about his

Lois Guillory  8/14/2018

1    **sleeping patterns?**
2              A   I think I heard the doctor answering back
3    to him about sleep.  I don't recall what it was,
4    though.
5              Q   The doctor wrote that, "Moriarty said his
6    wife had cheated on him with a twenty year old rock
7    star."  Did you hear anything like that?
8              A   No.
9              Q   Next paragraph down, the heading is MSE.
10   Do you know what MSE stands for?
11             A   No, I don't know what that is.
12             Q   It says pressured speech.  Do you know
13   what that means?
14             A   Not really.  Maybe rapid.
15             Q   Any idea what it means when the doctor
16   writes mood is expansive?  Do you know what that
17   means?
18             A   No, I don't.
19             Q   On the bottom of the page there's some
20   Roman numerals under the word assessment.  Do you know
21   what those are?  Do you know what the Roman numerals I,
22   II, III, IV, V mean?
23             A   No, I don't.
24             Q   The plan there looks like for medication.
25   Do you see that?

Lois Guillory  8/14/2018

```
1            A  Yes.

2            Q  Were you present when they talked about

3    him taking his meds?

4            A  While who talked about it?

5            Q  When Dr. Lissaur and Mr. Moriarty talked

6    about Mr. Moriarty taking his meds, were you present?

7            A  Yes, I was.

8            Q  Did Mr. Moriarty agree at that point in

9    time to begin taking his meds?

10           A  I don't think he refused.  I don't recall

11   him saying yes or no.  I just know Dr. Lissaur

12   discussed with him about the medication and

13   Mr. Moriarty said yes.

14           Q  Did Dr. Lissaur actually give him any

15   meds, hand him any meds at that meeting that you were

16   aware of?

17           A  At that time?

18           Q  Yes.

19           A  No.

20           Q  Would that be atypical for Dr. Lissaur to

21   actually hand the meds?  Would that be something he

22   would have a nurse come do?  Have you been present when

23   the actual psych providers give the meds?

24           A  Normally the nurse.  The doctor will go

25   back, chart it in his notes give this person meds.
```

Lois Guillory  8/14/2018

1    There have been times in the past where they've done a

2    stat medication and they would do that.

3              Q  Unless it's a stat meds, they let the

4    nurses come give meds?

5              A  Yes.

6              Q  Do you know if, subsequent to this meeting

7    with Dr. Lissaur, if Mr. Moriarty actually began taking

8    his meds, do you know?

9              MR. WELSH:  Calls for speculation.

10             THE WITNESS:  No.  Normally they will

11   start them on meds and it's possible he could get it

12   that night.  I was off that night.

13   BY MR. MORRIS:

14             Q  Then there's a follow-up note.  This is

15   confusing because you have the 5-28 note we just read

16   and then there's a 5-26 entry note by a Salter.  Do you

17   know who that is?

18             A  It's on the same sheet?

19             Q  Yes.

20             A  She would have been the charge nurse that

21   night.

22             Q  Her entry is 5-26-2016, right?

23             A  According to this, yes.

24             Q  She wrote, "5-26 ISR written:  states he's

25   the devil, threatening other inmates, unable to

Lois Guillory  8/14/2018

1    transfer due to behavior.  He is scheduled for PRNP."

2    Do you know what that is?

3              A  I think that's nurse practitioner,

4    psychiatric nurse practitioner.

5              Q  5-27-16.  Were you working 5-27-16?

6              A  That Friday, yes.

7              Q  You did't see him with a nurse

8    practitioner that Friday, right?

9              A  I don't recall, no.  Once with Amanda.

10             Q  That would have been subsequent to the

11   meeting with Dr. Lissaur, right?

12             A  Meeting?  Yes, it would have been that

13   Tuesday when I saw him, the 31st.

14             Q  It says, "Not seen by PRNP then

15   reschedule."  Is that what we see here?

16             A  Yes.

17             Q  It's odd because that statement that he

18   wasn't seen was actually written on 5-26.  He was

19   scheduled to be seen on 5-27.  Do you know why he

20   wasn't seen on either 5-26 or 5-27 by a PRNP?

21             MR. WELSH:  Calls for speculation and

22   compound.

23             THE WITNESS:  No, I don't.

24   BY MR. MORRIS:

25             Q  Let's move on to Exhibit 4.  Take a look

Lois Guillory  8/14/2018

1    at that.  This is your entry for your interaction on

2    5-28, right?

3              (Exhibit 4 was marked.)

4         A  Yes.

5         Q  This was drafted by you shortly after the

6    event, I imagine?

7         A  Yes.

8         Q  In this note you wrote, "On 5-26 at 1025

9    in the morning, I was assigned as the mental health

10   liaison deputy --"

11             MR. WELSH:  You started wrong.  May 28.

12   BY MR. MORRIS:

13        Q  Sorry.  "On May 28 at approximately 1025,

14   I was assigned as the mental health liaison deputy at

15   VDF when inmate Heron Moriarty was seen by Psychiatrist

16   Lissaur."  We already talked about that.  You write

17   your observations and actions.  You recap, on 5-26 you

18   wrote, "Inmate Moriarty was placed into ad seg housing

19   for being disorganized."  He was placed in disciplinary

20   housing, though, right?

21        A  Yes, as a ad seg basically overflow.  He

22   was in the isolation cell, but it wasn't for

23   disciplinary reasons.

24        Q  When you described the disciplinary

25   housing, you called them iso cells?

Lois Guillory  8/14/2018

1           A  Just isolation.

2               Q  Is there a difference -- can you refer

3    both to ad seg cells and disciplinary cells as

4    isolation cells?

5           A  Yes, they are single body cell.

6               Q  Can you refer to ad seg cells and

7    disciplinary cells as ad seg cells?

8           A  It should be overflow ad seg, basically.

9    I don't know if the cells were full, why they didn't

10   place him in a normal ad seg housing.  I'm assuming,

11   like I said, it was close enough from the court side to

12   place him there.  I don't know why.

13              Q  At this point I'm not asking why they did

14   what they did.  I'm just trying to get down the

15   nomenclature, how you would refer to different cells.

16   You said that he was in a disciplinary housing, then

17   you write he was in ad seg housing.  I'm just trying to

18   figure out:  Are those one and the same?  Is ad seg

19   housing the same as disciplinary housing?

20          A  It can be used as an ad seg housing if

21   there's no space anywhere else in the ad seg housing.

22   That's what I meant.

23              Q  If somebody is meant for ad seg housing

24   and it's full and they end up in the disciplinary

25   housing, do they get that one hour out?

Lois Guillory  8/14/2018

1             A  Technically, yes.

2             Q  Do you know in this case if Mr. Moriarty

3    was placed in disciplinary housing because ad seg was

4    full or he was placed in disciplinary housing because

5    that's where Angulo put him?

6                 MR. WELSH:  Calls for speculation.

7                 THE WITNESS:  I don't know why he put him

8    in there.

9    BY MR. MORRIS:

10            Q  Do you know if Mr. Moriarty was actually

11   given that one hour out during the time that he was

12   placed into disciplinary housing?

13                MR. WELSH:  Calls for speculation.

14                THE WITNESS:  I don't know that either.

15   BY MR. MORRIS:

16            Q  Why is it that you wrote ad seg housing

17   and not disciplinary housing here?

18            A  Because he wasn't in discipline.  He was

19   labeled an ad seg inmate.

20            Q  He wasn't housed in ad seg -- in

21   disciplinary housing for disciplinary reasons, that's

22   why you referred to him as an ad seg?

23            A  Yes.

24            Q  Referred to him as an ad seg inmate?

25            A  Yes.

Lois Guillory  8/14/2018

1          Q   Then you wrote, "Per Dr. Lissaur, Moriarty

2    is manic and not able to maintain in mainline housing

3    at this time."  That was your impression of what Dr.

4    Lissaur said to you, right?

5          A   Yes.

6          Q   "Dr. Lissaur prescribed some medications

7    to help him with his symptoms and recommends he remain

8    in ad seg housing until he's cleared by a member of the

9    psychiatric staff," right?

10         A   Yes.

11         Q   Dr. Lissaur was a member of the

12   psychiatric staff, he just hadn't cleared him for

13   mainline housing or some other housing, right?

14              MR. WELSH:  Vague and ambiguous.

15              THE WITNESS:  No, he did not clear him.

16   BY MR. MORRIS:

17         Q   Then it says, "Moriarty will be

18   re-evaluated in one week."  Do you see that?

19         A   Yes.

20         Q   Is that different, that re-evaluation that

21   you referred to here, different than the visit that you

22   had with Dr. Daniels?

23              MR. WELSH:  It's vague, ambiguous,

24   incomplete hypothetical and calls for speculation.

25              THE WITNESS:  Is it different?

Lois Guillory  8/14/2018

```
1    BY MR. MORRIS:
2            Q  Yes.  You had a meeting just a couple days
3    later with Dr. Daniels, then you have re-evaluated in a
4    week.  Was the Dr. Daniels meeting, was that for the
5    purposes of re-evaluating?  What's your understanding
6    of the meeting?
7            MR. HARRISON:  Vague, because I'm not sure
8    it's Dr. Daniels.
9            MR. WELSH:  Lacks foundation, calls for
10   speculation.  She's a nurse.
11   BY MR. MORRIS:
12           Q  Amanda.
13           A  Technically after the provider has seen
14   the inmate, they would suggest okay, he could be seen
15   in a week.  Since he started -- he was agreeing to
16   start his medication, Dr. Lissaur wanted to make sure
17   medication took effect before he was seen again.
18           Q  Why did Dr. Daniels see him a couple days
19   later?
20           A  I'm not sure, but normally --
21           Q  Nurse Daniels.  My bad.
22           MR. WELSH:  Calls for speculation,
23   incomplete hypothetical, vague and ambiguous.
24   BY MR. MORRIS:
25           Q  Why did Nurse Daniels see him a few days
```

Lois Guillory  8/14/2018

1    later?

2                    MR. WELSH:  Same objections.

3                    THE WITNESS:  From what I remember, I

4    believe he was refusing to take his medication, so then

5    they would have to re-evaluate within the next day or

6    two.

7    BY MR. MORRIS:

8            Q  The re-evaluation that's referenced here,

9    does that have to be done by a psychiatrist or can that

10   be done by a nurse practitioner?

11                   MR. WELSH:  Lacks foundation.

12                   THE WITNESS:  Whoever is working that

13   day.

14   BY MR. MORRIS:

15           Q  Either/or?

16           A  Yes.

17           Q  We'll mark this as exhibit next in order,

18   Number 5.  Take a look at it.  Exhibit Number 5 is a

19   note written by I'm not sure whom.  It doesn't have a

20   deputy at the top.  It just says resource officer CPMG.

21   Does that indicate to you who drafted this note, this

22   encounter detail?

23                   (Exhibit 5 was marked.)

24           A  At the bottom it's a nurse's last name,

25   Tanacio.

Lois Guillory  8/14/2018

1          Q  Does the encounter note refer to the
2     encounter detail?  The encounter note is May 30.  This
3     encounter detail is dated 5-28.
4          A  This is from the medical staff.
5          Q  When you say "this", are you referring to
6     the encounter detail?
7          A  Yes.
8          Q  It says, "Type: Psych SC."  Is that psych
9     screening?
10          A  Psych sick call.
11          Q  Psych sick call.  Can we tell from this
12     note whether or not this was actually drafted by Dr.
13     Lissaur?
14               MR. WELSH:  Calls for speculation.
15               THE WITNESS:  Not me, I don't know.
16     BY MR. MORRIS:
17          Q  It has a different day than when Ms.
18     Tanacio's note is written at the bottom, right?
19          A  Yes.
20          Q  This note reads, "Level 2."  Do you know
21     what that means?  Are there different levels of
22     psychiatric patients?
23          A  At the time, yes.
24          Q  What is a Level 2?
25          A  I don't remember exactly what the levels

Lois Guillory  8/14/2018

1    were.

2              Q   How many levels were there?

3              A   Don't remember that either.

4              Q   Is 1 somebody who is in more critical

5    distress than a 2 or was 2 more critical than a 1?

6              A   I believe 1 was priority.

7              Q   1 is priority, so 2 is next in line?

8              A   I think so.

9              Q   Do you know if it went to 5 or 10?

10             A   Not that high.

11             Q   You don't use levels anymore?

12             A   I'm not the psych deputy.  I'm not sure if

13   they changed it.

14             Q   When you were last the psych deputy in

15   2016, were they still using levels?

16             A   I believe so.

17             Q   You don't have a distinct recollection of

18   what was the highest level you went to or the highest

19   number, lowest level?

20             A   I think 3, but I'm not sure.

21             Q   It says, "5-28-16:" then "... one week."

22   Do you have any idea what that means?

23             A   No.

24             MR. WELSH:  Calls for speculation.

25   BY MR. MORRIS:

Lois Guillory  8/14/2018

1          Q  It says, "Patient manic and started on

2  Risperdal," then it says, "LiCO3."  Do you know what

3  that is?

4          A  No.

5          Q  Is that a medication?

6          A  I don't know.

7          Q  "Benadryl on 5-28-16."  That's when you

8  were there, right, those medications started when you

9  were with him on 5-28, right?

10          A  Yes.

11          MR. WELSH:  Vague and ambiguous.

12  BY MR. MORRIS:

13          Q  "Refusing HS medication."  Any idea what

14  HS means in this context?

15          A  No.

16          Q  "Psych sick call scheduled earlier, wife

17  concerned about his mental status and if a 5150 could

18  be done if released by court 5-31."  Were you aware

19  they were considering -- or there was talk of making

20  Mr. Moriarty a 5150 if he was released any time?

21          MS. HARDISTY:  I'm just going to object

22  it's vague and ambiguous when you say "they."

23          THE WITNESS:  The day of the MDG meeting,

24  yes.

25  BY MR. MORRIS:

Lois Guillory  8/14/2018

1          Q   The day of the MDG meeting it was
2   discussed that if Mr. Moriarty were to be released that
3   day, he would be -- they would do a 5150 hold on him?
4          A   Yes.
5              MR. WELSH:  Wait a second.  You are
6   agreeing that if he was going to be released on the day
7   of the meeting?
8              MR. MORRIS:  Yeah, that's when he was
9   supposed to be released, that day, he was going to
10  court.  Or the next day maybe.
11             MR. WELSH:  We're guessing now.
12             THE WITNESS:  I was told that if he was
13  going to be released from court, he needed to be --
14             MR. WELSH:  He's asking you that day.  If
15  he's going to be released on May 31st is the question.
16  You are saying yes.  The day is irrelevant.
17  BY MR. MORRIS:
18         Q   The day is irrelevant.  Your understanding
19  was from the MDG meeting that if Mr. Moriarty was going
20  to be released following court, they were going to
21  place a 5150 hold on him, right?
22         A   Yes.
23             MR. WELSH:  Calls for speculation, lacks
24  foundation.
25             MS. HARDISTY:  Vague as to "they."

Lois Guillory  8/14/2018

1    BY MR. MORRIS:

2              Q   We'll get to the MDG meeting.   What's your

3    understanding of a 5150 hold?

4              A   Someone that's a great danger to themself,

5    can't take care of themself, suicidal, they can be

6    transported to either CMH or Tri-City.

7              Q   Is that something -- when a 5150 hold is

8    placed on somebody who is already in custody, already

9    in jail, is that something where the 5150 hold is

10   placed inside of jail?  Or is that something where the

11   5150, that inmate is transported from jail to a mental

12   hospital in Vista in and around May of 2016?

13             MR. WELSH:  Vague and ambiguous, lacks

14   foundation, calls for speculation, incomplete

15   hypothetical.

16             THE WITNESS:  If someone -- in his case,

17   if he was to be released, if he was still manic, they

18   would have placed a 5150 hold for him to go.

19   BY MR. MORRIS:

20             Q   Can you place a 5150 hold on an inmate who

21   is already incarcerated?

22             MR. WELSH:  Calls for speculation, lacks

23   foundation, incomplete hypothetical.

24             THE WITNESS:  They do for PSU admits.

25   BY MR. MORRIS:

Lois Guillory  8/14/2018

1         Q   If there was an inmate who they wanted to

2    place a 5150 hold on, that would be transferred to PSU

3    for somebody who is already incarcerated, right?

4              MR. WELSH:   Calls for speculation, lacks

5    foundation, incomplete hypothetical, vague and

6    ambiguous.

7              THE WITNESS:   Yes.

8    BY MR. MORRIS:

9         Q   If that inmate is released, a 5150 hold

10   would then enable the jail staff to transport that

11   individual from jail to CMH, right?

12        A   Yes.

13        Q   The incident that Mr. Moriarty was taken

14   from the bus and put into the disciplinary hold, did

15   you know -- do you know if Dr. Lissaur was aware of

16   that incident at the time that you guys met with

17   Mr. Moriarty on 5-28?

18             MR. WELSH:  Calls for speculation.

19             THE WITNESS:  I believe I would have

20   informed him of that.

21   BY MR. MORRIS:

22        Q   I'll show you what we'll mark as Exhibit

23   Number 6.  Take a look at that.  I've shown you a

24   note -- an incident report, Exhibit Number 6, SDSO 018,

25   written by Deputy San Nicolas regarding an incident

Lois Guillory  8/14/2018

1    that took place early in the morning of 5-27.  Were you

2    aware on 5-27 early in the morning that Mr. Moriarty

3    was threatening to assault other inmates, as detailed

4    here, at 2:32 in the morning in the first paragraph?

5                (Exhibit 6 was marked.)

6          A   No.

7          Q   Deputy San Nicolas quotes Mr. Moriarty as

8    saying, "Don't care how many I take on.  Is anybody

9    brave enough to open this door?"  Also detailed that

10   when Mr. Moriarty said this he was hitting and kicking

11   the cell door inside.

12               Had you read this ISR prior to your

13   interaction with Mr. Moriarty with Dr. Lissaur on 5-28?

14          MR. WELSH:  Calls for speculation.

15          THE WITNESS:  No, I did not.

16   BY MR. MORRIS:

17          Q   This type of action, threatening to take

18   anybody on, anybody brave enough to open the door, and

19   kicking and hitting the door, that fits the criteria

20   for placement in the EOH, right?

21          MR. WELSH:  Lacks foundation, incomplete

22   hypothetical.

23          THE WITNESS:  It could.

24   BY MR. MORRIS:

25          Q   It's a danger to others because he's

Lois Guillory  8/14/2018

1   saying, "I want to kick everyone's butt," right?

2              A   Yes.

3              Q   It's property damage because he's hitting

4   and kicking the door, right?

5              A   Yes.

6              Q   It's potential to hurt himself because

7   he's hitting and kicking the cell door, right?

8              A   Yes.

9              Q   We go down to 0411 that same morning, it

10  reads, "Mr. Moriarty was hitting and kicking his cell

11  door.  He verbally stated to me, 'Hey, officer, open

12  this door and put me where those guys are so I can take

13  them on.'"  It reads, "He stated he does not care, will

14  challenge anyone to a fight."  The last sentence reads,

15  "Moriarty was then hitting and kicking his cell door

16  inside, and yelling incoherent remarks."

17              That type of behavior fits the criteria

18  for EOH placement, true?

19              MR. WELSH:   Incomplete hypothetical, lacks

20  foundation.

21              THE WITNESS:   Yes, it does.

22  BY MR. MORRIS:

23              Q   Do you know if Dr. Lissaur was aware this

24  was what Mr. Moriarty was doing on 5-27 in the early

25  morning hours when he met with him on 5-28?

Lois Guillory  8/14/2018

1                    MR. WELSH:  Calls for speculation.

2                    MR. HARRISON:  Calls for speculation.

3                    THE WITNESS:  No, I'm not.

4     BY MR. MORRIS:

5              Q     Going back to your time as a line deputy,

6     would this be the type of information that you would

7     expect Deputy San Nicolas to pass down to the incoming

8     shift?  Does this fit within the kind of information

9     that's typically passed down one shift to another?

10             A     Yes.

11             Q     The records indicate in between the time

12    that you saw Mr. Moriarty on 5-28 and the time of the

13    next encounter note we have, which is on 5-30,

14    Mr. Mortiarty's wife called, I think the records

15    indicate, five or six times and sent two letters.  Were

16    you aware of any of that information at the time?

17                   MR. WELSH:  Calls for speculation.

18                   THE WITNESS:  I'm trying to remember when

19    I was notified of that information.  I want to say yes.

20    BY MR. MORRIS:

21             Q     To the best of your recollection, ma'am,

22    what information did you have regarding the calls made

23    by Mrs. Moriarty?

24             A     I don't know the exact details of what was

25    said.  I just know that his wife called several times.

Lois Guillory  8/14/2018

```
1              Q  It's hard, as we sit here right now, to
2   kind of separate what we know now versus what we knew
3   then.  I'm really trying to figure out if you as a
4   correctional staff, as the psych liaison, actually knew
5   that his wife was calling in and around that time?  Is
6   this something you may have picked up after the fact?
7   Do you have a distinct recollection one way or the
8   other?
9              MR. WELSH:  It's asked and answered.
10             THE WITNESS:  I knew she had called just
11  from being with the nurses.  I don't know what was
12  said.  I don't know exactly when she called.
13  BY MR. MORRIS:
14             Q  What nurses are you talking about?
15             A  Just in general, nurses.
16             Q  How about Ms. Daniels, did she ever tell
17  you that she had spoken with Mrs. Moriarty?
18             A  I don't recall that.
19             Q  I'll show you the next note.  Give me one
20  second while we find it.  Do you have a copy of it?
21             MR. WELSH:  I have it as 546.
22             MR. MORRIS:  You have it as 546?
23             MR. WELSH:  Right.
24             MR. MORRIS:  Let's just use that one.
25             MR. WELSH:  You have one over there.
```

Lois Guillory  8/14/2018

1              MR. MORRIS:  I know, but I'm going to mark

2   it.

3              (Exhibit 7 was marked.)

4   BY MR. MORRIS:

5         **Q  I'll show you what we now marked as**

6   **Exhibit Number 7, which is your Bates Number 546,**

7   **right?**

8         A  Yes.

9         **Q  I'll give you a minute to look this over.**

10             MR. WELSH:  He corrected his typo and

11  spelled "is" right.

12  BY MR. MORRIS:

13            **Q  This is an encounter note written by Dr.**

14  **Lissaur on May 30, 2016, looks like at 1110 in the**

15  **morning.  Do you see that, ma'am?**

16            **A  Yes.**

17            **Q  This details a visit with Mr. Moriarty.  I**

18  **take it, given the date, May 30th, that you were**

19  **there?**

20            **A  Yes, but I don't remember this incident.**

21            **Q  You've had a chance to read the encounter**

22  **note in its entirety, right?**

23            A  Yes, I did.

24            **Q  That did not trigger any specific**

25  **recollection in your mind of this encounter that you**

Lois Guillory  8/14/2018

```
 1   and Dr. Lissaur had with Mr. Moriarty on May 30?

 2               MR. WELSH:  Assumes facts not in evidence.

 3               MR. HARRISON:  May I ask a clarifying

 4   question?

 5               MR. MORRIS:  Certainly.

 6               MR. HARRISON:  Ma'am, this is May 30,

 7   which was a Monday, Memorial Day probably.

 8               THE WITNESS:  Yes.

 9               MR. HARRISON:  Would that explain why Dr.

10   Lissaur may have been at the facility, since you

11   mentioned earlier he worked on weekends?

12               THE WITNESS:  Yes.

13               MR. HARRISON:  It would include Monday

14   holidays?

15               THE WITNESS:  Yes.

16               MR. HARRISON:  Thank you.

17   BY MR. MORRIS:

18        Q  Your days off were Wednesday, Thursday,

19   right?

20        A  Yes.

21        Q  Then every other five-day split?

22        A  Yes.

23        Q  According to the schedule, at least, you

24   would have been there and would have accompanied him on

25   this date and time?
```

Lois Guillory  8/14/2018

1           A   Yes.

2           Q   You don't have a specific independent

3   recollection, true?

4           A   True.

5           Q   The second full paragraph reads, "Today

6   patient is seen at his cell front.  He is standing

7   naked in his cell speaking out loud."  You don't have

8   any recollection of him speaking naked in his cell?

9               MR. WELSH:  You're asking all these about

10   on May 30, right?

11               MR. MORRIS:  Yes.

12               THE WITNESS:  I don't recall this day.

13   BY MR. MORRIS:

14           Q   He talks about not needing any medication.

15   That doesn't ring a bell with you?

16           A   No.

17           Q   How about the statement, "That my clothes

18   are under the bed and I'm naked because I'm talking to

19   God and you need to be naked for some special things

20   with God," anything like that ring a bell with you?

21           A   No.

22           Q   Dr. Lissaur continues to write from 5-28,

23   sort of recapsulates what we've already read on 5-28

24   about what he knew.  This MSE is different.  It reads,

25   "Forty-three year old man standing naked in his cell

Lois Guillory  8/14/2018

1    talking with rolled-up towel in his hand."  Then it

2    says, "Motor wnl."   Do you know what that means?

3         A  No.

4              MR. WELSH:  Within normal limits.

5              MR. HARRISON:  Within normal limits.  MSE

6    is mental status examination.

7              MR. MORRIS:  Okay.  Thank you.

8         Q  Then it says, "Patient responding to

9    internal stimuli."  Do you know what that means?

10        A  I believe talking to himself maybe.

11        Q  Then it says, last sentence, "Thought

12   process is irrational and disorganized and delusional."

13   I assume you know what that means, right?

14        A  Yes.

15        Q  Again, this doesn't trigger any

16   independent recollection of anything you may have seen,

17   right?

18        A  No, because -- I could have been standing

19   there, but normally I write an incident report every

20   encounter.  I don't have an incident report so I don't

21   recall this.

22        Q  Under plan, look at page two of Exhibit

23   Number --

24              MR. WELSH:  7.

25   BY MR. MORRIS:

Lois Guillory  8/14/2018

1          Q   -- 7, it says, "Possibility that patient

2     will be released tomorrow has been raised and we

3     recommend that 5150 will be issued if patient

4     presentation is as it is today."   Do you see that?

5          A   Yes.

6          Q   You understand from this note that if

7     Mr. Moriarty looks tomorrow like he looks today, he

8     needs to be 5150, right?

9          A   From this note, yes.

10         Q   If Mr. Moriarty fit the criteria for 5150,

11    he would also fit the criteria for being transferred to

12    PSU, right?

13             MR. WELSH:   Calls for speculation, lacks

14    foundation, incomplete hypothetical.

15             THE WITNESS:   They could have recommended

16    that, yes.

17    BY MR. MORRIS:

18         Q   It says, "He was arrested in the context

19    of threatening his family and also is currently GD."

20    Anybody want to try what that means?

21         A   Grave danger.

22             MR. HARRISON:   Gravely disabled.

23    BY MR. MORRIS:

24         Q   "...is currently gravely disabled, unable

25    to accept the benefit of food, clothing or housing."

Lois Guillory  8/14/2018

1    Again, those all fit the criteria for 5150, right?

2              MR. WELSH:  Lacks foundation.

3    BY MR. MORRIS:

4         Q  As far as you know?

5         A  Yes.

6         Q  In your interaction with Mr. Moriarty you

7    would agree that he fit that definition of manic and

8    psychotic, right?

9              MR. WELSH:  Lacks foundation.

10             MR. HARRISON:  Join.

11   BY MR. MORRIS:

12        Q  I know you're not a medical doctor.  You

13   were the psych liaison for a long time.  In your

14   opinion, ma'am, did he fit that definition of manic?

15             MR. WELSH:  Lacks foundation.

16             MS. HARDISTY:  Calls for expert opinion.

17             MR. WELSH:  Calls for expert opinion,

18   right.

19             THE WITNESS:  Yes.

20   BY MR. MORRIS:

21        Q  Would you agree that he would also fit the

22   definition, as far as you understand the term, as being

23   psychotic?

24             MR. WELSH:  Same objection.

25             THE WITNESS:  Yes.

Lois Guillory  8/14/2018

1    BY MR. MORRIS:

2         Q   That existed in the interaction you had

3    with him beginning on -- you didn't see him until May

4    28, right?

5         A   Yes, 5-28.

6         Q   Then there's another note at the end of

7    this note from 5-29, dated one day earlier from Ms.

8    Salter detailing a bunch of interaction that she had

9    with Mrs. Moriarty.

10        This is consistent with your testimony

11   earlier that you heard the nurses talking about calls

12   that they had received from Mrs. Moriarty, right?

13        A   Yes.

14        Q   Is that the last page of yours?

15        A   Yes.

16        Q   I'll show you Exhibit Number 8.  Take a

17   look at Exhibit Number 8.  This is on 5-30.  Dr.

18   Lissaur's encounter note we just read was dated

19   5-30-2016 at 1110.  This is dated 5-30-2016 at 1111.

20   Based on the documentation, shortly thereafter, after

21   the initial encounter note.  In this one he writes,

22   "PRIORITY" in all caps with stars -- asterisks on

23   either side.  Do you know what that means?

24             (Exhibit 8 was marked.)

25             MR. WELSH:  First of all, don't assume he

Lois Guillory  8/14/2018

1       Q   When it says all caps priority, with

2   double asterisks on either side, do you know what that

3   means?

4       A   Important.

5       Q   I like that.   Very, very perfect answer.

6   It says, "Sworn evaluation request."   What does that

7   mean?

8       A   They want someone from the sworn staff to

9   evaluate the person.

10          MR. WELSH:   What did you say?

11          MR. MORRIS:   They wanted someone from the

12  sworn staff to evaluate that person.

13          THE WITNESS:   That's what it looks like to

14  me, sworn evaluation.

15          MR. WELSH:   Don't guess or speculate.

16          MR. MORRIS:   She's not.   She understands,

17  she worked in the jail twenty years, she's got it.

18          MR. WELSH:   Don't say that the sworn staff

19  is going to do a psych evaluation.

20          THE WITNESS:   I'm saying that's what he's

21  requesting.

22          MR. WELSH:   The sworn staff is requesting?

23          THE WITNESS:   No, he is, I'm assming Dr.

24  Lissaur.

25          MR. WELSH:   You are so far off of what you

Lois Guillory  8/14/2018

1    know.  Don't guess.

2              MR. MORRIS:  What are you talking about?

3    It says sworn -- eval request from sworn staff.

4              MR. WELSH:  Right, from the sworn staff.

5    They're not requesting the sworn staff to do a psych

6    eval.

7              MR. MORRIS:  It doesn't say psych in

8    there.  Where are you getting the word psych from?

9              MR. WELSH:  You guys are getting away from

10   the facts.  We need to stop.  Don't guess anymore, all

11   right?

12             THE WITNESS:  Yes, sir.

13             MR. WELSH:  If you don't know what that

14   means, tell him you don't know what it means.  You

15   don't have to be helpful by making stuff up.  Don't

16   make stuff up or --

17             MR. MORRIS:  Don't yell at poor Lois.

18             MR. WELSH:  -- we'll be here all day.  She

19   can take that.

20   BY MR. MORRIS:

21        Q  Next it says, "Level 2."  We've already

22   talked about.  Then it says, "LDS."  I don't think he

23   was a Latter Day Saint.

24        A  Last day seen.

25        Q  Last day seen was May 30, 2016.  "Patient

Lois Guillory  8/14/2018

1    currently in bipolar manic episode."  That's what we

2    already talked about, right, that's what was going on.

3    You agreed with that?

4              A  Yes.

5              Q  "Remains very symptomatic."  Then it says,

6    "If he is released on 5-31 recommend he be take,"

7    there's a typo there, "to hospital with a 5150 for

8    inpatient stabilization."  Do you see that?

9              A  Yes.

10             Q  On that date, May 30th, which was a day

11   before the MDG meeting, do you remember Dr. Lissaur

12   telling you about his recommendation that he be 5150'd

13   if he was released the next day?

14             A  Again, I don't recall this evaluation with

15   Mr. Moriarty, so I don't remember.

16             Q  I understand that you don't recall this

17   particular encounter with Mr. Moriarty.  At any time

18   prior to the multi-disciplinary group meeting, do you

19   remember discussion of 5150 of Mr. Moriarty if he was

20   released, outside the context of the MDG meeting?

21             A  Just from this email I got from the charge

22   nurse.

23             Q  Let's look at the email from the charge

24   nurse.  We'll mark that as exhibit next in order,

25   Number 9.

Lois Guillory  8/14/2018

```
 1                    (Exhibit 9 was marked.)

 2                    MR. WELSH:  Has Bates 558 at the bottom.

 3  BY MR. MORRIS:

 4             Q  This says, "Moriarty is scheduled for

 5  court tomorrow and psych MD..." that would have been

 6  Dr. Lissaur, right?

 7             A  Yes.

 8             Q  "... recommends sending inmate patient to

 9  TCMC," right?

10             A  Yes.

11             Q  "For 5150 if his presentation remains,"

12  right?

13             A  Yes.

14             Q  Again, saying that if he looks the same as

15  he looks today, he needs to be 5150'd, right?

16             A  Yes.

17             Q  Meaning he was 5150 at the time Lissaur

18  saw him on May 30th, true?

19                    MR. WELSH:  That's lacking foundation,

20  calling for speculation.

21                    MS. HARDISTY:  Join.

22  BY MR. MORRIS:

23             Q  Is that a safe assumption, ma'am?

24                    MR. WELSH:  Same objections.

25                    MS. HARDISTY:  Also calls for a legal
```

Lois Guillory  8/14/2018

 1   conclusion.

 2                    THE WITNESS:  Per the doctor's

 3   recommendation.

 4   BY MR. MORRIS:

 5        **Q  The note says if his presentation**

 6   **continues the same, he needs to be 5150, right?**

 7        A  Yes.

 8        **Q  Meaning that if he looks -- meaning from**

 9   **that that he's 5150 at the time he's seeing him on May**

10   **30th, right?**

11                    MR. WELSH:  Calls for speculation.

12                    THE WITNESS:  According to the doctor,

13   yes.

14                    MS. HARDISTY:  Wait.

15                    MR. HARRISON:  May I ask another

16   clarifying question?

17                    MR. MORRIS:  You guys can all ask your

18   questions with a lot of winks and a lot of hrumphing.

19   When I'm done, you can ask all the questions you want.

20        **Q  If we can look at Exhibit Number 8.  Is**

21   **this a note?  It say, "Psychiatric Rnp."  It's in the**

22   **medical chart, right?  So a deputy couldn't write that**

23   **note, right?**

24        A  No, not in the medical chart.

25        **Q  Could this have been written by a**

Lois Guillory  8/14/2018

1                MR. MORRIS:  Sure.

2                MR. WELSH:  Bob, did you have a question

3    on Exhibit 9?

4                MR. HARRISON:  Vicky Felizardo, do you

5    know what her title is?

6                THE WITNESS:  She was a charge nurse at

7    the time.

8                MR. HARRISON:  Do you know if she had any

9    training as a psychiatric nurse?

10               THE WITNESS:  No, I don't.

11   BY MR. MORRIS:

12          Q   Exhibit Number 9 Vicky Felizardo wrote,

13   "Psych MD recommends sending inmate patient to Tri-City

14   Medical Center for 5150."  Were you present for any

15   communication between Dr. Lissaur, the psych MD, and

16   the nursing staff regarding 5150ing Mr. Moriarty if he

17   were released the following day?

18          A   Was I present?

19          Q   Were you part of that communication chain

20   at all?

21          A   Yes, I should have been, yes.

22          Q   I understand.  What I'm asking is:  Do you

23   have a specific recollection, yeah, I remember, I was

24   standing there and Dr. Lissaur was talking to Nurse

25   Felizardo, he said X, Y and Z, anything like that?

Lois Guillory  8/14/2018

```
 1              A   I don't remember that day.  That's what
 2   I'm saying.  I don't remember.  But I should have been
 3   part of that.
 4              Q   Have you ever been part of any other thing
 5   where somebody -- where the decision is made that if
 6   this guy is released we're going to 5150 him?
 7              MR. WELSH:  Vague and ambiguous,
 8   incomplete hypothetical.
 9              THE WITNESS:  Can you repeat.
10   BY MR. MORRIS:
11              Q   Have you ever been part of any other
12   situation where the decision was made if an inmate is
13   released we're going to 5150 him?
14              A   Yes.
15              Q   In that particular situation, I take it
16   you were involved in that communication chain?
17              A   Yes.
18              Q   In those situations where somebody else --
19   the decision had been made that he was going to be 5150
20   upon his release, where was that individual housed at
21   the time the decision was made to 5150 him when he's
22   released?
23              A   There's several incidents.  Could have
24   been housed -- bailed out, being released from the
25   safety cell.  Or if someone came in with a B and R,
```

Lois Guillory  8/14/2018

1  that was gravely disabled, couldn't take care of

2  themself, intake.

3        Q  Somebody who is getting released from a

4  safety cell or somebody is booked and released?

5        A  Yes.

6        Q  Who is gravely disabled, right?

7        A  Yes.

8        Q  I'll show you what we'll mark as Exhibit

9  Number 10.  I apologize, we're going to go back in

10  time.  Do you know who Nurse Velez is?

11            (Exhibit 10 was marked.)

12        A  She's an LVN that distributes medication.

13        Q  5-28-16 she wrote this encounter note at

14  2242 in the evening.  That would have been after your

15  visit to Mr. Moriarty on 5-28 with Dr. Lissaur, true?

16        A  Yes.  I'm at home.

17        Q  In the last sentence she writes, "Unable

18  to give the inmate patient a pen to sign refusal due to

19  inmate patient possibly being unpredictable."  Had you

20  seen this encounter note prior to your interaction with

21  Mr. Moriarty on May 30?

22        A  No.

23        Q  What is your understanding of the

24  information that Nurse Velez is trying to convey when

25  she writes that she couldn't give him a pen because he

Lois Guillory  8/14/2018

1            Q   When they document things, it's important

2     to know what the reader of the documented information

3     understands from what is written.   What is your

4     understanding when she writes, "Couldn't give him a pen

5     because he was unpredictable"?

6                 MS. HARDISTY:   Probably that he was

7     unpredictable.

8                 THE WITNESS:   Possibly injure himself.

9     BY MR. MORRIS:

10            Q   Thank you.   Do you know if Dr. Lissaur had

11     looked at that encounter note when you -- when he saw

12     him on May 30th?

13                 MR. WELSH:   Calls for speculation.   Don't

14     guess as to what Dr. Lissaur looked at.

15                 MR. HARRISON:   Join.

16                 THE WITNESS:   I don't know.

17                 MR. MORRIS:   I'd like to show you now a

18     series of encounter notes.   These are from the sworn

19     staff.   Exhibit 11.

20                 (Exhibit 11 was marked.)

21                 MR. WELSH:   After this let's take a break

22     for a minute.

23                 MR. MORRIS:   Sure.

24                 THE WITNESS:   I haven't seen any of these.

25                 MR. MORRIS:   These all detail the same

Lois Guillory  8/14/2018

1          Q  At the time that you had your last

2  interaction with Mr. Moriarty with Nurse Daniels that

3  we are about to discuss, were you aware that earlier

4  that day -- earlier earlier that day, just after

5  midnight the previous day, that Mr. Moriarty was

6  involved in a use of force with deputies?

7          A  Yes, I heard.

8          Q  What exactly had you heard regarding this

9  use of force?

10          A  Just that he was taken out to get his

11  blood drawn.  Apparently he ran from the deputies.

12  They got him on the ground, placed him in handcuffs.

13          Q  Were you told that he was placed in any

14  sort of restraints or anything?

15          A  Just handcuffs.  Oh, and on the gurney,

16  that's right.  They picked him up, put him on the

17  gurney and drew his blood, I believe.

18          Q  When they put him on the gurney, I imagine

19  they had to strap him down or do you know?

20          A  Normally when we place people on the

21  gurney, yes, we strap the straps on the gurney, yes.

22          Q  Did you speak directly with any of the

23  deputies that were involved in the use of force?

24          A  No.  I believe the deputy that was running

25  the house that night was a female.  I talked to her

Lois Guillory  8/14/2018

1    about it.

2              Q   What exactly did she say?

3              A   Basically, she asked the guys to take

4    Mr. Moriarty to medical for lab work and they agreed.

5    When he got there I guess he ran off on the deputies.

6    They put him on the gurney, extracted his blood and

7    brought him back to the housing unit.

8              Q   Who was it that relayed this information

9    to you?

10             A   Perez.

11             Q   She related that to you when you got to

12   work on the 31st?

13             A   I believe so on that day, yes.

14             Q   Do you know why -- for what purpose she

15   relayed that information to you?

16             MR. WELSH:  Would call for what was in her

17   mind.

18   BY MR. MORRIS:

19             Q   Did she indicate to you why she thought

20   that was important for you to know?

21             A   Because he was on the psych sick call

22   list.  I'm not sure.  Because I'm a psych deputy and he

23   was one of our patients.

24             Q   When you saw Mr. Mortiarty that day, later

25   that day, did he show any signs of having been involved

Lois Guillory  8/14/2018

1    **in the use of force?**

2                **A**  Not that I saw, no.

3                **Q**  **For instance, his teeth weren't broken up,**

4    **or anything like that, right?**

5                **A**  I didn't get that close.

6                Q  Let's go now to Exhibit Number 12.

7                MR. WELSH:  Does your say page 22 on the

8    bottom?

9                MR. MORRIS:  Yes, sir.

10               MR. WELSH:  We got it.

11               MR. MORRIS:  I want to mark one so we have

12   it for the record.  Give you a chance to look that

13   over.  We'll mark SDSO 22 as Exhibit Number 12.

14               (Exhibit 12 was marked.)

15               **Q**  **This is your note regarding your last**

16   **visit with Mr. Moriarty, right?**

17               A  Yes.

18               **Q**  **You wrote this note on 5-31-2016, looks**

19   **like updated time at the top 0905?**

20               A  Yes.

21               **Q**  **This details an encounter you had with**

22   **Mr. Moriarty with Nurse Daniels at approximately 0835**

23   **on the morning of 5-31-2016, right?**

24               **A**  Yes.

25               **Q**  **You write under deputy's observation and**

Lois Guillory  8/14/2018

1    actions, "On 5-26-16 inmate Moriarty was placed into ad

2    seg housing."  We already discussed that.  By that you

3    meant he was an ad seg inmate placed in the

4    disciplinary housing, right?

5                A  Yes.

6                Q  "For being disorganized, making incoherent

7    statements and rambling."  When you say that, where are

8    you getting that information from?  Was it your own

9    observations at that point?  Were you looking at some

10   other medical note?

11               A  No.  This is from my prior incident with

12   Dr. Lissaur, I'm just recapping what I wrote or what I

13   saw.  The first one was from Angulo.  The second was

14   when I saw Mr. Mortiarty with Dr. Lissaur.  I just put

15   it on the different ISR.  If someone is reading it that

16   hasn't read the first incident, they can know what's

17   going on.

18               Q  The 5-26, that was the Angulo incident.

19   You weren't there for that.  That was something you

20   would have picked up from reading his ISR?

21               A  Yes.

22               Q  5-28 you write, "Moriarty was evaluated by

23   Dr. Lissaur.  Per the doctor, Moriarty was manic and he

24   recommended Mortiarty remain in ad seg housing."

25   Again, that's recapping Lissaur's note, right?

Lois Guillory  8/14/2018

1          A  Yes.

2              Q  On 5-31-2016 you write, "During the

3      interview with Nurse Daniels Moriarty said, 'If someone

4      comes in my cell tonight I'm going to kill them, I need

5      to be in solitary, I have racing thoughts, I need my

6      medication, I feel violent and I'm going to go off.'"

7      Those are in quotes, right?

8              A  Yes.

9              Q  Were those the exact words that

10     Mr. Moriarty said to you?

11             A  That I heard, yes.

12             Q  He said those to Nurse Daniels, excuse me,

13     right?

14             A  Yes, and I heard.

15             Q  You heard.  Can you tell me that morning

16     at 0835 what Heron Moriarty looked like?

17             A  As I said before, I don't believe -- the

18     clothes were on or off, I don't remember which one.

19             Q  Is this the time he was standing in his

20     toilet?

21             A  I think it was.  Yeah, feet in the toilet.

22     I don't remember -- when I first opened the food slot,

23     I made sure he wasn't right at the door -- I mean at

24     the window, so he wouldn't be right up on the window.

25     I just saw him standing in the back of the cell with

Lois Guillory  8/14/2018

1   his feet in the toilet.

2          Q   You don't recall, sitting here today,

3   whether his clothes were on or off, right?

4          A   No, I don't.

5          Q   When you open the flap, you open it

6   outwards towards the haulway or inwards towards the

7   cell?

8          A   It opens out in the hallway.

9          Q   You made a flipping motion.  Does it open

10  up?

11         A   Sorry.  That was the window I opened up

12  first before we open up the flap to see how much

13  distance.  We don't want to open it right away if he's

14  right there.  I opened the window first.

15         Q   I take it from your testimony and your

16  hand motions you just did, you can open the window and

17  actually flip it open like you could -- what kind of a

18  window would open like that?

19         A   Like a door almost.

20         Q   Like a door you can flip the window open

21  that way?

22         A   Yes.

23         Q   The window, I imagine, is plexiglass?

24         A   Yes.

25         Q   Is it eye level for you?

Lois Guillory  8/14/2018

1       A  Yes.

2       Q  You can look in and see what's going on?

3       A  Yes.

4       Q  Before you open the window, do you knock

5  on the door and let them know you are coming or you are

6  going to open the window or anything?

7       A  No, just open it.

8       Q  When you opened it, you saw Mr. Moriarty

9  standing towards the back of the cell in the toilet.

10  And you don't recall if his clothes were on or off?

11      A  No, I don't.

12      Q  I take it from that point you stepped back

13  and let Nurse Daniels handle the direct interaction?

14      A  Yes.

15      Q  That's when you heard these statements

16  that we just read where if somebody comes in his cell

17  he's going to kill them?

18      A  Yes.

19      Q  That would definitely fit the criteria for

20  transfer either to EOH or PSU, right?

21          MR. WELSH:  Lacks foundation.

22  BY MR. MORRIS:

23      Q  EOH, PSU or safety cell, right?

24          MR. WELSH:  Incomplete hypothetical, lacks

25  foundation.

Lois Guillory  8/14/2018

1                    THE WITNESS:   Yes.

2   BY MR. MORRIS:

3           Q  Nurse Daniels had this interaction.   She

4   asked him why he's refusing his medication.   He said,

5   "I wasn't getting enough."   Did that make any sense to

6   you?

7           A  He just said he wasn't getting enough.

8   That's what I heard.

9           Q  Doesn't make sense to refuse meds because

10  you're not getting enough.   That's incoherent, right?

11          A  Uh-huh.

12          Q  Yes?

13          A  Yes.   Sorry.

14          Q  "Nurse Daniels asked Mortiarty if he was

15  willing to start taking his medications again.

16  Moriarty said yes.   Moriarty will remain in ad seg

17  housing until he's cleared by a member of the

18  psychiatric staff.   Moriarty will be re-evaluated in

19  the morning.   Sergeant Weidenthaler was notified."

20  That's your note, right?

21          A  Yes.

22          Q  How long did this interaction with Nurse

23  Daniels take at the window?

24          A  She was pretty thorough so twenty minutes,

25  I'm assuming, if not, longer than that.

Lois Guillory  8/14/2018

```
1              Q  At the conclusion of her interaction with

2      Mr. Moriarty, did she indicate to you that she wanted

3      Mr. Moriarty moved to a safety cell?

4              A  I'm remembering as she was talking to him,

5      she turned to me and said, "He needs to be in a safety

6      cell."

7              Q  Once you were informed by a nurse

8      practitioner in the jail that an inmate needs to be

9      moved to a safety cell, what's your responsibility as

10     the psych liaison?

11             A  Once she concluded her evaluation of him,

12     we went back to the office.  My job is to relay that

13     information to my supervisor, chain of command.  So I

14     called the sergeant's office.  Sergeant Weidenthaler

15     happened be the one that answered the phone.  I

16     basically said she recommended safety cell for

17     Mr. Moriarty.

18             Q  How did Mr. Weidenthaler react to that?

19             A  I don't remember exact words, but

20     basically it was a no -- no, not -- no.

21             Q  In your interaction in the jail in your

22     experience, are sworn staff supposed to overrule

23     housing recommendations from psychiatric staff?

24             MR. KUTYLA:  Incomplete hypothetical.

25             MR. WELSH:  Incomplete hypothetical, lacks
```

Lois Guillory  8/14/2018

1    foundation, calls for speculation.

2              THE WITNESS:  Can you repeat it, please?

3    BY MR. MORRIS:

4         **Q   In your experience in the jail, are sworn**

5    **staff supposed to overrule housing recommendations by**

6    **psychiatric staff?**

7              MR. KUTYLA:  Incomplete hypothetical,

8    vague and ambiguous, calls for speculation.

9              MR. WELSH:  Lacks foundation.

10   BY MR. MORRIS:

11        Q   Ma'am, I've read your interview on that

12   and I know what you've said.  I'm asking you now under

13   oath.  In your opinion, ma'am, can sworn staff overrule

14   psychiatric staff housing recommendations?

15             MR. KUTYLA:  Incomplete hypothetical.

16   Regardless of what she said in her interview, that's am

17   improper question.

18             MR. WELSH:  Same objection, plus vague and

19   ambiguous.

20             THE WITNESS:  I'd say no.

21   BY MR. MORRIS:

22        **Q   Did Sergeant Weidenthaler give you an**

23   **indication as to why he was rejecting the**

24   **recommendation from Nurse Daniels?**

25             MR. KUTYLA:  Objection.  Mr. Morris, that

Lois Guillory  8/14/2018

1    misstates her testimony.  That's not what I heard.

2    Incomplete hypothetical and it's argumentative.  I

3    could go on, but I think that covers the line items.

4                MR. MORRIS:  Can I have the question read

5    back, please?

6                (The record was read.)

7                MR. KUTYLA:  Ready?

8                MR. MORRIS:  You already registered your

9    objection.  We had the question read back.  Your

10   objections are noted for the record.

11               MR. KUTYLA:  I just want to practice.  The

12   question as reread and as originally phrased misstates

13   her prior testimony on the subject.  It's vague and

14   ambiguous.

15   BY MR. MORRIS:

16        **Q  You can answer.**

17        A  Like I say, I don't recall exact words or

18   wording.  I remember, "No."

19        **Q  We have your recorded statement here.  We**

20   **can have it played back to you.  The way I heard your**

21   **recorded statement -- did you listen to your recorded**

22   **statement before you came?**

23        A  Yes, I have.

24        **Q  The way I heard the recorded statement**

25   **was, and it's sort of difficult to understand, was**

Lois Guillory  8/14/2018

1    something to the effect he said, "No, it was his

2    Friday."  Does that refresh your recollection as to why

3    he said he wasn't going to move him?

4            A  I don't know what his exact words were,

5    but, technically, something about, "Not on my Friday."

6            Q  By that you mean the way your schedule is

7    set up you get -- the next set of time was his day off,

8    right, if it was his Friday?

9            MR. WELSH:  You are asking her to say what

10   he meant or telling her something else?

11   BY MR. MORRIS:

12           Q  In jail nomenclature when somebody says,

13   "No, it's my Friday," what does that mean, refer to a

14   specific day of the week as "my Friday"?

15           A  Friday, before we get off, our last day.

16           Q  Before you have your scheduled days off?

17           A  Yes.

18           Q  What did you understand Sergeant

19   Weidenthaler to be conveying when he said, "No, I'm not

20   going to move him, it's my Friday"?

21           A  What was that?

22           Q  What about it being his Friday would

23   dissuade Sergeant Weidenthaler from moving Mr.

24   Moriarty?

25           MR. WELSH:  Calls for speculation.

Lois Guillory  8/14/2018

```
 1                    MR. KUTYLA:  My objection is it calls for

 2      speculation, calls for mind reading, it's vague and

 3      ambiguous.

 4                    THE WITNESS:  I don't know.

 5      BY MR. MORRIS:

 6           Q  What did you understand Sergeant

 7      Weidenthaler to be conveying when he said, "I'm not

 8      going to move him, it's my Friday"?  What was your

 9      understanding of that statement?

10           A  That he was not going to place him in the

11      safety cell.

12           Q  Because it was his Friday?  Why was it

13      being his Friday relevant to the decision?  What was

14      your understanding of why it being a Friday was

15      relevant to that decision?

16                    MR. WELSH:  Calls for speculation.

17                    MR. KUTYLA:  Calls for speculation.

18      BY MR. MORRIS:

19           Q  Your understanding of why Friday was

20      relevant?

21                    MR. WELSH:  Calls for speculation.  That

22      question has been asked and answered.  Now it's

23      argumentative and misstates her testimony.

24                    THE WITNESS:  I believe he was getting off

25      early that day, from my understanding.
```

Lois Guillory  8/14/2018

```
 1    BY MR. MORRIS:
 2             Q   Is there a certain amount of paperwork
 3    that has to be done when an individual is moved into a
 4    safety cell?
 5             A   Paperwork?  Yes.
 6             Q   Would that have been Sergeant
 7    Weidenthaler's responsibility to do that paperwork as
 8    the sergeant?
 9             A   Physically write, no.  Just correct.
10             Q   Sorry?
11             A   Not to physically write, no.
12             Q   But to correct it?
13             A   To correct it, yes.
14             Q   He would have had to wait for that
15    paperwork to be finished --
16             MR. WELSH:  Calls for speculation,
17    incomplete hypothetical.
18    BY MR. MORRIS:
19             Q   -- in order to correct it?
20             A   I don't know how the sergeants, if they
21    can leave or not, I don't know.
22             Q   What would be the process that it would
23    undertake the staff to move an inmate into a safety
24    cell?
25             A   In Mr. Moriarty's case?
```

Lois Guillory  8/14/2018

1           Q   Yeah.   Logistically, what would have to

2    happen?

3           A   With him verbalizing that he was going to

4    kill someone, it would have been possibly use of force

5    taking him out.

6           Q   In addition to the actual physical

7    movement of Mr. Moriarty, which in your estimation --

8    based on your interaction with Mr. Moriarty, did you

9    anticipate that would have to be an extraction type of

10   situation based on his demeanor?

11          MR. WELSH:   Lacks foundation, calls for

12   speculation.

13          THE WITNESS:   Yes.

14   BY MR. MORRIS:

15          Q   In addition to the extraction of

16   Mr. Moriarty from his cell, what paperwork would then

17   accompany the extraction and the transfer?

18          A   First, the use of force paperwork.

19          Q   Right.

20          A   Safety cell paperwork.

21          Q   Anything else?  Extraction paperwork, use

22   of force paperwork and the safety cell placement

23   paperwork.  Anything else?

24          A   That I can think of right now, no, just

25   those two.

Lois Guillory  8/14/2018

1          Q   How did you have this communication with

2   Sergeant Weidenthaler?   Was it face to face, over the

3   phone, how did that go down?

4          A   Over the phone.

5          Q   Where were you calling from?

6          A   The psych office.

7          Q   What number did you call where

8   Weidenthaler picked up?   What office were you calling

9   to?

10          A   The processing sergeant's office.

11          Q   Sergeant Weidenthaler, is he a member of

12   the processing office?

13          A   There's usually two sergeants on duty, one

14   is processing, one is a security sergeant.  I'm not

15   sure which one Sergeant Weidenthaler was that day.  All

16   I know is he answered the phone.

17          Q   When Sergeant Weidenthaler rejected the

18   request, how did you react to that?

19          A   I was shocked.  Shocked.

20          Q   Had that ever happened to you before where

21   a recommendation from a psych medical staff was

22   rejected -- a medical recommendation for safety housing

23   is rejected by sworn staff?

24          A   Not me personally, no.

25          Q   Have you heard of that happening in the

Lois Guillory  8/14/2018

1    past?

2              A  Yes.

3              Q  Should that happen?

4                 MR. KUTYLA:  Objection, calls for

5    speculation.

6                 MR. HARRISON:  Lacks foundation.

7    BY MR. MORRIS:

8              Q  Should sworn staff be rejecting

9    recommendations for housing made by psych staff, ma'am?

10                MR. WELSH:  Incomplete hypothetical, calls

11   for speculation, vague and ambiguous.

12                MR. KUTYLA:  It really does call for some

13   clarity as to what facts you are asking for her to

14   assume.  It's an incomplete hypothetical, it misstates

15   her testimony.

16                THE WITNESS:  I'd say no.

17   BY MR. MORRIS:

18             Q  Do you know if Sergeant Weidenthaler was

19   aware of all the previous interactions and incidents

20   regarding Mr. Moriarty in those four days that you had

21   been interacting with him?

22                MR. WELSH:  Calls for speculation,

23   misstates her testimony.

24                MR. MORRIS:  I asked do you know.

25             Q  Do you know if he had?

Lois Guillory  8/14/2018

1          A   No, I do not know.

2          Q   Did you take the opportunity to advocate

3     on behalf of Nurse Daniels' recommendation?   Did you

4     push back at all on Sergeant Weidenthaler?

5          A   No.

6          Q   Can you tell us why not?

7          A   He was my sergeant, chain of command.

8          Q   Was Nurse Daniels present in the room when

9     you had this interaction with Sergeant Weidenthaler?

10         A   Yes.

11         Q   When you got off the phone with Sergeant

12    Weidenthaler, can you tell me about the communication

13    you had with Nurse Daniels?

14         A   I hung up the phone and I sid, "He said

15    no."

16         Q   How did she react?

17         A   She wasn't happy.   It's happened before.

18         Q   Did it happen before to her?

19         A   I'm not sure to her.   We've discussed it

20    in the past.   It's happened to other deputies and other

21    providers.   She knew about it.

22         Q   Did she say, "This is happening to me

23    again," or anything like that?

24         A   No, I don't recall that.

25         Q   Did you tell her you're aware that you

Lois Guillory  8/14/2018

1   heard that happening to other psych providers as

2   well?

3           A   Yes.

4           Q   Can you tell me about that conversation

5   you had with Nurse Daniels about that part of the

6   conversation?

7           A   Just neither one of us was happy.

8           Q   Anything else you can remember about that

9   communication between you and Nurse Daniels after your

10  communication with Sergeant Weidenthaler?

11          A   I don't remember right now, no.

12          Q   At any time did you go over Sergeant

13  Weidenthaler's head, like before your MDG meeting, did

14  you say, hey, if he's not going to do it I'm going to

15  go to the lieutenant or the captain, anything like

16  that?

17          A   No.   Chain of command.

18          Q   You felt like you needed to follow your

19  chain of command?

20          A   Yes.

21          Q   How long after this interaction with

22  Weidenthaler and Nurse Daniels did you then attend the

23  MDG meeting?

24          A   Maybe a half hour, forty minutes, if even

25  that.

Lois Guillory  8/14/2018

1          Q  We already discussed who was at the

2   meeting.  Can you tell me the substance of what you can

3   recall as far as what was communicated or stated

4   regarding Mr. Moriarty inside the MDG meeting?

5          A  Can you repeat it, please?

6          Q  Sure.  Can you tell me what you recall as

7   far as the discussion related to Mr. Moriarty that took

8   place at the MDG meeting?

9          A  I remember Dr. Goldstein being there.  I

10  can't remember -- normally in the previous MDG

11  meetings, the providers' notes will be on the screen.

12  I don't remember if Mr. Mortiarty's notes from Dr.

13  Lissaur or Amanda were on the screen so everyone can

14  see.

15          They discussed -- between Dr. Goldstein

16  and Amanda, they discussed Mr. Mortiarty's issues,

17  about him being prescribed medication, refusing, his

18  agreeing to take the medication again.  I can't

19  remember other than that right now.

20          Q  Dr. Goldstein in his deposition testified

21  that he raised the issue of potential placement in the

22  PSU at that meeting.  Do you recall anything like

23  that?

24          A  He mentioned the fact about what about

25  sending Mr. Moriarty to PSU.  I remember that.

Lois Guillory  8/14/2018

1          Q   What, if anything, do you recall anybody

2     in that meeting saying as far as moving Mr. Moriarty to

3     PSU?

4          A   Just Dr. Goldstein talking about it.   Him

5     and Amanda agreeing that he is willing to take his

6     medication.   Basically, they were going to leave him at

7     the jail.

8          Q   In the disciplinary cell?

9          A   Just at the jail.   They didn't make any --

10    in the jail, basically ad seg, until his medication

11    took effect.

12         Q   At that meeting did Dr. Daniels at all

13    voice her previous --

14              MR. WELSH:   You said Dr. Daniels.   It gets

15    mixed up when we have Dr. Goldstein in the same

16    setting.

17    BY MR. MORRIS:

18         Q   I totally agree.   In that meeting did

19    Nurse Daniels, did she ever voice her earlier

20    recommendation that Mr. Moriarty be moved to a safety

21    cell?

22         A   I don't recall.

23         Q   Was Sergeant Weidenthaler at that

24    meeting?

25         A   No.

Lois Guillory  8/14/2018

1         Q  Did you ever stand up and say, "Nurse

2    Daniels has recommended that if we're going to leave

3    him here we have to put him in a safety cell," anything

4    like that?

5         A  No.

6         Q  Can you tell me why you didn't at that

7    meeting say, "We've already recommended he be moved to

8    a safety cell.  If he's going to stay here, he should

9    be in a safety cell"?

10        A  I'm a deputy.  I'm not the medical

11    provider, I'm not the supervisor.

12        Q  Did you consider at any time stepping up

13    and voicing that opinion?  Or you thought I'm just a

14    deputy, I can't say that?

15        A  Not at that time I did not, no.

16        Q  Did you ever ask Nurse Daniels how come

17    she didn't step up and say, "Hey, I've already

18    recommended safety cell placement for this guy.  If

19    he's going to stay here, he needs to be safety cell"?

20            MS. HARDISTY:  Objection, assumes facts

21    not in evidence, misstates testimony.  She said she

22    didn't recall if that conversation came up or if it

23    didn't.

24    BY MR. MORRIS:

25        Q  Fair enough.  At any time did you follow

Lois Guillory  8/14/2018

1    **up with Nurse Daniels as to whether or not -- as to**

2    **what she did or didn't say at that meeting?**

3                 MR. WELSH:  Vague and ambiguous.

4                 THE WITNESS:  The day of that meeting?

5    BY MR. MORRIS:

6         **Q  Yeah.**

7         A  During the meeting, why I didn't say

8    something to her about it?

9         **Q  I understand why you wouldn't say that in**

10   **the middle of the meeting.  After the meeting**

11   **adjourned, did you ever say, "Hey, how come you didn't**

12   **step up and say Mr. Moriarty needs to be a safety**

13   **cell"?**

14                MS. HARDISTY:  Same objections.

15                THE WITNESS:  Because --

16   BY MR. MORRIS:

17        **Q  Did you?**

18        A  I'm trying to think if I did.  I don't

19   think I did at all.  I really don't think I did.

20        Q  How about after, in the aftermath of his

21   death or anything, did you and Nurse Daniels ever sit

22   down and say, "Oh, man, we should have stepped up in

23   the meeting and we should have said something, we

24   should have told them that we recommended a safety cell

25   at that meeting," anything like that?

Lois Guillory  8/14/2018

1          MS. HARDISTY:  I want to object that it

2     calls for speculation as to Nurse Daniels because she's

3     not here to explain that.

4     BY MR. MORRIS:

5          Q  Did you and Nurse Daniels ever sit down

6     after the meeting had adjourned, after Mr. Mortiarty

7     had already died, did you ever sit down with Nurse

8     Daniels and kind of rehash what you did or didn't do

9     and say, "One of us should have stepped up in that

10    meeting and said he needs to be a safety cell"?

11         A  I believe we talked about it after the

12    fact, yes.  What's happened in the past is they say no

13    to a provider.  The provider can't go move the inmate

14    to a safety cell.  We've talked about it.

15         Q  Can you tell me what you can recall about

16    those discussions between you and Nurse Daniels about

17    coulda, shoulda, woulda kind of discussions you had

18    after Mr. Mortiarty had died?

19         A  Should I talk to you about it, you said?

20    Can I tell you?

21         Q  Tell me about it, what you recall.

22         A  That we both felt bad about it.  Just felt

23    bad.  She comforted me and I comforted her.  He should

24    have been in a safety cell.

25         Q  Did you feel like you could have done

Lois Guillory  8/14/2018

1    more?

2              MR. WELSH:  Vague and ambiguous.

3              THE WITNESS:  No.  If I would have stood

4    up in the meeting, I don't know if that would have made

5    a difference or not.

6    BY MR. MORRIS:

7         Q   Did Nurse Daniels ever express to you she

8    felt she could have done something different?

9         A   No, I don't think she did.

10        Q   What, if anything, do you recall Captain

11   Schroeder saying about Moriarty in that meeting?  Did

12   he weigh in at all on the decision?

13        A   I don't think he did, no.

14        Q   How about Lieutenant Mitchell, do you

15   remember what, if anything, Lieutenant Mitchell may

16   have said in the meeting regarding Mr. Mortiarty's

17   placement?

18        A   Neither one of them -- as a group,

19   basically said he can stay at the jail, continue his

20   medication.

21        Q   Would you say that was the overall

22   unanimous decision as far as at least what was voiced

23   at the meeting, that everybody was in agreement?  Or

24   did anybody voice disagreement about his staying at the

25   jail?

Lois Guillory  8/14/2018

```
1                    MR. WELSH:  Compound, calls for
2     speculation, vague and ambiguous.
3                    THE WITNESS:  I don't think anyone said
4     anything besides that, basically, he could just stay.
5     BY MR. MORRIS:
6             Q   Was his being 5150 in the event he was
7     released, was that discussed at the meeting?
8             A   I believe it was.
9             Q   Who raised that issue, if you can
10    recall?
11            A   I don't recall, but I believe it was
12    mentioned.
13            Q   Was the decision made that if, in fact, he
14    were released that the jail was going to 5150 him?
15            A   Yes.
16                   MR. WELSH:  Calls for speculation,
17    incomplete hypothetical.
18    BY MR. MORRIS:
19            Q   In the meeting were any of the bizarre
20    incidents that we've discussed here today, the standing
21    in the toilet, all the stuff that we've talked about,
22    stuff that happened in the field, stuff that happened
23    in the jail, were those incidents discussed as a group,
24    any of his behaviors?
25                   MR. WELSH:  Compound, vague and ambiguous.
```

Lois Guillory  8/14/2018

1           THE WITNESS:  I don't remember.

2     BY MR. MORRIS:

3           Q   How about the use of force, either taking

4     him off the bus or the night before, the early morning

5     hours before May 31, was the use of force discussed?

6           A   At the meeting you are asking?

7           Q   Yes.

8           A   I don't think so.

9           Q   Do you recall any discussions that you had

10    with Nurse Daniels during the rest of your shift on May

11    31, 2016, regarding Mr. Moriarty?

12          A   Just we finished -- we had other patients

13    to see, we just finished our sick call.  After the

14    meeting, we finished our sick call.  I don't recall.

15    I'm sure we probably -- I mean, we're still upset about

16    it but there was nothing we could do.  Other than that,

17    I don't recall anything else.

18          Q   I forgot to ask you this.  During the

19    meeting was the word safety cell used in relation to

20    Mr. Moriarty, used by anybody?

21              MR. WELSH:  Asked and answered, calls for

22    speculation.

23              THE WITNESS:  I don't remember.

24              MR. WELSH:  Can I ask you something?  I'm

25    trying to get Captain Schroeder and Lieutenant Mitchell

Lois Guillory  8/14/2018

1    out.  Dani said you needed to get from Deputy Guillory

2    information on them before you could dismiss them.

3              You are suing them for going against

4    recommendations of the medical staff and the mental

5    health staff.  I don't think they did.  Do you have

6    enough now?  If there's anything more you need, we

7    should get it now.

8    BY MR. MORRIS:

9         **Q  Let's focus on Lieutenant Mitchell for a**

10   **minute.  You testified earlier that the decision to**

11   **keep Mr. Moriarty at the jail was a consensus or a**

12   **unanimous decision of everybody who was there, what**

13   **they voiced.  Was that your testimony?  I don't want to**

14   **misstate it.**

15        A  Yes, after Dr. Goldstein and Amanda, Nurse

16   Practitioner Daniels told everyone the decision, yes.

17        Q  I want to make sure I understand.  Amanda,

18   I imagine, led the discussion related to Mr. Moriarty

19   talking about her interaction with him, I imagine, at

20   this meeting?

21        A  Both Dr. Goldstein and Nurse Practitioner

22   Daniels.

23        Q  Dr. Goldstein as sort of the elder

24   statesman looking at the paperwork asking Amanda

25   questions, I imagine?

Lois Guillory  8/14/2018

1            A  Yes.

2                MS. HARDISTY:  Can you speak up?  I didn't

3     hear the last answer.

4                THE WITNESS:  Sorry.

5     BY MR. MORRIS:

6            Q  Dr. Goldstein was sort of looking at the

7     paperwork asking Amanda questions, Amanda explaining

8     her interaction with Mr. Moriarty?

9            A  Yes.

10           Q  He raised the issue of moving him to PSU.

11    Amanda's response was, "He agreed to take his meds,

12    let's leave him here"?

13           A  Something to that effect, yes.

14           Q  In that interaction between Goldstein and

15    Amanda, was the issue of safety cell raised by either

16    Goldstein or Amanda?

17                MR. WELSH:  You don't have to answer that.

18    You've already asked her two different ways if the

19    issue of the safety cell was raised.  If you have

20    anything different to add to your last answer, you can

21    add it.  He's already asked you that question twice,

22    you've answered it twice.

23                MR. MORRIS:  At your behest, I'm trying to

24    get to that.

25                MR. WELSH:  Don't do it at my behest.  You

Lois Guillory  8/14/2018

1   are asking the question for a third time.  I know

2   exactly what you are doing.  You don't have to answer

3   that question unless you have something you want to add

4   to what you said last time.

5              THE WITNESS:  I don't remember.

6   BY MR. MORRIS:

7          Q  You don't remember that?

8          A  No, I don't.

9          Q  When the discussion turned to the group,

10  what, in particular, do you recall Lieutenant Mitchell

11  saying?

12         A  Honestly, nothing at all.

13         Q  Do you know if he said anything?  Was this

14  the kind of thing in the meeting where everybody has a

15  say, we go around the table and everybody weighs in?

16  Or is it just the kind of thing where a decision is

17  reached, if anybody objects, they step up?  What's the

18  typical dynamic of that meeting?

19         A  They can speak up.  I don't recall him

20  speaking up at all in the meeting.

21         Q  Sometimes you've been in meetings, right,

22  where it's a round table, like this, and everybody goes

23  around and says, "Agreed, agreed, agreed"?  Or is this

24  a meeting where it's discussed and if somebody has an

25  objection they feel strongly enough about, they speak

Lois Guillory  8/14/2018

1    up?  What's the dynamic in that MDG meeting?

2            A  Pretty much we sit and listen to the

3    provider and Dr. Goldstein.  Normally, if we have

4    something to say, myself, the deputy or supervisors,

5    they would say it.

6            Q  If you don't feel compelled to get up and

7    voice a strong opinion, it just moves onto the next

8    topic?

9            A  Yes.

10            Q  In that situation, did Lieutenant Mitchell

11    voice any opinion, right, wrong, indifferent, stay in

12    the safety cell, move to PSU, anything at all that you

13    recall Lieutenant Mitchell saying?

14            A  No, I don't.

15            Q  Captain Schroeder, do you recall what, if

16    anything, Captain Schroeder said as far as we need to

17    keep him here, we should move him, anything like

18    that?

19            A  No.

20            Q  I'll show you this Nurse Daniels chart.

21    This is Exhibit Number 13.  You've had a chance to look

22    at Exhibit 13, ma'am?

23            (Exhibit 13 was marked.)

24            A  Yes.

25            Q  Nurse Daniels' note, right?

Lois Guillory  8/14/2018

1          A  Yes.

2              Q  In this note she details, in fact, about

3  halfway down the first paragraph, has feet in the

4  toilet.  See over here?

5          A  Yes.

6          Q  See that?

7          A  Yes.

8          Q  Confirms what you had recollected, that

9  this was the time he was standing with his feet in the

10  toilet, right?

11          A  Yes.

12          Q  She writes, "States he needs to be in

13  solitary confinement, that he will kill someone if they

14  come into his cell tonight.  States he has been

15  agitated and banging in his cell.  Reports racing

16  thoughts, not sleeping times twelve days and denies

17  suicidal ideation."

18              This would fit the criteria under both

19  5150 and EOH for harm to others, right?  He voiced he's

20  going to kill somebody if they come in.

21          A  Yes.

22              MR. WELSH:  Lacks foundation.

23  BY MR. MORRIS:

24          Q  If he's banging and not sleeping, that's

25  potential harm to himself, right, and harm to

Peterson Reporting Video & Litigation Services                180

Lois Guillory  8/14/2018

1       property?

2               A  Yes.

3               Q  Then we skip down where it says under MSE,

4       which is -- Bob, help me out.

5                    MR. HARRISON:   Mental status examination.

6       BY MR. MORRIS:

7               Q  Mental status examination.  It says, "Mood

8       is anxious, affect is congruent with mood.  Thought

9       process is linear, coherent, goal directed.  Denies

10      suicidal ideation, denies homicidal ideation."

11                   Did you ever have any discussions with

12      Nurse Daniels related to her characterizations of him

13      not having homicidal ideation but he's quoted as

14      saying, "I'm going to kill somebody if they come into

15      my cell"?  Is there a difference there that I'm not

16      aware of?

17                   MS. HARDISTY:  What's the question?

18      BY MR. MORRIS:

19              Q  Did you have any discussions with Nurse

20      Daniels related to this?

21                   MR. WELSH:  First of all, calls for

22      speculation.  It assumes that you saw this note at the

23      time.  Did you see this?

24                   THE WITNESS:  That day?

25                   MR. WELSH:  Yes.

Lois Guillory  8/14/2018

```
1   BY MR. MORRIS:
2           Q  I realize you wouldn't have seen it that
3   day.  Have you ever had any discussions with Nurse
4   Daniels about what she meant by denies homicidal
5   ideation but is quoted above as saying he was going to
6   kill somebody if they come into his cell?
7           A  No, I haven't.
8           Q  Is stating that he will kill someone if
9   they come into his cell, does that fit the definition
10  of homicidal ideation in your mind?
11              MS. HARDISTY:  Objection, calls for
12  speculation, calls for an expert opinion.  I think
13  Nurse Daniels is probably the perfect person to ask
14  this question.  You can answer.
15              THE WITNESS:  Yes.
16  BY MR. MORRIS:
17          Q  Under plan it reads, "Continue current
18  meds.  Please offer this morning as inmate --" is that
19  what that says, "please offer"?
20          A  Yes.
21          Q  "Please offer this morning as inmate
22  states he will take them.  Discussed safety cell
23  placement for homicidal ideation with deputy, who in
24  turn spoke to sergeant."  The deputy would have been
25  you, right?
```

Lois Guillory  8/14/2018

1        A  Yes.

2        Q  "Decision was made to continue in current

3   housing.  Psych to follow up in AM."  That sort of

4   references the discussion that we've had here today

5   with respect to your discussion with Sergeant

6   Weidenthaler, true?

7        A  Yes.

8        Q  You pointed out something.

9        A  I was thinking maybe it was something she

10  did by mistake, denying homicidal.  I'm just assuming.

11       Q  She says down here, "Spoke with him

12  because of homicidal ideation" and she details the

13  homicidal ideation.  It may have been a typo.

14          Tell me when was the first time you

15  learned that Heron Mortiarty had died?

16       A  When I got the text from Johnson around

17  midnight sometime.

18       Q  We talked about that text.  You no longer

19  have access to that text.  I've talked to you about

20  what you recall about the text.  Your impression, just

21  to characterize, so we can skip this part, it was a

22  hey, this is what happened kind of text, right?

23       A  Yes.

24       Q  No indication that anybody had made a

25  mistake or was at fault in that text?

Lois Guillory  8/14/2018

1           A  Yes.

2           **Q  In this one --**

3               MR. WELSH:  We've been told it's Nurse

4    Daniels.  We're deducing that from the context.  It

5    just has a giraffe symbol instead of a name.

6    BY MR. MORRIS:

7           **Q  It says, "Sorry for the lateness.  Just**

8    **heads up.  Moriarty killed himself tonight.  You saw**

9    **him today?"  Answer was, "Yes.  How?"  Answer: "He**

10   **stuffed his thirty down his throat and choked."  Is**

11   **thirty, that's not like a jail slang for t-shirt,**

12   **right?**

13          A  No.  I think it's misspelled.

14          **Q  You know now that he stuffed his t-shirt**

15   **down his throat, right?**

16          A  Uh-huh.

17          **Q  Yes?**

18          A  Yes, I do.

19          **Q  Then it says, "I heard you had recommended**

20   **safety cell but were overruled?"  Then she writes back,**

21   **"Oh, my God.  Thank you for letting me know.  Yes.  I**

22   **asked but sergeant said no.  He denied SI."**

23              **The sergeant, we know in this case, is**

24   **Sergeant Weidenthaler, right?**

25          A  Yes.

Lois Guillory  8/14/2018

1          Q  Then he writes, "This was Nishimoto all

2  over again."  Do you know what Deputy Johnson is

3  referring to when he says, "This was Nishimoto all over

4  again"?

5                MR. WELSH:  Calls for speculation.

6                THE WITNESS:  No, just that another inmate

7  had committed suicide.  That's all I know.

8  BY MR. MORRIS:

9          Q  Did you have any involvement in the

10  Nishimoto case at all?

11          A  No.

12          Q  Had the Nishimoto case been discussed

13  between you and Johnson and Daniels?

14          A  No.

15          Q  She writes, "I feel sick."

16                MR. HARRISON:  Do you know who wrote that?

17                MR. MORRIS:  This is Daniels' symbol.

18                MR. HARRISON:  The other ones had the

19  giraffe symbol.  This one is different.

20                MR. MORRIS:  No, they all have the giraffe

21  symbol on mine.

22                MR. HARRISON:  11:47, "I feel sick."

23  BY MR. MORRIS:

24          Q  Does that indicate to you a different --

25  is that little crescent moon, is that a symbol you

Lois Guillory  8/14/2018

1      used?

2                    A   No.

3                    MR. WELSH:   Looks like the bottom section

4      of the giraffe is cut off.   There's something on top.

5                    MR. MORRIS:   Looks like maybe a hole

6      punch.   That's what it looks like to me, a hole punch

7      in the giraffe.

8                    Q   Then he talks about -- Deputy Johnson

9      writes, "Yea, apparently he ate his shirt, but you

10     could see--"   I imagine it's "couldn't see anything

11     when they are under those two thick blankets.   It looks

12     bad cause tiger had already set it."   He corrected to

13     rigormortis.

14                   Did you know -- anybody tell you that by

15     the time they pulled Moriarty out of there, he already

16     had rigor?

17                   A   No, except for maybe Johnson.   That's the

18     only person I heard it from, I believe.

19                   Q   Reviewing any of the information that you

20     have, did you see any indication of how long Mortiarty

21     had been dead by the time they got him out?

22                   A   I didn't know.   I don't know.

23                   Q   You don't have a particular scientific

24     background to determine, based on things such as

25     temperature of the room and those kind of things, how

Lois Guillory  8/14/2018

1  long it would take to have rigor mortis set in on Mr.

2  Moriarty, I imagine?

3          A  No, I don't.

4          Q  She writes, "Oh, my God."  Then Johnson

5  writes, "Yea, this one is going to cost the county."

6  Do you see that?

7          A  Yes.

8          Q  Did you ever have any discussions with

9  Johnson relating to potential legal exposure for the

10  county, as referenced in this text message?

11          A  Not in this text message.  I'm sure we

12  talked about it after the fact about it's going to cost

13  money.

14          Q  Did you ever have any discussion to that

15  effect with Nurse Daniels?

16          A  Probably.  I don't recall, but probably,

17  we probably have.  Any particular day I don't remember

18  or what was said.

19          Q  Nurse Daniels writes something I found

20  curious.  In the second one she writes, "Do you have

21  access to my note?  Can you print it?  I put safety

22  cell was discussed.  I don't want someone getting rid

23  of it."

24          Have you ever heard of a history of

25  somebody changing encounter notes or ISRs to protect

Lois Guillory  8/14/2018

1   the county, anything like that?   Any discussion of that

2   at all that you're aware of?

3           A   Yes, I've heard it.

4           Q   Have you ever had that experience

5   yourself, where something you've written has gone --

6   somebody has gone in and changed it?

7           A   Myself, no, not to myself.

8           Q   Have you ever had specific factual

9   background where you heard that that's been discussed,

10  you looked into it and found out, oh, my gosh, yes,

11  somebody did change it?

12          A   Not in fact, no, nothing that I saw or

13  someone told me it was true or not, no.

14          Q   Just so I can button this up.  You've

15  heard this issue discussed, right, hey, my note was

16  changed, something like that?

17          A   With them, no.  What do you mean?

18          Q   Just generally?   Not in this context.

19  Have you heard it discussed where people talk as a

20  topic of discussion about notes being changed?

21                MR. WELSH:   Vague and ambiguous.

22                THE WITNESS:   I've heard it.

23  BY MR. MORRIS:

24          Q   In those discussions, was it somebody

25  speaking in the first person, like, "My note was

Lois Guillory  8/14/2018

1    changed," or is it somebody just speaking about rumors

2    about notes being changed?

3           A   Speaking about rumors.

4           Q   Have you ever seen any documentary

5    evidence, where somebody said, "Hey, look, this is my

6    note and this is what's in JIMS," anything like that?

7           A   No.

8           Q   Was the changing of notes that you heard

9    discussed, was that in the context of psych

10   providers?

11          A   Myself, Johnson and psych providers, yes.

12          Q   Did you ever hear any discussion related

13   to the Nishimoto case where there was an allegation

14   that records may have been changed after the fact

15   related to the availability of MOB beds, anything like

16   that?

17          A   If I heard discussion?

18          Q   Yeah.

19              MS. HARDISTY:   To the extent that we're

20   going to get into specific questions in the Nishimoto

21   case, I request you bring her back --

22              MR. MORRIS:   We're not going to bring her

23   back.  I'm entitled to this information.  The county

24   will assist her.

25          Q   Have you ever heard that topic discussed

Lois Guillory  8/14/2018

1    with respect to Nishimoto, that there was an allegation

2    that there was a count of MOB beds that had been

3    doctored after the fact?

4                    MR. WELSH:   Vague and ambiguous.

5                    THE WITNESS:   I recall something, yes, not

6    fully, but I recall something.

7    BY MR. MORRIS:

8            Q   Did you have that discussion with -- do

9    you recall who you had that discussion with?

10                   MR. WELSH:   Which discussion?

11                   MR. MORRIS:   Related to Nishimoto and the

12   allegation that records had been changed after the

13   fact.

14                   MS. HARDISTY:   I'm just going to make a

15   record.  To the extent that you are asking questions

16   about Nishimoto, I think it's totally improper to ask

17   these questions without counsel here.  I understand

18   that you are entitled to ask these questions.  I also

19   don't think that it's relevant to the Moriarty case.  I

20   think that it's objectionable that Mr. Kish and Anne

21   Brantman aren't present for your questioning.  That's

22   my objection.  You can answer.

23                   MR. WELSH:   It's also assuming that she

24   was having that discussion, which was not her

25   testimony.

Lois Guillory  8/14/2018

1    BY MR. MORRIS:

2            Q  With whom --

3            A  I don't remember.  I honestly don't.

4            Q  Outside of Nishimoto, had you ever heard

5    of any other allegations related to the changing of

6    notes after the fact?

7            A  No.

8            Q  Safe to say then that this text reference

9    to somebody getting rid of it and the allegation in

10   Nishimoto, those are the two things that you can recall

11   as far as allegations being raised that records had

12   been changed?

13              MR. WELSH:  This is not an allegation that

14   a record had been changed.

15   BY MR. MORRIS:

16           Q  Fair enough.  Those are the only two

17   references, true?

18           A  That I can remember.

19           Q  He writes, Deputy Johnson, "I can't right

20   now.  I'll talk to Jeanette."  Do you know the Jeanette

21   he's referring to?

22           A  Yes.

23           Q  Who is that?

24           A  Medical records clerk.

25           Q  What's her last name?

Lois Guillory  8/14/2018

 1            A  Warner.

 2            Q  Deputy Johnson writes in the second

 3   entries there, "I read the whole history with this guy.

 4   He was supposed to go into a safety cell at CJ.  But

 5   they were full that Thursday night so he was brought

 6   here to VDF.  And I don't know why he never went into

 7   the safety cell or at least EOH."

 8            Was this the first -- you weren't on this

 9   text chain, right?

10            A  I don't believe, no.

11            Q  When was the first time you remember

12   learning that Mr. Moriarty was sent up from Central to

13   be put into a safety cell?

14            A  Talking with Deputy Johnson.

15            Q  When?  This happened the evening of May

16   31st after you went home.

17            A  I don't recall if it was that night or the

18   next day that I worked, because he worked a lot of

19   overtime as well.  I just know we discussed it after.

20            Q  Did you ever say anything to Sergeant

21   Weidenthaler about his decision?

22            A  Like what do you mean?

23            Q  "Look what happened," anything like

24   that?

25            A  No, I haven't spoken to him, except

Lois Guillory  8/14/2018

```
 1    professionally, "Hi Sarge" when he was still there.  I
 2    never said anything else to him.
 3              Q  Did Sergeant Weidenthaler ever ask you if
 4    Mortiarty had ever denied suicidal ideation?
 5              A  No.
 6              Q  Down at the bottom of the page, the last
 7    entry from Deputy Johnson, he writes, "Try to have a
 8    nice day.  Don't worry, as usual everyone else dropped
 9    the ball not you."
10              Was this a typical conversation that you
11    guys would have, where there was an as usual ball
12    dropping?  Do you know what he's referring to there?
13              MR. WELSH:  Calls for speculation, vague
14    and ambiguous.
15              MR. KUTYLA:  This is a text message
16    between people other than the witness.  You are asking
17    the witness a conversation which she knows nothing
18    about.  It's a mangled question, vague and ambiguous.
19              MR. WELSH:  Assumes facts not in evidence.
20    BY MR. MORRIS:
21              Q  You can answer.
22              MR. KUTYLA:  I don't think she
23    understands.
24              MR. MORRIS:  I think she does.
25              THE WITNESS:  That night, no.
```

Lois Guillory  8/14/2018

1     BY MR. MORRIS:

2              Q   Have you had any other discussions with

3     Deputy Johnson where it was discussed amongst you guys

4     that, per usual, everyone else has dropped the ball?

5              A   Like I said, they'd override providers in

6     the past, other supervisors.   Of course we discussed

7     it.   We were both psych deputies.

8              Q   The next page, on SDSO 1044, two-thirds of

9     the way down, there's an entry regarding EOH where

10    Deputy Johnson writes, "EOH is a good thing but they

11    have to use it.   There was no reason he should have not

12    gone in, I was working when he was brought in and they

13    stuck into S5."

14                  Did you have any discussions with Deputy

15    Johnson about the propriety of sticking Moriarty into

16    S5, the disciplinary unit?

17             A   I probably did, but I don't remember the

18    conversation.

19             Q   As you sit here today, can you recall any

20    opinion that Deputy Johnson may have voiced about the

21    propriety of sticking Moriarty into S5?

22             A   No.   Basically, why he shouldn't have been

23    placed in EOH, why S5.   I don't know why S5.

24             Q   You don't think S5 was the right place for

25    him, do you?

Lois Guillory  8/14/2018

```
 1                    MR. WELSH:  Incomplete hypothetical, calls

 2      for speculation, seeks opinion testimony of a lay

 3      witness.

 4                    MR. KUTYLA:  Vague as to time, incomplete

 5      hypothetical.

 6                    THE WITNESS:  I didn't know anything about

 7      Mr. Moriarty until all this happened.  I don't know if

 8      S5 was a good place or not.

 9      BY MR. MORRIS:

10           Q  In retrospect, you know it's not a good

11      place for him, right?

12                    MR. WELSH:  Don't answer that.  I'm

13      instructing you not to answer.  It's argumentative.

14      BY MR. MORRIS:

15           Q  Do you think S5 was an appropriate

16      placement for Mr. Moriarty at any time?

17                    MR. KUTYLA:  Objection, rephrasing of a

18      prior bad question.  Argumentative.

19                    MR. MORRIS:  I can ask argumentative

20      questions.

21           Q  Do you think S5 was an appropriate

22      placement for Mr. Moriarty at any time?

23                    MR. WELSH:  Vague, ambiguous, calls for

24      speculation, lacks foundation, seeks opinion from a

25      layperson, incomplete hypothetical.
```

Lois Guillory  8/14/2018

1             THE WITNESS:   Myself and Deputy Angulo not

2    knowing the extent of Mr. Moriarty, I think he was --

3    at that time he was okay, it was the closest placement

4    in that cell.

5    BY MR. MORRIS:

6             Q   Placement in S5?

7             A   At that time we didn't know anything about

8    him.   I would say yes.

9             Q   At the time he was taken off the bus, you

10   don't have quibble with him being put into S5 then?

11            A   Because he was by himself, he wasn't

12   around any other inmates, yes.

13            Q   It says, "Who decided that?"   "Lieutenant

14   Banks and Sergeant Estrada."   Who are these people?

15   These are two new names.

16            A   From what I'm reading from this is that

17   this was the night he came in.   That afternoon is when

18   Deputy Angulo placed him in S5.   I'm not sure if they

19   were there that day at that time, Lieutenant Banks and

20   Sergeant Estrada.

21            Q   Lieutenant Banks and Sergeant Estrada are

22   correctional staff, right?

23            A   Yes.

24            Q   They worked day shift --

25            MR. WELSH:   Calls for speculation.

Lois Guillory  8/14/2018

1          Q   Lieutenant Banks was the watch commander

2   the night he was brought from Central to Vista?

3          A   Yes.

4          Q   Same with Sergeant Estrada?

5              MR. WELSH:   Calls for speculation.

6              THE WITNESS:   Yes, they were both there.

7              MR. WELSH:   Remember, you weren't working

8   that day.

9              THE WITNESS:   I know.

10             MR. WELSH:   You might not want to testify

11  who was there when you were not there.

12             MR. MORRIS:   If she knows.

13             MR. WELSH:   That would be a guess.

14  BY MR. MORRIS:

15         Q   I want to talk to you now about some of

16  the investigative follow-ups.   I know we talked about

17  what happened on May 31st, you were notified.   When was

18  the first time you were contacted by anybody to give a

19  statement regarding your interactions with

20  Mr. Moriarty?

21         A   July, I believe, I talked to homicide.

22         Q   That's when you gave the interview,

23  right?

24         A   Yes.

25         Q   Any other statements that you've given to

Lois Guillory  8/14/2018

1    anybody, outside the context of legal, that you have

2    given regarding this incident?

3             A   Outside of legal?

4             Q   Outside any discussions you may have had

5    with Mr. Welsh?

6             MR. WELSH:   Anything in my office, any

7    contacts, communications we have are attorney-client

8    privileged.  He's trying to say other than this

9    homicide detective or whoever it was that interviewed

10   you in July of 2016, if you've given other statements.

11   Go ahead and answer that.

12            THE WITNESS:   Just what we discussed

13   between Mr. Johnson and myself and Amanda, no one

14   else.

15   BY MR. MORRIS:

16            Q   I'm just talking more about a formal

17   setting, like when the investigator came and

18   interviewed you and put a recorder on the table and

19   recorded your statement.  Remember that in July?

20            A   Yes, that was for homicide.

21            Q   Correct.  Anything else like that where

22   somebody -- I know we are sitting here, you and me and

23   we're in a pretty formal setting here.  Anything other

24   than here and that one with homicide, have you given

25   any other formal statements related to this?

Lois Guillory  8/14/2018

```
 1            A   No.

 2            Q   Do you know what CLERG is?

 3            A   I've heard of them, yes.

 4            Q   Did you get a worksheet or a questionnaire

 5    from CLERG or from anybody related to CLERG asking

 6    about your interactions with Mr. Moriarty in this

 7    case?

 8            A   I don't think so.

 9            Q   Before I turn the time over to the other

10    attorneys in this case, I wanted to just follow up a

11    little bit more about this whole notion of the psych

12    recommendation getting overruled.  Approximately how

13    many times have you been aware that a psych

14    recommendation for housing has been overruled by sworn

15    staff?  In your best estimate, is it ten, less than

16    ten, more than ten?

17            A   Less than ten.

18            Q   More than five?

19                MR. WELSH:  Calls for speculation, vague

20    and ambiguous, incomplete hypothetical.

21                THE WITNESS:  Probably less than five.

22    BY MR. MORRIS:

23            Q   What's your best estimate of the number?

24    You can give me a range.

25                MR. WELSH:  Same objections.
```

Lois Guillory  8/14/2018

1              THE WITNESS:  Three to four.

2    BY MR. MORRIS:

3              Q   Has that happened during the time that you

4    were a psych liaison deputy, those three to four

5    incidents?

6              A   Yes.

7              Q   Were you directly involved in any of those

8    other three to four incidents like you were in this

9    one, were you the go-between or communicator?

10             A   Maybe two or three of those times.

11             Q   Was Sergeant Weidenthaler involved in any

12   of those other three to four times, that you are aware

13   of?

14             A   I don't remember.

15             Q   In your interview -- I forgot to ask you

16   about this.  In your interview you talked about after

17   the meeting that you had a communication with the

18   captain about psych getting overruled by sworn staff.

19   In your interview you said he agreed that that wasn't

20   appropriate.  Do you recall that communication you had

21   with the captain?

22             A   It was a week after the incident.  Amanda

23   and I talked to each other, we were upset.  I believe

24   the captain had came and spoke to her one day.  She

25   recommend that he come speak to me.  He came to the

Lois Guillory  8/14/2018

```
 1    office.   I pretty much voiced my opinion of providers

 2    being overruled by sworn staff.

 3              Q   What did the captain think about that?

 4                  MR. WELSH:   Calls for speculation.

 5                  THE WITNESS:   I don't exactly remember

 6    what he said or his words, and all that.

 7    BY MR. MORRIS:

 8              Q   He didn't think it should happen, right?

 9              A   I believe that's what it was.

10              Q   In those other incidents that you were

11    involved with, the two to three or the three to four

12    that you knew about, do you know if any of those were

13    raised to the captain like you did with respect to how

14    this happened to Mr. Moriarty?

15                  MR. WELSH:   Don't speculate.

16                  THE WITNESS:   No, I don't.

17    BY MR. MORRIS:

18              Q   Do you, in the two to three you were

19    directly involved with, did you raise that issue with

20    the captain like you did in this incident with

21    Mr. Moriarty?

22              A   No.

23              Q   Did any of those other incidents that

24    you've been aware of where the psych recommendation was

25    overruled by sworn staff, any of those result in death
```

Lois Guillory  8/14/2018

1    or injury?

2             A  No.

3             Q  In addition to the conversation you had

4    with the captain, did you have any conversations with

5    Ms. Felizardo or any other nursing supervisor related

6    to sworn staff overruling psych staff?

7             A  In the past, yes, I've talked to them

8    about it.

9             Q  Who have you spoken to?

10            A  The charge nurse that day.  If it was an

11   issue, I would have brought it up to them.

12            Q  To the best of your recollection, did

13   those occur prior to Mr. Moriarty?

14            A  Yes.

15            Q  When you had that communication with the

16   nursing staff, was everybody in agreement that that was

17   something that shouldn't happen?  When I say something

18   that shouldn't happen, I'm talking about psych staff

19   getting overruled by sworn staff for housing.

20                MR. WELSH:  Calls for speculation.

21                THE WITNESS:  Some would agree, some would

22   stay mum.

23   BY MR. MORRIS:

24            Q  I'm sorry?

25            A  Some would agree and some wouldn't say

Lois Guillory  8/14/2018

1   anything.

2              Q   Either some people were mum or some people

3   agreed?

4              A   Yes.

5              Q   Nobody disagreed?

6              A   That I can remember, no.

7              Q   Since Mr. Mortiarty's passing, have you

8   been aware of any briefings or line updates, or,

9   anything like that, policy updates, where it's been

10  made clear that sworn staff are not to overrule psych

11  staff when it comes to housing recommendations?

12             A   I haven't seen it, no.

13             Q   How about any policy changes at all

14  related to suicides, EOH, PSU, anything like that since

15  Mr. Mortiarty's passing in May of 2016?

16                 MR. WELSH:   Vague, overbroad.

17                 THE WITNESS:   I don't think anything.

18  BY MR. MORRIS:

19             Q   Prior to Mr. Mortiarty's passing, were you

20  made aware of this issue of the suicide rate in the San

21  Diego County jails as being an issue of discussion in

22  the media or within the county?

23             A   We heard about it, yes.

24             Q   Did you personally read any of the

25  reports, either in the San Diego Union Tribune or in

Lois Guillory  8/14/2018

1    **CDC's articles, regarding the suicide rates?**

2              A   Not to an extent, but yes.

3              Q   **Prior to Mr. Mortiarty's passing, did you**

4    **have an opinion as to whether or not the county was**

5    **doing everything it could to prevent suicides in the**

6    **jail?**

7              MR. WELSH:  Vague and ambiguous.

8              MR. MORRIS:  I'm not trying to cost you

9    your job.  I'm so sorry to make you do this, I really

10   am.

11             MS. HARDISTY:  Then don't.

12   BY MR. MORRIS:

13             Q   **Did you have an opinion, ma'am, as to**

14   **whether or not you felt the county was doing everything**

15   **it could to avoid suicides in the jail?**

16             MR. WELSH:  Vague and ambiguous.

17             THE WITNESS:  The best that we could, yes,

18   I felt.

19

20             MR. MORRIS:  Give me one minute.

21             MR. WELSH:  Chris, let's take a couple

22   minutes, then you can finish up and we'll move to the

23   next person.

24             (The proceedings were recessed at 3:41

25   p.m. and reconvened at 3:49 p.m.)

Lois Guillory  8/14/2018

```
1    BY MR. MORRIS:
2            Q  We were earlier looking at Exhibit 14,
3    which was the exchange of text messages between Deputy
4    Johnson and Nurse Daniels.  On page three of that he
5    makes reference to having read the full history.
6    Earlier in your deposition you were talking about some
7    people have access or know how to get into the system
8    to see some of the things that most people don't know
9    how to see.
10           Do you know what he's referring to as far
11   as what documents he would have been able to access to
12   see the whole history on this guy?  Did you ever talk
13   to him about what he saw?
14           MR. WELSH:  Don't guess or speculate.  If
15   there's a category of documents, you can tell him.
16           THE WITNESS:  He told me it was CAD.
17   BY MR. MORRIS:
18           Q  CAD?
19           A  C-A-D.  Something that patrol deputies do.
20   I want to say they type out their PCD, probable cause.
21   He was able to access that.
22           Q  Deputy Johnson knew how to get into CAD as
23   opposed to you and everyone else just really know how
24   to get into JIMS, right?
25           A  Yes.  We all can get into CAD if we know
```

Lois Guillory  8/14/2018

1   how to do it.

2                   MR. WELSH:  Just to be clear, she's

3   surmising.

4   BY MR. MORRIS:

5        Q   She talked to him.  She said that he told

6   her he got into CAD.

7        A   He actually told me he looked in CAD.  I

8   asked him how he saw that information and we didn't

9   know it.  He told me.

10       Q   Have you since been able to figure out how

11  to get into CAD?

12                  MR. WELSH:  It's already been asked and

13  answered.

14                  THE WITNESS:  I do know how to get into

15  CAD now.

16  BY MR. MORRIS:

17       Q   You do?

18       A   Yes.  Sorry.  I remember now.  Back then I

19  did not know.

20       Q   In your experience, is that atypical for

21  line deputies to know how to use CAD in your twenty

22  years in the jail?

23       A   That was the first I heard about CAD.  I'm

24  sure other people know.  The patrol deputies that come

25  to the jail first before they go out to the streets,

Lois Guillory  8/14/2018

1    I'm sure they showed other deputies how to do it.

2                    Q   Do you know in this case, based on

3    everything that you've read or seen in this case -- I

4    know your understanding was Mr. Moriarty was in intake,

5    then he was taken from intake onto the bus and from the

6    bus into S5.   Do you know if Mr. Moriarty ever actually

7    reached the classification level?   Was he ever

8    interviewed by a classification deputy?

9                    MR. WELSH:   Calls for speculation.

10                   THE WITNESS:   When I was looking through

11   his history, there's a note from classification, yes,

12   he was seen by class.

13   BY MR. MORRIS:

14                   Q   Do you know who that classification deputy

15   was in this case?

16                   A   I don't remember.   I think it was Durham

17   again, but I'm not sure.

18                   Q   Do you know where the classification

19   deputy had him assigned prior to him being put on the

20   bus for Central?

21                   MR. WELSH:   Assumes facts not in evidence.

22                   THE WITNESS:   No, I don't.

23                   MR. MORRIS:   That's all I have.   Thank

24   you.

25                   Anybody else?

Lois Guillory  8/14/2018

1          Q  I'm going to show this to you, just ask

2    you to familiarize yourself with that.

3               MR. WELSH:  Do you want to point out the

4    top paragraph on page two that you are going to ask

5    about?

6               MR. KUTYLA:  I didn't ask her to memorize

7    it.

8               THE WITNESS:  I'm ready whenever you

9    are.

10   BY MR. KUTYLA:

11          Q  As Mr. Welsh suggested, I'm interested in

12   the top paragraph on the second page.  I'm just going

13   to read this verbatim.  "Deputy Guillory called

14   Sergeant Weidenthaler and told him about the nurse's

15   recommendations.  Sergeant Weidenthaler said he was not

16   going to put Moriarty in the safety cell at that time."

17   Did I read that correctly?

18          A  On paper, yes.

19          Q  When the court reporter read back your

20   earlier answer, the answer was "No, not --"  To me,

21   sitting a few feet away, it sounded like you hadn't

22   finished your answer.  Is it true that Sergeant

23   Weidenthaler said to you on that day that his response

24   or his words were, "No, not now"?

25          A  Looking back and listening to the

Lois Guillory  8/14/2018

1    recording, his answer was, "No."  I don't know why I

2    said, "Not at this time."  I know in the recording I

3    said, "At that time."  At that time we talked, he said

4    no.

5              A little bit past that it said that I

6    said, "Not at this time."  My recollection, and I've

7    been going over and over, it was a, "No."  I don't know

8    why in this interview I said, "Not at this time."  When

9    that question is brought to any supervisor, it's either

10   a yes or no.  It's never not at this time.  I don't

11   know why I got that in my head.

12        Q  When you spoke to Sergeant Weidenthaler on

13   the phone, were you calling for him in particular or

14   were you calling the desk to talk to whoever was

15   answering?

16        A  I don't remember who was the processing

17   sergeant or security sergeant.  Normally someone from

18   housing, the security sergeant, handles that call.  I

19   don't recall if Sergeant Weidenthaler was processing,

20   meaning intake at the desk, or security.  I just know

21   he picked up the phone and I relayed the message to

22   him.

23        Q  Was he the watch commander at that time?

24        A  No, he was not.

25        Q  The watch commander, under these policies,

Lois Guillory  8/14/2018

1    is the person who makes the decision to transfer to a

2    safety cell, isn't that correct?

3              A  I'm not sure it's just the watch

4    commander.  I know my chain of command, I'm supposed to

5    let the sergeant know, who is supposed to let the

6    lieutenant know.  From my understanding, it's the

7    sergeant or the lieutenant.

8              Q  Do you recall at the time that you made

9    that phone call in which you spoke to Sergeant

10   Weidenthaler that Sergeant Weidenthaler was involved in

11   another cell extraction at that exact same time?

12              MR. WELSH:  Calls for speculation.

13              MS. HARDISTY:  Misstates testimony.

14              MR. MORRIS:  Lack of foundation, calls for

15   speculation, misstates testimony.

16              THE WITNESS:  I know there was an inmate

17   being cell extracted prior to us speaking to

18   Mr. Moriarty.  I don't know if Sergeant Weidenthaler

19   was on it or the other sergeant.  I do not know that.

20   I did not know that at the time because we were

21   interviewing Mr. Moriarty.

22   BY MR. KUTYLA:

23              Q  What do you recall about that other cell

24   extraction?

25              A  I remember the TAC team was called out.

Lois Guillory  8/14/2018

1    They were up there because he was refusing to do a

2    blood draw.  They got a court order on this inmate to

3    give a blood draw, so they were going to cell extract

4    him and then extract blood from him.

5              Q   Were you at all involved in sending your

6    request to the desk to have this cell extraction done

7    for the blood draw?

8              A   Was I?

9              MR. WELSH:  On this other inmate.

10             THE WITNESS:  Amanda spoke to this inmate

11   prior to speaking to Mr. Moriarty.  They were both on

12   our list that day to be seen.  She was trying to

13   convince -- I can't remember the inmate's name.  She

14   was trying to convince him to come out without being

15   forced out.

16             MR. WELSH:  Don't use the inmate's name

17   if you remember it.

18             THE WITNESS:  We were there to try to

19   convince him to come out without being force used on

20   him, I believe.

21   BY MR. KUTYLA:

22             Q   That interaction with the other inmate,

23   did that occur at the same time that you were in the

24   vicinity of Mortiarty's cell for your assessment of Mr.

25   Moriarty with Amanda Daniels?

Lois Guillory  8/14/2018

1              MR. WELSH:  Vague and ambiguous.

2              THE WITNESS:  They took him out.  He

3    agreed to come out peacefully.  They took him out and

4    they escorted him out of the area.  So it was just

5    Amanda and I at the cell with Mr. Moriarty.

6    BY MR. KUTYLA:

7         Q  You are saying that the cell extraction of

8    the other inmate for the blood draw took place before

9    you and Amanda Daniels did this assessment of

10   Mr. Moriarty?

11        A  Yes.  That inmate first and then

12   Mr. Moriarty was second.

13        Q  Do you recall Dale Weidenthaler being

14   involved in that other cell extraction?

15             MR. WELSH:  Asked and answered.

16             THE WITNESS:  I don't recall who was the

17   sergeant on that side.  I don't remember that.  I just

18   know that I called and he answered the phone.  To my

19   knowledge, they were out in the sallyport putting this

20   person in the van.  That's all I know.

21             MR. WELSH:  You went past the question.

22   Just listen to the question and answer a straight

23   answer.

24   BY MR. KUTYLA:

25        Q  When you say "they" brought someone to the

Lois Guillory  8/14/2018

1   sallyport, you are saying that the other inmate who

2   needed this blood draw, at sometime after the blood

3   draw was taken out to the sallyport for transport, is

4   that correct?

5          A  Yes.

6          Q  Was it Dale Weidenthaler who was involved

7   in each phase of that extraction, blood draw and

8   transport to the sallyport, if you know?

9              MR. WELSH:  Calls for speculation.

10             THE WITNESS:  I don't know that part.

11  Like I said, I don't know who was the security sergeant

12  or the processing sergeant.  I don't know that at that

13  time.

14  BY MR. KUTYLA:

15         Q  For this other cell extraction for the

16  blood draw, was that based upon a recommendation from

17  Amanda Daniels, if you know?

18         A  No, I don't remember that.

19         Q  Is there a double door that leads into

20  this module, the S5 module, a blue door that opens up

21  and you go down the hall, the ad seg cells are on the

22  right?

23         A  The door slides.

24         Q  Do you recall seeing any of the deputies

25  involved in the cell extraction for the other inmate

Lois Guillory  8/14/2018

1  assembled outside of that door at any time prior to

2  them approaching this other inmate for the blood

3  draw?

4           A  Like I said, we spoke to this inmate

5  first.  When they extracted him, we moved on to Mr.

6  Moriarty they were there in the beginning, yes.

7           Q  Do you recall seeing Amanda Daniels

8  anywhere near the assembly of deputies that were

9  congregated anywhere near the ad seg cell for the

10  purpose of this blood draw on the other inmate?

11           A  Like I said, I believe we were there to

12  try to convince him to come out peacefully.  That's

13  what they normally use the psych provider for.  If

14  someone was not complying with the deputy, they would

15  bring someone in, the psych provider to try to convince

16  him to come on out of the cell.  She was there, yes.

17           Q  At any time, Deputy Guillory, did you ever

18  convey -- during your phone conversation with Deputy

19  Weidenthaler, did you ever convey any information to

20  the effect that the reason for the request for transfer

21  was because Heron Mortiarty had been acting out

22  suicidally giving express suicidal thoughts?

23           A  Not for suicidal thoughts, but for

24  homicidal thoughts.

25           Q  Was there any mention of suicidal behavior

Lois Guillory  8/14/2018

1   or thoughts of any kind whatsoever in any conversation

2   you had with Dale Weidenthaler concerning Heron

3   Moriarty?

4            A   No.   When I called him, I said she

5   recommends safety cell for homicidal thoughts, not

6   suicidal thoughts, homicidal thoughts is what I told

7   him.

8            Q   During this multi-disciplinary meeting,

9   did Dale Weidenthaler's name come up at all?

10           A   I can't recall that.  I honestly don't

11   remember if his name came up.  We just said supervisor.

12           Q   Getting back to this report that's been

13   marked as Exhibit 15.  Did you ever see that report,

14   were you given a chance to review that by the deputy

15   who prepared it in order to review it to make any

16   corrections to the report?

17           A   No, not until I --

18           MR. WELSH:  You weren't given it to make

19   corrections.  That's what he's asking you.

20           THE WITNESS:  No.

21   BY MR. KUTYLA:

22           Q   In the interview with the homicide

23   investigator, you did use the words, when referring to

24   Dale Weidenthaler's statement, that Dale Weidenthaler

25   had said the words, "No, not now."  Those words are on

Lois Guillory  8/14/2018

 1    the interview with the homicide investigator.

 2              MR. WELSH:  Misstates the recording.  It's

 3    been asked and answered.

 4    BY MR. KUTYLA:

 5         Q  To the best of your knowledge?

 6         A  Yes.  I don't know where I got that from.

 7    That's not what was said.

 8              MR. WELSH:  He's asking if it's on the

 9    recording.  You are explaining something else other

10    than what he's asking.  It's getting late in the day,

11    but I'm going to get on you if you don't answer his

12    questions.

13              THE WITNESS:  I thought I answered that

14    question too.

15              MR. WELSH:  You did.

16              MR. MORRIS:  You did answer it.

17              THE WITNESS:  Yes, it's on the recording.

18              MR. KUTYLA:  That's all I have.  Thank you

19    very much.

20              MR. WELSH:  This gentleman here, he may

21    have some follow-up questions.

22              MR. HARRISON:  I do.  I'll be brief.

23                   E X A M I N A T I O N

24    BY MR. HARRISON:

25         Q  Ma'am, my name is Bob Harrison.  I

Lois Guillory  8/14/2018

1          Q  Then it gets updated and it's approved

2   later that morning at 11:02, correct?

3          A  That's approved by the supervisor, yes.

4          Q  From what we saw also, the note we looked

5   at by Nurse Daniels was generated 0855.

6               MR. WELSH:  The first one we were just

7   talking about was Exhibit 12.  Now we are moving to

8   Exhibit 13.

9   BY MR. HARRISON:

10          Q  So, basically, her note is just a few

11   minutes before you prepared your note, correct?

12          A  Yes.

13          Q  I'm not sure if it was made an exhibit,

14   the MDG meeting email from Arnold Fajayan, indicates

15   that meeting started at ten a.m.  That's SDSO 559.

16               My question is:  To your recollection, did

17   the MDG meeting on May 31st occur about an hour after

18   you had entered your note into the system concerning

19   your interaction with Mr. Moriarty?

20          A  They normally start at ten o'clock.  I'm

21   not sure of the times on the paperwork.  We normally

22   started at ten o'clock.

23          Q  That's what this indicates as the start

24   time.  We'll mark this next in order, Exhibit 16.

25               (Exhibit 16 was marked.)

Lois Guillory  8/14/2018

1              MR. HARRISON:  Yes.

2              MR. MORRIS:  Misstates testimony with

3      respect to the word preference or recommendation.

4      BY MR. HARRISON:

5          Q  You communicated what you understood to be

6      a recommendation of Nurse Daniels that he be moved to a

7      safety cell, you communicated that to Sergeant

8      Weidenthaler?

9          A  Yes, I did.

10         Q  During the course of the MDG, Mr. Moriarty

11     was the subject of discussion?

12         A  Yes, we discussed him.

13         Q  During the MDG, was there any discussion

14     that you recall about placement of the inmate in a

15     safety cell?

16              MR. WELSH:  Objection, asked and answered.

17     If you have anything to add --

18              THE WITNESS:  I don't recall.

19              MR. WELSH:  -- to that answer you can add

20     it.

21              THE WITNESS:  I don't recall.

22     BY MR. HARRISON:

23         Q  You don't recall?

24         A  No, I don't recall.

25         Q  I think you indicated earlier you would

Lois Guillory  8/14/2018

1    not typically raise that issue, you would expect that

2    to be done by someone else?

3          A  Yes.

4          Q  One of the health care providers,

5    potentially?

6          A  Yes.

7          Q  Just backing up again.  With respect to

8    Dr. Lissaur, did you have any understanding -- you're

9    not a trained mental health professional, although you

10   worked in conjunction with mental health professionals

11   for a couple years.  During the course of that session

12   on May 28, 2016, did you have any reservation or

13   concerns about Dr. Lissaur's management of

14   Mr. Moriarty?

15            MS. PENA:  Vague.

16            MR. WELSH:  Lacks foundation, may call for

17   an opinion of a lay witness on an expert witness issue.

18            THE WITNESS:  No, I did not.

19            MR. HARRISON:  I have nothing further.

20            F U R T H E R   E X A M I N A T I O N

21   BY MR. MORRIS:

22            Q  One last question.  I apologize.  The

23   three to four previous times where the recommendation

24   from psych had been overruled by sworn staff, can you

25   draw any similarities between circumstances that the

Lois Guillory  8/14/2018

1    inmates had found themselves in?  Were they all

2    suicidal inmates, all homicidal inmates, all inmates

3    that were endangering public property?  Any

4    similarities at all between the inmates themselves and

5    the decision to overrule their placement?

6              MR. WELSH:  Calls for speculation, assumes

7    facts not in evidence, vague and ambiguous, incomplete

8    hypothetical.

9              THE WITNESS:  Suicidal with me.  I don't

10   know about anybody else.

11   BY MR. MORRIS:

12        Q    The ones you dealt with, the inmates had

13   been suicidal and that recommendation had been

14   overruled?

15        A    Yes.

16             MR. MORRIS:  Thank you.

17             MR. WELSH:  I propose to have the original

18   transcript sent to me at my office.  We'll forward it

19   to Deputy Guillory for signing under penalty of

20   perjury.

21             Are you planning to be out of town or

22   otherwise unavailable during the next month?

23             THE WITNESS:  No.

24             MR. WELSH:  Will you be able to sign and

25   return the deposition transcript within a couple weeks

Lois Guillory  8/14/2018

```
1              DECLARATION UNDER PENALTY OF PERJURY

2

3    Case name: Michelle Moriarty vs. County of San Diego

4    Date of Deposition: August 14, 1018

5    Job No.: 231971

6

7

8              I, Lois Guillory, hereby certify under

9    penalty of perjury under the laws of the State of

10   California that the foregoing is true and correct.

11              Executed this _____day of

12   _____, 2018, at_____.

13

14

15

16

17        _____

              LOIS GUILLORY
18

19

20

21

22

23

24

25
```

Lois Guillory  8/14/2018

 1              I, the undersigned, a Certified Shorthand

 2    Reporter of the State of California, do hereby certify:

 3              That the foregoing proceedings were taken

 4    before me at the time and place herein set forth; that

 5    any witnesses in the foregoing proceedings, prior to

 6    testifying, were duly sworn; that a record of the

 7    proceedings was made by me using machine shorthand,

 8    which was thereafter transcribed under my direction;

 9    that the foregoing transcript is a true record of the

10    testimony given.

11              Further, that if the foregoing pertains to

12    the original transcript of a deposition in a federal

13    case, before completion of the proceedings, review of

14    the transcript [ ] was [ ] was not requested.

15

16              I further certify that I am neither

17    financially interested in the action nor a relative or

18    employee of any attorney or party to this action.

19         IN WITNESS WHEREOF, I have this date subscribed my

20    name.

21    Dated: August 21, 2018

22

23         _____

24              Annette Moore

25              CSR No. 2648